**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| Del Monte Foods Corporation II Inc., *et al.*,[1] | ) ) ) | Case No. 25-16984 (MBK) |
| Debtors. | ) ) ) | (Joint Administration Requested) |

**DECLARATION OF SCOTT MATES IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, Scott Mates, hereby declare under penalty of perjury as follows:

1. I am a Managing Director in the Restructuring & Special Situations Group at PJT Partners LP ("PJT"), a global investment banking firm listed on the New York Stock Exchange with its principal offices located at 280 Park Avenue, New York, New York 10017. PJT is the proposed investment banker for the debtors and debtors-in-possession (collectively, the "Company," "Del Monte," or the "Debtors") in the above-captioned chapter 11 cases.

2. I submit this declaration (the "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Motion"). Pursuant to the

---

[1] The last four digits of Debtor Del Monte Food Corporation II, Inc.'s tax identification number are 1894. A complete list of the Debtors in these Chapter 11 Cases and their respective tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent, at https://cases.stretto.com/DelMonte. The location of the Debtor Del Monte Food Corporation II, Inc.'s principal place of business and the Debtors' service address is 205 North Wiget Lane, Walnut Creek, California 94598.

Motion, the Debtors are seeking approval of a priming superpriority senior secured multiple draw term loan credit facility (the "DIP Term Loan Facility") in the amount of $412.5 million, of which $165 million is comprised of new money commitments (the "New Money Commitments"), and a superpriority senior secured asset-based revolving credit facility (the "DIP ABL Facility," and together with the DIP Term Loan Facility, the "DIP Facilities").

3.  In particular, I submit this Declaration in support of my view that the proposed DIP Facilities are (a) the product of an arm's-length, good-faith negotiation process, (b) the best and, in fact only, available postpetition financing options currently available to the Debtors under the circumstances of these chapter 11 cases, and (c) contain reasonable economic terms and conditions, taken as a whole, under the circumstances.

4.  Except as otherwise indicated, all statements set forth in this Declaration are based on my experience, my personal knowledge of the Debtors' operations, finances, and restructuring initiatives, information I learned from my review of relevant documents, information supplied to me by members of the Debtors' management and/or their other advisors, or information that I received from employees of PJT working directly with me or under my supervision or direction. I am not being compensated specifically for this testimony other than through payments received by PJT as a professional proposed to be retained by the Debtors, subject to approval by the Court.[2] I am authorized to submit this Declaration on behalf of the Debtors, and, if called to testify as a witness, I could and would testify competently to the statements set forth in this Declaration.

**Qualifications**

5.  PJT is a leading global financial advisory firm with more than 1,100 employees in fifteen offices in the United States, Europe, and Asia. The firm offers integrated advisory services

---

[2] Pursuant to PJT's engagement letter with the Debtors, subject to Court approval thereof, PJT will be entitled to receive certain fees in connection with the transactions described herein.

for mergers and acquisitions, restructuring and special situations, and fund placement. PJT is an industry leader and has advised companies and creditors in all aspects of complex restructurings and bankruptcies. The firm has extensive experience providing financial advisory and investment banking services to financially distressed companies, including the representation of both debtors and lenders in the procurement and provision of postpetition financing. PJT is a registered broker-dealer with the United States Securities and Exchange Commission, is a member of the Securities Investor Protection Corporation, and is regulated by the Financial Industry Regulatory Authority.

6. Since joining The Blackstone Group ("Blackstone") in 2011, and continuing at PJT subsequent to its spinoff from Blackstone on October 1, 2015, I have worked on a broad range of restructuring and reorganization assignments for companies and various creditor groups. Over the course of my career, I have advised senior management and boards of directors of companies in a wide variety of industries in connection with restructurings and financing transactions, both outside of court and within chapter 11 proceedings. In particular, I have been involved in numerous restructurings, including, among others the following publicly disclosed engagements: Aceto Corporation; Arch Coal, Inc.; At Home Group Inc.; Endo International Plc.; Energy & Exploration Partners, LLC; H-Food Holdings, LLC; Harvey Gulf International Marine, LLC; Hostess Brands, Inc.; Indianapolis Downs LLC; LINN Energy, Inc.; Pennsylvania Real Estate Investment Trust; Residential Capital, LLC.; and Revlon, Inc.

7. I hold a Bachelor of Science degree from Babson College, where I graduated *summa cum laude* from the Honors Program, and an MBA with a concentration in Finance from The Wharton School of the University of Pennsylvania, where I graduated as a Palmer Scholar. Prior to joining Blackstone, I served as a Research Analyst at Southpaw Asset Management, an

Associate at Citi Private Equity, and an Analyst at Salomon Smith Barney. In these capacities, I have helped invest in and advise companies in a number of mergers and acquisitions and financing transactions across various industries.

8. PJT was initially retained on or around April 1, 2024 by Kramer Levin Naftalis & Frankel ("Kramer," now known as Herbert Smith Freehills Kramer (US) LLP ("HSF Kramer")), as counsel to Del Monte Foods Holdings Limited, to provide financial advisory and investment banking services in connection with a potential capital raise and/or exchange transaction. In connection therewith, PJT provided services to Kramer, as counsel to the Debtors, in connection with the Debtors' refinancing transactions consummated on or around August 14, 2024. Subsequent thereto, on or around May 29, 2025, PJT was retained by Kramer, as counsel to Del Monte Foods Holdings Limited, to provide financial advisory and investment banking services in connection with the Debtors' review of strategic alternatives to address their capital structure and liquidity needs, ultimately leading to the Debtors' decision to file these chapter 11 cases. In that capacity, I, along with other members of the PJT team, have been directly involved in the matters leading up to the Debtors' chapter 11 filings, including the negotiations regarding the proposed DIP Facilities. Based on PJT's work for the Debtors since our retention date as well as during our previous engagement, I am familiar with the Debtors' day-to-day operations, business affairs, financial performance, and restructuring efforts.

9. Since PJT's initial engagement by Kramer, PJT has worked with the Debtors' management and other professionals, including HSF Kramer, the Debtors' legal counsel, and Alvarez & Marsal North America, LLC ("A&M"), the Debtors' restructuring advisor, to assist the Debtors in evaluating strategic and restructuring alternatives. PJT's work has included, among other things: (i) analyzing the Debtors' liquidity and projected cash flows in coordination with the

4

Debtors' management team and the A&M team; (ii) understanding the Debtors' businesses, operations, and finances; (iii) reviewing and analyzing the Debtors' balance sheet and capital structure alternatives; (iv) providing strategic advice to the Debtors' board of directors and management; (v) participating in negotiations with the Debtors' existing lenders and other parties in interest; (vi) soliciting, negotiating, and analyzing debtor-in-possession financing proposals; and (vii) assisting the Debtors in connection with preparations for commencement of these chapter 11 cases, including work relating to the proposed DIP Facilities.

### The Debtors' Need for DIP Financing and Access to Cash Collateral

10. As further described in the First Day Declaration, the Debtors are in urgent need of liquidity to operate their businesses in the ordinary course through the chapter 11 cases. Based on my professional experience, the Debtors' existing cash balance, and cash flow forecasts prepared by A&M and the Debtors' management team, I do not believe the Debtors can prudently operate their businesses or fund the costs of these chapter 11 cases solely with the use of existing cash collateral. Absent approval of the DIP Facilities and use of cash collateral (including pursuant to the Interim Order), my understanding is that the Debtors would not be able to fund normal business operations, which would significantly impair the value of the Debtors' estates to the detriment of stakeholders and would likely force a value-destructive liquidation of their businesses. I also believe, based on PJT's prepetition marketing efforts, that the DIP Facilities, taken as a whole, are the best, and in fact, only, sources of new-money postpetition financing currently available to the Debtors. Accordingly, I believe entry into the proposed DIP Facilities is necessary, value-maximizing, and should provide the Debtors with sufficient liquidity to continue to operate their businesses in the ordinary course during these chapter 11 cases.

### The Debtors' Efforts to Obtain Financing

11. As described in greater detail in the First Day Declaration, the Debtors took various

cost-saving and liquidity management measures from 2024 through the present in response to the headwinds faced by the business, including the closing of a financing and exchange transaction in August 2024. These measures provided meaningful incremental liquidity and helped the Debtors navigate through certain of their challenges, including funding of the Company's 2024 working capital cycle (the "pack"). Unfortunately, ongoing business pressures continued, and the Company once again found itself in a highly strained liquidity situation.

12. In response to concerns over the Company's liquidity position, on June 2, 2025, the Prepetition ABL Agent gave notice to the Company that it planned to impose a $10 million restructuring reserve, the implication of which would put the Company into a negative liquidity position within just days. The Company's advisors, in coordination with the Ad Hoc Term Lender Group's advisors, negotiated with the Prepetition ABL Agent to rescind the reserve notice in exchange for certain restructuring milestones and information requirements.

13. Given the above circumstances, the Debtors and their advisors engaged in negotiations with an ad hoc group of lenders holding approximately 73.2% of Super-Senior First-Out Loans and approximately 58.2% of all Super-Senior Term Loans (collectively, the "Ad Hoc Term Lender Group" and each of their designated affiliates or managed entities, the "Backstop Parties") as well as with the agent and lenders under the Prepetition ABL Credit Agreement (collectively, the "Prepetition ABL Secured Parties") around financing in the context of a recapitalization. The Ad Hoc Term Lender Group made it clear that they were unwilling to once again fund the Debtors' operations outside of a chapter 11 filing. In the absence of a viable out-of-court alternative, the Debtors determined that a chapter 11 filing could allow the Debtors to raise the liquidity necessary to fund immediate term working capital requirements. On or around June 17, 2025, the Debtors began to explore potential third-party sources of debtor-in-possession

financing and, in parallel, negotiated the provisions of debtor-in-possession financing facilities from the Ad Hoc Term Lender Group and Prepetition ABL Secured Parties.

14. Starting on June 17, 2025, PJT contacted 12 parties that PJT deemed to be sophisticated third-party financial institutions experienced in and able to provide debtor-in-possession financings in complex distressed situations in the timeframe and amount required by the Debtors. Importantly, all of the third-party financial institutions contacted had previously signed non-disclosure agreements with the Company as part of the process related to the Company's 2024 financing and exchange transaction and were, therefore, intimately familiar with the Company's business, operations, and assets. Of the 12 third-parties contacted, seven such parties once again signed non-disclosure agreements and received financial diligence from the Debtors, but none submitted an actionable proposal. Based on my participation in the process and my experience, these efforts were unsuccessful because, among other things, the Debtors' prepetition secured creditors hold, based upon my understanding, liens on substantially all of the Debtors' most valuable assets and have told the Debtors that they are unwilling to agree to third-party debtor-in-possession financing on a priming basis. This view is consistent with the feedback we received from the third-party financing sources that declined the opportunity to provide financing. Specifically, my understanding is that the third-party financing sources contacted by PJT were not interested in providing debtor-in-possession financing because, among other reasons, they (a) did not wish to provide a financing facility on a junior basis, (b) were not interested in providing a priming facility on a nonconsensual basis and undertaking a potentially value-destructive "priming fight," (c) did not want to lend against the Debtors' limited pool of unencumbered assets, and/or (d) they did not expect to be able to achieve a competitive refinancing of the Prepetition ABL Credit Facility on the timeline required by the Debtors.

15. In parallel with the solicitation of third-party proposals, PJT and the Debtors' other advisors continued to engage with the Ad Hoc Term Lender Group (in their capacity as lenders under the DIP Term Loan Facility, the "<u>DIP Term Loan Lenders</u>") and the Prepetition ABL Secured Parties (in their capacity as lenders under the DIP ABL Facility, the "<u>DIP ABL Lenders</u>," and together with the DIP Term Loan Lenders, the "<u>DIP Lenders</u>") regarding the terms on which the Debtors could obtain debtor-in-possession financing from such parties. Those negotiations were ultimately successful and resulted in the proposed DIP Facilities.

### The Terms of the Proposed DIP Facilities

16. As noted in the Motion, in the lead up to the Petition Date, and after several rounds of negotiations with the Ad Hoc Term Lender Group and the Prepetition ABL Secured Parties, the Debtors reached agreements with both lender groups to provide the proposed DIP Facilities to fund the Debtors' chapter 11 cases.

17. The DIP Term Loan Facility is fully backstopped by the Ad Hoc Term Lender Group, and all holders of Super-Senior First-Out Loans who sign the RSA will be offered the opportunity to participate in the funding of the New Money Loans (as defined below) under the DIP Term Loan Facility on a *pro rata* basis. Holders of Super-Senior First-Out Loans who elect to fund the New Money Loans shall be entitled to "roll up" a portion of their Super-Senior First-Out Loans (as described below), split *pro rata* between Super-Senior First-Out Initial Loans and Super-Senior First-Out Incremental Loans.

18. The DIP Term Loan Facility is a $412.5 million priming superpriority senior secured multiple draw term loan credit facility, composed of: (a) new money term loans in an aggregate amount of $165 million (the "<u>New Money Loans</u>"), $100 million of which will be available upon entry of the Interim Order; and (b) "rolled-up" term loans in an aggregate principal

amount of $247.5 million (the "Roll-Up Loans"), $150 million of which will be "rolled-up" upon entry of the Interim Order, representing a 1.5:1 roll-up and conversion on a cashless basis of Super-Senior First-Out Loans held by the DIP Term Loan Lenders (the "DIP Roll-Up" and the commitments in respect thereof together with the New Money Commitments, the "DIP Commitments" and such loans, the "DIP Term Loans").

19. The DIP ABL Facility is to be provided by the Prepetition ABL Secured Parties on a *pro rata* basis. The DIP ABL Facility is a $500 million superpriority senior secured asset-based revolving credit facility, composed of a "roll-up" of amounts under the Prepetition ABL Credit Agreement (such loans, the "DIP ABL Loans"), to allow the Debtors to continue to access their working capital facility. Absent the consent of the ABL lenders and continued access to such working capital facility, my understanding is that the Debtors would need to raise an incremental approximately $100 million of new liquidity (i.e., the amounts expected to be funded by the DIP ABL Lenders during the pendency of the chapter 11 cases).

20. The DIP Facilities, if approved, are anticipated to be used, as applicable, (i) for working capital and general corporate purposes, (ii) to fund the administration of the chapter 11 cases, and (iii) to fund transaction costs, fees and expenses, in the case of each of the foregoing, in accordance with the Approved Budget or as otherwise approved by the DIP Lenders.

**A.    The DIP Facilities Interest and Fees.**

21. In connection with the DIP Facilities and the Interim Order, the Debtors have agreed to grant liens on certain unencumbered property on a first priority priming basis and pay interest and certain premiums and fees to the DIP Secured Parties, including a backstop premium and a commitment fee on the DIP Term Loan Facility, and an administrative agent fee and an upfront fee on the DIP ABL Facility. Specifically, the Debtors have agreed to pay:

9

*(a) Interest Rate on DIP Term Loan Facility:* The interest rate on the New Money Loans shall be equal to SOFR + 9.50% per annum, with SOFR + 1.00% paid in cash and 8.50% payable in kind. The interest rate on the Roll-Up Loans shall be payable in kind at a rate equal to SOFR + 9.50% per annum.

*(b) Fees on DIP Term Loan Facility:*

(i) *Backstop Premium*: 10.00% of New Money Commitments payable in kind, *pro rata* to the Backstop Parties in proportion to their backstop allocation of the New Money Commitments; and

(ii) *Commitment Fee*: 4.00% of New Money Commitments payable in kind, *pro rata* to the DIP Term Loan Lenders in proportion to their allocation of the DIP Term Loan Commitments;

*(c) Interest Rate on DIP ABL Facility:* Interest on the DIP ABL Obligations outstanding at such time shall be paid in cash at a rate equal to SOFR + 5.50% per annum, inclusive of 200 bps of default interest.

*(d) Fees on DIP ABL Facility:*

(iii) *Administrative Agent Fee*: As set forth in the administrative agent fee letter; and

(iv) *Upfront Fee*: 0.35% of DIP ABL Facility Commitments payable at exit, *pro rata* to consenting DIP ABL Lenders in proportion to their allocation of the DIP ABL Commitments;

22. The Backstop Parties are seeking, upon entry of the Interim Order, a Backstop Premium that compensates them for an upfront commitment to provide the full amount of the DIP Term Loan Facility, as further described in the DIP Credit Agreement. The Backstop Parties agreed that all fees associated with the DIP Term Loan Facility—including the Backstop Premium and Commitment Fee—as well as the majority of interest would be paid in kind rather than in cash, reducing the cash burden of the DIP Term Loan Facility on the Debtors during the chapter 11 cases, which is advantageous given the Debtors' current liquidity position.

**B.    The Milestones.**

23. The DIP Documents also contain certain milestones related to the Sale Transaction, as further detailed in the RSA, that the Debtors must meet throughout the chapter 11 cases. The

milestones are an important condition to the DIP Term Loan Lenders' providing the DIP Term Loan Facility.

**C.    The DIP Facilities Provide Certain Adequate Protection to Secured Creditors.**

24.    The DIP Term Loan Lenders conditioned their DIP financing proposals on, among other things, superpriority status and postpetition priming liens on substantially all of the Debtors' assets.  Additionally, the DIP Term Loan Facility provides the Debtors' relevant prepetition secured creditors with customary adequate protection liens, including replacement liens, on the Prepetition Collateral and additional liens on unencumbered assets.

**The Proposed DIP Facilities, Inclusive of Their Respective Terms, Taken as a Whole, Are the Best and In Fact Only Postpetition Financing Arrangements Currently Available to the Debtors**

25.    Based on the Debtors' and their advisors' (including PJT's) efforts to secure postpetition financing, my experience in raising DIP financing, current market conditions, and the Debtors' circumstances in light of these chapter 11 cases, the proposed DIP Facilities, taken as a whole, are the best, and indeed only, financing options currently available to the Debtors.  The DIP Facilities provide the Debtors with liquidity at the outset of these chapter 11 cases, including on an interim basis, necessary to avoid immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In addition, entry into the DIP Facilities will also provide the Debtors with continued access to their ABL Facility on a fully consensual basis.  Such liquidity should allow the Debtors to fund their businesses in the ordinary course during these chapter 11 cases, ensure uninterrupted operations, and preserve the value of the Debtors' estates for the benefit of all stakeholders while the Debtors conduct an orderly and value-maximizing going-concern sale process.  The DIP Facilities should provide assurances to customers, employees, and vendors that operations will proceed uninterrupted – particularly in the midst of the Company's critical 2025 pack season. I believe that there are no alternative sources of financing currently available on both

better and more executable terms, taken as a whole, than the DIP Facilities.

26. ***First***, the proposed DIP Facilities and related relief are expected to provide the Debtors with access to the amount of capital that the Debtors, in consultation with their advisors, believe is necessary to administer these chapter 11 cases effectively and efficiently.

27. ***Second***, the terms of the proposed DIP Facilities are the result of the negotiations and the marketing process described above, which, as described herein, enabled the Debtors to obtain DIP financing on terms, taken as a whole, that are reasonable under the current circumstances described herein and in the Motion. As previously noted, the Debtors, with the assistance of their advisors, market-tested the DIP Facilities by soliciting and considering other sources of postpetition financing, but were unable to secure any alternative postpetition financing proposals on better and more executable terms, taken as a whole, than the DIP Facilities. Accordingly, the DIP Facilities are the result of the Debtors' reasonable and informed determination that no alternative sources of postpetition financing are currently available to the Debtors (whether unsecured or secured) on terms better than the DIP Facilities.

28. ***Third***, the DIP Facilities represent the willingness of the DIP Lenders and Backstop Parties to provide the Debtors with critical incremental liquidity that will bridge the Debtors through these chapter 11 cases, despite significant macroeconomic uncertainty. These commitments were conditioned on, among other things, (i) the payment of fees under the DIP Term Loan Credit Agreement, including the Backstop Premium and the Commitment Fee, (ii) the payment of fees under the DIP ABL Credit Agreement, including the Administrative Agent Fee and the Upfront Fee, (iii) customary forms of adequate protection, including replacement liens and superpriority status for adequate protection claims, (iv) the grant of liens under the DIP Facilities, and (v) the DIP Roll-Up.

29. *Finally*, the economic terms proposed under the DIP Facilities, such as the contemplated pricing, fees, and interest rates, are customary for DIP financings of this type, and DIP roll-ups, similar to the DIP Roll-Up described herein, are not uncommon features required by DIP lenders under DIP financings of this type. Additionally, the fees under the DIP Term Loan Facility are structured on a payment-in-kind basis and the fees under the DIP ABL Facility are to be paid upon exit, both of which are projected to allow the Debtors to maintain sufficient liquidity during the pendency of these chapter 11 cases. As a result of several rounds of negotiations, the Debtors were able to achieve more favorable terms, including an increase in the quantum of New Money Commitments, a longer maturity, and less restrictive covenants. In my view, based on my discussions during the negotiation process, such economic terms were negotiated at arm's length, are an integral component of the DIP Facilities, and are, taken as a whole, appropriate and represent the best terms currently available to the Debtors under the current circumstances.

## Conclusion

30. Accordingly, based on my experience, the lack of postpetition financing alternatives currently available to the Debtors, the circumstances of these cases, and the tangible benefit to the estates of having substantial postpetition financing commitments, I believe that the proposed DIP Facilities, taken as a whole, are the best sources of financing currently available to address the Debtors' liquidity needs while preserving value for the benefit of all stakeholders. In my professional opinion, the terms of the DIP Facilities, taken as a whole, including the DIP Roll-Up, are reasonable under the circumstances, are the product of good faith, arm's-length negotiations, and will maximize the value of the Debtors for the benefit of all stakeholders. Thus, I believe that the DIP Facilities are in the best interests of the Debtors and their creditors and should be approved.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

PJT PARTNERS LP

Dated: July 1, 2025

*/s/ Scott Mates*
Name: Scott Mates
Title: Managing Director