**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff, Esq. (*pro hac vice* pending)
Rachael L. Ringer, Esq. (*pro hac vice* pending)
Megan M. Wasson, Esq. (*pro hac vice* pending)
Ashland J. Bernard, Esq. (*pro hac vice* pending)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| Del Monte Foods Corporation II Inc., *et al.*,[1] | ) |
|  | ) Case No. 25-16984 (MBK) |
| Debtors. | ) |
|  | ) (Joint Administration Requested) |

## DECLARATION OF JONATHAN GOULDING,
## AS CHIEF RESTRUCTURING OFFICER OF THE DEBTORS,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, Jonathan Goulding, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:[2]

## INTRODUCTION

1.    Del Monte is one of the country's leading producers, distributors, and marketers of premium quality, primarily branded, plant-based packaged food products, and is driven by its mission: "Nourishing Families. Enriching Lives. Every Day." The Company's corporate purpose,

---

[1]    The last four digits of Debtor Del Monte Foods Corporation II, Inc.'s tax identification number are 1894. A complete list of the Debtors in these Chapter 11 Cases and their respective tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent, at https://cases.stretto.com/DelMonteFoods. The location of the Debtor Del Monte Foods Corporation II, Inc.'s principal place of business and the Debtors' service address is 205 North Wiget Lane, Walnut Creek, California 94598.

[2]    Defined terms shall have the meaning ascribed to them below in this Declaration.

"Growers of Good," supports that mission by making responsibly nutritious foods accessible to all.  Proudly partnering with hundreds of family farmers in the United States and Mexico, the majority of Del Monte's products are locally sourced and travel less than 100 miles to the Company's production facilities.  This sourcing strategy allows Del Monte and the third-party companies that pack products for Del Monte to process and package produce the same day for optimal freshness, taste and nutrition.  The Company is committed to providing convenient, healthy snacking solutions and flavor and meal enhancing products for consumers.

2.      Founded in 1886 and headquartered in Walnut Creek, California, the Del Monte business has been a cornerstone of American grocery stores for more than 130 years.  Today, Del Monte has approximately 2,780 employees and operates four plants, two in the United States and two in Mexico.  Del Monte produces and sells its products through both its own brands (including *Del Monte*®, *Contadina*®, and *Joyba*®, among others), as well as through retailers under private labels.  The Company enjoys market leading brand recognition and trust, due in large part to the long legacy of its flagship brand.  That heightened brand awareness provides the Company with a unique advantage as it seeks to expand distribution into new channels, roll out new innovations and deepen household penetration of its products, which include the following:

    

3.      While it is a pioneer in the food production and distribution sector, like many consumer packaged goods companies, Del Monte has experienced changing consumer purchase behavior and increased inflationary costs.  The Company commits resources and plans production volumes well in advance of its "**Pack Season**," which is when the Company purchases inventory and packs its products.  The Pack Season runs June through October for many products.  The resulting inventory is typically sold over the next 12-18 months.  The Company is currently in its 2025 Pack Season.  Following strong performance and demand during Fiscal Year 2022, the Company committed to high production volumes for its 2023 Pack Season, and increased its existing funded debt facilities to provide the necessary liquidity for that Pack Season.  Heightened consumer demand continued during Fiscal Year 2023,[3] and the Company and its peers expected that trend to continue into Fiscal Year 2024 (and made contractual commitments on that basis).  Unfortunately, consumer demand declined during Fiscal Year 2024, and the Company's outsized production commitments caused it to incur increased promotional spend to move excess inventory, as well as incremental warehousing and logistics costs to manage the surplus inventory.

4.      On top of these market-driven pressures, the Company has been highly leveraged for a number of years, with an average balance sheet always exceeding $1 billion in funded debt.  The sharp rise in interest rates in 2023 and 2024 increased the Company's annual cash interest expense to approximately $125,000,000, which materially exceeds the Company's current projected annual EBITDA.

5.      In early calendar year 2024, the ABL Lenders conducted a new appraisal of their collateral (as discussed further herein), which resulted in lower advance rates and requests to impose additional reserves.

---

[3] The Company's fiscal year runs from May to April.

6.      All of the foregoing factors culminated in the Company having historically low liquidity as it approached the higher capital demands of its 2024 Pack Season.  To address its funding constraints, Del Monte evaluated its options and ultimately obtained a capital infusion from the Ad Hoc Term Lender Group (as defined below), that provided the necessary liquidity to allow Del Monte to successfully complete the 2024 Pack Season.

7.      At the same time, the Company was proactively rationalizing its costs, including closing production facilities with high overhead costs, transitioning to third-party product supply agreements, and imposing other operating cost-cutting measures.  As part of these cost-cutting measures and in response to decreased customer demand, the Company reduced its planned inventory, which resulted in higher production costs on a per-case basis (as certain fixed costs had already been locked in).  These pressures continued into Fiscal Year 2025, as customers became increasingly price-sensitive and the market became increasingly reliant on promotional spending, which increased the Company's required trade spend and collectively compressed the Company's margins.  This increased margin pressure was further exacerbated by costs for the 2025 Pack Season exceeding forecasts.

8.      Accordingly, in May 2025, Del Monte, in conjunction with its advisors, determined that additional liquidity would be necessary to fund the upcoming 2025 Pack Season.  The Company began negotiations with its existing lenders, and it quickly became clear that the Company's most value-maximizing path forward was through a Chapter 11.  Discussions then shifted to utilizing Chapter 11 to substantially reduce its overall leverage, right-size its balance sheet and assure its long-term operations.  Over the last few weeks, Del Monte and its advisors engaged in extensive good-faith, arms'-length negotiations with the Ad Hoc Term Lender Group and the ABL Lenders, as well as other key stakeholders, on the terms of this comprehensive path

forward, including providing necessary liquidity through the DIP Facilities (as defined below) to meet immediate operating needs for the 2025 Pack Season and continue to operate in the normal course.

9.      Fortunately, Del Monte enters bankruptcy with the support of its secured creditors: the ABL Lenders holding 100% of the aggregate outstanding principal amount of outstanding amounts under the Prepetition ABL Facility have entered into a commitment letter with the Company under which it has agreed to provide a DIP ABL facility (the "**DIP ABL Facility**"), and the Ad Hoc Term Lender Group holding 73.2% of the aggregate outstanding principal amount of Super-Senior First Out Loans and 61% of the aggregate outstanding principal amount of Super-Senior Second Out Loans has entered into a restructuring support agreement (the "**RSA**") with the Company under which it agreed to provide a DIP term loan facility (the "**DIP Term Loan Facility**," and together with the DIP ABL Facility, the "**DIP Facilities**") and, subject to reaching agreement on bidding procedures, to serve as a stalking horse bidder and "credit bid" to purchase of all or substantially all of the Debtors' assets as a going-concern business.  The RSA and DIP Facilities contain case milestones to ensure that the Chapter 11 Cases and the sale process proceed efficiently, allowing Del Monte to avoid a prolonged stay in chapter 11 and promptly close on a sale transaction, and permitting Del Monte to continue as an ongoing business that provides high quality products for consumers.  The RSA is attached to this Declaration as **Exhibit C**.

## Background and Qualifications

10.      I serve as the Chief Restructuring Officer of Del Monte Foods Corporation II Inc.[4] ("**DMFC**"), Del Monte Foods Holdings Limited ("**DMFHL**") and their affiliated debtors-in-possession in the above-captioned chapter 11 cases (collectively, "**Del Monte**," the "**Debtors**" or

---

[4] DMFC is a New Jersey corporation that was incorporated in July 2024, as is its immediate parent company, Debtor DM Intermediate II Corporation.

the "**Company**").  I was appointed as the Company's Chief Restructuring Officer on June 29, 2025.  I am a Managing Director with Alvarez & Marsal North America, LLC ("**A&M**").

11.     I have more than two decades of experience in management consulting and financial restructuring, specializing in liquidity management, financial and strategic planning, and implementing financial strategies for corporate turnarounds and restructurings.  I am a Certified Insolvency and Restructuring Advisor and a CFA charterholder with experience in a wide variety of industries, including retail, energy, agriculture, transportation and logistics, manufacturing, telecommunications, and financial services.

12.     I have advised clients in numerous complex Chapter 11 cases, including *Global Eagle Entertainment*, *Savers / Value Village*, *Forever 21*, *Toys "R" Us*, *Washington Mutual, Inc*., *Ciber*, *Global Geophysical Services*, *Haggen*, *Fresh and Easy Neighborhood Markets*, *Movie Gallery*, *US Gen New England*, and *Allegheny Power*.  I have extensive knowledge and experience advising large companies and assisting financially distressed organizations with stabilizing their financial condition, developing business plans, and assessing restructuring alternatives.

13.     I, along with my team at A&M, am deeply familiar with the Company's businesses, financial affairs and capital structure.  Since A&M's engagement by the Company in February 2024, my team and I have been working closely with the Company's management and other professionals, and I have developed significant relevant experience and expertise regarding the Debtors, their operations, day-to-day business affairs, books and records, and the circumstances leading to the commencement of these Chapter 11 Cases.

14.     I submit this declaration to help the Court and interested parties understand the circumstances that led to these chapter 11 cases (the "**Chapter 11 Cases**"), and to provide an

overview of the Debtors' business, these Chapter 11 Cases and the First Day Motions (each, as defined below), and in support of the relief sought therein.

15.    Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Company's management and advisors, my review of relevant operational and financial documents and information, as well as my experience, knowledge, and familiarity with the Company's businesses, operations, and the events leading up to the commencement of these Chapter 11 Cases.  I am over the age of 18 and, if called to testify, I would attest to the facts set forth herein.

16.    On the date hereof (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"), thereby commencing these Chapter 11 Cases.  The Debtors continue to operate their businesses and manage their affairs as debtors-in-possession.  No trustee, examiner, or official committee has been appointed in these Chapter 11 Cases.  The Debtors have also filed a number of motions contemporaneously herewith, seeking certain "first day" relief in connection with the commencement of the Chapter 11 Cases (the "**First Day Motions**").[5]

17.    As further discussed below, the First Day Motions seek various types of administrative and operational relief in order to minimize the adverse effects of the Chapter 11 Cases on the Debtors' employees, customers, and business operations, and to facilitate an efficient transition into chapter 11 and value-maximizing restructuring.  I am generally familiar with the contents of each First Day Motion and believe that the relief sought therein is necessary to enable

---

[5]    Unless otherwise noted in this declaration (this "**Declaration**"), each capitalized term used but not otherwise defined herein has the meaning ascribed to it in the applicable First Day Motion.

the Debtors to operate during these Chapter 11 Cases with minimum disruption and to preserve

value in a manner that best serves the interests of the Debtors' estates and all parties in interest.

18.     This declaration is organized, as follows: **Section I** provides a brief overview of the

Debtors' businesses, capital structure and operations.  Annexed as **Exhibit A** hereto is a corporate

organizational chart of the Company.  **Section II** describes the circumstances that precipitated the

commencement of these cases.  **Section III** describes the Debtors' objectives throughout the

Chapter 11 process.  **Section IV** and **Exhibit B** contain a summary overview of the First Day

Motions and relief sought therein, and the facts supporting the First Day Motions.

## PART I
### CORPORATE STRUCTURE AND BUSINESS OPERATIONS

**A.      Nature of the Debtors' Business and Corporate Structure**

19.     The Debtors' products have been omnipresent in American grocery stores for more

than 130 years, and the Company is an internationally renowned producer, distributor, and

marketer of plant-based packaged food products with a powerful portfolio of brands.  Founded in

1886 in San Francisco, California and currently headquartered in Walnut Creek, California, Del

Monte expanded across the United States, opening canneries across the West Coast and Midwest,

including Hawaii, as well as in Florida, the Midwest, and the Philippines.  Nearly a century after

its founding, Del Monte was one of the first large domestic food processors to voluntarily adopt

nutritional labeling on its food products.  In 1979, Del Monte was acquired by R.J. Reynolds

Industries, Inc.  Later, several Del Monte divisions, including the fresh fruit business, were sold to

third parties.  These sales included, among other things, license agreements allowing for third

parties to use the *Del Monte*® brand name variously in the U.S. and internationally.  Del Monte

became a public company again in 1999, and purchased several brands from Heinz, expanding the

Company's operations dramatically and leading to the establishment of the Company's East Coast headquarters in Pittsburgh, Pennsylvania.

20.      In 2014, Philippines-based Del Monte Pacific Limited ("**DMPL**"), a public company listed on the Singapore Stock Exchange, acquired Del Monte from a group of funds led by Kohlberg Kravis Roberts.  As discussed herein, the Company remains a closely-held, private business owned by its ultimate parent, DMPL.[6]

21.      As noted above, the Company's organizational chart is annexed as **Exhibit A** hereto.  DMFC is the Debtors' main operating entity, the entity that is party to most external contracts, and where most of the Debtors' bank accounts sit.

### B.      Overview of the Company's Business Operations

22.      The Company currently operates two plants in the United States and two additional plants in Mexico.[7]  The Debtors' fruit plants are located in California, and its vegetable plants are in the Midwest.  Del Monte has a seasonal production cycle that generally runs between the months of June and October, depending upon the specific product, although certain of its processed fruit and tomato products and *College Inn*® and *Kitchen Basics*® stock and broth products are produced year-round.  The Debtors also rely on third-party manufacturers for existing and new products, and leverage third-party co-packing arrangements to ensure year-round offerings of seasonal fruit and vegetables.  Many of the Company's products are sourced in the United States and travel less than 100 miles from the farms where they are harvested to where they are ultimately processed.

---

[6] DMPL is a public company listed on the Singapore Stock Exchange that trades under the symbol D03.

[7] The Debtors previously operated plants in Toppenish, Washington and Markesan, Wisconsin, which ended production in April 2024, Hanford, California which ended production in 2024, and in Yakima, Washington, which was closed in May 2025.

To achieve that goal, the Company partners with hundreds of family farmers across the United States and Mexico.

23.    Del Monte distributes its products through a wide variety of channels, including to traditional grocery retailers, club stores, and mass merchandiser stores like Walmart, Kroger, Publix, Albertsons and Target, to online, grocery delivery services, dollar stores, drug stores, natural stores, convenience stores, the U.S. military, and foodservice channels.  Del Monte's operations are divided into three segments:

- **<u>U.S. Branded Retail</u>**: Includes branded product sales from the Debtors' seven brands:
  - *Del Monte*®: Packaged vegetables, fruit cup snacks, packaged fruit, frozen foods, and refrigerated snacks
  - *Contadina*®: Packaged tomatoes
  - *College Inn*®: Broth and stock
  - *Kitchen Basics*®: Broth and stock
  - *S&W*®: Tomatoes and packaged fruit
  - *Joyba*®: Shelf-stable and refrigerated beverages
  - *Take Root Organics*®: Packaged organic tomatoes

     

- **<u>U.S. Private Label Retail</u>**: Non-branded products sold through retailers in the United States marketed under private labels, though this business has contracted substantially as a result of the Company's plant closures in 2024 and 2025.
- **<u>All Other</u>**: Includes the following:
  - Food Service: branded and non-branded products in the food service industry.
  - Branded Products in Latin America.
  - Branded and Non-Branded Products in a variety of other business categories, including a limited level of sales of food ingredients to third-party food

processors, manufacturing of products on behalf of third-party food processors, and sales to customers outside of the Debtors' primary channels or customer base.

24.    Del Monte also owns the rights to certain of its brands (*Contadina®*, *College Inn®*, *Kitchen Basics®*, and *S&W®*) in other countries, including Canada.  The Debtors granted Fresh Del Monte, an unaffiliated Florida-based company, exclusive, royalty-free licenses to use the *Del Monte®* trademarks for processed foods in Europe, Africa and the Middle East, and a worldwide exclusive license to use the *Del Monte®* trademark in connection with fresh fruit, fresh vegetables, and other fresh and fresh-cut produce and other refrigerated food products.[8]  Additionally, Del Monte has granted unaffiliated third parties, exclusive and non-exclusive licenses to use the *Del Monte®* trademark for processed foods in Canada, Mexico for certain products, much of the Asia Pacific region, Central America, and the Caribbean, and for dried fruits and nuts in North America. The Debtors have also granted an exclusive license to use the *S&W®* brand for dry soaked beans in North America to another unaffiliated company, and have granted licenses to DMPL for certain of their brands.

25.    As discussed below, despite the economic headwinds affecting the Debtors and their competitors, as well as many other retail related businesses, including inflation and increased material costs, Del Monte continues to operate successfully and with the support of its major stakeholders, including the Ad Hoc Term Lender Group.

---

[8] While some of the processed fruit and vegetable products that the Debtors sell in the United States are similar to those sold by Fresh Del Monte in Europe, Africa and the Middle East, the Debtors do not offer any products sold (whether under the *Del Monte®* trademark or at all) by Fresh Del Monte pursuant to its exclusive licenses in such territories.  In addition, Del Monte entered into a settlement agreement with Fresh Del Monte in 2017 pursuant to which it granted Fresh Del Monte an exclusive, perpetual license to use the *Del Monte®* trademark in the United States, South America, the Philippines, Myanmar and the Indian subcontinent in connection with the production, manufacture, sale and distribution of sandwiches, wraps, salads, composed meals, dips, soups, yogurt and other refrigerated products with a shelf life of less than 30 days.

C.    **Non-Debtor Operations**

26.    Certain of the business operations described above are undertaken by non-Debtor subsidiaries of Debtor DMFC, specifically in Mexico and South America (collectively, the "**Non-Debtor Subsidiaries**").  The Debtors utilize several Non-Debtor Subsidiaries domiciled in Latin America to market and distribute their products in that region.  Non-Debtor Subsidiaries Del Monte Colombiana S.A., Del Monte Ecuador DME C.A., and Del Monte Peru, S.A.C. (collectively, the "**LatAm Subsidiaries**") purchase products from Non-Debtor Subsidiary Del Monte Andina C.A. ("**Andina**") for re-sale in Columbia, Ecuador, and Peru, respectively.  The LatAm Subsidiaries are used solely to market the Debtors' product line in the Latin American market and do not manufacture their own products.  All of the Debtors' intercompany transactions with the LatAm Subsidiaries are effectuated indirectly through Andina.  In addition, the Debtors historically transfer up to $70,000 per year to Andina in support of its operations in Venezuela.

27.    The Debtors also purchase produce and products from their Mexican Non-Debtor Subsidiary Industrias Citrícolas de Montemorelos, S.A. de C.V. ("**ICMOSA**").  The Debtors' *Joyba®* ready-made boba tea product line is manufactured exclusively by ICMOSA, and the Debtors' transfers of produce and other materials to ICMOSA support its ability to distribute *Joyba®* products in the United States.  In addition, ICMOSA supplies the Debtors with certain products such as white grapefruit, red grapefruit, orange, and mango and supplies raw product to Del Monte's Mexico-based grapefruit co-packer.  The Debtors also transfer cash to ICMOSA to the extent that receipts from local distribution are insufficient to cover ICMOSA's operating expenses, including payroll.

D.   **Employees**

28.   As of the Petition Date, the Debtors employ approximately 2,780 individuals, approximately 410 of which are salaried and 2,370 of which are compensated on an hourly basis. Except as set forth herein and in the Wages Motion, all employees are based in the United States and are employed by Debtor DMFC.   Approximately 280 employees perform corporate-level functions, including administration, supply chain logistics, procurement, sales, accounting, human resources, legal, information technology, customer service, and other general administrative functions.   The Debtors' other approximately 2,500 employees are dedicated to the management and day-to-day operations of the Debtors' various production facilities, with the bulk of such operations located in the Debtors' production facilities in Plover, Wisconsin and Modesto, California.   Given the seasonal nature of the Debtors' business, many of these employees (approximately 1,370) are seasonal and maintain employment only during the Pack Season.

29.   DMPL and its affiliates have historically provided support services to the Debtors – specifically, approximately 15 individuals that provide support to the Debtors' finance and accounting departments are employees of DMPL and its affiliates.   DMPL and its affiliates charge the Debtors approximately $140,000 per month on account of those support services, and in calendar year 2024, the Debtors paid DMPL approximately $2,040,000 for its employees' services.

30.   The Debtors are party to five collective bargaining agreements, which cover approximately 64% of the Debtors' full-time employees in the United States.   Certain of the Debtors' employees in Mexico are also represented by unions.   As set forth in further detail in the Wages Motion, the Debtors sponsor a qualified defined benefit pension plan and several unfunded defined benefit post-retirement plans providing certain medical, dental, and life insurance benefits to eligible retired, salaried, non-union hourly and union employees.

31.     The Debtors are seeking to continue satisfying all ordinary course-employee related obligations for the duration of these Chapter 11 Cases, and hope to minimize any disruption to the workforce that is the lifeblood of the Company.

### E.     Board of Directors

32.     Debtor DMFHL, which is the direct and indirect sole shareholder of the other Debtors, maintains a ten-member board of directors (the "**Board**").  The substantial majority of the Board members (80%) are unaffiliated with DMPL, resulting from gradual changes to the Board's composition in which DMPL representatives resigned and were replaced by new directors unaffiliated with DMPL.  As such, as of the Petition Date, there are five "Ordinary Directors" and five "Special Directors."  The Ordinary Directors consist of (i) Gregory Longstreet, who is the Debtors' Chief Executive Officer, (ii) Jane Morreau and Karen Matusinec, who are independent directors who joined the Board in 2023, and (iii) Rolando C. Gapud and Joselito D. Campos, Jr., who were appointed by DMPL.

33.     With respect to the five Special Directors, Jon F. Weber was appointed to the Board in July 2024 by the Ad Hoc Term Lender Group in furtherance of equity and governance rights afforded to them under the Super-Senior Credit Agreement, and has served as Chairman of the Board since May 2025.  Joseph Gerard Hartsig was appointed to the Board in April 2025 by the Ad Hoc Term Lender Group in furtherance of equity and governance rights afforded to them under the 2025 Amendment (as defined below).  Michael O'Hara and Giselle Everett were appointed to the Board in May 2025 by a special purpose entity formed by the Ad Hoc Term Lender Group (the "**Special Shareholder**") pursuant to the Transfer Agreement (discussed below).[9]  Jill Frizzley was

---

[9] An additional Special Director was appointed to the Board in April 2025.  However, he resigned from the Board effective June 21, 2025.

appointed to the Board in June 2025 and is unaffiliated with any of the Debtors' lenders or with DMPL.

34.    The Board has four standing committees (i) Finance, (ii) Audit, (iii) Nominating, Governance, and Compensation, and (iv) the Special Investigation Committee (the "**Board Committees**").  The Finance and Audit Committees were reconstituted in connection with the changes to the Board in May 2025.  The Nominating, Governance and Compensation Committee was formed in May 2025 to perform the functions of two previously separate Board Committees – the Nominating and Governance Committee and the Compensation Committee.  The Special Investigation Committee was formed in June 2025.  All of the Board Committees are comprised solely of independent directors.  The Finance Committee (which was formerly called the Refinance Committee) oversees the Company's deployment of capital, capital structure and financing efforts, business operations and financial plans, and strategic transactions, and is overseeing the Company's restructuring process, including its sale process.  The Audit Committee oversees the Company's compliance with legal and regulatory requirements, assists in the retention of outside auditors, and assists the Board monitoring the integrity of the Company's financial statements.  The Nominating, Governance and Compensation Committee oversees corporate governance-related matters, director and management compensation, and evaluation and selection of board members, among other things.  The Special Investigation Committee oversees investigations into certain causes of action, including those where other members of the Board may have a conflict of interest, and has been delegated full authority to investigate, litigate, and settle any such causes of action.  Jill Frizzley is the sole member of the Special Investigation Committee (subject to additional sub-committees being formed).

F.      **Relationship with DMPL**

35.      DMPL has supported Del Monte in numerous ways since acquiring the Company in 2014.  For example, affiliates of DMPL have provided supplemental working capital support for packaging materials during seasonal peaks.  Additionally, as noted above, DMPL and its employees also provide administrative support, including financing, accounting and back office functions.

36.      The Debtors purchase raw inventory from subsidiaries of DMPL at cost plus markup pricing; they provide DMPL with a rolling three-year forecast of their needs for finished products and packing materials and are then obligated to purchase inventory from DMPL subject to that forecast.  In addition, the Debtors sell finished products to certain subsidiaries of DMPL for distribution in Asia in the ordinary course of business.  As set forth in further detail in the Cash Management Motion, the Debtors also source the majority of their pineapple requirements from a subsidiary of DMPL.  As of the Petition Date, the Debtors' balance sheet reflects approximately $65,000,000 in intercompany balances in favor of DMPL for pineapple purchases and other trade payables, most of which are past due by more than 365 days and payable on demand.  Under the terms of the Company's Prepetition ABL Agreement and Super-Senior Credit Agreement, the Debtors are not permitted to repay DMPL on account of any intercompany claims unless specific payment conditions are satisfied.

37.      In April 2024, DMPL agreed to provide the Company with an $85,000,000 advanced deposit, to be credited against future inventory purchased by DMPL from the Company, pursuant to the terms of an inventory purchase agreement (the "**Inventory Purchase Agreement**").  In May 2024, the Inventory Purchase Agreement was amended to provide for a $850,000 per month inventory management fee, which accrues until applied in connection with

the purchase of inventory from the Company by DMPL. In the period after it entered into the agreement, DMPL did not purchase any inventory from the Company against which the deposit would be credited. The Inventory Purchase Agreement terminated pursuant to its terms on May 1, 2025, at which point DMPL had the right to request the return of the deposit, which it had not done as of the Petition Date.

**G.    Capital Structure**

38.    As of the Petition Date, the Debtors' long-term, secured funded debt obligations totaled approximately $1.23 billion:

| Facility | Maturity | Outstanding Amount |
|---|---|---|
| *Prepetition ABL Facility* | | |
| Prepetition ABL | 2027 | $210,000,000 |
| Letters of Credit | Various | $26,000,000 |
| *Super-Senior Credit Facility* | | |
| First Out Term Loan | August 2028 | $395,500,000.00 |
| Second Out Term Loan | August 2028 | $468,800,000.00 |
| Third Out Term Loan | August 2028 | $135,000,000.00 |
| **Total Secured Debt:** | | $1,235,300,000.00 |

***Prepetition ABL Facility***

39.    Debtors DM Intermediate II Corporation, DMFC, and certain of their Debtor subsidiaries, and JPMorgan Chase Bank, N.A., as administrative agent (the "**Prepetition ABL Agent**"), are parties to that certain Credit Agreement, dated as of August 2, 2024, as amended (the "**Prepetition ABL Agreement**"). The Prepetition ABL Agreement provides for a senior secured asset-based revolving credit facility (the "**Prepetition ABL Facility**," and the lenders under the

Prepetition ABL Facility together with the Prepetition ABL Agent, the "**Prepetition ABL Secured Parties**") with maximum availability of $550,000,000, subject to certain borrowing base limitations. The Prepetition ABL Secured Parties consist of a syndicate of approximately eight (8) financial institutions who participate in the Prepetition ABL Facility at varying percentage levels. The Prepetition ABL Facility is guaranteed by substantially all of Debtor DM Intermediate II Corporation's domestic subsidiaries (such guarantors, the "**Prepetition Obligors**"). The Prepetition ABL Facility is secured by substantially all assets of the Prepetition Obligors (subject to certain customary exceptions),[10] including a first priority lien on accounts receivable and inventory (the "**ABL Priority Collateral**"), and a junior lien on the Term Loan Priority Collateral, including intellectual property but excluding real estate.

40.     As of the date hereof, the outstanding balance under the Prepetition ABL Facility, including aggregate outstanding principal and accrued interest for funded debt obligations under the Prepetition ABL Facility, is approximately $236,000,000, which includes prepetition letters of credit as of the Petition Date in a total amount of not less than $26,000,000.

### *Super-Senior Credit Agreement Facility*

41.     Debtor DM Intermediate II Corporation and certain of its subsidiaries, including DMFC, and Wilmington Savings Fund Society, FSB, as administrative agent (the "**Super-Senior Agent**"), are parties to that certain Super-Priority Credit and Guaranty Agreement, dated as of August 2, 2024, as amended (the "**Super-Senior Credit Agreement**" and the facility thereunder, the "**Prepetition Term Loan Facility**"). The Super-Senior Credit Agreement provides for three tranches of term loans: the First Out Term Loan, the Second Out Term Loan, and the Third Out

---

[10] The Prepetition ABL Facility is not secured by the Debtors' real property, equity interests in joint-ventures and certain non-wholly owned subsidiaries, and equity interests in unrestricted subsidiaries.

Term Loan, all of which are guaranteed by the Prepetition Obligors.  The First Out Term Loan, Second Out Term Loan and Third Out Term Loan are secured by three separate and distinct liens as evidenced by the three separate and distinct grants of security interests for each tranche as set forth under the Super-Senior Credit Agreement.

42.    *First Out Term Loan*.   The Super-Senior Credit Agreement provides for a $395,500,000 first-out term loan facility[11] (the "**First Out Term Loan**," and the lenders under the First Out Term Loan, together with the Super-Senior Agent, the "**Prepetition Super-Senior Secured Parties**"), maturing in August 2028, and with an interest rate of SOFR + 11.00%, of which 8.00% is paid in cash and 3.00% is PIK.  The First Out Term Loan is secured by a separate and distinct first-priority lien on all non-ABL Priority Collateral (the "**Term Loan Priority Collateral**"),[12] which includes the Debtors' real estate and intellectual property, and a second priority lien on the ABL Priority Collateral.  The First Out Term Loan includes $122,000,000 of Incremental First Out Term Loans issued in April 2025, as discussed in further detail below.

43.    *Second Out Term Loan*.   The Super-Senior Credit Agreement also provides for $468,800,000 in second out term loans, secured by a separate and distinct second-priority lien on the Term Loan Priority Collateral (the "**Second Out Term Loan**," and the lenders under the Second Out Term Loan, the "**Second Out Secured Parties**").  The Second Out Term Loan matures in August 2028 and has a cash interest rate of SOFR + 4.25%.

44.    *Third Out Term Loan*.  The Super-Senior Credit Agreement further provides for $135,000,000 in third out term loans, secured by a separate and distinct third-priority lien on the

---

[11] The Super-Senior Credit Agreement originally provided for approximately $236,000,000 in First Out Term Loans, which was upsized to $395,000,000 in connection with the 2025 Amendment.

[12] Pursuant to that certain Security Agreement, dated as of August 2, 2024, certain of the Debtors granted three separate and distinct grants of security interests, in favor of the Super-Senior Agent, for each of the First Out Term Loans, Second Out Term Loans and Third Out Term Loans, respectively.

Term Loan Priority Collateral (the "**Third Out Term Loan**," and the lenders under the Third Out

Term Loan, the "**Third Out Secured Parties**," and together with the Prepetition ABL Secured

Parties and the Prepetition Super-Senior Secured Parties, and the Second Out Secured Parties,

collectively, the "**Prepetition Secured Parties**").  The Third Out Term Loan matures in August

2028 and has an interest rate of SOFR + 4.75%, of which 3.25% is paid in cash and 1.50% is PIK.

### H.    Del Monte's Liquidity

45.    The Debtors have approximately $9,800,000 of liquidity as of the Petition Date,

comprised of $8,800,000 in availability under the Prepetition ABL Facility and $1,000,000 of cash

on hand.  As described in further detail below and in the Cash Management Motion, the Debtors

have been operating in "cash dominion" under the Prepetition ABL Facility since September 2022,

meaning that each day, the Debtors' receipts are deposited into a lockbox account, transferred

directly to an account with the Prepetition ABL Agent, and then used to pay-down amounts

outstanding under the Prepetition ABL Facility in accordance with the terms of the Prepetition

ABL Agreement.  To fund their operations, the Debtors take daily advances against the Prepetition

ABL Facility, which are deposited into the Debtors' concentration account and then moved to

various disbursement accounts, all of each are zero-balanced into the concentration account at the

end of each business day.  As a result of this construct, the Debtors have relatively little cash on

hand on a daily basis and their primary liquidity is derived from availability under the Prepetition

ABL Facility.

### PART II
### CIRCUMSTANCES AND EVENTS LEADING TO CHAPTER 11 FILING

46.    Over the last few years, the Debtors have tried to address a number of industry

headwinds, including the lasting impact of the COVID-19 pandemic, as well as their over-

leveraged balance sheet.  The following is a summary of the various steps the Debtors have taken

to try to right-size their operations and capital structure, and eventually, to prepare for the Chapter 11 Cases.

### A.    **Liability Management Efforts and Transactions**

47.     The Company has carried substantial funded indebtedness since its acquisition by DMPL in 2014, whereby DMPL placed debt on the Company to fund its acquisition.  Over time, as the capital structure has been refinanced, interest rates have continued to increase, and the Company's annual cash interest expense went from approximately $66,000,000 in Fiscal Year 2020 to $125,000,000 in Fiscal Year 2025, which significantly constrained the Company's liquidity.

48.     The Company has executed several transactions and debt pay-downs over recent years.  These transactions allowed the Company to extend its runway to consider different restructuring and refinancing alternatives at the time, and as discussed in more detail below, to smooth its transition into these Chapter 11 Cases.

49.     *First,* in May 2022, certain of the Debtors, including Debtor Del Monte Foods, Inc. ("**DMFI**"), entered into a credit agreement providing for a $600,000,000 senior secured term loan, due May 2029 (the "**2022 Term Loan**").  The proceeds of the 2022 Term Loan were used to repay $500,000,000 in outstanding senior secured notes due in 2025.

50.     *Second*, in February 2023, (i) the Company and the lenders under the 2022 Term Loan agreed to issue an additional $125,000,000 of loans under the 2022 Term Loan credit agreement, the proceeds of which were used to partially pay-down the outstanding balance under the then-existing prepetition ABL facility, which had originally been entered into in May 2020 (the "**2020 ABL Facility**"), and (ii) the commitments under the 2020 ABL Facility were increased by $125,000,000.

51.    *Third,* in early April 2024, following delivery by the lenders under the 2020 ABL Facility of an updated net orderly liquidation value that would have resulted in a significant reduction of the borrowing base under the 2020 ABL Facility and a corresponding overdraft and default under the 2020 ABL Facility, the Company and the lenders under the 2020 ABL Facility entered into a standstill agreement (the "**ABL Standstill**").    The ABL Standstill delayed implementation of the new net orderly liquidation value and provided the Company and its advisors with sufficient time to examine value-maximizing paths forward.    Without the ABL Standstill, the Company would not have been able to fund its 2024 Pack Season (although as discussed below, additional liquidity was ultimately needed to fund the 2024 Pack Season).[13]

52.    *Fourth*, the Company commenced a refinancing process when it determined that it had insufficient liquidity to fund the 2024 Pack Season, which included discussions with both existing lenders in the capital structure as well as outreach to multiple third parties.    Through that outreach process, the Company solicited interest in funding a first-in, last-out facility to provide sufficient liquidity to bridge through the remainder of the Company's 2024 Pack Season. Following extensive and competitive negotiations among the Company, its existing lenders and various third-party strategic investors, the Company ultimately entered into a transaction support agreement (the "**TSA**") with certain of the lenders under the 2022 Term Loan facility, and with the support of the lenders under the 2020 ABL Facility and DMPL.    Under the TSA, the Company raised new capital, allowing it to fund the 2024 Pack Season, through a series of financing transactions opened to all existing 2022 Term Loan lenders and backstopped by the Ad Hoc Term

---

[13] The impacts of the borrowing base redetermination would have been particularly acute because the Company has been subject to cash dominion under the terms of the 2020 ABL Facility since September 2022 (meaning that the Company's operations have been funded through daily borrowings under the 2020 ABL Facility for almost three years).  As a result, the Company's ability to retain cash on hand has been severely limited and the Company has been forced to stretch payments with its vendors and accrue significant past due payables, which put further pressure on the Company's operations.

Lender Group (the "**August 2024 Transactions**") that substantially reshaped the Company's capital structure.  With the support of an ad hoc group of 2022 Term Loan lenders then holding a majority of the 2022 Term Loan, represented by Gibson, Dunn, & Crutcher LLP and Houlihan Lokey (the "**Ad Hoc Term Lender Group**") and the 2020 ABL Facility lenders, represented by Simpson Thatcher & Bartlett LLP and FTI Consulting (the "**ABL Lenders**"), the Company amended the 2020 ABL Facility credit agreement (i) to provide for the issuance of a new $125,000,000 first-in, last-out bridge loan under the 2020 ABL Facility credit agreement (the "**2024 FILO**"), funded by the Ad Hoc Term Lender Group, and (ii) to create DM Escrow Corporation, an unrestricted subsidiary.  The Ad Hoc Term Loan Group lent an additional $115,000,000 to DM Escrow Corporation to be held in escrow (the "**Escrow Loan**") and, upon certain conditions being met, the Escrow Loan would be released from escrow and exchanged for new loans as described below.

53.      As part of the August 2024 Transaction, as contemplated by the TSA, DMFI contributed substantially all of its assets into DM Intermediate Corporation, which then contributed substantially all of its assets to DM Intermediate II Corporation, a new non-guarantor restricted subsidiary.  DM Intermediate II Corporation then contributed substantially all of its assets to DMFC, a second new unrestricted subsidiary.  The 2024 FILO and the Escrow Loan were then exchanged into indebtedness incurred by DMFC under the Super Senior Credit Agreement; the 2020 ABL Facility was converted into the obligations under the Prepetition ABL Facility, and the 2024 FILO and the Escrow Loan were converted into the First Out Term Loan.[14]  As a result of the August 2024 Transactions, the 2020 ABL Facility was terminated.

---

[14] The Super-Senior Credit Agreement also included an obligation for DMPL to contribute $30,000,000 to fund the Company's operations by a date certain.  If that contribution was not made and if certain performance metrics were not met, the Ad Hoc Term Lender Group would have the right to appoint one additional independent director.  The

54.    DMFI also repurchased the vast majority of the outstanding 2022 Term Loan pursuant to open market and exchange agreements, with the consideration for such repurchases being the issuance of Second Out Term Loans and Third Out Term Loans under the Super-Senior Credit Agreement.  Approximately $105,000,000 of the remaining outstanding 2022 Term Loan remained outstanding as an obligation of DMFI at that time.

55.    As a result of the August 2024 Transactions, the Company's existing funded secured indebtedness was almost completely converted into the Prepetition ABL Facility, the First Out Term Loan, the Second Out Term Loan and the Third Out Term Loan, with only a stub amount of the 2022 Term Loan remaining outstanding.  These transactions provided the Company with incremental liquidity necessary to resume paying its vendors through the 2024 Pack Season.

### B.    Withdrawn IPO

56.    During fiscal years 2023 and early fiscal 2024, the Company, in conjunction with its parent, DMPL, explored conducting an initial public offering, or "IPO", of its stock.  Following discussions with DMPL, the Company ultimately decided not to move forward with the IPO given headwinds faced by the Debtors' business and constraints on the Debtors' financial performance.

### C.    Delaware Chancery Court Litigation and Settlement

57.    In the fall of 2024, a group of holders of the stub 2022 Term Loan led by Black Diamond (the "**Black Diamond Group**") purported to replace the administrative agent for the 2022 Term Loan.  The Black Diamond Group then directed its purported agent to declare various (contested and alleged) events of default under the 2022 Term Loan credit agreement, most of which were connected to the August 2024 Transactions.  The purported agent then claimed to exercise voting control over a pledge of equity in DMFI and invoked that purported voting control

---

contribution was not made and any potential additional director appointment right was addressed in the Transfer Agreement.

to replace DMFI's board with the Black Diamond Group's own purported "directors."  The purported agent and one of the purported new directors filed a complaint against DMFI and certain of its affiliates in Delaware Chancery Court (the "**Chancery Court Complaint**"), which sought a determination that the new directors had been properly installed.  Subsequently, the purported agent asserted additional (contested and alleged) events of default, most of which were again connected to the August 2024 Transactions, and claimed to have replaced the boards of two of DMFI's parent entities as well.  The Black Diamond Group directed the plaintiffs to amend the Chancery Court Complaint to seek a determination that the new directors of those entities had also been properly installed.

58.    The Company vigorously opposed the relief sought in the Chancery Court Complaint and a full evidentiary hearing on the complaint was held in the Chancery Court (including pre-trial and post-trial briefing).  While the Company continues to believe that the relief sought in the Complaint was meritless, all litigation has inherent risk.  Additionally, the specific relief sought in the Chancery Court Complaint – replacement of the directors of three of the Company's subsidiary boards – had the potential to severely negatively impact the Company's operations.  As a result, simultaneously with the hearing and post-trial briefing, the Company and the Black Diamond Group engaged in settlement discussions to resolve the allegations made in the Chancery Court Complaint.  The Company and the Black Diamond Group ultimately negotiated a consensual settlement of the Chancery Court Complaint that resulted in dismissal of the Complaint with prejudice.  The settlement payment was made on April 8, 2025.

**D.    Incremental First Out Term Loans**

59.    In April 2025, the Company incurred an additional $122,000,000 of First Out Term Loans (the "**Incremental First Out Term Loans**," and the amendment authorizing the

Incremental First Out Term Loans, the "**2025 Amendment**") under the Super-Senior Credit Agreement to repay the outstanding 2022 Term Loan as well as various related fees and expenses, which was backstopped by certain members of the Ad Hoc Term Lender Group and open to all holders of First Out Term Loans.  Because the transaction entailed the repayment of approximately $102,000,000 of 2022 Term Loans and the corresponding issuance of $122,000,000 of First Out Term Loans, the Company's funded indebtedness only increased by approximately a net of $20,000,000 and was consolidated at DMFC.  Concurrently with incurrence of the incremental First Out Term Loans, the Prepetition ABL Facility Agreement was amended to reduce the commitments under the Prepetition ABL Facility from $625,000,000 to $550,000,000.

60.      As part of their agreement to backstop the Incremental First Out Term Loans, the Ad Hoc Term Lender Group negotiated for certain equity and governance rights, which were documented in an agreement between the Ad Hoc Term Lender Group and DMPL (the "**Transfer Agreement**").  Pursuant to the Transfer Agreement, the Special Shareholder was issued one non-voting share of DMFHL, which entitles the Special Shareholder to appoint three members of the Board.  The Special Shareholder exercised this right in April 2025 and appointed Brian Driscoll and Joe Hartsig (Jon F. Weber, an existing member of the Board, was also deemed Special Director at that time).[15]  The Transfer Agreement provided the Ad Hoc Term Lender Group and Special Shareholder with additional equity and governance rights that varied based on whether DMPL contributed up to $45,000,000, the proceeds of which would have been used to repay a portion of the Incremental First Out Term Loans.  DMPL ultimately elected not make the contribution; as a result, (i) pursuant to the Transfer Agreement, the Ad Hoc Term Lender Group obtained the right to transfer 25% of the common equity in DMFHL that was held by DMPL to the Special

---

[15] Brian Driscoll resigned from the Board in June 2025.

Shareholder,[16] and (ii) the Special Shareholder, obtained the right to appoint six members of the Board.  As noted above the Special Shareholder exercised that right and appointed two additional Special Directors in May 2025, for a total of five Special Directors.[17]

       **E.**       **June 2025 Term Loan Amendment**

61.       On June 24, 2025, the Super Senior Credit Agreement was amended to, among other things, extend the grace period for the interest payment due on June 17, 2025 for the Second Out Term Loans and Third Out Term Loans from three (3) business days to twelve (12) business days.  As a result of this amendment, the Company did not make the interest payment for the Second Out and Third Out Term Loans that was due on June 17, 2025.

       **F.**       **Market Constraints and Revised Business Plan**

62.       As noted above, the Company has faced substantial market constraints in recent years.  One of the most significant challenges has been excess inventory in the wake of the COVID-19 pandemic, which has continued to create operational and financial headwinds.  In advance of the 2023 Pack Season, the Company committed to production volumes based on elevated COVID-era demand levels, which had reached historic highs.  After the pandemic subsided, consumer demand decreased, and Del Monte was left with substantial excess inventory that it was forced to variously store, write-off, and sell at substantial losses.  These inventory write-offs not only decreased potential profits, but reduced the Company's borrowing base under the Prepetition ABL Facility, which further reduced liquidity.  After the outsized summer 2023 Pack Season, the Company scaled back production in response to softened demand from consumers.  The Company's reduced volumes, however, then resulted in higher production costs on a per-case basis

---

[16] As of the Petition Date, the transfer had not occurred.

[17] In lieu of appointing a sixth Special Director, Mr. Longstreet was designated as a fifth Ordinary Director.

due to fixed manufacturing costs and higher logistics costs for storage.  These margin pressures, combined with a heavily promotional environment and elevated trade spending, contributed to the Company missing its Fiscal Year 2025 projections, driven largely by misses in the fourth quarter (February through April 2025).  Typically, annual production, manufacturing variances and trade costs are reconciled by the Company during the fourth quarter, after Pack Season invoices have been reconciled and accounted for, meaning losses incurred throughout the entire year are often fully reflected in the fourth quarter.

63.     Altogether, this perfect storm of reduced margins, excess inventory and decreased customer demand created an unprecedented liquidity crisis for the Company.  To manage its liquidity, the Company has historically (and increasingly in recent years) relied on favorable trade terms with its vendors and has stretched vendor payments, resulting in substantial accounts payable, some of which is subject to contractual penalties and interest.  On May 5, 2025, DMPL publicly announced that it was declining to make the $45,000,000 equity investment in the Company under the Transfer Agreement (discussed above).  In the wake of this announcement, the Company's vendors began to contract trade terms, which in turn further reduced the Company's liquidity.  It was at this point, as discussed further herein, that the Company began discussions with its stakeholders on the terms of a potential restructuring.

64.     Notwithstanding these challenging conditions, the Company has implemented a number of strategies to reduce overhead costs and improve cost margins as part of a broader pivot towards an "asset-light" operational structure.  Beginning in 2024, the Company reduced its inventory by approximately 30%, in part by reducing its Pack Season production.  Additionally, in April 2024 the Company closed canning operations at its Markesan, Wisconsin and Toppenish, Washington facilities, forcing the Company to lay off approximately 215 workers.  Limited

operations at the two facilities continued through Fall 2024, and the facilities are being marketed for sale.  As a result of the facility closures, the Company reduced its workforce by approximately 25%.

65.    Additionally, in late 2024 the Company decided to sell its Hanford, California facility, which had been a financial drain on operations for years.  Consumer and business demand for the Company's tomato products has been falling, which caused the Hanford Facility to operate at 56% utilization in calendar-year 2023 and 28% utilization in calendar-year 2024.  Despite that reduced utilization, overhead and operational costs remained substantially the same and continued to increase due to inflation and other economic factors.  In addition, existing technology and infrastructure at the plant were outdated, and Del Monte would have needed to invest approximately $9,000,000 in capital expenditures in the next two years to make necessary repairs to the structures and equipment in order to operate it effectively.  As a result, the Company determined that, in order to have a viable tomato business going forward in this changing environment, its best course was to stop operations at and sell its Hanford Facility, and to engage with lower-cost tomato-product producers in California and the Midwest.

66.    In March 2025, the Company sold its production facility in Hanford, California, for $56,000,000, and entered into a multi-year lease agreement under which it continues limited runout operations at the facility through Fall 2025.  The sale agreement provides for the buyer to market the Hanford facility and remaining equipment for further resale for up to three years and share limited upside and downside risk with DMFC.  In connection with the Hanford sale, the Company entered into various co-packing and logistics agreements with third-parties that allow the Company to continue manufacture and sell the goods previously produced at the Hanford facility in a more cost-effective manner.  The Company has begun to market  its Yakima plant and ancillary facilities

and equipment for sale and is currently transitioning a portion of its fruit production to its Modesto, California facility as well as a co-packing arrangement for cherries and discontinuation of the Company's apples line, which will materially reduce fixed overhead costs for products previously produced by the Company at its Yakima plant.

67. More broadly, the Company continues to focus on cash management and cost reduction, including by eliminating surplus inventory, and also continues to explore (with the help of outside advisors) various potential non-core asset and intellectual property sales. While the Company had hoped that these asset sales would help defray ongoing operating costs and create sufficient incremental liquidity to forestall other liquidity management exercises, to date those discussions have not resulted in any actionable proposals. As set forth in further detail here, the Debtors are continuing to engage in discussions with third parties and potential strategic investors on various asset sales as part of the broader sale process contemplated by the RSA.

### G.      Advisor Engagements

68. Herbert Smith Freehills Kramer (US) LLP (formerly known as Kramer Levin Naftalis & Frankel LLP) has worked with the Debtors since 2016, advising the Company on a certain issues, including assisting the Debtors in analyzing their financing needs and exploring capital structure alternatives and structuring options. The Company also engaged Alvarez & Marsal North America, LLC in February 2024 and PJT Partners LP in April 2024 and again in May 2025 to facilitate those efforts and support contingency planning preparations. The Company engaged Cole Schotz, P.C. in June 2025 to support its restructuring efforts.

### H.      Stakeholder Engagement

69. The Debtors and their advisors have been in near-constant communication with the advisors to the Ad Hoc Term Lender Group and the ABL Lenders for the last few months. In early

May 2025, the Company determined, with the assistance of its advisors, that additional liquidity would be necessary to sustain the Company's operations through the 2025 Pack Season. The Company and its advisors explored various mechanisms to generating additional liquidity, and had extensive discussions with many of the Company's key stakeholders, including the Ad Hoc Term Lender Group and the ABL Lenders, on strategic alternatives to alleviate pressure on the Company's business. Those discussions revealed that in conjunction with any capital raise, the Company also needed to right-size its balance sheet and implement a comprehensive deleveraging transaction. It became clear that given the scope of the necessary deleveraging, proceeding through an out-of-court restructuring would not be viable, and that the Company needed to pursue an in-court restructuring through a chapter 11 filing, as discussed below.

70.     In response to concerns over the Company's liquidity position, on June 2, 2025, the Prepetition ABL Agent gave notice to the Company that it planned to impose a $10,000,000 restructuring reserve, the implication of which would put the Company into a negative liquidity position within just days. The Company's advisors, in coordination with the Ad Hoc Term Lender Group's advisors, negotiated with the Prepetition ABL Agent to rescind the reserve notice in exchange for certain restructuring milestones and information requirements.

## PART III
### THE CHAPTER 11 CASES

71.     The Company believes that a drawn-out and protracted bankruptcy process would be value-destructive for the Company and its stakeholders, and that any chapter 11 process must be on an expeditious timeline and supported by a majority of the Company's creditors. To that end, the Company entered into the RSA prepetition with the Ad Hoc Term Lender Group holding approximately 73.2% of the aggregate outstanding principal amount of Super-Senior First Out Loans and 61% of the aggregate outstanding principal amount of Super-Senior Second Out Loans

that will allow the Company to pursue a swift, value-maximizing restructuring through a going-concern sale of its assets and, in support thereof, conduct a thorough sale process.

72.    Pursuant to the RSA, the Ad Hoc Term Lender Group has agreed to backstop $165,000,000 in additional liquidity through the DIP Term Loan Facility, in connection to which the Company has agreed to roll-up $247,500,000 of First Out Term Loans into DIP obligations. If approved by the Court, all holders of First Out Loans will be offered the opportunity to participate in the DIP Term Loan Facility through a syndication process. The Company has also agreed to roll up the Prepetition ABL Facility into the DIP ABL Facility, in furtherance of which the Prepetition ABL Lenders have agreed to allow the Company to continue to draw on the ABL Facility throughout the pendency of the Chapter 11 Cases. The DIP Facilities are key to ensuring that the Company has sufficient liquidity to operate during the Chapter 11 Cases and will fund necessary working capital, payroll, and vendor payments, as well as the inherent costs of the Chapter 11 Cases. If the DIP Facilities are approved by the Bankruptcy Court, they will enable the Company to continue serving its customers in the ordinary course throughout the bankruptcy case.

73.    The RSA also contemplates that the Debtors will run a post-petition sale process to identify potential third-party bidders for some or all of the Debtors' assets. Subject to reaching agreement on mutually acceptable bidding procedures, the Ad Hoc Term Lender Group would agree to "credit bid" their claims and serve as a stalking horse bidder for all or substantially of the Debtors' assets. The Debtors plan to file their bidding procedures motion within 10 days of the Petition Date, pursuing a value-maximizing sale process with a floor set by the stalking horse bid.

74.    Through the transactions contemplated by the RSA, the Company will be able to stabilize its operations, and run a thorough sale process to preserve its workforce and going-

concern business value.  Additionally, given the Company's immediate need for incremental liquidity, use of the Prepetition Secured Parties' cash collateral and the funding provided under the DIP Facility are key to the Company's ability to continue operating as a going-concern.  The support of the Ad Hoc Term Lender Group through the RSA and the DIP Facilities is a lynchpin to the Company's proposed path forward (and path to emergence from) these Chapter 11 Cases.

**PART IV**
**EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS**

75.     The Debtors have concurrently filed First Day Motions seeking assorted relief necessary to stabilize the Debtors' business operations and facilitate a smooth transition into these Chapter 11 Cases.  A description of the relief requested in, and the facts supporting the First Day Motions, is attached hereto as **Exhibit B**.

76.     I have consulted with the Debtors' advisors regarding each of the First Day Motions.  The relief sought therein is necessary and in the best interests of the Debtors' estates, as it will allow the Debtors to operate with minimal disruption during these Chapter 11 Cases.  The Debtors' requests for immediate relief in the First Day Motions have been narrowly tailored to relief necessary to avoid immediate and irreparable harm to the Debtors' estates.

\*\*\*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 1, 2025                    */s/ Jonathan Goulding*
                                       Jonathan Goulding

## Exhibit A

**Corporate Organizational Chart**



## Exhibit B

### Evidentiary Support for First Day Motions

- **Cash Management Motion**

  - *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Honor Prepetition Obligations Related Thereto, (B) Maintain Existing Bank Accounts, (C) Perform Intercompany Transactions in the Ordinary Corse, and (D) Maintain Existing Business Forms; and (II) Granting Related Relief*

- **Insurance Motion**

  - *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Maintain Prepetition Insurance Policies and Surety Bonds, and Pay Related Prepetition Obligations, and (B) Renew, Replace, or Otherwise Modify Such Insurance Policies and Surety Bonds; (II) Modifying the Automatic Stay with Respect to the Workers' Compensation Program; and (III) Granting Related Relief*

- **Wages Motion**

  - *Debtors' Motion for Interim and Final Orders (I) Authorizing (A) Payment of Prepetition Wages, Salaries and Related Workforce Obligations, and (B) Continuation of Benefits Programs, and (II) Granting Related Relief*

- **Utilities Motion**

  - *Debtors' Motion for Interim and Final Orders (I) Approving Debtors' Proposed Adequate Assurance of Payment for Future Utility Services; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services; and (IV) Granting Related Relief*

- **Taxes Motion**

  - *Debtors' Motion for Interim and Final Orders (I) Authorizing the (A) Payment of Certain Prepetition Taxes and Fees and (B) Undertaking Certain Tax Planning Activities and (II) Granting Related Relief*

- **Customer Programs Motion**

  - *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Continue their Customer Programs and Honor Certain Prepetition Obligations Related Thereto, (II) Authorizing, But Not Directing, Banks to Honor and Process Payments Related to the Foregoing, and (III) Granting Related Relief*

- **Critical Vendors Motion**

  - *Debtors' Motion for Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors, Lienholders, 503(B)(9) Claimants, and PACA Vendors; (B) Directing Financial Institutions to Honor and Process Payments in Connection Therewith, and (C) Granting Related Relief*

- A number of the Debtors' existing vendors have informed the Debtors that they intend to withhold services if they are not given "critical vendor" status. Some of those vendors are party to contracts with the Debtors, but given the seasonal nature of the Pack Season, the delay caused by having to litigate with those critical vendors in order to compel performance under their contracts could be fatal to the Debtors' operations. A majority of the vendors that the Debtors have tentatively identified as "critical" are not under contract.

- **NOLs Motion**

  o *Debtors' Motion for Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of, and Declarations of Worthlessness with Respect to, Common Stock, and (II) Granting Related Relief*

- **Joint Administration Motion**

  o *Debtors' Motion for an Order Authorizing the Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief*

- **Schedules/SOFAs Extension Motion**

  o *Debtors' Motion for Entry of an Order Extending Time To (I) File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs; and (II) Granting Related Relief*

- **Stretto 156(c) Retention Application**

  o *Debtors' Application for Appointment of Stretto, Inc. as Claims and Noticing Agent*

- **Creditor Matrix Motion**

  o *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix and (B) Redact Certain Personally Identifiable Information of Natural Persons and (II) Granting Certain Related Relief*

- **Automatic Stay Motion**

  o *Debtors' Motion for Entry of an Order (I) Enforcing Sections 362, 365, 525, and 541 of the Bankruptcy Code, (II ) Approving the Form and Manner of Notice to Non-U.S. Customers, Suppliers and Other Stakeholders of Non-Debtor Affiliates, (III) Confirming the Debtors' Authority With Respect to Postpetition Operations, and (IV) Granting Related Relief*

- **DIP Motion**

  o *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*

**<u>Exhibit C</u>**

**Restructuring Support Agreement**

*EXECUTION VERSION*

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ATTACHED TO THIS RESTRUCTURING SUPPORT AGREEMENT COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF DEL MONTE FOODS CORPORATION II INC., A NEW JERSEY CORPORATION, DM INTERMEDIATE II CORPORATION, A NEW JERSEY CORPORATION, AND CERTAIN OF THEIR RESPECTIVE SUBSIDIARIES ON THE TERMS AND CONDITIONS DESCRIBED HEREIN AND SET FORTH ON **EXHIBITS A–B** ATTACHED TO THIS RESTRUCTURING SUPPORT AGREEMENT.

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS, INCLUDING THE SALE TRANSACTION, DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS, INCLUDING THE SALE TRANSACTION, WILL BE SUBJECT TO THE COMPLETION OF THE DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH ON **EXHIBITS A–B** ATTACHED TO THIS RESTRUCTURING SUPPORT AGREEMENT. THE CLOSING OF ANY RESTRUCTURING TRANSACTION, INCLUDING THE SALE TRANSACTION, SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS, IN EACH CASE, SUBJECT TO THE TERMS HEREOF.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, and any other exhibits, annexes, and schedules hereto in accordance with Section 15.02, this "**Agreement**") is made and entered into as of July 1, 2025 (the "**Execution Date**"), by and among the following parties (each

of the following described in sub-clauses (i) and (iii) of this preamble, a "**Party**" and, collectively, the "**Parties**"):[1]

  i. Del Monte Foods Corporation II, Inc., a corporation incorporated under the Laws of New Jersey ("**Del Monte**" or the "**Borrower**"), Del Monte Foods Holdings Limited, a company limited by shares incorporated under the Laws of the British Virgin Islands with registered number 1798494 ("**Holdings**"), and certain of their respective subsidiaries listed on Del Monte's signature page to this Agreement that have executed, or in the future execute and deliver, counterpart signature pages to this Agreement to counsel to the Parties (the "**Company Parties**", and, each, a "**Company Party**"); and

  ii. Each of the beneficial owners (or nominees, investment managers, advisors or subadvisors for, or subaccount or funds of, the beneficial owners) of Super-Senior Term Loans, in each case, as identified on the signature pages hereto, or that have executed a Joinder or a Transfer Agreement (collectively, the "**Consenting Lenders**").

## *RECITALS*

**WHEREAS**, the Parties have engaged in good faith and arm's-length negotiations regarding a restructuring of the Debtors;

**WHEREAS**, as of the date hereof, the Consenting Lenders collectively hold 73.2% of the aggregate outstanding principal amount of Super-Senior First Out Loans and 61.0% of the aggregate outstanding principal amount of Super-Senior Second Out Loans;

**WHEREAS**, the Company Parties and the Consenting Lenders, have in good faith and at arms' length negotiated and agreed to undertake and support certain restructuring transactions with respect to the Company Parties' capital structure on the terms and subject to the consent rights set forth in this Agreement and the Term Sheets, including the implementation through the sale of all or substantially all of the assets of the Company Parties (the "**Sale Transaction**"), pursuant to which an entity designated by or on behalf of the Consenting Lenders (or a duly authorized designee thereof) shall serve as the stalking horse bidder and agree to credit bid (including via a direction to the applicable agent) certain of the Consenting Lenders' claims pursuant to section 363(k) of the Bankruptcy Code or, solely if mutually agreed to by the Required Consenting Lenders and the Debtors if necessary to maintain tax attributes, section 1129(b)(2)(A)(ii) of the Bankruptcy Code, as applicable, and otherwise conducted pursuant to the Bidding Procedures (such transactions, including the Sale Transaction, as described in this Agreement and the Term Sheets, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including the Sale Transaction, through the commencement by the Company Parties of voluntary

---

[1] Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings given to them in Section 1.

cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**");

**WHEREAS**, on the date hereof, the Company Parties, and each of the Consenting Lenders have agreed to the terms hereof;

**WHEREAS**, the Parties acknowledge and agree that the Restructuring Term Sheet is a summary of the material terms of the Restructuring Transactions and that implementation of the Restructuring Transactions will require the negotiation of, and agreement on, documented terms not fully covered by the Restructuring Term Sheet; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions, including the Sale Transaction, on the terms and conditions and subject to the consent rights set forth in this Agreement and the Term Sheets.

**NOW, THEREFORE**, in consideration of the promises, mutual covenants, and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**     *Definitions and Interpretation.*

1.01     <u>Definitions</u>. The following terms shall have the following definitions:

"**ABL Commitment Letter**" means a commitment letter entered into on or around the date of this Agreement between the Company Parties and the ABL Lenders holdings at least 100% of the aggregate outstanding principal amount of the ABL Claims in connection with the Restructuring Transactions.

"**ABL Claims**" means all claims held by the ABL Lenders derived from, based upon, or secured pursuant to the ABL Loan Documents, including any aggregate principal amount outstanding, plus all interest, fees, expenses, costs, and other charges arising under or related to the Obligations (as defined in the ABL Credit Agreement).

"**ABL Credit Agreement**" means, as it may be amended, restated, supplemented, or otherwise modified from time to time, that certain ABL Credit Agreement, dated as of August 2, 2024, by and among Del Monte Foods Corporation II, Inc., as borrower, DM Intermediate II Corporation, as holdings, the other loan parties thereto, the lenders from time to time party thereto, as lenders, and JPMorgan Chase Bank, N.A., as administrative agent (together with its permitted successors).

"**ABL Lenders**" means the lenders who own or control the ABL Loan Commitments.

"**ABL Loan Commitments**" has the meaning ascribed to the term "Total Commitment" in the ABL Credit Agreement.

3

"**ABL Loan Documents**" means, collectively, the ABL Credit Agreement, the Existing Intercreditor Agreement and the other "Loan Documents" (as defined therein), and all documents and agreements executed in connection therewith.

"**Acquired Assets**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Ad Hoc Group**" means the ad hoc group of holders of Super-Senior Term Loans represented by the Ad Hoc Group Advisors.

"**Ad Hoc Group Advisors**" means, collectively, (i) Gibson, Dunn & Crutcher LLP, as co-counsel to the Ad Hoc Group, (ii) Sills Cummis & Gross P.C., as co-counsel to the Ad Hoc Group, (iii) Houlihan Lokey Capital, Inc., as financial advisor and investment banker to the Ad Hoc Group, and (iv) any other advisor retained by the Ad Hoc Group with the prior consent of the Company Parties (not to be unreasonably withheld, delayed or conditioned).

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity was a debtor in a case under the Bankruptcy Code.

"**Agents**" means, collectively, any administrative agent, collateral agent, escrow agent, or similar Entity under the Super-Senior Credit Agreement and/or the DIP Term Loan Facility, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 15.02 (including any Term Sheet).

"**Agreement Effective Date**" has the meaning set forth in Section 2.01 of this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date (or, in the case of any Consenting Lender that becomes a Party hereto after the Agreement Effective Date, as of the date such Consenting Lender becomes a Party hereto) to the Termination Date applicable to such Party.

"**Alternative Restructuring Proposal**" means any oral or written plan of reorganization or liquidation, proposal, expression of interest, offer, term sheet, material discussions, or agreement with respect to a dissolution, winding up, liquidation, receivership, assignment for the benefit of creditors, restructuring, reorganization, workout, exchange, extension, sale, disposition, new-money investment, merger, acquisition, consolidation, partnership, plan of arrangement, plan of reorganization, plan of liquidation, investment, debt investment, equity investment, tender offer, refinancing, recapitalization, share exchange, business combination, joint venture, or similar transaction to any of the foregoing, in each case, involving all or a material portion of the assets, debt, or equity of the Company Parties and/or their respective subsidiaries that in each case, is material and would reasonably be expected to interfere with, delay, or preclude consummation of, or is an alternative to, the Restructuring Transactions; *provided*, *however*, that the Restructuring Transactions shall not individually or collectively be considered an Alternative Restructuring Proposal so long as such transactions are consistent in all material respects with the terms of this Agreement and the Term Sheets, as it may be amended in accordance with Section 13, and as may be provided in the Definitive Documents. For the avoidance of doubt, an Alternative Restructuring

Proposal shall not include (i) any transactions contemplated by the DIP Budget or otherwise consented to in an advance written communication by the Company Parties and the Required Consenting Lenders, or (ii) any action taken by the Company Parties contemplated by the Bidding Procedures Order, such as the Company Parties' acceptance and/or consummation of a transaction by one or more third-party purchasers for the Acquired Assets.

"**Backstop Premium**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time-to-time.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time-to-time.

"**Bidding Procedures**" means the bidding procedures used to market the Company Parties' assets and effectuate the Sale Transaction.

"**Bidding Procedures Motion**" means the motion seeking approval of the Bidding Procedures.

"**Bidding Procedures Order**" means the final order granting the Bidding Procedures Motion.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the Laws of the state of New York.

"**Cash**" means cash and cash equivalents, including bank deposits, checks, and other similar items, in legal tender in the state of New York.

"**Causes of Action**" means any Claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whenever arising before, on, or after the Petition Date, as applicable, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Equity Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy

Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Chapter 11 Cases**" means voluntary cases under chapter 11 of the Bankruptcy Code of some or all of the Company Parties.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"**Commitment Premium**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Company Claims/Equity Interests**" means, collectively, any Claim against, or Equity Interest in, a Company Party or a wholly or partially owned direct or indirect subsidiary of any Company Party, including the Super-Senior Term Loan Claims.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions, including the Sale Transaction, including any such confidentiality obligations imposed pursuant to the Super-Senior Credit Agreement.

"**Confirmation**" means the Bankruptcy Court's entry of a Confirmation Order on the docket of the Chapter 11 Cases.

"**Confirmation Order**" means an order of the Bankruptcy Court confirming a Plan pursuant to section 1129 of the Bankruptcy Code.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means, if applicable, the Company Parties that commence Chapter 11 Cases in their capacities as debtors in the Chapter 11 Cases.

"**Definitive Documents**" means, collectively, all documents and filings related to the documentation, implementation, and consummation of the Restructuring Transactions, including the Sale Transaction, including, without limitation: (a) this Agreement (including any exhibits that are now or may be subsequently annexed, including any Term Sheet); (b) the Bidding Procedures; (c) the Bidding Procedures Motion; (d) the Bidding Procedures Order; (e) the Stalking Horse APA; (f) the Sale Order; (g) the Plan; (h) any Confirmation Order; (i) any Disclosure Statement (and any motions or orders related thereto); (j) any order of the Bankruptcy Court approving the Disclosure Statement; (k) any Solicitation Materials; (l) the First Day Pleadings and all orders sought pursuant thereto; (m) the Plan Supplement (including but not limited to any restructuring transactions memorandum and/or schedules to assume or reject executory contracts and unexpired leases); (n) the DIP Documents (including the DIP Budget and the motion filed with the Bankruptcy Court seeking entry of the DIP Orders); (o) the DIP Orders; (p) the New Organizational Documents, if applicable (including any shareholders' or similar agreements and/or any corporate formational documents necessary or desirable to give effect to the Restructuring Transactions, including the

Sale Transaction); (q) the Exit Term Loan Facility Documents, if applicable; (r) any other Sale Document; and (s) all other material pleadings and/or other material documents filed with the Bankruptcy Court; in each case, including any amendments, modifications, and supplements thereto and any related notes, certificates, agreements, documents, and instruments (as applicable).

"**DIP ABL Credit Agreement**" means the debtor-in-possession credit agreement for the DIP ABL Facility in connection with the Restructuring Transactions, which shall be consistent with the Interim DIP Order in all material respects.

"**DIP ABL Claims**" means any Claim that arises under the DIP ABL Documents or the DIP Orders with respect to the DIP ABL Facility.

"**DIP ABL Documents**" means, collectively, DIP ABL Credit Agreement and any amendments, modifications, or supplements thereto, and including any related notes, certificates, agreements, intercreditor agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"**DIP ABL Facility**" means the superpriority secured first lien debtor-in-possession asset-based lending facility to be provided to the Debtors on the terms and conditions set forth in the DIP ABL Documents and the DIP Orders.

"**DIP ABL Lenders**" means the lenders who own or control the DIP ABL Loan Commitments.

"**DIP ABL Loan Commitments**" has the meaning ascribed to the term "Total Commitment" in the DIP ABL Credit Agreement.

"**DIP Budget**" means the initial debtor-in-possession financing budget attached to the Interim DIP Order, and any subsequent debtor-in-possession financing budget agreed to in accordance with the DIP Orders.

"**DIP Documents**" means, collectively, the DIP ABL Documents, the DIP Term Loan Documents, the DIP Budget, and any amendments, modifications, or supplements thereto, and including any related notes, certificates, agreements, intercreditor agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

"**DIP Term Loan Claims**" means any Claim that arises under the DIP Term Loan Documents or the DIP Orders with respect to the DIP Term Loan Facility.

"**DIP Term Loan Credit Agreement**" means the debtor-in-possession credit agreement for the DIP Term Loan Facility in connection with the Restructuring Transactions.

"**DIP Term Loan Documents**" means, collectively, DIP Term Loan Credit Agreement and any amendments, modifications, or supplements thereto, and including any related notes,

certificates, agreements, intercreditor agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"**DIP Term Loan Facility**" means the $412.5 million senior secured superpriority debtor-in-possession financing facility to be provided to the Debtors on the terms and conditions set forth in the DIP Term Loan Documents and the DIP Orders.

"**DIP Term Loan Lenders**" means the lenders from time-to-time party to the DIP Term Loan Credit Agreement.

"**Disclosure Statement**" means a disclosure statement disclosing the terms and conditions of a Plan, as may be amended, supplemented, or otherwise modified from time-to-time in accordance with the terms of this Agreement and in accordance with, among other things, applicable securities Law, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law.

"**DMPL**" means Del Monte Pacific Limited, the ultimate, indirect parent of the Company Parties.

"**Entity**" means any person, individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, Governmental Body or any agency or political subdivision of any Governmental Body, or any other entity, whether acting in an individual, fiduciary, or other capacity.

"**Equity Interests**" means, with respect to any Person, (i) any capital stock (including common stock and preferred stock), limited liability company interests, partnership interests, or other equity, ownership, beneficial, or profits interests of such Person, and (ii) any options, warrants, securities, stock appreciation rights, phantom units, incentives, commitments, calls, redemption rights, repurchase rights, or other agreements, arrangements, or rights of any kind that are convertible into, exercisable, or exchangeable for, or otherwise permit any Person to acquire, any capital stock (including common stock and preferred stock), limited liability company interests, partnership interests, or other equity, ownership, beneficial, or profits interests of such Person.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Existing Documents**" means, collectively, the Super-Senior Documents, and all documents and agreements (including amendments) related thereto.

"**Existing Intercreditor Agreement**" means, as it may be amended, restated, supplemented, or otherwise modified from time to time, that certain intercreditor agreement, dated as of August 2, 2024, by and among JPMorgan Chase Bank, N.A., as collateral agent for the ABL Lenders, Wilmington Savings Fund Society, FSB, as collateral agent for the Term Loan Secured Parties (as defined therein), each additional representative in respect of additional debt from time to time party thereto, and each of the Loan Parties (as defined therein) party thereto.

"**Exit Intercreditor Agreement**" means an intercreditor agreement governing the Exit ABL Facility and the Exit Term Loan Facility, if applicable.

"**Exit Term Loan Facility Documents**" means the Exit Term Loan Credit Agreement, the Exit Intercreditor Agreement, and any other agreements, documents, and instruments delivered or entered into in connection therewith including, without limitation, any guarantee agreements, pledge, and collateral agreements, and other security documents, in each case, as applicable.

"**Exit Term Loan Credit Agreement**" means the credit agreement for the Exit Term Loan Facility, if applicable.

"**Exit Term Loan Facility**" means an exit facility incurred pursuant to the Exit Term Loan Credit Agreement, if applicable.

"**Final DIP Order**" means the order entered by the Bankruptcy Court approving, among other things, the terms of the DIP ABL Facility and the DIP Term Loan Facility, the Debtors' entry into the DIP Documents, and the use of Cash collateral on a final basis.

"**First Day Pleadings**" means the first day pleadings that the Company Parties determine, subject to the reasonable consent of the Required Consenting Lenders, are necessary or desirable to file.

"**Governmental Body**" means any U.S. or non-U.S. federal, state, municipal, or other government, or other department, commission, board, bureau, agency, public authority, or instrumentality thereof, any other U.S. or non-U.S. court or arbitrator, or any self-regulatory organization (including the New York Stock Exchange).

"**Holder**" means an Entity that is the record owner of a Claim or Equity Interest. For the avoidance of doubt, affiliated record owners of Claims or Equity Interests managed or advised by the same institution shall constitute separate Holders.

"**Holdings**" has the meaning set forth in the preamble to this Agreement.

"**Interim DIP Order**" means the order entered by the Bankruptcy Court approving, among other things, the terms of the DIP ABL Facility and the DIP Term Loan Facility, the Debtors' entry into the DIP Documents, and the use of Cash collateral on an interim basis, substantially in the form attached hereto as **Exhibit B**.

"**Joinder**" means an executed joinder providing, among other things, that the signing holder of Company Claims/Equity Interests agrees to be bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

"**Law**" means any applicable jurisdiction, any applicable federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is adopted, promulgated, issued, or entered by an applicable Governmental Body of competent jurisdiction.

"**Milestone(s)**" has the meaning set forth in <u>Section 4</u> of this Agreement.

9

"**New Organizational Documents**" means the documents providing for the corporate governance of the Reorganized Debtors, including any charters, bylaws, operating agreements, or other organizational documents or shareholder's agreements, as applicable, which shall be consistent with section 1123(a)(6) of the Bankruptcy Code, as applicable.

"**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, a government Entity, an unincorporated organization, a group or any legal Entity or association.

"**Permitted Transferee**" has the meaning given to it in Section 9.01.

"**Petition Date**" means the first date that any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means a joint plan filed by the Debtors under chapter 11 of the Bankruptcy Code in accordance with, and subject to the terms and conditions and consent rights of, this Agreement.

"**Plan Effective Date**" means the date on which all of the conditions precedent to consummation of the Plan have been satisfied in full or waived, in accordance with the terms of the Plan.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Equity Interests (or enter with customers into long and short positions in Company Claims/Equity Interests), in its capacity as a dealer or market maker in Company Claims/Equity Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Releases**" means the standard and customary Debtor releases, third-party releases (which, in the case of Releases to be included in the Plan, shall be opt-out third-party releases, and as described in Section 5.01(a)(iv)), and exculpation provisions, in each case, to be included in the Sale Order or the Plan, as applicable, and subject to carve-outs for fraud, willful misconduct, bad faith, and gross negligence, in form and substance acceptable to the Company Parties and the Required Consenting Lenders; *provided* that the Releases, whether approved pursuant to the Sale Order or the Plan, shall be consistent in all material respects with the Sale Releases.

"**Reorganized Debtors**" means the Debtors as reorganized under the Plan, or any successor or assign thereto, by transfer, merger, consolidation, or otherwise.

"**Required Consenting Lenders**" means, as of the relevant date, Consenting Lenders holding in the aggregate, at least 50.01% of the aggregate outstanding principal amount of Super-Senior First Out Loans that are held by the Consenting Lenders.

"**Restructuring Expenses**" means the reasonable, documented, and due and owing fees and out-of-pocket expenses of the Ad Hoc Group Advisors (including, in each case, fees and

expenses incurred before, on, or after the Petition Date, to the extent applicable), in each case, in accordance with their respective engagement letters or fee letters with the Company Parties and/or any applicable order of the Bankruptcy Court (including, for the avoidance of doubt, the DIP Orders); *provided* that any and all fixed monthly fees, restructuring fees, liability management fees, and/or transaction fees shall be deemed reasonable to the extent provided for in an engagement or fee letter between the Debtors and any Ad Hoc Group Advisor.

"**Restructuring Term Sheet**" means the term sheet outlining the key and material terms of the Restructuring Transaction, including the Sale Transaction, as set forth on **Exhibit A** attached hereto.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Sale Documents**" means, collectively, the Bidding Procedures, the Bidding Procedures Order, the Stalking Horse APA, the Sale Order, and all documents, instruments, deeds, notifications, agreements, and filings related to the documentation, implementation, and consummation of any of the foregoing.

"**Sale Order**" means an order entered by the Bankruptcy Court approving the Sale Transaction (which, if the Sale Transaction is consummated under a chapter 11 plan pursuant to section 1123 of the Bankruptcy Code, may be the Confirmation Order).

"**Sale Releases**" has the meaning set forth in the Restructuring Term Sheet.

"**Sale Transaction**" has the meaning set forth in the recitals to this Agreement.

"**Secured Claim**" means a Claim as of the Petition Date: (a) properly secured by a valid, perfected, and enforceable lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"**Securities Act**" means the Securities Act of 1933, as amended and including any rule or regulation promulgated thereunder.

"**Sellers**" means each of the Company Parties who shall be signatories to the Stalking Horse APA.

"**Solicitation Materials**" means, collectively, all documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, including, but not limited to, the Disclosure Statement.

"**Stalking Horse APA**" means the stalking horse asset purchase agreement to be entered into by the Sellers, on the one hand, and the Consenting Lenders (or a designee thereof) on the other hand, which shall be acceptable in form and substance to the Required Consenting Lenders.

"**Stalking Horse Bidder**" means the "Buyer" as set forth in the Stalking Horse APA.

"**Super-Senior Credit Agreement**" means, as it may be amended, restated, supplemented, or otherwise modified from time to time, that certain super-priority credit and guaranty agreement, dated as of August 2, 2024, by and among Del Monte Foods Corporation II Inc., as borrower, DM Intermediate II Corporation, as holdings, the other loan parties from time-to-time party thereto, as guarantors, the lenders party thereto from time to time, as lenders, and Wilmington Savings Fund Society, FSB, as administrative agent.

"**Super-Senior Documents**" means, collectively, the Super-Senior Credit Agreement, the Existing Intercreditor Agreement, and the other "Loan Documents" (as defined therein), and all documents and agreements executed in connection therewith.

"**Super-Senior First Out Incremental Loans**" means the incremental First Out term loans incurred under the Super-Senior Credit Agreement.

"**Super-Senior First Out Initial Loans**" means the first-out term loans incurred under the Super-Senior Credit Agreement other than the Super-Senior First Out Incremental Loans.

"**Super-Senior First Out Loans**" means, collectively, the Super-Senior First Out Incremental Loans and the Super-Senior First Out Initial Loans.

"**Super-Senior Second Out Loans**" means the second-out term loans incurred under the Super-Senior Credit Agreement.

"**Super-Senior Third Out Loans**" means the third-out term loans incurred under the Super-Senior Credit Agreement.

"**Super-Senior Lenders**" means each of the beneficial owners (or nominees, investment managers, advisors or subadvisors for, or subaccount or funds of, the beneficial owners) of terms loans issued pursuant to the Super-Senior Credit Agreement.

"**Super-Senior Term Loan Claims**" means any Claim against a Company Party arising under, derived from, based on, or related to the Super-Senior Term Loans under the Super-Senior Credit Agreement.

"**Super-Senior Term Loans**" means the First Out Term Loans, Second Out Term Loans and Third Out Term Loans as defined in the Super-Senior Credit Agreement.

"**Term Sheet**" means any term sheet outlining the key and material terms of the Restructuring Transactions, including the Sale Transaction, and which may be subsequently annexed to this Agreement, including but not limited to the Restructuring Term Sheet attached as **Exhibit A**.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 12.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hedge, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

"**Transfer Agreement**" means an executed transfer agreement providing, among other things, that a transferee agrees to be bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

"**U.S. Trustee**" means the Office for the jurisdiction of the applicable Chapter 11 Cases.

1.02    Interpretation. This Agreement and the Term Sheets are the product of negotiations among the Parties, and the enforcement or interpretation hereof is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof shall not be effective in regard to the interpretation hereof. For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof, unless otherwise agreed;

(e)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," or "officers" shall also include "members" or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)     the use of "include" or "including" is without limitation, whether stated or not;

(j)     the use of "or" shall not be exclusive; and

(k)     (i) the phrase "counsel to the Company Parties" refers to each counsel specified in Section 15.10(a); (ii) the phrase "counsel to the Ad Hoc Group" and the phrase "counsel to the Consenting Lenders" refer to Gibson, Dunn & Crutcher LLP.

All exhibits attached to this Agreement are expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein. All exhibits attached to this Agreement set forth the material terms and conditions of the Restructuring Transactions, including the Sale Transaction; *provided*, *however*, that all exhibits attached to this Agreement are supplemented by the terms and conditions of this Agreement and are subject to completion of the Definitive Documents in all respects.

**Section 2.     *Effectiveness of this Agreement*.**

2.01     <u>Agreement Effective Date</u>. This Agreement shall become effective and binding upon each of the Parties as of the time and date on which all of the following conditions have been satisfied or waived in accordance with this Agreement (the "**<u>Agreement Effective Date</u>**"):

(a)     the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Consenting Lenders;

(b)     the Consenting Lenders holding in the aggregate at least 66.67% of the aggregate principal amount of Super-Senior First Out Loans in the aggregate shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties; *provided*, that signature pages executed by Consenting Lenders shall be delivered to (x) other Consenting Lenders, and the Company Parties in a redacted form that removes such Consenting Lenders' holdings of Super-Senior Term Loans, and (y) the advisors to the Company Parties and the Ad Hoc Group Advisors in an unredacted form;

(c)     counsel to the Company Parties shall have given notice to counsel to each of the Consenting Lenders in the manner set forth in <u>Section 15.10</u> hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred;

(d)     the Company Parties shall have paid all Restructuring Expenses to the extent an invoice has been received by the Company Parties on or before the date that is one (1) Business Day prior to the Agreement Effective Date;

(e)     the Company Parties and the ABL Lenders holdings at least 100% of the aggregate outstanding principal amount of the ABL Claims shall have entered into an ABL Commitment Letter acceptable to the Required Lenders; and

(f)    no temporary restraining order, preliminary or permanent injunction, judgment or other order preventing the consummation of any part of the Restructuring Transactions, including the Sale Transaction, shall have been entered, issued, rendered or made by any court of competent jurisdiction; nor shall there be any law, rule or regulation promulgated, enacted, entered, enforced or deemed applicable to the Company Parties which makes the consummation of any part of the Restructuring Transactions, including the Sale Transaction, illegal, void or rescinded.

This Agreement shall be effective from the Agreement Effective Date until validly terminated pursuant to the terms set forth in Section 12. To the extent that a signatory to this Agreement holds, as of the date hereof or thereafter, multiple Company Claims/Equity Interests, such Party shall be deemed to have executed this Agreement in its respective capacity as a holder of all such Company Claims/Equity Interests as is provided for herein and solely to the extent provided herein and in such capacity as set forth in its signature page hereto, and this Agreement shall apply severally to such Party with respect to each such Company Claims/Equity Interests held by such Party.

2.02    Without limiting any provision of Section 9, following the Agreement Effective Date, additional holders of Company Claims/Equity Interests may become parties to this Agreement with the consent of the Company Parties and the Required Consenting Lenders by executing a Joinder.

**Section 3.**    *Definitive Documents*.

3.01    The Definitive Documents not executed or not in a form attached to this Agreement as of the Execution Date remain subject to negotiation in good faith, agreement, and completion. Upon completion or execution, each of the Definitive Documents and every other document, deed, agreement, filing, notification, form, letter, or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement, including the Term Sheets, as may be modified, amended, or supplemented in accordance with Section 13.  The Definitive Documents, including those not executed or in a form attached to this Agreement as of the Execution Date, shall be in form and substance consistent with the Term Sheets and otherwise acceptable to the Company Parties and the Required Consenting Lenders.

3.02    For the avoidance of doubt, Consenting Lender consent shall not be required for the filing of any nonmaterial motions, applications, or other pleadings, any ministerial notices and similar ministerial documents, retention applications, fee applications, fee statements, similar pleadings or motions relating to the retention or fees of any professional, any statements or schedules required pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure, or any monthly or quarterly operating reports.

**Section 4.**    *Milestones*. On and after the Agreement Effective Date, the Parties shall implement the Restructuring Transactions, including the Sale Transaction in accordance with the following milestones (collectively, the "**Milestones**"), unless extended, modified, or waived in writing

15

(which may be by electronic mail), as applicable, by the Company Parties and the Required Consenting Lenders:

(a)      no later than July 1, 2025, the Petition Date shall have occurred;

(b)      no later than two calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(c)      no later than 10 calendar days after the Petition Date, the Company Parties shall have filed the Bidding Procedures Motion;

(d)      subject to the Bankruptcy Court's availability, no later than the date that is 40 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(e)      subject to the Bankruptcy Court's availability, no later than the date that is 40 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order;

(f)      subject to the Bankruptcy Court's availability, no later than a date to be agreed by the Company Parties and the Required Consenting Lenders in the Bidding Procedures, the Bankruptcy Court shall have entered the Sale Order;

(g)      subject to the Bankruptcy Court's availability, solely if the Sale Transaction is being consummated pursuant to a Plan, no later than a date to be agreed by the Company Parties and the Required Consenting Lenders in the Bidding Procedures, the Bankruptcy Court shall have entered the order approving the Disclosure Statement;

(h)      subject to the Bankruptcy Court's availability, solely if the Sale Transaction is being consummated pursuant to a Plan, no later than a date to be agreed by the Company Parties and the Required Consenting Lenders in the Bidding Procedures, the Bankruptcy Court shall have entered the Confirmation Order; and

(i)      solely if the Sale Transaction is being consummated pursuant to a Plan, no later than a date to be agreed by the Company Parties and the Required Consenting Lenders in the Bidding Procedures, the Plan Effective Date shall have occurred; provided that, if the necessary regulatory approvals associated with the effectuation of the Plan remain pending as of such date, this Milestone shall be extended to the date that is the third Business Day following receipt of all necessary regulatory approvals.

**Section 5.      *Commitments of the Consenting Lenders.***

5.01      General Commitments, Forbearances, and Waivers.

(a)      Except as set forth in Section 6, during the Agreement Effective Period, each Consenting Lender agrees, severally and not jointly, in respect of all of its Company Claims/Equity Interests, to the extent permitted by Law and subject to the other terms hereof, to:

(i)     support, approve, implement, cooperate with each of the Parties, and take all actions necessary to facilitate the implementation and consummation of the Restructuring Transactions, including the Sale Transaction in accordance with this Agreement and the Term Sheets, including voting and exercising all Company Claims/Equity Interests owned, held or otherwise controlled by such Consenting Lender, and exercising any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting, approval or any action to which it is legally entitled to participate), in each case in favor of any matter requiring voting, approval, or action to the extent necessary to implement the Restructuring Transactions, including the Sale Transaction;

(ii)     if any Acquired Assets are located outside of the United States, use commercially reasonable efforts to negotiate and agree to a method of implementation of the Sale Transaction in jurisdictions outside the United States;

(iii)     negotiate in good faith and use commercially reasonable efforts to execute, deliver, implement, and effectuate Definitive Documents that are in form and substance consistent with this Agreement and Term Sheets to which it is required to be a party and that the Consenting Lenders determine are otherwise acceptable in accordance with Section 3.01;

(iv)     to the extent it is permitted to elect whether to not to opt out of the Releases, elect to not to opt out of the Releases by timely delivering its duly executed and completed ballot(s) or other documents indicating such election;

(v)     oppose any party or Person from taking any actions contemplated in Section 5.02 of this Agreement;

(vi)     direct any applicable Agent not to take, solicit, encourage or support, and/or to refrain from taking, soliciting, encouraging or supporting any other Person from taking any action inconsistent with such Consenting Lender's obligations under this Agreement and the Term Sheets, and in the event any party directs or attempts to direct such applicable Agent to take an action inconsistent with this Agreement and the Term Sheets, to provide a countermanding direction to any applicable Agent to take such steps as necessary to remedy such actions; *provided* that, except to the extent otherwise agreed in the Stalking Hose APA, no Consenting Lender shall be required to provide any Agent, or any other Person, with any indemnity or similar undertaking in connection with taking any such action or incur any fees or expenses in connection therewith (beyond any existing indemnity obligations provided for in the Existing Documents);

(vii)     give any notice, order, instruction, consent, or direction to any applicable Agent to the extent necessary to give effect to the Restructuring Transactions, including the Sale Transaction; *provided* that except to the extent otherwise agreed in the Stalking Horse APA, no Consenting Lender shall be required to provide any Agent, or any other Person, with any indemnity or similar undertaking in connection with taking any such action or incur any fees or expenses in connection therewith (beyond any existing indemnity obligations provided for in the Existing Documents);

(viii)     validly and timely deliver, and not withdraw, the consents, proxies, signature pages, tenders, ballots, or other means of voting or participation in the Restructuring

Transactions (including directing its nominee or custodian, if applicable, on behalf of itself and the accounts, funds, or Affiliates for which it is acting as investment advisor, sub advisor, or manager to validly and timely deliver and not withdraw) with respect to all of the Company Claims/Equity Interests owned by or held by such Consenting Lender;

(ix)    use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions, including the Sale Transaction, from the Company Parties' other stakeholders; *provided* that, for the avoidance of doubt, such provision does not obligate the Consenting Lenders to use any efforts to otherwise affirmatively seek or to obtain additional support for the Restructuring Transactions, including the Sale Transaction;

(x)    enter into and effectuate the Definitive Documents, as applicable, within the timeframes contemplated herein and consistent with the Milestones in all material respects;

(xi)    to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, including the Sale Transaction, use commercially reasonable efforts to negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(xii)    act in good faith with regard to the Restructuring Transactions, including the Sale Transaction, materially consistent with this Agreement and the Term Sheets;

(xiii)    cooperate with the Company Parties to obtain any and all required third-party governmental, regulatory, licensing, and/or other third-party approvals (including, without limitation, any necessary third-party consents) necessary to implement and/or consummate the Restructuring Transactions, including the Sale Transaction;

(xiv)    affirmatively support and not object to entry of the Interim DIP Order and Final DIP Order in accordance with this Agreement;

(xv)    forbear from exercising or directing any Entity to exercise rights or remedies, including the enforcement, collection, or recovery of any Claims or Equity Interests in the Company Parties, including the Company Parties that are non-Debtor guarantors, including, for the avoidance of doubt, as a result of a breach by any Company Party, and/or any occurrence and/or continuation of any "Default" or "Event of Default" (as defined in the applicable document) under the Super-Senior Credit Agreement and/or any other document entered into in connection therewith during the Agreement Effective Period;

(xvi)    provide to the Company Parties, on a monthly basis (unless there are no changes from the prior month) or upon reasonable request from the Company Parties or their advisors, a report of updated holdings information setting forth the amount of (A) Super-Senior First Out Incremental Loans, (B) Super-Senior First Out Loans, (C) Super-Senior Second Out Loans, and (D) Super-Senior Third Out Loans, in each case, collectively held by the Consenting Lenders;

(xvii)    notify counsel to the Company Parties in writing as promptly as reasonably practicable (and in any event within three (3) Business Days after obtaining actual knowledge

thereof) of (A) any material, uncured breach by such Consenting Lender in any respect of any of its obligations, representations, warranties or covenants set forth in this Agreement or (B) the occurrence of a Termination Event pursuant to Section 11 of this Agreement; and

(xviii)  on the Plan Effective Date, except to the extent otherwise provided in this Agreement, the Plan, Confirmation Order, or other Definitive Documents, as applicable, all notes, instruments, certificates, and other documents evidencing Claims against the Company Parties, including those Company Parties that are non-Debtor guarantors (other than those that are reinstated) or Equity Interests in Del Monte, including credit agreements, shall be cancelled, and all present and future obligations and liabilities under or in connection therewith shall be deemed satisfied in full, cancelled, discharged, and of no force or effect, and the Agents shall be released from all duties and obligations thereunder.

(b)    During the Agreement Effective Period, each Consenting Lender agrees, severally and not jointly, to the extent permitted by Law and subject to the other terms hereof, in respect of all of its Company Claims/Equity Interests, that it shall not, directly or indirectly, and shall not direct or encourage any of its Affiliates or any third party to:

(i)    object to, delay, impede, or take any other action that is inconsistent with, or interferes with, the acceptance, implementation, or consummation of the Restructuring Transactions, including the Sale Transaction;

(ii)    solicit, encourage, participate in, negotiate, propose, file, support, deliver consents with respect to, or vote (or allow any proxy appointed by it to vote) for any Alternative Restructuring Proposal;

(iii)    take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions, including the Sale Transaction, described in the Agreement, the Term Sheets, the Definitive Documents, or the Sale Documents;

(iv)    direct any Agent to take any action inconsistent with such Consenting Lenders' obligations under this Agreement, any Definitive Document, or the Plan, and in the event any Agent takes any action inconsistent with such Consenting Lenders' obligations under this Agreement, such Consenting Lender shall direct such Agent to (A) cease, desist, and refrain from taking any such action, and (B) take such action as may be necessary to implement and consummate the Restructuring Transactions; *provided* that except to the extent otherwise agreed in connection with any Stalking Horse APA, no Consenting Lender shall be required to provide any Agent, or any other Person, with any indemnity or similar undertaking in connection with taking any such action or incur any fees or expenses in connection therewith (beyond any existing indemnity obligations provided for in the Existing Documents);

(v)    seek to modify the Definitive Documents, in whole or in part, in a manner inconsistent with this Agreement and the Term Sheets in any material respect;

(vi)    file any pleading seeking entry of an order, (A) directing the appointment of an examiner (with expanded powers) or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, or (D) for relief

that (x) is inconsistent with this Agreement and the Term Sheets in any material respect or (y) would frustrate the purposes of this Agreement;

(vii)    file any motion, objection, pleading, agreement, joinder, instrument, order, form, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, the Term Sheets, or the Sale Documents (nor directly or indirectly direct any other person or Entity to make such a filing);

(viii)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the Definitive Documents, the other Restructuring Transactions, including the Sale Transaction, contemplated herein against the Company Parties, their Affiliates, or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement (nor directly or indirectly direct any other person or Entity to make such a filing);

(ix)    object to any First Day Pleadings and "second day" pleadings consistent with this Agreement and the Term Sheets filed by the Debtors in furtherance of the Restructuring Transactions, including the Sale Transaction, including the Bidding Procedures Motion or any motion seeking approval of the DIP ABL Facility or the DIP Term Loan Facility on the terms set forth herein and the DIP Documents;

(x)    except as agreed between the Company Parties and the Required Consenting Lenders, exercise, or direct any other Person to exercise (either directly or indirectly), any right or remedy for the enforcement, collection, or recovery of any of Claims against or Equity Interests, including as such actions may relate to the Company Parties' ownership and possession of their assets;

(xi)    announce publicly its intention not to support the Restructuring Transactions, including the Sale Transaction;

(xii)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; or

(xiii)    encourage or facilitate any person or Entity to take any of the actions described in the foregoing Section 5.01(b)(i) through Section 5.01(b)(xiii).

5.02    Commitments with Respect to the Chapter 11 Cases.

(a)    During the Agreement Effective Period, as applicable, each Consenting Lender that is entitled to vote to accept or reject the Plan pursuant to its terms agrees, severally and not jointly that it shall, subject to receipt by such Consenting Lender of the Solicitation Materials:

(i)    (A) vote each of its Company Claims/Equity Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot, and (B) regardless of whether such Consenting Lender is entitled to vote to accept

20

or reject the Plan, agree to elect to not opt out of or object to, the Releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) or other documents indicating such election, as applicable;

        (ii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clause (i) above;

        (iii)    cooperate with the Company Parties' efforts to support, defend, and seek Bankruptcy Court approval of the DIP Orders, and give any notice, order, instruction, or direction to the Agent necessary to give effect to the Restructuring Transactions or to issue a notice or letter recommending to vote in favor of the Plan;

        (iv)    support and take all commercially reasonable actions reasonably requested by the Company Parties to facilitate approval of the Sale Transaction; and

        (v)    if applicable, support and take all commercially reasonable actions reasonably requested by the Company Parties to facilitate approval of the Disclosure Statement, solicitation of the Plan, and Confirmation and consummation of the Plan.

        (b)    During the Agreement Effective Period, each Consenting Lender, in respect of each of its Company Claims/Equity Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement and the Term Sheets.

        5.03    For the avoidance of doubt, the affirmative and negative commitments of the Consenting Lenders pursuant to Sections 5.01 and 5.02 are expressly conditioned upon the Restructuring Transactions, including the Sale Transaction, and the Definitive Documents (including the Sale Order) being in all respects consistent with this Agreement and the Term Sheets and otherwise approved by the Required Consenting Lenders as contemplated in Section 3.

**Section 6.**    *Additional Provisions Regarding the Consenting Lenders' Commitments.* Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Lender to consult with any other Consenting Lender, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the U.S. Trustee); (b) impair or waive the rights of any Consenting Lender to assert or raise any objection not prohibited under this Agreement; (c) prevent any Consenting Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, the Term Sheets, or any other Definitive Document; (d) limit the rights of a Consenting Lender under the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in these Chapter 11 Cases, so long as the exercise of any such right and the positions advocated in connection therewith is not inconsistent in any material respect with this Agreement or with such Consenting Lender's obligations hereunder; (e) limit the ability of a Consenting Lender to purchase, sell, or enter into any transactions regarding the Company Claims/Equity Interests, subject to the terms of this Agreement; (f) constitute a waiver or amendment of any term or provision of the Super-Senior Credit Agreement, or any intercreditor agreement; (g) pending

consummation of the Restructuring Transactions, including the Sale Transaction, constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under the Super-Senior Credit Agreement; (h) prohibit any Consenting Lender from taking any action that is not inconsistent with this Agreement, the Term Sheets, or the Restructuring Transactions, including the Sale Transaction; (i) solely for the period from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date), obligate a Consenting Lender to deliver a vote to support the Plan (or any other Restructuring Transactions, including the Sale Transaction) or prohibit a Consenting Lender from withdrawing such vote; *provided* that upon the withdrawal of any such vote after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date), such vote shall be deemed void *ab initio* and such Consenting Lender shall have the opportunity to change its vote; (j) require any Consenting Lender to take any action which is prohibited by applicable Law or to waive or to forgo the benefit of any applicable legal or professional privilege or prevent a Consenting Lender from taking any action that is required to comply with applicable Law; *provided*, that, in each case, if a Consenting Lender proposes to take any action that is inconsistent with this Agreement in order to comply with applicable Law, such Consenting Lender shall use commercially reasonable efforts to provide at least two (2) Business Days' advanced notice to the Company Parties to the extent the provision of such notice is legally permissible; (k) require any Consenting Lender, other than as expressly set forth and agreed to in this Agreement or any other Definitive Document (if any), to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities, or other obligations or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Lender, except with respect to costs and expenses that a Company Party has agreed to reimburse on terms satisfactory to such Consenting Lender, except as contemplated in the Definitive Documents; or (l) subject to the application of the automatic stay under section 362 of the Bankruptcy Code, as applicable, prevent any Consenting Lender from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, and priority of its Company Claims/Equity Interests or any lien securing any such Company Claims/Equity Interests; *provided* that nothing herein shall expand, create, remove, or modify any "Obligations" under the Super-Senior Credit Agreement.

**Section 7.** *Commitments of the Company Parties*.

7.01   <u>Affirmative Commitments</u>. Subject to the terms hereof, and except as set forth in <u>Section 8</u>, during the Agreement Effective Period, the Company Parties agree, and shall cause their Debtor Affiliates to, and shall use commercially reasonable efforts to cause their non-Debtor Affiliates (other than DMPL), to:

(a)   support, approve, implement, and cooperate with each of the Parties, and take all steps necessary to facilitate the implementation and consummation of the Restructuring Transactions, including the Sale Transaction, in accordance with this Agreement and the Term Sheets, including voting and exercising any powers or rights available to it (including in any board, shareholders', creditors', or noteholders' meeting or in any process requiring voting, approval or any action to which they are legally entitled to participate), in each case, in favor of any matter requiring voting, approval, or action to the extent reasonably necessary to implement the Restructuring Transactions, including the Sale Transaction;

22

(b)      enter into and effectuate the Definitive Documents, as applicable, within the timeframes contemplated herein and consistent with the Milestones in all material respects;

(c)      comply with the Milestones, subject to a two (2)-Business Day cure period if failure to comply with any Milestone is due to the Bankruptcy Court's availability;

(d)      to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, including the Sale Transaction, contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(e)      use commercially reasonable efforts to promptly obtain any and all regulatory, governmental, and/or third-party approvals necessary or advisable to effectuate, implement and/or consummate the Restructuring Transactions, including the Sale Transaction;

(f)      support and take all commercially reasonable actions necessary or reasonably requested by the Consenting Lenders to facilitate the approval and consummation of the Restructuring Transactions, including the Sale Transaction, and not, nor encourage another person to, object to, delay or impede or take any other action to delay, impede or interfere with, directly or indirectly, the Restructuring Transactions, including the Sale Transaction;

(g)      use commercially reasonable efforts to enter into a transition services agreement with Del Monte Pacific Limited and/or any of its Affiliates and subsidiaries (excluding the Company Parties) or, in the alternative, negotiate a comparable transition or services arrangement with a third party, as soon as reasonably practicable but in any event no later than 60 days of the Petition Date (or such later date as agreed to by the Company Parties and the Required Consenting Lenders);

(h)      negotiate in good faith and execute, deliver, implement and effectuate the Definitive Documents (consistent with this Agreement and the Term Sheets) and any other agreements that are necessary or advisable to effectuate and consummate the Restructuring Transactions, including the Sale Transaction, as contemplated by this Agreement;

(i)      if the Company Parties receive an Alternative Restructuring Proposal, within one (1) Business Day of the receipt thereof, notify the Ad Hoc Group Advisors of the receipt thereof, with such notice to include a copy of such proposal, if it is in writing, or otherwise a summary of the material terms thereof, in each case, in accordance with any applicable confidentiality obligations of the Company Parties; *provided* that any applicable confidentiality obligations shall apply solely as to the inclusion of the material terms in the notice, and not as to the notification obligation itself; *provided, further*, that the Company Parties shall not consent to any additional confidentiality obligations in connection with receiving any proposal or expression of interest with respect to an Alternative Restructuring Proposal;

(j)      except as otherwise contemplated by this Agreement, the Definitive Documents, and the Restructuring Transactions contemplated thereby, use commercially reasonable efforts to operate their business in a matter that is materially consistent with past practices as may be limited by the commencement of the Chapter 11 Cases, including by (i) preserving intact its material business organization, (ii) maintaining in effect all of their material foreign, federal, state, and local

licenses, permits, consents, franchises, approvals, and authorizations required to operate their business, and (iii) taking all actions reasonably within their control to preserve relationships with their material landlords, customers, suppliers, and others having material business relationships with them, in each case to the extent practicable (it being understood that the Company Parties may modify or end any such relationships in the ordinary course of business as necessary), in the case of each of the foregoing subclauses (i) through (iii), taking into account the Restructuring Transactions, including the Sale Transaction, the Chapter 11 Cases, this Agreement and the Term Sheets, and the facts and circumstances affecting the Company Parties on the date of this Agreement;

(k)     maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized, except to the extent that any failure to maintain such Company Party's good standing arises solely from the filing of the Chapter 11 Cases; *provided* that in the event that any of the Company Parties are unable to maintain good standing, the Company Parties shall consult with the Required Consenting Lenders promptly and take commercially reasonable steps to reinstate their good standing;

(l)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions, including the Sale Transaction from their other material stakeholders to the extent reasonably prudent;

(m)     pay in full, in Cash, when due all accrued Restructuring Expenses, including all fees, costs, and out-of-pocket expenses of the Ad Hoc Group Advisors, in accordance with their respective engagement letters or fee letters with the Company Parties and any applicable Definitive Documents, and subject to the terms of this Agreement;

(n)     (i) provide counsel for the Ad Hoc Group with a reasonable opportunity to review draft copies of all Definitive Documents, including but not limited to, all material motions or pleadings , and any drafts or proposed amended version of the First Day Pleadings that the Company Parties intend to file with the Bankruptcy Court, at least two (2) Business Days before the date of filing any such pleading or other document (or such shorter period as is necessary or appropriate under the circumstances), (ii) without limiting any approval or consent rights set forth in this Agreement, consult in good faith with the Ad Hoc Group Advisors regarding the form and substance of any such proposed filing, (iii) not file, execute, distribute, or use (as applicable) any of the Definitive Documents unless each document is consistent with this Agreement and the Term Sheets and in accordance with the consent rights set forth in this Agreement, and (iv) provide draft copies of any motion or pleading that materially affects any Consenting Lender to the counsel of such Consenting Lenders in no event less than two (2) Business Days prior to the date when the Company Parties intend to file such motion or pleading with the Bankruptcy Court; *provided* that in the event that such notice periods are impossible or impracticable under the circumstances, the Company Parties shall provide such draft copies to the applicable counsels as soon as otherwise practicable before the date when the Company Parties intend to file any such motion or other pleading; *provided*, *further*, that the rights set forth in this provision shall be subject Section 3.01 of this Agreement;

(o)     promptly notify counsel to the Ad Hoc Group in writing (email being sufficient) after becoming aware of the commencement of any material governmental or third-party

24

complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened);

(p)     inform counsel to the Ad Hoc Group as soon as reasonably practicable (and in any event within two (2) Business Days of such actual knowledge) after becoming aware of the following (to the extent not previously disclosed to counsel to the Ad Hoc Group prior to the Execution Date): (i) the occurrence, or failure to occur, of any event of which any Company Party has actual knowledge which the occurrence or failure to occur of any such event would be reasonably likely to permit any Party to terminate, or would result in the termination of, this Agreement; (ii) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring Transactions, including the Sale Transaction; (iii) receipt of any written notice from any governmental or regulatory body regarding any approval necessary to consummate the Restructuring Transactions, including the Sale Transaction; (iv) any matter or circumstance which any Company Party has actual knowledge that it is reasonably likely to be a material impediment to the implementation or consummation of the Restructuring Transaction, including the Sale Transaction; (v) any notice of any commencement of any proceeding commenced, or, to the actual knowledge of the Company Parties, threatened against any of the Company Parties, relating to or involving or otherwise affecting in any material respect the Restructuring Transactions, including the Sale Transaction; (iv) a breach of this Agreement by any Party (including a breach by any Company Party) or a breach by any Company Party of such Company Party's obligations, undertakings, representations, warranties, or covenants set forth in the Agreement or any other Definitive Documents; or (vii) any representation made by any Company Party under this Agreement which is proven that the Company Party had actual knowledge to have been incorrect in any material respect when made.

(q)     use commercially reasonable efforts to actively and timely oppose and object to the efforts of any person seeking in any manner to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions, including the Sale Transaction (including, if applicable, the Debtors' timely filing of objections or written responses in these Chapter 11 Cases);

(r)     timely object to any motion filed with the Bankruptcy Court by a third party challenging the validity, enforceability, perfection, or priority of, or seeking avoidance, disallowance, or subordination of, any portion of the DIP Term Loan Claims, the Super-Senior Term Loan Claims, or the liens securing such claims (as applicable);

(s)     to the extent applicable, not file any pleading seeking entry of an order, and object to any motion, application, or proceeding filed with the Bankruptcy Court by any person seeking the entry of an order, (i) directing the appointment of an examiner (with expanded powers) or a trustee, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, (iv) seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of the Plan; (v) terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset, without the consent of the Required Consenting Lenders; or (vi) for relief that (A) is inconsistent with this Agreement and the Term Sheets in any material respect

25

or (B) would frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions, including the Sale Transaction;

(t)      cause any and all of its subsidiaries to comply with the terms of this Agreement and the other Definitive Documents as if they were a party hereto and had the obligations of the Company Parties hereunder and, at the request of Required Consenting Lenders, shall use commercially reasonable efforts to cause such subsidiaries to sign reasonable documentation (including pursuant to a Joinder) as may be required to effect the foregoing;

(u)      upon reasonable advance notice and to the extent such requests are related to the Restructuring Transactions, including the Sale Transaction, provide to the Consenting Lenders and the Ad Hoc Group Advisors: (i) reasonable access during normal business hours to the non-privileged, non-confidential books and records, and to the facilities of the Company Parties (in each case, without any material disruption to the conduct of the Company Parties' businesses and operations); (ii) without any material disruption to the conduct of the Company Parties' businesses and operations, reasonable access to the management of and advisors to the Company Parties for purposes of evaluating the Company Parties' finances and operations in connection with, participating in the planning process in respect of, the Restructuring Transactions, including the Sale Transaction, including without limitation, bi-weekly calls with advisors to the Companies; (iii) reasonably timely updates regarding the status of obtaining any necessary or desirable authorizations (including any consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body, if any; and (iv) any other information reasonably related to the Restructuring Transaction, including the Sale Transaction, reasonably requested by the Ad Hoc Group Advisors (e-mail shall suffice);

(v)      to the extent they become aware that any legal or structural impediments arise that would prevent, hinder, or delay the consummation of the Restructuring Transactions, including the Sale Transaction, (i) take all commercially reasonable steps necessary to eliminate any such impediment, including notifying the Ad Hoc Group Advisors of any material governmental or third-party complaints, litigations, investigations, or hearings related to the Restructuring Transactions, including the Sale Transaction, and (ii) negotiate, subject to applicable Laws and regulations, in good faith appropriate additional or alternative provisions to eliminate any such impediments; provided that (A) the material terms of the Restructuring Transactions, including the Sale Transaction, the intent of the Parties, and the economic rights of the Super-Senior Lenders as contemplated herein and in the Term Sheets shall, to the extent practicable, be substantially preserved and (B) the additional or alternative provisions cannot have a material and adverse impact on the consideration or economic rights and treatment of the Consenting Lenders in the Restructuring Transactions, including the Sale Transaction; and

(w)      use commercially reasonable efforts to avoid and/or cure any breach or default under any material contractual obligations (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of these Chapter 11 Cases or any Company Parties undertaking to implement the Restructuring Transactions, including the Sale Transaction, through these Chapter 11 Cases).

7.02   <u>Negative Commitments</u>. Subject to the terms hereof, and except as (x) set forth in <u>Section 8</u>, or (y) expressly contemplated by this Agreement, during the Agreement Effective

26

Period, the Company Parties (except with the prior written consent of the Required Consenting Lenders) shall not, directly or indirectly:

(a)       object to, delay, impede, or take any other action to interfere or that would be inconsistent with, the acceptance, implementation, or consummation of the Restructuring Transactions, including the Sale Transaction, other than as permitted herein;

(b)       take any action or encourage any other person or Entity to take any action that is inconsistent in any material respect with, or take any action that is intended to frustrate or impede approval, implementation, and consummation of, the Restructuring Transactions, including the Sale Transaction, described in this Agreement, the Term Sheets, the Definitive Documents, or the Sale Documents;

(c)       subject to Section 8, solicit, participate in, negotiate, propose, support, vote for, initiate, or encourage any Alternative Restructuring Proposal that the Company Parties or their subsidiaries intend to, or take any action to, consummate or enter into a binding agreement to consummate, prior to the consummation of the Restructuring Transactions, including the Sale Transaction;

(d)       take any action that is inconsistent in any material respect with or would have a material adverse impact upon, or that is intended to or reasonably likely to frustrate, impede, or delay approval, implementation, or consummation of, the Restructuring Transactions, including the Sale Transaction described in this Agreement, the Term Sheets, the Definitive Documents, or the Sale Documents;

(e)       without the prior written consent of the Required Consenting Lenders, enter into any proposed settlement of any Claim if, in the reasonable judgment of the Company Parties, such settlement would materially impair the Company Parties' ability to consummate the Restructuring Transactions, including the Sale Transaction;

(f)       except as otherwise permitted or contemplated by this Agreement, execute, deliver, and/or file with the Bankruptcy Court any agreement, instrument, motion, pleading, order, form, or other document that relating to the implementation or consummation of the Sale Transaction, and/or the Restructuring Transactions, including the Sale Transaction, that, in whole or in part, is inconsistent with this Agreement and the Term Sheets (including the consent rights set forth in this Agreement);

(g)       seek to modify the Definitive Documents, in whole or in part, in a manner that is inconsistent with this Agreement and the Term Sheets;

(h)       file any material motion, objection, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that is inconsistent with this Agreement and the Term Sheets (nor directly or indirectly direct any other person or Entity to make such a filing) or is otherwise not in form and substance reasonably acceptable to the Required Consenting Lenders;

(i)      sell, or file any motion or application seeking to sell any material assets having an aggregate fair market value of not less than $1,000,000 without the prior written consent of the Required Consenting Lenders;

(j)      amend any of their existing corporate governance or organizational documents in a manner than would be inconsistent with this Agreement or the Restructuring Transactions without the prior written consent of the Required Consenting Lenders;

(k)      without the prior written consent of the Required Consenting Lenders, (i) enter into or amend, establish, adopt, supplement, or otherwise materially modify or accelerate (x) any deferred compensation, incentive, success, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans, or agreements, including, without limitation, offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any employee, or (y) any contracts, arrangements, or commitments that entitle any current or former director, officer, employee, manager, or agent to indemnification from the Company Parties, or (ii) materially modify or terminate any existing compensation or benefit plans or arrangements (including employment agreements); *provided*, that the Company Parties may take any of the actions set forth in this section in the ordinary course of business, consistent with past practice, and consistent with the terms of any contracts, arrangements, and/or commitments in effect on the Agreement Effective Date, including with respect to insider and non-insider employees, or otherwise necessary to comply with their fiduciary duties under applicable Law;

(l)      grant, agree to grant, or make any payment on account of a key employee retention plan or key employee incentive plan or other similar arrangement any additional or any increase in the wages, salary, bonus, commissions, retirement benefits, pension, severance, or other compensation or benefits of any management or executive-level employee or director qualifying as an insider under the Bankruptcy Code without the prior written consent of the Required Consenting Lenders;

(m)      other than in the ordinary course of business and consistent with past practice, (i) enter into any material agreement, (ii) amend, supplement, modify, or terminate any material agreement, (iii) allow any material permit, license, or regulatory approval to be terminated, revoked, suspended, or modified, in each case without the prior written consent of the Required Consenting Lenders, or (iv) enter into, terminate, or modify any material operational contracts, leases, or other agreements that would, individually or in the aggregate, reasonably be expected to have a material and adverse effect on the Company Parties, taken as a whole, without the consent of the Required Consenting Lenders (not to be unreasonably withheld); other than in connection with the Restructuring Transactions, including the Sale Transaction, and as consistent with this Agreement and the Term Sheets;

(n)      without the prior written consent of the Required Consenting Lenders (i) authorize, create, issue, sell, or grant any additional Equity Interests; or (ii) reclassify, recapitalize, redeem, purchase, acquire, declare any distribution on, or make any distribution on any Equity Interests;

(o)      other than as contemplated in the Plan, the Sale Documents, or the First Day Pleadings, incur any indebtedness, guarantee any indebtedness of another entity, and/or guarantee

any liabilities, in each case in excess of $1,000,000 million, relating to the Company Parties' material contracts and facilities (including, for the avoidance of doubt, with respect to any of the Company Parties' non-Debtor subsidiaries) without the prior written consent of the Required Consenting Lenders (not to be unreasonably withheld); *provided* that, for the avoidance of doubt, any indebtedness incurred pursuant to the DIP Term Loan Facility and the DIP ABL Facility shall not be subject to this Section 7.02(o);

(p)     except as otherwise contemplated by this Agreement, the First Day Pleadings, or the Restructuring Transactions, enter into any contract with respect to debtor-in-possession financing, Cash collateral usage, exit financing, and/or other financing arrangements, in each case, without the prior written consent of the Required Consenting Lenders;

(q)     except as otherwise contemplated by this Agreement, the First Day Pleadings, or the Restructuring Transactions, pledge, encumber, assign, sell, or otherwise transfer, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any Equity Interests in the Company Parties, whether held directly or indirectly, to the extent such pledge, encumbrance, assignment, sale, or other transfer will impair any of the Company Parties' tax attributes and is reasonably expected to result in material adverse tax consequences to the Company Parties;

(r)     file any Plan that (i) has not been approved by the Consenting Lenders in accordance with Section 3 hereof, or (ii) does not provide for treatment of the DIP Obligations (as defined in the DIP Orders) and the Super-Senior First Out Loans in a manner acceptable to the Consenting Lenders;

(s)     (i) take any action (except to the extent expressly contemplated by this Agreement) if such action would result in a change in the tax status of any Company Party or (ii) make any election outside the ordinary course of business, or settle any tax audit or contest, in each case, if such election or action pursuant to clause (i) or (ii) is reasonably expected to result, individually or in the aggregate, in material adverse tax consequences to any of the Company Parties; or

(t)     encourage or facilitate any Entity to do any of the foregoing.

**Section 8.     *Additional Provisions Regarding Company Parties' Commitments*.**

8.01     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require any Company Party or the board of directors, board of managers, or similar governing body of any Company Party, including any director, manager, or officer of any Company Party, after consulting with counsel (including external counsel), to take any action or to refrain from taking any action with respect to the Restructuring Transactions, including the Sale Transaction (including, without limitation, terminating this Agreement pursuant to Section 12.03 hereof) to the extent that taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement; provided that such determination shall not impede any Party's rights to terminate this Agreement pursuant to Section 12. The Company Parties shall notify (with email being sufficient) the Ad Hoc Group Advisors of

29

any determination to take any action or to refrain from taking any action pursuant to this <u>Section 8.01</u> within twenty-four (24) hours following such determination.

8.02    Notwithstanding anything to the contrary in this Agreement (but subject to <u>Section 8.01</u>), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) receive, consider, discuss, respond to, and maintain and continue discussions or negotiations with respect to any unsolicited Alternative Restructuring Proposal to the extent that the board of directors, board of managers, or similar governing body of any Company Party, after consulting with outside counsel (including outside counsel to the Company Parties), determines that failure to take such action would be inconsistent with its fiduciary obligations under applicable Law, and (b) provide access to non-public information concerning any Company Party to any Entity, subject to compliance with applicable securities law, or enter into Confidentiality Agreements or nondisclosure agreements with any Entity with respect to an unsolicited Alternative Restructuring Proposal. If any Company Party receives a written or oral proposal or expression of interest regarding any Alternative Restructuring Proposal that the requisite majority of the Company Parties' applicable board of directors, board of managers, or similar governing body determines in good faith and following consultation with outside counsel (including outside counsel to the Company Parties) is a *bona fide* committed proposal that is higher or otherwise better for the Company Parties than the Restructuring Transactions, including the Sale Transaction, taken as a whole, within twenty-four (24) hours of such determination, the Company Parties shall notify (with e-mail being sufficient) the Ad Hoc Group Advisors of any such proposal with such notice to include a copy of such proposal if it is in writing, or otherwise a summary of the material terms thereof. Notwithstanding the foregoing, the Company Party shall provide the Ad Hoc Group Advisors with prompt updates on the status of any discussions regarding an Alternative Restructuring Proposal and provide a summary of any written offer or proposal for any Alternative Restructuring Proposal within one (1) Business Day of the Company's receipt of such offer or proposal.

8.03    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions, including the Sale Transaction; (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement and the Term Sheets; or (c) require any Company Party to take any action which is prohibited by applicable Law or to waive or forgo the benefit of any legal or professional privilege.

8.04    Nothing in this Agreement shall compel any entities located outside of the United States or their directors or officers to take any action which is prohibited by applicable Law.

**Section 9.    *Transfer of Interests and Securities.***

9.01    During the Agreement Effective Period, no Consenting Lender shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Exchange Act) in any Company Claims/Equity Interests to any other Person (whether affiliated or unaffiliated) that is not a Consenting Lender, unless (such transferee described in subparagraphs (a) and (b) hereof, a "**<u>Permitted Transferee</u>**"):

(a)      in the case of any Company Claims/Equity Interests, the authorized transferee is either (i) a "qualified institutional buyer" as defined in Rule 144A of the Securities Act, (ii) a non-U.S. person (as defined in Rule 902(k) of Regulation S under the Securities Act) and is acquiring such Company Claims/Equity Interests in an offshore transaction in accordance with Regulation S under the Securities Act and not participating on behalf of, or on account of, a "U.S. person," (iii) an institutional "accredited investor" within the meaning of the Rules, or (iv) a Consenting Lender; and

(b)      either (i) the transferee executes and delivers to counsel to the Company Parties, no later than one (1) Business Day after the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Lender and such transferee provides notice of such Transfer (including the amount and type of Company Claims/Equity Interests transferred) to counsel to the Company Parties no later than one (1) Business Day after the proposed Transfer.

(c)      Such Transfer shall not violate the terms of any order entered by the Bankruptcy Court with respect to the preservation of tax attributes.

9.02      Upon compliance with the requirements of Section 9.01, (a) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Equity Interests and (b) the transferee shall be deemed to be a Consenting Lender under this Agreement with respect to such transferred Company Claims/Equity Interests.  Any Transfer in violation of Section 9 shall be void *ab initio* and of no force or effect.

9.03      This Agreement shall in no way be construed to preclude the Consenting Lenders from acquiring additional Company Claims/Equity Interests; *provided*, *however*, that (a) such additional Company Claims/Equity Interests shall automatically and immediately upon acquisition by a Consenting Lender be deemed to be subject to the terms of this Agreement, including the covenants set forth in Section 5 and Section 6, as applicable (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or the Consenting Lenders), and (b) such Consenting Lender must provide notice of such acquisition (including the amount and type of Company Claim/Equity Interest acquired) to counsel to the Company Parties prior to such acquisition or within five (5) Business Days of any acquisition (calculated based on the settled trade date); *provided*, *further*, *however*, that the Consenting Lenders acknowledge that the United States securities laws impose restrictions on trading in securities when in possessions of material non-public information.

9.04      This Section 9 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling any Consenting Lender to Transfer any of its Company Claims/Equity Interests (or permit any such Consenting Lender to do so). Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05    Notwithstanding Section 9.01, a Qualified Marketmaker that acquires any Company Claims/Equity Interests that are subject to this Agreement with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Equity Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Equity Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Equity Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is a Permitted Transferee under Section 9.01; and (ii) the Transfer otherwise is a permitted Transfer under Section 9.01. To the extent that a Consenting Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Equity Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Equity Interests who is not a Consenting Lender without the requirement that the transferee be a Permitted Transferee. Notwithstanding the foregoing, if, at the time of the proposed Transfer of such Company Claims/Equity Interests to the Qualified Marketmaker, (i) such Company Claims/Equity Interests may be voted on (A) the Plan or (B) any Alternative Restructuring Proposal, then the proposed transferor Consenting Lender must first vote such Company Claims/Equity Interests in accordance with the requirements of Section 5 or (ii) such Company Claims/Equity Interests have not yet been, and may not yet be, voted on the Plan or any Alternative Restructuring Proposal and such Qualified Marketmaker does not Transfer such Company Claims/Equity Interests to a subsequent transferee prior to the fifth (5th) Business Day prior to the expiration of the applicable voting deadline (such date, the "**Qualified Marketmaker Joinder Date**"), then such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first (1st) Business Day immediately following the Qualified Marketmaker Joinder Date, become a Consenting Lender with respect to such Company Claims/Equity Interests in accordance with the terms hereof; *provided* that, with respect to clause (ii) of the foregoing, the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Lender with respect to such Company Claims/Equity Interests at such time that the transferee of such Company Claims/Equity Interests becomes a Consenting Lender with respect to such Company Claims/Equity Interests.

9.06    Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon a valid Transfer of such claims and interests in a manner consistent with this Agreement and the Term Sheets.

9.07    Any Transfer in violation of this Section 9 shall be void *ab initio*.

9.08    Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any claims and interests (i) in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests or (ii) related to any collateralized loan obligation and its fund structuring or the issuance of any notes or any similar instruments related thereto.

**Section 10.** *Representations and Warranties.*

(a)     Each Consenting Lender, severally, and not jointly, represents and warrants that, as of the date such Consenting Lender executes and delivers this Agreement (subject to any Transfers made pursuant to Section 9) and as of the date the Restructuring Transactions are consummated:

(i)     it is the beneficial or record owner of the face amount of its respective Company Claims/Equity Interests, or is the nominee, investment manager, or advisor for beneficial owners of such Company Claims/Equity Interests reflected on, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Equity Interests other than those reflected on, such Consenting Lender's signature page (including a Joinder hereto) to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 9) or as are held in its capacity as Qualified Marketmaker;

(ii)     it has (or will have, at the relevant time) the full power and authority to act on behalf of, vote, tender, and consent to matters concerning such Company Claims/Equity Interests;

(iii)     such Company Claims/Equity Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, Transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(iv)     it has (or will have, at the relevant time) the full power to vote, consent, approve changes to, and transfer all of its Company Claims/Equity Interests as contemplated by this Agreement subject to applicable Law;

(v)     it has made no prior assignment, sale, participation, grant, conveyance, or other Transfer of, and has not entered into any agreement to assign, sell, participate, grant, convey, or otherwise Transfer, in whole or in part, any portion of its rights, titles, or interests in any Company Claims/Equity Interests that is inconsistent in any material respect with the representations and warranties of such Consenting Lender herein or would render such Consenting Lender otherwise unable to comply with this Agreement and perform its obligations hereunder;

(vi)     solely with respect to Holders of Company Claims/Equity Interests, such Holder is (A) (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) not a U.S. person (as defined in Regulation S of the Securities Act), or (ii) an institutional accredited investor (as defined in the Rules) and (B) any securities acquired by the Consenting Lender in connection with the Restructuring Transactions, including the Sale Transaction, will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

(vii)     it does not directly or indirectly own any Company Claims/Equity Interests other than as identified below its name on its signature page hereof or as otherwise reported in accordance with Section 5.01(a)(xvi) of this Agreement; *provided*, that it shall not be deemed a breach of this Section 10(a)(vii) if a Consenting Lender is an affiliate of, or under common investment manager with, an individual fund or account that cannot execute this Agreement or

participate in the Restructuring Transactions, including the Sale Transaction, for structural reasons; and/or

       (viii)   it has made its own analysis and decision to enter into this Agreement.

    (b)    Each Company Party, severally and not jointly, represents and warrants that, as of the date such Company Party executes and delivers this Agreement and as of the date the Restructuring Transactions are consummated:

       (i)    it has (or will have, at the relevant time) all requisite corporate or other power and authority to, and has obtained all consents necessary to, enter into, execute, and deliver the Definitive Documents and to effectuate the Restructuring Transactions, including the Sale Transaction, contemplated by, and perform its respective obligations under, the Definitive Documents; and/or

       (ii)    the board of directors of Holdings is (and will remain) the governing body of Holdings, and Holdings has the power, directly or indirectly, to direct or cause the direction of the management and policies of the Company Parties and their subsidiaries, subject to any limitations imposed by applicable Law.

**Section 11.**    *__Mutual Representations, Warranties, and Covenants__*. Each of the Parties, severally and not jointly, represents, warrants, and covenants to each other Party that, as of the date such Party executes and delivers this Agreement, a Transfer Agreement, or a Joinder, as applicable, and as of the date the Restructuring Transactions are consummated, the following statements are true:

    (a)    it is validly existing and in good standing under the Laws of the state of its organization, and has all requisite corporate, partnership, limited liability company, or other organizational power and authority to enter into this Agreement and to carry out the Restructuring Transactions, including the Sale Transaction, contemplated herein, and to perform its respective obligations under this Agreement and the Definitive Documents;

    (b)    this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of a court of competent jurisdiction;

    (c)    except as expressly provided in this Agreement (including the Term Sheets), the entry into and performance by such Party of, and the transactions contemplated by, this Agreement do not, and will not, (i) violate any provision of Law, rule, or regulation applicable to it or any of its subsidiaries or conflict in any material respect with any Law or regulation applicable to it or its articles of association, memorandum of association, or other constitutional documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under its organizational documents or any material contractual obligations to which it or any of its subsidiaries is a party;

    (d)    except as expressly provided in this Agreement, the Sale Documents, and the Bankruptcy Code, no consent or approval is required by any other person or Entity in order for it

34

to effectuate the Restructuring Transactions, including the Sale Transaction, contemplated by, and perform its respective obligations under, this Agreement;

(e)    the issuance by any Governmental Body, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment, decision, determination, or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions, including the Sale Transaction ,or renders the Restructuring Transactions, including the Sale Transaction, illegal or impossible and (ii) remains in effect for (20) Business Days after the Required Consenting Lenders transmit a written notice in accordance with Section 15.10 detailing any such issuance; provided, that this termination right shall not apply to or be exercised by the Required Consenting Lenders or any individual Consenting Lender if such Party sought. requested, or otherwise supported the issuance of, such ruling, judgment, decision, determination, or order in contravention of any obligation or restriction set out in this Agreement or the Definitive Documents;

(f)    except as expressly provided in this Agreement, such Party has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions, including Sale Transaction, contemplated by, and perform its respective obligations under, this Agreement (including the Term Sheets) and the Definitive Documents;

(g)    as of the Agreement Effective Date (or such later date that it delivers its signature page hereto to the other Parties), such Party has no actual knowledge of any event that, due to any fiduciary or similar duty to any other Person or entity, would prevent it from taking any action required of it under this Agreement; and

(h)    except as expressly provided by this Agreement, it is not party to, any restructuring support or similar agreements or arrangements regarding the equity or indebtedness of any of the Company Parties that have not been disclosed to all Parties to this Agreement.

**Section 12.    *Termination Events*.**

12.01    Consenting Lender Termination Events. This Agreement may be terminated solely with respect to the Consenting Lenders, by the Required Consenting Lenders by the delivery to the Company Parties and the other Parties (including the other Consenting Lenders) of a written notice in accordance with Section 15.10, stating in reasonable detail the basis for exercising such termination right, upon the occurrence of the following events:

(a)    the breach in any material respect by a Company Party of any of the respective undertakings, representations, warranties, covenants, or obligations of the Company Parties set forth in this Agreement or any Definitive Document that remains uncured for five (5) Business Days after such terminating Consenting Lenders transmit a written notice in accordance with Section 15.10 detailing any such breach;

(b)    any Milestone (as may be extended with the approval of the Required Consenting Lenders) is not achieved except where such Milestone has been waived by the Required Consenting Lenders (e-mail shall suffice); *provided* that the right to terminate this Agreement under this clause shall not be available if the failure to achieve such Milestone is caused by, or

resulted from, the Consenting Lenders' failure to comply with this Agreement; *provided, further* that any failure to achieve a Milestone shall be deemed cured upon the achievement of such Milestone and shall not be a basis to terminate this Agreement;

(c)     the issuance by any Governmental Body, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment, decision, determination, or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions, including the Sale Transaction, or renders the Restructuring Transactions, including the Sale Transaction, illegal or impossible and (ii) remains in effect for thirty (30) Business Days after the Required Consenting Lenders transmit a written notice in accordance with Section 15.10 detailing any such issuance; *provided*, that this termination right shall not apply to or be exercised by the Required Consenting Lenders if such terminating Party sought, requested, or otherwise supported the issuance of, such ruling, judgment, decision, determination, or order in contravention of any obligation or restriction set out in this Agreement;

(d)     any Company Party (i) consummates, or enters into a binding agreement to consummate, an Alternative Restructuring Proposal, (ii) exercises any of its rights, or provides notice under, Section 8.01, (iii) publicly announces, or announces to any Consenting Super-Senior Lender, other holder of Company Claims/Equity Interests, or the Ad Hoc Group Advisors, its intention to pursue an Alternative Restructuring Proposal or not to pursue or support the Restructuring Transactions, including the Sale Transaction, or (iv) terminates this Agreement in accordance with its terms;

(e)     any Definitive Document does not comply with Section 3.01 of this Agreement that remains uncured following three (3) Business Days of receipt of written notice by the Company Parties and other applicable Parties;

(f)     the Company fails to timely pay the documented and invoiced fees, costs, and expenses of the Ad Hoc Group Advisors in accordance with Section 7.01(m) and Section 15.23 of this Agreement and such invoiced fees, costs, and expenses have not been paid within two (2) Business Days of occurrence of a Termination Event under this Section 15.01(f) in accordance with Section 15.10; *provided* that such failure to pay may be cured at any time prior to delivery of a written notice terminating this Agreement in accordance with Section 15.10 of this Agreement

(g)     an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or consummate the Restructuring Transactions, including the Sale Transaction;

(h)     any Company Party files any motion, pleading, or Definitive Document with the Bankruptcy Court that is not consistent in all material respects with this Agreement and the Term Sheets and such document has not been withdrawn within five (5) Business Days of receipt by the Company Parties of written notice from the Required Consenting Lenders that such document is inconsistent with this Agreement and the Term Sheets;

(i)      either (i) entry of a DIP Order that is not reasonably acceptable to the Required Consenting Lenders, or (ii) without the prior written consent of the Required Consenting Lenders, the entry of an order by the Bankruptcy Court or the filing of a motion or application by any Company Party seeking an order vacating or modifying the DIP Orders;

(j)      either (i) filing of a Bidding Procedures Motion or entry of a Bidding Procedures Order or Sale Order that is not acceptable to the Required Consenting Lenders, or (ii) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Lenders), vacating or modifying the Bidding Procedures Order or Sale Order;

(k)      any Company Party files (or supports another party in filing) any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Super-Senior Term Loan Claims or asserts any other Cause of Action against any Consenting Lender, or with respect or relating to such Super-Senior Term Loan Claims, the Super-Senior Credit Agreement, or the prepetition liens securing the Super-Senior Term Loan Claims or challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of such Super-Senior Term Loan Claims;

(l)      any Company Party files (or supports another party in filing) any motion, application or other pleading with, or commences an adversary proceeding in, the Bankruptcy Court seeking relief that is inconsistent in any material respect with this Agreement;

(m)      the termination of any Company Party's consensual use of Cash collateral under the DIP Orders by order of the Bankruptcy Court, unless such Company Party's use of Cash collateral has been restored through a modified DIP Order acceptable to the Required Consenting Lenders;

(n)      any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code, *provided* that termination of such exclusivity periods is not the result of any action by a Consenting Lender;

(o)      the occurrence of any default or "Event of Default" under the DIP Term Loan Facility or DIP Term Loan Documents that has not been (i) cured by the Company Parties within the applicable cure period or (ii) waived by the applicable percentage of lenders in accordance with the terms of the DIP Term Loan Documents (if susceptible to cure or waiver, as applicable);

(p)      the Bankruptcy Court enters an order (i) denying the Sale Transaction or Confirmation of the Plan or (ii) disallowing any material provision of the Sale Transaction or the Plan, as applicable, and such order has not been stayed, reversed or otherwise remains in effect for fourteen (14) days after entry thereof (in each case, unless waived by the Required Consenting Lenders);

(q)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (either without the prior written consent of the Required Consenting Lenders or that is not withdrawn within two (2) days of such entry or filing thereof, as applicable), (i) converting one or more of these Chapter 11 Cases of a Company

Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of these Chapter 11 Cases of a Company Party, or (iii) dismissing one or more of the Chapter 11 Cases;

(r)     any representation or warranty in this Agreement made by any Company Party shall have been untrue in any material respect when made, and such breach remains uncured (to the extent curable) for a period of five (5) Business Days after the receipt of written notice from the Required Consenting Lenders to the Company Parties detailing such breach pursuant to this Section 12.01 and in accordance with Section 15.10 (as applicable); or

(s)     the Company Parties terminate this Agreement pursuant to Section 12.03.

12.02   [Reserved].

12.03   Company Party Termination Events. Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 15.10 upon the occurrence of any of the following events; *provided* that the occurrence of any of the following events is not as a result of any action or inaction on the part of any Company Party:

(a)     the breach in any material respect by one or more of the Consenting Lenders of any of the respective undertakings, representations, warranties, covenants, or obligations of such Consenting Lender set forth in this Agreement or any Definitive Document that remains uncured for a period of five (5) Business Days after the Company Parties transmit a written notice in accordance with Section 15.10 detailing any such breach; *provided*, *however*, that such termination shall only be effective as against the breaching Consenting Lender; *provided*, *further*, that the Company Parties may terminate this Agreement as to all Consenting Lenders if, as a result of the breach of one or more Consenting Lender, the non-breaching Consenting Lenders hold less than 66.67% of the aggregate principal amount of the Super-Senior First Out Loans then outstanding;

(b)     any representation or warranty in this Agreement made by any Consenting Lender shall have been untrue in any material respect when made, and such breach remains uncured (to the extent curable) for a period of five (5) Business Days after the receipt of written notice from the Company Parties to the Required Consenting Lenders detailing such breach pursuant to this Section 12.03 and in accordance with Section 15.10 (as applicable) and, as a result, as of the date that is ten (10) Business Days after the Consenting Lenders' receipt of the aforementioned written notice from the Company Parties, the non-breaching Consenting Lenders hold 66.67% or less of the aggregate principal amount of the Super-Senior First Out Loans then outstanding; *provided* that the Company Parties may, at their option, terminate this Agreement solely as to any Consenting Lender that breaches, in any material respect, any of the representations or warranties set forth herein (to the extent breach remains uncured for a period of five (5) Business Days after the receipt of written notice of such breach pursuant to Section 15.10), whether or not such breach would entitle the Company Parties to terminate this Agreement with respect to all Consenting Lenders;

(c)     the issuance by any Governmental Body, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment, decision,

determination, or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions, including the Sale Transaction or renders the Restructuring Transactions, including the Sale Transaction, illegal or impossible and (ii) remains in effect for ten (10) Business Days after any Company Party transmits a written notice in accordance with Section 15.10 detailing any such issuance; *provided*, that this termination right shall not apply to or be exercised by any of the Company Parties if it sought or requested such ruling, judgment, decision, determination, or order in contravention of any obligation or restriction set out in this Agreement;

(d)     the board of directors, board of managers, or similar governing body of any Company Party determines, after consulting with counsel, in accordance with Section 8, (i) that proceeding with any aspect of the Restructuring Transactions, including the Sale Transaction (including taking any action or refraining from taking any action) would be inconsistent with the exercise of its fiduciary duties or applicable Law, or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal in accordance with Section 8.02;

(e)     if any Releases in the Sale Order, any Chapter 11 plan, or the Confirmation Order, as applicable, are not materially consistent with the Restructuring Term Sheet, except as expressly preserved in the definitive documentation implementing the Sale Transaction in a manner to be agreed by the Company Parties and Required Consenting Lenders in their respective sole discretions;

(f)     any Consenting Lender files, or directly or indirectly supports another party in filing, any motion, application or other pleading with, or commences an adversary proceeding in, the Bankruptcy Court seeking relief that is inconsistent in any material respect with this Agreement;

(g)     the entry of an order by the Bankruptcy Court or the filing of a motion or application by any Consenting Lender, (i) converting one or more of the Chapter 11 Cases of the Company Parties to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iv) dismissing one or more of the Chapter 11 Cases of any Company Party;

(h)     if any Consenting Lender publicly announces their intention not to support the Restructuring Transaction or in which case the Company Parties may terminate only with respect to Consenting Lender and this Agreement shall otherwise remain in full force and effect with respect to each non-terminating or non-breaching Consenting Lender; *provided*, *however*, that the Company Parties may terminate this Agreement as to all Consenting Lenders if, as a result of such valid termination by any Consenting Lender, the non-breaching Consenting Lenders hold less than 66.67% of the aggregate principal amount of the Super-Senior First Out Loans then outstanding;

(i)     the Consenting Lenders entitled to vote on the Plan have failed to timely vote their Claims in favor of the Plan, or at any time change their votes to constitute rejections to the Plan, in either case in a manner inconsistent with this Agreement; *provided that* this termination event will not apply if sufficient Consenting Lenders have timely voted (and not withdrawn) their Claims to accept the Plan in amounts necessary for each applicable impaired class under the Plan to "accept" the Plan consistent with section 1126 of the Bankruptcy Code;

(j)      subject to reaching agreement on Bidding Procedures mutually acceptable to the Required Consenting Lenders and the Company Parties in each of their sole discretion, the Consenting Lenders fail to submit a credit bid in the Sale Transaction following agreement on Bidding Procedures in accordance with this Agreement and pursuant to such Bidding Procedures; or

(k)      the Required Consenting Lenders terminate this Agreement pursuant to <u>Section 12.01</u>.

12.04   <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting Lenders; and (b) each Company Party.

12.05   <u>Automatic Termination</u>. This Agreement shall terminate automatically as to all Parties without any further required action or notice immediately after the Plan Effective Date.

12.06   <u>Effect of Termination</u>. Except as set forth in <u>Section 15.20</u>, upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action and no such rights or remedies shall be deemed waived pursuant to a claim of laches or estoppel by virtue of such Party's compliance with the terms of this Agreement during the Agreement Effective Period, provided that no termination shall relieve a Party from liability for its breach or non-performance of its obligations hereunder before such termination or any obligations under this Agreement which by their terms expressly survive termination. Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by the Bankruptcy Court, any and all consents, directions, or ballots provided to or tendered by the Parties subject to such termination with respect to the Restructuring Transaction, , including the Sale Transaction, in each case before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions, , including the Sale Transaction, and this Agreement or otherwise; *provided, however*, that any Consenting Lender withdrawing or changing its vote pursuant to this <u>Section 12.06</u> shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its Claims against any Consenting Lender, and (b) any right of any Consenting Lender, or the ability of any Consenting Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its Claims against any Company Party or any other Consenting Lender. Nothing in this Agreement shall be construed as prohibiting any Company Party or Consenting Lender from contesting whether any such termination is in accordance with the terms of this Agreement or to seek enforcement of any rights under this Agreement that arose or existed

before the Termination Date, which rights are fully preserved and reserved. No purported termination of this Agreement shall be effective under this <u>Section 12.06</u> or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to <u>Section 12.03(d)</u> or <u>Section 12.03(i)</u>. Nothing in this <u>Section 12.06</u> shall restrict any Company Party's right to terminate this Agreement in accordance with <u>Section 12.03(d)</u>.

**Section 13.**     *Amendments and Waivers.*

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this <u>Section 13</u>.

(b)     This Agreement, including the Term Sheets, may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in writing signed by each Company Party and the Required Consenting Lenders.

(c)     Any proposed modification, amendment, waiver, or supplement that does not comply with this <u>Section 13</u> shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.**     *Tax Treatment.*

14.01   <u>Backstop Premium</u>. The Parties agree that any Backstop Premium paid to the Super-Senior Lenders shall be treated (and reported) by the Borrower and Agent as put option premium or discount for U.S. federal, state and local income tax purposes, unless otherwise required pursuant to a final determination under Section 1313(a) of the Internal Revenue Code.

14.02   <u>Commitment Premium</u>. The Parties agree that any Commitment Premium paid to the Super-Senior Lenders shall be treated (and reported) by the Borrower and Agent as put option premium or discount for U.S. federal, state, and local income tax purposes, unless otherwise required pursuant to a final determination under Section 1313(a) of the Internal Revenue Code.

**Section 15.**     *Miscellaneous.*

15.01   <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities, or solicitation of votes for the acceptances of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

15.02   Exhibits Incorporated by Reference; Conflicts. Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules, including the Term Sheets. Subject to Section 3.01, in the event of any inconsistency between this Agreement (without reference to the Term Sheets or the other exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, the exhibits, annexes, and schedules thereto (including the Term Sheets) shall govern; *provided*, *however*, that, in the event of any inconsistency between the Term Sheets and any of the Definitive Documents, the applicable Definitive Document shall govern; *provided, further*, that in the case of any conflict or inconsistency between the Sale Order and the Plan or any other Definitive Document, the Sale Order shall control.

15.03   Further Assurances.   Subject to the other terms of this Agreement, each Party hereby covenants and agrees to cooperate with each other in good faith with respect to the pursuit, approval, implementation, and consummation of the Restructuring Transactions, including the Sale Transaction, as well as the negotiation, drafting, execution, and delivery of documents (including any related orders, agreements, instruments, schedules, or exhibits) described in this Agreement or the Definitive Documents or otherwise necessary or appropriate or as may be required by order of the Bankruptcy Court to effectuate the Restructuring Transactions, including the Sale Transaction, in accordance with this Agreement, the Term Sheets and the Definitive Documents; *provided* that this Section 15.03 shall not limit the right of any Party to exercise any right or remedy provided for in this Agreement (including the approval rights set forth in Section 3). Furthermore, subject to the terms hereof, each Party shall take such action as may be reasonably appropriate or necessary to effectuate the Restructuring Transactions, including the Sale Transaction, and shall refrain from taking any action that would frustrate the Restructuring Transactions, including the Sale Transaction.

15.04   Complete Agreement. Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

15.05   GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT AND ANY CLAIMS, DISPUTES, CONTROVERSIES OR CAUSES OF ACTION (WHETHER IN CONTRACT, TORT, OR OTHERWISE AND IN LAW OR IN EQUITY) BASED UPON, ARISING OUT OF, OR RELATING TO THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD REQUIRE THE APPLICATION OF LAWS OF ANY OTHER JURISDICTION. Each Party to this Agreement agrees that it shall bring any action, suit, or proceeding in respect of any claim (whether in contract, tort, or otherwise and in law or in equity) arising under or out of or in connection with this Agreement in the U.S. District Court for the Southern District of New York in New York City, New York or the state courts located therein, and solely in connection with claims arising under or out of or in connection with this Agreement: (a) irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit, or proceeding; (b) waives any

objection to laying venue in any such action, suit, or proceeding in such court; and (c) waives any objection that such court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement.   Notwithstanding the foregoing, following commencement of the Chapter 11 Cases, each of the Parties hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement. Each Party hereto agrees that, upon commencement of the Chapter 11 Cases, it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

15.06   <u>TRIAL BY JURY WAIVER</u>. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING (WHETHER IN CONTRACT, TORT, OR OTHERWISE AND IN LAW OR IN EQUITY) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. Each Party (a) certifies that, as of the Execution Date, no representative, agent, or attorney of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other Parties have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this <u>Section 15.06</u>.

15.07   <u>Execution of Agreement</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party. The words "execution," "execute," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by us, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity, or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

15.08   <u>Rules of Construction</u>. This Agreement is the product of negotiations among the Company Parties and the Consenting Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

15.09   <u>Successors and Assigns; Third Parties</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third-party beneficiaries under this Agreement and the rights or

obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

15.10    <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Del Monte Foods Corporation II, Inc.
205 N. Wiget Lane
Walnut Creek, CA 94598
Attention: Greg Longstreet, Chief Executive Officer, and William Sawyers, General Counsel
E-mail address: Greg.Longstreet@DelMonte.com;
William.Sawyers@DelMonte.com

with copies to (which shall not constitute notice hereof):

Herbert Smith Freehills Kramer (US) LLP
1177 Avenue of the Americas
New York, NY 10036
Attention: Adam C. Rogoff, Rachael L. Ringer, Megan M. Wasson
E-mail address: adam.rogoff@hsfkramer.com;
rachael.ringer@hsfkramer.com; and
megan.wasson@hsfkramer.com;

(b)      if to a member of the Ad Hoc Group or a Consenting Lender, to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Attention: Scott J. Greenberg, Jason Zachary Goldstein, Caith Kushner
E-mail address: sgreenberg@gibsondunn.com;
jgoldstein@gibsondunn.com; and ckushner@gibsondunn.com

(c)      if to a Consenting Lender or a member of the Ad Hoc Group, to the address and e-mail address set forth on such Consenting Lender's signature page to this Agreement, with copies to (which shall not constitute notice hereof):

> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, New York 10166
> Attention: Scott J. Greenberg, Jason Zachary Goldstein,
> Caith Kushner
> E-mail address: sgreenberg@gibsondunn.com;
> jgoldstein@gibsondunn.com; and ckushner@gibsondunn.com

Any notice given by delivery, mail, or courier shall be effective when received.

15.11   <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Lender hereby confirms that its respective decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

15.12   <u>Enforceability of Agreement</u>. Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for the sole purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

15.13   <u>Waiver</u>. If the Restructuring Transactions, including the Sale Transaction, are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Each of the Company Parties hereby confirms that nothing in this Agreement constitutes a waiver of any existing or future default or event of default under the Existing Documents, or compliance with any term or provision of the Existing Documents or applicable Law, equity or any options, rights and remedies to which the Consenting Lenders may be entitled upon termination of this Agreement. The Company Parties and the Consenting Lenders acknowledge and agree that nothing contained in this Agreement or any other documents amended and/or executed and delivered in connection herewith shall constitute a novation of the Super-Senior Documents, as applicable, as in effect prior to the Agreement Effective Date. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

15.14   <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.  Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law, or in equity.

15.15   <u>Several, Not Joint, Claims</u>. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.16   <u>Public Disclosure</u>. The Company Parties shall deliver drafts to the Consenting Lenders' advisors of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement, its exhibits, the Sale Transactions, or any amendment thereof to the general public (each a "**Public Disclosure**") at least two (2) Business Days before making any such disclosure or as soon as practicable thereafter; *provided*, *however*, the foregoing shall not prohibit disclosure of any such information (a) if required in any filings required by applicable Law or regulation or the rules of any applicable stock exchange or regulatory body, and (b) on a confidential basis to a party who has signed a non-disclosure agreement and agreed to keep such information confidential. Under no circumstances may any Party make any public disclosure of any kind that would disclose either (a) the holdings of any Consenting Lender (including on the signature pages of the Consenting Lender, which shall not be publicly disclosed or filed) or (b) the identity of any Consenting Lender without the prior written consent of such Consenting Lender or the order of a Bankruptcy Court or other court with competent jurisdiction; *provided*, *however*, notwithstanding the foregoing, the Company Parties shall not be required to keep confidential the aggregate holdings of all Consenting Lenders, and each Consenting Lender hereby consents to the disclosure of the execution of this Agreement by the Company Parties, and the terms hereof, in filings by the Company Parties with the Bankruptcy Court or as required by the Securities Act, or as otherwise required by applicable Law or regulation, or the rules of any applicable stock exchange or regulatory body; *provided*, *further*, that if disclosure of additional identifying information of any Consenting Lender is required by applicable Law or regulation, or the rules of any applicable stock exchange or regulatory body, advance notice of the intent to disclose such information, if permitted by applicable Law, shall be given by the disclosing Party to each Consenting Lender (who shall have the right to seek a protective order prior to disclosure) and such Party shall take all reasonable measures to limit such disclosure. The Company Parties further agree that such information shall be redacted from "closing sets" or other representations of the fully executed Agreement and any Joinder or Transfer Agreement.

15.17   <u>Severability and Construction</u>. This Agreement is the product of negotiations among the Company Parties and the Consenting Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. Each of the Parties hereto were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.18   <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.19   <u>Capacities of the Consenting Lenders</u>. Each Consenting Lender has entered into this agreement on account of all Company Claims/Equity Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise expressly specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Equity Interests, including any Company Claims/Interests acquired in the future. In addition, the Parties understand that the Consenting Lenders are engaged in a wide range of financial services and businesses. In furtherance of the foregoing, the Parties acknowledge and agree that, to the extent a Consenting Lender expressly indicates on its signature page hereto that it is executing this Agreement on behalf of specific trading desk(s), funds, and/or business group(s) of the Consenting Lender, the obligations set forth in this Agreement shall only apply to such trading desk(s), fund(s), and/or business group(s) and shall not apply to any other trading desk, fund, or business group of the Consenting Lender so long as they are not acting at the direction or for the benefit of such Consenting Lender or such Consenting Lenders' investment in the Company Parties; *provided*, that the foregoing shall not diminish or otherwise affect the obligations and liability therefor of any legal entity that (i) executes this Agreement or (ii) on whose behalf this Agreement is executed by a Consenting Lender.

15.20   <u>Survival</u>. Notwithstanding (a) any Transfer of any Company Claims/Equity Interests in accordance with this Agreement or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations in <u>Section 7.01(m)</u> (solely to the extent accrued up to and including such Termination Date), <u>Section 12.06</u>, and <u>Section 15</u> (other than <u>Section 15.03</u> and <u>Section 15.22</u>), and the Confidentiality Agreements (in accordance with the terms thereof) shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

15.21   <u>Email Consents</u>. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, including pursuant to <u>Section 3.01</u>, <u>Section 13</u>, or otherwise, including a written approval by a Party, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if it is conveyed in writing (including electronic mail) between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, in each case without representations or warranties of any kind on behalf of such counsel.

15.22   <u>Relationship Among the Parties</u>. It is understood and agreed that no Party to this Agreement has any duty of trust or confidence in any form with any other Party, and, except as provided in this Agreement, there are no agreements, commitments, or undertakings between or among them. In this regard, it is understood and agreed that, any Party to this Agreement may trade in Company Claims/Equity Interests without the consent of the Company Parties, as the case may be, or any other Party, subject in each case to applicable securities laws, the terms of any applicable Confidentiality Agreement or non-disclosure agreement, and the terms of this Agreement (including section 9.03); *provided* that no Party shall have any responsibility for any such trading by any other Party by virtue of this Agreement. No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.

15.23   <u>Restructuring Expenses</u>.   Whether or not the transactions contemplated by this Agreement are consummated, and subject in all respects to any order of the Bankruptcy Court governing the payment of any such fees and expenses (including, for the avoidance of doubt, the DIP Orders and the Sale Order), the Company Parties hereby agree, on a joint and several basis, to pay in Cash all Restructuring Expenses during the Agreement Effective Period, as follows: (a) all accrued and unpaid Restructuring Expenses incurred up to (and including) and after the Agreement Effective Date; (b) after the Petition Date on a regular and continuing basis through the Agreement Termination Agreement; (c) upon any termination of this Agreement with respect to the Required Consenting Lenders, all accrued and unpaid Restructuring Expenses which have been incurred up to (and including) the applicable Termination Date; (d) so long as this Agreement is still effective, on the Plan Effective Date (but in any event within two (2) Business Days of the delivery to the Company Parties of any invoice in respect thereto), without any requirement for the Bankruptcy Court to provide further review or additional court orders; and (e) so long as this Agreement is still effective, the Sale Closing Date, subject to the terms of the Sale Order, within two (2) Business Days of the delivery to the Company Parties of any invoice in respect thereto and without any requirement for the Bankruptcy Court to provide further review or additional court orders.   The terms set forth in this Section 15.23 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement are consummated. For the avoidance of doubt, the rights to receive payment of Restructuring Expenses set forth in this section 15.23 shall be in addition to and not in lieu of any other rights for the payment of fees and expenses set forth in another other document, including, without limitation, the DIP Orders, the Sale Order, and any engagement letter or fee letter with the Company Parties; *provided, however*, that the terms governing the Company Parties' obligations in respect of the Restructuring Expenses (including, for the avoidance of doubt, relating to timing and amount of payment) during the pendency of the Chapter 11 Cases shall be subject in all cases to any order of the Bankruptcy Court governing the payment of any such fees and expenses (including, without limitation, the DIP Orders and the Sale Order).

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.


[*Signature pages immediately follow.*]

48

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**DEL MONTE FOODS CORPORATION II INC.**

By:    _Greg Longstreet_

Name:   Greg N. Longstreet

Title:   President

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**DEL MONTE FOODS HOLDINGS LIMITED**

By: _Greg Longstreet_____

Name: _Greg N. Longstreet_____

Title: _President_____

**Company Parties' Signature Page to
the Restructuring Support Agreement**

## DEL MONTE FOODS HOLDINGS II, INC.

By: _Greg Longstreet_

Name:   Greg N. Longstreet

Title:   President

**Company Parties' Signature Page to
the Restructuring Support Agreement**

## DEL MONTE FOODS HOLDINGS, INC.

By: _Greg Longstreet_____

Name: _Greg N. Longstreet_____

Title: _President_____

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**DEL MONTE FOODS, INC.**

By: _Greg Longstreet_

Name: Greg N. Longstreet

Title: President

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**DEL MONTE VENTURES, LLC.**

By: _Greg Longstreet_

Name: Greg N. Longstreet

Title: President

**Company Parties' Signature Page to
the Restructuring Support Agreement**


**DEL MONTE CHILLED FRUIT SNACKS, LLC**

By: _Greg Longstreet_____

Name: _Greg N. Longstreet_____

Title: _President_____

**Company Parties' Signature Page to
the Restructuring Support Agreement**


**DEL MONTE MEXICO HOLDINGS LLC**

By: _Greg Longstreet_

Name: _Greg N. Longstreet_

Title: _President_

**Company Parties' Signature Page to
the Restructuring Support Agreement**

### DM INTERMEDIATE CORPORATION

By: _Greg Longstreet_____

Name: _Greg N. Longstreet_____

Title: _President_____

**Company Parties' Signature Page to**
**the Restructuring Support Agreement**

## DM INTERMEDIATE II CORPORATION

By: _Greg Longstreet_

Name: _Greg N. Longstreet_

Title: _President_

**Company Parties' Signature Page to
the Restructuring Support Agreement**

## COLLEGE INN FOODS

By: _Greg Longstreet_____

Name: _Greg N. Longstreet_____

Title: _President_____

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**CONTADINA FOODS, INC.**

By: _Greg Longstreet_____

Name: _Greg N. Longstreet_____

Title: _President_____

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**GREEN THUMB FOODS, INC.**

By: _Greg Longstreet_

Name:   Greg N. Longstreet

Title:   President

**Company Parties' Signature Page to**
**the Restructuring Support Agreement**

## HI CONTINENTAL CORPORATION

By:    _Greg Longstreet_
        DocuSigned by:
        755AFBD3827D4A9...

Name:    Greg N. Longstreet

Title:    President

**Company Parties' Signature Page to
the Restructuring Support Agreement**


**JOYBA, INC.**

By: _Greg Longstreet_

Name: Greg N. Longstreet

Title: President

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**KITCHEN BASICS, INC.**

By: _Greg Longstreet_

Name: Greg N. Longstreet

Title: President

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**SAGER CREEK FOODS, INC.**

By: _Greg Longstreet_

Name:  Greg N. Longstreet

Title:  President

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**S&W FINE FOODS, INC.**

By: _Greg Longstreet_

Name: __Greg N. Longstreet__

Title: __President__

**Consenting Lender Signature Page to
the Restructuring Support Agreement**

**FMAP SOC LIMITED
SILVER ROCK OPPORTUNISTIC FUND LP
SILVER ROCK OPPORTUNITIES FUND I LP
SRF PLAN ASSETS OPPORTUNISTIC CREDIT FUND LP
SILVER ROCK SAGA FUND LLC – SERIES B
WELLWATER LLC,**
each as Lender

By:  Silver Rock Financial LP, its investment adviser

_____
Name:  Patrick Hunnius
Title: General Counsel and CCO

Address:  12100 Wilshire Blvd., Suite 1000
             Los Angeles, CA 90025

E-mail  address(es):   legal@silver-rock.com;  mhaberkorn@silver-rock.com;  ogrossman@silver-rock.com



**Consenting Lender Signature Page to
the Restructuring Support Agreement**

**SILVER ROCK CLO II, LTD.**
**SILVER ROCK CLO III, LTD.**,
each as Lender

By:  Silver Rock Management LLC, its collateral manager



_____
Name:  Patrick Hunnius
Title: General Counsel and CCO

Address:  12100 Wilshire Blvd., Suite 1000
          Los Angeles, CA 90025

E-mail  address(es):  legal@silver-rock.com;  mhaberkorn@silver-rock.com;  ogrossman@silver-rock.com

**Consenting Lender Signature Page to**
**the Restructuring Support Agreement**

**MIDTOWN ACQUISITIONS L.P.**

By: Midtown Acquisitions GP LLC, its general partner

DocuSigned by:

*Morgan P. Blackwell*

79904908B555424...

Name:  Morgan P. Blackwell

Title:  Manager

Address:  9 W. 57th St. Floor 29

New York, NY 10019

E-mail address(es):  TransactionLegalUS@dkpartners.com



**Consenting Lender Signature Page to
the Restructuring Support Agreement**

**AGL CREDIT MANAGEMENT LLC**, as investment advisor for and on behalf of the Consenting Lenders listed on Appendix A hereto



Name:  Wynne Comer
Title:  Authorized Signatory

Address:  535 Madison Avenue, 24th Floor
          New York, New York 10022

E-mail address(es):  rdugger@aglcredit.com; bpilko@aglcredit.com

## **Appendix A**

| Consenting Lender | Super-Senior First-Out Incremental Loans (principal amount) | Super-Senior Second-Out Loans (principal amount) |
|---|---|---|



| Consenting Lender | Super-Senior First-Out Incremental Loans (principal amount) | Super-Senior Second-Out Loans (principal amount) |
| --- | --- | --- |



**Consenting Lender Signature Page to**
**the Restructuring Support Agreement**

**[ICG DEBT ADVISORS – MANAGER SERIES]**

Name:  [DAVID SAITOWITZ]
Title:  [AUTHORIZED SIGNER]


Address:  [277 PARK AVENUE 41ˢᵗ FLOOR NEW YORK,NY 10172 ]

E-mail address(es):  [DEALS@ICGAM.COM / ANDY.WONG@ICGAM.COM ]



| Pool Re MAC Fund New York |
|---|
| ICG US CLO 2014-1, Ltd. |
| ICG Rhinebeck CLO 2021-4, Ltd. |
| ICG GTC I DAC New York |
| ICG US CLO 2020-1, Ltd. |
| ICG GLF I DAC New York |
| ICG US CLO 2021-3, Ltd. |
| ICG US CLO 2021-1, Ltd. |
| ICG US CLO 2016-1, Ltd. |
| ICG US CLO 2024-1, Ltd. |
| ICG US CLO 2017-1, Ltd. |
| ICG US CLO 2023-1(i), Ltd. |
| ICG US CLO 2018-1, Ltd. |
| ICG US CLO 2021-2, Ltd. |
| ICG US CLO 2015-2R, Ltd. |
| ICG US CLO 2018-3, Ltd. |
| ICG US CLO 2022-1(i), Ltd. |
| ICG US CLO 2014-2, Ltd. |

**Consenting Lender Signature Page to
the Restructuring Support Agreement**

**SPCP GROUP, LLC**

_____
Name: Stacey Hatch
Title: Authorized Signatory

Address: 2 Greenwich Plaza, Suite 1, Greenwich, CT 06830

E-mail  address(es):    creditadmin@silverpointcapital.com  ;  mfortino@silverpointcapital.com  ;
rhurd@silverpointcapital.com ; dstaples@silverpointcapital.com



**Consenting Lender Signature Page to**
**the Restructuring Support Agreement**

## EACH ENITITY LISTED ON APPENDIX A – PART 1 HERETO, EACH SEVERALLY AND NOT JOINTLY

Signed by:

*J. Wegmann*

650000⁴EA3CA40C

Name:  James Wegmann
Title:  Authorized Signatory

Address:  Fidelity Investments
245 Summer Street
Boston, MA 02210-1129
ATTN: Bill Wall, Managing Director, Special Situations

E-mail address(es):  Bill.Wall@FMR.com

*Notwithstanding anything in the Agreement to the contrary, each above signed entity is executing this Agreement solely on behalf of the funds and accounts indicated on the corresponding Appendix listed in its signature block and only such funds and accounts shall be Parties hereunder and the obligations, covenants, representations, warranties and other provisions of this Agreement shall only apply to such funds and accounts severally and not jointly and shall not apply to any investment advisor signing on behalf of any funds or accounts or any funds or accounts managed or advised by such investment advisor that are not listed on an Appendix hereto or other Affiliates of any above signed entity.  Execution of this Agreement by the above signed entity shall not, and shall not be deemed to, bind or inure to the benefit of any other Affiliates of such entity.  This signature page has been executed and delivered solely in reliance on the foregoing limitations*

**Consenting Lender Signature Page to
the Restructuring Support Agreement**


**EACH ENITITY LISTED ON APPENDIX A – PART 2 HERETO,
EACH SEVERALLY AND NOT JOINTLY**
            BY: BALLYROCK INVESTMENT ADVISORS LLC,
            AS COLLATERAL MANAGER

Signed by:

J. Wegmann

6500000FA3CA40C...
_____
Name:  James Wegmann
Title:  Authorized Signatory



Address:  Fidelity Investments
245 Summer Street
Boston, MA 02210-1129
ATTN: Bill Wall, Managing Director, Special Situations


E-mail address(es):  Bill.Wall@FMR.com




*Notwithstanding anything in the Agreement to the contrary, each above signed entity is executing this Agreement solely on behalf
of the funds and accounts indicated on the corresponding Appendix listed in its signature block and only such funds and accounts
shall be Parties hereunder and the obligations, covenants, representations, warranties and other provisions of this Agreement shall
only apply to such funds and accounts severally and not jointly and shall not apply to any investment advisor signing on behalf of
any funds or accounts or any funds or accounts managed or advised by such investment advisor that are not listed on an Appendix
hereto or other Affiliates of any above signed entity.  Execution of this Agreement by the above signed entity shall not, and shall
not be deemed to, bind or inure to the benefit of any other Affiliates of such entity.  This signature page has been executed and
delivered solely in reliance on the foregoing limitations*

**Consenting Lender Signature Page to
the Restructuring Support Agreement**


**EACH ENITITY LISTED ON APPENDIX A – PART 3 HERETO,
EACH SEVERALLY AND NOT JOINTLY**
BY: FIDELITY INVESTMENTS CANADA ULC, ITS MANAGER

Signed by:

*J. Wegmann*

6500004FA3CA40C...

Name:  James Wegmann
Title:  Authorized Signatory



Address:  Fidelity Investments
245 Summer Street
Boston, MA 02210-1129
ATTN: Bill Wall, Managing Director, Special Situations


E-mail address(es):  Bill.Wall@FMR.com




*Notwithstanding anything in the Agreement to the contrary, each above signed entity is executing this Agreement solely on behalf of the funds and accounts indicated on the corresponding Appendix listed in its signature block and only such funds and accounts shall be Parties hereunder and the obligations, covenants, representations, warranties and other provisions of this Agreement shall only apply to such funds and accounts severally and not jointly and shall not apply to any investment advisor signing on behalf of any funds or accounts or any funds or accounts managed or advised by such investment advisor that are not listed on an Appendix hereto or other Affiliates of any above signed entity.  Execution of this Agreement by the above signed entity shall not, and shall not be deemed to, bind or inure to the benefit of any other Affiliates of such entity.  This signature page has been executed and delivered solely in reliance on the foregoing limitations*

**Consenting Lender Signature Page to
the Restructuring Support Agreement**

**EACH ENITITY LISTED ON APPENDIX A – PART 4 HERETO,
EACH SEVERALLY AND NOT JOINTLY**
BY: FIAM LLC, AS INVESTMENT MANAGER,
SUB-ADVISOR OR AS OTHERWISE AUTHORIZED

Signed by:

*J. Wegmann*

6500004FA3CA40C...

Name:  James Wegmann
Title:  Authorized Signatory

Address:  Fidelity Investments
245 Summer Street
Boston, MA 02210-1129
ATTN: Bill Wall, Managing Director, Special Situations

E-mail address(es):  Bill.Wall@FMR.com

*Notwithstanding anything in the Agreement to the contrary, each above signed entity is executing this Agreement solely on behalf of the funds and accounts indicated on the corresponding Appendix listed in its signature block and only such funds and accounts shall be Parties hereunder and the obligations, covenants, representations, warranties and other provisions of this Agreement shall only apply to such funds and accounts severally and not jointly and shall not apply to any investment advisor signing on behalf of any funds or accounts or any funds or accounts managed or advised by such investment advisor that are not listed on an Appendix hereto or other Affiliates of any above signed entity.  Execution of this Agreement by the above signed entity shall not, and shall not be deemed to, bind or inure to the benefit of any other Affiliates of such entity.  This signature page has been executed and delivered solely in reliance on the foregoing limitations*

**Consenting Lender Signature Page to**
**the Restructuring Support Agreement**

## EACH ENITITY LISTED ON APPENDIX A – PART 5 HERETO, EACH SEVERALLY AND NOT JOINTLY

BY: FIDELITY INSTITUTIONAL ASSET MANAGEMENT
TRUST COMPANY, AS TRUSTEE, INVESTMENT MANAGER
OR AS OTHERWISE AUTHORIZED

Signed by:

J. Wegmann
6500000FFA3CA40C
_____

Name:  James Wegmann
Title:  Authorized Signatory

Address:  Fidelity Investments
245 Summer Street
Boston, MA 02210-1129
ATTN: Bill Wall, Managing Director, Special Situations

E-mail address(es):  Bill.Wall@FMR.com

*Notwithstanding anything in the Agreement to the contrary, each above signed entity is executing this Agreement solely on behalf of the funds and accounts indicated on the corresponding Appendix listed in its signature block and only such funds and accounts shall be Parties hereunder and the obligations, covenants, representations, warranties and other provisions of this Agreement shall only apply to such funds and accounts severally and not jointly and shall not apply to any investment advisor signing on behalf of any funds or accounts or any funds or accounts managed or advised by such investment advisor that are not listed on an Appendix hereto or other Affiliates of any above signed entity.  Execution of this Agreement by the above signed entity shall not, and shall not be deemed to, bind or inure to the benefit of any other Affiliates of such entity.  This signature page has been executed and delivered solely in reliance on the foregoing limitations*

| APPENDIX A |
|:---:|

PART 1



Docusign Envelope ID: EBAA281E-30F0-463E-A981-FE298799A969



**PART 2**



**PART 3**

**PART 4**



**PART 5**



**Consenting Lender Signature Page to
the Restructuring Support Agreement**

522 Funding CLO 2017-1(A), Ltd.
By: Morgan Stanley Eaton Vance CLO CM LLC
as its Collateral Manager

522 Funding CLO 2018-2(A), Ltd.
By: Morgan Stanley Eaton Vance CLO CM LLC
as its Collateral Manager

522 Funding CLO 2018-3(A), Ltd.
By: Morgan Stanley Eaton Vance CLO CM LLC
as its Collateral Manager

Brighthouse Funds Trust I - Brighthouse/Eaton Vance Floating Rate Portfolio
By: Eaton Vance Management
as Investment Sub-Advisor

Eaton Vance CLO 2013-1 LTD.
By: Eaton Vance Management
Portfolio Manager

Eaton Vance CLO 2014-1R, Ltd.
By: Eaton Vance Management
As Investment Advisor

Eaton Vance CLO 2015-1 Ltd.
By: Eaton Vance Management
Portfolio Manager

Eaton Vance CLO 2019-1, Ltd.
By: Eaton Vance Management
As Investment Advisor

Morgan Stanley Eaton Vance CLO 2021-1, Ltd.
By: Morgan Stanley Eaton Vance CLO Manager LLC

Morgan Stanley Eaton Vance CLO 2022-16, Ltd.
By: Morgan Stanley Eaton Vance CLO Manager LLC as its Collateral Manager

Morgan Stanley Eaton Vance CLO 2022-17A, Ltd.
By: Morgan Stanley Eaton Vance CLO Manager LLC

Morgan Stanley Eaton Vance CLO 2022-18, Ltd.
By: Morgan Stanley Eaton Vance CLO Manager LLC

Morgan Stanley Eaton Vance CLO 2023-19, Ltd.
By: Morgan Stanley Eaton Vance CLO Manager LLC

Morgan Stanley Eaton Vance CLO 2023-20, Ltd.
By: Morgan Stanley Eaton Vance CLO Manager LLC

522 Funding CLO 2019-5, Ltd.
By: Morgan Stanley Investment Management Inc. as its Collateral Manager

522 Funding CLO 2020-6 Ltd.
By: Morgan Stanley Eaton Vance CLO Manager LLC Collateral Manager

Eaton Vance Senior
Floating-Rate Trust
By: Eaton Vance Management
as Investment Advisor

Eaton Vance Floating-Rate
Income Trust
By: Eaton Vance Management
as Investment Advisor

Eaton Vance Senior
Income Trust
By: Eaton Vance Management
as Investment Advisor

Eaton Vance Institutional Senior Loan Fund
By: Eaton Vance Management as Investment Advisor

Eaton Vance Institutional Senior Loan Plus Fund
By: Eaton Vance Management as Investment Advisor

Eaton Vance Limited Duration Income Fund
By: Eaton Vance Management
as Investment Advisor

Eaton Vance Floating Rate Portfolio
By: Boston Management and Research
as Investment Advisor

Eaton Vance Multi-Asset Credit Fund
By: Eaton Vance Management
as Investment Advisor

Morgan Stanley Loan Holding II Limited
By: Eaton Vance Management
as Investment Manager

Senior Debt Portfolio
By: Boston Management and Research
as Investment Advisor

Eaton Vance VT
Floating-Rate Income Fund
By: Eaton Vance Management
as Investment Advisor

_____

Name:
Title:  Managing Director

Address:  One Post Office Square 18th Floor Boston MA 02109

E-mail address(es):  imfloatingrate@morganstanley.com



## EXHIBIT A

**Restructuring Term Sheet**

*EXECUTION VERSION*

**Del Monte Foods Corporation II, Inc.,** *et al.*

**RESTRUCTURING TERM SHEET[1]**

**THIS TERM SHEET (THE "RESTRUCTURING TERM SHEET") SETS FORTH THE PRINCIPAL TERMS OF THE RESTRUCTURING TRANSACTIONS AND CERTAIN RELATED TRANSACTIONS CONCERNING THE COMPANY PARTIES THAT HAVE BEEN AGREED TO BY THE COMPANY PARTIES AND THE CONSENTING LENDERS. THIS RESTRUCTURING TERM SHEET DOES NOT CONTAIN A COMPLETE LIST OF ALL TERMS AND CONDITIONS OF THE POTENTIAL TRANSACTIONS DESCRIBED HEREIN. SUBJECT TO THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT TO WHICH THIS RESTRUCTURING TERM SHEET IS ATTACHED, THE RESTRUCTURING TRANSACTIONS SHALL BE CONSUMMATED THROUGH A SALE TRANSACTION PURSUANT TO CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532 IN THE BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY.**

**WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THIS RESTRUCTURING TERM SHEET AND THE UNDERTAKINGS CONTEMPLATED HEREIN ARE SUBJECT IN ALL RESPECTS TO THE SATISFACTORY NEGOTIATION, EXECUTION, AND DELIVERY OF DEFINITIVE DOCUMENTATION CONSISTENT WITH THE RESTRUCTURING SUPPORT AGREEMENT. THIS RESTRUCTURING TERM SHEET IS PROFFERED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THIS RESTRUCTURING TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE TO ANY PERSON OR ENTITY PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE RULE, STATUTE, OR DOCTRINE OF SIMILAR IMPORT PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS, WHETHER ARISING UNDER FEDERAL OR STATE LAW. UNTIL PUBLICLY DISCLOSED UPON THE PRIOR WRITTEN AGREEMENT OF THE COMPANY PARTIES AND REQUIRED CONSENTING LENDERS, THIS RESTRUCTURING TERM SHEET SHALL REMAIN STRICTLY CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY OTHER PARTY OR PERSON WITHOUT THE CONSENT OF THE COMPANY PARTIES AND REQUIRED CONSENTING LENDERS.**

**THE REGULATORY, TAX, ACCOUNTING, AND OTHER LEGAL AND FINANCIAL MATTERS AND EFFECTS RELATED TO THE RESTRUCTURING TRANSACTIONS OR ANY RELATED RESTRUCTURING OR SIMILAR TRANSACTION HAVE NOT BEEN FULLY EVALUATED AND ANY SUCH EVALUATION MAY AFFECT THE TERMS AND STRUCTURE OF ANY RESTRUCTURING TRANSACTIONS OR RELATED TRANSACTIONS.**

**THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW, INCLUDING THE BANKRUPTCY CODE.**

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement.

| **Restructuring Term Sheet** |
| :---: |
| **Restructuring Overview** |

| | |
| :--- | :--- |
| **Debtors/Company Parties** | The Company Parties that are listed on Exhibit A to the Restructuring Support Agreement, which shall also be signatories to the Restructuring Support Agreement (each a "Debtor" or "Company Party," and collectively, the "Debtors" or "Company Parties"). |
| **Form of the Restructuring** | To effectuate the restructuring, certain parties, including (i) the Company Parties and (ii) the Consenting Lenders will enter into a restructuring support agreement consistent in all respects with the material terms set forth herein (and to which this Restructuring Term Sheet shall be attached as an exhibit) (the "Restructuring Support Agreement"), and the Company Parties and the ABL Lenders holdings at least 100% of the aggregate outstanding principal amount of the ABL Claims shall enter into the ABL Commitment Letter. |
| | The restructuring will be consummated through: |
| | (i)    the commencement of voluntary chapter 11 cases of the Company Parties (the "Chapter 11 Cases" and the date on which the Chapter 11 Cases are commenced, the "Petition Date") pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"); |
| | (ii)    the funding of the DIP Facilities (as defined and further described herein) by the DIP Term Loan Lenders and DIP ABL Lenders, which DIP Facilities will fund the Chapter 11 Cases; and |
| | (iii)    a sale of all or substantially all of the assets of the Debtors (or equity of the Reorganized Debtors under a chapter 11 plan if mutually agreed by the Required Consenting Lenders and the Debtors if necessary to maintain tax attributes), which sale shall be undertaken either pursuant to section 363 (or section 1123) of the Bankruptcy Code, (the "Sale Transaction," and the date on which such transaction closes, the "Closing Date"), as provided in this Restructuring Term Sheet and the RSA and subject to the Bidding Procedures (as defined below), which Sale Transaction and all related documentation shall be acceptable to the Company Parties and Required Consenting Lenders (the restructuring transactions contemplated hereunder, including by (i)-(iii), the "Restructuring Transactions"). |
| | As part of the Sale Transaction, subject to reaching agreement on Bidding Procedures mutually acceptable to the Required Consenting Lenders and the Debtors in each of their sole discretion, the Consenting Lenders will agree to serve as the stalking horse bidder (the "Stalking Horse Bidder") and "credit bid" all or a portion of their Claims (the "Stalking Horse Credit |

| | |
|---|---|
| | Bid"), including DIP Facility claims and certain Super-Senior Term Loan Claims subject to the consent of the Company Parties, in accordance with this Restructuring Term Sheet and pursuant to such Bidding Procedures.<br><br>If the Sale Transaction is consummated via the Stalking Horse Credit Bid pursuant to section 363 of the Bankruptcy Code, the Consenting Lenders agree to negotiate a wind down of the Debtors' estates in accordance with the Wind-Down Budget (as defined below), to be agreed by the Required Consenting Lenders and the Debtors in each of their sole discretion, to permit an orderly wind-down process of the Debtors.<br><br>The Restructuring Transactions shall be subject to the Definitive Documents, the terms of the Restructuring Support Agreement (including the exhibits thereto), and the consent rights set forth therein. |
| **Sale Transaction** | Subject to the terms and conditions set forth in this Restructuring Term Sheet, the Sale Transaction shall be implemented to effectuate a sale of all, or substantially all, of the Debtors' assets.<br><br>An entity to be formed by or on behalf of the Consenting Lenders (the "Buyer") will serve as the Stalking Horse Bidder in connection with the Sale Transaction. Buyer will be represented by Gibson, Dunn & Crutcher LLP and Houlihan Lokey (the "Buyer Advisors"). The stalking horse asset purchase agreement shall be acceptable to the Company Parties and the Required Consenting Lenders (the "Stalking Horse APA"). If the Sale Transaction with the Buyer is consummated, the resulting entity will be "NewCo."<br><br>Following the Petition Date, and in accordance with the RSA and the DIP Facilities (including the milestones thereunder), the Debtors shall file Bidding Procedures acceptable to the Company Parties and the Required Consenting Lenders and shall have commenced a third-party marketing process for the Sale Transaction (and such process, the "Sale Process"). The Debtors will continue such process on the timeline contemplated in the Bidding Procedures. For the avoidance of doubt, the Bidding Procedures shall include, and the Sale Process shall be implemented, in accordance with the dates set forth in **Annex 1** hereto (the "Sale Milestones"), unless extended, modified, or waived in writing (which may be by electronic mail), as applicable, by the Company Parties and the Required Consenting Lenders. The proposed Sale Transaction shall remain subject to higher or otherwise better offers that may be obtained by the Debtors in connection with the Bidding Procedures and the Bidding Procedures Order.<br><br>At the conclusion of the Sale Process, the Sellers will sell the Acquired Assets (as defined below) to the Stalking Horse Bidder or one or more third-party purchaser(s) determined to have submitted the highest or otherwise best offer in accordance with the Bidding Procedures Order. The order entered by the Bankruptcy Court approving the Sale Transaction (the "Sale Order" which, if the Sale Transaction is consummated under a chapter 11 plan pursuant to section 1123 of the Bankruptcy Code, may be the Confirmation Order), shall provide, as applicable, (i) for all of the protections granted pursuant to section 363(m) of the Bankruptcy Code and |

(ii) that, to the maximum extent permitted by law, upon the consummation of the Sale Transaction, all of the Debtors' right, title, and interest in, to and under the Acquired Assets shall be sold free and clear of any and all liens, encumbrances, claims, and other interests, subject to any agreed upon exceptions. The terms and conditions of such sale will be consistent with this Restructuring Term Sheet, the RSA, and the Stalking Horse APA (or such other asset purchase agreement as may be agreed to by the Company and any third-party purchaser(s)) and acceptable to the Company Parties and Required Consenting Lenders.

The Sale Order will contain mutual general releases, subject to customary carveouts and, other than as expressly set forth herein, as agreed between the Debtors and the Required Consenting Lenders, (the "Sale Releases") effective on the Closing Date, by and among the following persons (and such other persons as may be agreed by the Debtors and the Required Consenting Lenders): (a) Debtors, (b) NewCo, (c) the Buyer, (d) the Consenting Lenders, and (e) in the case of the entities listed from (b)-(d), such entities' respective officers and directors and, solely with respect to the Debtors and their non-Debtor subsidiaries, their respective Unaffiliated Officers and Directors, and (f) in the case of the entities listed from (a)-(e), such entities' respective employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, for any claims up to the Closing Date (the "**Released Parties**"), except as expressly preserved in the definitive documentation implementing the Sale Transaction in a manner to be agreed by the Debtors and Required Consenting Lenders; *provided*, however, that the Required Consenting Lenders may agree, in their sole discretion, that  that some amount of the Consenting Lenders' First Out obligations will not be released and shall remain outstanding for treatment pursuant to a Chapter 11 plan, subject to the Bidding Procedures and *provided further* that, for the avoidance of doubt, Del Monte Pacific Limited and Del Monte Philippines Inc. (together "DMPL") shall not be a Released Party .

"Unaffiliated Officers and Directors" shall mean all persons that (a) serve or served as an officer and/or director of any of the Debtors and their non-Debtor subsidiaries at any time, (b)(i) are not officers, directors or employees of DMPL or any of its Affiliates (other than DMFHL and its subsidiaries) or equity owners (collectively, "Parent"), or (ii) were not appointed as a director or officer by or on behalf of the Parent and prior to appointment, had no material relationship with or affiliation with the Parent, or (iii) with respect to directors, are independent, including pursuant to NYSE standards, as to Parent, and (c) in all cases, have no material preexisting personal relationship (unrelated to the Company Parties) or familial relationship with any director or officer of Parent.

The terms of the Sale Order, including the Sale Releases, and the Stalking Horse APA, including any schedules and exhibits thereto, shall be acceptable to the Consenting Lenders and the Debtors in their respective sole discretion.

| | |
|---|---|
| **Acquired Assets and Acquired Subsidiaries** | Subject in all respects to the Stalking Horse APA, the Buyer will acquire on the Closing Date, all right, title and interest of the Company Parties in, to or under the properties and assets of the Company Parties of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible consisting of, relating to or developed or used in connection with the Sellers' business, and the stock that the Debtors hold in all of the Sellers' subsidiaries (each, a "Non-Debtor Subsidiary" and collectively, the "Non-Debtor Subsidiaries") but excluding the Excluded Assets (as defined below), as further described below (such assets, collectively the "Acquired Assets"). Each Non-Debtor Subsidiary shall be set forth in a schedule to the Stalking Horse APA. |
| | For the avoidance of doubt, the Acquired Assets shall include all claims and causes of action including but not limited to (a) any claims that could be asserted derivatively through the Debtors (such claims, collectively, the "Derivative Claims"), (b) any claims arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), or 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents or non-U.S. law and the proceeds of such actions, (c) all claims and causes of action of the Debtors' estates; and (d) to the extent not included in (a)-(c), all claims or causes of action against any of the Sellers' respective (i) directors or officers; (ii) employees other than officers; (iii) subsidiaries; (iv) affiliates, including DMPL; or (v) trade vendors, suppliers, customers or other parties that the Sellers otherwise conduct business with in the ordinary course, including in each case all proceeds thereof; *provided that* all claims and rights referenced in clauses (a), (b), (c), and (d)(i) through (iii) that constitute a claim against any Released Party shall be released by the Buyer on the Closing Date. |
| | Acquired Assets will expressly exclude only those assets designated by the Stalking Horse Bidder as an "Excluded Asset" in the Stalking Horse APA and cash sufficient to fund the Wind-Down Budget, *provided* that "Acquired Assets" and "Excluded Assets" in the Stalking Horse APA shall be otherwise consistent with this Term Sheet. |
| | Buyer may, at least five business days prior to the Closing Date by notice to Sellers, designate any Acquired Assets as additional Excluded Assets, provided that there will be no modification to the amount of consideration provided by the Buyer to the Sellers in connection with the Sale Transaction. |
| **Assumed Liabilities** | Subject in all respects to the Stalking Horse APA, the Stalking Horse Bidder shall assume certain liabilities related to the Acquired Assets, subject to certain exceptions to be negotiated based on diligence. |
| **Wind-Down Budget** | If the Sale Transaction is consummated via the Stalking Horse Credit Bid pursuant to section 363 of the Bankruptcy Code, cash, in an amount to be agreed between the Debtors and the Required Consenting Lenders, in each of their respective sole discretion, shall be used to fund a wind down of the Debtors (the "Wind-Down Budget"); *provided* that the Stalking Horse Bidder will work in good faith with the Debtors to ensure that the Wind-Down Budget includes sufficient funds for payment of all expected |

| | administrative expense costs necessary to confirm a wind-down Chapter 11 plan; *provided further* that any residual amount of the Wind-Down Budget, if any, following completion of the wind-down shall be returned to the Buyer.<br><br>The Stalking Horse Bidder shall use commercially reasonable efforts to agree to provide reasonably requested finance, IT, and legal personnel to the Debtors that is reasonably necessary to assist the Debtors in an orderly wind down of the Debtors' estates. |
|---|---|
| **Professional Fee Escrow Accounts** | No later than ten (10) business days before the anticipated Closing Date, the Debtors shall deposit into a segregated account amounts sufficient to satisfy all Allowed Professional Fees (as defined in the Interim DIP Order) contemplated to be incurred in the Approved DIP Budget through the Closing Date, consistent in all respects with paragraph 13 of the Interim DIP Order. |
| **Bidding Procedures** | The equity or assets of the Debtors will be marketed pursuant to the Bidding Procedures, which shall permit bids to acquire all or substantially all of the assets (or equity) of the Debtors; *provided, however*, that the Bidding Procedures shall allow for partial asset bids.<br><br>In the event that one or more qualified bids pursuant to the Bidding Procedures are obtained, the Debtors shall conduct an auction to determine the highest or otherwise best bid for the Company Parties' assets (or equity).<br><br>The Stalking Horse Bidder will not be entitled to a break-up fee. |
| **Back Up Bid** | In the event that the Stalking Horse Bid is not selected as the successful bid but is otherwise the next highest or best alternative bid, the Stalking Horse Bidder will serve as the "back-up bid" for the Acquired Assets and will be binding and irrevocable until the date on which such other transaction is consummated. |
| **Other Terms and Conditions** | Closing of the Sale Transaction will be subject to, among other customary conditions, (a) entry of the Sale Order and such Sale Order not being subject to any stay, (b) the Sellers' and Buyer's (in the event of a Sale Transaction to the Stalking Horse Bidder) representations and warranties in the Stalking Horse APA being true and correct in all respects except where such breaches would not constitute a material adverse effect, and (c) no breach of the Sellers' or Buyer's covenants in the Stalking Horse APA in any material respect. |
| **Restructuring** | If the Sale Transaction is consummated pursuant to section 363 of the Bankruptcy Code, consistent with the RSA and this Restructuring Term Sheet, in connection with the Sale Transaction, the Debtors may pursue a plan of liquidation, which shall (a) provide for the orderly liquidation of the Debtors' estates including the dissolution of the Company Parties under applicable law, (b) include customary terms and conditions, (c) provide for the funding of the Wind-Down Budget, and (d) be confirmed by the Bankruptcy Court after entry of the Sale Order. The Consenting Lenders agree to support such plan of liquidation. |

| | |
|---|---|
| **DIP Term Loan Facility** | A facility comprised of:<br><br>(i)    (i) a superpriority senior secured multiple draw term loan credit facility in the principal new money amount of $165.0 million (the "<u>DIP New Money Facility</u>"; the loans under the DIP New Money Facility, the "<u>DIP New Money Loans</u>"; the lenders of the DIP New Money Loans, the "<u>DIP New Money Lenders</u>"); and<br><br>(ii)    a superpriority term loan facility in the principal amount of up to $247.5 million (the "<u>DIP Roll-Up Facility</u>," and together with the DIP New Money Facility, the "<u>DIP Term Loan Facility</u>"; the loans under the DIP Roll-Up Facility, the "<u>DIP Roll-Up Loans</u>," and together with the DIP New Money Loans, the "<u>DIP Term Loans</u>"), which DIP Roll-Up Loans shall be deemed funded and an equal amount of Super-Senior First-Out Loans, pro rata between Super-Senior First-Out Initial Loans and Super-Senior First-Out Incremental Loans, shall be deemed converted into and exchanged for such DIP Roll-Up Loans in accordance with the terms and conditions set forth in the DIP Term Loan Documents.  The DIP Roll-Up Loans shall be available to holders of the Super-Senior First-Out Loans that elect to provide their pro rata share of the DIP New Money Loans.<br><br>Participation in the DIP New Money Facility shall be open to all holders of Super-Senior First-Out Loans on a pro rata basis based on such holders' amount of Super-Senior First-Out Loans.  In order to participate in the DIP New Money Facility, a holder of Super-Senior First-Out Loans must execute the RSA.<br><br>In the event of a Sale Transaction where the Stalking Horse Bidder is the "successful bidder," on the Closing Date, all DIP Term Loan Claims shall be used to credit bid under the Stalking Horse APA pursuant to section 363(k) of the Bankruptcy Code.<br><br>In the event of a Sale Transaction where the Stalking Horse Bidder is not the "successful bidder," the DIP Term Loan Claims shall be indefeasibly repaid in full in Cash from the proceeds of any Sale Transaction on the Closing Date of any such Sale Transaction, which treatment shall be provided for in any applicable Sale Order or related order, on terms acceptable to the Required Consenting Lenders and the Company Parties. |
| **DIP Term Loan Facility Fees** | <u>Backstop Premium</u>: Backstop premium equal to 10% or $16.5 million of the total amount of the DIP New Money Loans (the "<u>Backstop Premium</u>"), payable in kind to certain holders of the Super-Senior First-Out Loans who are members of an ad hoc group of lenders under the Super-Senior Credit Agreement on a *pro rata* basis, based on their respective percentages applicable to the DIP New Money Loans.  The Backstop Premium shall be earned and paid in kind upon entry of the Interim DIP Order and funding of the DIP New Money Loans pursuant to the terms of such order.<br><br><u>Commitment Premium</u>: Commitment premium equal to 4% or $6.6 million of the total amount of the DIP New Money Loans (the "<u>Commitment Premium</u>"), payable in kind to the DIP New Money Lenders on a *pro rata* |

| | |
|---|---|
| | basis, based on their respective percentages applicable to the DIP New Money Loans. The Commitment Premium shall be earned and paid in kind upon entry of the Interim DIP Order and funding of the DIP New Money Loans pursuant to the terms of such order. |
| **DIP ABL Facility** | A superpriority senior secured asset-based revolving credit facility (the "DIP ABL Facility," and together with the DIP Term Loan Facility, the "DIP Facilities"; the loans under the DIP ABL Facility, the "DIP ABL Loans," and together with the DIP Term Loans, the "DIP Loans") in the principal amount of $500 million; the Interim DIP Order shall provide for the deemed cashless dollar-for-dollar conversion and exchange of all commitments under the prepetition ABL Facility upon entry of the Interim DIP Order in accordance with the terms and conditions set forth in the DIP ABL Documents. |
| | In the event of a Sale Transaction where the Stalking Horse Bidder is the "successful bidder," on the Closing Date, the Company Parties and Consenting Lenders shall work in good faith to provide that all DIP ABL Claims shall, subject to modifications to be agreed between the Company Parties, the Required Consenting ABL Lenders (as defined in the ABL Commitment Letter) and the Required Consenting Lenders, convert into Exit ABL Claims under the Exit ABL Facility by means of a cashless settlement pursuant to which (i) all principal amount of DIP ABL Loans shall be on a one-to-one basis automatically converted to and deemed to be loans under the Exit ABL Facility, (ii) the letters of credit issued pursuant to the DIP ABL Documents issued and outstanding under the DIP ABL Documents shall automatically be converted to letters of credit deemed to be issued and outstanding under the Exit Facilities Documents, and (iii) all DIP ABL Collateral that secures the DIP ABL Obligations (each as defined in the DIP Documents) under the DIP ABL Documents that shall also secure the Exit ABL Facility shall be reaffirmed, ratified and shall automatically secure all Obligations under the Exit ABL Facility, subject to the priorities of liens set forth in the Exit Facilities Documents and the Exit Intercreditor Agreement. |
| **Additional Terms** | |
| **Definitive Documents** | This Restructuring Term Sheet does not include a description of all the terms, conditions, and other provisions that will be contained in the Definitive Documents, which shall be as set forth in the applicable term sheets referred to herein and otherwise subject to the consent rights set forth in the Restructuring Support Agreement and the Definitive Documents. |
| **New Organizational Documents** | If the Sale Transaction is consummated with the Stalking Horse Bidder, any documentation evidencing the corporate governance for NewCo, including charters, bylaws, limited liability company agreements, shareholder agreements and any other customary organizational documents shall be consistent with the Restructuring Support Agreement, including the consent rights set forth therein. |

| | |
|---|---|
| **Exit Term Loan Facility** | If the Sale Transaction is consummated with the Stalking Horse Bidder, Newco may incur takeback debt (the "<u>Exit Term Loan Facility</u>") on the terms set forth below. |
| **New Board of Directors** | If the Sale Transaction is consummated with the Stalking Horse Bidder, the board of directors NewCo (the "<u>New Board</u>") shall be appointed by and acceptable to the Required Consenting Lenders. |
| **Management Incentive Plan** | The Buyer shall reserve a pool of up to 10% of the fully diluted reorganized equity that is issued and outstanding on the Effective Date for a post-Effective Date management incentive plan (the "<u>MIP</u>"). The material terms and conditions of the MIP shall be fixed by the New Board in its discretion subject to approval by shareholders holding the majority of the reorganized equity at the relevant time. All grants under the MIP shall be determined at the sole discretion of the New Board, including with respect to the participants, allocation, timing, vesting terms and the form and structure of the options, warrants, and/or equity compensation to be provided thereunder, except as otherwise provided herein. |
| **Employee Matters** | The Buyer will use reasonable good faith efforts to offer employment to all of the Company Parties' active employees, subject to ongoing evaluation of the Company Parties' financial condition and subject to satisfactory diligence. If the Buyer makes any offer of employment, Buyer will use reasonable good faith efforts to provide employment offers for comparable positions, responsibilities, base salaries, short and long term incentive opportunities and employee benefits, taken as a whole, than those of as such employees' current positions, responsibilities, base salaries, short and long term incentive opportunities and employee benefits. |
| **Restructuring Expenses** | The Debtors shall pay, as and to the extent set forth in the Restructuring Support Agreement, the reasonable and documented Restructuring Expenses. |
| **Milestones** | The Restructuring Transactions shall be effectuated in accordance with the Milestones set forth in Section 4 of the Restructuring Support Agreement. |
| **Director, Officer, Manager, and Employee Tail Coverage** | Prior to the Petition Date, the Company Parties, with the consent of the Required Consenting Lenders, shall have obtained liability insurance policies (including any "tail policy") covering the directors, managers, and officers of each Company Party reasonably acceptable to the Required Consenting Lenders, it being understood that the tail policy available under the current D&O Policy is reasonably acceptable.<br><br>If the Sale Transaction is consummated with the Stalking Horse Bidder, on the Closing Date, the Buyer shall be deemed to have assumed all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") and the Company Parties shall use reasonable good faith efforts obtain any insurer consents, if any, required to assume such policies. |

| | |
|---|---|
| **Tax Structuring and Implementation** | The Company Parties and the Consenting Lenders shall reasonably cooperate to structure the Sale Transaction or any other transaction, including, by way of example, an equitization transaction in connection with a restructuring in place pursuant to a plan under section 1123 of the Bankruptcy Code (collectively, the "<u>Tax Structure</u>") to (a) minimize any cash taxes payable by the Company and the Consenting Lenders (including, as applicable, through the Wind-Down Budget) arising from the Tax Structure, and (b) maximize any favorable tax attributes of the Company (or successor), including tax basis, available after the restructuring, including, without limitation, by implementing a Tax Structure intended to qualify as a reorganization under Section 368(a)(1)(G) of the Internal Revenue Code of 1986, as amended. The final Tax Structure shall be subject to the consent of the Company Parties and the Consenting Lenders. The Company Parties (or the Consenting Lenders at the expense of the Company) shall engage a nationally recognized tax accounting firm selected by the Company Parties, with the reasonable consent of the Consenting Lenders, to perform analysis for purposes of determining the final Tax Structure. |
| **Conditions Precedent to the Closing Date** | It shall be a condition to the Closing Date that the following conditions shall have been satisfied or waived (in accordance with customary waiver provisions to be contained in the Stalking Horse APA or other Definitive Documents, as applicable): <br><br> a. The Restructuring Support Agreement shall not have been terminated as to the Required Consenting Lenders and shall be in full force and effect; <br><br> b. The Bankruptcy Court shall have entered the Sale Order in form and substance consistent with and subject to the consent rights set forth in the Restructuring Support Agreement (including this Restructuring Term Sheet), which shall have become a final order; <br><br> c. The Stalking Horse APA shall have been executed (or deemed executed) and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Company Parties and the Buyer), other than such conditions that relate to the effectiveness of the Definitive Documents and related transactions; <br><br> d. All Restructuring Expenses shall have been paid in full in cash; <br><br> e. The Definitive Documents shall (i) be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms consistent with the Restructuring Support Agreement and this Restructuring Term Sheet; <br><br> f. The Company Parties shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan, if applicable, and each of the other Restructuring Transactions; |

<table>
<tr><td></td><td>

g. None of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code or shall have been dismissed;

h. No trustee or examiner with expanded powers shall have been appointed under any chapter of the Bankruptcy Code with respect to the Debtors;

i. There shall not have been instituted or threatened or be pending any material action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim, or proceeding currently instituted, threatened, or pending) before or by any court, governmental, regulatory or administrative agency or instrumentality, domestic or foreign, or by any other person, domestic or foreign, in connection with the Restructuring Transactions that, in the judgment of the Company Parties and the Required Consenting Lenders would prohibit, prevent, or restrict consummation of the Restructuring Transactions in a materially adverse manner;

j. The Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in this Restructuring Term Sheet in a manner consistent with the Restructuring Support Agreement and this Restructuring Term Sheet;

k. No party shall have been granted derivative standing to pursue any chapter 5 causes of action on behalf of the Debtors' estates or otherwise; and

l. Such other conditions precedent to the Closing Date that are customary or otherwise reasonably requested by the Required Consenting Lenders and agreed to by the Debtors.

</td></tr>
</table>

| **Exit Term Loan Facility** | |
|---|---|
| **Principal Amount** | $125.0 million |
| **Maturity** | 3 years |
| **Interest** | SOFR + 6.00% per annum payable in cash _plus_ 2.00% per annum payable in kind |
| **Security / Ranking** | The Exit Term Loans shall be secured by (a) a first lien on (i) all non-Exit ABL Facility priority collateral and (ii) all unencumbered collateral, and (b) a second lien on all Exit ABL Facility priority collateral. |

**<u>Annex 1</u>**

**Sale Milestones**

1. Key sale process materials (CIM, Forecast Model, Buyer's List, Process Letter): 30 days from the Petition Date

2. Indications of Interest: 50 days from the Petition Date

3. Binding Offers: 75 days from the Petition Date

## **EXHIBIT B**

### **Interim DIP Order**

*(To be filed separately)*

## <u>EXHIBIT C</u>

**Provision for Transfer Agreement**

The undersigned ("**<u>Transferee</u>**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of July 1, 2025 (the "**<u>Agreement</u>**")[2] by and among the Company Parties and the Consenting Lenders, including the transferor to the Transferee of any Company Claims/Equity Interests (each such transferor, a "**<u>Transferor</u>**"), and agrees to be bound by the terms and conditions thereof, and shall be deemed a "Consenting Lender" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote, tender, or consent, as applicable, of the Transferor if such vote, tender, or consent was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| Super-Senior Term Loan (principal amount) | |
| ABL Loan Commitments | |

---

[2]     Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

## <u>EXHIBIT D</u>

### Form of Joinder

The undersigned ("**<u>Joinder Party</u>**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of July 1, 2025 (the "**<u>Agreement</u>**"),[3] by and among the Company Parties and the Consenting Lenders, and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Lender", under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and subject to the conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof and any further date specified in the Agreement.

Date Executed:

_____

Name:

Title:

Address:

E-mail address(es):

---

[3]    Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.