**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff, Esq. (*pro hac vice* pending)
Rachael L. Ringer, Esq. (*pro hac vice* pending)
Megan M. Wasson, Esq. (*pro hac vice* pending)
Ashland J. Bernard, Esq. (*pro hac vice* pending)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: | ) ) ) Chapter 11 |
| Del Monte Foods Corporation II Inc., *et al.*,[1] | ) ) Case No. 25-16984 (MBK) |
| Debtors. | ) ) (Joint Administration Requested) ) |

## NOTICE OF FILING OF DIP CREDIT AGREEMENTS

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

On July 1, 2025, Del Monte Foods Corporation II Inc. and its affiliated debtors and debtors

in possession (collectively, the "**Debtors**") filed that certain *Motion for Entry of Interim and Final*

*Orders  (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash*

*Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting*

*Adequate Protection, (IV) Modifying Automatic Stay, (V) Scheduling a Final Hearing, and (VI)*

*Granting Related Relief* [Docket No. 17] (the "**DIP Motion**"), which indicated that the forms of

(a)  that  certain  Debtor-in-Possession  ABL  Credit  Agreement  (the  "**DIP ABL Credit**

---

[1]  The last four digits of Debtor Del Monte Foods Corporation II Inc.'s tax identification number are 1894.  A complete
list of the Debtors in these Chapter 11 Cases and their respective tax identification numbers may be obtained on the
website of the Debtors' proposed claims and noticing agent, at https://cases.stretto.com/DelMonteFoods.  The
location of the Debtor Del Monte Foods Corporation II Inc.'s principal place of business and the Debtors' service
address is 205 North Wiget Lane, Walnut Creek, California 94598.

**Agreement**"), and (b) that certain Super-Priority Senior Secured Debtor-in-Possession Credit and Guaranty Agreement (the "**DIP Term Loan Credit Agreement**"), to be filed as **Exhibit A** and **Exhibit B** to the Motion, respectively, would be filed separately.

Copies of the forms of the DIP ABL Credit Agreement and the DIP Term Loan Credit Agreement (together, the "**DIP Credit Agreements**") are attached to this notice as exhibits. A copy of the DIP ABL Credit Agreement is attached as **Exhibit A**, and a copy of the DIP Term Loan Credit Agreement is attached as **Exhibit B**.

Copies of documents filed in above-captioned chapter 11 cases may be obtained for free of charge by visiting the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/DelMonteFoods. You may also obtain copies of such documents by visiting the Court's website at https://ecf.njb.uscourts.gov/ in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Dated: July 2, 2025

/s/ Michael D. Sirota
Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota
David M. Bass
Felice R. Yudkin
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:  msirota@coleschotz.com
            dbass@coleschotz.com
            fyudkin@coleschotz.com

– and –

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff*
Rachael L. Ringer*
Megan M. Wasson*
Ashland J. Bernard*
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
E-mail: Adam.Rogoff@HSFKramer.com
            Rachael.Ringer@HSFKramer.com
            Megan.Wasson@HSFKramer.com
            Ashland.Bernard@HSFKramer.com

*Pending Admission Pro Hac Vice*

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

# EXHIBIT A

**Execution Version**

DEBTOR-IN-POSSESSION ABL CREDIT AGREEMENT

among

DM INTERMEDIATE II CORPORATION,

as Holdings,

DEL MONTE FOODS CORPORATION II INC.,

as Borrower,

The Several Lenders from Time to Time Parties Hereto,

JPMORGAN CHASE BANK, N.A.,

as Administrative Agent,

WELLS FARGO BANK, NATIONAL ASSOCIATION, CAPITAL ONE, NATIONAL ASSOCIATION, BMO CAPITAL MARKETS CORP. and MUFG BANK, LTD.

as Co-Syndication Agents,

and

U.S. BANK NATIONAL ASSOCIATION AND MUFG BANK, LTD.,

as Documentation Agents

Dated as of July 2, 2025

JPMORGAN CHASE BANK, N.A., WELLS FARGO BANK, NATIONAL ASSOCIATION, CAPITAL ONE, NATIONAL ASSOCIATION, BMO CAPITAL MARKETS CORP. and MUFG BANK, LTD.

as Joint Lead Arrangers and Joint Bookrunners

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

SECTION 1.  DEFINITIONS ................................................................................................ 1
    1.1    Defined Terms ......................................................................................... 1
    1.2    Classification of Loans and Borrowings ............................................. 55
    1.3    Other Definitional Provisions ............................................................. 55
    1.4    Interest Rate; Benchmark Notification ............................................... 56
    1.5    Letter of Credit Amounts .................................................................... 56
    1.6    [Reserved] ............................................................................................ 56
    1.7    Divisions .............................................................................................. 57

SECTION 2.  AMOUNT AND TERMS OF COMMITMENTS ...................................... 57
    2.1    Commitments ....................................................................................... 57
    2.2    Procedure for Loan Borrowing ........................................................... 57
    2.3    Protective Advances ............................................................................ 58
    2.4    [Reserved] ............................................................................................ 58
    2.5    Swingline Sublimit ............................................................................. 58
    2.6    Procedure for Swingline Borrowing; Refunding of Swingline Loans ............................. 59
    2.7    Repayment of Loans ........................................................................... 60
    2.8    Fees, etc. .............................................................................................. 60
    2.9    Termination or Reduction of Commitments ....................................... 60
    2.10    Optional Prepayments ......................................................................... 61
    2.11    Prepayment of Loans .......................................................................... 61
    2.12    Conversion and Continuation Options ................................................ 62
    2.13    Limitations on Term Benchmark Borrowings .................................... 62
    2.14    Interest Rates and Payment Dates ...................................................... 62
    2.15    Computation of Interest and Fees ....................................................... 63
    2.16    Alternate Rate of Interest ................................................................... 63
    2.17    Pro Rata Treatment and Payments ..................................................... 66
    2.18    Requirements of Law .......................................................................... 68
    2.19    Taxes .................................................................................................... 69
    2.20    Indemnity ............................................................................................. 72
    2.21    Change of Lending Office ................................................................... 73
    2.22    Replacement of Lenders ..................................................................... 73
    2.23    Defaulting Lenders ............................................................................. 74

SECTION 3.  LETTERS OF CREDIT .............................................................................. 76
    3.1    L/C Sublimit ........................................................................................ 76
    3.2    Procedure for Issuance of Letter of Credit ......................................... 77
    3.3    Fees and Other Charges ...................................................................... 77
    3.4    L/C Participations ............................................................................... 77
    3.5    Reimbursement Obligation of the Borrower ...................................... 78
    3.6    Obligations Absolute .......................................................................... 78
    3.7    Letter of Credit Payments ................................................................... 79
    3.8    Applications ......................................................................................... 79
    3.9    Replacement of an Issuing Lender ...................................................... 79
    3.10    Letters of Credit Issued for Account of Subsidiaries ......................... 80

i

SECTION 4.    REPRESENTATIONS AND WARRANTIES ...................................................... 80
    4.1    Financial Condition ................................................................................................ 80
    4.2    No Change ............................................................................................................. 80
    4.3    Existence; Compliance with Law .......................................................................... 80
    4.4    Power; Authorization; Enforceable Obligations .................................................... 80
    4.5    No Legal Bar .......................................................................................................... 81
    4.6    Litigation ................................................................................................................ 81
    4.7    No Default .............................................................................................................. 81
    4.8    Ownership of Property; Liens ................................................................................ 81
    4.9    Intellectual Property .............................................................................................. 81
    4.10    Taxes ...................................................................................................................... 82
    4.11    Federal Regulations ............................................................................................... 82
    4.12    Labor Matters ......................................................................................................... 82
    4.13    ERISA .................................................................................................................... 82
    4.14    Investment Company Act; Other Regulations ....................................................... 83
    4.15    Subsidiaries; Capital Stock ................................................................................... 83
    4.16    Use of Proceeds ..................................................................................................... 83
    4.17    Environmental Matters .......................................................................................... 83
    4.18    Accuracy of Information, etc ................................................................................. 84
    4.19    Security Documents ............................................................................................... 84
    4.20    [Reserved] .............................................................................................................. 85
    4.21    Anti-Corruption Laws, Anti-Money Laundering and Sanctions ........................... 85
    4.22    Plan Assets; Prohibited Transactions .................................................................... 85
    4.23    EEA Financial Institutions .................................................................................... 85
    4.24    Variance Report ..................................................................................................... 85
    4.25    Orders ..................................................................................................................... 86
    4.26    Bankruptcy Matters ............................................................................................... 86

SECTION 5.    CONDITIONS PRECEDENT ............................................................................... 86
    5.1    Conditions to Initial Extension of Credit .............................................................. 86
    5.2    Conditions to Each Extension of Credit ................................................................ 89

SECTION 6.    AFFIRMATIVE COVENANTS ............................................................................ 90
    6.1    Financial Statements .............................................................................................. 90
    6.2    Certificates; Borrowing Base; Other Information .................................................. 91
    6.3    Payment of Obligations ......................................................................................... 93
    6.4    Maintenance of Existence; Compliance ................................................................ 93
    6.5    Maintenance of Property; Insurance ...................................................................... 94
    6.6    Inspection of Property; Books and Records; Discussions; Appraisals; Field
        Examinations ......................................................................................................... 94
    6.7    Notices ................................................................................................................... 95
    6.8    Environmental Laws .............................................................................................. 96
    6.9    [Reserved] .............................................................................................................. 96
    6.10    Additional Collateral, etc ...................................................................................... 96
    6.11    [Reserved] .............................................................................................................. 97
    6.12    Deposit Account Control Agreements ................................................................... 97
    6.13    [Reserved] .............................................................................................................. 98
    6.14    [Reserved] .............................................................................................................. 98
    6.15    DMPL Arrangements ............................................................................................. 98
    6.16    Other Obligations .................................................................................................. 98
    6.17    [Reserved] .............................................................................................................. 98

6.18     Additional Chapter 11 Reporting................................................................98
6.19     Cash Management....................................................................................99
6.20     Approved DIP Budget ..............................................................................99

SECTION 7.   NEGATIVE COVENANTS ............................................................... 100
7.1      Excess Availability and Minimum Liquidity.............................................. 100
7.2      Indebtedness........................................................................................... 100
7.3      Liens ...................................................................................................... 102
7.4      Fundamental Changes............................................................................. 105
7.5      Disposition of Property ........................................................................... 105
7.6      Restricted Payments............................................................................... 107
7.7      Investments ............................................................................................ 107
7.8      Optional Payments of Certain Debt Instruments ..................................... 109
7.9      Transactions with Affiliates .................................................................... 109
7.10     Sales and Leasebacks............................................................................. 110
7.11     Swap Agreements................................................................................... 110
7.12     Changes in Fiscal Periods ....................................................................... 110
7.13     Negative Pledge Clauses........................................................................ 110
7.14     Clauses Restricting Subsidiary Distributions........................................... 111
7.15     Lines of Business ................................................................................... 112
7.16     Use of Proceeds .................................................................................... 112
7.17     Amendment of Organizational Documents............................................... 112
7.18     Delivery of Defined Inventory and Return of Inventory Purchaser Deposit ................ 112
7.19     Material Property ................................................................................... 112
7.20     Chapter 11 Cases .................................................................................. 113

SECTION 8.   EVENTS OF DEFAULT .................................................................... 113
8.1      Events of Default .................................................................................... 113
8.2      Bankruptcy Code and Other Remedies.................................................... 121

SECTION 9.   THE AGENTS ................................................................................. 123
9.1      Appointment .......................................................................................... 123
9.2      Administrative Agent's Reliance, Indemnification, Etc. .............................. 125
9.3      Posting of Communications..................................................................... 127
9.4      The Administrative Agent Individually ..................................................... 128
9.5      Successor Administrative Agent .............................................................. 128
9.6      Acknowledgments .................................................................................. 129
9.7      Collateral Matters .................................................................................. 131
9.8      Credit Bidding........................................................................................ 131
9.9      Certain ERISA Matters ........................................................................... 132

SECTION 10.  MISCELLANEOUS ........................................................................... 133
10.1     Amendments and Waivers ...................................................................... 133
10.2     Notices .................................................................................................. 135
10.3     No Waiver; Cumulative Remedies ........................................................... 135
10.4     Survival of Representations and Warranties.............................................. 136
10.5     Expenses; Limitation of Liability; Indemnity; Etc ..................................... 136
10.6     Successors and Assigns; Participations and Assignments ......................... 138
10.7     Adjustments; Set-off .............................................................................. 141
10.8     Counterparts .......................................................................................... 142
10.9     Severability ........................................................................................... 142

| 10.10 | Integration | 142 |
| 10.11 | GOVERNING LAW | 143 |
| 10.12 | Submission To Jurisdiction; Waivers | 143 |
| 10.13 | Acknowledgments | 143 |
| 10.14 | Releases of Guarantees and Liens | 144 |
| 10.15 | Confidentiality | 144 |
| 10.16 | **WAIVERS OF JURY TRIAL** | 146 |
| 10.17 | USA Patriot Act; Beneficial Ownership Regulation | 146 |
| 10.18 | [Reserved] | 146 |
| 10.19 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 146 |
| 10.20 | Acknowledgement Regarding Any Supported QFCs | 147 |
| 10.21 | Orders Control | 147 |
| 10.22 | Milestones. | 147 |

SCHEDULES:

| 1.1A | Commitments |
| 1.1B | Permitted Inventory Locations |
| 3.1 | Existing Letters of Credit |
| 4.12 | Labor Matters |
| 4.13 | Pension Plans |
| 4.15 | Subsidiaries |
| 4.19(a) | UCC Filing Jurisdictions |
| 6.13 | Post-Closing Deliverables |
| 7.2(e) | Existing Indebtedness |
| 7.3(f) | Existing Liens |
| 7.5(l) | Scheduled Dispositions |
| 7.7(k) | Existing Investments |
| 7.9 | Transactions with Affiliates |

EXHIBITS:

| A | [Reserved] |
| B | Form of Interest Election Request |
| C-1 | Form of Officer's Certificate |
| C-2 | New Subsidiary Officer's Certificate |
| D | Guarantee Agreement |
| E-1 | Form of Assignment and Assumption |
| F | Form of Compliance Certificate |
| G | [Reserved] |
| H-1 | U.S. Tax Certificate (For Non-U.S. Lenders that are not Partnerships for U.S. Federal Income Tax Purposes) |
| H-2 | U.S. Tax Certificate (For Non-U.S. Lenders that are Partnerships for U.S. Federal Income Tax Purposes) |
| H-3 | U.S. Tax Certificate (For Non-U.S. Participants that are not Partnerships for U.S. Federal Income Tax Purposes) |
| H-4 | U.S. Tax Certificate (For Non-U.S. Participants that are Partnerships for U.S. Federal Income Tax Purposes) |
| I-1 | [Reserved] |
| I-2 | [Reserved] |

J    Form of Borrowing Base Certificate

L    [Reserved]

M    Approved DIP Budget

DEBTOR-IN-POSSESSION ABL CREDIT AGREEMENT (this "Agreement"), dated as of July 2, 2025 among DM Intermediate II Corporation, a New Jersey corporation ("Holdings"), Del Monte Foods Corporation II Inc., a New Jersey corporation (the "Borrower"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "Lenders"), JPMorgan Chase Bank, N.A., as administrative agent, and the other agents from time to time parties hereto.

**W I T N E S S E T H:**

WHEREAS, on July 1, 2025 (the "Petition Date"), the Borrower, Holdings and certain direct and indirect Subsidiaries of the Borrower (each, a "Chapter 11 Debtor" and collectively, the "Chapter 11 Debtors") filed voluntary petitions with the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") initiating their respective jointly administered cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") (Case No. 25-16984-MBK) (collectively, the "Chapter 11 Cases"), and each Chapter 11 Debtor has continued and is continuing in the possession of its assets and management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, the Borrower has requested that the Lenders extend credit in the form of Revolving Loans at any time and from time to time during the Revolving Commitment Period, in an aggregate principal amount at any time outstanding not to exceed the Line Cap, in order to (i) fund the continued operation of the Borrower's and other Loan Parties' businesses during the pendency of the Chapter 11 Cases and (ii) repay in full all obligations under the Pre-Petition ABL Credit Agreement, subject to the terms and conditions set forth in this Agreement and the Orders;

NOW, THEREFORE, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein and the Orders.  Accordingly, the parties hereto hereby agree as follows:

SECTION 1.  DEFINITIONS

1.1    Defined Terms.  As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"ABL Priority Collateral" has the meaning set forth in the Pre-Petition Intercreditor Agreement; provided, for clarity, that as used herein, "ABL Priority Collateral" includes Previously Unencumbered Property (as defined in the Orders) that is of the nature of ABL Priority Collateral (as defined in the Pre-Petition Intercreditor Agreement).

"ABR" means, when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Alternate Base Rate.

"Account" has the meaning set forth in the Pre-Petition Guarantee and Collateral Agreement.

"Account Debtor" means any Person obligated on an Account.

"Actual Disbursements" means the Actual Non-Operating Items / Restructuring Items and the Actual Operating Disbursements.

"Actual Non-Operating Items / Restructuring Items" means with respect to any period, the amount of non-operating items / restructuring items expended during such period for which the Loan Parties

are liable for payment (including as reimbursement to any Secured Party or the Lender Financial Advisor) that correspond to the heading "Non-Operating Items / Restructuring Items" in the Approved DIP Budget as then in effect.

"Actual Operating Disbursements" means with respect to any period, the sum, for such period, of all such disbursements for all such line items which comprise "Operating Disbursements" (as set forth in the Approved DIP Budget), on a cumulative basis, as determined by reference to the Approved DIP Budget as then in effect.

"Actual Receipts" shall mean with respect to any period, as the context requires, (x) the amount of actual receipts during such period of the Loan Parties (excluding any borrowings under this Agreement or the DIP Term Loan Credit Agreement) under the heading "Receipts" in the Approved DIP Budget and/or (y) the sum, for such period, of all such receipts for all such line items which comprise "Receipts" (as set forth in the Approved DIP Budget), on a cumulative basis, in each case, as determined by reference to the Approved DIP Budget as then in effect. For the avoidance of doubt, any proceeds received from asset sales shall be excluded.

"Additional Permitted Amount" has the meaning set forth in the definition of Permitted Refinancing Indebtedness.

"Adjusted Daily Simple SOFR" means, an interest rate per annum equal to (a) the Daily Simple SOFR, plus (b) 0.10%; provided that if the Adjusted Daily Simple SOFR as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.

"Adjusted Term SOFR Rate" means, for any Interest Period, an interest rate per annum equal to (a) the Term SOFR Rate for such Interest Period, plus (b) 0.10%; provided that if the Adjusted Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.

"Adjustment Date" has the meaning set forth in the Applicable Margin Pricing Grid.

"Administrative Agent" means JPMorgan Chase Bank, N.A., together with its affiliates, as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agents" means the collective reference to the Administrative Agent and any other agent identified on the cover page of this Agreement.

"Aggregate Exposure Percentage" means, as to any Lender, its Revolving Percentage.

"Agreement" has the meaning set forth in the preamble hereto.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1% and (c) the Adjusted Term SOFR Rate for a one month Interest Period as published two U.S. Government Securities Business Days prior to such day (or if such day is not a U.S. Government Securities Business Day, the immediately preceding U.S. Government Securities Business Day) plus 1.00%; provided that for the purpose of this definition, the Adjusted Term SOFR Rate for any day shall be based on the Term SOFR Reference Rate at approximately 5:00 a.m. Chicago time on such day (or any amended publication time for the Term SOFR Reference Rate, as specified by the CME Term SOFR Administrator in the Term SOFR Reference Rate methodology).  Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate, respectively.  If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 2.16 (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to Section 2.16(b)), then the Alternate Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above.  For the avoidance of doubt, if the Alternate Base Rate as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement.

"Annual Field Examination" has the meaning set forth in Section 6.6(c).

"Annual Inventory Appraisal" has the meaning set forth in Section 6.6(b).

"Anti-Corruption Laws" means all laws, rules and regulations of any jurisdiction applicable to Holdings or its Subsidiaries from time to time concerning or relating to bribery, corruption, money-laundering, or any financial record keeping (including the U.S. Foreign Corrupt Practices Act of 1977, as amended, the U.K. Bribery Act of 2010 and the Patriot Act) and reporting requirements related thereto.

"Applicable Commitment Fee Pricing Grid" means the table set forth below:

| Average Quarterly Unused Commitments | Commitment Fee Rate |
|---|---|
| <50% | 0.375% |
| ≥50% | 0.50% |

For the purposes of the tables set forth above, changes to the Commitment Fee Rate as a result of changes in Average Quarterly Unused Commitments shall become effective on the first day of each fiscal quarter based upon the Average Quarterly Unused Commitments during the most recently ended fiscal quarter and shall remain in effect until the next change to be effected pursuant to this paragraph.  If, as of any date that a Borrowing Base Certificate is scheduled to be delivered pursuant to Section 6.2(g), any Borrowing Base Certificate required to be delivered on or prior to such date shall not have been delivered, then, until the date of the next change to be effected pursuant to the first sentence of this paragraph occurring after the date on which all required Borrowing Base Certificates are delivered, the Administrative Agent, acting at the direction of the Required Lenders, shall declare that the highest rate set forth in the Applicable Commitment Fee Pricing Grid shall apply.  Automatically, upon the occurrence and continuance of an Event of Default pursuant to Section 8.1(g), the highest rate set forth in the Applicable Commitment Fee Pricing Grid shall apply.

"Applicable Group Members" means the collective reference to Existing Holdings and its Subsidiaries (other than any Unrestricted Subsidiaries); provided that at any time that Applicable Holdings is Holdings, Applicable Group Members shall mean the Group Members.

3

"Applicable Holdings" means Existing Holdings; provided that if Existing Holdings or any of its Subsidiaries (other than any Group Members) commences new operations after the Closing Date, or expands its existing operations after the Closing Date or acquires any Person or business after the Closing Date, Applicable Holdings shall mean Holdings.

"Applicable Margin" means, initially, 4.50% in the case of ABR Loans and 5.50% in the case of Term Benchmark Loans through the first fiscal quarter ending after the Closing Date and thereafter, subject to adjustment in accordance with the Applicable Margin Pricing Grid.

"Applicable Margin Pricing Grid" means the table set forth below:

| Average Quarterly Availability | Applicable Margin for ABR Loans | Applicable Margin for Term Benchmark Loans and RFR Loans |
|---|---|---|
| ≥ 66% of the Line Cap | 4.00% | 5.00% |
| <66% but ≥ 33% of the Line Cap | 4.25% | 5.25% |
| <33% of the Line Cap | 4.50% | 5.50% |

For the purposes of the Applicable Margin Pricing Grid, changes in the Applicable Margin as a result of changes in Average Quarterly Availability shall become effective on the first day of each fiscal quarter (the "Adjustment Date") based upon the Average Quarterly Availability during the most recently ended fiscal quarter and shall remain in effect until the next change to be effected pursuant to this paragraph. If, as of any date that a Borrowing Base Certificate is scheduled to be delivered pursuant to Section 6.2(g), any Borrowing Base Certificate required to be delivered on or prior to such date shall not have been delivered, then, until the Adjustment Date occurring after the date on which all required Borrowing Base Certificates are delivered, the Administrative Agent, acting at the direction of the Required Lenders, shall declare that the highest rate set forth in each column of the Applicable Margin Pricing Grid shall apply. Automatically, upon the occurrence and continuance of an Event of Default pursuant to Section 8.1(g), the highest rate set forth in each column of the table set forth above in this defined term shall apply.

"Applicable Parties" has the meaning set forth in Section 9.3(c).

"Applicable Reference Period" means as of any date of determination, the most recently ended Reference Period for which financial statements with respect to each fiscal quarter included in such Reference Period have been delivered or were required to have been delivered pursuant to Section 6.1(a) or 6.1(b); provided that prior to delivery (or required delivery) of any financial statements pursuant to Section 6.1(a) or 6.1(b), the Applicable Reference Period shall be the Reference Period ended April 27, 2025.

"Applicable Transaction" has the meaning set forth in the definition of "Pro Forma Basis".

"Application" means an application, in such form as the Issuing Lender may specify from time to time, requesting the Issuing Lender to open a Letter of Credit, specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day) and the date on which such Letter of Credit is to expire and such other information as the Issuing Lender may request.

"Approved DIP Budget" means the then most current budget prepared by the Borrower and approved by the Required Lenders in accordance with Section 6.20. As of the Closing Date, the Approved DIP Budget is attached hereto as Exhibit M.

4

"Approved DIP Budget Variance Report" means with respect to a Testing Period, a report provided by the Borrower to the Administrative Agent and the Lender Financial Advisor, for prompt further delivery to the Revolving Lenders, (a)(i) showing, on a line item by line item and cumulative basis, the Actual Disbursements and the Actual Receipts for such Testing Period, (ii) showing, on a line item by line item and cumulative basis, a comparison (whether positive or negative, in dollars and expressed as a percentage) of the Actual Disbursements and the Actual Receipts for such Testing Period to the Budgeted Disbursements and the Budgeted Receipts, (iii) an indication as to whether each variance is temporary or permanent and analysis and explanations in detail for all variances, (iv) only in the event that a Subsequent DIP Budget has been requested during the last week of a Budget Period, a weekly roll forward of the Loan Parties' cash forecast; and (v) a cash balance for the Loan Parties; and (b) which such reports shall be in a form, and shall contain supporting information, satisfactory to the Required Lenders in their sole discretion (it being acknowledged and agreed that the form of the variance report provided by the Borrower to the Revolving Lenders prior to the Closing Date shall be deemed satisfactory).

"Approved Electronic Platform" has the meaning set forth in Section 9.3(a).

"Approved Fund" has the meaning set forth in Section 10.6(b).

"Arranger" means each Joint Lead Arranger and Joint Bookrunner identified on the cover page of this Agreement.

"Asset Sale Reserve" means, with respect to any Sweep Asset Sale, 40% of the net consideration for such Sweep Asset Sale not attributable to Borrowing Base Property. In the event of a Sweep Asset Sale that does not allocate consideration between Borrowing Base Property on the one hand and other assets on the other hand, then the portion of net consideration allocable to assets not constituting Borrowing Base Property shall be calculated as the difference between (a) the gross consideration for Sweep Asset Sale minus (b) the book value of the Borrowing Base Property sold (for the avoidance of doubt, before applying net orderly liquidation values or Borrowing Base advance rates).

"Assignee" has the meaning set forth in Section 10.6(b).

"Assignment and Assumption" means an Assignment and Assumption, substantially in the form of Exhibit E or any other form (including electronic records generated by the use of an electronic platform) approved by the Administrative Agent.

"Availability" means at any time, an amount equal to (a) the Line Cap minus (b) the Total Revolving Extensions of Credit then outstanding (calculated, with respect to any Defaulting Lender, as if such Defaulting Lender had funded its Revolving Percentage of all outstanding Revolving Loans).

"Available Revolving Commitment" means as to any Revolving Lender at any time, an amount equal to the excess, if any, of (a) such Lender's Revolving Commitment then in effect over (b) such Lender's Revolving Extensions of Credit then outstanding.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark (or component thereof) or payment period for interest calculated with reference to such Benchmark (or component thereof), as applicable, that is or may be used for determining the length of an Interest Period for any term rate or otherwise, for determining any frequency of making payments of interest calculated pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (e) of Section 2.16.

"<u>Average Quarterly Availability</u>" means, for any fiscal quarter of Holdings, an amount equal to the average daily Availability during such fiscal quarter, as determined by the Administrative Agent's system of records; provided, that in order to determine Availability on any day for purposes of this definition, the Borrower's Borrowing Base for such day shall be determined by reference to the most recent Borrowing Base Certificate delivered pursuant to Section 6.2(g), Section 6.2(l), Section 6.11 or Section 7.5 to the Administrative Agent as of such day.

"<u>Average Quarterly Outstanding Amount</u>" means, for any fiscal quarter of Holdings, an amount equal to the average daily Total Revolving Extensions of Credit during such fiscal quarter, as determined by the Administrative Agent's system of records.

"<u>Average Quarterly Unused Commitments</u>" means, for any fiscal quarter of Holdings, an amount equal to the average daily Unused Commitments during such fiscal quarter, as determined by the Administrative Agent's system of records.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"<u>Bail-In Legislation</u>" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"<u>Bank Products</u>" means any of the following bank: (a) commercial credit cards, (b) stored value cards, (c) purchasing cards and (d) treasury, depositary or cash management services (including controlled disbursement, automated clearinghouse transactions, return items, overdrafts, supply chain finance services related to accounts payable and interstate depository network services) or any similar transaction.

"<u>Banking Services</u>" means Bank Products provided to any Group Member or any Subsidiary of a Group Member by (a) the Administrative Agent or any of its Affiliates or (b) any Lender or any of its Affiliates.

"<u>Banking Services Obligations</u>" means with respect to the Group Members or any Subsidiary of a Group Member, any and all obligations of the Group Members or any Subsidiary of a Group Member, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with Banking Services.

"<u>Banking Services Reserves</u>" means all Reserves that the Administrative Agent from time to time establishes in its Permitted Discretion for Banking Services then provided or outstanding.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"Bankruptcy Event" means with respect to any Person, such Person becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, provided, further, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Benchmark" means, initially, with respect to any (i) RFR Loan, the Daily Simple SOFR or (ii) Term Benchmark Loan, the Term SOFR Rate; provided that if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Daily Simple SOFR or Term SOFR Rate, as applicable, or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (b) of Section 2.16.

"Benchmark Replacement" means, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(1)      the Adjusted Daily Simple SOFR;

(2)      the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time in the United States and (b) the related Benchmark Replacement Adjustment;

If the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for dollar-denominated syndicated credit facilities at such time.:

7

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement and/or any Term Benchmark Loan, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of such Benchmark and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Replacement Date" means, with respect to any Benchmark, the earliest to occur of the following events with respect to such then-current Benchmark:

(1)       in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2)       in the case of clause (3) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date. For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means, with respect to any Benchmark, the occurrence of one or more of the following events with respect to such then-current Benchmark:

(1)       a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2)       a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof),

the Federal Reserve Board, the NYFRB, the CME Term SOFR Administrator, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), in each case, which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means, with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.16 and (y) ending at the time that a Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.16.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code to which Section 4975 of the Code applies, and (c) any Person whose assets include (for purposes of the Plan Asset Regulations or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan."

"Benefitted Lender" has the meaning set forth in Section 10.7(a).

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Bid Deadline" means such date as 100% of the Lenders may agree from time to time (including by electronic mail to the Administrative Agent (or its counsel)).

"Bidding Procedures Order" means an order of the Bankruptcy Court approving procedures for the sale of all or substantially all of the assets of the Debtors, which order contains sales milestones and deadlines in form and substance acceptable and is otherwise in form and substance reasonably acceptable to the Administrative Agent and the Required Lenders.

"Board" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower" has the meaning set forth in the preamble hereto.

"Borrowing" means (a) Revolving Loans of the same Facility and Type, made, converted or continued on the same date and, in the case of Term Benchmark Loans, as to which a single Interest Period is in effect or (b) a Swingline Loan.

"Borrowing Base" means at any time, the sum of:

(a)      (i) 85% (or, during the Seasonal Advance Period, 90%) of the book value of the Borrowing Base Parties' Non-Investment Grade Eligible Accounts at such time and (ii) 90% of the book value of the Borrowing Base Parties' Investment Grade Eligible Accounts, plus

(b)      the lesser of (i) the amount equal to 85% (or, during the Seasonal Advance Period, 90%) multiplied by the Net Orderly Liquidation Value percentage identified in the most recent Inventory appraisal ordered by the Administrative Agent multiplied by the book value of the Borrowing Base Parties' Eligible Inventory and (ii) 75% (or, during the Seasonal Advance Period, 80%) multiplied by the cost of the Borrowing Base Parties' Eligible Inventory valued on a first-in-first-out basis, minus

(c)      Reserves (excluding, for avoidance of doubt, the Cumulative Reserve);

provided that (i) in determining the Net Orderly Liquidation Value with respect to Inventory, the Administrative Agent may determine such value on a blended, product-line or other basis as it determines in its Permitted Discretion and (ii) unless an Event of Default has occurred and is continuing, no change in the Net Orderly Liquidation Values as in effect on the Closing Date shall become effective as a result of a Post-Closing Appraisal prior to the date that is the six-month anniversary of the Closing Date (or such earlier date as agreed by the Borrower).

The Administrative Agent may, in its Permitted Discretion (following (to the extent practicable) reasonable prior notice to, and consultation with, the Borrower) adjust Reserves or reduce one or more of the other elements used in computing the Borrowing Base, with any such changes to be effective five Business Days after delivery of notice thereof to the Borrower and the Lenders; provided that if consultation with the Borrower and/or notice to the Borrower and the Lenders is not practicable or if failure to implement any such change within a shorter time period would, in the good faith judgment of the Administrative Agent, reasonably be expected to result in a Material Adverse Effect or materially and adversely affect the Collateral or the rights of the Lenders under the Loan Documents, such change may be implemented within a shorter time as determined by the Administrative Agent in its Permitted Discretion. The Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 6.2(g), Section 6.2(l), Section 6.11 or Section 7.5 of this Agreement, as adjusted to give effect to Reserves; provided that, with respect to any Seasonal Advance Period, (i) the higher advance rates applicable during such Seasonal Advance Period will become effective on the date that a Borrowing Base Certificate is first delivered to the Administrative Agent pursuant to Section 6.2(g), Section 6.2(l), Section 6.11 or Section 7.5 of this Agreement during such Seasonal Advance Period and (ii) the lower advance rates applicable when such Seasonal Advance Period ends will automatically become effective on February 1 of any fiscal year.

"Borrowing Base Certificate" means a certificate, signed and certified as accurate and complete by a Responsible Officer of the Borrower, in substantially the form of Exhibit J or another form which is acceptable to the Administrative Agent in its sole discretion.

"Borrowing Base Parties" means the Loan Parties other than the Parent Guarantors.

"Borrowing Base Property" means Eligible Inventory and Eligible Accounts.

"Borrowing Date" means any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"Borrowing Request" means a request by the Borrower for a Revolving Borrowing in accordance with Section 2.2, which shall be substantially in the form approved by the Administrative Agent and separately provided to the Borrower.

"Budget" has the meaning set forth in Section 6.2(c).

"Budget Period" means each four-week period set forth in the Approved DIP Budget in effect at such time, with each new four-week period commencing at the end of the prior four-week period. The first Budget Period shall be the four-week period ending July 25, 2025.

"Budgeted Disbursements" means the Budgeted Non-Operating Items / Restructuring Items and the Budgeted Operating Disbursements.

"Budgeted Non-Operating Items / Restructuring Items" means with respect to any period, the amount of non-operating items / restructuring items for such period that are set forth under the heading "Non-Operating Items / Restructuring Items" in the Approved DIP Budget, as then in effect.

"Budgeted Operating Disbursements" means with respect to any period, as the context requires, the sum of all such line items under the heading "Operating Disbursements" (as set forth in the Approved DIP Budget), as determined by reference to the Approved DIP Budget as then in effect.

"Budgeted Receipts" means with respect to any period, as the context requires, (x) the line item under the heading "Receipts" in the Approved DIP Budget and/or (y) the sum, for such period, of all the amounts for all such line items which comprise "Receipts" (as set forth in the Approved DIP Budget), on a cumulative basis, in each case, as determined by reference to the Approved Budget as then in effect.

"Budgeted Liquidity" means as of any date of determination, as the context requires, for the Loan Parties, the amount set forth as of such date as Liquidity, in each case as determined by reference to the Approved DIP Budget as then in effect.

"Business Day" means, any day (other than a Saturday or a Sunday) on which banks are open for business in New York City; provided that, in addition to the foregoing, a Business Day shall be (a) in relation to RFR Loans and any interest rate settings, fundings, disbursements, settlements or payments of any such RFR Loan, or any other dealings of such RFR Loan and (b) in relation to Loans referencing the Adjusted Term SOFR Rate and any interest rate settings, fundings, disbursements, settlements or payments of any such Loans referencing the Adjusted Term SOFR Rate or any other dealings of such Loans referencing the Adjusted Term SOFR Rate, any such day that is only a U.S. Government Securities Business Day.

"Capital Lease" means a lease required to be capitalized on a balance sheet (excluding the footnotes thereto) prepared in accordance with IFRS.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under a Capital Lease, and the amount of such obligation shall be the capitalized amount thereof determined in accordance with IFRS as in effect immediately prior to January 1, 2019, excluding liabilities resulting from a change in IFRS subsequent to January 1, 2019 (and, for the avoidance of doubt, without giving effect to IFRS 16 Leases).

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing, but excluding any debt securities convertible into any of the foregoing.

"Carve-Out" has the meaning set forth in the Orders.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within two years from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $250,000,000; (c) commercial paper of an issuer rated at least A-2 by S&P or P-2 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within nine months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days, with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of two years or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; (g) money market mutual or similar funds that invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition; or (h) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Cash Management Motion" means the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Honor Prepetition Obligations Related Thereto, (B) Maintain Existing Bank Accounts, (C) Perform Intercompany Transactions in the Ordinary Course, and (D) Maintain Existing Business Forms; and (II) Granting Related Relief* to be filed on the docket of the Bankruptcy Case.

"CFC" means (a) each Person that is a "controlled foreign corporation" for purposes of the Code and (b) each Subsidiary of any such Person.

"CFC Holding Company" means each Domestic Subsidiary substantially all of the assets of which consist of Capital Stock of one or more (a) CFCs or (b) Persons described in this definition.

12

"Change of Control" means, (i) Holdings ceases, directly or indirectly, to own legally and beneficially 100% of the issued and outstanding equity interests (for avoidance of doubt, excluding unexercised options and warrants) of the Borrower, (ii) DMFI ceases, directly or indirectly, to own legally and beneficially 100% of the issued and outstanding common equity interests (for avoidance of doubt, excluding unexercised options and warrants) of the Borrower, (iii) Existing Holdings ceases, directly or indirectly, to own legally and beneficially 100% of the issued and outstanding common equity interests (for avoidance of doubt, excluding unexercised options and warrants) of the Borrower, (iv) Permitted Holders shall fail to own beneficially, directly or indirectly, in the aggregate Capital Stock representing at least a majority of the aggregate ordinary voting power represented by the issued and outstanding Capital Stock of Holdings, (v) any "person" or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) (other than the Permitted Holders) shall acquire, directly or indirectly, at any time beneficial ownership representing (a) more than 35% of the ordinary voting power represented by the issued and outstanding Capital Stock of DMPL and (b) more than the percentage of the ordinary voting power represented by the issued and outstanding Capital Stock of DMPL beneficially owned, directly or indirectly, by the Permitted Holders, (vi) one or more sales of all or substantially all of the assets of the Loan Parties have been consummated pursuant to the Chapter 11 Cases or (vii) any "Change of Control" (or words of like import) as defined in the Term Loan Credit Agreement or any Refinancing thereof.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Chapter 11 Debtors" has the meaning set forth in the recitals.

"Closing Date" means July 2, 2025.

"CME Term SOFR Administrator" means CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (SOFR) (or a successor administrator).

"Co-Syndication Agent" means each Co-Syndication Agent identified on the cover page of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document, which, for the avoidance of doubt, shall exclude all Excluded Collateral.

"Collateral Access Agreement" means any landlord waiver or other agreement, in form and substance reasonably satisfactory to the Administrative Agent, between the Administrative Agent and any third party (including any bailee, consignee, customs broker, or other similar Person) in possession of any Collateral or any landlord of any real property where any Collateral is located, as such landlord waiver or other agreement may be amended, restated, or otherwise modified from time to time.

"Collection Account" means individually and collectively, each "Collection Account" referred to in the Pre-Petition Guarantee and Collateral Agreement.

"Commitment Fee Rate" means, initially as of the Closing Date, 0.375% per annum through the first fiscal quarter ending after the Closing Date, and, thereafter, subject to adjustment based on Average Quarterly Unused Commitments in accordance with the Applicable Commitment Fee Pricing Grid.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed by the Administrative Agent, any Lender or any Issuing Lender by means of electronic communications pursuant to this Section, including through an Approved Electronic Platform.

"Compliance Certificate" means a certificate duly executed by a Responsible Officer of Holdings substantially in the form of Exhibit F.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Amortization Expense" for any period means the amortization expense of Applicable Holdings and the Applicable Group Members for such period, determined on a consolidated basis in accordance with IFRS.

"Consolidated Cash Balance" means, at any time, (a) the aggregate amount of cash and Cash Equivalents held or owned by (either directly or indirectly), credited to the account of or reflected as an asset on the balance sheet of Holdings and its Subsidiaries less (b) the sum of (i) any restricted cash or Cash Equivalents to pay royalty obligations, working interest obligations, suspense payments, severance taxes, payroll, payroll taxes, other taxes, employee wage and benefit payments and trust and fiduciary obligations or other obligations of Holdings or any Subsidiary to third parties and for which Holdings or such Subsidiary has issued checks or has initiated wires or Automated Clearing House ("ACH") transfers (or, in the Borrower's discretion, will issue checks or initiate wires or ACH transfers within five Business Days) in order to pay, (ii) other amounts for which Holdings or such Subsidiary has issued checks or has initiated wires or ACH transfers but have not yet been subtracted from the balance in the relevant account of Holdings or such Subsidiary and (iii) to the extent reflected in clause (a) above, any cash or Cash Equivalents of Holdings or any Subsidiaries constituting purchase price deposits held in escrow pursuant to a binding and enforceable purchase and sale agreement with a third party.

"Consolidated Depreciation Expense" for any period means the depreciation expense of Applicable Holdings and the Applicable Group Members for such period, determined on a consolidated basis in accordance with IFRS.

"Consolidated EBITDA" means for any period, with respect to Applicable Holdings and the Applicable Group Members, without duplication, the sum of the amounts for such period of:

(a)     Consolidated Net Income; plus

(b)     in each case, only to the extent deducted in determining Consolidated Net Income,

(i)     Consolidated Income Tax Expense; plus

(ii)     Consolidated Amortization Expense; plus

(iii)     Consolidated Depreciation Expense; plus

(iv)     Consolidated Interest Expense; plus

14

(v)        any costs, expenses or charges (including advisory, legal and professional fees) related to any issuance of debt or equity, investments, acquisition, disposition, asset sale, recapitalization or incurrence, issuance, amendment, waiver, modification, redemption or refinancing of any Indebtedness, whether or not consummated, including (A) prepayment premiums, breakage costs and funding costs, (B) fees, expenses or charges related to the Transactions, (C) any amendment or modification of the Loan Documents or the Term Loans, (D) any net loss from the extinguishment of any Indebtedness of any Person or the amortization or write-off of Indebtedness issuance costs or Indebtedness discount, (E) any expenses in connection with related due diligence activities or other transactions costs, (F) any write-off or amortization of deferred financing costs and (G) any net after tax extraordinary, nonrecurring or unusual gains or losses or income or expense or charge (less all fees and expenses relating thereto), whether cash or non-cash, including, bonuses payable, any "change of control" payments, and expenses in connection with the exercise of stock options by certain holders of options in connection with any such acquisition; plus

(vi)        any non-cash compensation charges or other non-cash charges or expenses (including write-offs and write-downs) with respect to the grant, issuance or repricing of stock or shares, stock options, restricted stock or other equity compensation awards or any amendment, modification, substitution or change of any equity-based award; plus

(vii)       any costs, charges, accruals, reserves or expenses attributable to the undertaking and/or implementation of business optimization, reorganization or restructuring initiatives, cost savings initiatives, cost rationalization programs, operating expense reductions (including in connection with any integration, restructuring or transition, facility openings and/or re-openings, inventory optimization programs, curtailments and/or future lease commitments), charges relating to the closure or consolidation of facilities (including severance, rent termination costs, moving costs and legal costs), severance charges, retention or completion bonuses, charges associated with modifications to pension and post-retirement employee benefit plans, corporate development charges and professional and consulting fees incurred in connection with any of the foregoing; plus

(viii)      the amount of "run rate" cost savings, operating expense reductions, restructuring charges and expenses and cost saving synergies projected by Applicable Holdings in good faith to be realized, as a result of actions taken or expected to be taken, within 12 months of the end of the relevant Reference Period (calculated on a pro forma basis as though such cost savings, operating expense reductions, restructuring charges and expenses and cost saving synergies had been realized on the first day of such Reference Period), net of the amount of actual benefits realized during such Reference Period from such actions; provided that (i) such cost savings, operating expense reductions, restructuring charges and expenses and cost saving synergies are reasonably identifiable and factually supportable and (ii) such adjustments may be incremental to (but not duplicative of) pro forma adjustments otherwise made pursuant to this Agreement; plus

(ix)       any non-cash impairment charges relating to goodwill or other intangible assets; plus

(x)        long-term incentive compensation for employees of any entity acquired in a transaction not prohibited under the terms of this Agreement; plus

(xi)    all other non-cash items reducing Consolidated Net Income (excluding any non-cash charge that results in an accrual of a reserve for cash charges in any future period) for such period,

provided that, any amounts added back pursuant to clauses (v), (vi), (vii) and (viii), in the aggregate, shall not exceed 20% of Consolidated EBITDA in any Reference Period (prior to giving effect to the addbacks in clauses (v), (vi), (vii) and (viii)); provided that the following shall be excluded from such limit: (i) disposition costs related to the Hanford, California facility in an aggregate principal amount not to exceed $10,000,000, (ii) costs related to the transactions set forth in "Step 1" of the "Transaction Structure" section of the Financing Commitment Letter and the Step 2 Transactions incurred on or prior to September 30, 2024 and (iii) expenses exclusively related to any reduction in force and other restructuring related activities in an aggregate principal amount not to exceed $10,000,000 and incurred on or prior to July 2, 2025;

minus

(c)    Consolidated Income Tax Benefit; minus

(d)    the aggregate amount of all non-cash items, determined on a consolidated basis, to the extent such items increased Consolidated Net Income for such period (excluding any non-cash items to the extent they represent the reversal of an accrual of a reserve for a potential cash item that reduced Consolidated EBITDA in any prior period); minus

(e)    any cash payments made in respect of items described in clause (b)(vi) or (b)(x) above subsequent to the fiscal quarter in which the relevant non-cash expenses or losses were reflected as a charge in the statement of Consolidated Net Income; and

(f)    increased or decreased to eliminate from Consolidated Net Income the effects of adjustments (including the effects of such adjustments pushed down to Holdings and its Restricted Subsidiaries) in any line item in Applicable Holdings' consolidated financial statements in such period pursuant to IFRS resulting from the application of purchase accounting in relation to any completed acquisition.

For the purposes of calculating Consolidated EBITDA for any Reference Period pursuant to any determination of the Consolidated Leverage Ratio, if at any time during such Reference Period Applicable Holdings or any other Applicable Group Member shall have made any Material Disposition, the Consolidated EBITDA for such Reference Period shall be reduced by an amount equal to the Consolidated EBITDA (if positive) attributable to the property that is the subject of such Material Disposition for such Reference Period or increased by an amount equal to the Consolidated EBITDA (if negative) attributable thereto for such Reference Period.

"Consolidated Income Tax Benefit" for any period means the income tax benefit of Applicable Holdings and the Applicable Group Members for such period, determined on a consolidated basis in accordance with IFRS.

"Consolidated Income Tax Expense" for any period means all provisions for taxes based on the net income, profits or capital, including federal, provincial, territorial, foreign, state, franchise and excise and similar taxes and foreign withholding taxes paid or accrued during such period (including in respect of repatriated funds and any penalties and interest related to such taxes), in each case, of Applicable

16

Holdings and the Applicable Group Members (including any additions to such taxes, and any penalties and interest with respect thereto), determined on a consolidated basis in accordance with IFRS.

"Consolidated Interest Expense" for any period means the sum, without duplication, of the total interest expense of Applicable Holdings and the Applicable Group Members for such period, determined on a consolidated basis in accordance with IFRS, including, without duplication:

(a)      imputed interest on Capital Lease Obligations;

(b)      commissions, discounts and other fees and charges owed with respect to letters of credit securing financial obligations, bankers' acceptance financing and receivables financings;

(c)      the net costs associated with Swap Obligations related to interest rates (excluding amortization of fees or any non-cash interest expense attributable to the movement in mark-to-market valuation of such obligations);

(d)      amortization of original issue discount;

(e)      all other non-cash interest expense;

(f)      capitalized interest;

(g)      all dividend payments on any series of Disqualified Capital Stock of Applicable Holdings or any of the Applicable Group Members or any Preferred Stock of any Applicable Group Member (other than dividends on Capital Stock payable solely in Qualified Capital Stock of Applicable Holdings, or to Applicable Holdings or any Applicable Group Member);

(h)      all interest payable on DMPL Payables, Disqualified Parent Payables and DMPL Intercompany Debt;

(i)      all interest payable with respect to discontinued operations; and

(j)      all interest on any Indebtedness described in clause (h) or (i) of the definition of Indebtedness.

Consolidated Interest Expense shall not include any interest expenses relating to (A) penalties and interest related to taxes, (B) amortization or write-off of deferred financing fees, debt issuance costs, debt discount or premium, terminated hedging obligations and other commissions, financing fees and expenses, (C) any expensing of bridge, commitment or other financing fees, (D) fees related to undrawn letters of credit and (E) any expense resulting from the discounting of any Indebtedness in connection with the application of purchase accounting in connection with any acquisition.

"Consolidated Leverage Ratio" means as at the last day of any Reference Period, the ratio of  Consolidated Total Debt on such day to Consolidated EBITDA for such period.

"Consolidated Net Income" means for any period the net income (or loss) of Applicable Holdings and the Applicable Group Members, in each case for such period determined on a consolidated basis in accordance with IFRS; provided that there shall be excluded in calculating such net income (or loss), to the extent otherwise included therein, without duplication:

17

(a)      the net income (or loss) of any Person (other than an Applicable Group Member) in which any Person other than Applicable Holdings and the Applicable Group Members has an ownership interest, except to the extent that cash in an amount equal to any such income has actually been received by Applicable Holdings or any of the Applicable Group Members during such period;

(b)      except to the extent includible in the net income (or loss) of Applicable Holdings pursuant to the foregoing clause (a), the net income (or loss) of any Person that accrued prior to the date that (i) such Person becomes a Restricted Subsidiary or is merged into or consolidated with the Borrower or any Restricted Subsidiary or (ii) the assets of such Person are acquired by the Borrower or any Restricted Subsidiary;

(c)      gains or losses attributable to discontinued operations;

(d)      any gain (or loss), charge or write-off, together with any related provisions for taxes on any such gain (or the tax effect of any such loss), realized or recorded during such period by Applicable Holdings or any Applicable Group Member upon (i) the acquisition of any securities, or the extinguishment of any Indebtedness, of any Applicable Group Member or (ii) any asset sale outside the ordinary course of business by Applicable Holdings or any Applicable Group Member or abandonments or reserves relating thereto;

(e)      gains and losses due solely to fluctuations in currency values and the related tax effects according to IFRS;

(f)      unrealized gains and losses with respect to Swap Obligations;

(g)      the cumulative effect of any change in accounting principles or policies; and

(h)      any extraordinary, non-recurring, exceptional or unusual gain, loss, expense or charge and the related tax effect; provided, that the amounts excluded pursuant to this clause (h) shall not exceed 10% of Consolidated Net Income for any Reference Period.

"Consolidated Net Tangible Assets" means, with respect to Applicable Holdings as of any date, the amount which, in accordance with IFRS, would be set forth under the caption "Total Assets" (or any like caption) on a consolidated balance sheet of Applicable Holdings and the Applicable Group Members determined in accordance with IFRS, less, to the extent included in a determination of "Total Assets," and without duplication, all goodwill, patents, tradenames, trademarks, copyrights, franchises, experimental expenses, organization expenses and any other amounts classified as intangible assets in accordance with IFRS.

"Consolidated Total Debt" means at any date (without duplication), all Capital Lease Obligations, purchase money Indebtedness, Indebtedness for borrowed money and letters of credit (but only to the extent drawn and not reimbursed), in each case of Applicable Holdings and the Applicable Group Members at such date, determined on a consolidated basis in accordance with IFRS; provided, that with respect to calculating Consolidated Total Debt with respect to the Total Revolving Extensions of Credit, Total Revolving Extensions of Credit shall be deemed to be the Average Quarterly Outstanding Amount.

"Contractual Obligation" means as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

18

"Contribution Agreement" means that certain Contribution Agreement, dated as of August 2, 2024, by and among DMFI, DM Intermediate Corporation, a New Jersey corporation, Holdings and the Borrower.

"Corresponding Tenor" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Cost" means the cost of purchase of Inventory determined according to the accounting policies used in the preparation of the Holdings's audited financial statements.

"Covered Entity" means any of the following:

(a)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(b)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(c)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning set forth in Section 10.20.

"Credit Party" means the Administrative Agent, the Issuing Lender, the Swingline Lender or any other Lender and, for the purposes of Section 10.13 only, any other Agent and any Arranger.

"Cumulative Reserve" means, on any date, the sum of (a) all Asset Sale Reserves with respect to all Sweep Asset Sales occurring on or prior to such date and (b) the sum of all Excess Cash Reserves for all Excess Cash Payment Dates occurring on or prior to such date.

"Customary Recourse Exceptions" means, with respect to any Non-Recourse Debt of an Unrestricted Subsidiary, exclusions from the exculpation provisions with respect to such Non-Recourse Debt for the voluntary bankruptcy of such Unrestricted Subsidiary, fraud, misapplication of cash, environmental claims, waste, willful destruction and other circumstances customarily excluded by lenders from exculpation provisions or included in separate indemnification agreements in non-recourse financings.

"Daily Cash Sweep Period" means the period from the Closing Date until the Revolving Termination Date.

"Daily Simple SOFR" means, for any day (a "SOFR Rate Day"), a rate per annum equal SOFR for the day (such day "SOFR Determination Date") that is five (5) U.S. Government Securities Business Day prior to (i) if such SOFR Rate Day is a U.S. Government Securities Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website.  Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to the Borrower.

"Debtor" has the meaning ascribed to such term in the Orders.

19

"Default" means any of the events specified in Section 8.1, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, (ii) fund any portion of its participations in Letters of Credit, Swingline Loans or Protective Advances or (iii) pay over to any Credit Party any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower or any Credit Party in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by a Credit Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations as of the date of certification) to fund prospective Loans and participations in then outstanding Letters of Credit, Swingline Loans and Protective Advances under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Credit Party's receipt of such written certification in form and substance satisfactory to it and the Administrative Agent, or (d) has a direct or indirect parent company that has become the subject of (i) a Bankruptcy Event or (ii) a Bail-In Action.

"Defined Inventory" means the Inventory subject to the Inventory Purchase Agreement.

"Deposit Account Control Agreement" means individually and collectively, each "Deposit Account Control Agreement" referred to in the Pre-Petition Guarantee and Collateral Agreement.

"Designated Underutilized Assets" means the assets constituting the Borrower's or any Guarantor's manufacturing facilities in Markesan, Wisconsin and Toppenish, Washington.

"DIP Term Loan Agent" has the meaning set forth in the definition of "DIP Term Loan Credit Agreement".

"DIP Term Loan Credit Agreement" means the Senior Secured Superpriority Debtor in Possession First Lien Credit and Guaranty Agreement, dated as of July 2, 2025 among the Borrower, Holdings, certain subsidiaries party thereto, the lenders from time to time party thereto and Wilmington Savings Fund Society, FSB, as the administrative agent and collateral agent (the "DIP Term Loan Agent").

"DIP Motion" means the *Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing and (VII) Granting Related Relief* to the filed on the docket of the Bankruptcy Court.

"Disposition" means with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer, license or other disposition (in one transaction or in a series of related

transactions) of any property by any Person (including any sale and leaseback transaction and any issuance of Capital Stock by a Subsidiary of such Person), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Capital Stock" means with respect to any Person, any Capital Stock of such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

(a)       matures or is mandatorily redeemable (other than solely for Capital Stock of such Person that does not constitute Disqualified Capital Stock and cash in lieu of fractional shares of such Capital Stock) whether pursuant to a sinking fund obligation or otherwise;

(b)       is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Capital Stock (other than solely for Capital Stock of such Person that does not constitute Disqualified Capital Stock and cash in lieu of fractional shares of such Capital Stock); or

(c)       is redeemable (other than solely for Capital Stock of such Person that does not constitute Disqualified Capital Stock and cash in lieu of fractional shares of such Capital Stock) or is required to be repurchased by Holdings or any Restricted Subsidiary, in whole or in part, at the option of the holder thereof;

in each case, on or prior to the date that is 91 days after the Revolving Termination Date (or, in the case of any such Capital Stock outstanding on the Closing Date, the Closing Date); provided, however, that (i) Capital Stock of any Person that would not constitute Disqualified Capital Stock but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Capital Stock upon the occurrence of an "asset sale" or a "change of control" (or similar event, however denominated) shall not constitute Disqualified Capital Stock if any such requirement becomes operative only after repayment in full of all the Loans and all other Obligations that are accrued and payable and (ii) Capital Stock of any Person that is issued to any employee or to any plan for the benefit of employees or by any such plan to such employees shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased by such Person or any of its subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"Disqualified Lenders" means (a) certain banks, financial institutions, other institutional lenders and other Persons that have been specified in writing to the Administrative Agent by the Borrower prior to the Closing Date, (b) competitors of the Borrower and its Restricted Subsidiaries and any affiliate of such competitor, in each case, that is identified in writing to the Administrative Agent by the Borrower from time to time and (c) any affiliates of the entities described in the foregoing clauses (a) or (b) that are clearly identifiable as affiliates of such entities solely on the basis of the similarity of their names (other than affiliates that constitute bona fide debt funds primarily investing in loans). In no event shall the designation of any Person as a Disqualified Lender apply (x) to disqualify any Person until three (3) Business Days after such Person shall have been identified in writing to the Administrative Agent via electronic mail submitted to JPMDQ_Contact@jpmorgan.com (or to such other address as the Administrative Agent may designate to the Borrower from time to time). For the avoidance of doubt, with respect to any assignee that becomes a Disqualified Lender after the applicable Trade Date (including as a result of the delivery of a notice pursuant to, and/or the expiration of the notice period referred to in, this definition) or is otherwise party to a pending trade as of the date of such notice, (x) such assignee shall not retroactively be disqualified from becoming a Lender and (y) the execution by the Borrower of an

Assignment and Assumption with respect to such assignee will not by itself result in such assignee no longer being considered a Disqualified Lender.

"Disqualified Parent Payable" means any Parent Payable (a) that has been sold, assigned or otherwise transferred to a Person that is not an Affiliate of Holdings, (b) for which cash interest is payable with respect thereto, (c) that provides for financial or other restrictive covenants for the benefit of the payee or (d) that is or is required under IFRS to be reflected on the balance sheet of Holdings as indebtedness as the result of clauses (a), (b) or (c) or due to any other action taken by Holdings or any Affiliate of Holdings.

"DMFI" means Del Monte Foods, Inc., a Delaware corporation.

"DMPL" means Del Monte Pacific Limited, a company limited by shares incorporated under the laws of the British Virgin Islands with registered number 326349.

"DMPL Arrangements" means evidence reasonably satisfactory to the Administrative Agent that the Group Members have no less than $50,000,000 of the DMPL Payables.

"DMPL Intercompany Debt" means any intercompany loan or advance by DMPL or any of its Affiliates (other than any Group Member) to any Group Member. For the avoidance of doubt, none of the Term Loans shall constitute DMPL Intercompany Debt.

"DMPL Payable" means any trade payable owed by Holdings or any of its Restricted Subsidiaries to DMPL or any of its Affiliates (other than any Group Member).

"Documentation Agent" means each Documentation Agent identified on the cover page of this Agreement.

"Documents" has the meaning set forth in the Pre-Petition Guarantee and Collateral Agreement.

"Dollars" and "$" means dollars in lawful currency of the United States.

"Domestic Subsidiary" means any Restricted Subsidiary of Holdings organized under the laws of any jurisdiction within the United States.

"EEA Financial Institution" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

22

"Eligible Accounts" means at any time, the Accounts of the Borrowing Base Parties which the Administrative Agent determines in its Permitted Discretion (following (to the extent practicable) reasonable prior notice to, and consultation with, the Borrower) are eligible as the basis for the extension of Loans and the issuance of Letters of Credit.  Without limiting the Administrative Agent's Permitted Discretion provided herein, Eligible Accounts shall not include any Account:

(a)    which is not subject to a first priority perfected security interest in favor of the Administrative Agent;

(b)    which is subject to any Lien other than (i) a Lien in favor of the Administrative Agent, (ii) a Lien in favor of any Term Priority Agent which does not have priority over the Lien in favor of the Administrative Agent, (iii) [reserved] and (iv) a Permitted Encumbrance which does not have priority over the Lien in favor of the Administrative Agent;

(c)    (i) which is unpaid more than 90 days after the date of the original invoice therefor or more than 60 days after the original due date therefor, (ii) which arises from a sale with original payment terms in excess of 90 days or (iii) which has been written off the books of the Borrowing Base Parties or otherwise designated as uncollectible (in determining the aggregate amount from the same Account Debtor that is unpaid hereunder there shall be excluded the amount of any net credit balances relating to Accounts due from such Account Debtor which are unpaid more than 90 days from the date of the original invoice therefor or more than 60 days from the original due date or which arise from a sale with original payment terms in excess of 90 days);

(d)    which is owing by an Account Debtor for which more than 50% of the Accounts owing from such Account Debtor and its Affiliates are ineligible pursuant to clause (c) above;

(e)    which is owing by (i) an Account Debtor (other than Walmart) to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to the Borrowing Base Parties exceeds 15% of the aggregate Eligible Accounts, but only to the extent of such excess or (ii) Walmart to the extent that the aggregate amount of Accounts owing from Walmart to the Borrowing Base Parties exceeds 35% (or, if any class of non-credit enhanced long term senior unsecured debt issued by Walmart shall be rated lower than B by S&P or B2 by Moody's, 25%) of the aggregate Eligible Accounts, but only to the extent of such excess;

(f)    with respect to which any covenant, representation or warranty contained in this Agreement or (assuming it were in effect in respect of this Agreement and the Obligations, *mutatis mutandis*) the Pre-Petition Guarantee and Collateral Agreement has been breached or is not true in any material respect;

(g)    which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to the Administrative Agent (utilizing its Permitted Discretion (following (to the extent practicable) reasonable prior notice to, and consultation with, the Borrower)) which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon a Borrowing Base Party's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, (vi) relates to payments of interest or (vii) comprises only service charges or finance charges;

(h)    (i) for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by a Borrowing Base Party or if such Account was invoiced more than once, (ii) for which the goods

23

giving rise to such Account have been shipped to the Account Debtor by FOB destination and such goods have not yet been received by the Account Debtor or (iii) for which the goods giving rise to such Account have been returned or rejected;

(i)      with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(j)      which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal bankruptcy laws (other than post-petition accounts payable of an Account Debtor that is a debtor-in-possession under the Bankruptcy Code and reasonably acceptable to the Administrative Agent), (iv) admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(k)      which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(l)      which is owed in any currency other than Dollars;

(m)      which is owed by (i) the government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the U.S. unless such Account is backed by (A) a letter of credit acceptable to the Administrative Agent which is in the possession of, and is directly drawable by, the Administrative Agent or (B) other credit support acceptable to the Administrative Agent in its sole discretion, or (ii) the government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.), and any other steps necessary to perfect the Lien of the Administrative Agent in such Account have been complied with to the Administrative Agent's satisfaction; provided that up to $5,000,000 in the aggregate of Accounts described in this clause (ii) may be Eligible Accounts notwithstanding that the applicable Borrowing Base Party has not assigned its rights to payments of such Accounts so as to comply with the Federal Assignment of Claims Act of 1940;

(n)      which is owed by a Loan Party, any Affiliate of any Loan Party or any employee, officer, director, agent or stockholder of any Loan Party or any of its Affiliates;

(o)      which is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Loan Party is indebted, but only to the extent of such indebtedness, or is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor, in each case to the extent thereof;

(p)      which is subject to any counterclaim, deduction, defense, setoff or dispute but only to the extent of any such counterclaim, deduction, defense, setoff or dispute;

(q)      which is evidenced by any promissory note, chattel paper or instrument;

(r)      which is owed by an Account Debtor (i) located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit the

24

applicable Borrowing Base Party to seek judicial enforcement in such jurisdiction of payment of such Account, unless the applicable Borrowing Base Party has filed such report or qualified to do business in such jurisdiction or (ii) which is a Sanctioned Person;

(s)     with respect to which any Loan Party has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business, or any Account which was partially paid and the applicable Borrowing Base Party created a new receivable for the unpaid portion of such Account;

(t)     which does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state or local, including the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Board;

(u)     which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates that any Person other than a Borrowing Base Party has or has had an ownership interest in such goods, or which indicates any party other than a Borrowing Base Party as payee or remittance party;

(v)     which was created on cash on delivery terms;

(w)     which is a Foreign Account unless such Account is backed by (i) a Letter of Credit acceptable to the Administrative Agent in its Permitted Discretion and which is, if requested by the Administrative Agent, in the possession of, and is directly drawable by, the Administrative Agent or (ii) other credit support acceptable to the Administrative Agent in its sole discretion; or

(x)     which the Administrative Agent determines in its Permitted Discretion (following (to the extent practicable) reasonable prior notice to, and consultation with, the Borrower) may not be paid by reason of the Account Debtor's inability to pay.

In determining the amount of an Eligible Account, the face amount of an Account may, in the Administrative Agent's Permitted Discretion (following (to the extent practicable) reasonable prior notice to, and consultation with, the Borrower), be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that any Loan Party may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the applicable Borrowing Base Party to reduce the amount of such Account. Standards of eligibility may be made more restrictive from time to time by the Administrative Agent in its Permitted Discretion, following (to the extent practicable) reasonable prior notice to, and consultation with, the Borrower, with any such changes to be effective five Business Days after delivery of notice thereof to the Borrower and the Lenders; provided that if consultation with the Borrower and/or notice to the Borrower and the Lenders is not practicable or if failure to implement any such change within a shorter time period would, in the good faith judgment of the Administrative Agent, reasonably be expected to result in a Material Adverse Effect or materially and adversely affect the Collateral or the rights of the Lenders under the Loan Documents, such change may be implemented within a shorter time as determined by the Administrative Agent in its Permitted Discretion; provided, further, that any Borrowing Base Certificate delivered during such five Business Day period will reflect any such changes.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, (d) any commercial bank and (e) any other financial institution or investment fund engaged as a primary

activity in the ordinary course of its business in making or investing in commercial loans or debt securities, other than, in each case, (i) a natural person, (ii) Holdings, the Borrower, any Subsidiary or any other Affiliate of Holdings, (iii) a Defaulting Lender or (iv) a Disqualified Lender.

"Eligible Inventory" means at any time, the Inventory of the Borrowing Base Parties which the Administrative Agent determines in its Permitted Discretion (following (to the extent practicable) reasonable prior notice to, and consultation with, the Borrower) is eligible as the basis for the extension of Loans and the issuance of Letters of Credit.  Without limiting the Administrative Agent's Permitted Discretion provided herein, Eligible Inventory shall not include any Inventory:

        (a)        which is not subject to a first priority perfected Lien in favor of the Administrative Agent;

        (b)        which is subject to any Lien other than (i) a Lien in favor of the Administrative Agent, (ii) a Lien in favor of any Term Priority Agent which does not have priority over the Lien in favor of the Administrative Agent, (iii) [reserved] and (iv) a Permitted Encumbrance which does not have priority over the Lien in favor of the Administrative Agent;

        (c)        which is, in the Administrative Agent's Permitted Discretion (following (to the extent practicable) reasonable prior notice to, and consultation with, the Borrower), slow moving, obsolete, unmerchantable, defective, used, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business or unacceptable due to age, type, category and/or quantity;

        (d)        with respect to which any covenant, representation or warranty contained in this Agreement or (assuming it were in effect in respect of this Agreement and the Obligations, *mutatis mutandis*) the Pre-Petition Guarantee and Collateral Agreement has been breached or is not true or which does not conform to all material standards applicable to such goods, their use or sale imposed by any Governmental Authority having regulatory authority over such matters;

        (e)        in which any Person other than a Borrowing Base Party shall (i) have any direct or indirect ownership, interest or title to such Inventory or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having an interest therein;

        (f)        [reserved];

        (g)        which constitutes (i) work-in-process, spare or replacement parts, subassemblies, packaging and shipping material (other than cans, can ends and shrink-wrap), salvage, manufacturing supplies, samples, prototypes, displays or display items not considered for sale in the ordinary course of business or (ii) bill-and-hold or ship-in-place goods, goods that are returned (except Inventory that is placed back into stock in the ordinary course of business) or marked for return, repossessed goods, used goods taken in trade, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

        (h)        which is in transit with a common carrier from vendors and suppliers;

        (i)        which is (i) not located in the United States of America at one of the Permitted Inventory Locations or (ii) is in transit within the United States from one Permitted Inventory Location to another Permitted Inventory Location for more than 20 consecutive Business Days;

(j)    which is stored with a bailee, warehouseman, processor, co-packer or similar Person unless (i) if such Inventory is subject to a warehouse receipt or negotiable Document, such warehouse receipt or negotiable Document is in the possession of the Administrative Agent, (ii) if such Inventory is located in any third party warehouse or is in the possession of a bailee, such Inventory is evidenced by a Document and (iii) either (A) the applicable bailee, warehouseman, processor or similar Person has delivered to the Administrative Agent a Collateral Access Agreement and such other documentation as the Administrative Agent may require or (B) an appropriate Reserve has been established by the Administrative Agent in its Permitted Discretion (following (to the extent practicable) reasonable prior notice to, and consultation with, the Borrower);

(k)    which is located at a location where the aggregate Value of all Inventory located at such location does not exceed $100,000;

(l)    which is a discontinued product or component thereof;

(m)    which is the subject of a consignment by the applicable Borrowing Base Party as consignor;

(n)    which consists of fresh fruit, fresh vegetables or other food that is fresh;

(o)    which contains or bears any Intellectual Property rights (i) owned by or licensed to the applicable Borrowing Base Party or (ii) owned by the applicable Borrowing Base Party and licensed to any other Person (other than the Specified Intellectual Property to the extent it is and remains subject to a license in effect as of the Closing Date granted to a Person who is a party to the License Intercreditor Agreement in effect on the Closing Date), in each case, unless the Administrative Agent is reasonably satisfied that it may sell or otherwise dispose of such Inventory without (x) infringing the rights of such licensor or other Person, (y) violating any contract with such licensor or other Person, or (z) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(p)    which is not reflected in a current perpetual inventory report or on the general ledger of the Borrowing Base Parties (unless such Inventory is reflected in a report to the Administrative Agent as "in transit" Inventory);

(q)    for which reclamation rights have been asserted by the seller;

(r)    which has been acquired from a Sanctioned Person;

(s)    to the extent that the value (calculated at the lower of (i) book value and (ii) cost (on a first-in first-out basis)) of such Inventory is increased due to favorable capitalized adjustments (but only to the extent of such increase); or

(t)    which the Administrative Agent in its Permitted Discretion (following (to the extent practicable) reasonable prior notice to, and consultation with, the Borrower) determines is unacceptable.

Standards of eligibility may be made more restrictive from time to time by the Administrative Agent in its Permitted Discretion (following (to the extent practicable) consultation with the Borrower) with any such changes to be effective five Business Days after delivery of notice thereof to

the Borrower and the Lenders; provided that if consultation with the Borrower and/or notice to the Borrower and the Lenders is not practicable or if failure to implement any such change within a shorter time period would, in the good faith judgment of the Administrative Agent, reasonably be expected to result in a Material Adverse Effect or materially and adversely affect the Collateral or the rights of the Lenders under the Loan Documents, such change may be implemented within a shorter time as determined by the Administrative Agent in its Permitted Discretion; provided, further, that any Borrowing Base Certificate delivered during such five Business Day period will reflect any such changes. Notwithstanding anything to the contrary set forth herein, Eligible Inventory shall not exclude Defined Inventory solely as a result of such Inventory being Defined Inventory and, for the avoidance of doubt, it is understood and agreed that all other criteria set forth in the definition of Eligible Inventory shall apply to Inventory that constitutes Defined Inventory.

"Engaged Financial Advisor" means, a financial advisor reasonably acceptable to the Administrative Agent on terms satisfactory to the Administrative Agent; it being agreed that Alvarez & Marsal is an acceptable Engaged Financial Advisor.

"Engaged Investment Bank" means an independent nationally recognized investment bank engaged by the Chapter 11 Debtors for the Chapter 11 Cases; it being understood that PJT Partners L.P. is the Engaged Investment Bank as of the Petition Date.

"Environmental Laws" means any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"Environmental Permits" means any and all permits, licenses, approvals, registrations, notifications, exemptions and any other authorization required under any Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Group Member, is treated as a single employer under Section 414(b) or (c) of the Code or Section 4001(a)(14) of ERISA or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) or (o) of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA) with respect to any Plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by any Group Member or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by any Group Member or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by any Group Member or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal of any Group Member or any ERISA Affiliate from any Plan or Multiemployer Plan; or (g) the receipt by any Group Member or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan of any notice, concerning the imposition upon any Group Member or any ERISA Affiliate of

28

Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent within the meaning of Title IV of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default" means any of the events specified in Section 8.1, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Availability" means at any time, an amount equal to (a) the Line Cap minus (b) the Total Revolving Extensions of Credit then outstanding (calculated, with respect to any Defaulting Lender, as if such Defaulting Lender had funded its Revolving Percentage of all outstanding Revolving Loans), minus (c) the aggregate amount of all outstanding trade payables of the Loan Parties which have been unpaid for more than 60 days after the due date therefor (other than (i) trade payables being contested or disputed by the applicable Loan Party in good faith and (ii) DMPL Payables), all as determined by the Administrative Agent in its Permitted Discretion.

"Excess Cash" means with respect to any Excess Cash Test Date on which the Sweep Conditions are not met, an amount equal to the maximum payment the Borrower and its Subsidiaries could make on such date that would result in Excess Availability being equal to the Excess Cash Minimum Excess Availability for the 30 days preceding such Excess Cash Test Date.

"Excess Cash Minimum Excess Availability" means the sum of (a) the Minimum Excess Availability Amount plus (b) the greater of (x) 20% of the Line Cap and (y) $100,000,000.

"Excess Cash Payment Date" means, in any fiscal year of the Borrower, each of the first Business Day of the third fiscal quarter of the Borrower and the first Business Day of the fourth fiscal quarter of the Borrower.

"Excess Cash Reserve" means, with respect to any Excess Cash Payment Date, the product of (a) 40% and (b) Excess Cash as of the immediately preceding Excess Cash Test Date.

"Excess Cash Test Date" means, in any fiscal year of the Borrower, each of the last Business Day of the second fiscal quarter of the Borrower and the last Business Day of the third fiscal quarter of the Borrower.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Account" has the meaning set forth in the Pre-Petition Guarantee and Collateral Agreement.

"Excluded Collateral" means (a) all real property and (b) all licenses and any other property and assets (including any lease, license, permit or agreement) (i) to the extent that the Administrative Agent may not validly possess a security interest therein under, or such security interest is restricted by, (x) applicable laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or (y) by contract, lease, license or other agreement with a counterparty that is not a Debtor or an affiliate thereof and that exists on the Closing Date or (ii) the pledge or creation of a security interest in which would require the consent, approval, license or authorization of (x) a Governmental Authority or (y) a third party that is not a Debtor or an affiliate thereof, which third party right to consent, approve or authorize such a pledge or creation of a security interest exists on the Closing Date and, in each case of clause (i) and (ii), other than to the extent such prohibition or limitation is rendered ineffective under the

29

UCC, the U.S. Bankruptcy Code, other applicable insolvency laws or other applicable law notwithstanding such prohibition or limitation; provided, however, that Excluded Collateral shall not include any proceeds, substitutions, replacements, economic interest and economic value unless such proceeds, substitutions, replacements economic interest and economic value constitute Excluded Collateral in accordance with clause (i) or (ii) above.

"Excluded Subsidiary" means (a) any Unrestricted Subsidiary, (b) Immaterial Subsidiary, (c) any non-Wholly Owned Subsidiary to the extent the organizational documents thereof prohibit it from guaranteeing the Obligations; provided that, no non-Wholly Owned Subsidiary shall be an Excluded Subsidiary if the transaction pursuant to which a Wholly Owned Subsidiary became a non-Wholly Owned Subsidiary was entered into primarily to achieve such purpose, (d) any Subsidiary that is prohibited or restricted by applicable law, rule or regulation or by any contractual obligation existing on the Closing Date or on the date such Subsidiary was acquired (so long as such contractual obligation was not entered into in contemplation of such acquisition) from guaranteeing the Obligations or which would require a non-ministerial governmental (including regulatory) consent, approval, license or authorization to provide a guarantee unless such consent, approval, licensor authorization has been received (the Loan Parties being under no obligation to obtain such consent, approval or licensor authorization), (e) any CFC or CFC Holding Company, (f) any Domestic Subsidiary of a Foreign Subsidiary, (g) not-for-profit Subsidiaries and captive insurance companies and (h) any Subsidiary whose provision of a guarantee would have a cost (including tax cost), burden, difficulty or consequence that is excessive in relation to the value afforded thereby as agreed between the Borrower and Administrative Agent; provided that no Subsidiary that is a Debtor shall be an Excluded Subsidiary. Each Excluded Subsidiary as of the Closing Date is set forth on Schedule 4.15.

"Excluded Swap Obligation" means with respect to any Loan Party (a) any Swap Obligation if, and to the extent that, and only for so long as, all or a portion of the guarantee of such Loan Party of, or the grant by such Loan Party of a security interest to secure, as applicable, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure to constitute an "eligible contract participant," as defined in the Commodity Exchange Act and the regulations thereunder, at the time the guarantee of (or grant of such security interest by, as applicable) such Loan Party becomes or would become effective with respect to such Swap Obligation or (b) any other Swap Obligation designated as an "Excluded Swap Obligation" of such Loan Party as specified in any agreement between the relevant Loan Parties and counterparty applicable to such Swap Obligations, and agreed by the Administrative Agent. If a Swap Obligation arises under a master agreement governing more than one Swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Credit Party or required to be withheld or deducted from a payment to a Credit Party, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of a Credit Party being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of a Lender with respect to an applicable interest in a Loan or Revolving Commitment pursuant to a law in effect on the date on which (i) a Lender acquires such interest in the Loan or Revolving Commitment (other than pursuant to an assignment request by the Borrower under Section 2.22) or (ii) a Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.19, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan

30

or Revolving Commitment or to such Lender immediately before it changed its lending office, (c) Taxes attributable to a Credit Party's failure to comply with Section 2.19(f) and (d) any withholding Taxes imposed under FATCA.

"Existing Holdings" has the meaning set forth in the definition of "Applicable Reference Period".

"Existing Indebtedness Payoff" has the meaning set forth in Section 5.1(c).

"Existing Letters of Credit" means those letters of credit described on Schedule 3.1 issued under the Pre-Petition ABL Credit Agreement that are outstanding thereunder on the Closing Date.

"Facility" means each of the Revolving Commitments and the Loans made thereunder.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the NYFRB's Website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; provided that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Fee Payment Date" means (a) the fifteenth (15th) day of each January, April, July and October and (b) the last day of the Revolving Commitment Period.

"Final DIP Order" means the final order entered by the Bankruptcy Court in the Chapter 11 Cases approving, among other things, (i) the Loan Parties' entry into the Loan Documents, (ii) the incurrence of the Obligations and the Loans hereunder, (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets, (iv) the use of cash collateral, and (v) the granting of adequate protection to the secured parties in respect of each Term Loan Credit Agreement and the Obligations, in each case, on a final basis, in form and substance acceptable to the Administrative Agent and the Required Lenders, which shall be in full force and effect and shall not be reversed, vacated, stayed, amended, supplemented or otherwise modified, in each case, without the prior written consent of the Required Lenders.

"First Day Orders" means all material orders entered by the Bankruptcy Court pursuant to motions filed on or about the Petition Date by the Chapter 11 Debtors.  The First Day Orders, including without limitation the Orders and Cash Management Order, must be reasonably acceptable to the Required Lenders.

"<u>Financing Commitment Letter</u>" means the Commitment Letter, dated as of June 21, 2024 (as amended by the Amendment to Commitment Letter, dated as of June 27, 2024) between DMFI and Jefferies Capital Services, LLC.

"<u>First Post-Closing Appraisal</u>" has the meaning set forth in Section 6.6(b).

"<u>Floor</u>" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to the Adjusted Term SOFR Rate or the Adjusted Daily Simple SOFR, as applicable. For the avoidance of doubt the initial Floor for each of Adjusted Term SOFR Rate and the Adjusted Daily Simple SOFR shall be zero.

"<u>Foreign Account</u>" means an Account that is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. (including any territory thereof) or Canada (including any province or territory thereof) or (ii) is not organized under applicable law of the U.S., any state of the U.S., the District of Columbia, Canada or any province or territory of Canada.

"<u>Foreign Benefit Arrangement</u>" means any employee benefit arrangement mandated by non-U.S. law that is maintained or contributed to by any Group Member, any ERISA Affiliate or any other entity related to a Group Member on a controlled group basis.

"<u>Foreign Plan</u>" means each employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not such plan is subject to ERISA) that is not subject to US law and is maintained or contributed to by any Group Member, or ERISA Affiliate or any other entity related to a Group Member on a controlled group basis.

"<u>Foreign Plan Event</u>" means with respect to any Foreign Benefit Arrangement or Foreign Plan, (a) the failure to make or, if applicable, accrue in accordance with normal accounting practices, any employer or employee contributions required by applicable law or by the terms of such Foreign Benefit Arrangement or Foreign Plan; (b) the failure to register or loss of good standing with applicable regulatory authorities of any such Foreign Benefit Arrangement or Foreign Plan required to be registered; or (c) the failure of any Foreign Benefit Arrangement or Foreign Plan to comply with any material provisions of applicable law and regulations or with the material terms of such Foreign Benefit Arrangement or Foreign Plan.

"<u>Foreign Subsidiary</u>" means any Restricted Subsidiary of Holdings that is not a Domestic Subsidiary.

"<u>Funding Office</u>" means the office of the Administrative Agent specified in Section 10.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders. "<u>IFRS</u>" means the International Financial Reporting Standards, as in effect from time to time. In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then the Borrower and the Administrative Agent agree to enter into negotiations to promptly amend such provisions of this Agreement so as to reflect equitably such Accounting Changes with the desired result that the criteria for evaluating Holdings's results of operations and/or financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made.  Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not

occurred.  "<u>Accounting Changes</u>" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the IFRS Foundation or any successor thereto.

"<u>Governmental Authority</u>"  means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"<u>Group Members</u>" means the collective reference to Holdings and its Restricted Subsidiaries.

"<u>Guarantee Agreement</u>" means the ABL Guarantee Agreement, dated as of the Closing Date, executed and delivered by the Borrower and each Guarantor.

"<u>Guarantee Obligation</u>" means as to any Person (the "<u>guaranteeing person</u>"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing Person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "<u>primary obligations</u>") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"<u>Guarantors</u>" means the collective reference to the Parent Guarantors and the Subsidiary Guarantors, <u>provided</u>, <u>further</u>, that each Debtor (other than the Borrower) shall be a Guarantor hereunder.

"<u>Holdings</u>" has the meaning set forth in the preamble hereto.

"<u>Immaterial Subsidiary</u>" means any Restricted Subsidiary that is not a Material Subsidiary and that is designated by Holdings in writing to the Administrative Agent as an "Immaterial Subsidiary"; provided that if (i) as of the last day of the most recently ended fiscal quarter of Holdings for which financial statements have been delivered pursuant to Section 5.1(a) or (b), the aggregate Consolidated Net Tangible Assets of all Immaterial Subsidiaries, as of the last day of such fiscal quarter, exceeds 5.0% of Consolidated Net Tangible Assets of Holdings and its Restricted Subsidiaries or (ii) the aggregate contribution of Consolidated EBITDA of all Immaterial Subsidiaries to Consolidated EBITDA for the Applicable

Reference Period exceeds 5.0% of Consolidated EBITDA of Holdings and its Restricted Subsidiaries for such Applicable Reference Period, then one or more Restricted Subsidiaries that are not Material Subsidiaries shall promptly be designated by Holdings in writing to the Administrative Agent as a "Material Subsidiary" until such excess has been eliminated. Each Immaterial Subsidiary as of the Closing Date is set forth on Schedule 4.15.

"Indebtedness" means of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than (i) trade payables incurred in the ordinary course of such Person's business (but excluding any Disqualified Parent Payables), (ii) deferred compensation payable to directors, officers or employees of any Group Member, (iii) any purchase price adjustment or earnout obligation until such adjustment or obligation becomes a liability on the balance sheet of such Person in accordance with IFRS, (iv) accrued expenses and liabilities and intercompany liabilities arising in the ordinary course of such Person's business, and (v) prepaid or deferred revenue arising in the ordinary course of business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all redeemable preferred Disqualified Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation (but only to the extent of the lesser of (i) the amount of such Indebtedness and (ii) the fair market value of such property), and (j) for the purposes of Section 8.1(f) only, after taking into account the effect of any legally enforceable netting agreement relating to Swap Agreements, (i) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (ii) for any date prior to the date referenced in the immediately preceding clause (i), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Agreements (which may include a Lender or any Affiliate of a Lender). The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor. Any Disqualified Parent Payable shall constitute "Indebtedness" and any creation or incurrence of a Disqualified Parent Payable shall be deemed to be an incurrence of Indebtedness.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a) above, Other Taxes.

"Indemnitee" has the meaning set forth in Section 10.5.

"Initial DIP Budget" has the meaning ascribed to such term in the Orders.

"Intellectual Property" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark

34

licenses, technology, know-how and processes, all registrations and applications therefor, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Election Request" means a request by the Borrower to convert or continue a Revolving Borrowing in accordance with Section 2.12 and the definition of "Interest Period", which shall be substantially in the form of Exhibit B or any other form approved by the Administrative Agent.

"Interest Payment Date" means (a) with respect to any ABR Loan (other than a Swingline Loan), the first day of each January, April, July and October and the Revolving Termination Date, (b) with respect to any RFR Loan each date that is on the numerically corresponding day in each calendar month that is one month after the Borrowing of such Loan (or, if there is no such numerically corresponding day in such month, then the last day of such month) and the Revolving Termination Date, (c) with respect to any Term Benchmark Loan, the last day of each Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Term Benchmark Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period, the Revolving Termination Date and (d) with respect to any Swingline Loan, the day that such Loan is required to be repaid and the Revolving Termination Date.

"Interest Period" means with respect to any Term Benchmark Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, three or six months thereafter (in each case, subject to the availability for the Benchmark applicable to the relevant Loan or Commitment), as the Borrower may elect; provided, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period, (iii) no tenor that has been removed from this definition pursuant to Section 2.16(e) shall be available for specification in such Borrowing Request or Interest Election Request and (iv) the Borrower may not select an Interest Period that would extend beyond the Revolving Termination Date.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and, in the case of a Borrowing, thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim DIP Order" means an interim order entered by the Bankruptcy Court in the Chapter 11 Cases approving, among other things, (i) the Loan Parties' entry into the Loan Documents, (ii) the incurrence of the Term Loan Obligations and the Loans hereunder, (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets, (iv) the use of cash collateral, and (v) the granting of adequate protection to the secured parties in respect of each Term Loan Credit Agreement and the Pre-Petition ABL Credit Agreement, in each case, on an interim basis, which order shall be in form and substance acceptable to the Administrative Agent and the Required Lenders and shall be in full force and effect, and shall not, subject to entry of the Final DIP Order, be reversed, stayed, amended, supplemented or otherwise modified without the prior written consent of the Required Lenders.

"Inventory" has the meaning set forth in the Pre-Petition Guarantee and Collateral Agreement.

"Inventory Purchase Agreement" means the executed Inventory Purchase Agreement, dated as of April 19, 2024, as amended from time to time, between DMFI, as seller and DMPL (or any of its affiliates (including, without limitation, Del Monte Philippines, Inc.)), as buyer.

"Inventory Purchaser" means DMPL (or any of its affiliates (including, without limitation, Del Monte Philippines, Inc.)).

"Investment Grade Eligible Accounts" means Eligible Accounts owing by an Account Debtor whose securities are rated BBB- or better by S&P or Baa3 or better by Moody's at such time.

"Investments" has the meaning set forth in Section 7.7.

"IRS" means the United States Internal Revenue Service.

"Issuer Document" means, with respect to any Letter of Credit, the Application, a letter of credit agreement, or any other document, agreement or instrument entered into (or to be entered into) by the Borrower in favor of the Issuing Lender and relating to such Letter of Credit.

"Issuing Lender" means, subject to Section 3.9, each of JPMCB, Wells Fargo Bank, National Association, Capital One, National Association, BMO Bank N.A., MUFG Bank, Ltd. and any other Revolving Lender reasonably approved by the Administrative Agent and the Borrower that has agreed in its sole discretion to act as an "Issuing Lender" hereunder, or any of their respective affiliates, in each case in its capacity as issuer of any Letter of Credit.  Each reference herein to "the Issuing Lender" shall be deemed to be a reference to the relevant Issuing Lender.

"Joint Venture" means a joint venture, partnership or other similar arrangement entered into by the Borrower or any Restricted Subsidiary, whether in corporate, partnership or other legal form; provided that in no event shall any Subsidiary be considered to be a Joint Venture.

"JPMCB" means JPMorgan Chase Bank, N.A., a national banking association, in its individual capacity, and its successors.

"Junior Indebtedness" means (a) any Material Subordinated Indebtedness, (b) any Indebtedness (other than the Term Loans) of any Group Member that is secured by a Lien on the Collateral that is junior to the Lien on the Collateral securing the Obligations and (c) any Material Unsecured Indebtedness of any Group Member. For the avoidance of doubt, none of the Term Loans shall constitute Junior Indebtedness.

"L/C Commitment" means (a) with respect to each of JPMCB, Wells Fargo Bank, National Association, Capital One, National Association, BMO Bank N.A. and MUFG Bank, Ltd., $8,000,000 (as such amount may be decreased as to any Issuing Lender as agreed between the Borrower and such Issuing Lender) and (b) with respect to any other Issuing Lender, such amount as separately agreed between the Borrower and such Issuing Lender.

"L/C Disbursement" means a payment made by an Issuing Lender pursuant to a Letter of Credit, including in respect of a time draft presented thereunder.

"L/C Exposure" means at any time, the total L/C Obligations.  The L/C Exposure of any Revolving Lender at any time shall be its Revolving Percentage of the total L/C Exposure at such time.  For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Article 29(a) of the Uniform

36

Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 600 (or such later version thereof as may be in effect at the applicable time) or Rule 3.13 or Rule 3.14 of the International Standby Practices, International Chamber of Commerce Publication No. 590 (or such later version thereof as may be in effect at the applicable time) or similar terms of the Letter of Credit itself, or if compliant documents have been presented but not yet honored, such Letter of Credit shall be deemed to be "outstanding" and "undrawn" in the amount so remaining available to be paid, and the obligations of the Borrower and each Lender shall remain in full force and effect until the Issuing Lender and the Lenders shall have no further obligations to make any payments or disbursements under any circumstances with respect to any Letter of Credit.

"L/C Obligations" means at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit and (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed pursuant to Section 3.5.

"L/C Participants" means the collective reference to all the Revolving Lenders other than the Issuing Lender.

"L/C Sublimit" means $40,000,000, as such amount may be reduced from time to time by the mutual agreement of the Administrative Agent and the Borrower.

"Lender Financial Advisor" means a financial advisor engaged by the Administrative Agent on behalf of the Lenders on terms satisfactory to the Administrative Agent. As of the Closing Date, the Administrative Agent has engaged FTI Consulting Inc. as the Lender Financial Advisor.

"Lender Parent" means with respect to any Lender, any Person as to which such Lender is, directly or indirectly, a Subsidiary.

"Lender-Related Person" has the meaning set forth in Section 10.5.

"Lenders" means the Persons listed on Schedule 1.1A and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption or otherwise, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption or otherwise. Unless the context otherwise requires, the term "Lenders" includes the Swingline Lender and the Issuing Lenders.

"Letters of Credit" has the meaning set forth in Section 3.1(a).

"Liabilities" means any losses, claims (including intraparty claims), demands, damages or liabilities of any kind.

"License Intercreditor Agreement" means that certain Amended and Restated Intercreditor Agreement, dated as of December 5, 1989, as executed by Wafer Limited, The First National Bank of Chicago, Nabisco Brands Canada Ltd. and Compañía Venezolana de Conservas C.A., among others, and consented to by Del Monte Corporation.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, license, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

37

"Limited Condition Transaction" means any Investment that Holdings or a Restricted Subsidiary is contractually committed to consummate (it being understood that such commitment may be subject to conditions precedent, which conditions precedent may be amended, satisfied or waived in accordance with the applicable agreement) and whose consummation is not conditioned on the availability or, or on obtaining, third party financing; provided that such Limited Condition Transaction shall be consummated within six months of the date that Holdings or a Restricted Subsidiary enters into the contractual commitment in respect of such Investment.

"Line Cap" means an amount equal to the difference between (a) the lesser of (i) the Total Revolving Commitments at such time and (ii) the Borrowing Base in effect at such time and (b) the Cumulative Reserve.

"Liquidity" means, as of any date, an amount equal to the sum of (A) Excess Availability and (B) an amount equal to the aggregate amount of cash and Cash Equivalents of the Borrower and the Guarantors as of such date, but excluding any such cash and Cash Equivalents that (i) would be listed as "restricted" on a balance sheet of the Borrower or the applicable Guarantors as of such date or (ii) constitute Net Asset Sale Proceeds (as defined in the Pre-Petition Term Loan Credit Agreement as in effect on the Closing Date) required to be applied to prepay the Term Loans.

"Loan" means the loans made by the Lenders to the Borrower pursuant to this Agreement, including Revolving Loans, Swingline Loans and Protective Advances.

"Loan Documents" means this Agreement, the Security Documents, the Pre-Petition Intercreditor Agreement, the Notes, the Letters of Credit, any Applications, any Issuer Documents and any amendment, waiver, supplement or other modification to any of the foregoing.

"Loan Parties" means the Borrower and the Guarantors.

"Management Conference Call" has the meaning set forth in Section 6.18(d).

"Margin Stock" means margin stock within the meaning of Regulations T, U and X, as applicable.

"Material Adverse Effect" means a material adverse change in, or a material adverse effect on, (a) the business, property, assets, liabilities (actual or contingent), operations or financial condition of Holdings and its Restricted Subsidiaries taken as a whole, (b) the ability of the Loan Parties (taken as a whole) to perform the obligations under the Loan Documents to which they are a party or (c) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder (other than the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Cases, the events that lead to the commencement of the Chapter 11 Cases, events that customarily and reasonably result from the commencement of the Chapter 11 Cases (in each case, other than matters affecting the Loan Parties that are not subject to the automatic stay) and the consummation of the transactions contemplated by the First Day Orders).

"Material Disposition" means any Disposition (or series of related Dispositions) of any operating segment, business unit, division, line of business, or the Capital Stock of any Subsidiary of the Borrower whose contribution to Consolidated EBITDA for the Applicable Reference Period exceeds 5.0% of Consolidated EBITDA (calculated without giving effect to the portion of Consolidated EBITDA contributed by such Disposed of assets) for the Applicable Reference Period.

38

"Material Indebtedness" means Indebtedness (other than the Loans) or Swap Obligations of any one or more of Holdings and the Restricted Subsidiaries in an aggregate principal amount of $5,000,000 or more; provided that any Indebtedness outstanding under any Term Loan Credit Agreement shall be deemed to be Material Indebtedness.  For purposes of determining Material Indebtedness, the "principal amount" of any Swap Obligation at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that Holdings and/or any applicable Restricted Subsidiary would be required to pay if the applicable Swap Agreement were terminated at such time.

"Material Property" means assets, including, without limitation, intellectual property, owned by the Borrower and its Restricted Subsidiaries that are material to the business, operations, assets, financial condition or prospects of the Borrower and its Restricted Subsidiaries, taken as a whole.

"Material Subordinated Indebtedness" means any Subordinated Indebtedness in an aggregate principal amount of $1,000,000 or more.

"Material Subsidiary" means, as of any date of determination, each Restricted Subsidiary (a) with tangible assets (including the value of Capital Stock of its subsidiaries) on such date of determination equal to or greater than 5.0% of Consolidated Net Tangible Assets, (b) whose contribution to Consolidated EBITDA for the Applicable Reference Period exceeds 5.0% of Consolidated EBITDA for the Applicable Reference Period or (c) that is designated as a "Material Subsidiary" pursuant to the definition of Immaterial Subsidiary.

"Material Unsecured Indebtedness" means any Indebtedness in an aggregate principal amount of $1,000,000 or more that is not secured by a Lien on any property of any Group Member.

"Materials of Environmental Concern" means any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, asbestos, polychlorinated biphenyls, urea-formaldehyde insulation, radioactivity, and any other substances, materials or wastes, that are regulated pursuant to or that could give rise to liability under any Environmental Law.

"Minimum Excess Availability Amount" means $50,000,000, provided that such amount shall be reduced by 10% of the Cumulative Reserve up to an aggregate reduction of $25,000,000. Notwithstanding the foregoing, under no circumstance shall the Minimum Excess Availability Amount be reduced below $25,000,000.

"Milestones" means the milestones set forth in Section 10.22 hereof.

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Group Member or any ERISA Affiliate (i) makes or is obligated to make contributions, (ii) during the preceding five plan years, has made or been obligated to make contributions or (iii) has any actual or contingent liability.

"Multiple Employer Plan" means as described in Section 4064 of ERISA a Plan which has two or more contributing sponsors (including any Group Member or any ERISA Affiliate) at least two of whom are not under common control.

"Net Cash Proceeds" means (a) in connection with any Disposition or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price

adjustment receivable or otherwise, but only as and when received), net of the direct costs relating to such Disposition or Recovery Event including attorneys' fees, accountants' fees, investment banking fees, sales commissions, amounts required to be applied to the repayment of Indebtedness (other than (i) the Loans, any Junior Indebtedness, any Subordinated Indebtedness or any unsecured Indebtedness and (ii) with respect to ABL Priority Collateral, the Term Loans or any Indebtedness secured by Liens on the Collateral on a *pari passu* basis with the Liens on the Collateral securing the Term Loans) secured by a Lien expressly permitted hereunder on any asset that is the subject of such Disposition or Recovery Event and other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements) and any (i) reasonable reserve for adjustment in respect of the sale price of such asset or assets established in accordance with IFRS; provided that upon release of any such reserve, the amount released shall be considered Net Cash Proceeds and (ii) any reasonable reserve or payment with respect to any liabilities associated with such asset or assets and retained by the applicable Group Member after such sale or other disposition thereof, including, severance costs, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction; provided that upon release of any such reserve, the amount released shall be considered Net Cash Proceeds and (b) in connection with any incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of all taxes paid or reasonably estimated to be payable as a result thereof and fees, including attorneys' fees, investment banking fees and discounts, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"Net Orderly Liquidation Value" means with respect to Inventory of any Person, the net orderly liquidation value expected to be realized at an orderly, negotiated sale held within reasonable time period from the most recent Inventory appraisal ordered by the Administrative Agent; provided that unless an Event of Default has occurred and is continuing, no change in the Net Orderly Liquidation Values as in effect on the Closing Date shall become effective as a result of a Post-Closing Appraisal prior to the date that is the six-month anniversary of the Closing Date (or such earlier date as agreed by the Borrower).

"Non-Investment Grade Eligible Accounts" means Eligible Accounts that are not Investment Grade Eligible Accounts.

"Non-Recourse Debt" means Indebtedness of an Unrestricted Subsidiary:

(a)    as to which neither Holdings nor any Restricted Subsidiary (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness), except for Customary Recourse Exceptions or (b) is directly or indirectly liable as a guarantor or otherwise; and

(b)    no default with respect to which (including any rights that the holders thereof may have to take enforcement action against an Unrestricted Subsidiary) would permit upon notice, lapse of time or both any holder of any other Indebtedness of Holdings or any Restricted Subsidiary to declare a default on such other Indebtedness or cause the payment thereof to be accelerated or payable prior to its Stated Maturity.

"Non-U.S. Lender" means (a) if the Borrower is a U.S. Person, a Lender, with respect to the Borrower, that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender, with respect to the Borrower, that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes.

"Notes" means the collective reference to any promissory note evidencing Loans.

"<u>NYFRB</u>" means the Federal Reserve Bank of New York.

"<u>NYFRB Rate</u>" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Administrative Agent from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"<u>NYFRB's Website</u>" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"<u>Obligations</u>" means collectively, (a) the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and Reimbursement Obligations and interest accruing after the filing of the Chapter 11 Cases or any other petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and Reimbursement Obligations, all other obligations and liabilities of the Borrower to the Administrative Agent or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which arise under, out of, or in connection with, this Agreement, any other Loan Document, the Letters of Credit or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower pursuant hereto including with respect to Letters of Credit) or otherwise, (b) all Banking Services Obligations and (c) all Secured Swap Obligations.

"<u>Official Committee</u>" means any statutory committee appointed in any of the Chapter 11 Cases.

"<u>Orders</u>" means the Interim DIP Order and/or the Final DIP Order, as the context requires.

"<u>Ordinary Course of Business</u>" means the ordinary course of business of DMFI and its Subsidiaries prior to the date hereof, consistent with the past practices of DMFI and its Subsidiaries prior to the date hereof; provided, however, for the avoidance of doubt, the foregoing shall not include the Transactions, or any portion thereof, which shall not be considered ordinary course of business or consistent with past practices.

"<u>Other Connection Taxes</u>" means with respect to any Credit Party, Taxes imposed as a result of a present or former connection between such Credit Party and the jurisdiction imposing such Tax (other than connections arising from such Credit Party having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"<u>Other Taxes</u>" means all present or future stamp, court, or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.22).

41

"<u>Overnight Bank Funding Rate</u>" means, for any day, the rate comprised of both overnight federal funds and overnight eurodollar transactions denominated in Dollars by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the NYFRB's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"<u>Parent Guarantors</u>" means (a) Holdings, (b) Del Monte Foods Holdings Limited, (c) Del Monte Foods Holdings II, Inc., (d) Del Monte Foods Holdings, Inc., (e) DMFI and (f) DM Intermediate Corporation.

"<u>Parent Payable</u>" means any DMPL Payable (or portion thereof) that has not been paid in full within 365 days of incurrence thereof.

"<u>Participant</u>" has the meaning set forth in Section 10.6(c).

"<u>Participant Register</u>" has the meaning set forth in Section 10.6(c).

"<u>Patriot Act</u>" has the meaning set forth in Section 10.17(a).

"<u>Payment</u>" has the meaning set forth in Section 9.6(c)(i).

"<u>Payment in Full</u>" means the payment in full in cash of the obligations (other than indemnification or reimbursement obligations under Section 2.18, 2.19(a), 2.19(d) or 2.20 for which the Borrower has not been notified and contingent indemnification obligations that are expressly stated to survive repayment of the Facility) under the Loan Documents, the termination of any outstanding Letters of Credit (other than Letters of Credit cash collateralized or otherwise backstopped in a manner satisfactory to the applicable Issuing Lender and the Administrative Agent) and the termination of the Revolving Commitments.

"<u>Payment Notice</u>" has the meaning set forth in Section 9.6(c)(ii).

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation established under Section 4002 of ERISA and any successor entity performing similar functions.

"<u>Pension Plan</u>" means any employee benefit plan (including a Multiple Employer Plan, but not including a Multiemployer Plan) that is subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA (i) which is or was sponsored, maintained or contributed to by, or required to be contributed to by, any Group Member or any ERISA Affiliate or (ii) with respect to which any Group Member or any ERISA Affiliate has any actual or contingent liability.

"<u>Permitted Amount</u>" means, as of any date, (a) $10,000,000, <u>less</u> (b) without duplication, the aggregate outstanding amount of Indebtedness of Restricted Subsidiaries that are not Loan Parties subject to Guarantee Obligations of Loan Parties under Section 7.7(c) as of such date.

"<u>Permitted Discretion</u>" means in respect of the adjustment of eligibility criteria and (without duplication) reserves with respect to the Borrowing Base collateral, a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment following (to the extent practicable) reasonable prior notice to, and consultation with, the Borrower and in accordance with customary business practices for asset-based transactions.

42

"Permitted Encumbrances" means Liens permitted pursuant to Section 7.3(a), (b), (c), (d), (e) or (n); provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness (other than with respect to Section 7.3(n)).

"Permitted Holders" means NutriAsia Pacific Limited, a company organized under the laws of the Philippines or its Affiliates.

"Permitted Inventory Locations" means each location listed on Schedule 1.1B and from time to time each other location within the United States which the Borrower has notified the Administrative Agent is a location at which Inventory of any Borrowing Base Party is maintained.

"Permitted Liens" means Liens permitted pursuant to Section 7.3.

"Permitted Refinancing Indebtedness" means with respect to any Indebtedness of any Person (the "Original Indebtedness"), any modification, refinancing, refunding, replacement, renewal or extension (any of the foregoing, a "Refinancing") of such Indebtedness, in whole or in part; provided, that (i) no Person that is not an obligor with respect to the Original Indebtedness shall be an obligor with respect to such Permitted Refinancing Indebtedness, (ii) the final maturity of such Indebtedness is no sooner and weighted average life to maturity of such Indebtedness is no shorter than such Original Indebtedness, (iii) in the case of any modification, refinancing, refunding, replacement, renewal or extension of Indebtedness incurred pursuant Section 7.2(b), the other material terms and conditions of such Indebtedness after giving effect to such modification, refinancing, refunding, replacement, renewal or extension, taken as a whole (other than interest rates, rate floors, fees and optional prepayment or redemption terms), either (x) reflect market terms at the time of issuance thereof, as reasonably determined by the Borrower in good faith, or (y) shall, taken as a whole, not be more favorable to the lenders providing such Indebtedness than the terms and conditions applicable to the Original Indebtedness, (iv) (x) in the case of any Original Indebtedness consisting of a revolving credit facility, the committed amount in respect of the Permitted Refinancing Indebtedness does not exceed the committed amount in respect of the Original Indebtedness and (y) otherwise, the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Original Indebtedness, except in each case by an amount (such amount, the "Additional Permitted Amount") equal to unpaid accrued interest and premium thereon at such time plus reasonable fees and expenses incurred in connection with such modification, refinancing, refunding, replacement, renewal or extension, (v) for the avoidance of doubt, the Original Indebtedness is paid down (or, with respect to revolving credit facilities, commitments in respect thereof are reduced (together with, if applicable, payments of principal)) on a dollar-for-dollar basis by such Permitted Refinancing Indebtedness (other than by the Additional Permitted Amount), (vi) if the Original Indebtedness shall have been subordinated to the Obligations, such Permitted Refinancing Indebtedness shall also be subordinated to the Obligations on terms not less favorable in any material respect to the Lenders and (vii) such Permitted Refinancing Indebtedness shall not be secured by any Lien on any asset other than the assets that secured such Original Indebtedness (or would have been required to secure such Original Indebtedness pursuant to the terms thereof) or, in the event Liens securing such Original Indebtedness shall have been contractually subordinated to any Lien securing the Obligations, by any Lien that shall not have been contractually subordinated to at least the same extent.

"Permitted Variances" has the meaning set forth in Section 6.20(c).

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Petition Date" has the meaning set forth in recitals.

43

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which Holdings or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan Asset Regulations" means 29 CFR § 2510.3-101 et seq., as modified by Section 3(42) of ERISA, as amended from time to time.

"Post-Closing Appraisal" means any Inventory appraisal ordered by the Administrative Agent the results of which are received by the Administrative Agent after the Closing Date.

"Pre-Petition ABL Credit Agreement" means that certain ABL Credit Agreement, dated as of August 2, 2024 (as amended by that certain Waiver and Amendment to ABL Credit Agreement, dated as of February 5, 2025, that certain Second Amendment to ABL Credit Agreement, dated as of April 8, 2025 and as further amended, supplemented or modified from time to time), by and among Holdings, the Borrower, the other Loan Parties party thereto, JPMorgan Chase Bank, as administrative agent, and the lenders from time to time party thereto.

"Pre-Petition Guarantee and Collateral Agreement" means the ABL Guarantee and Collateral Agreement, dated as of August 2, 2024, executed and delivered by the Borrower, each Guarantor and JPMorgan Chase Bank as administrative agent.

"Pre-Petition Intercreditor Agreement" means the intercreditor agreement, dated as of August 2, 2024, among Holdings, the Borrower, the Guarantors, the Administrative Agent as ABL Representative and Wilmington Savings Fund Society, FSB, as Term Loan Collateral Agent, as amended, supplemented and modified from time to time.

"Pre-Petition Term Loan Credit Agreement" means the First Lien Credit and Guaranty Agreement, dated as of August 2, 2024, among the Borrower, Holdings, certain subsidiaries party thereto, the lenders from time to time party thereto and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent.

"Preferred Stock" means, with respect to any Person, any and all preferred or preference stock or shares or other Capital Stock (however designated) of such Person whether now outstanding or issued after the Closing Date that is preferred as to the payment of dividends upon liquidation, dissolution or winding up.

"Prime Rate" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Pro Forma Basis" means with respect to the calculation of any test or covenant hereunder, such test or covenant being calculated after giving effect to (a) [reserved], (b) [reserved], (c) [reserved], (d) any Material Disposition, and (e) any assumption, incurrence, repayment or other Disposition of Indebtedness (all of the foregoing, "Applicable Transactions") using, for purposes of determining such compliance, the historical financial statements of all entities or assets so designated, acquired or sold (to the extent available) and the consolidated financial statements of Holdings and its Restricted Subsidiaries,

which shall be reformulated as if all Applicable Transactions during the Applicable Reference Period, or subsequent to the Applicable Reference Period and on or prior to the date of such calculation, had been consummated at the beginning of such period (and shall include, with respect to any Material Disposition, any adjustments calculated in accordance with (and subject to the requirements and limitations of) clause (i) of the definition of "Consolidated EBITDA"); provided that with respect to any assumption, incurrence, repayment or other Disposition of Indebtedness (i) if such Indebtedness has a floating rate of interest, the interest expense on such Indebtedness will be calculated as if the rate in effect on the date of calculation had been the applicable rate for the entire period (taking into account any Swap Obligations applicable to such Indebtedness if such Swap Obligation has a remaining term as at the date of calculation in excess of 12 months), (ii) interest on Capital Lease Obligations shall be deemed to accrue at an interest rate reasonably determined by a Responsible Officer of Holdings to be the rate of interest implicit in such Capital Lease Obligation in accordance with IFRS, (iii) interest on any Indebtedness under a revolving credit facility shall be based upon the average daily balance of such Indebtedness during the applicable period and (iv) interest on Indebtedness that may be optionally determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate as the Borrower may designate.

"Pro Forma Period" means with respect to any Restricted Payment, Investment, prepayment of Indebtedness, or any other measurement of the Sweep Conditions (any of the foregoing, a "Specified Event"), the period (a) commencing on the date of consummation of the Specified Event and (b) ending 365 days thereafter.

"Proceeding" means any claim, litigation, investigation, action, suit, arbitration or administrative, judicial or regulatory action or proceeding in any jurisdiction.

"Prohibited Transaction" has the meaning set forth in Section 406 of ERISA and Section 4975(c) of the Code.

"Protective Advance Exposure" means at any time, the sum of the aggregate amount of all outstanding Protective Advances at such time.  The Protective Advance Exposure of any Revolving Lender at any time shall be its Revolving Percentage of the total Protective Advance Exposure at such time.

"Protective Advances" has the meaning set forth in Section 2.3(a).

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public-Sider" means a Lender whose representatives may trade in securities of Holdings or any of its Subsidiaries while in possession of the financial statements provided by Holdings under the terms of this Agreement.

"QFC" means a "qualified financial contract" has the meaning set forth in, and interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning set forth in Section 10.20.

"Qualified Capital Stock" means Capital Stock of Holdings other than Disqualified Capital Stock.

"Recovery Event" means any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of any Group Member (other than assets that constitute Term Loan Priority Collateral).

"Reference Period" means each period of four consecutive fiscal quarters of Applicable Holdings.

"Reference Time" with respect to any setting of the then-current Benchmark means (1) if such Benchmark is the Term SOFR Rate, 5:00 a.m. (Chicago time) on the day that is two U.S. Government Securities Business Days preceding the date of such setting, (2) if the RFR for such Benchmark is Daily Simple SOFR, then four Business Days prior to such setting and (3) if such Benchmark is none of the Term SOFR Rate or Daily Simple SOFR, the time determined by the Administrative Agent in its reasonable discretion.

"Refinancing" has the meaning set forth in the definition of "Permitted Refinancing Indebtedness".

"Refunded Swingline Loans" has the meaning set forth in Section 2.6(b).

"Register" has the meaning set forth in Section 10.6(b)(iv).

"Regulation X" means Regulation X of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Reimbursement Obligation" means the obligation of the Borrower to reimburse the Issuing Lender pursuant to Section 3.5 for amounts drawn under Letters of Credit.

"Related Parties" with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping of any substance into the environment.

"Relevant Governmental Body" means the Federal Reserve Board and/or the NYFRB, or a committee officially endorsed or convened by the Federal Reserve Board and/or the NYFRB or, in each case, any successor thereto.

"Relevant Rate" means (a) with respect to any Term Benchmark Borrowing, the Adjusted Term SOFR Rate and (b) with respect to any RFR Borrowing, the Adjusted Daily Simple SOFR, as applicable.

"Rent Reserve" means with respect to any store, warehouse distribution center, regional distribution center or depot where any Inventory subject to Liens arising by operation of law is located, a reserve equal to three months' rent at such store, warehouse distribution center, regional distribution center or depot; provided that no Rent Reserve shall be established in respect of any store, warehouse distribution center, regional distribution center or depot if a Collateral Access Agreement has been delivered and remains in effect with respect to such location.

"Report" means reports prepared by the Administrative Agent or another Person showing the results of appraisals, field examinations or audits pertaining to the assets of the Borrowing  Base Parties

46

from information furnished by or on behalf of the Borrower, after the Administrative Agent has exercised its rights of inspection pursuant to this Agreement, which Reports may be distributed to the Lenders by the Administrative Agent.

"Required Lenders" means at any time, Lenders (other than Defaulting Lenders) having Revolving Extensions of Credit and Available Revolving Commitments representing more than 50% of the sum of the Total Revolving Extensions of Credit and Available Revolving Commitments at such time; provided that, for purposes of declaring the Loans to be due and payable pursuant to Section 8, and for all purposes after the Loans become due and payable pursuant to Section 2 or the Revolving Commitments expire or terminate, then as to each Revolving Lender, clause (x) of the definition of Swingline Exposure shall only be applicable for purposes of determining its Revolving Extensions of Credit to the extent such Lender shall have funded its participation in the outstanding Swingline Loans.

"Requirement of Law" means as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserves" means any and all reserves which the Administrative Agent deems necessary, in its Permitted Discretion (following (to the extent practicable) reasonable prior notice to, and consultation with, the Borrower), to maintain (including an availability reserve, reserves for accrued and unpaid interest on the Obligations, Banking Services Reserves, reserves for loggers' liens or Perishable Agricultural Commodities Act (PACA) liens, reserves for variance between perpetual inventory report and the general ledger of the Borrowing Base Parties, volatility reserves, Rent Reserves, reserves for dilution of Accounts, reserves for Inventory shrinkage, reserves for changes in eligibility criteria, reserves for customs charges and shipping charges related to any Inventory in transit, reserves for Swap Obligations, reserves for contingent liabilities of any Borrowing Base Party, reserves for uninsured losses of any Borrowing Base Party, reserves for uninsured, underinsured, un-indemnified or under-indemnified liabilities or potential liabilities with respect to any litigation, reserves for taxes, fees, assessments, and other governmental charges) with respect to the Collateral or any Borrowing Base Party. Any changes to reserves shall be effective five Business Days after delivery of notice thereof to the Borrower and the Lenders; provided that if consultation with the Borrower and/or notice to the Borrower and the Lenders is not practicable or if failure to implement any such change within a shorter time period would, in the good faith judgment of the Administrative Agent, reasonably be expected to result in a Material Adverse Effect or materially and adversely affect the Collateral or the rights of the Lenders under the Loan Documents, such change may be implemented within a shorter time as determined by the Administrative Agent in its Permitted Discretion; provided, further, that such changes will become effective immediately prior to any Borrowing that occurs during such five Business Day period.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means, with respect to any Person, the chief executive officer, president, treasurer, any vice president or chief financial officer (or, in the case of Holdings, a director) of such Person, but in any event, with respect to financial matters, the chief financial officer or chief executive officer of such Person.

"Restricted Debt Payment" has the meaning set forth in Section 7.8.

"Restricted Payments" has the meaning set forth in Section 7.6.

"Restricted Subsidiary" means any Subsidiary of Holdings other than an Unrestricted Subsidiary.

"Restructuring Support Agreement" means the "Restructuring Support Agreement" dated as of July 2, 2025, among Del Monte Foods Holdings Limited, the Borrower, certain subsidiaries party thereto and the Consenting Lenders (as defined therein) party thereto from time to time.

"Revolving Commitment" means, as to any Lender, the obligation of such Lender, if any, to make Revolving Loans and participate in Swingline Loans, Letters of Credit and Protective Advances in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Revolving Commitment" opposite such Lender's name on Schedule 1.1A or in the Assignment and Assumption or other documentation or record (as such term is defined in Section 9-102(a)(70) of the New York Uniform Commercial Code) as provided in Section 10.6(b)(ii)(B) pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof.  The original amount of the Revolving Commitments on the Closing Date is $500,000,000.

"Revolving Commitment Period" means the period from and including the Closing Date to the Revolving Termination Date.

"Revolving Extensions of Credit" means as to any Revolving Lender at any time, an amount equal to the sum of (a) the aggregate principal amount of all Revolving Loans held by such Lender then outstanding, (b) such Lender's Revolving Percentage of the L/C Obligations then outstanding, (c) such Lender's Revolving Percentage of the Swingline Loans then outstanding and (d) such Lender's Revolving Percentage of the Protective Advances then outstanding.

"Revolving Lender" means each Lender that has a Revolving Commitment or that holds Revolving Loans.

"Revolving Loans" has the meaning set forth in Section 2.1(a)(i).

"Revolving Obligations" means collectively, solely as it relates to Revolving Loans, (a) the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and Reimbursement Obligations and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and Reimbursement Obligations, all other obligations and liabilities of the Borrower to the Administrative Agent or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which arise under, out of, or in connection with, this Agreement, any other Loan Document, the Letters of Credit or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower pursuant hereto including with respect to Letters of Credit) or otherwise, (b) all Banking Services Obligations and (c) all Secured Swap Obligations.

"Revolving Percentage" means as to any Lender at any time, the percentage which such Lender's Revolving Commitment then constitutes of the Total Revolving Commitments or, at any time after the Revolving Commitments shall have expired or terminated, the percentage which the aggregate principal amount of such Lender's Revolving Loans then outstanding constitutes of the aggregate principal amount of the Revolving Loans then outstanding, provided, that, in the event that the Revolving Loans are paid in full prior to the reduction to zero of the Total Revolving Extensions of Credit, the Revolving

Percentages shall be determined in a manner designed to ensure that the other outstanding Revolving Extensions of Credit shall be held by the Revolving Lenders on a comparable basis.  Notwithstanding the foregoing, in the case of Section 2.23 when a Defaulting Lender shall exist, Revolving Percentages shall be determined without regard to any Defaulting Lender's Revolving Commitment.

"Revolving Termination Date" means the date which is the earliest to occur of (a) 11:59 p.m. New York City Time on the date that is nine (9) months after the Petition Date, (b) 11:59 p.m. New York City Time on the date that is forty (40) calendar days after the Petition Date (or if such fortieth (40th) calendar day is not a Business Day, the immediately succeeding Business Day) if the Final DIP Order, in form and substance acceptable to the Required Lenders, has not been entered by the Bankruptcy Court prior to such date and time, (c) the effective date of a chapter 11 plan of any Loan Party, which has been confirmed by an order entered by the Bankruptcy Court in any of the Chapter 11 Cases, (d) dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code, (e) [reserved], (f) consummation of a sale of all or substantially all of the Debtors' assets, (g) the date on which the Revolving Commitments are terminated in accordance with the terms hereof and (h) appointment of a Chapter 11 trustee or other Bankruptcy Court-mandated fiduciary with decision-making authority (including an examiner with expanded powers.

"RFR Borrowing" means, as to any Borrowing, the RFR Loans comprising such Borrowing.

"RFR Loan" means a Loan that bears interest at a rate based on the Adjusted Daily Simple SOFR.

"Sale Asset" has the meaning set forth in Section 10.22(c).

"S&P" means Standard & Poor's Rating Services, a Standard & Poor's Financial Services LLC business.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, the Crimea Region of Ukraine, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union, any European Union member state, His Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any government that is itself the subject or target of Sanctions, (d) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a), (b) or (c), or (e) any Person otherwise the subject of any Sanctions.

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state, His Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"Scheduled Borrowing Base Delivery Date" means any date on which the Borrower is obligated to deliver a Borrowing Base Certificate pursuant to Section 6.2(g).

"Seasonal Advance Period" means the period from August 1 (inclusive) through November 30 (inclusive) of each fiscal year of the Borrower.

"SEC" means the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Secured Parties" has the meaning set forth in the Pre-Petition Guarantee and Collateral Agreement.

"Secured Swap Obligations" means Swap Obligations of any Group Member or any Subsidiary of a Group Member owing to (a) the Administrative Agent or its Affiliates or (b) one or more Lenders or their respective Affiliates; provided that the Borrower (other than for transactions with JPMCB and its Affiliates) and the Lender party thereto or its Affiliate (other than JPMCB) shall have delivered written notice to the Administrative Agent that such a transaction has been entered into and that it constitutes a Secured Swap Obligation entitled to the benefits of the Security Documents.

"Security Documents" means the collective reference to the Orders and any security documents hereafter delivered to the Administrative Agent granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the NYFRB's Website, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"SOFR Determination Date" has the meaning specified in the definition of "Daily Simple SOFR".

"SOFR Rate Day" has the meaning specified in the definition of "Daily Simple SOFR".

"Specified Event" has the meaning specified in the definition of "Pro Forma Period".

"Specified Event of Default" means an Event of Default under clauses (a), (b) (with respect to any Borrowing Base Certificate), (d), (e) (with respect to any breach of Section 6.12 of this Agreement) or (g) of Section 8.1 of this Agreement.

"Specified Indebtedness" means (a) Junior Indebtedness, (b) DMPL Payables, (c) DMPL Intercompany Debt and (d) the Term Loans.

"Specified Intellectual Property" means the Intellectual Property subject, as of the Closing Date, to the License Intercreditor Agreement.

"Stated Maturity" means, with respect to any Indebtedness, the date specified in the agreement governing or certificate relating to such Indebtedness as the fixed date on which the final payment of principal of such Indebtedness is due and payable, including pursuant to any mandatory

redemption provision, but shall not include any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for the payment thereof.

"Step 2 Transactions" means the transactions described as Step 2 of the "Transaction Structure" section in the Financing Commitment Letter as of June 21, 2024, as amended on June 27, 2024.

"Subordinated Indebtedness" means any Indebtedness of any Group Member that is expressly subordinated in right of payment to the Obligations; provided that, (i) for the avoidance of doubt, the Term Loans shall not be considered Subordinated Indebtedness and (ii) on terms acceptable to the Administrative Agent.

"Subsidiary" means as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of Holdings.

"Subsidiary Guarantor" means all Subsidiaries of Holdings other than Excluded Subsidiaries.

"Subsequent DIP Budget" has the meaning set forth in Section 6.20(b).

"Supermajority Lenders" means, at any time, Lenders (other than Defaulting Lenders) having Revolving Extensions of Credit and Available Revolving Commitments representing more than 66 2/3% of the sum of the Total Revolving Extensions of Credit and Available Revolving Commitments (other than Total Revolving Extensions of Credit and Available Revolving Commitments held by Defaulting Lenders) at such time; provided that, for all purposes after the Loans become due and payable pursuant to Section 2 or the Revolving Commitments expire or terminate, then as to each Revolving Lender, clause (x) of the definition of Swingline Exposure shall only be applicable for purposes of determining its Revolving Extensions of Credit to the extent such Lender shall have funded its participation in the outstanding Swingline Loans.

"Supported QFC" has the meaning set forth in Section 10.20.

"Swap" means any agreement, contract, or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdings or any of its Subsidiaries shall be a "Swap Agreement".

"Swap Obligation" means with respect to any Person, any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a)

any and all Swap Agreements, and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction.

"Sweep Asset Sale" means any sale or other disposition by Existing Holdings or any of its Subsidiaries (other than an Unrestricted Subsidiary) for which proceeds are received when the Sweep Conditions are not met; provided that the proceeds from sales of Markesan and Toppenish reflected in the Company's Three Statement Model Forecast dated as of June 19, 2024 shall be excluded.

"Sweep Conditions" means (a) no Event of Default has occurred and is continuing, (b) after giving effect to the Specified Event on a Pro Forma Basis as if it occurred on the first day of the Applicable Reference Period, Consolidated Leverage Ratio for the Applicable Reference Period is less than 5.00:1.00 and (c) after giving effect to the Specified Event on a Pro Forma Basis as if it occurred on the first day of the Applicable Reference Period, Consolidated EBITDA for the Applicable Reference Period is greater than $125,000,000.

"Swingline Exposure" means, at any time, the aggregate principal amount of all Swingline Loans outstanding at such time.  The Swingline Exposure of any Revolving Lender at any time shall be the sum of (x) its Revolving Percentage of the total Swingline Exposure at such time other than with respect to any Swingline Loans made by such Revolving Lender in its capacity as the Swingline Lender and (y) the principal amount of all Swingline Loans made by such  Revolving Lender in its capacity as the Swingline Lender outstanding at such time (less the amount of participations funded by the other Lenders in such Swingline Loans).

"Swingline Lender" means JPMorgan Chase Bank, N.A., in its capacity as a lender of Swingline Loans hereunder.

"Swingline Loans" has the meaning set forth in Section 2.5(a).

"Swingline Participation Amount" has the meaning set forth in Section 2.6(c).

"Swingline Sublimit" means $20,000,000.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Benchmark" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted Term SOFR Rate.

"Term Loan Collateral Agent" means, with respect to the Pre-Petition Term Loan Credit Agreement and the DIP Term Loan Credit Agreement, Wilmington Savings Fund Society, FSB and its successors and assigns.

"Term Loan Credit Agreements" means collectively (a) the Pre-Petition Term Loan Credit Agreement, (b) the DIP Term Loan Credit Agreement and (c) any amendment, waiver, supplement or other modification to any of the documents described in clauses (a) through (b).

"Term Loan Documents" means collectively (a) the Term Loan Credit Agreements, (b) the Term Loan Security Documents, (c) the Pre-Petition Intercreditor Agreement, (d) any promissory note

evidencing the Term Loans and (e) any amendment, waiver, supplement or other modification to any of the documents described in clauses (a) through (d).

"Term Loan Obligations Payment Date" has the meaning set forth in the Pre-Petition Intercreditor Agreement.

"Term Loan Priority Collateral" has the meaning set forth in the Pre-Petition Intercreditor Agreement.

"Term Loan Security Documents" means the collective reference to the Security Agreement (in and as defined in each Term Loan Credit Agreement), the Mortgages (in and as defined in each Term Loan Credit Agreement) and all other security documents delivered to the applicable Term Loan Collateral Agent granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Term Loan Document.

"Term Loans" means the term loans made pursuant to the Pre-Petition Term Loan Credit Agreement and the DIP Term Loan Credit Agreement.

"Term Priority Agent" means each Term Loan Collateral Agent.

"Term SOFR Determination Day" has the meaning assigned to it under the definition of Term SOFR Reference Rate.

"Term SOFR Rate" means, with respect to any Term Benchmark Borrowing and for any tenor comparable to the applicable Interest Period, the Term SOFR Reference Rate at approximately 5:00 a.m., Chicago time, two U.S. Government Securities Business Days prior to the commencement of such tenor comparable to the applicable Interest Period, as such rate is published by the CME Term SOFR Administrator.

"Term SOFR Reference Rate" means, for any day and time (such day, the "Term SOFR Determination Day"), with respect to any Term Benchmark Borrowing denominated in Dollars and for any tenor comparable to the applicable Interest Period, the rate per annum published by the CME Term SOFR Administrator and identified by the Administrative Agent as the forward-looking term rate based on SOFR. If by 5:00 pm (New York City time) on  such Term SOFR Determination Day, the "Term SOFR Reference Rate" for the applicable tenor has not been published by the CME Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Rate has not occurred, then, so long as such day is otherwise a U.S. Government Securities Business Day, the Term SOFR Reference Rate for such Term SOFR Determination Day will be the Term SOFR Reference Rate as published in respect of the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate was published by the CME Term SOFR Administrator, so long as such first preceding U.S. Government Securities Business Day is not more than five (5) U.S. Government Securities Business Days prior to such Term SOFR Determination Day.

"Testing Period" has the meaning set forth in Section 6.20(c).

"Total Revolving Commitments" means at any time, the aggregate amount of the Revolving Commitments then in effect.

"Total Revolving Extensions of Credit" means at any time, the aggregate amount of the Revolving Extensions of Credit of the Revolving Lenders outstanding at such time.

"Transactions" means collectively, (a) the execution, delivery and performance by the Borrower and the other Loan Parties of this Agreement, the borrowing of Loans hereunder and the use of proceeds thereof, (b) the execution, delivery and performance by the Borrower and the other Loan Parties of the Term Loan Credit Agreements, the borrowing of loans thereunder and the use of proceeds thereof and (c) the Existing Indebtedness Payoff.

"Transferee" means any Assignee or Participant.

"Transition Services Agreement" means that certain Transition Services Agreement, dated as of August 2, 2024, between DMFI and the Borrower.

"Type" means, when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted Term SOFR Rate, the Alternate Base Rate or the Adjusted Daily Simple SOFR.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"United States" means the United States of America.

"Unrestricted Cash" means unrestricted cash and Cash Equivalents owned by any Group Member and not controlled by or subject to any Lien or other preferential arrangement in favor of any creditor (other than Liens created under the Security Documents and corresponding Liens created under the Term Loan Security Documents (or any Term Loan Security Documents (as defined in the Pre-Petition Intercreditor Agreement)) and Liens of the type referred to in Section 7.3(u)).

"Unrestricted Subsidiary" means any Unrestricted Subsidiary designated as such under the Pre-Petition ABL Credit Agreement.

"Unused Commitments" means at any time, an amount equal to (a) the Total Revolving Commitments minus (b) the Total Revolving Extensions of Credit then outstanding (calculated, with respect to any Defaulting Lender, as if such Defaulting Lender had funded its Revolving Percentage of all outstanding Revolving Loans).

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"<u>U.S. Special Resolution Regimes</u>" has the meaning set forth in Section 10.20.

"<u>U.S. Tax Compliance Certificate</u>" has the meaning set forth in Section 2.19(f)(ii)(B)(3).

"<u>Value</u>" means, with reference to Eligible Inventory, on any date, the lower of (i) the Cost thereof and (ii) the fair market value thereof.

"<u>Walmart</u>" means Wal-Mart Stores, Inc. and its Affiliates.

"<u>Wholly Owned Subsidiary</u>" means as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"<u>Withdrawal Liability</u>" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"<u>Write-Down and Conversion Powers</u>" means (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2    <u>Classification of Loans and Borrowings</u>.  For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "Term Benchmark Loan").  Borrowings also may be classified and referred to by Type (e.g., a "Term Benchmark Borrowing").

1.3    <u>Other Definitional Provisions</u>.  (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to any Group Member not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under IFRS; provided that all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to (x) any election under any accounting standard codification or financial accounting standard similar to GAAP Accounting Standards Codification 825-10-25 to value any Indebtedness or other liabilities of Holdings or any Subsidiary at "fair value" and (y) any treatment of Indebtedness in respect of convertible debt instruments under any accounting standard codification or financial accounting standard similar to GAAP Accounting Standards Codification 470-20 to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof, (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property"

shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time and (vi) the concept of "letters of credit" shall be construed to include banker's acceptances.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    Unless otherwise defined herein or the context otherwise requires, terms for which meanings are provided in the UCC are used in this Agreement, including its preamble and recitals, with such meanings.

1.4    Interest Rate; Benchmark Notification.  The interest rate on a Loan denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform.  Upon the occurrence of a Benchmark Transition Event, Section 2.16(b) provides a mechanism for determining an alternative rate of interest.  The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability.  The Administrative Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any  interest rate used in this Agreement or any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

1.5    Letter of Credit Amounts.  Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the amount of such Letter of Credit available to be drawn at such time; provided that with respect to any Letter of Credit that, by its terms provides for one or more automatic increases in the available amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum amount is available to be drawn at such time. For clarity, the calculation of the amount of such Letter of Credit shall take into account any reduction on account of (a) any permanent reduction of such Letter of Credit or (b) any amount that is drawn, reimbursed and no longer available under such Letter of Credit.

1.6    [Reserved].

1.7    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Capital Stock at such time.

## SECTION 2.  AMOUNT AND TERMS OF COMMITMENTS

2.1    Commitments.  (a)  Subject to the terms and conditions hereof, each Revolving Lender severally agrees to make revolving credit loans denominated in Dollars ("Revolving Loans") to the Borrower from time to time during the Revolving Commitment Period in an aggregate principal amount at any one time outstanding which would not result in either (i) the Revolving Loans of such Lender when added (after giving effect to any application of proceeds of such Revolving Loans pursuant to Section 2.5) to the sum of (x) such Lender's Revolving Percentage of the L/C Obligations then outstanding, (y) such Lender's Swingline Exposure then outstanding and (z) such Lender's Protective Advance Exposure then outstanding, exceeding the amount of such Lender's  Revolving Commitment or (ii) the Total Revolving Extensions of Credit exceeding the Line Cap, subject to the authority of the Administrative Agent, in its sole discretion, to make Protective Advances pursuant to the terms of Section 2.3.  During the Revolving Commitment Period the Borrower may, subject to the terms and conditions hereof, use the Revolving Commitments by borrowing, prepaying the Revolving Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof.  The Revolving Loans may from time to time be Term Benchmark Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 2.12, or may from time to time be RFR Loans in accordance with Section 2.16.

(b)    The Borrower shall repay all outstanding Revolving Loans on the Revolving Termination Date.

2.2    Procedure for Loan Borrowing.  The Borrower may borrow under the Revolving Commitments during the Revolving Commitment Period, on any Business Day, provided that the Borrower shall give the Administrative Agent a Borrowing Request (which notice must be received by the Administrative Agent prior to (a) 12:00 Noon, New York City time three U.S. Government Securities Business Days prior to the requested Borrowing Date, in the case of Term Benchmark Loans, or (b) 12:00 Noon, New York City time, the date of the requested Borrowing Date, in the case of ABR Loans), specifying (i) the amount and Type of Loans to be borrowed, (ii) the requested Borrowing Date (which may be the same day as the day of the Borrowing Request in the case of ABR Loans) and (iii) in the case of Term Benchmark Loans, the respective amounts of each such Type of Loan and the respective lengths of the initial Interest Period therefor.  Each borrowing under the Revolving Commitments shall be in an amount equal to (x) in the case of ABR Loans, $1,000,000 or a whole multiple thereof (or, if the then aggregate Available Revolving Commitments are less than $1,000,000, such lesser amount) and (y) in the case of Term Benchmark Loans, $5,000,000 or a whole multiple of $1,000,000 in excess thereof; provided that the Swingline Lender may request, on behalf of the Borrower, borrowings under the Revolving Commitments that are Revolving Loans in other amounts pursuant to Section 2.6.  Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each Revolving Lender thereof. Each Revolving Lender will make the amount of its pro rata share of each borrowing of Revolving Loans based on its Revolving Percentage available to the Administrative Agent for the account of the Borrower at the Funding Office prior to 2:00 P.M., New York City time, on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent; provided that to the extent separately agreed by the Borrower and a Lender and notified to the Administrative Agent, any funding of Revolving

Loans on the Closing Date by a Lender that is also a lender under the Pre-Petition ABL Credit Agreement immediately prior to giving effect to the Closing Date may be made on a cashless basis pursuant to mechanics agreed by the Borrower and the Administrative Agent. Such borrowing will then be made available to the Borrower by the Administrative Agent crediting the account of the Borrower on the books of such office with the aggregate of the amounts made available to the Administrative Agent by the Revolving Lenders and in like funds as received by the Administrative Agent.

2.3    <u>Protective Advances</u>.    (a) Subject to the limitations set forth below, the Administrative Agent is authorized by the Borrower and the Lenders, from time to time in the Administrative Agent's Permitted Discretion (but shall have absolutely no obligation to), to make Revolving Loans  denominated in Dollars to the Borrower, on behalf of all Lenders, which the Administrative Agent, in its Permitted Discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations, or (iii) to pay any other amount chargeable to or required to be paid by the Borrower pursuant to the terms of this Agreement, including payments of reimbursable expenses (including costs, fees, and expenses as described in Section 10.5) and other sums payable under the Loan Documents (any of such Loans are herein referred to as "<u>Protective Advances</u>"); provided that, as of the date of the making of any Protective Advance, the aggregate amount of outstanding Protective Advances shall not exceed 10% of the Revolving Commitments outstanding as of such date; provided further that the Total Revolving Extensions of Credit outstanding any time shall not exceed the total Revolving Commitments. Protective Advances may be made even if the conditions precedent set forth in Section 5.2 have not been satisfied. The Protective Advances shall be secured by the Liens in favor of the Administrative Agent in and to the Collateral and shall constitute Obligations hereunder. All Protective Advances shall be ABR Loans. The Administrative Agent's authorization to make Protective Advances may be revoked at any time by the Required Lenders. Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof. At any time (a) the amount equal to (i) the Line Cap <u>minus</u> (ii) the Total Revolving Extensions of Credit then outstanding (calculated, with respect to any Defaulting Lender, as if such Defaulting Lender had funded its Revolving Percentage of all outstanding Revolving Loans) exceeds the amount of any Protective Advance and (b) the conditions precedent set forth in Section 5.2 have been satisfied, the Administrative Agent may request the Revolving Lenders to make a Revolving Loan to repay a Protective Advance. At any other time the Administrative Agent may require the Lenders to fund their risk participations described in Section 2.3(b).

(b)    Upon the making of a Protective Advance by the Administrative Agent (whether before or after the occurrence of a Default), each Revolving Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Administrative Agent, without recourse or warranty, an undivided interest and participation in such Protective Advance in proportion to its Revolving Percentage. From and after the date, if any, on which any Revolving Lender is required to fund its participation in any Protective Advance purchased hereunder, the Administrative Agent shall promptly distribute to such Revolving Lender such Revolving Lender's Revolving Percentage of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Protective Advance (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's participating interest was outstanding and funded and, in the case of principal and interest payments, to reflect such Lender's pro rata portion based on its Revolving Percentage of such payment if such payment is not sufficient to pay the principal of and interest on all Protective Advances then due).

2.4    [Reserved].

2.5    <u>Swingline Sublimit</u>. (a) Subject to the terms and conditions hereof, from time to time during the Revolving Commitment Period, the Borrower may request that a portion of the credit

otherwise available to the Borrower under the Revolving Commitments be made in the form of swing line loans ("Swingline Loans") by the Swingline Lender to the Borrower, and the Swingline Lender may, but shall have no obligation, to make such requested Swingline Loans pursuant to this Agreement; provided that (i) the sum of (w) the Swingline Exposure of the Swingline Lender (in its capacity as the Swingline Lender and a Revolving Lender), (x) the aggregate principal amount of outstanding Revolving Loans made by the Swingline Lender (in its capacity as a Revolving Lender), (y) the L/C Exposure of the Swingline Lender (in its capacity as a Revolving Lender) and (z) the Protective Advance Exposure of the Swingline Lender (in its capacity as a Revolving Lender) shall not exceed its Revolving Commitment then in effect, (ii) the sum of the outstanding Swingline Loans shall not exceed the Swingline Sublimit and (iii) the Borrower shall not request, and the Swingline Lender shall not make, any Swingline Loan if, after giving effect to the making of such Swingline Loan, the Total Revolving Extensions of Credit would exceed the Line Cap, subject to the authority of the Administrative Agent, in its sole discretion, to make Protective Advances pursuant to the terms of Section 2.3. During the Revolving Commitment Period, the Borrower may borrow, repay and reborrow Swingline Loans, all in accordance with the terms and conditions hereof. Swingline Loans shall be ABR Loans only.

(b)     The Borrower shall repay to the Swingline Lender the then unpaid principal amount of each Swingline Loan on the earlier of the Revolving Termination Date and five Business Days after such Swingline Loan is made; provided that, in each case, on each date that a Revolving Loan is borrowed, the Borrower shall repay all Swingline Loans then outstanding and the proceeds of any such Revolving Loans shall be applied by the Administrative Agent to repay any Swingline Loans outstanding.

2.6     Procedure for Swingline Borrowing; Refunding of Swingline Loans. (a)Whenever the Borrower desires that the Swingline Lender make Swingline Loans it shall give the Swingline Lender irrevocable telephonic notice confirmed promptly in writing (which telephonic notice must be received by the Swingline Lender not later than 12:00 P.M., New York City time, on the proposed Borrowing Date), specifying (i) the amount to be borrowed and (ii) the requested Borrowing Date (which shall be a Business Day during the Revolving Commitment Period). Each borrowing of Swingline Loans shall be in an amount equal to $500,000 or a whole multiple of $100,000 in excess thereof. Not later than 3:00 P.M., New York City time, on the Borrowing Date specified in a notice in respect of Swingline Loans, with respect to any such Swingline Loans the Swingline Lender agrees in its sole discretion to make, the Swingline Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to such Swingline Loans. The Administrative Agent shall make the proceeds of such Swingline Loans available to the Borrower on such Borrowing Date by depositing such proceeds in the account of the Borrower with the Administrative Agent on such Borrowing Date in immediately available funds.

(b)     The Swingline Lender, at any time and from time to time in its sole and absolute discretion may, on behalf of the Borrower (which hereby irrevocably directs the Swingline Lender to act on its behalf), on one Business Day's notice given by the Swingline Lender no later than 12:00 Noon, New York City time, request each Revolving Lender to make, and each Revolving Lender hereby agrees to make, a Revolving Loan in an amount equal to such Revolving Lender's Revolving Percentage of the aggregate amount of the Swingline Loans (the "Refunded Swingline Loans") outstanding on the date of such notice, to repay the Swingline Lender. Each Revolving Lender shall make the amount of such Revolving Loan available to the Administrative Agent at the Funding Office in immediately available funds, not later than 10:00 A.M., New York City time, one Business Day after the date of such notice. The proceeds of such Revolving Loans shall be immediately made available by the Administrative Agent to the Swingline Lender for application by the Swingline Lender to the repayment of the Refunded Swingline Loans. The Borrower irrevocably authorizes the Swingline Lender to charge the Borrower's accounts with the Administrative Agent (up to the amount available in each such account) in order to immediately pay the amount of such Refunded Swingline Loans to the extent amounts received from the Revolving Lenders are not sufficient to repay in full such Refunded Swingline Loans.

(c)     If prior to the time a Revolving Loan would have otherwise been made pursuant to Section 2.6(b), one of the events described in Section 8.1(g) shall have occurred and be continuing with respect to the Borrower or if for any other reason, as determined by the Swingline Lender in its sole discretion, Revolving Loans may not be made as contemplated by Section 2.6(b), each Revolving Lender shall, on the date such Revolving Loan was to have been made pursuant to the notice referred to in Section 2.6(b), purchase for cash an undivided participating interest in the then outstanding Swingline Loans by paying to the Swingline Lender an amount (the "Swingline Participation Amount") equal to (i) such Revolving Lender's Revolving Percentage times (ii) the sum of the aggregate principal amount of Swingline Loans of the Swingline Lender then outstanding that were to have been repaid with such Revolving Loans.

(d)     Whenever, at any time after the Swingline Lender has received from any Revolving Lender such Lender's Swingline Participation Amount, the Swingline Lender receives any payment on account of the Swingline Loans, the Swingline Lender will distribute to such Lender its ratable portion of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's participating interest was outstanding and funded and, in the case of principal and interest payments, to reflect such Lender's pro rata portion of such payment if such payment is not sufficient to pay the principal of and interest on all Swingline Loans then due); provided, however, that in the event that such payment received by the Swingline Lender is required to be returned, such Revolving Lender will return to the Swingline Lender any portion thereof previously distributed to it by the Swingline Lender.

(e)     Each Revolving Lender's obligation to make the Loans referred to in Section 2.6(b) and to purchase participating interests pursuant to Section 2.6(c) shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right that such Revolving Lender or the Borrower may have against the Swingline Lender, the Borrower or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Section 5, (iii) any adverse change in the condition (financial or otherwise) of the Borrower, (iv) any breach of this Agreement or any other Loan Document by the Borrower, any other Loan Party or any other Revolving Lender or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

2.7     Repayment of Loans.  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of and ratable benefit of each Lender the aggregate outstanding principal amount of the Revolving Loans (including Swingline Loans and Protective Advances) on the Revolving Termination Date.

2.8     Fees, etc.  (a) The Borrower agrees to pay to the Administrative Agent for the ratable account of each Revolving Lender a commitment fee for the period from and including the Closing Date to the last day of the Revolving Commitment Period equal to the Commitment Fee Rate multiplied by the average daily amount of unused Total Revolving Commitments during the period for which payment is made, in each case, payable quarterly in arrears on each Fee Payment Date, commencing on the first such date to occur after the Closing Date.

(b)     The Borrower agrees to pay to the Administrative Agent the fees in the amounts and on the dates as set forth in any fee agreements with the Administrative Agent and to perform any other obligations contained therein.

2.9     Termination or Reduction of Commitments.  The Borrower shall have the right, upon not less than three Business Days' notice to the Administrative Agent, to terminate the Revolving Commitments or, from time to time, to reduce the amount of the Revolving Commitments; provided that

60

no such termination or reduction of Revolving Commitments shall be permitted if, after giving effect thereto and to any prepayments of the Revolving Loans made on the effective date thereof, the Total Revolving Extensions of Credit would exceed the Line Cap.  Any such reduction shall be in an amount equal to $5,000,000, or a whole multiple thereof, and shall reduce permanently the Revolving Commitments then in effect.

2.10    <u>Optional Prepayments</u>.  The Borrower may at any time and from time to time prepay the Revolving Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent no later than 12:00 Noon, New York City time, three Business Days prior thereto, in the case of Term Benchmark Loans, 12:00 Noon, New York City time, three Business Days prior thereto, in the case of RFR Loans and no later than 12:00 Noon, New York City time, on the date of such prepayment, in the case of ABR Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of Term Benchmark Loans, RFR Loans or ABR Loans; provided, that if a Term Benchmark Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.20.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with (except in the case of Revolving Loans that are ABR Loans and Swingline Loans) accrued interest to such date on the amount prepaid.  Partial prepayments of Revolving Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof. The application of any prepayment pursuant to this Section 2.10 shall be made <u>first</u>, to ABR Loans and <u>second</u>, to Term Benchmark Loans (or RFR Loans, if applicable).

2.11    <u>Prepayment of Loans</u>.  (a) In the event and on such occasion that (i) the Total Revolving Extensions of Credit exceed the Total Revolving Commitments or (ii) the Total Revolving Extensions of Credit (excluding for such purposes Protective Advances) exceed the Borrowing Base, the Borrower shall promptly (and in any event within two Business Days) prepay (or in the case of L/C Exposure, cash collateralize) the Revolving Loans, L/C Exposure, Swingline Loans and/or (in the case of clause (i) above) the Protective Advances in an aggregate amount equal to such excess (it being understood that the Borrower shall prepay Revolving Loans, Swingline Loans and/or Protective Advances prior to cash collateralization of L/C Exposure).

(b)    In the event and on each occasion that any Net Cash Proceeds are received by or on behalf of any Group Member in respect of any Disposition (other than a Disposition pursuant to Sections 7.5(a), 7.5(b) and (solely with respect to Dispositions to a Loan Party) 7.5(k)) or Recovery Event, in each case in respect of ABL Priority Collateral, the Borrower shall, within three Business Days after such Net Cash Proceeds are received by any Group Member, prepay the Revolving Loans and cash collateralize the L/C Obligations as set forth in Section 2.11(d) below in an aggregate amount equal to 100% of such Net Cash Proceeds, provided that, this Section 2.11 shall not require any such prepayment with respect to Net Cash Proceeds received on account of any Disposition or Recovery Event during any fiscal year of Holdings not exceeding $5,000,000 in the aggregate so long as no Event of Default then exists. For the avoidance of doubt, any prepayment of such Net Cash Proceeds shall be applied without any reduction in the Revolving Commitments.

(c)    If, as of the final Business Day of each weekly period starting from the first complete calendar week after the Closing Date, (a) Revolving Loans are outstanding and (b) the Consolidated Cash Balance exceeds $100,000,000 as of the end of such applicable Business Day, then the Borrower shall, on the next Business Day thereafter, prepay Revolving Loans in an aggregate principal amount equal to such excess (up to the amount of such outstanding Revolving Loans).

(d)　　The application of any prepayment pursuant to this Section 2.11 shall be applied first, to ABR Loans, second, to Term Benchmark Loans (or RFR Loans, if applicable) and third, to cash collateralize L/C Obligations.

(e)　　On each Business Day during any Daily Cash Sweep Period, the Administrative Agent shall apply, subject to Section 2.17(b), all funds credited to any applicable Collection Account as of 10:00 A.M., New York City time, on such Business Day (whether or not immediately available) first to prepay any Protective Advances that may be outstanding, second to prepay the Swingline Loans and third to prepay other Revolving Loans (without a corresponding reduction in Revolving Commitments).

2.12　　Conversion and Continuation Options.  (a)  The Borrower may elect from time to time to convert Term Benchmark Loans to ABR Loans (or, if applicable, RFR Loans to ABR Loans) by giving the Administrative Agent prior irrevocable notice of such election by submitting an Interest Election Request no later than 11:00 A.M., New York City time, on the Business Day preceding the proposed conversion date, provided that any such conversion of Term Benchmark Loans may only be made on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert ABR Loans to Term Benchmark Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 12:00 Noon, New York City time, on the third Business Day preceding the proposed conversion date (which Interest Election Request shall, in the case of Term Benchmark Loans,  specify the length of the initial Interest Period therefor), provided that no ABR Loan may be converted into a Term Benchmark Loan when any Event of Default has occurred and is continuing and the Administrative Agent or the Required Lenders have determined in its or their sole discretion not to permit such conversions.  Upon receipt of any such Interest Election Request the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)　　Any Term Benchmark Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice by submitting an Interest Election Request to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans, provided that no Term Benchmark Loan may be continued as such (i) when any Event of Default has occurred and is continuing and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such continuations or (ii) if a Specified Event of Default is in existence, and provided, further, that if the Borrower shall fail to give any required Interest Election Request as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period.  Upon receipt of any such Interest Election Request the Administrative Agent shall promptly notify each relevant Lender thereof.

2.13　　Limitations on Term Benchmark Borrowings.  Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Term Benchmark Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Term Benchmark Loans comprising each Term Benchmark Borrowing shall be equal to $5,000,000 or a whole multiple of $1,000,000 in excess thereof and (b) no more than 10 Term Benchmark Borrowings shall be outstanding at any one time.

2.14　　Interest Rates and Payment Dates.  Subject to Section 2.16, (a) Each Term Benchmark Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Adjusted Term SOFR Rate determined for such day plus the Applicable Margin.

(b)　　Each RFR Loan shall bear interest at a rate per annum equal to the Adjusted Daily Simple SOFR plus the Applicable Margin.

(c)        Each ABR Loan shall bear interest at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin.

(d)        (i) (A) If all or a portion of the principal amount of any Loan or Reimbursement Obligation shall not be paid when due (whether at the stated maturity, by acceleration or otherwise) upon the election of the Required Lenders, such overdue amount shall bear interest at a rate per annum equal to (x) in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section 2.14 plus 2% or (y) in the case of Reimbursement Obligations, the rate applicable to Revolving Loans that are ABR Loans plus 2%, and (B) if all or a portion of any commitment fee or other amount payable hereunder (other than as covered in clause (d)(ii) below) shall not be paid when due (whether at the stated maturity, by acceleration or otherwise) upon the election of the Required Lenders, such overdue amounts shall bear interest at a rate per annum equal to the rate then applicable to Revolving Loans that are ABR Loans plus 2%, in each case, with respect to clauses (i)(A) and (B) above, from the date of such non-payment until such amount is paid in full (as well after as before judgment) and (ii) if any Event of Default shall have occurred and be continuing, all interest payable on any Loan or Reimbursement Obligation hereunder shall accrue and be payable at a rate per annum equal to the rate then applicable to Revolving Loans that are ABR Loans (assuming Average Quarterly Availability <33% of the Line Cap) plus 2% .

(e)        Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (d) of this Section 2.14 shall be payable from time to time on demand.

2.15    Computation of Interest and Fees.  (a)  Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed (including the first day, but excluding the last day; provided that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on such Loan).  The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of an Adjusted Term SOFR Rate.

(b)        Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error.  The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.14(a).

2.16    Alternate Rate of Interest.  (a)  Subject to clauses (b), (c), (d), (e) and (f) of this Section 2.16, if:

(i)        the Administrative Agent determines (which determination shall be conclusive absent manifest error) (A) prior to the commencement of any Interest Period for a Term Benchmark Borrowing, that adequate and reasonable means do not exist for ascertaining the Adjusted Term SOFR Rate (including because the Term SOFR Reference Rate is not available or published on a current basis), for such Interest Period or (B) at any time, that adequate and reasonable means do not exist for ascertaining the applicable Adjusted Daily Simple SOFR; or

(ii)        the Administrative Agent is advised by the Required Lenders that (A) prior to the commencement of any Interest Period for a Term Benchmark Borrowing, the Adjusted Term SOFR Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders

(or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for such Interest Period or (B) at any time, Adjusted Daily Simple SOFR will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone, telecopy or electronic mail as promptly as practicable thereafter and, until (x) the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark and (y) the Borrower delivers a new Interest Election Request in accordance with the terms of <u>Section 2.12</u> or a new Borrowing Request in accordance with the terms of Section 2.2, any Interest Election Request that requests the conversion of any Revolving Borrowing to, or continuation of any Revolving Borrowing as, a Term Benchmark Borrowing and any Borrowing Request that requests a Term Benchmark Revolving Borrowing shall instead be deemed to be an Interest Election Request or a Borrowing Request, as applicable, for (x) an RFR Borrowing so long as the Adjusted Daily Simple SOFR is not also the subject of <u>Section 2.16(a)(i)</u> or <u>(ii)</u> above or (y) an ABR Borrowing if the Adjusted Daily Simple SOFR also is the subject of Section <u>2.16(a)(i)</u> or <u>(ii)</u> above; provided that if the circumstances giving rise to such notice affect only one Type of Borrowings, then all other Types of Borrowings shall be permitted.  Furthermore, if any Term Benchmark Loan or RFR Loan is outstanding on the date of the Borrower's receipt of the notice from the Administrative Agent referred to in this <u>Section 2.16(a)</u> with respect to a Relevant Rate applicable to such Term Benchmark Loan or RFR Loan, then until (x) the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark and (y) the Borrower delivers a new Interest Election Request in accordance with the terms of <u>Section 2.12</u> or a new Borrowing Request in accordance with the terms of <u>Section 2.2</u>, (1) any Term Benchmark Loan shall on the last day of the Interest Period applicable to such Loan, be converted by the Administrative Agent to, and shall constitute, (x) an RFR Borrowing so long as the Adjusted Daily Simple SOFR is not also the subject of <u>Section 2.16(a)(i)</u> or (ii) above or (y) an ABR Loan if the Adjusted Daily Simple SOFR also is the subject of <u>Section 2.16(a)(i)</u> or <u>(ii)</u> above, on such day and (2) any RFR Loan shall on and from such day be converted by the Administrative Agent to, and shall constitute, an ABR Loan.

(b)    Notwithstanding anything to the contrary herein or in any other Loan Document (and any Swap Agreement shall be deemed not to be a "Loan Document" for purposes of this <u>Section 2.16</u>), if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(c)    Notwithstanding anything to the contrary herein or in any other Loan Document, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any

amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(d)     The Administrative Agent will promptly notify the Borrower and the Lenders of (1) any occurrence of a Benchmark Transition Event, (2) the implementation of any Benchmark Replacement, (3) the effectiveness of any Benchmark Replacement Conforming Changes, (4) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (f) below and (5) the commencement or conclusion of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.16, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.16.

(e)     Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (1) if the then-current Benchmark is a term rate (including the Term SOFR Rate) and either (a) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (b) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Administrative Agent may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (2) if a tenor that was removed pursuant to clause (1) above either (a) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (b) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(f)     Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Term Benchmark Borrowing of, conversion to or continuation of Term Benchmark Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any request for a Term Benchmark Borrowing into a request for a Borrowing of or conversion to (A) an RFR Borrowing so long as the Adjusted Daily Simple SOFR is not the subject of a Benchmark Transition Event or (B) an ABR Borrowing if the Adjusted Daily Simple SOFR is the subject of a Benchmark Transition Event.  During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR.  Furthermore, if any Term Benchmark Loan or RFR Loan is outstanding on the date of the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period with respect to a Relevant Rate applicable to such Term Benchmark Loan or RFR Loan, then until such time as a Benchmark Replacement is implemented pursuant to this Section 2.16, (1) any Term Benchmark Loan shall on the last day of the Interest Period applicable to such Loan, be converted by the Administrative Agent to, and shall constitute, (x) an RFR Borrowing so long as the Adjusted Daily Simple SOFR is not the subject of a Benchmark Transition Event or (y) an ABR Loan if the Adjusted Daily Simple SOFR is the subject of a Benchmark Transition Event, on such day and (2) any RFR Loan shall on and from such day be converted by the Administrative Agent to, and shall constitute, an ABR Loan.

2.17    Pro Rata Treatment and Payments.  (a) Each borrowing by the Borrower from the Revolving Lenders hereunder, each payment by the Borrower on account of any commitment fee and any reduction of the Revolving Commitments of the Revolving Lenders shall be made pro rata according to the Revolving Percentages of the Lenders, in each case unless otherwise provided in this Agreement.

(b)        Any proceeds of Collateral of any Loan Party received by the Administrative Agent (i) after an Event of Default has occurred and is continuing and the Administrative Agent so elects or the Required Lenders so direct or (ii) at any other time, not constituting (A) a specific payment of principal, interest, fees or other sum payable under the Loan Documents (which shall be applied as specified by the Borrower), (B) a mandatory prepayment (which shall be applied in accordance with Section 2.11(a)) or (C) amounts to be applied from the Collection Account (which shall be applied in accordance with Section 2.11(e)), shall be applied, subject to the Orders, ratably first, to pay any fees, indemnities, or expense reimbursements then owing to the Administrative Agent and any Issuing Lender from, or guaranteed by, such Loan Party under the Loan Documents related to the Revolving Loans (other than in connection with Banking Services Obligations or Swap Obligations), second, to pay any fees or expense reimbursements then owing to the Revolving Lenders from, or guaranteed by, such Loan Party under the Loan Documents (other than in connection with Banking Services or Swap Obligations), third, to pay interest due in respect of the Protective Advances owing by or guaranteed by such Loan Party, fourth, to pay the principal of the Protective Advances owing by or guaranteed by such Loan Party, fifth, to pay interest then due and payable on the Revolving Loans (other than the Protective Advances) and unreimbursed L/C Disbursements, in each case owing or guaranteed by such Loan Party, ratably, sixth, to prepay principal on the Revolving Loans (other than the Protective Advances) and unreimbursed L/C Disbursements owing or guaranteed by such Loan Party, to pay an amount to the Administrative Agent equal to 103% of the aggregate undrawn face amount of all outstanding Letters of Credit issued on behalf of, or guaranteed by, such Loan Party, to be held as cash collateral for such Obligations and to pay any amounts owing with respect to Banking Services Obligations to the extent that there are Banking Services Reserves established in respect of such Banking Services Obligations, ratably, seventh, to the payment of any amounts owing with respect to Banking Services Obligations and Secured Swap Obligations owing or guaranteed by such Loan Party, ratably, eighth, to the payment of any other Revolving Obligations owing to the Administrative Agent or any Lender by, or guaranteed by, such Loan Party, ratably and ninth, any balance remaining after the Obligations shall have been paid in full and no Letters of Credit shall be outstanding (other than Letters of Credit which have been cash collateralized in accordance with the foregoing) shall be paid over to the applicable Loan Party at its account designated for such purpose by written notice by such Loan Party to the Administrative Agent or to whomsoever else may be lawfully entitled to receive the same. The application of any payment pursuant to this Section 2.17(b) shall be made first, to ABR Loans and second, to Term Benchmark Loans (or RFR Loans, if applicable). Each of the Administrative Agent and the Revolving Lenders shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Obligations to maximize realization of the Collateral (it being understood that, notwithstanding the foregoing, in no event shall be payments be made pursuant to levels "seventh" through "ninth" above prior to the payment in full of all obligations described in levels "first" through "sixth" above). Notwithstanding the foregoing, no amount received from any Loan Party shall be applied to any Excluded Swap Obligation of such Loan Party.

(c)        Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Revolving Loans shall be made pro rata according to the respective outstanding principal amounts of the Revolving Loans then held by the Revolving Lenders, unless otherwise provided by this Agreement.

(d)        All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Administrative

Agent, for the account of the Lenders, at the Funding Office, in Dollars and in immediately available funds. The Administrative Agent shall distribute such payments to each relevant Lender promptly upon receipt in like funds as received, net of any amounts owing by such Lender pursuant to Section 9.2(d). If any payment hereunder (other than payments on the Term Benchmark Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a Term Benchmark Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension. During any Daily Cash Sweep Period, solely for purposes of determining the amount of Loans available for borrowing purposes, checks (in addition to immediately available funds applied pursuant to Section 2.11(e)) from collections of items of payment and proceeds of any Collateral shall be applied in whole or in part against the applicable Obligations as of 10:00 A.M., New York City time, on the Business Day of receipt, subject to actual collection.

(e)    Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the NYFRB Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to Revolving Loans that are ABR Loans, on demand, from the Borrower.

(f)    Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower pursuant to the terms hereof or any other Loan Document (including any date that is fixed for prepayment by notice from the Borrower to the Administrative Agent pursuant to Section 2.11(e)) that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average NYFRB Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

(g)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.6(b), 2.6(c), 2.17(e), 2.17(f), 2.19(e), 3.4(a) or 9.2(d), then the Administrative Agent may, in its discretion and notwithstanding any contrary provision hereof, (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender for the benefit of the Administrative Agent, the Swingline Lender or the Issuing Lender to satisfy such Lender's obligations to it under such Sections until all such unsatisfied obligations are fully paid, and/or (ii) hold any such amounts in a segregated account as

cash collateral for, and application to, any future funding obligations of such Lender under any such Section, in the case of each of clauses (i) and (ii) above, in any order as determined by the Administrative Agent in its discretion.

2.18    Requirements of Law.  (a)  If the adoption of or any change in any Requirement of Law or in the interpretation, administration, implementation or application thereof or compliance by any Lender or other Credit Party with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority, in each case made or occurring subsequent to the Closing Date:

(i)    shall subject any Credit Party to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit (or participations therein) by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Adjusted Term SOFR Rate; or

(iii)    shall impose on such Lender any other condition (other than Taxes);

and the result of any of the foregoing is to increase the cost to such Lender or such other Credit Party, by an amount that such Lender or other Credit Party deems to be material, of making, converting into, continuing or maintaining Loans or issuing or participating in Letters of Credit, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender or such other Credit Party, upon its demand, any additional amounts necessary to compensate such Lender or such other Credit Party for such increased cost or reduced amount receivable.  If any Lender or such other Credit Party becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)    If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital or liquidity requirements or in the interpretation, administration, implementation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital or liquidity requirements (whether or not having the force of law) from any Governmental Authority made subsequent to the Closing Date shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder or under or in respect of any Letter of Credit to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy or liquidity) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)    Notwithstanding anything herein to the contrary, (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer

68

Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented.

(d)    A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error.  Notwithstanding anything to the contrary in this Section, the Borrower shall not be required to compensate a Lender pursuant to this Section for any amounts incurred more than nine months prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such nine-month period shall be extended to include the period of such retroactive effect.  The obligations of the Borrower pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(e)    Notwithstanding any other provision of this Section 2.18 to the contrary, no Lender shall be entitled to receive any compensation pursuant to this Section 2.18 unless it shall be the general policy or practice of such Lender to seek compensation from other similarly situated borrowers in the U.S. syndicated loan market with respect to its similarly affected loans under agreements with such borrowers having provisions similar to this Section 2.18.

2.19    Taxes.  (a)  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that, after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.19), the amounts received with respect to this Agreement equal the sum which would have been received had no such deduction or withholding been made.

(b)    The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for, Other Taxes.

(c)    As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.19, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)    Without duplication of payments made pursuant to Section 2.19(a) above, the Loan Parties shall jointly and severally indemnify each Credit Party, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.19) payable or paid by such Credit Party or required to be withheld or deducted from a payment to such Credit Party and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

69

(e)    Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so) and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(c) relating to the maintenance of a Participant Register, in either case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)    (i)  Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.19(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest"

70

article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed copies of IRS Form W-8ECI;

(3)      in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit H-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)      to the extent a Non-U.S. Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-2 or Exhibit H-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-4 on behalf of each such direct and indirect partner;

(C)      any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to

71

determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the Closing Date.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.19 (including by the payment of additional amounts pursuant to this Section 2.19), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.19 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 2.19 shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Each party's obligations under this Section 2.19 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Revolving Commitments and the repayment, satisfaction or discharge of all obligations under the Loan Documents.

(i)    For purposes of this Section 2.19, the term "Lender" includes the Swingline Lender and the Issuing Lender and the term "applicable law" includes FATCA.

2.20    Indemnity.

(a)    With respect to Loans that are not RFR Loans, the Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender sustains or incurs as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Term Benchmark Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment of or conversion from Term Benchmark Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Term Benchmark Loans on a day that is not the last day of an Interest Period with respect thereto.  Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the

Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market.  A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error.  This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder for nine months.

(b)    With respect to RFR Loans, the Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender sustains or incurs as a consequence of (a) default by the Borrower in making a borrowing of or conversion into RFR Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement or (b) default by the Borrower in making any prepayment of or conversion from RFR Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement.  Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed or converted, for the period from the date of such prepayment or of such failure to borrow or convert to Interest Payment Date (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank market.  A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error.  This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder for nine months.

2.21    <u>Change of Lending Office</u>.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.18 or 2.19(a) with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts to designate another lending office for any Loans affected by such event or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates with the object of avoiding the consequences of such event; provided, that such designation or assignment is made on terms that, in the sole judgment of such Lender, (i) would eliminate or reduce amounts payable pursuant to Section 2.18 or 2.19(a), as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, and provided, further, that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.18 or 2.19 (a).

2.22    <u>Replacement of Lenders</u>.  The Borrower shall be permitted to replace any Lender that (a) requests reimbursement for amounts owing pursuant to Section 2.18 or 2.19(a), (b) becomes a Defaulting Lender or (c) does not consent to any proposed amendment, supplement, modification, consent or waiver of any provision of this Agreement or any other Loan Document that requires the consent of the Supermajority Lenders, each of the Lenders or each of the Lenders affected thereby (so long as the consent of the Required Lenders has been obtained), with a replacement financial institution; provided that (i) such replacement does not conflict with any Requirement of Law, (ii) no Event of Default shall have occurred and be continuing at the time of such replacement, (iii) prior to any such replacement, such Lender shall have taken no action under Section 2.21 so as to eliminate the continued need for payment of amounts owing pursuant to Section 2.18 or 2.19(a), (iv) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (v) the Borrower shall be liable to such replaced Lender under Section 2.20 if any Term Benchmark Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (vi) the replacement financial institution shall be reasonably satisfactory to the Administrative Agent, (vii) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of

Section 10.6 (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein), (viii) until such time as such replacement shall be consummated, the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.18 or 2.19(a), as the case may be, and (ix) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.  Each party hereto agrees that an assignment required pursuant to this Section may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee, and that the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective.

      2.23    <u>Defaulting Lenders</u>.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

      (a)    fees shall cease to accrue on the unfunded portion of the Revolving Commitment of such Defaulting Lender pursuant to Section 2.8(a);

      (b)    any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 2.17(b) or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 10.7 shall be applied at such time or times as may be determined by the Administrative Agent as follows: <u>first</u>, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; <u>second</u>, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to any Issuing Lender or Swingline Lender hereunder; <u>third</u>, to cash collateralize the Issuing Lender's L/C Exposure with respect to such Defaulting Lender in accordance with this Section; <u>fourth</u>, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; <u>fifth</u>, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (y) cash collateralize the Issuing Lender's future L/C Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in accordance with this Section; <u>sixth</u>, to the payment of any amounts owing to the Lenders, the Issuing Lender or Swingline Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the Issuing Lender or Swingline Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement or under any other Loan Document; <u>seventh</u>, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such  Defaulting Lender's breach of its obligations under this Agreement or under any other Loan Document; and <u>eighth</u>, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans or L/C Disbursements in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 5.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and L/C Disbursements owed to, all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or L/C Disbursements owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in the Borrower's obligations corresponding to such Defaulting Lender's L/C Exposure and Swingline Loans are held by the Lenders pro rata in accordance with the Revolving Commitments without giving effect to clause (d) below. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender

that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this Section shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto;

(c)      the Revolving Commitment and Revolving Extensions of Credit of such Defaulting Lender shall not be included in determining whether the Required Lenders or Supermajority Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 10.1); provided, that this clause (c) shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification requiring the consent of such Lender or each Lender affected thereby;

(d)      if any Swingline Exposure, L/C Exposure or Protective Advance Exposure exists at the time such Lender becomes a Defaulting Lender then:

(i)      all or any part of the Swingline Exposure, L/C Exposure and Protective Advance Exposure of such Defaulting Lender shall be reallocated among the non-Defaulting Lenders in accordance with their respective Revolving Percentages but only to the extent the sum of all non-Defaulting Lenders' Revolving Extensions of Credit plus such Defaulting Lender's Swingline Exposure, L/C Exposure and Protective Advance Exposure does not exceed the total of all non-Defaulting Lenders' Revolving Commitments;

(ii)      if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Borrower shall within one Business Day following notice by the Administrative Agent (x) first, prepay such Protective Advance Exposure, (y) second, prepay such Swingline Exposure and (z) third, cash collateralize for the benefit of the Issuing Lender only the Borrower's obligations corresponding to such Defaulting Lender's L/C Exposure (after giving effect to any partial reallocation pursuant to clause (i) above) in accordance with the procedures set forth in Section 8.1 for so long as such L/C Exposure is outstanding;

(iii)      if the Borrower cash collateralizes any portion of such Defaulting Lender's L/C Exposure pursuant to clause (ii) above, the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 3.3(a) with respect to such Defaulting Lender's L/C Exposure during the period such Defaulting Lender's L/C Exposure is cash collateralized;

(iv)      if the L/C Exposure of the non-Defaulting Lenders is reallocated pursuant to clause (i) above, then the fees payable to the Lenders pursuant to Section 2.8(a) and Section 3.3(a) shall be adjusted in accordance with such non-Defaulting Lenders' Revolving Percentages; and

(v)      if all or any portion of such Defaulting Lender's L/C Exposure is neither reallocated nor cash collateralized pursuant to clause (i) or (ii) above, then, without prejudice to any rights or remedies of the Issuing Lender or any other Lender hereunder, all fees payable under Section 3.3(a) with respect to such Defaulting Lender's L/C Exposure shall be payable to the Issuing Lender until and to the extent that such L/C Exposure is reallocated and/or cash collateralized; and

(e)      so long as such Lender is a Defaulting Lender, the Swingline Lender shall not be required to fund any Swingline Loan and the Issuing Lender shall not be required to issue, amend or increase any Letter of Credit, unless it is satisfied that the related exposure and the Defaulting

Lender's then outstanding L/C Exposure will be 100% covered by the Revolving Commitments of the non-Defaulting Lenders and/or cash collateral will be provided by the Borrower in accordance with Section 2.23(d), and participating interests in any newly made Swingline Loan or any newly issued or increased Letter of Credit shall be allocated among non-Defaulting Lenders (and defined terms (including, other than for purposes of Section 9.2(d), the defined term "Revolving Percentage") shall be read to give effect to such allocation) in a manner consistent with Section 2.23(d)(i) (and such Defaulting Lender shall not participate therein).

If (i) a Bankruptcy Event with respect to a Lender Parent of any Lender shall occur following the Closing Date and for so long as such event shall continue or (ii) the Swingline Lender or the Issuing Lender has a good faith belief that any Lender has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, the Swingline Lender shall not be required to fund any Swingline Loan and the Issuing Lender shall not be required to issue, amend or increase any Letter of Credit, unless the Swingline Lender or the Issuing Lender, as the case may be, shall have entered into arrangements with the Borrower or such Lender, satisfactory to the Swingline Lender or the Issuing Lender, as the case may be, to defease any risk to it in respect of such Lender hereunder.

In the event that the Administrative Agent, the Borrower, the Swingline Lender and the Issuing Lender each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Swingline Exposure, L/C Exposure and Protective Advance Exposure of the Lenders shall be readjusted to reflect the inclusion of such Lender's Revolving Commitment and on such date such Lender shall purchase at par such of the Loans of the other Lenders (other than Swingline Loans) as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Revolving Percentage.

SECTION 3.  LETTERS OF CREDIT

3.1    L/C Sublimit.  (a)  Subject to the terms and conditions hereof, the Borrower may request on any Business Day during the Revolving Commitment Period the issuance of letters of credit ("Letters of Credit") in Dollars for its account or the account of its Subsidiaries in such form as may be approved from time to time by the Issuing Lender and the Issuing Lender may, but shall have no obligation, to issue such requested Letters of Credit pursuant to this Agreement; provided that the Issuing Lender shall not issue any Letter of Credit if, after giving effect to such issuance, (i) the Total Revolving Extensions of Credit would exceed the Line Cap, subject to the authority of the Administrative Agent, in its sole discretion, to make Protective Advances pursuant to the terms of Section 2.3 or (ii) the total L/C Obligations would exceed the L/C Sublimit; provided further that no Issuing Lender shall be required to issue any Letter of Credit if, after giving effect to such issuance, the total L/C Obligations in respect of Letters of Credit issued by such Issuing Lender would exceed its L/C Commitment.  Each Letter of Credit shall (x) be denominated in Dollars and (y) expire no later than the earlier of (1) the first anniversary of its date of issuance (or such longer period as agreed to by the applicable Issuing Lender in its sole discretion) and (2) the date that is five Business Days prior to the Revolving Termination Date, provided that any Letter of Credit with a one-year term may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (2) above unless such Letter of Credit has been cash collateralized or other arrangements backstopping such Letter of Credit have been made, in each case, reasonably satisfactory to the Issuing Lender).  No more than 20 Letters of Credit shall be outstanding at any one time. The parties hereto agree that the Existing Letters of Credit will automatically, without any further action on the part of any Person, be deemed to be Letters of Credit hereunder issued hereunder on the Closing Date for the account of the Borrower.

(b)    The Issuing Lender shall not at any time be obligated to issue any Letter of Credit, including if the issuance of such Letter of Credit would (i) violate one or more policies of the Issuing Lender

applicable to letters of credit generally or (ii) conflict with, or cause the Issuing Lender or any L/C Participant to exceed any limits imposed by, any applicable Requirement of Law.

3.2    Procedure for Issuance of Letter of Credit.  The Borrower may from time to time request that the Issuing Lender issue a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit) by delivering to the Issuing Lender at its address for notices specified herein, with a copy to the Administrative Agent, an Application therefor, completed to the reasonable satisfaction of the Issuing Lender, and such other certificates, documents and other papers and information as the Issuing Lender may request.  Upon receipt of any Application, if the Issuing Lender agrees, in its sole discretion, to issue the requested Letter of Credit, the Issuing Lender will process such Application and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby (but in no event shall the Issuing Lender be required to issue, amended, renew or extend any Letter of Credit earlier than three Business Days after its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto) by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed to by the Issuing Lender and the Borrower.  The Issuing Lender shall furnish a copy of such Letter of Credit to the Borrower promptly following the issuance thereof.  The Issuing Lender shall promptly furnish to the Administrative Agent, which shall in turn promptly furnish to the Lenders, notice of the issuance of each Letter of Credit (including the amount thereof).

3.3    Fees and Other Charges.  (a) The Borrower will pay a fee on all outstanding Letters of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Revolving Loans that are Term Benchmark Loans, shared ratably among the Revolving Lenders and payable quarterly in arrears on each Fee Payment Date after the issuance date.  In addition, the Borrower shall pay to each Issuing Lender for its own account a fronting fee equal to 0.125% per annum multiplied by the daily average undrawn and unexpired amount of each Letter of Credit issued by such Issuing Lender, payable quarterly in arrears.

(b)    In addition to the foregoing fees, the Borrower shall pay or reimburse the Issuing Lender for such normal and customary costs and expenses as are incurred or charged by the Issuing Lender in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit.

3.4    L/C Participations.  (a) The Issuing Lender irrevocably agrees to grant and hereby grants to each L/C Participant, and, to induce the Issuing Lender to issue Letters of Credit, each L/C Participant irrevocably agrees to accept and purchase and hereby accepts and purchases from the Issuing Lender, on the terms and conditions set forth below, for such L/C Participant's own account and risk an undivided interest equal to such L/C Participant's Revolving Percentage in the Issuing Lender's obligations and rights under and in respect of each Letter of Credit and the amount of each draft paid by the Issuing Lender thereunder. Each L/C Participant agrees with the Issuing Lender that, if a draft is paid under any Letter of Credit for which the Issuing Lender is not reimbursed in full by the Borrower in accordance with the terms of Section 3.5 (or in the event that any reimbursement received by the Issuing Lender shall be required to be returned by it at any time), such L/C Participant shall pay to the Issuing Lender upon demand at the Issuing Lender's address for notices specified herein an amount equal to such L/C Participant's Revolving Percentage of the amount that is not so reimbursed (or is so returned).  Each L/C Participant's obligation to pay such amount shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right that such L/C Participant may have against the Issuing Lender, the Borrower or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Section 5, (iii) any adverse change in the condition (financial or otherwise) of the Borrower, (iv) any breach of this Agreement or any other Loan Document by the

77

Borrower, any other Loan Party or any other L/C Participant or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

(b)    If any amount required to be paid by any L/C Participant to the Issuing Lender pursuant to Section 3.4(a) in respect of any unreimbursed portion of any payment made by the Issuing Lender under any Letter of Credit is not paid to the Issuing Lender within three Business Days after the date such payment is due, such L/C Participant shall pay to the Issuing Lender on demand an amount equal to the product of (i) such amount, times (ii) the greater of (x) the daily average NYFRB Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to the Issuing Lender and (y) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, times (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360. If any such amount required to be paid by any L/C Participant pursuant to Section 3.4(a) is not made available to the Issuing Lender by such L/C Participant within three Business Days after the date such payment is due, the Issuing Lender shall be entitled to recover from such L/C Participant, on demand, such amount with interest thereon calculated from such due date at the rate per annum applicable to the Alternate Base Rate plus the Applicable Margin. A certificate of the Issuing Lender submitted to any L/C Participant with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error.

(c)    Whenever, at any time after the Issuing Lender has made payment under any Letter of Credit and has received from any L/C Participant its pro rata share of such payment in accordance with Section 3.4(a), the Issuing Lender receives any payment related to such Letter of Credit (whether directly from the Borrower or otherwise, including proceeds of collateral applied thereto by the Issuing Lender), or any payment of interest on account thereof, the Issuing Lender will distribute to such L/C Participant its pro rata share thereof; provided, however, that in the event that any such payment received by the Issuing Lender shall be required to be returned by the Issuing Lender, such L/C Participant shall return to the Issuing Lender the portion thereof previously distributed by the Issuing Lender to it.

3.5    Reimbursement Obligation of the Borrower. If any draft is paid under any Letter of Credit, the Borrower shall, subject to Section 3.7, reimburse the Issuing Lender for the amount of (a) the draft so paid and (b) any taxes, fees, charges or other costs or expenses incurred by the Issuing Lender in connection with such payment, not later than 1:00 P.M., New York City time, on (i) the Business Day that the Borrower receives notice of such draft, if such notice is received on such day prior to 11:00 A.M., New York City time and JPMCB is the applicable Issuing Lender, or (ii) if clause (i) above does not apply, the Business Day immediately following the day that the Borrower receives such notice. Each such payment shall be made to the Issuing Lender at its address for notices referred to herein in Dollars and in immediately available funds. Interest shall be payable on any such amounts from the date on which the relevant draft is paid until payment in full at the rate set forth in (x) until the Business Day next succeeding the date of the relevant notice, Section 2.14(c) and (y) thereafter, Section 2.14(d).

3.6    Obligations Absolute. The Borrower's obligations under this Section 3 shall be absolute, unconditional and irrevocable under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment that the Borrower may have or have had against the Issuing Lender, any beneficiary of a Letter of Credit or any other Person. The Borrower also agrees with the Issuing Lender that the Issuing Lender shall not be responsible for, and the Borrower's Reimbursement Obligations under Section 3.5 shall not be affected by, among other things, (a) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (b) any draft or other document presented under a Letter of Credit proving to be invalid, fraudulent or forged in any respect or any statement therein being untrue or inaccurate in any respect, (c) any dispute between or among the Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of the Borrower against any beneficiary of such Letter of Credit or any such

transferee, (d) payment by the Issuing Lender under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (e) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder. The Issuing Lender shall not have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or message or advice, however transmitted, in connection with any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Lender; provided that the foregoing shall not be construed to excuse the Issuing Lender from liability to the Borrower to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Lender's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Lender (as finally determined by a court of competent jurisdiction), the Issuing Lender shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Lender may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

3.7    Letter of Credit Payments.  If any draft shall be presented for payment under any Letter of Credit, the Issuing Lender shall promptly notify the Administrative Agent of the date and amount thereof and the Administrative Agent shall provide such notice to the Borrower; provided that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Lender and the Revolving Lenders pursuant to Section 3.5. The Borrower may request that a Revolving Loan (or Swingline Loan) be made to provide funds for the payment required by this Section 3.7; provided that, after giving effect to any such Revolving Loan (or Swingline Loan), the Line Cap would not be exceeded at such time. The proceeds of such Revolving Loan (or Swingline Loan) shall be paid directly to the Issuing Lender to reimburse it for the payment made by it under the Letter of Credit.

3.8    Applications.  To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this Section 3, the provisions of this Section 3 shall apply.

3.9    Replacement of an Issuing Lender. An Issuing Lender may be replaced at any time by (a) the Borrower in its sole discretion upon written notice to the Administrative Agent; provided that there are no outstanding Letters of Credit issued by such Issuing Lender which are not cash collateralized by the Borrower or (b) written agreement among the Borrower, the Administrative Agent, the replaced Issuing Lender and the successor Issuing Lender. The Administrative Agent shall notify the Lenders of any such replacement of an Issuing Lender. At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Lender pursuant to Section 3.3. From and after the effective date of any such replacement, (a) the successor Issuing Lender shall have all the rights and obligations of the Issuing Lender under this Agreement with respect to Letters of Credit to be issued thereafter and (b) references herein to the term "Issuing Lender" shall be deemed to refer to such successor or to any previous Issuing Lender, or to such successor and all previous Issuing Lenders, as the context shall require. After the replacement of an Issuing Lender hereunder, the replaced

Issuing Lender shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Lender under this Agreement with respect to Letters of Credit then outstanding and issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

3.10    Letters of Credit Issued for Account of Subsidiaries. Notwithstanding that a Letter of Credit issued or outstanding hereunder supports any obligations of, or is for the account of, a Subsidiary, or states that a Subsidiary is the "account party," "applicant," "customer," "instructing party," or the like of or for such Letter of Credit, and without derogating from any rights of the Issuing Lender (whether arising by contract, at law, in equity or otherwise) against such Subsidiary in respect of such Letter of Credit, the Borrower (i) shall reimburse, indemnify and compensate the Issuing Lender hereunder for such Letter of Credit (including to reimburse any and all drawings thereunder) as if such Letter of Credit had been issued solely for the account of the Borrower and (ii) irrevocably waives any and all defenses that might otherwise be available to it as a guarantor or surety of any or all of the obligations of such Subsidiary in respect of such Letter of Credit. The Borrower hereby acknowledges that the issuance of such Letters of Credit for its Subsidiaries inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of such Subsidiaries.

SECTION 4.  REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans and issue or participate in the Letters of Credit, each of Holdings and the Borrower hereby represents and warrants to the Administrative Agent and each Lender that:

4.1    Financial Condition.   The audited consolidated balance sheets of Existing Holdings and its consolidated Subsidiaries as at May 1, 2022, April 30, 2023 and April 28, 2024, and the related consolidated statements of income, stockholders' equity and cash flows for the fiscal years ended on such dates, reported on by and accompanied by an unqualified report from SyCip Gorres Velayo & Co., present fairly, in all material respects, the consolidated financial condition of Existing Holdings and its consolidated Subsidiaries as at such date, and the consolidated results of its operations and its consolidated cash flows for the respective fiscal years then ended. All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with IFRS applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein), except that the interim financial statements are subject to year-end adjustments and are lacking footnote disclosures.

4.2    No Change.  Since the Petition Date, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect.

4.3    Existence; Compliance with Law.  Each Group Member (a) is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) subject to entry of the Interim DIP Order, has the corporate or similar organizational power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except where the failure to be so qualified could not, in the aggregate, reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4    Power; Authorization; Enforceable Obligations. (a)  Subject to entry of the Interim DIP Order, each Loan Party has the corporate or similar organizational power and authority, and the legal

right, to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to obtain extensions of credit hereunder. Each Loan Party has taken all necessary corporate or similar organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement. Each Loan Document has been duly executed and delivered on behalf of each Loan Party party thereto. Subject to entry of the Interim DIP Order, this Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

(b)    Subject to entry of the Interim DIP Order, no consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except (i) consents, authorizations, filings and notices that have been obtained or made and are in full force and effect and (ii) the filings referred to in Section 4.19.

4.5    No Legal Bar. Except as a result of, and in connection with, the Chapter 11 Cases, the execution, delivery and performance of this Agreement and the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law or any Contractual Obligation of any Group Member, except for violations that could not reasonably be expected to have a Material Adverse Effect, and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents and the Term Loan Documents).

4.6    Litigation. Except for the Chapter 11 Cases, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of Holdings or the Borrower, threatened by or against any Group Member or against any of their respective properties (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) that could reasonably be expected to have a Material Adverse Effect if determined adversely to any applicable Group Member.

4.7    No Default. No Default or Event of Default has occurred and is continuing.

4.8    Ownership of Property; Liens. Each Group Member has such title in fee simple or valid leasehold to the real property owned or leased by it as is necessary to the conduct of its business and valid and legal title to all of its personal property owned by it, in each case, subject to Permitted Liens.

4.9    Intellectual Property. Subject to the Transition Services Agreement, except as could not reasonably be expected to have a Material Adverse Effect, each Group Member owns, or is licensed to use, all Intellectual Property reasonably necessary for the conduct of its business as currently conducted, free and clear of all Liens, except as permitted by Section 7.3, and the use of any such Intellectual Property and the conduct of each of the Group Members does not infringe upon the rights of any Person. Except as could not reasonably be expected to have a Material Adverse Effect, no claim has been asserted or is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any material Intellectual Property, nor does Holdings or the Borrower know of any valid basis for any such claim.

81

4.10    Taxes.  Each Group Member has filed or caused to be filed all Federal, state and other material Tax returns that are required to be filed and has paid all Taxes shown to be due and payable on said returns or on any assessments made against it or any of its property and all other Taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than (i) any amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with IFRS have been provided on the books of the relevant Group Member, or (ii) to the extent that the failure to file or pay, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect); to the knowledge of Holdings and the Borrower, no material Liens for Taxes have been filed, and, to the knowledge of Holdings and the Borrower, no claim is being asserted, with respect to any such Tax, fee or other charge.

4.11    Federal Regulations.  Neither Holdings nor the Borrower is engaged and neither Holdings nor the Borrower will engage, principally or as one of its respective important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no part of the proceeds of any Borrowing or Letter of Credit hereunder will be used to buy or carry any Margin Stock.  Following the application of the proceeds of each Borrowing or drawing under each Letter of Credit, not more than 25% of the value of the assets (either of Holdings individually or of Holdings and its Restricted Subsidiaries on a consolidated basis) will be Margin Stock.

4.12    Labor Matters.  Except as set forth on Schedule 4.12, no domestic Group Member is a party to or otherwise bound by any collective bargaining or similar agreement with any labor union, works council or similar employee representative and, to the knowledge of Holdings or the Borrower, no union organizing activities or petitions for representation are pending or threatened.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other work stoppages of any kind, or other labor disputes against any Group Member pending or, to the knowledge of Holdings or the Borrower, threatened; and (b) each Group Member is in compliance with all applicable Requirements of Law concerning labor and employment matters, including with respect to hours of work  and payment of wages, the withholding, payment, and reporting of payroll taxes (including the Fair Labor Standards Act and any other applicable Requirement of Law dealing with such matters).

4.13    ERISA.  Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (a) each Group Member is in compliance with all applicable provisions and requirements of ERISA and the Code and other federal and state laws and the regulations and published interpretations thereunder with respect to each Plan and Pension Plan and have performed all their obligations under each Plan and Pension Plan; (b) no ERISA Event or Foreign Plan Event has occurred or is reasonably expected to occur, and no ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event; (c) each Plan or Pension Plan which is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS, or, with respect to a preapproved plan, can rely on an opinion letter or advisory letter from the IRS to the preapproved plan sponsor indicating that such Plan or Pension Plan is so qualified and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code or, with respect to an individually designed Plan or Pension Plan, an application for such a determination is currently pending before the Internal Revenue Service and, to the knowledge of Holdings and the Borrower, nothing has occurred which would cause such Plan or Pension Plan to lose its qualified status; (d) no liability to the PBGC (other than required premium payments) or the IRS has been or is reasonably expected to be incurred by any Group Member or ERISA Affiliate; (e) each of the Group Members and each ERISA Affiliate has complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and is not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan; (f) all amounts required by applicable law with respect to, or by the terms of, any retiree welfare benefit arrangement maintained by any Group Member or any ERISA Affiliate or to which any Group Member or any ERISA Affiliate has an

obligation to contribute have been accrued in accordance with ASC Topic 715-60; (g) reserved; (h) there has been no Prohibited Transaction or violation of the fiduciary responsibility rules with respect to any Plan or Pension Plan; and (i) neither any Group Member nor any ERISA Affiliate maintains or contributes to, or has any unsatisfied obligation to contribute to, or liability under, any active or terminated Pension Plan other than (i) on the Closing Date, those listed on Schedule 4.13 hereto and (ii) thereafter, Pension Plans not otherwise prohibited by this Agreement.  Except as disclosed on Schedule 4.13, the present value of all accumulated benefit obligations under each Pension Plan, did not, as of the close of its most recent plan year, exceed by more than $10,000,000 the fair market value of the assets of such Pension Plan allocable to such accrued benefits (determined in both cases using the applicable assumptions for financial statement reporting purposes under ASC Topic 715), and the present value of all accumulated benefit obligations of all underfunded Pension Plans did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $10,000,000 the fair market value of the assets of all such underfunded Pension Plans (determined in both cases using the applicable assumptions for financial statement reporting purposes under ASC Topic 715). Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, there are no pending or, to the knowledge of Holdings or Borrower, threatened claims, actions, proceedings or lawsuits (other than claims for benefits in the normal course) asserted or instituted against (i) any Plan or its assets, (ii) any fiduciary with respect to any Plan, or (iii) any Group Member or any ERISA Affiliate with respect to any Plan.  Except as required by Section 4980B of the Internal Revenue Code or other applicable law and except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, no Group Member or any ERISA Affiliates maintains an employee welfare benefit plan (as defined in Section 3(1) of ERISA) which provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Group Member or any ERISA Affiliate or coverage after a participant's termination of employment.

4.14    <u>Investment Company Act; Other Regulations</u>.  No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.  No Loan Party is subject to regulation under any Requirement of Law (other than Regulation X of the Board) that limits its ability to incur Indebtedness.

4.15    <u>Subsidiaries; Capital Stock</u>.  As of the Closing Date, (a) Schedule 4.15 sets forth the name and jurisdiction of incorporation or formation, as applicable, of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party and (b) there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options and restricted stock units granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of Holdings or any Subsidiary, except (i) with respect to Capital Stock of Loan Parties, as created by the Loan Documents or the Notes Documents and (ii) otherwise, as permitted by this Agreement.

4.16    <u>Use of Proceeds</u>.  Subject to the Orders, the proceeds of the Revolving Loans and the Swingline Loans and the Letters of Credit shall be used for (a) general corporate purposes (including repayment of certain Indebtedness outstanding under the Pre-Petition ABL Credit Agreement), (b) bankruptcy-related costs and expenses and (c) costs, fees, and expenses related to the DIP ABL Credit Facility, in each case, solely in accordance with the Initial DIP Budget or Subsequent DIP Budget.

4.17    <u>Environmental Matters</u>.  Except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)    Materials of Environmental Concern are not present at, on, under, in, or about any real property now or formerly owned, leased or operated by any Group Member or at any other location (including any location to which Materials of Environmental Concern have been sent for

re-use or recycling or for treatment, storage, or disposal), in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could give rise to liability under, any Environmental Law;

(b)    no Group Member has received or is aware of any notice of violation, alleged violation, non-compliance, liability or potential liability under or relating to any Environmental Law, nor is Holdings or the Borrower aware of any facts, events or circumstances that could reasonably be expected to result in any such notice received or threatened;

(c)    no judicial, arbitral, governmental or administrative litigation, investigation, proceeding or similar action is pending or, to the knowledge of either Holdings or the Borrower, threatened, under any Environmental Law to which any Group Member is or will be named as a party, nor has any Group Member entered into or agreed to any settlements or other agreements, consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements relating to compliance with or liability under any Environmental Law that have not been fully and finally resolved;

(d)    each Group Member (i) is in compliance, and within the period of all applicable statute of limitation has been in compliance, with all applicable Environmental Laws, and (ii) possesses and is in compliance with all Environmental Permits necessary for its business as currently conducted, and there is no reasonable basis for any such permit to be revoked, not renewed or adversely modified; and

(e)    no Group Member has assumed or retained, by contract or operation of law, any liability of any other Person under Environmental Laws or with respect to any Material of Environmental Concern.

4.18    Accuracy of Information, etc. (a) The statements and information contained in this Agreement, the other Loan Documents, and the other material documents, certificates and statements furnished by or on behalf of any Loan Party to the Administrative Agent or the Lenders, or any of them, in writing, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents (as modified or supplemented by other information so furnished), taken together as a whole, did not contain as of the date such written statements, information, documents or certificates were so furnished, any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained herein or therein not misleading in any material respect.  The projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of Holdings to be reasonable at the time made, it being recognized by the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.

(b)    As of the Closing Date, to the best knowledge of Holdings and the Borrower, the information included in any Beneficial Ownership Certification provided on or prior to the Closing Date to any Lender in connection with this Agreement is true and correct in all respects.

4.19    Security Documents.  (a) The Orders are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, enforceable and automatically perfected security interest in the Collateral described therein and proceeds thereof, in each case, having the priorities set forth in the Orders and the Pre-Petition Intercreditor Agreement and subject only to the Carve-Out in accordance with the Interim DIP Order and other exceptions set forth in the Orders.

(b)    Pursuant to the Orders, no filing or other action will be necessary to perfect or protect such Liens and security interests.

(c)    Pursuant to and to the extent provided in, and subject to the entry of, the Orders, the Obligations of the Loan Parties under this Agreement will constitute allowed superpriority administrative expense claims in the Chapter 11 Cases under section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code on a joint and several basis and all superpriority administrative expense claims granted to any other Person, having the priorities set forth in the Orders, subject in all respects to the Carve-Out in accordance with the Interim DIP Order and other exceptions set forth in the Orders, which claims shall have recourse to all of the Loan Parties' assets to the extent set forth in the Orders.

4.20    [Reserved].

4.21    Anti-Corruption Laws, Anti-Money Laundering and Sanctions.  Holdings has implemented and maintains in effect policies and procedures designed to ensure compliance in all material respects by Holdings, its Subsidiaries and its and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and Holdings, its Subsidiaries and its their respective officers and directors and to the knowledge of Holdings and the Borrower their respective employees and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of (a) Holdings, any Subsidiary, any of its or their respective directors, officers or employees, or (b) to the knowledge of Holdings and the Borrower, any agent of Holdings, the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate any Anti-Corruption Law or applicable Sanctions.

4.22    Plan Assets; Prohibited Transactions.  None of Holdings or any of its Subsidiaries is an entity deemed to hold "plan assets" (within the meaning of the Plan Asset Regulations), and neither the execution, delivery nor performance of the transactions contemplated under this Agreement, including the making of any Loan and the issuance of any Letter of Credit hereunder, will give rise to a non-exempt Prohibited Transaction. For purposes of the foregoing, each of Holdings and the Borrower may rely on the Lender's representation in Section 9.9(a).

4.23    EEA Financial Institutions.  No Loan Party is an EEA Financial Institution.

4.24    Variance Report.  The Initial DIP Budget and each Subsequent DIP Budget is based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, in light of the circumstances under which they were made, it being recognized by the Agents and the Lenders that such financial information as it relates to future events is not to be viewed as fact, such financial information as it relates to future events are subject to uncertainties and contingencies, many of which are beyond the Borrower's control, no assurance can be given that such financial information as it relates to future events will be realized and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein and such differences may be material.  From and after the delivery of any Approved DIP Budget Variance Report, such Approved DIP Budget Variance Report shall be true, complete and correct in all material respects and fairly represent in all material respects the results of operations of Holdings, the Borrower and its Subsidiaries for the period covered thereby and in the detail to be covered thereby.

4.25    Orders.  The Interim DIP Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and the Required Lenders, amended or modified and no appeal of such Interim DIP Order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.  After entry of the Final DIP Order, the Final DIP Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and the Required Lenders, amended or modified and no appeal of such Final DIP Order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

4.26    Bankruptcy Matters.

(a)    The Chapter 11 Cases were validly commenced on the Petition Date, and (x) proper notice under the circumstances of the motion seeking approval of the Loan Documents and entry of the Orders was given, and (y) the hearing for the approval of the Interim DIP Order has been held by the Bankruptcy Court.

(b)    After the entry of the Orders, the Obligations will constitute a "DIP Superpriority Claim" (as defined in the Orders) and the liens securing the Obligations shall be senior secured, valid, enforceable, and automatically and properly perfected priming liens on the Collateral, having the priorities set forth in the Orders, subject in all respects to the Carve-Out in accordance with the Interim DIP Order and other exceptions set forth in the Orders and the Loan Documents.

(c)    The Interim DIP Order (with respect to the period prior to the entry of the Final DIP Order) or the Final DIP Order (with respect to the period on and after the entry of the Final DIP Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended without the Required Lenders' consent.

## SECTION 5.  CONDITIONS PRECEDENT

5.1    Conditions to Initial Extension of Credit.  The agreement of each Lender to make the Revolving Commitments available and make the initial extension of credit requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

(a)    Loan Documents.  The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Administrative Agent, Holdings, the Borrower and each Person listed on Schedule 1.1A and (ii) the Guarantee Agreement, executed and delivered by the Borrower and each Guarantor.

(b)    Initial DIP Budget. The Administrative Agent and the Lenders shall have received the Initial DIP Budget, which shall be in form and substance satisfactory to the Required Lenders.

(c)    Payoff of Pre-Petition ABL Credit Agreement. Substantially concurrently with the initial extensions of credit under this Agreement on the Closing Date, (i) the indebtedness outstanding under the Pre-Petition ABL Credit Agreement shall have been repaid in full in accordance with the Interim DIP Order, (ii) the commitments outstanding under the Pre-Petition ABL Credit Agreement shall have been terminated and (iii) all guarantees in respect of, and lien securing, obligations under the Pre-Petition ABL Credit Agreement shall have been released and (clauses (i) through (iii), the foregoing, the "Existing Indebtedness Payoff").

(d)    [Reserved].

(e)　　[Reserved].

(f)　　Fees.  All costs, fees and expenses required to be paid by the Borrower to the Administrative Agent, the Arrangers and the Lenders in connection with this Agreement (including the reasonable and documented fees and expenses of legal counsel to the Administrative Agent) and all costs, fees and expenses required to be paid by the Borrower pursuant to letter agreements entered into with the Arrangers shall have been paid or shall have been authorized to be deducted from the proceeds of the initial extensions of credit under this Agreement to the extent due and invoiced to the Borrower.

(g)　　Officer's Certificate; Good Standing Certificates.  The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Closing Date, with appropriate insertions and attachments, including (w) the certificate of incorporation, in the case of a Loan Party that is a corporation, and certificate of formation, in the case of a Loan Party that is a limited liability company, in each case certified by the relevant authority of the jurisdiction of organization of such Loan Party as of a recent date, (x) the bylaws, in the case of a Loan Party that is a corporation, and limited liability company agreement or operating agreement, in the case of a Loan Party that is a limited liability company, certified as of the Closing Date by its secretary, an assistant secretary or a Responsible Officer as being in full force and effect without modification or amendment, (y) resolutions of the governing bodies of each Loan Party approving and authorizing the execution, delivery and performance of Loan Documents to which it is a party, certified as of the Closing Date by its secretary, an assistant secretary or a Responsible Officer as being in full force and effect without modification or amendment and (z) signature and incumbency certificates of the Responsible Officers of each Loan Party executing the Loan Documents to which it is a party, and (ii) a long form good standing certificate for each Loan Party from its jurisdiction of organization.

(h)　　Legal Opinions.  The Administrative Agent shall have received the executed legal opinions of (i) Herbert Smith Freehills Kramer (US) LLP, New York counsel to Holdings and its Restricted Subsidiaries and (ii) Cole Schotz P.C., New Jersey counsel to Holdings and its Restricted Subsidiaries, each in form and substance reasonably acceptable to the Administrative Agent.

(i)　　[Reserved].

(j)　　[Reserved].

(k)　　[Reserved].

(l)　　[Reserved].

(m)　　PATRIOT Act.  The Administrative Agent shall have received, at least three Business Days prior to the Closing Date, (i) all documentation and other information about any Loan Party reasonably requested by the Administrative Agent in writing at least five days prior to the Closing Date and that the Administrative Agent reasonably determines is required by United States bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and (ii) if the Borrower qualifies as a "legal entity" customer under the Beneficial Ownership Regulation, and to the extent requested by any Lender at least five days prior to the Closing Date, a Beneficial Ownership Certificate.

(n)　　[Reserved].

(o)    Borrowing Base Certificate. The Administrative Agent shall have received a completed Borrowing Base Certificate.

(p)    [Reserved].

(q)    Excess Availability. After giving effect to all extensions of credit to be made on the Closing Date, Excess Availability on a Pro Forma Basis shall be greater than or equal to the Minimum Excess Availability Amount.

(r)    Officer's Certificate.  The Administrative Agent shall have received a certificate of the Borrower, dated the Closing Date, substantially in the form of Exhibit C-1 certifying that the conditions in Section 5.2(a) and Section 5.2(b) have been met.

(s)    Chapter 11 Cases.

(i)    The Petition Date shall have occurred.

(ii)    The Interim DIP Order shall have been entered on the docket of the Bankruptcy Court which Interim DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent and the Required Lenders.

(iii)    All material "first day" motions filed by the Debtors in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the Administrative Agent, including, without limitation the DIP Motion and the Cash Management Motion submitted by the Debtors to the Bankruptcy Court on the first day of the Chapter 11 Cases.

(iv)    The Restructuring Support Agreement in form and substance reasonably satisfactory to the Administrative Agent shall be in full force and effect.

(t)    Other than the Chapter 11 Cases, there shall not exist any actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Debtors, threatened in writing against or affecting any Debtor, (i) that involve this Agreement or the transactions contemplated herein or (ii) which is not otherwise subject to the automatic stay as a result of the Chapter 11 Cases.

(u)    All Obligations shall be secured by a perfected lien and security interest on all Collateral pursuant to and with the priority set forth in, the Interim DIP Order.

(x)    Term Loan. Concurrently with the initial funding hereunder, the DIP Term Loan Credit Agreement shall have been effective with aggregate commitments in an amount not less than $165,000,000 and the Borrower shall have received gross proceeds thereunder in an amount of $100,000,000.

(y)    All necessary governmental and third party consents and approvals necessary in connection with the Facility and the Transactions shall have been obtained (without the imposition of any materially adverse conditions that are not acceptable to the Required Lenders) and shall remain in effect; and the making of the loans under the Facility shall not violate any material applicable requirement of law and shall not be enjoined temporarily, preliminarily or permanently.

(z)      The Administrative Agent shall have received the most recent information required to be delivered under Section 6.1 of the Prepetition Credit Agreement.

For the purpose of determining compliance with the conditions specified in this Section 5.1, each Lender that has signed this Agreement shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this Section 5.1 unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

5.2      Conditions to Each Extension of Credit.  The agreement of each Lender to make any extension of credit requested to be made by it on any date (including, for the avoidance of doubt, the making of its Revolving Commitments and the making of its initial extension of credit on the Closing Date, but excluding any Protective Advance) is subject to the satisfaction of the following conditions precedent:

(a)      Representations and Warranties.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (or in all respects if qualified by materiality) on and as of such date as if made on and as of such date, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall have been so true and correct as of such earlier date.

(b)      No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(c)      DIP Order. The Bankruptcy Court shall have entered the Interim DIP Order no later than five (5) calendar days after the Petition Date, which Interim DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders. The Bankruptcy Court shall have entered the Final DIP Order no later than forty (40) calendar days after the Petition Date (or if such fortieth (40th) calendar day is not a Business Day, the immediately succeeding Business Day), which Final DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent and the Required Lenders.

(d)      Budget. The Administrative Agent and the Lenders shall have received the Initial DIP Budget and any Subsequent DIP Budget, which shall be in form and substance satisfactory to the Required Lenders.

(e)      Closing Date. The Closing Date shall have occurred on or before the date that is five (5) calendar days after the date of entry of the Interim DIP Order.

(f)      Perfected Liens. The Administrative Agent, for the benefit of the Secured Parties, shall have valid, binding, enforceable, non-avoidable, and automatically and fully and perfected Liens on, and security interests in, the Collateral, in each case, having the priorities set forth in the Orders and subject only to the payment in full in cash of any amounts due under the Carve-Out in accordance with the Interim DIP Order.

(g)      Other than the Chapter 11 Cases, there shall not exist any actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Debtors, threatened in writing against or affecting any Debtor,

89

(i) that involve this Agreement or the transactions contemplated herein or (ii) which is not otherwise subject to the automatic stay as a result of the Chapter 11 Cases.

(h)    The Restructuring Support Agreement remains in full force and effect and the Loan Parties are not in Default under such agreement.

(i)    The Borrower shall be in compliance in all respects with the Milestones.

(j)    The Loan Parties shall be in compliance with the Initial DIP Budget and any Subsequent DIP Budget (subject to the Approved DIP Budget Variance Report) in all respects.

(k)    Solely with respect to any extension of credit on or after the date that is one Business Day after the Final DIP Order (such date, the "Second TL Funding Deadline Date"), the Borrower shall have received gross proceeds under the Term Loan Credit Agreement in an amount of $65,000,000 on or prior to the Second TL Funding Deadline Date.

Each borrowing by and issuance of a Letter of Credit on behalf of the Borrower hereunder (other than the initial extensions of credit on the Closing Date and other than with respect to a Protective Advance) shall constitute a representation and warranty by the Borrower as of the date of such extension of credit that the conditions contained in this Section 5.2 have been satisfied.

## SECTION 6.  AFFIRMATIVE COVENANTS

Holdings and the Borrower hereby agree that, so long as the Revolving Commitments remain in effect, any Letter of Credit remains outstanding or any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, each of Holdings and the Borrower shall and, in the case of Sections 6.3 through 6.8, 6.10 and 6.13, shall, to the extent applicable, cause each of its Restricted Subsidiaries to and, in the case of Section 6.12, shall cause each of its Domestic Subsidiaries to:

6.1    _Financial Statements_.  Furnish to the Administrative Agent (who will furnish to each Lender):

(a)    as soon as available, but in any event within 90 days after the end of each fiscal year of Applicable Holdings beginning with the fiscal year ended April 30, 2025, a copy of the audited consolidated balance sheet of Applicable Holdings and its consolidated Subsidiaries as at the end of such year, the related audited consolidated statements of income, stockholders' equity and cash flows for such year (and until the assignment or transfer of each Delayed Assignment Asset has been consummated, the related consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of any parent company of Holdings (which may be in footnote form only) from such consolidated financial statements), setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by SyCip Gorres Velayo & Co. or other independent certified public accountants of nationally recognized standing acceptable to the Administrative Agent;

(b)    as soon as available, but in any event not later than 45 days after the end of each quarterly periods of each fiscal year of Applicable Holdings, the unaudited consolidated balance sheet of Applicable Holdings and its consolidated Subsidiaries as at the end of such quarter, the related unaudited consolidated statements of income, stockholders' equity and cash flows for such quarter and/or the portion of the fiscal year through the end of such quarter, as required by applicable SEC rules (and until the assignment or transfer of each Delayed Assignment Asset has

been consummated, the related consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of any parent company of Holdings (which may be in footnote form only) from such consolidated financial statements), setting forth in each case in comparative form the figures for the corresponding period or periods of the previous fiscal year (or, in the case of the balance sheet, as of the end of the previous fiscal year), certified by a Responsible Officer of Applicable Holdings as being fairly stated in all material respects (subject to normal year-end audit adjustments and the absence of footnotes);

      (c)      as soon as available, but in any event not later than 45 days after the end of each fiscal month of Applicable Holdings, commencing with the month ended June 30, 2025, the unaudited consolidated balance sheet of Applicable Holdings and its consolidated Subsidiaries as at the end of such month, the related unaudited consolidated statements of income and cash flows for such month and the portion of the fiscal year through the end of such month, setting forth in each case in comparative form the figures for the previous year, certified by a Responsible Officer of Applicable Holdings as being fairly stated in all material respects (subject to normal year-end audit adjustments); and

      (d)      if any Unrestricted Subsidiary exists, concurrently with each delivery of financial statements under clause (a), (b) or (c) above, financial statements (in substantially the same form as the financial statements delivered pursuant to clause (a), (b) or (c) above, as applicable) prepared on the basis of consolidating the accounts of Applicable Holdings and the Applicable Group Members and treating any Unrestricted Subsidiaries as if they were not consolidated with Applicable Holdings, together with an explanation of reconciliation adjustments in reasonable detail.

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with IFRS applied (except as approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods.

      Documents required to be delivered pursuant to Section 6.(c) or (d) or Section 6.2(c) or (d) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which (i) such documents are posted on Holdings's behalf on IntraLinks/IntraAgency or another relevant Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent) or (ii) such documents are filed of record with the SEC; provided that, upon written request by the Administrative Agent, Holdings or the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent. The Administrative Agent shall have no obligation to request the delivery of or to maintain or deliver to Lenders paper copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by Holdings or the Borrower with any such request for delivery, and each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

      6.2      <u>Certificates; Borrowing Base; Other Information</u>.  Furnish to the Administrative Agent (who will furnish to each Lender):

      (a)      The Borrower shall deliver to the Administrative Agent any additional reporting required to be delivered to the DIP Term Loan Agent under the DIP Term Loan Credit Agreement;

(b)    concurrently with the delivery of any financial statements pursuant to Sections 6.1(a) or (b), (i) a Compliance Certificate executed by a Responsible Officer of Holdings, which Compliance Certificate shall (x) include a statement that, to each such Responsible Officer's knowledge, each Loan Party during such period has observed or performed all of its covenants and other agreements, and satisfied every condition contained in this Agreement and the other Loan Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate, (y) set forth, in reasonable detail, the calculation of the Consolidated EBITDA with reasonable detail as to the amounts of each addback thereto and to which clause of Consolidated EBITDA such addback relates (and which detail shall delineate which addbacks are subject to the 20% of Consolidated EBITDA as to clauses (v), (vi), (vii) and (viii) of the definition of such term (or are otherwise excluded from such limit by virtue of the proviso thereto)) and Consolidated Leverage Ratio for the Reference Period ending as of the last day of the fiscal year or fiscal quarter for which financial statements are being delivered pursuant to Section 6.1(a) or 6.1(b) and (z) set forth the amount of Parent Payables and Disqualified Parent Payables as of the last day of the fiscal year or fiscal quarter for which financial statements are being delivered pursuant to Section 6.1(c) and (ii) to the extent not previously disclosed to the Administrative Agent, (x) a description of any change in the jurisdiction of organization of any Loan Party, (y) a list of any registered Intellectual Property (or applications therefor) acquired or created by any Loan Party and (z) a description of any Person that has become a Group Member or a Restricted Subsidiary, in each case since the date of the most recent report delivered pursuant to this clause (ii) (or, in the case of the first such report so delivered, since the Closing Date); provided that no deliverables shall be required pursuant to this Section 6.2(b) concurrently with the delivery of financial statements pursuant to Section 6.1(b) for the fourth fiscal quarter of each fiscal year of Holdings.

(c)    [reserved].

(d)    (i) within 45 days after the end of each fiscal quarter of Holdings (or 105 days, in the case of the fourth fiscal quarter of each fiscal year), a narrative discussion and analysis of the financial condition and results of operations of Applicable Holdings and the Applicable Group Members for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, as compared to the comparable periods of the previous year and (ii) within 45 days after the end of each fiscal month of Holdings, a narrative discussion and analysis of the financial condition and results of operations of Applicable Holdings and the Applicable Group Members for such fiscal month.

(e)    promptly after the same are sent, copies of all financial statements and reports that the Borrower (or Existing Holdings or Holdings, as applicable) sends to the holders of any class of its public debt securities or public equity securities or sends to the lenders under the DIP Term Loan Credit Agreement and, promptly after the same are filed, copies of all financial statements and reports that the Borrower (or Existing Holdings or Holdings, as applicable) may make to, or file with, the SEC;

(f)    promptly following receipt thereof, copies of any documents described in Section 101(k) or 101(l) of ERISA that any Group Member or any ERISA Affiliate may request with respect to any Multiemployer Plan or any documents described in Section 101(f) of ERISA that any Group Member or any ERISA Affiliate may request with respect to any Pension Plan; provided, that if the relevant Group Members or ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plans, then, upon reasonable request of the Administrative Agent, such Group Member or the ERISA Affiliate shall

92

promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof;

(g)     as soon as available but in any event within five Business Days of the end of each week commencing with the first week ended after the Closing Date or within five Business Days of the end of the Seasonal Advance Period, as of the last day of the period then ended, a Borrowing Base Certificate and the information supporting the Borrowing Base calculation required by the Borrowing Base Certificate (including the information set forth on the schedule of reporting requirements attached thereto (in each case as modified from time to time by the Administrative Agent in its Permitted Discretion)), an inventory report (including aging), an accounts receivable report (including aging) and any additional reports or information with respect to the Borrowing Base as the Administrative Agent may reasonably request or, in addition, at the Borrower's discretion, a Borrowing Base Certificate and the information supporting the Borrowing Base calculation required by the Borrowing Base Certificate (including the information set forth on the schedule of reporting requirements attached thereto (in each case as modified from time to time by the Administrative Agent in its Permitted Discretion)) may be delivered prior to any Scheduled Borrowing Base Delivery Date, and if the Borrower so elects, then the Borrower must deliver a Borrowing Base Certificate within five Business Days of the end of each week until the next Scheduled Borrowing Base Delivery Date.

(h)     an annex with each Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 6.2(g) if, subsequent to the Closing Date, a Loan Party shall acquire or obtain any Inventory that contains or bears Intellectual Property rights licensed to any Loan Party that may be sold or otherwise disposed of without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to the sale of such Inventory under the current licensing agreement, which annex shall specify all reasonable details (including the location, title, patent number(s) and issue date) as to the Inventory so acquired or obtained and the Intellectual Property rights licensed to the Loan Party in connection therewith.

(i)     promptly, such (x) additional financial and other information (including, without limitation, the information previously agreed between the Loan Parties' advisors and the Administrative Agent's advisors on or prior to the Closing Date) as the Administrative Agent or any Lender may from time to time reasonably request and (y) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

6.3     <u>Payment of Obligations</u>.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature (including Taxes), except where (a) the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves to the extent required by IFRS with respect thereto have been provided on the books of the relevant Group Member or (b) the failure to make such payments, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

6.4     <u>Maintenance of Existence; Compliance</u>.  Subject to Section 7.4, (a) (i) preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.4, Section 7.5 and except, in the case of clause (ii) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (b) comply

with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect; and (c) maintain in effect and enforce policies and procedures reasonably designed to ensure compliance in all material respects by Holdings, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

6.5    Maintenance of Property; Insurance. (a) Maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations (including hazard and business interruption insurance) and (b) use commercially reasonable efforts to cause, in the case of each property or casualty insurance policy, as requested by the Administrative Agent, to be endorsed to the benefit of the Administrative Agent (including by naming the Administrative Agent as lender loss payee and/or additional insured). If the Borrower or any other Loan Party shall fail to maintain insurance in accordance with this Section 6.5, or if the Borrower or any other Loan Party shall fail to so endorse and deliver all policies or certificates with respect thereto, the Administrative Agent shall have the right (but shall be under no obligation) to procure such insurance and the Borrower agrees to reimburse the Administrative Agent for all reasonable costs and expenses of procuring such insurance.

6.6    Inspection of Property; Books and Records; Discussions; Appraisals; Field Examinations. (a) (i) Keep proper books of records and account in which full, true and correct (in all material respects) entries in conformity with IFRS and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (ii) upon reasonable prior notice, permit representatives of the Administrative Agent or any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and, accompanied by one or more officers or designees of the Borrower if requested by the Borrower, with their independent certified public accountants; provided that only the Administrative Agent, acting individually or on behalf of the Lenders may exercise rights under this Section 6.6(a) and excluding any such visits and inspections during the continuation of an Event of Default, the Administrative Agent shall not exercise rights under this Section 6.6(a) more often than one time during any calendar year.

(b)    Cooperate with an appraiser selected and engaged by the Administrative Agent to provide Inventory appraisals or updates thereof, which appraisals shall be prepared on a basis consistent with (and on the same form and with the same scope and parameters as) the last Inventory appraisal delivered under the Pre-Petition ABL Credit Agreement and shall otherwise be reasonably satisfactory to the Administrative Agent (and to include information required by applicable law and regulations) and furnished to the Administrative Agent and Revolving Lenders. The Borrower shall ensure that the first Inventory appraisal after the Closing Date (the "First Post-Closing Appraisal") shall be completed on or prior to the date that is four months following the Closing Date. The Borrower shall be responsible for the costs and expenses of two Inventory appraisals or updates thereof during any 12-month period (the "Annual Inventory Appraisals") and one additional Inventory appraisal or update thereof (for a total of three such Inventory appraisals or updates thereof during any 12-month period) conducted at any time, in the Administrative Agent's sole discretion, if during such 12-month period Availability is less than or equal to 12.5% of the Total Revolving Commitments at any time; provided, that the Borrower shall be responsible for the costs and expenses of all Inventory appraisals or updates thereof conducted while an Event of Default has occurred and is continuing. For purposes of this Section 6.6(b), it is understood and agreed that a single appraisal may consist of appraisals conducted at multiple relevant sites and include multiple classes of assets and involve one or more relevant Loan Parties and their assets.

(c)     Permit any representatives designated by the Administrative Agent (including employees of the Administrative Agent or any consultants, accountants, lawyers, agents and appraisers retained by the Administrative Agent), upon reasonable prior notice, to conduct a field examination to ensure the adequacy of Collateral included in the Borrowing Base and related reporting and control systems and determine any variance between the Loan Parties' general ledger and perpetual inventory report. The Borrower shall be responsible for the costs and expenses of two field examinations during any 12-month period (the "Annual Field Examinations") and one additional field examination (for a total of three such field examinations during any 12-month period) conducted at any time, in the Administrative Agent's sole discretion if during such 12-month period Availability is less than or equal to 12.5% of the Total Revolving Commitments at any time; provided, that the Borrower shall be responsible for the costs and expenses of all field examinations conducted while an Event of Default has occurred and is continuing. For purposes of this Section 6.6(c), it is understood and agreed that a single field examination may be conducted at multiple relevant sites and involve one or more relevant Loan Parties and their assets. Any such field examination shall be furnished to the Administrative Agent and Lenders.

(d)     Concurrently with the Annual Field Examination the Borrower will provide an updated customer list for each Loan Party, which list shall state the customer's name, mailing address and phone number, delivered electronically in a text formatted file acceptable to the Administrative Agent and certified as true and correct by a Responsible Officer of the Borrower.

(e)     To the extent that the Borrower or any Loan Party commences or continues a process to sell all or a substantial part of the assets of the Chapter 11 Debtors (including a sale of the Chapter 11 Debtors or equity held in Affiliates), whether pursuant to Section 363 of the Bankruptcy Code or otherwise in a like process in connection with the Chapter 11 Cases, the Engaged Investment Bank shall participate in weekly telephonic conferences at times to be mutually agreed with the Lender Financial Advisor, commencing on the later of the first full week following the Petition Date and the date on which any such sales process has commenced, and at each such telephonic conference, the Engaged Investment Bank shall provide the Lender Financial Advisor applicable updates as to the status and progress of any such sales process and other information that the Lender Financial Advisor may deem reasonably necessary to be reasonably informed about the sales process and which is not otherwise protected by the attorney client privilege.

6.7     Notices.  Promptly give notice to the Administrative Agent (who will furnish to each Lender), on behalf of each Lender, of:

(a)     the occurrence of any Default or Event of Default;

(b)     any (i) default or event of default under any Contractual Obligation of any Group Member or (ii) litigation, investigation or proceeding that may exist at any time between any Group Member and any Governmental Authority, that in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

(c)     any litigation or proceeding affecting any Group Member which relates to any Loan Document;

(d)     (i) as soon as reasonably possible and in any event within 10 days upon becoming aware of the occurrence of, or forthcoming occurrence of, any material ERISA Event, a written notice specifying the nature thereof, what action the Borrower, any other Group Member or any ERISA Affiliate has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the IRS, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness, upon the Administrative Agent's reasonable request, copies

95

of (1) each Schedule SB (Actuarial Information) to the annual report (Form 5500 Series) filed by the Borrower, any other Group Member or any ERISA Affiliate with the IRS with respect to each Pension Plan; (2) all notices received by the Borrower, any other Group Member or any ERISA Affiliate from a Multiemployer Plan sponsor concerning a material ERISA Event; and (3) copies of such other documents or governmental reports or filings relating to any Plan or Pension Plan as the Administrative Agent shall reasonably request;

        (e)      any amendment, modification, waiver to, or consent provided under, the DIP Term Loan Credit Agreement, any notice of an Event of Default under (and as defined in) the DIP Term Loan Credit Agreement and any Carve Out Trigger Notice (as defined in the Orders); and

        (f)      any other development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 6.7 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto.

        6.8    <u>Environmental Laws</u>.  (a) Comply with, and use reasonable efforts to ensure compliance by all tenants, subtenants, contractors, subcontractors, and invitees, if any, with, all applicable Environmental Laws, and obtain and comply with and maintain, and use reasonable efforts to ensure that all tenants, subtenants, contractors, subcontractors, and invitees, obtain and comply with and maintain, any and all Environmental Permits. It being understood that any noncompliance with this Section 6.8(a) shall be deemed not to constitute a breach of this covenant provided that, such noncompliance with Environmental Laws, individually or in the aggregate, could not reasonably be expected to give rise to a Material Adverse Effect.

        (b)      Promptly comply with all orders and directives of all Governmental Authorities regarding Environmental Laws, other than such orders and directives as to which an appeal has been timely and properly taken in good faith, and provided that the pendency of any and all such appeals could not reasonably be expected to give rise to a Material Adverse Effect.

        6.9    [Reserved].

        6.10   <u>Additional Collateral, etc</u>.  (a) Without limitation of the grant of liens and security interests in the Orders, with respect to any property acquired after the Closing Date by any Loan Party (other than (w) Excluded Collateral and any real property, (x) any property described in paragraph (c) or (d) below, (y) any property subject to a Lien expressly permitted by Section 7.3(g), and (z) any property as to which the Administrative Agent determines, in its reasonable discretion and in consultation with the Borrower, that the cost of obtaining a security interest therein is excessive in relation to the value of the security to be afforded thereby) as to which the Administrative Agent, for the benefit of the Secured Parties, does not have a perfected Lien, promptly (i) execute and deliver to the Administrative Agent such documents as the Administrative Agent deems necessary or reasonably advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a security interest in such property and (ii) take all actions necessary or reasonably advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected security interest in such property with the priority required by the Pre-Petition Intercreditor Agreement or the Orders, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Orders or by law or as may be requested by the Administrative Agent.

        (b)      [Reserved].

(c)    Without limitation of the grant of liens and security interests in the Orders, with respect to any new Domestic Subsidiary (other than any Excluded Subsidiary) created or acquired after the Closing Date by any Loan Party (which, for the purposes of this paragraph (c), shall include any (1) existing Subsidiary that becomes a Domestic Subsidiary that is not an Excluded Subsidiary and (2) any existing Domestic Subsidiary that ceases to be an Excluded Subsidiary) within forty-five (45) days after the creation or acquisition of such new Domestic Subsidiary (or such later date as the Administrative Agent shall agree to in its sole discretion) (i) execute and deliver to the Administrative Agent such documents as the Administrative Agent deems necessary or reasonably advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected security interest with the priority required by the Pre-Petition Intercreditor Agreement or the Orders in the Capital Stock of such new Subsidiary that is owned by any Loan Party, (ii) subject to the Pre-Petition Intercreditor Agreement and the Orders, deliver to the Administrative Agent the certificates (if any) representing such Capital Stock, together with undated endorsements, in blank, executed and delivered by a duly authorized officer of the relevant Loan Party and (iii) cause such new Subsidiary (A) to take such actions necessary or reasonably advisable to grant to the Administrative Agent for the benefit of the Secured Parties a perfected security interest with the priority required by the Pre-Petition Intercreditor Agreement or the Orders in the Collateral described in the Orders with respect to such new Subsidiary, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Orders or by law or as may be requested by the Administrative Agent and (C) subject to the Pre-Petition Intercreditor Agreement or the Orders, to deliver to the Administrative Agent a certificate of such Subsidiary, substantially in the form of Exhibit C-2, with appropriate insertions and attachments.

(d)    Without limitation of the grant of liens and security interests in the Orders, with respect to any new CFC Holding Company or Foreign Subsidiary created or acquired after the Closing Date by any Loan Party (which, for the purposes of this paragraph (d), shall include any existing Subsidiary that becomes a CFC Holding Company or a Foreign Subsidiary), within sixty (60) days after the creation or acquisition of such new CFC Holding Company or Foreign Subsidiary (or such later date as the Administrative Agent shall agree to in its sole discretion) (i) execute and deliver to the Administrative Agent such documents as the Administrative Agent deems necessary or reasonably advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected security interest with the priority required by the Pre-Petition Intercreditor Agreement or the Orders in the Capital Stock of such CFC Holding Company or Foreign Subsidiary that is owned by any such Loan Party (provided that in no event shall more than 65% of the total outstanding voting Capital Stock of any such CFC Holding Company or Foreign Subsidiary that is a CFC be required to be so pledged), and (ii) subject to the Pre-Petition Intercreditor Agreement or the Orders, deliver to the Administrative Agent the certificates representing such pledged Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Loan Party and take such other action as the Administrative Agent deems necessary or reasonably advisable to perfect the Administrative Agent's security interest therein.

(e)    Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no Loan Document other than the Orders shall grant the Secured Parties a security interest in any fee-owned or leased real property.

6.11    [Reserved].

6.12    Deposit Account Control Agreements. With respect to any new Deposit Account that is not an Excluded Account opened by a Loan Party after the Closing Date or any Excluded Account that ceases to be an Excluded Account, deliver to the Administrative Agent, within 45 days of the opening thereof (or such later date as the Administrative Agent may agree in its reasonable discretion), any Deposit Account Control Agreement required to be delivered pursuant to the Orders, in each case, in form and substance reasonably satisfactory to the Administrative Agent.

6.13    [Reserved].

6.14    [Reserved].

6.15    DMPL Arrangements. Maintain the DMPL Arrangements and keep the DMPL Arrangements in place at all times.

6.16    Other Obligations. (a) Through and until the Revolving Termination Date, (i) maintain an engagement with the Engaged Financial Advisor and (ii) reimburse the Lender Financial Advisor for its fees and expenses incurred in connection with its engagement by the Administrative Agent, (b) comply with the obligations of the Debtors in the Orders, (c) with respect to the Inventory Purchase Agreement, (i) ensure that any claim Inventory Purchaser may have against the Borrower with respect to the Inventory Purchase Deposit shall be unsecured, (ii) ensure it has no obligation to sell any inventory to the Inventory Purchaser and that the inventory of the Borrower may be sold free and clear of any claim of interest of the Inventory Purchaser and (iii) not amend the Inventory Purchase Agreement or otherwise modify it in any manner adverse to the Administrative Agent and Lenders without the Required Lenders' consent and (d) promptly after the Closing Date, furnish to the Administrative Agent all insurance certificates, endorsements and other information reasonably requested by the Administrative Agent to conduct a complete insurance review, provided that any updates to insurance certificates and endorsements requested by the Administrative Agent shall be made no event later than 90 days after the Closing Date (as such date may be extended in the Administrative Agent's sole discretion) if such requests are made within 45 days after the Closing Date.

6.17    [Reserved].

6.18    Additional Chapter 11 Reporting.

(a)    Pleadings.  The Loan Parties shall deliver to the Administrative Agent all material pleadings, motions and other material documents to be filed with the Bankruptcy Court on behalf of the Chapter 11 Debtors in the Chapter 11 Cases no later than three (3) Business Days prior to filing thereof, unless such delivery is not possible under the circumstances (in which case such pleadings, motions and other material documents shall be delivered to the Administrative Agent as promptly as is possible).

(b)    [Reserved].

(c)    [Reserved].

(d)    Management Conference Calls.  The Borrower shall participate in a teleconference with the Lender Financial Advisor (the "Management Conference Call") to take place at least once per calendar week (at such time as is reasonably satisfactory to the Lender Financial Advisor with at least two (2) Business Days' notice to the Borrower), which Management Conference Call shall (i) require participation by at least one senior member of the Borrower's management team and such professional advisors to the Borrower as the Lender Financial Advisor elects and (ii) include discussion of the Variance Report, the Chapter 11 Cases, the financial and operational performance of Holdings and its Subsidiaries, and such other matters as may be reasonably requested by the Lender Financial Advisor.

(e)    Additional Reporting. The Borrower shall deliver to the Administrative Agent any additional reporting required to be delivered to the Term Loan Collateral Agent under each Term Loan Credit Agreement.

6.19    Cash Management. The Loan Parties shall maintain the cash management of the Loan Parties in accordance in all material respects with the Cash Management Motion.

6.20    Approved DIP Budget. The use of Revolving Loans by the Loan Parties under this Agreement and the other Loan Documents shall be limited in accordance with the Approved DIP Budget (subject to Permitted Variances). The Approved DIP Budget shall set forth, on a weekly basis, for the period ending the week of [  ], 2025 covered thereby, the Budgeted Receipts, Budgeted Disbursements and Budgeted Liquidity for the period commencing with the week that includes the Petition Date and shall be approved by, and be in form and substance satisfactory to, the Required Lenders (it being acknowledged and agreed that the form of Approved DIP Budget set forth as Exhibit M hereto is approved by and satisfactory to the Required Lenders and is and shall be the Approved DIP Budget unless and until replaced in accordance with the terms of this Section 6.20). The Approved DIP Budget shall (i) include line-item reporting, the nature and scope of which shall be satisfactory to the Required Lenders and (ii) otherwise be in form and substance satisfactory to, and subject to the approval of, the Required Lenders.

(b)    On or before the fifth (5th) Business Day before the end of each Budget Period, the Borrower and/or the Administrative Agent (acting at the direction of the Required Lenders) may request that the Approved DIP Budget be updated by the Borrower for the subsequent 13-week period (a "Subsequent DIP Budget"), which Subsequent DIP Budget shall be in form and substance satisfactory to, and subject to the approval of, the Required Lenders; provided that Subsequent DIP Budget shall be deemed to an Approved DIP Budget absent response or objection by the Required Lenders (which objection may be communicated by means of a direction of the Required Lenders) within ten (10) Business Days of receipt; provided, further, however, that in the event the Required Lenders, on the one hand, and the Borrower, on the other hand, cannot agree as to a Subsequent DIP Budget, the then current Approved DIP Budget shall remain in effect and the Borrower shall be required to work in good faith with the Required Lenders to modify such Subsequent DIP Budget until the Required Lenders approve such Subsequent DIP Budget as an "Approved DIP Budget". Each Approved DIP Budget delivered to the Administrative Agent and the Lender Financial Advisor shall be accompanied by such supporting documentation as reasonably requested by the Required Lenders.  Each Approved DIP Budget shall be prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time of preparation thereof.

(c)    During each Budget Period, Permitted Budget Variances shall be tested on a cumulative weekly basis for the following periods (each, a "Testing Period") (i) the first and second weeks of such Budget Period, (ii) the first, second and third weeks of such Budget Period and (iii) such Budget Period in its entirety. With respect to each Budget Period, the Borrower shall not permit, for any Testing Period during such Budget Period: (x) Actual Disbursements (in the aggregate) to be more than 115% (on a cumulative basis during the Budget Period) of the Budgeted Disbursements (for the avoidance of doubt, excluding the fees and expenses of Professional Persons (as defined in the DIP Orders)) (in the aggregate) as set forth in the Approved DIP Budget with respect to such period; and (y) Actual Receipts (in the aggregate) to be less than 85% (on a cumulative basis during the Budget Period) of the Budgeted Receipts (in the aggregate) as set forth in the Approved DIP Budget with respect to such period (the "Permitted Variances").

(d)    With respect to each Testing Period in a Budget Period, the Borrower shall deliver to the Administrative Agent and the Lenders on or before 5:00 p.m. New York City time on Friday of the week immediately following the end of such Testing Period, an Approved DIP Budget Variance Report.

(e)    The Borrower shall  deliver to the Administrative Agent and the Lender Financial Advisor concurrently with the delivery of the Approved DIP Budget Variance Report pursuant to

clause (d) above, a certificate which shall include such detail as is reasonably satisfactory to the Required Lenders, signed by a Responsible Officer of the Borrower certifying that (i) the Loan Parties are in compliance with the covenants contained in this Section 6.20, (ii) no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and (iii) the Loan Parties are in compliance with Section 7.1.

(f)      The Revolving Lenders (i) may assume that the Loan Parties will comply with the Approved DIP Budget (subject to Permitted Variances), (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved DIP Budget. The line items in the Approved DIP Budget for payment of interest, expenses and other amounts to the Administrative Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents regardless of whether such amounts exceed such estimates. Nothing in any Approved DIP Budget shall constitute an amendment or other modification of any Loan Document or other lending limits set forth therein.

SECTION 7.  NEGATIVE COVENANTS

Each of Holdings and the Borrower hereby agrees that, so long as the Revolving Commitments remain in effect, any Letter of Credit remains outstanding or any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, each of Holdings and the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

7.1      Excess Availability and Minimum Liquidity.  (a) Permit Excess Availability to be less than or equal to the Minimum Excess Availability Amount or (b) permit Liquidity at any time to be less than $50,000,000; provided that such amount shall be reduced by 10% of any paydown of the Loans in connection with the implementation of a Cumulative Reserve up to an aggregate reduction of up to $25,000,000.

7.2      Indebtedness.  Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness, except:

(a)      Indebtedness in respect of the Obligations of any Group Member under or secured by this Agreement;

(b)      Indebtedness of the Loan Parties in respect of the Term Loans in an aggregate principal amount not to exceed (i) $1,187,343,400.24 plus (ii) any interest payment in respect of term loans as of the Closing Date that is paid in kind by the Borrower as permitted by the Pre-Petition Term Loan Credit Agreement or the DIP Term Loan Credit Agreement, as applicable, and any Permitted Refinancing Indebtedness in respect of the Term Loans made pursuant to the DIP Term Loan Credit Agreement;

(c)      Indebtedness of any Group Member owing to any Group Member; provided that (x) any Indebtedness of any Loan Party shall be unsecured and shall be subordinated in right of payment to the Obligations on terms customary for intercompany subordinated Indebtedness, as reasonably determined by the Administrative Agent, (y) any such Indebtedness owing to any Loan Party shall be evidenced by a promissory note which shall have been pledged pursuant to the Orders and (z) any such Indebtedness owing by any Subsidiary that is not a Loan Party to any Loan Party shall be incurred in compliance with Section 7.7;

100

(d)    Guarantee Obligations incurred by any Group Member of obligations of any Group Member to the extent such obligations are not prohibited hereunder; provided that (i) to the extent any such obligations are subordinated to the Obligations, any such related Guarantee Obligations incurred by a Loan Party shall be subordinated to the guarantee of such Loan Party of the Obligations on terms no less favorable to the Lenders than the subordination provisions of the obligations to which such Guarantee Obligation relates and (ii) any Guarantee Obligations incurred by any Loan Party of obligations of a Restricted Subsidiary that is not a Loan Party shall be permitted to the extent incurred in compliance with Section 7.7;

(e)    Indebtedness (other than Capital Lease Obligations and purchase money Indebtedness, which shall be deemed incurred pursuant to Section 7.2(f)) outstanding on the Closing Date and listed on Schedule 7.2(e);

(f)    Capital Lease Obligations and purchase money Indebtedness outstanding as of the Petition Debt and incurred in the Ordinary Course of Business, made in good faith, for a bona fide business purpose (and not for any other purpose, including, without limitation, a "liability management transaction") and that are secured by Liens permitted by Section 7.3(g)];

(g)    Indebtedness representing deferred compensation to employees or directors of Holdings and its Restricted Subsidiaries incurred in the ordinary course of business;

(h)    Indebtedness incurred in the ordinary course of business or that is consistent with past practice and owed in respect of any netting services, overdrafts and related liabilities arising from treasury, depository, credit or debit card, purchase card or other cash management services or in connection with any automated clearing-house transfers of funds, in each case that does not constitute Indebtedness for borrowed money;

(i)    Indebtedness arising under any Swap Agreement permitted by Section 7.11;

(j)    Indebtedness (other than Indebtedness for borrowed money) that may be deemed to exist pursuant to any guarantees, warranty or contractual service obligations, performance, surety, statutory, appeal, bid, prepayment guarantee, payment (other than payment of Indebtedness) or completion of performance guarantees or similar obligations incurred in the ordinary course of business;

(k)    Indebtedness in respect of workers' compensation claims, payment obligations in connection with health, disability or other types of social security benefits, unemployment or other insurance obligations, reclamation and statutory obligations, in each case in the ordinary course of business;

(l)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds, so long as such Indebtedness is covered or extinguished within five Business Days;

(m)    Indebtedness consisting of (i) the financing of insurance premiums or self-insurance obligations or (ii) take-or-pay obligations contained in supply or similar agreements in each case in the ordinary course of business;

(n)    Indebtedness in the form of purchase price adjustments (including in respect of working capital), earnouts, deferred compensation, indemnification or other arrangements representing acquisition consideration or deferred payments of a similar nature incurred in

101

connection with any Investments permitted under Section 7.7 or Dispositions permitted under Section 7.5;

    (o)    [reserved];

    (p)    [reserved];

    (q)    [reserved];

    (r)    [reserved];

    (s)    [reserved];

    (t)    [reserved];

    (u)    [reserved];

    (v)    [reserved]; and

    (w)    additional unsecured Indebtedness of Holdings or any of its Restricted Subsidiaries in the Ordinary Course of Business, made in good faith, for a bona fide business purpose (and not for any other purpose, including, without limitation, a "liability management transaction") in an aggregate principal amount (for Holdings and all Restricted Subsidiaries) not to exceed at any time outstanding $1,000,000.

For purposes of determining compliance with this Section 7.2, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Indebtedness described in clauses (a) through (w) above, the Borrower may, in its sole discretion, divide or classify or later divide, classify or reclassify all or a portion of such item of Indebtedness in a manner that complies with this Section 7.2 and will only be required to include the amount and type of such Indebtedness (or any portion thereof) in one or more of the above clauses; provided that all Indebtedness outstanding under the Loan Documents and the Term Loans that were made to the Borrower under any Term Loan Credit Agreement as in effect prior to the Closing Date will at all times be deemed to be outstanding in reliance only on the exception in Section 7.2(a) and Section 7.2(b), respectively.

Notwithstanding the foregoing, Indebtedness of the Borrower or any Loan Party owing to Holdings, the Borrower or another Restricted Subsidiary that is not a Loan Party shall be unsecured, subordinated in right of payment to the guarantee of Holdings, the Borrower or such Guarantor as the case may be and any guarantee by Holdings, the Borrower or any Loan Party of Indebtedness of Holdings, the Borrower or another Restricted Subsidiary that is not a Loan Party shall be subordinated in right of payment to the guarantee of Holdings, the Borrower or such Guarantor as the case may be.

    7.3    <u>Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except:

    (a)    Liens for Taxes not yet due or that are being contested in good faith by appropriate proceedings; provided that adequate reserves with respect thereto are maintained on the books of the relevant Group Member to the extent required by IFRS;

(b)      carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 60 days or that are being contested in good faith by appropriate proceedings;

(c)      pledges, deposits or similar Liens in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)      (i) deposits to secure (x) the performance of bids, supplier and other trade contracts (including government contracts) (other than for borrowed money), leases, statutory obligations (other than for borrowed money and other than any such obligation imposed pursuant to Section 430(k) of the Code or Sections 303(k) or 4068 of ERISA) and (y) surety and appeal bonds, performance bonds and other obligations of a like nature, in each case (with respect to clauses (x) and (y)) incurred in the ordinary course of business and (ii) Liens on cash earnest money deposits in connection with any letter of intent or purchase agreement permitted under this Agreement;

(e)      easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of Holdings or any of its Restricted Subsidiaries;

(f)      Liens in existence on the Closing Date listed on Schedule 7.3(f), securing Indebtedness permitted by Section 7.2(e); provided that no such Lien is spread to cover any additional property after the Closing Date and that the amount of Indebtedness secured thereby is not increased;

(g)      Liens outstanding on the Petition Date securing Indebtedness of any Group Member incurred pursuant to Section 7.2(f) to finance the acquisition of fixed or capital assets (and any Permitted Refinancing Indebtedness in respect thereof); provided that (i) such Liens were created within 270 days of the acquisition of such fixed or capital assets, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and the proceeds and products thereof and (iii) the amount of Indebtedness secured thereby is not increased; provided further that in the event that purchase money obligations are owed to any Person with respect to financing of more than one purchase of any fixed or capital assets, such Liens may secure all such purchase money obligations and may apply to all such fixed or capital assets financed by such Person;

(h)      (i) Liens on the Collateral created pursuant to the Security Documents, (ii) Liens on cash granted in favor of any Lenders and/or the Issuing Lender created as a result of any requirement to provide cash collateral pursuant to this Agreement and (iii) Liens on the Collateral and any real property created pursuant to the Term Loan Security Documents (or any Term Loan Security Documents (as defined in the Pre-Petition Intercreditor Agreement)), provided that any Liens on the Collateral shall be subject to the Pre-Petition Intercreditor Agreement and the Orders;

(i)      any interest or title of a licensor or lessor under any lease or license entered into by any Group Member in the ordinary course of its business and covering only the assets so leased;

(j)      [reserved];

(k)      Liens in favor of any Loan Party so long as (in the case of any Lien granted by a Loan Party) such Liens are junior to the Liens created pursuant to the Security Documents;

103

(l)     Liens arising from filing Uniform Commercial Code or personal property security financing statements (or substantially equivalent filings outside of the United States) regarding leases incurred in the ordinary course of business;

(m)     any option or other agreement to purchase any asset of any Group Member, the purchase, sale or other disposition of which is not prohibited by Section 7.5;

(n)     Liens arising from the rendering of an interim or final judgment or order against any Group Member that does not give rise to an Event of Default;

(o)     [reserved];

(p)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by Holdings or any other Restricted Subsidiary in the ordinary course of business and permitted by this Agreement;

(q)     licenses, sublicenses, leases and subleases of Intellectual Property of any Group Member in the Ordinary Course of Business, made in good faith, for a bona fide business purpose (and not for any other purpose, including, without limitation, a "liability management transaction"), to the extent that they exist as of the Closing Date and that they do not materially interfere with the business of any Group Member;

(r)     Liens existing as of the Closing Date encumbering reasonable and customary initial deposits and margin deposits and similar Liens attaching to brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(s)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(t)     Liens on premium refunds granted in favor of insurance companies (or their financing affiliates) in connection with the financing of insurance premiums;

(u)     banker's liens, rights of setoff or similar rights and remedies as to deposit accounts or other funds maintained with depository institutions and securities accounts and other financial assets maintained with a securities intermediary; provided that such deposit accounts or funds and securities accounts or other financial assets are not established or deposited for the purpose of providing collateral for any Indebtedness and are not subject to restrictions on access by Holdings or any Restricted Subsidiary in excess of those required by applicable banking regulations;

(v)     Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.7 to be applied against the purchase price for such Investment or (ii) consisting of an agreement to dispose of any property in a Disposition permitted by Section 7.5, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(w)     [reserved];

(x)     Liens existing as of the Closing Date on Specified Intellectual Property (and proceeds thereof) in favor of licensees of such Specified Intellectual Property licensed by a Group Member to such licensee, which Liens secure damage claims in the event of a rejection of such

104

applicable license in a Bankruptcy Event; provided such Liens are subject to the License Intercreditor Agreement; and

(y)      Liens not otherwise permitted by this Section so long as neither (i) the aggregate outstanding principal amount of the obligations secured thereby nor (ii) the aggregate fair market value (determined as of the date such Lien is incurred) of the assets subject thereto exceeds (as to all Group Members) $1,000,000; provided, that if such Lien is securing Indebtedness for borrowed money, such Lien shall be expressly subordinated or junior to the Liens securing the Obligations.

7.4      Fundamental Changes.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except pursuant to the Chapter 11 Cases.

7.5      Disposition of Property.  Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of any Restricted Subsidiary, issue or sell any shares of such Restricted Subsidiary's Capital Stock to any Person, except:

(a)      the Disposition of surplus, outdated, obsolete or worn out, or no longer used or useable property (other than accounts receivable or inventory) in the ordinary course of business;

(b)      Dispositions of inventory, cash and Cash Equivalents in the ordinary course of business;

(c)      Dispositions permitted by Section 7.4(c)(i) or Section 7.4(d)(i);

(d)      the sale or issuance of any Restricted Subsidiary's Capital Stock to Holdings, the Borrower or any Subsidiary Guarantor except pursuant to the Chapter 11 Cases;

(e)      Dispositions of accounts receivable in connection with the compromise, settlement or collection thereof in the ordinary course of business consistent with past practice and not as part of any accounts receivables financing transaction;

(f)      Dispositions of assets other than Accounts or Inventory included in the Borrowing Base (including as a result of like-kind exchanges) to the extent that (i) such assets are exchanged for credit (on a fair market value basis) against the purchase price of similar or replacement assets or (ii) such asset is Disposed of for fair market value and the proceeds of such Disposition are promptly applied to the purchase price of similar or replacement assets;

(g)      Dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any asset of any Group Member;

(h)      non-exclusive or exclusive licenses or sublicenses of non-U.S. Intellectual Property (and non-exclusive licenses or sublicenses of U.S. Intellectual Property), in each case, in the ordinary course of business, to the extent that they do not materially interfere with the business of Holdings or any Restricted Subsidiary; provided, in no event shall any Intellectual Property be transferred directly or indirectly by the Borrower or its Restricted Subsidiaries to an Unrestricted Subsidiary;

(i)      the lapse, abandonment, cancellation, non-renewal or discontinuance of use or maintenance of non-material Intellectual Property or rights relating thereto that the Borrower

105

determines in its reasonable judgment to be desirable to the conduct of its business and not materially disadvantageous to the interests of the Lenders;

(j)      licenses (other than with respect to Intellectual Property), leases or subleases entered into in the ordinary course of business, to the extent that they do not materially interfere with the business of Holdings or any Restricted Subsidiary;

(k)      Dispositions to any Group Member; provided that any such Disposition involving a Restricted Subsidiary that is not a Loan Party shall be made in compliance with Sections 7.7 and 7.9;

(l)      (i) Dispositions of assets to the extent that such Disposition constitutes an Investment referred to in and permitted by Section 7.7, (ii) Dispositions of assets to the extent that such Disposition constitute a Restricted Payment referred to in and permitted by Section 7.6 (iii) Dispositions set forth on Schedule 7.5(l) and (iv) sale and leaseback transactions permitted under Section 7.10;

(m)      [reserved];

(n)      [reserved];

(o)      [reserved];

(p)      the surrender or waiver of contract rights in the ordinary course of business or the surrender or waiver of litigation claims or the settlement, release or surrender of tort or litigation claims of any kind;

(q)      the transfer of improvements or alterations in connection with any lease of property upon the termination thereof;

(r)      any Restricted Payment permitted by Section 7.6 or Investment permitted by Section 7.7;

(s)      the termination of a lease of real or personal property;

(t)      Dispositions so long as (i) the consideration for such assets shall be in an amount at least equal to the fair market value thereof (determined in good faith by the board of directors of the Borrower (or similar governing body), (ii) with respect to Dispositions in excess of $2,000,000, no less than 90% thereof shall be paid in cash and Cash Equivalents) and (iii) the Borrower shall have provided the Administrative Agent (x) with respect to Dispositions of assets included in the Borrowing Base, a completed Borrowing Base Certificate giving pro forma effect to such Disposition prior to consummation thereof demonstrating that the Total Revolving Extensions of Credit (excluding for such purposes Protective Advances) shall not exceed the Borrowing Base as of such date and (y) a calculation of any Asset Sale Reserve resulting therefrom; and

(u)      Dispositions of the Designated Underutilized Assets, in each case, solely to the extent that such proceeds are being used in accordance with the Approved DIP Budget.

Notwithstanding anything to the contrary contained in this Section 7.5, in no event shall any Disposition (or series of related Dispositions) of assets included in the Borrowing Base and contributing more than $5,000,000 of the Borrowing Base (other than Dispositions permitted pursuant to Section 7.5(b))

106

be permitted unless the Administrative Agent receives a completed Borrowing Base Certificate giving pro forma effect to such Disposition prior to consummation thereof.

Notwithstanding anything to the contrary contained in this Agreement, in no event shall (a) the Borrower or any Loan Party sell, transfer or otherwise dispose of any Material Property (whether pursuant to a sale, lease, license, transfer, Investment, restricted payment, dividend or otherwise or relating to the exclusive rights thereto) to any Subsidiary that is not a Loan Party; provided that in no event shall this sentence prohibit the Borrower or its Restricted Subsidiaries from entering into non-exclusive licensing arrangements of Intellectual Property to a Restricted Subsidiary in the ordinary course of business for a bona fide business purpose and (b) no Subsidiary that is not a Loan Party shall own or hold an exclusive license to any Material Property.

7.6     Restricted Payments.  Declare or pay any dividend (other than dividends payable solely in common stock of the Person making such dividend) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of any Group Member, whether now or hereafter outstanding, make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any Group Member, or make any principal payment on, or other retirement for value of, any Parent Payable (collectively, "Restricted Payments"), except that:

(a)     any Restricted Subsidiary may make Restricted Payments to its equity holders that are Loan Parties;

(b)     [reserved];

(c)     Holdings may declare and pay dividends with respect to its Capital Stock payable solely in shares of Qualified Capital Stock;

(d)     [reserved];

(e)     [reserved];

(f)     Holdings may convert or exchange any of its Capital Stock for or into Qualified Capital Stock;

(g)     payments to DMPL and its affiliates as expressly permitted by Section 7.18;

(h)     so long as such payment is in accordance with the Approved DIP Budget, payments to DMFI pursuant to the terms of the (i) Transition Services Agreement and (ii) the Contribution Agreement, in the case of this clause (ii) in respect of liabilities owing by the Borrower to DMFI under Section 18 of the Contribution Agreement.

Notwithstanding anything to the contrary contained in this Agreement, in no event shall (a) the Borrower or any Loan Party sell, transfer or otherwise dispose of any Material Property (whether pursuant to a sale, lease, license, transfer, Investment, restricted payment, dividend or otherwise or relating to the exclusive rights thereto) to any Subsidiary that is not a Loan Party and (b) no Subsidiary that is not a Loan Party shall own or hold an exclusive license to any Material Property.

7.7     Investments.  Make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt

securities of, or any assets constituting a business unit of, or make any other investment in, any other Person (all of the foregoing, "Investments"), except:

(a)        extensions of trade credit in the ordinary course of business;

(b)        investments in cash and Cash Equivalents;

(c)        Guarantee Obligations of any Group Member in respect of Indebtedness or other obligations of Holdings or any Restricted Subsidiary (including any such Guarantee Obligations arising as a result of any such Person being a joint and several co-applicant with respect to any letter of credit or letter of guaranty); provided that (i) (A) a Restricted Subsidiary that is not a Loan Party shall not Guarantee any Indebtedness for borrowed money of any Loan Party and (B) any Guarantee Obligations in respect of Subordinated Indebtedness shall be subordinated to the Obligations on terms no less favorable to the Lenders than those of the Subordinated Indebtedness and (ii) no Guarantee Obligations of any Loan Party of Indebtedness (excluding, for the avoidance of doubt, Guarantee Obligations in respect of obligations not constituting Indebtedness) of any Restricted Subsidiary that is not a Loan Party shall be permitted pursuant to this Section 7.7(c) if, at the time of the incurrence of, and after giving effect to, such Guarantee Obligations (and any substantially simultaneous use of the Permitted Amount), the Permitted Amount would be less than zero;

(d)        [reserved];

(e)        [reserved];

(f)        [reserved];

(g)        [reserved];

(h)        [reserved];

(i)        promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 7.5;

(j)        [reserved];

(k)        Investments existing on the Closing Date and set forth on Schedule 7.7(k) and any modification, refinancing, renewal, refunding, replacement or extension thereof; provided that the amount of any Investment permitted pursuant to this Section 7.7(k) is not increased from the amount of such Investment on the Closing Date;

(l)        Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(m)        [reserved];

(n)        guarantees by Holdings or any Restricted Subsidiary of leases (other than Capital Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(o)     Investments made to effect the pledges and deposits described in, and permitted under, Section 7.3(c) and (d); and

(p)     Investments by Holdings or any Restricted Subsidiary that result solely from the receipt by Holdings or such Restricted Subsidiary from any of its Subsidiaries of a dividend or other Restricted Payment in the form of Capital Stock, evidences of Indebtedness or other securities (but not any additions thereto made after the date of the receipt thereto).

Notwithstanding anything to the contrary contained in this Agreement, in no event shall (a) the Borrower or any Loan Party sell, transfer or otherwise dispose of any Material Property (whether pursuant to a sale, lease, license, transfer, Investment, restricted payment, dividend or otherwise or relating to the exclusive rights thereto) to any Subsidiary that is not a Loan Party; provided that in no event shall this sentence prohibit the Borrower or its Restricted Subsidiaries from entering into non-exclusive licensing arrangements of Intellectual Property to a Restricted Subsidiary in the ordinary course of business for a bona fide business purpose and (b) any Subsidiary that is not a Loan Party own or hold an exclusive license to any Material Property.  Holdings and the Borrower shall not, nor permit any of their Restricted Subsidiaries to, form or acquire any Restricted Subsidiary after the Closing Date that is an Excluded Subsidiary or permit any Loan Party to become an Excluded Subsidiary.

7.8     Optional Payments of Certain Debt Instruments.  Each of Holdings and the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, make or offer to make any optional or voluntary payment, prepayment, repurchase or redemption of or otherwise optionally or voluntarily defease or segregate funds with respect to any Specified Indebtedness (any of the foregoing, a "Restricted Debt Payment") without the written approval of the Required Lenders.

Notwithstanding anything to the contrary contained in this Section 7.8, in no event shall any payment in respect of Subordinated Indebtedness be permitted if such payment is in violation of the subordination provisions of such Subordinated Indebtedness.

7.9     Transactions with Affiliates.  Enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than (x) transactions between or among the Loan Parties, (y) transactions between or among Restricted Subsidiaries that are not Loan Parties and (z) transactions between or among Holdings and its Restricted Subsidiaries consistent with past practices and made in the ordinary course of business) unless such transaction is (a) otherwise permitted under this Agreement and (b) upon fair and reasonable terms no less favorable to the relevant Group Member than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate as determined in good faith by the Board of Directors; provided that the foregoing restriction in clause (b) shall not apply to (i) transactions permitted under Section 7.6; (ii) the payment of customary directors' fees and indemnification and reimbursement of expenses to directors, officers or employees; (iii) any issuance of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans approved by the Board of Directors; (iv) employment, retention, severance and similar arrangements (including equity or equity based incentive plans, stock ownership plans, compensation or incentive plans and arrangements and employee benefit plans and arrangements) and indemnification arrangements entered into in the ordinary course of business between Holdings or any Restricted Subsidiary and any employee, officer or director thereof; (v) intercompany transactions undertaken in good faith (as certified by a Responsible Officer of Holdings) for the purpose of improving the consolidated tax efficiency of the Group Members; (vi) [reserved]; (vii) payment of customary fees and reasonable out of pocket costs to, and indemnities for the benefit of, directors, officers and employees of Holdings and its Restricted Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of Holdings and its Restricted Subsidiaries; (viii) [reserved]; and

109

(ix) any agreement or arrangement in effect on the Closing Date (and performance thereunder) set forth on Schedule 7.9 or as thereafter amended or replaced in any manner that, taken as a whole, is not materially less advantageous to Holdings and its Restricted Subsidiaries than such agreement as it was in effect on the Closing Date; provided that, from and including the Closing Date, each of Holdings and the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate pursuant to Section 7.9(z)(b)(v) without the written approval of the Required Lenders.

7.10    Sales and Leasebacks.  No Loan Party shall, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease, rental or similar arrangement of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Loan Party (a) has sold or transferred or is to sell or to transfer to any other Person (other than a Loan Party), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Loan Party to any Person (other than Holdings or any of its Restricted Subsidiaries) in connection with such lease.

7.11    Swap Agreements.  Enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which any Group Member has actual exposure (other than those in respect of Capital Stock) and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of any Group Member.

7.12    Changes in Fiscal Periods.  Change the fiscal year end of Holdings or change Holdings's method of determining fiscal months or fiscal quarters (without the consent of the Administrative Agent) except as permitted by IFRS and recommended by the auditors of Holdings or required by IFRS.

7.13    Negative Pledge Clauses.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Group Member to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired to secure its obligations under the Loan Documents to which it is a party other than (a) (i) this Agreement, the other Loan Documents and the Term Loan Documents, (ii) agreements related to other Indebtedness permitted by this Agreement to the extent that encumbrances or restrictions imposed by such other Indebtedness are not more restrictive on the Loan Party or any of its applicable Subsidiaries than the encumbrances and restrictions contained in this Agreement as determined by the chief executive officer or the chief financial officer of the Borrower in good faith and (iii) any agreement governing any Permitted Refinancing Indebtedness (or any successive Permitted Refinancing Indebtedness) in respect of the Loans or the Term Loans made pursuant to the DIP Term Loan Credit Agreement, in each case, with respect to this clause (iii), so long as any such agreement is not more restrictive than the Loan Documents, the Term Loan Documents or the documents governing the Indebtedness being refinanced, as applicable, (b) any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby), (c) any agreement in effect at the time any Subsidiary becomes a Restricted Subsidiary of Holdings, so long as such prohibition or limitation applies only to such Restricted Subsidiary (and, if applicable, its Subsidiaries) and such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary of Holdings, as such agreement may be amended, restated, supplemented, modified extended renewed or replaced, so long as such amendment, restatement, supplement, modification, extension, renewal or replacement does not expand in any material respect the scope of any restriction contemplated by this Section 7.13 contained therein, (d) customary provisions restricting assignments, subletting, sublicensing, pledging or other transfers contained in leases, subleases, licenses or sublicenses, so long as such

110

restrictions are limited to the property or assets subject to such leases, subleases, licenses or sublicenses, as the case may be, (e) customary restrictions and conditions contained in agreements relating to the sale of a Restricted Subsidiary or any assets pending such sale; provided that such restrictions or conditions apply only to the Restricted Subsidiary or assets that is to be sold and such sale is permitted hereunder, (f) restrictions imposed by applicable law or regulation or license requirements; (g) customary provisions restricting assignment of any agreement, which provisions are entered into in the ordinary course of business; (h) any customary restriction pursuant to any document, agreement or instrument governing or relating to any Lien permitted under Section 7.3 and (i) customary provisions contained in joint venture agreements, shareholder agreements and other similar agreements applicable to joint ventures permitted hereunder and applicable solely to such joint venture (and its assets or Capital Stock issued by such Person) entered into in the ordinary course of business.

   7.14 <u>Clauses Restricting Subsidiary Distributions</u>. Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary of Holdings to (a) make Restricted Payments in respect of any Capital Stock of such Restricted Subsidiary held by, or pay any Indebtedness owed to, any Group Member, (b) make loans or advances to, or other Investments in, any Group Member or (c) transfer any of its assets to any Group Member, except for (i) any encumbrances or restrictions existing under (A) this Agreement, the other Loan Documents and the Term Loan Documents, (B) any agreement governing Indebtedness incurred pursuant to Section 7.2 so long as such encumbrances or restrictions are customary in agreements governing Indebtedness of such type and are not, when taken as a whole, materially more restrictive than the encumbrances and restrictions contained in the Loan Documents or (C) any agreement governing Permitted Refinancing Indebtedness (or any successive Permitted Refinancing Indebtedness) in respect of the Loans, the Term Loans made pursuant to the DIP Term Loan Credit Agreement or any other Indebtedness incurred pursuant to Section 7.2, in each case so long as any such encumbrances or restrictions are not, when taken as a whole, materially more restrictive than the encumbrances and restrictions contained in the Loan Documents, the Term Loan Documents or the documents governing the Indebtedness being refinanced, as applicable, (ii) any encumbrances or restrictions with respect to a Restricted Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Restricted Subsidiary, (iii) any encumbrance or restriction applicable to a Restricted Subsidiary (and, if applicable, its Subsidiaries) under any agreement of such Restricted Subsidiary in effect at the time such Person becomes a Restricted Subsidiary of Holdings, so long as such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary of Holdings, as such agreement may be amended, restated, supplemented, modified extended renewed or replaced, so long as such amendment, restatement, supplement, modification, extension, renewal or replacement does not expand in any material respect the scope of any restriction contemplated by this Section 7.14 contained therein, (iv) customary provisions restricting assignments, subletting, sublicensing, pledging or other transfers contained in leases, subleases, licenses or sublicenses, so long as such restrictions are limited to the property or assets subject to such leases, subleases, licenses or sublicenses, as the case may be, (v) customary restrictions and conditions contained in agreements relating to the sale of a Restricted Subsidiary or any assets pending such sale, provided that such restrictions or conditions apply only to the Restricted Subsidiary or assets that is to be sold and such sale is permitted hereunder, (vi) restrictions of the nature referred to in clause (c) above under the agreements governing purchase money liens or Capital Lease Obligations otherwise permitted hereby, which restrictions are only effective against the assets financed thereby, (vii) any applicable law, rule or regulation (including applicable currency control laws and applicable state corporate statutes restricting the payment of dividends in certain circumstances), (viii) agreements related to other Indebtedness permitted by this Agreement to the extent that encumbrances or restrictions imposed by such other Indebtedness (x) are (A) customary for financing arrangements of their type or (B) not, when taken as a whole, materially more restrictive on the Loan Party or any of its applicable Subsidiaries than the restrictions contained in this Agreement as determined by the chief executive officer or the chief financial officer of the Borrower in good faith and (y) will not materially affect the Loan Parties'

ability to satisfy their obligations hereunder or under the other Loan Documents, (ix) customary provisions contained in joint venture agreements, shareholder agreements and other similar agreements applicable to joint ventures permitted hereunder and applicable solely to such joint venture (and its assets or Capital Stock issued by such Person) entered into in the ordinary course of business or (x) restrictions applicable solely to Foreign Subsidiaries.

7.15    Lines of Business.    Enter into any business, either directly or through any Restricted Subsidiary, except for those businesses in which the Group Members were engaged on the Closing Date or that are reasonably related, ancillary or complementary thereto.

7.16    Use of Proceeds.    Request any Loan or Letter of Credit, and neither Holdings nor the Borrower shall use, and each shall procure that its respective Restricted Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Loan or Letter of Credit (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent that such activities, businesses or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States or a European Union member state or (c) in any manner that would result in the violation of  any Sanctions applicable to any party hereto.

7.17    Amendment of Organizational Documents  Amend, modify, supplement or waive any of its rights under its charter, articles or certificate of incorporation or organization, by-laws, operating, management or partnership agreement or other organizational or governing documents (collectively, the "Organizational Documents") to the extent any such amendment, modification or waiver would be materially adverse to the Lenders.

7.18    Delivery of Defined Inventory and Return of Inventory Purchaser Deposit. The Borrower shall not (a) deliver any Defined Inventory to the Inventory Purchaser, (b) return any portion of the Inventory Purchaser Deposit to the Inventory Purchaser, (c) return or make any payment in respect of any DMPL Payables or (d) make any other payment to DMPL or Inventory Purchaser (including, without limitation, any fees owed to such Party) (each of clauses (a) through (d) "Restricted Parent Payments"), except for payments by the Loan Parties of the purchase price on arms-length customary industry terms (including payment terms that are substantially consistent with the payment terms of other suppliers of fresh produce to the Loan Parties) in respect of current purchases (excluding past-due payables outstanding prior to July 2, 2024) of fresh pineapple and other processed products in an aggregate amount not to exceed $25,000,000, subject to quarterly reporting to the Administrative Agent and Lenders regarding the price, terms and sale and quantity of fresh pineapple and other processed products purchases to be delivered within 10 business days of the end of each fiscal quarter.

7.19    Material Property. Notwithstanding anything to the contrary contained in this Agreement, in no event shall (a) the Borrower or any Loan Party sell, transfer or otherwise dispose of any Material Property (whether pursuant to a sale, lease, license, transfer, Investment, restricted payment, dividend or otherwise or relating to the exclusive rights thereto) to any Subsidiary that is not a Loan Party; provided that in no event shall this sentence prohibit the Borrower or its Restricted Subsidiaries from entering into non-exclusive licensing arrangements of Intellectual Property to a Restricted Subsidiary in the ordinary course of business for a bona fide business purpose and (b) no Subsidiary that is not a Loan Party shall own or hold an exclusive license to any Material Property.

7.20    <u>Chapter 11 Cases</u>.  Holdings and the Borrower will not, and will not permit any of their Restricted Subsidiaries to, directly or indirectly:

(a)    Except for the Carve-Out, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other superpriority claim which is *pari passu* with, or senior to, the Obligations (except as may be set forth in the Orders or the Loan Documents);

(b)    Incur, create, assume, suffer to exist or permit or file any motion seeking, any lien which is *pari passu* with the liens granted hereunder, (except as may be set forth in the Orders or the Loan Documents);

(c)    Make or permit to be made any amendment, modification, supplement or change to the Orders, Bidding Procedures or the milestones (and deadlines applicable thereto) set forth in the Bidding Procedures Order, as applicable, (other than technical modifications to correct grammatical, ministerial or typographical errors) without the prior written consent of the Required Lenders;

(d)    Commence any adversary proceeding, contested matter or other action (or otherwise support any party) asserting any claims or defenses or otherwise against (or asserting any surcharge under section 506(c) of the Bankruptcy Code or otherwise against) the Administrative Agent, any Lender, any other Secured Party and any holder of the Term Loan Obligations, and any lender or agent party to the Pre-Petition ABL Credit Agreement with respect to this Agreement, the other Loan Documents, the transactions contemplated hereby or thereby, the Pre-Petition ABL Credit Agreement, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby; or

(e)    File any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Loan Parties without consulting with the Lenders and providing the Lenders two (2) Business Days' (or as soon thereafter as is practicable) notice and the opportunity to review and comment on each such motion.

SECTION 8.  EVENTS OF DEFAULT

8.1    <u>Events of Default</u>.

If any of the following events shall occur and be continuing:

(a)    the Borrower shall fail to pay any principal of any Loan or Reimbursement Obligation when due in accordance with the terms hereof; the Borrower shall fail to pay any interest on any Loan or Reimbursement Obligation, or any other amount payable hereunder or under any other Loan Document, within three Business Days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)    any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made; or

(c)    any Loan Party shall default in the observance or performance of any agreement contained in clause (i) or (ii) of Section 6.4(a) (with respect to Holdings or the Borrower only),

Section 6.7(a), Section 6.15, Section 6.16, Section 6.19, Section 6.20, Section 7 or Section 10.22 of this Agreement or the Orders; or

(d)    any Loan Party shall default in the observance or performance of any agreement in Section 6.2(g) and such default shall continue unremedied for a period of one (1) Business Day; or

(e)    any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section 8.1), and such default shall continue unremedied for a period of 5 days after notice to the Borrower from the Administrative Agent or the Required Lenders; or

(f)    any Group Member shall (i) default in making any payment of any principal of any Material Indebtedness (including any Guarantee Obligation, but excluding the Loans); (ii) default in making any payment of any interest on any such Material Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Material Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Material Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable or (iv) breach or default with respect to any material term of any Material Indebtedness of any Parent Guarantor; or

(g)    Other than the Chapter 11 Cases, (i) a court of competent jurisdiction shall enter a decree or order for relief in respect of the Parent Guarantors or any of their Subsidiaries in an involuntary case under any Debtor Relief Laws now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable international, federal, state or local law; or (ii) an involuntary case shall be commenced against the Parent Guarantors or any of their Subsidiaries under any Debtor Relief Laws now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over the Parent Guarantors or any of their Subsidiaries, or over any of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee, custodian or any other person having similar powers of the Parent Guarantors or any of their Subsidiaries for any of its property; or a warrant of attachment, execution or similar process shall have been issued against any part of the property of the Parent Guarantors or any of their Subsidiaries, and any such event described in this clause (g) shall continue for sixty days without having been dismissed, bonded or discharged; or

(h)    (i) an ERISA Event and/or a Foreign Plan Event shall have occurred; (ii) a trustee shall be appointed by a United States district court to administer any Pension Plan; (iii) the PBGC shall institute proceedings to terminate any Pension Plan; (iv) any Parent Guarantor, Group Member or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner; or (v) any other event or condition shall occur or exist with respect to a Plan, a Foreign Benefit Arrangement, or a Foreign

114

Plan; and in each case in clauses (i) through (v) above, such event or condition, together with all other such events or conditions, if any, would reasonably be expected to result in a Material Adverse Effect; or

(i)      one or more judgments or decrees shall be entered against any Parent Guarantor or any Group Member involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has not disputed coverage) of $1,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, satisfied, stayed or bonded, as applicable, pending appeal within 30 days from the entry thereof; or

(j)      any of the Security Documents shall cease, for any reason, to be in full force and effect (other than pursuant to the terms hereof), or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby (and, for the avoidance of doubt, as required by the Orders); or

(k)      the guarantees provided in the Loan Documents shall cease, for any reason, to be in full force and effect or any Loan Party shall so assert; or

(l)      Other than the Chapter 11 Cases, (i) the Parent Guarantors or any of their Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case under any Debtor Relief Laws, now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for any of its property; or the Parent Guarantors or any of their Subsidiaries shall make any assignment for the benefit of creditors; or (ii) the Parent Guarantors or any of their Subsidiaries shall be unable, or shall fail generally, or shall admit in writing its general inability, to pay its debts as such debts become due; or the board of directors (or similar governing body) of the Parent Guarantors or any of their Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to in this Section 8.1(l) or in Section 8.1(g);

(m)      a Change of Control shall occur; or

(n)      any of the following shall have occurred in the Chapter 11 Cases:

(i)      the Closing Date shall not have occurred within five (5) calendar days of the Petition Date (or if such fifth calendar day is not a Business Day, the immediately succeeding Business Day);

(ii)      the Interim DIP Order (a) at any time ceases to be in full force and effect or (b) shall be vacated, reversed, stayed, amended, supplemented or modified without the prior written consent of the Administrative Agent and the Required Lenders;

(iii)      the Final DIP Order (a) at any time ceases to be in full force and effect, (b) shall be vacated, reversed, stayed, amended, supplemented or modified without the prior written consent of the Required Lenders, or (c) shall not have been entered by the Bankruptcy Court within forty (40) calendar days after the Petition Date (or if such fortieth calendar day is not a Business Day, the immediately succeeding Business Day);

115

(iv)      except with the prior written consent of the Administrative Agent and the Required Lenders, the entry of an order in any of Chapter 11 Cases (a) staying, reversing, amending, supplementing, vacating or otherwise modifying any of the Loan Documents, the Interim DIP Order or the Final DIP Order, or (b) adversely impairing or modifying any of the liens, security interests, claims, rights, remedies, privileges, benefits or protections granted under the Loan Documents or under the Orders to the Secured Parties or the Prepetition Secured Parties (as defined in the Orders);

(v)      the failure of any of the Chapter 11 Debtors to comply with any of the terms or conditions of the Interim DIP Order or the Final DIP Order;

(vi)      an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to any of the Chapter 11 Cases;

(vii)      the dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a Chapter 7 case;

(viii)      the appointment or election of a Chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) under section 1104 of the Bankruptcy Code with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Debtor in the Chapter 11 Cases;

(ix)      the entry of an order in any of the Chapter 11 Cases authorizing the Chapter 11 Debtors (i) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for Payment in Full; (ii) to grant any Lien, other than Liens expressly permitted under this Agreement and the Orders, upon or affecting any Collateral; or (iii) take any other action adverse to the Administrative Agent and the other Secured Parties' rights and remedies under the Loan Documents or the validity of their Liens on the Collateral;

(x)      (a) the consensual use of prepetition cash collateral is terminated or modified, or (b) the entry of an order in any of the Chapter 11 Cases terminating or modifying the use of cash collateral other than as provided in this Agreement and the Orders, in each case, without the prior written consent of the Required Lenders;

(xi)      except as expressly permitted hereunder or the Orders, the entry of an order in any of the Chapter 11 Cases granting any claim against any Chapter 11 Debtor entitled to superpriority administrative expense status in any of the Chapter 11 Cases pursuant to section 364(c)(2) of the Bankruptcy Code that is *pari passu* with or senior to the claims of the Administrative Agent and the Lenders or the DIP ABL Adequate Protection Claims (as defined in the Orders) (without the prior written consent of the Required Lenders);

(xii)      except as expressly permitted hereunder or the Orders, the entry of an order in any of the Chapter 11 Cases granting any Lien in Collateral that is *pari passu* with or senior to any Lien granted to the Administrative Agent or the Lenders, or any DIP ABL Adequate Protection Lien (as defined in the Orders) (without the prior written consent of the Administrative Agent and the Required Lenders);

116

(xiii)    except as provided in the Orders, the making of any adequate protection payment or the granting of any adequate protection (including, without limitation, the granting of any Liens on the Collateral, superpriority claims, the right to receive cash payments or otherwise), without the prior written consent of the Required Lenders;

(xiv)    the Chapter 11 Debtors' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing and/or solicitation of a chapter 11 plan is terminated or modified for any reason, provided that termination of such exclusivity periods is not the result of any action by a Lender;

(xv)    the payment of, or any Chapter 11 Debtors file a motion or application seeking authority to pay, any Prepetition Debt or other prepetition claim other than (A) as provided in any of the First Day Orders, (B) to the extent such payment is expressly permitted pursuant to this Agreement and the Approved DIP Budget, or (C) with the prior written consent of the Required Lenders;

(xvi)    the entry of an order in any of the Chapter 11 Cases granting relief from or otherwise modifying any stay of proceeding (including the automatic stay) to allow a third party to execute upon or enforce a Lien against any assets of the Chapter 11 Debtors that have an aggregate value in excess of $2.5 million, or with respect to any Lien of or the granting of any Lien on any assets of the Chapter 11 Debtors to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Secured Parties without the prior written consent of the Required Lenders;

(xvii)    (A) any Chapter 11 Debtor shall (i) challenge or contest the validity or enforceability of the Orders or any Loan Document or deny that it has further liability thereunder, (ii) challenge or contest the nature, extent, amount, enforceability, validity, priority or perfection of the Obligations, Liens securing the Obligations, the DIP Superpriority Claims (as defined in the Orders), Loan Documents, Prepetition Secured Obligations (as defined in the Orders), Adequate Protection Liens (as defined in the Orders), Adequate Protection Claims (as defined in the Orders), the Liens securing the Prepetition Secured Obligations (as defined in the Orders), (iii) assert any claim, defense or cause of action that seeks to avoid, recharacterize, subordinate, disgorge, disallow, impair or offset all or any portion of the Obligations, Liens securing the Obligations, the DIP Superpriority Claims, Loan Documents, Adequate Protection Liens, Adequate Protection Claims, the Prepetition Secured Obligations (as defined in the Orders), and the Liens securing the Prepetition Secured Obligations (as defined in the Orders) (iv) investigate, join or file any motion, application or other pleading in support of, or publicly support any other Person that has asserted any of the claims, challenges or other requested relief contemplated in clauses (i) or (ii) above or standing to pursue such claims challenged or other requested relief, or fails to timely contest such claims, challenges or other requested relief in good faith (provided, that responding to any investigation conducted by an Official Committee or other party with respect to the nature, extent, amount, enforceability, validity, priority or perfection of the Prepetition Secured Obligations (as defined in the Orders), the Liens securing the Prepetition Secured Obligations (as defined in the Orders), subject in each case to the Orders, shall not, in and of itself, constitute an Event of Default hereunder); or (B) the entry of a judgment or order in any of the Chapter 11 Cases sustaining any of the claims, challenges or other relief contemplated in clauses (i) or (ii) above made by a Debtor or any other party;

117

(xviii)   the entry of an order in any of the Chapter 11 Cases, avoiding, disallowing, offsetting, recharacterizing, subordinating, disgorging or requiring repayment of any payments made to the Secured Parties on account of the Obligations owing under the Orders, this Agreement, the other Loan Documents or any prepetition loan documents;

(xix)    the entry of any order in any of the Chapter 11 Cases (a) charging any of the Collateral with respect to the Secured Parties, whether under Section 506(c) of the Bankruptcy Code or otherwise or (b) charging any of the prepetition collateral securing the ABL Claims (as defined in the Orders) with respect to the secured parties in respect of the ABL Claims, whether under Section 506(c) of the Bankruptcy Code or otherwise;

(xx)    any Chapter 11 Debtor shall enter into any definitive agreement for, or consummates any sale or other disposition of all or any portion of the Collateral outside the ordinary course of business pursuant to Section 363 of the Bankruptcy Code or otherwise (other than in ordinary course of business that is expressly permitted by the Approved DIP Budget and this Agreement), that does not pay the Obligations (other than indemnification or reimbursement obligations under Section 2.18, 2.19(a), 2.19(d) or 2.20 for which the Borrower has not been notified and contingent indemnification obligations that are expressly stated to survive repayment of the Facility) in full in cash (other than Letters of Credit cash collateralized or otherwise backstopped as required by the terms of this Agreement or in a manner satisfactory to the applicable Issuing Lender and the Administrative Agent) on the closing date thereof, without the prior written consent of the Administrative Agent and the Required Lenders;

(xxi)    the Restructuring Support Agreement is terminated by any party thereto or otherwise terminates in accordance with the terms thereof, or the Restructuring Support Agreement is amended, modified or waived in a manner materially adverse to Chapter 11 Debtors or the Lenders;

(xxii)    the filing by any Chapter 11 Debtor of any chapter 11 plan or any disclosure statement attendant to a chapter 11 plan that purports to not pay the Obligations (other than indemnification or reimbursement obligations under Section 2.18, 2.19(a), 2.19(d) or 2.20 for which the Borrower has not been notified and contingent indemnification obligations that are expressly stated to survive repayment of the Facility) in full in cash (other than Letters of Credit cash collateralized or otherwise backstopped as required by the terms of this Agreement or in a manner satisfactory to the applicable Issuing Lender and the Administrative Agent) on the effective date thereof without the consent of the Administrative Agent and the Required Lenders;

(xxiii)    if any Chapter 11 Debtor or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order or a Governmental Authority from continuing to conduct all or any material part of the business affairs of the Chapter 11 Debtors and their Subsidiaries;

(xxiv)    any order having been entered or granted (or requested, unless actively opposed by the Loan Parties) by either the Bankruptcy Court or any other court of competent jurisdiction adversely impacting the rights of the Administrative Agent and the other Secured Parties under the Loan Documents;

(xxv)    any Loan Party or any Subsidiary thereof files any motion, pleading or other request with the Bankruptcy Court seeking to modify or affect any of the rights of the Administrative Agent or the Lenders under the Orders or the Loan Documents;

(xxvi)    the filing of a motion, pleading or the taking of any action in the Chapter 11 Cases by any Loan Party seeking the entry of an order by the Bankruptcy Court precluding the Administrative Agent from having the right to, or being permitted to, or precluding any Secured Party from directing or instructing the Administrative Agent to exercise the right to, "credit bid" in any manner in respect of any applicable collateral;

(xxvii)    any Loan Party or any Subsidiary of a Loan Party shall file a motion (without consent of the Required Lenders) seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Administrative Agent) to execute upon or enforce a Lien on any Collateral, solely if the value of such collateral exceeds $250,000;

(xxviii)    the entry by a Loan Party into any proposed settlement of any Claim, litigation, dispute, cause of action, or other proceeding, in each case, against the Debtors which requires a payment by the Debtors of any amount greater than $250,000;

(xxix)    any Chapter 11 Debtor initiates, commences, joins, publicly supports, pursues, files any motion, application or other pleading in support of, the entry of an order or any of the relief described in clauses (iv) through (xxvii) in this Section 8.1(n);

(xxx)    other than in the ordinary course of business and consistent with past practice, a Loan Party shall (i) enter into any material agreement, (ii) amend, supplement, modify, or terminate any material agreement, (iii) other than to the extent resulting from the Chapter 11 Cases, allow any material permit, license, or regulatory approval to be terminated, revoked, suspended, or modified, in each case without the prior written consent of the Administrative Agent and the Required Lenders, or (iv) enter into, terminate, or modify any material operational contracts, leases, or other agreements that would, individually or in the aggregate, reasonably be expected to have a material and adverse effect on the Loan Parties, taken as a whole, without the consent of the Administrative Agent and the Required Lenders;

(xxxi)    an "Event of Default" under and as defined in the DIP Term Loan Credit Agreement (other than an event of default pursuant to Section 8.1(a) of the DIP Term Loan Credit Agreement which shall be an immediate Event of Default under Section 8.1(a)(f) hereof) has occurred and such Event of Default has not been waived within five (5) days of the occurrence thereof;

(xxxii)    a failure of the Loan Parties to satisfy any of the Milestones or to satisfy the deadlines in the Bidding Procedures Order with respect to the Debtors' sales process; or

(xxxiii)    a default under the Restructuring Support Agreement by any of the Loan Parties or any of its Affiliates or Subsidiaries party to the Restructuring Support Agreement shall have occurred and be continuing (with all applicable grace periods having expired);

then, and in any such event, either or both of the following actions may be taken:  (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare the Revolving Commitments to be terminated forthwith, whereupon the Revolving Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) to be due and payable forthwith, whereupon the same shall immediately become due and payable.   With respect to all Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this paragraph, the Borrower shall at such time deposit in a cash collateral account opened by the Administrative Agent an amount equal to 103% of the aggregate then undrawn and unexpired amount of such Letters of Credit. Amounts held in such cash collateral account shall be applied by the Administrative Agent to the payment of drafts drawn under such Letters of Credit, and the unused portion thereof after all such Letters of Credit shall have expired or been fully drawn upon, if any, shall be applied to repay other obligations of the Borrower hereunder and under the other Loan Documents.   After all such Letters of Credit shall have expired or been fully drawn upon, all Reimbursement Obligations shall have been satisfied and all other obligations of the Borrower hereunder and under the other Loan Documents shall have been paid in full and no Letters of Credit shall be outstanding, the balance, if any, in such cash collateral account shall be returned to the Borrower (or such other Person as may be lawfully entitled thereto).   Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

In addition to any other rights and remedies granted to the Administrative Agent and the Lenders in the Loan Documents, the Administrative Agent on behalf of the Lenders may exercise all rights and remedies of a secured party under the New York Uniform Commercial Code or any other applicable law.  Without limiting the generality of the foregoing, the Administrative Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Loan Party or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, or consent to the use by the Loan Parties of any cash collateral arising in respect of the Collateral on such terms as the Administrative Agent deems reasonable, and/or may forthwith sell, lease, assign give an option or options to purchase or otherwise dispose of and deliver, or acquire by credit bid on behalf of the Lenders, the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Administrative Agent or any Lender or elsewhere, upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery, all without assumption of any credit risk. The Administrative Agent or any Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in any Loan Party, which right or equity is hereby waived and released.  The Borrower further agrees, at the Administrative Agent's request, to assemble, or cause the applicable Loan Party to assemble, the Collateral and make it available to the Administrative Agent at places which the Administrative Agent shall reasonably select, whether at the Borrower's or such Loan Party's premises or elsewhere.   The Administrative Agent shall apply the net proceeds of any action taken by it pursuant to this Section 8.1, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any other way relating to the Collateral or the rights of the Administrative Agent and the Lenders hereunder, including reasonable attorneys' fees and disbursements, to the payment in whole or in part of the obligations of the Loan Parties under the Loan Documents, in such order as the Administrative Agent may elect, and only after such application and after

120

the payment by the Administrative Agent of any other amount required by any provision of law, including Section 9-615(a)(3) of the New York UCC, need the Administrative Agent account for the surplus, if any, to any Loan Party. To the extent permitted by applicable law, the Borrower on behalf of itself and the other Loan Parties, waives all claims, damages and demands it or any other Loan Party may acquire against the Administrative Agent or any Lender arising out of the exercise by them of any rights hereunder, except to the extent such damages are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Administrative Agent or such Lender, as the case may be. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

      8.2    <u>Bankruptcy Code and Other Remedies</u>.

      (a)    <u>General</u>. During the continuance of an Event of Default, subject to the Orders, the Administrative Agent may exercise, in addition to all other rights and remedies granted to it in this Agreement (including, without limitation, Section 8.1) and in any other instrument or agreement securing, evidencing or relating to any Obligation, all rights and remedies of a secured party under the Bankruptcy Code, the Uniform Commercial Code and any other applicable law.

      (b)    <u>Disposition of Collateral</u>. Subject to the Orders, without limiting the generality of the foregoing, the Administrative Agent may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by the Orders and any notice required by law referred to below) to or upon any Loan Party or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived (except as required by the Orders)), during the continuance of any Event of Default (personally or through its agents or attorneys), (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self- help, without judicial process, without first obtaining a final judgment or giving any Loan Party or any other Person notice or opportunity for a hearing on the Administrative Agent's claim or action, (ii) collect, receive, appropriate and realize upon any Collateral, (iii) dispose of, sell, grant option or options to purchase and deliver any Collateral (enter into contractual obligations to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of any Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk, (iv) withdraw all cash and Cash Equivalents in any deposit account or securities account of a Loan Party (other than an Excluded Deposit Account) and apply such cash and Cash Equivalents and other cash, if any, then held by it as Collateral in satisfaction of the Obligations, and (v) give notice and take sole possession and control of all amounts on deposit in or credited to any deposit account or securities account (other than an Excluded Deposit Account) pursuant to any related control agreement. The Administrative Agent shall have the right, upon any such public sale or sales and, to the extent permitted by the Bankruptcy Code and other applicable Requirements of Law, upon any such private sale, to purchase the whole or any part of the Collateral so sold (and, in lieu of actual payment of the purchase price, may "credit bid" or otherwise set off the amount of such price against the Obligations), free of any right or equity of redemption of any Loan Party, which right or equity is hereby waived and released.

      (c)    <u>Management of the Collateral</u>. Subject to the Orders, each Loan Party further agrees, that, during the continuance of any Event of Default, (i) at the Administrative Agent's request, it shall assemble the Collateral and make it available to the Administrative Agent at places that the Administrative Agent shall reasonably select, whether at such Loan Party's premises or elsewhere, (ii) without limiting the foregoing, the Administrative Agent also has the right to require

121

that each Loan Party store and keep any Collateral pending further action by the Administrative Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until the Administrative Agent is able to sell any Collateral, the Administrative Agent shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Administrative Agent and (iv) the Administrative Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Administrative Agent's remedies (for the benefit of the Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment. The Administrative Agent shall not have any obligation to any Loan Party to maintain or preserve the rights of any Loan Party as against third parties with respect to any Collateral while such Collateral is in the possession of the Administrative Agent.

(d)     Direct Obligation. Subject to the Orders, neither the Administrative Agent nor any other Secured Party shall be required to make any demand upon, or pursue or exhaust any right or remedy against, any Loan Party or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof. All of the rights and remedies of the Administrative Agent and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any Requirements of Law. To the extent it may lawfully do so, each Loan Party absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent or any Lender or other Secured Party, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 calendar days before such sale or other disposition.

(e)     Commercially Reasonable. To the extent that any Requirements of Law impose duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, each Loan Party acknowledges and agrees that it is not commercially unreasonable for the Administrative Agent to do any of the following: (i) fail to incur significant costs, expenses or other liabilities reasonably deemed as such by the Administrative Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition; (ii) fail to obtain permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by other Requirements of Law, fail to obtain permits or other consents for the collection or disposition of any Collateral; (iii) fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral; (iv) advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature or to contact other Persons, whether or not in the same business as any Loan Party, for expressions of interest in acquiring any such Collateral; (v) exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature or, to the extent deemed appropriate by the Administrative Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the

122

Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral; (vi) dispose of assets in wholesale rather than retail markets; (vii) disclaim disposition warranties, such as title, possession or quiet enjoyment; or (viii) purchase insurance or credit enhancements to insure the Administrative Agent against risks of loss, collection or disposition of any Collateral or to provide to the Administrative Agent a guaranteed return from the collection or disposition of any Collateral. Each Loan Party acknowledges that the purpose of clauses (i) through (viii) of this Section 8.2(e) is to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by the Secured Parties shall not be deemed commercially unreasonable solely on account of not being indicated in such clauses. Without limitation upon the foregoing, nothing contained herein shall be construed to grant any rights to any Loan Party or to impose any duties on the Administrative Agent that would not have been granted or imposed by this Agreement or by applicable Requirements of Law in the absence of this Section 8.2.

(f)      Deficiency. Each Loan Party shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Obligations and the fees and disbursements of any attorney employed by the Administrative Agent or any other Secured Party to collect such deficiency.

## SECTION 9.  THE AGENTS

9.1      Appointment.

(a)      Each Lender hereby irrevocably appoints the entity named as Administrative Agent in the heading of this Agreement and its successors and assigns to serve as the administrative agent under the Loan Documents and each Lender, the Swingline Lender and each Issuing Lender authorizes the Administrative Agent to take such actions as agent on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Administrative Agent under such agreements and to exercise such powers as are reasonably incidental thereto. Without limiting the foregoing, each Lender hereby authorizes the Administrative Agent to execute and deliver, and to perform its obligations under, each of the Loan Documents to which the Administrative Agent is a party, and to exercise all rights, powers and remedies that the Administrative Agent may have under such Loan Documents.

(b)      As to any matters not expressly provided for herein and in the other Loan Documents (including enforcement or collection), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the written instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, pursuant to the terms in the Loan Documents), and, unless and until revoked in writing, such instructions shall be binding upon each Lender; provided, however, that the Administrative Agent shall not be required to take any action that (i) the Administrative Agent in good faith believes exposes it to liability unless the Administrative Agent receives an indemnification and is exculpated in a manner satisfactory to it from the Lenders, the Swingline Lender and the Issuing Lenders with respect to such action or (ii) is contrary to this Agreement or any other Loan Document or applicable law, including any action that may be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors; provided, further, that the Administrative Agent may seek clarification or direction from the Required Lenders (or, for matters that require consent of a greater or different number or percentage pursuant to Section 10.1, such other number or percentage of Lenders) prior to the exercise of any such instructed action and may

123

refrain from acting until such clarification or direction has been provided. Except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Holdings, any of its Subsidiaries or any Affiliate of any of the foregoing that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity. Nothing in this Agreement shall require the Administrative Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(c)     In performing its functions and duties hereunder and under the other Loan Documents, the Administrative Agent is acting solely on behalf of the Lenders, the Swingline Lender and the Issuing Lenders (except in limited circumstances expressly provided for herein relating to the maintenance of the Register), and its duties are entirely mechanical and administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent does not assume and shall not be deemed to have assumed any obligation or duty or any other relationship as the agent, fiduciary or trustee of or for any Lender, other than as expressly set forth herein and in the other Loan Documents, regardless of whether a Default or an Event of Default has occurred and is continuing (and it is understood and agreed that the use of the term "agent" (or any similar term) herein or in any other Loan Document with reference to the Administrative Agent is not intended to connote any fiduciary duty or other implied (or express) obligations arising under agency doctrine of any applicable law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties); additionally, each Lender agrees that it will not assert any claim against the Administrative Agent based on an alleged breach of fiduciary duty by the Administrative Agent in connection with this Agreement and/or the transactions contemplated hereby.

(d)     Nothing in this Agreement or any Loan Document shall require the Administrative Agent to account to any Lender for any sum or the profit element of any sum received by the Administrative Agent for its own account.

(e)     The Administrative Agent may perform any of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any of their respective duties and exercise their respective rights and powers through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities pursuant to this Agreement. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

(f)     No Arranger shall have obligations or duties whatsoever in such capacity under this Agreement or any other Loan Document and shall incur no liability hereunder or thereunder in such capacity, but all such persons shall have the benefit of the indemnities provided for hereunder.

(g)     In case of the pendency of any proceeding with respect to any Loan Party under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Loan or any Reimbursement Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

124

(i)        to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim under Sections 2.12, 2.13, 2.15, 2.17 and 9.3) allowed in such judicial proceeding; and(ii) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender and each other Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent, under the Loan Documents (including under Sections 9.3 and 9.7). Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender, Swingline Lender or Issuing Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender, Swingline Lender or Issuing Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender or Issuing Lender in any such proceeding.

(h)        The provisions of this Section are solely for the benefit of the Administrative Agent, the Lenders, the Swingline Lender and the Issuing Lenders, and, except solely to the extent of Holdings's or the Borrower's rights to consent pursuant to and subject to the conditions set forth in this Section, none of Holdings or any Subsidiary, or any of their respective Affiliates, shall have any rights as a third party beneficiary under any such provisions. Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Obligations provided under the Loan Documents, to have agreed to the provisions of this Section.

9.2    <u>Administrative Agent's Reliance, Indemnification, Etc.</u>.

(a)        Neither the Administrative Agent nor any of its Related Parties shall be (i) liable for any action taken or omitted to be taken by such party, the Administrative Agent or any of its Related Parties under or in connection with this Agreement or the other Loan Documents (x) with the consent of or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents) or (y) in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and non-appealable judgment) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party to perform its obligations hereunder or thereunder.

(b)        The Administrative Agent shall be deemed not to have knowledge of any (i) notice of any of the events or circumstances set forth or described in Section 6.7 unless and until written notice thereof stating that it is a "notice under Section 6.7" in respect of this Agreement and identifying the specific clause under said Section is given to the Administrative Agent by the Borrower, or (ii) notice of any Default or Event of Default unless and until written notice thereof (stating that it is a "notice of default") is given to the Administrative Agent by the Borrower, a Lender, the Swingline Lender or an Issuing Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any

125

statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (iv) the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items (which on their face purport to be such items) expressly required to be delivered to the Administrative Agent or satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the Administrative Agent or (vi) the creation, perfection or priority of Liens on the Collateral.

(c)        Without limiting the foregoing, the Administrative Agent (i) may treat the payee of any promissory note as its holder until such promissory note has been assigned in accordance with Section 10.6, (ii) may rely on the Register to the extent set forth in Section 10.6(b), (iii) may consult with legal counsel (including counsel to the Borrower), independent public accountants and other experts selected by it, and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts, (iv) makes no warranty or representation to any Lender, Swingline Lender or Issuing Lender and shall not be responsible to any Lender, Swingline Lender or Issuing Lender for any statements, warranties or representations made by or on behalf of any Loan Party in connection with this Agreement or any other Loan Document, (v) in determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender, Swingline Lender or an Issuing Lender, may presume that such condition is satisfactory to such Lender, Swingline Lender or Issuing Lender unless the Administrative Agent shall have received notice to the contrary from such Lender, Swingline Lender or Issuing Lender sufficiently in advance of the making of such Loan or the issuance of such Letter of Credit and (vi) shall be entitled to rely on, and shall incur no liability under or in respect of this Agreement or any other Loan Document by acting upon, any notice, consent, certificate or other instrument or writing (which writing may be a fax, any electronic message, Internet or intranet website posting or other distribution) or any statement made to it orally or by telephone and believed by it to be genuine and signed or sent or otherwise authenticated by the proper party or parties (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the maker thereof).

(d)        The Lenders agree to indemnify the Administrative Agent and its officers, directors, employees, affiliates, agents, advisors and controlling persons (each, an "Agent Indemnitee") (to the extent not reimbursed by Holdings or the Borrower and without limiting the obligation of Holdings or the Borrower to do so), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Revolving Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent Indemnitee in any way relating to or arising out of, the Revolving Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent Indemnitee's gross negligence or willful misconduct (it being understood that pending the outcome of any such decision, the Lenders remain obligated to pay amounts on a current basis).  The agreements in

126

this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

9.3      Posting of Communications.

(a)      The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make any Communications available to the Lenders, the Swingline Lender and the Issuing Lenders by posting the Communications on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic platform chosen by the Administrative Agent to be its electronic transmission system (the "Approved Electronic Platform").

(b)      Although the Approved Electronic Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Closing Date, a user ID/password authorization system) and the Approved Electronic Platform is secured through a per-deal authorization method whereby each user may access the Approved Electronic Platform only on a deal-by-deal basis, each of the Lenders, the Swingline Lender, each of the Issuing Lenders and the Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Administrative Agent is not responsible for approving or vetting the representatives or contacts of any Lender that are added to the Approved Electronic Platform, and that there may be confidentiality and other risks associated with such distribution. Each of the Lenders, the Swingline Lender, each of the Issuing Lenders and the Borrower hereby approves distribution of the Communications through the Approved Electronic Platform and understands and assumes the risks of such distribution.

(c)      THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE". THE APPLICABLE PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE APPROVED ELECTRONIC PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE APPLICABLE PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE APPROVED ELECTRONIC PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT, ANY ARRANGER OR ANY OF THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "*APPLICABLE PARTIES*") HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER, THE SWINGLINE LENDER, ANY ISSUING LENDER OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET OR THE APPROVED ELECTRONIC PLATFORM.

(d)      Each Lender agrees that notice to it (as provided in the next sentence) specifying that Communications have been posted to the Approved Electronic Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees (i) to notify the Administrative Agent in writing (which could be in the form of electronic communication) from time to time of such Lender's, Swingline Lender's or Issuing Lender's (as applicable) email address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such email address.

127

(e)     Each of the Lenders and the Borrower agrees that the Administrative Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Communications on the Approved Electronic Platform in accordance with the Administrative Agent's generally applicable document retention procedures and policies, but subject to the requirements of Section 10.15.

(f)     Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

9.4     <u>The Administrative Agent Individually</u>. With respect to its Revolving Commitment and Loans, Letter of Credit Commitments and Letters of Credit, the Person serving as the Administrative Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender, Swingline Lender or Issuing Lender, as the case may be. The terms "Lenders", "Required Lenders" and any similar terms shall, unless the context clearly otherwise indicates, include the Administrative Agent in its individual capacity as a Lender or as one of the Required Lenders, as applicable. The Person serving as the Administrative Agent and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of banking, trust or other business with, the Borrower, any Subsidiary or any Affiliate of any of the foregoing as if such Person was not acting as the Administrative Agent and without any duty to account therefor to the Lenders, the Swingline Lender or the Issuing Lenders.

9.5     <u>Successor Administrative Agent</u>.

(a)     The Administrative Agent may resign at any time by giving 30 days' prior written notice thereof to the Lenders and the Borrower, whether or not a successor Administrative Agent has been appointed. Upon any such resignation, the Required Lenders shall have the right to appoint a successor Administrative Agent. If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving of notice of resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a bank with an office in New York, New York or an Affiliate in New York, New York of any such bank. In either case, such appointment shall be subject to the prior written approval of the Borrower (which approval may not be unreasonably withheld and shall not be required while an Event of Default has occurred and is continuing). Upon the acceptance of any appointment as Administrative Agent by a successor Administrative Agent, such successor Administrative Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Administrative Agent. Upon the acceptance of appointment as Administrative Agent by a successor Administrative Agent, the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents. Prior to any retiring Administrative Agent's resignation hereunder as Administrative Agent, the retiring Administrative Agent shall take such action as may be reasonably necessary to assign to the successor Administrative Agent its rights as Administrative Agent under the Loan Documents.

(b)     Notwithstanding paragraph (a) of this Section, in the event no successor Administrative Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders and the Borrower, whereupon, on the date of effectiveness of such resignation stated in such notice, (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents; provided that, solely for purposes of maintaining any security interest granted to the Administrative Agent under any Security Document for the benefit of the Secured Parties, the retiring Administrative Agent shall

continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties, and continue to be entitled to the rights set forth in such Security Document and Loan Document, and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this Section (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Security Document, including any action required to maintain the perfection of any such security interest), and (ii) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent; provided that (A) all payments required to be made hereunder or under any other Loan Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person and (B) all notices and other communications required or contemplated to be given or made to the Administrative Agent shall directly be given or made to each Lender. Following the effectiveness of the Administrative Agent's resignation from its capacity as such, the provisions of this Article and Section 10.3, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent and in respect of the matters referred to in the proviso under clause (i) above.

(c)     Any successor Administrative Agent appointed pursuant to this Section 9.5 shall deliver to Borrower, on or before the date on which it becomes the Administrative Agent hereunder, either (i) a duly executed copy of IRS Form W-9 (or any applicable successor form) certifying that the successor Administrative Agent is not subject to backup withholding, or (ii) (A) a duly completed and executed copy of IRS Form W-8ECI to establish that the successor Administrative Agent is not subject to withholding Taxes under the Code with respect to any amounts payable for the account of the successor Administrative Agent under any of the Loan Documents, and (B) a duly executed copy of IRS Form W-8IMY, certifying on Part I and Part VI of such IRS Form W-8IMY (or applicable successor form or Parts) that it is a U.S. branch that has agreed to be treated as a U.S. person for United States federal withholding Tax purposes with respect to payments received by it from the Borrower for the account of others under the Loan Documents.

9.6     <u>Acknowledgments</u>.

(a)     Each Lender represents that it is engaged in making, acquiring or holding commercial loans in the ordinary course of its business and that it has, independently and without reliance upon the Administrative Agent, any Arranger or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Loans hereunder. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any Arranger or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

(b)     Each Lender, by delivering its signature page to this Agreement on the Closing Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Closing Date.

(c)      (i)      Each Lender  hereby agrees that (x) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from the Administrative Agent or any of its Affiliates (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "Payment") were erroneously transmitted to such Lender (whether or not known to such Lender), and demands the return of such Payment (or a portion thereof), such Lender shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect, and (y) to the extent permitted by applicable law, such Lender shall not assert, and hereby waives, as to the Administrative Agent, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Payments received, including without limitation any defense based on "discharge for value" or any similar doctrine.  A notice of the Administrative Agent to any Lender under this Section 9.6(c) shall be conclusive, absent manifest error.

(ii)      Each Lender hereby further agrees that if it receives a Payment from the Administrative Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Payment (a "Payment Notice") or (y) that was not preceded or accompanied by a Payment Notice, it shall be on notice, in each such case, that an error has been made with respect to such Payment.  Each Lender agrees that, in each such case, or if it otherwise becomes aware a Payment (or portion thereof) may have been sent in error, such Lender shall promptly notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(iii)      The Borrower and each other Loan Party hereby agrees that in the event an erroneous Payment (or portion thereof) are not recovered from any Lender that has received such Payment (or portion thereof) for any reason, (x) the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party, except, in each case, to the extent such erroneous Payment is, and solely with respect to the amount of such erroneous Payment that, comprised of funds of the Borrower or any other Loan Party.

(iv)      Each party's obligations under this Section 9.6(c) shall survive the resignation or replacement of the Administrative Agent or any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Revolving Commitments or the repayment, satisfaction or discharge of all Obligations under any Loan Document.

9.7     <u>Collateral Matters</u>.

(a)     Except with respect to the exercise of setoff rights in accordance with Section 9.8 or with respect to a Secured Party's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent on behalf of the Secured Parties in accordance with the terms thereof.

(b)     The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion, to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.3. The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders or any other Secured Party for any failure to monitor or maintain any portion of the Collateral.

(c)     At least once each calendar year, the Administrative Agent will conduct or caused to be conducted an Annual Field Examination, pursuant to Section 6.6(c), and an Annual Inventory Appraisal, pursuant to Sections 6.6(b).

9.8     <u>Credit Bidding</u>.     The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid, (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 10.1 of this Agreement), (iv) the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured

131

Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

        9.9    <u>Certain ERISA Matters</u>.

        (a)    Each Lender represents and warrants, as of the date such Person became a Lender party hereto, to, and covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, and each Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

        (i)    such Lender is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Revolving Commitments,

        (ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement,

        (iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Revolving Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, and each Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that none of the Administrative Agent, or any Arranger or any of their respective Affiliates is a fiduciary with respect to the Collateral or the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto).

(c)    The Administrative Agent hereby informs the Lenders that it is not undertaking to provide investment advice or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Letters of Credit, the Revolving Commitments, this Agreement and any other Loan Documents (ii) may recognize a gain if it extended the Loans, the Letters of Credit or the Revolving Commitments for an amount less than the amount being paid for an interest in the Loans, or the Revolving Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing

## SECTION 10.  MISCELLANEOUS

10.1    <u>Amendments and Waivers</u>.  Subject to Section 2.16(b), neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1.  The Required Lenders and each Loan Party party to the relevant Loan Document may, or, with the written consent of the Required Lenders, the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; <u>provided</u>, however, that no such waiver and no such amendment, supplement or modification shall (i) forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fee payable hereunder (except (x) in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders of each adversely affected Facility) and (y) that any amendment or modification of defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the rate of interest or fees for purposes of this clause (i)) or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Commitment, in each case without the written consent of each Lender directly affected thereby; (ii) eliminate or reduce the voting rights of any Lender under this Section 10.1 without the written consent of

such Lender; (iii) reduce any percentage specified in the definition of "Required Lenders" or "Supermajority Lenders" without the written consent of each Lender of the applicable Facility or change any other provision of this Agreement or any other Loan Document specifying the number or percentage of Lenders (or Lenders of any Facility) required to waive, amend or otherwise modify any rights thereunder or make any determination or grant any consent thereunder without the written consent of each Lender (or each Lender of the applicable Facility, as applicable), (iv) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release or subordinate Administrative Agent's Liens on all or substantially all of the Collateral or release all or substantially all of the Guarantors from their obligations under the Orders, in each case without the written consent of all Lenders; (v) amend, modify or waive any provision of Section 2.17 without the written consent of each Lender in respect of each Facility adversely affected thereby; (vi) (A) increase the advance rates set forth in the definition of "Borrowing Base" or add new categories of eligible assets or (B) amend the definition of "Minimum Excess Availability Amount" or any use thereof, without the written consent of the Supermajority Lenders; (vii) modify eligibility criteria, as such eligibility criteria are in effect on the Closing Date (including adding new categories of eligible assets or eliminating any new category of the Reserves (including without limitation the Cumulative Reserve) in effect on the Closing Date and, for the avoidance of doubt, not established or contemplated on or before the Closing Date; provided, however, that, for the avoidance of doubt, notwithstanding anything in this Section 10.1 to the contrary, the Administrative Agent may, in its Permitted Discretion and without the consent of any other Lenders, eliminate any new category of Reserve that was added after the Closing Date) in any manner that has the effect of increasing the amounts available to be borrowed hereunder without the written consent of the Supermajority Lenders; (viii) amend, modify or waive any provision of Section 9 or any other provision of any Loan Document that affects the Administrative Agent without the written consent of the Administrative Agent; (ix) amend, modify or waive any provision of Section 2.5 or 2.6 without the written consent of the Swingline Lender; (x) amend, modify or waive any provision of Section 3 without the written consent of the Issuing Lender, (xi) amend, modify or waive any provision of Section 10.22(e) without the written consent of each Lender; provided that only Required Lenders shall be required to amend, modify or waive any provision of Section 10.22(e) if on or prior to the Bid Deadline (as defined as of the Closing Date), the valuation set forth in the First Post-Closing Appraisal has been implemented pursuant to the defined term "Net Orderly Liquidation Value" or (xii) subordinate any of the Obligations owed to the Lenders in right of payment or any of the Liens granted in favor of the Lenders hereunder without the consent of all Lenders.  Notwithstanding anything to the contrary in this Agreement, any amendment, modification or change to the Final DIP Order, Interim DIP Order or any other order entered by the Bankruptcy Court that would, if it were an amendment to this Agreement, require a higher threshold of voting pursuant to this Section 10.1(a)(i)-(xi), shall be subject to the higher voting threshold set forth in this Section 10.1(a)(i)-(xi). Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Administrative Agent and all future holders of the Loans.  In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding the foregoing, (i) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower to: (a) add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share in the benefits of this Agreement and the other Loan Documents with the Revolving Extensions of Credit and the accrued interest and fees in respect thereof, in each case, as permitted by this Agreement and (b) include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and (ii) no Lender's consent is required to effect any amendment or supplement to any intercreditor agreement or arrangement that is not prohibited by this Agreement that is for the purpose of adding the holders of any

134

Indebtedness as expressly contemplated by the terms of such intercreditor agreement or arrangement and such other amendments reasonably related thereto as the Administrative Agent may determine.

Furthermore, notwithstanding the foregoing, the Administrative Agent, with the consent of the Borrower, may amend, modify or supplement any Loan Document without the consent of any Lender or the Required Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Loan Document not materially adverse to any Lender.

10.2    <u>Notices</u>.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile or e-mail), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of facsimile or e-mail notice, when received, addressed as follows in the case of the Borrower and the Administrative Agent, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

Borrower:

Del Monte Foods Corporation II Inc.
205 North Wiget Lane
Walnut Creek, CA 94598
Attention: Alfred Artis, Treasurer
Phone: 415-848-5794
Email: alfred.artis@delmonte.com

Administrative Agent:

JPMorgan Chase Bank, N.A.
1900 North Akard Street, 4th Floor
Dallas, TX 75201
Attention: Will Eifert
Phone: 214-965-3172
E-mail:  will.d.eifert@jpmorgan.com

with a copy to:

JPMorgan Chase Bank, N.A.
383 Madison Avenue, 24th floor
New York, NY 10179
Attention: Juliana Orellana Reid
Phone: 214-622-0674
E-mail: juliana.orellanareid@jpmorgan.com

provided that any notice, request or demand to or upon the Administrative Agent or the Lenders shall not be effective until received.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

10.3    <u>No Waiver; Cumulative Remedies</u>.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege

135

hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.4    Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5    Expenses; Limitation of Liability; Indemnity; Etc.

(a)    The Borrower agrees (a) to pay or reimburse the Administrative Agent and the Arrangers for all of their respective reasonable and documented out-of-pocket costs and expenses incurred in connection with the syndication of the Revolving Commitments and the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable and documented fees, disbursements and other charges of one primary counsel to the Administrative Agent and the Arrangers and, if necessary, one local counsel in each applicable jurisdiction and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrower at least three (3) Business Days prior to the Closing Date (in the case of amounts to be paid on the Closing Date) and from time to time thereafter on a quarterly basis or such other periodic basis as the Administrative Agent shall deem appropriate, (b) to pay or reimburse each Lender, the Swingline Lender, the Issuing Lenders and the Administrative Agent for all its reasonable and documented costs and out-of-pocket expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents, including the reasonable and documented fees, disbursements and other charges of counsel to the Administrative Agent and the Lenders and including all reasonable and documented costs and expenses incurred during any workout, restructuring or negotiations in connection therewith (it being understood that expenses reimbursed by the Borrower under this Section 10.5 shall include costs and expenses incurred in connection with (1) appraisals, environmental reviews and insurance reviews, (2) field examinations and the preparation of Reports based on the fees charged by a third party retained by the Administrative Agent or the internally allocated fees for each Person employed by the Administrative Agent with respect to each field examination and (3) forwarding loan proceeds, collecting checks and other items of payment and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral, in each case (with respect to appraisals, field examinations and clause (3)) in accordance with the provisions of the Loan Documents), (c) to pay, indemnify, and hold each Lender, the Issuing Lenders, the Swingline Lender and the Administrative Agent harmless from, any and all recording and filing fees and any and all Liabilities with respect to the execution and delivery of, or consummation or administration (including any act or omission of the Administrative Agent in connection with such administration) of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify, and hold each Lender, the Issuing Lenders, the Swingline Lender, the Arrangers and each Agent, their respective affiliates, and their respective officers, directors, employees, agents, advisors and controlling persons, and with respect to Issuing Lenders, correspondents and branches (each, an "Indemnitee") harmless from and against any and all other Liabilities or expenses (including the reasonable and documented fees, disbursements and other charges of counsel) of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including any actual or prospective claim, litigation, investigation or proceeding regardless of

136

whether any Indemnitee is a party thereto and whether or not the same are brought by the Borrower, its equity holders, affiliates or creditors or any other Person, including any of the foregoing relating to the use of proceeds of the Loans or Letters of Credit (including any refusal by the Issuing Lender to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit) or the violation of, noncompliance with or liability under, any Environmental Law applicable to any Group Member or its operations or properties and the reasonable and documented fees, disbursements and other charges of legal counsel (limited to reasonable and documented fees, disbursements and other charges of one primary counsel for all Indemnitees (taken together as a single group or client) and, if necessary, one local counsel required in any relevant jurisdiction (which may include a single counsel acting in multiple jurisdictions) and applicable special regulatory counsel for all Indemnitees (and, in the case of an actual or perceived conflict of interest, of another firm of counsel (and, if applicable, another local counsel in any relevant jurisdiction and applicable special regulatory counsel) for all similarly affected Indemnitees) (in connection with claims, actions or proceedings by any Indemnitee against any Loan Party under any Loan Document (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from (x) the bad faith, gross negligence or willful misconduct of such Indemnitee (or any of its Affiliates, officers, directors, employees, agents, advisors or controlling persons), (y) a material breach by such Indemnitee of its obligations under the Loan Documents or (z) disputes or proceedings that are brought by an Indemnitee against any other Indemnitee (other than any claims against any Arranger or Agent in its capacity or in fulfilling its roles as an Arranger or Agent hereunder or any similar role with respect to any Facility) to the extent such disputes do not arise from any act or omission of any Loan Party or any of its Affiliates.  Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee.  No Indemnitee shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from (x) the gross negligence or willful misconduct of such Indemnitee (or any of its Affiliates, officers, directors, employees, agents, advisors or controlling persons) or (y) a material breach in bad faith by such Indemnitee of its obligations under the Loan Documents.

      (b)       Limitation of Liability.  To the extent permitted by applicable law (i) neither the Borrower nor any Loan Party shall assert, and the Borrower and each Loan Party hereby waives, any claim against the Administrative Agent, any Arranger, any Co-Syndication Agent, any Documentation Agent, any Issuing Lender, Swingline Lender and any Lender, and any Related Party of any of the foregoing Persons (each such Person being called a "Lender-Related Person") for any Liabilities arising from the use by others of information or other materials (including, without limitation, any personal data) obtained through telecommunications, electronic or other information transmission systems (including the Internet), and (ii) no party hereto shall assert, and each such party hereby waives, any Liabilities against any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof; provided that, nothing in this Section 10.5(b) shall relieve the Borrower or any Loan Party of any obligation it may have to indemnify an Indemnitee, as provided in Section 10.5(a), against any special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(c)      Payments.  All amounts due under this Section 10.5 shall be payable not later than 10 days after written demand therefor.  This Section 10.5 shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.  The agreements in this Section 10.5 shall survive the termination of this Agreement and the repayment of the Loans and all other amounts payable hereunder.

10.6      Successors and Assigns; Participations and Assignments.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any affiliate of the Issuing Lender that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.

(b)      (i)      Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees (each, an "Assignee"), all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Commitments and the Loans at the time owing to it) with the prior written consent of:

(A)      the Borrower (such consent not to be unreasonably withheld), provided that no consent of the Borrower shall be required for an assignment to a Lender, an affiliate of a Lender, an Approved Fund (as defined below) or, if an Event of Default has occurred and is continuing, any other Person; and provided, further, that the Borrower shall be deemed to have consented to any such assignment unless the Borrower shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice thereof;

(B)      the Administrative Agent (such consent not to be unreasonably withheld), provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of its Revolving Commitment or Loan to a Lender, an Affiliate of a Lender or an Approved Fund;

(C)      the Issuing Lender (such consent not to be unreasonably withheld);

(D)      the Swingline Lender (such consent not to be unreasonably withheld).

(ii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment to a Lender, an affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Revolving Commitments or Loans, the amount of the Revolving Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000) unless each of the Borrower and the Administrative Agent otherwise consent, provided that (1) no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing and (2) such amounts

138

shall be aggregated in respect of each Lender and its affiliates or Approved Funds, if any;

(B)      (1) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 and (2) the assigning Lender shall have paid in full any amounts owing by it to the Administrative Agent; and

(C)      the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its Affiliates and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.

For the purposes of this Section 10.6, "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an affiliate of a Lender or (c) an entity or an affiliate of an entity that administers or manages a Lender.

(iii)      Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.18, 2.19, 2.20 and 10.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)      The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Revolving Commitments of, and principal amount (and stated interest) of the Loans and L/C Obligations owing, to each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent, the Swingline Lender, the Issuing Lender and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.

(v)      Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), the processing

139

and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi)      Each assignee, by its execution and delivery of an Assignment and Assumption, shall be deemed to have represented to the assigning Lender and the Administrative Agent that such assignee is an Eligible Assignee. In no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any prospective assignee is an Eligible Assignee or have any liability with respect to any assignment made to a Disqualified Lender or any other Person that is not an Eligible Assignee.

(c)      Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more Eligible Assignees (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Revolving Commitments and the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent, the Swingline Lender, the Issuing Lender and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (i) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 10.1 and (ii) directly affects such Participant.  Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to effectuate the provisions of Section 2.22 with respect to any Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.18, 2.19 and 2.20 (subject to the requirements and limitations therein, including the requirements under Section 2.19(f) (it being understood that the documentation required under Section 2.19(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (i) agrees to be subject to the provisions of Sections 2.18 and 2.19 as if it were an assignee under paragraph (b) of this Section and (ii) shall not be entitled to receive any greater payment under Sections 2.18 or 2.19, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent that (x) the Borrower is notified of the participation sold to such Participant and the sale of the participation to the Participant is made with the Borrower's prior written consent or (y) such entitlement to receive a greater payment results from an adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the Closing Date that occurs after the Participant acquired the applicable participation.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.7(b) as though it were a Lender, provided such Participant shall be subject to Section 10.7(a) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Revolving Commitments, Loans, Letters of Credit or its other obligations under any Loan Document) except to the

140

extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.   For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)        Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central banking authority, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.  The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in this paragraph (d).

(e)        [Reserved].

(f)        The list of Disqualified Lenders (i) shall be made available to the Lenders by posting on IntraLinks/IntraAgency or another relevant Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent) and (ii) shall be provided to any Lender upon request by such Lender to the Administrative Agent.  A Lender may provide the list of Disqualified Lenders to any potential assignee or participant on a confidential basis in accordance with Section 10.15 hereof for the purpose of verifying whether such Person is a Disqualified Lender.

10.7        Adjustments; Set-off.  (a)  Except to the extent that this Agreement or a court order expressly provides for payments to be allocated to a particular Lender, if any Lender (a "Benefitted Lender") shall receive any payment of all or part of the Obligations owing to it (other than in connection with an assignment made pursuant to Section 10.6), or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 8.1(g), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefitted Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest; provided further, that to the extent prohibited by applicable law as described in the definition of "Excluded Swap Obligation," no amounts received from, or set-off with respect to, any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.

(b)        In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any Obligations becoming due and payable by the Borrower (whether at the stated maturity, by acceleration or otherwise), to apply to the payment of such Obligations, by setoff or otherwise, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender,

any affiliate thereof or any of their respective branches or agencies to or for the credit or the account of the Borrower; provided that if any Defaulting Lender shall exercise any such right of setoff (i) all amounts so set-off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of this Agreement and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the Issuing Lenders, the Swingline Lender and the Lenders and (ii) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the obligations owing to such Defaulting Lender as to which it exercised such right of set-off. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such application made by such Lender, provided that the failure to give such notice shall not affect the validity of such application.

10.8    Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by e-mail or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that nothing herein shall require the Administrative Agent to accept electronic signatures in any form or format without its prior written consent; provided further that if the Administrative Agent accepts electronic signatures of the Loan Parties with respect to this Agreement, the Loan Parties shall deliver to the Administrative Agent original signature pages within five Business Days of the Closing Date (or such later date as agreed by the Administrative Agent). Without limiting the generality of the foregoing, the Borrower hereby (i) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the Lenders and the Loan Parties, electronic images of this Agreement or any other Loan Documents (in each case, including with respect to any signature pages thereto) shall have the same legal effect, validity and enforceability as any paper original, and (ii) waives any argument, defense or right to contest the validity or enforceability of the Loan Documents based solely on the lack of paper original copies of any Loan Documents, including with respect to any signature pages thereto.

10.9    Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.10    Integration.  This Agreement and the other Loan Documents represent the entire agreement of the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

10.11    <u>GOVERNING LAW</u>.

(a)    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    Each of the Lenders and the Administrative Agent hereby irrevocably and unconditionally agrees that, notwithstanding the governing law provisions of any applicable Loan Document, any claims brought against the Administrative Agent by any Lender relating to this Agreement, any other Loan Document, the Collateral or the consummation or administration of the transactions contemplated hereby or thereby shall be construed in accordance with and governed by the law of the State of New York.

10.12    <u>Submission To Jurisdiction; Waivers</u>.  The Borrower and each Credit Party hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the courts of the United States for the Southern District of New York located in the Borough of Manhattan (or in the event such courts lack subject matter jurisdiction, to the courts of the State of New York located in the Borough of Manhattan), and appellate courts from any thereof; provided, that nothing contained herein or in any other Loan Document will prevent any Lender or the Administrative Agent from bringing any action to enforce any award or judgment or exercise any right under the Security Documents or against any Collateral or any other property of any Loan Party in any other forum in which jurisdiction can be established;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower or the applicable Credit Party at its address set forth in Section 10.2 or at such other address of which the applicable party shall have been notified pursuant thereto;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any indirect, special, exemplary, punitive or consequential damages.

10.13    <u>Acknowledgments</u>.  The Borrower hereby acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Loan Parties and the Credit Parties is intended to be or has been created in respect of any of the transactions contemplated by this Agreement or the other Loan Documents, irrespective of whether the Credit Parties have advised or are advising the Loan Parties on other matters, and the relationship between the Credit Parties, on the one hand, and the Loan Parties, on the other hand, in connection herewith and therewith is solely that of creditor and debtor, (b) the Credit Parties, on the one hand, and the Loan Parties, on the other hand, have an arm's length business relationship that

143

does not directly or indirectly give rise to, nor do the Loan Parties rely on, any fiduciary duty to the Loan Parties or their affiliates on the part of the Credit Parties, (c) the Loan Parties are capable of evaluating and understanding, and the Loan Parties understand and accept, the terms, risks and conditions of the transactions contemplated by this Agreement and the other Loan Documents, (d) the Loan Parties have been advised that the Credit Parties are engaged in a broad range of transactions that may involve interests that differ from the Loan Parties' interests and that the Credit Parties have no obligation to disclose such interests and transactions to the Loan Parties, (e) the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent the Loan Parties have deemed appropriate in the negotiation, execution and delivery of this Agreement and the other Loan Documents, (f) each Credit Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Loan Parties, any of their affiliates or any other Person, (g) none of the Credit Parties has any obligation to the Loan Parties or their affiliates with respect to the transactions contemplated by this Agreement or the other Loan Documents except those obligations expressly set forth herein or therein or in any other express writing executed and delivered by such Credit Party and the Loan Parties or any such affiliate and (h) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Credit Parties or among the Loan Parties and the Credit Parties.

10.14    Releases of Guarantees and Liens. At such time as the Loans and the other obligations (other than indemnification or reimbursement obligations under Section 2.18, 2.19(a), 2.19(d) or 2.20 for which the Borrower has not been notified and contingent indemnification obligations that are expressly stated to survive repayment of the Facility) under the Loan Documents shall have been paid in full, no Letters of Credit shall be outstanding (other than Letters of Credit cash collateralized or otherwise backstopped in a manner satisfactory to the applicable Issuing Lender and the Administrative Agent) and the Revolving Commitments have been terminated, all Collateral shall automatically be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Loan Party under the Security Documents shall automatically terminate, all without delivery of any instrument or performance of any act by any Person. In connection with any termination or release pursuant to this clause (b), the Administrative Agent shall promptly execute and deliver to the relevant Loan Party, and shall file and record, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such release, including UCC-3 amendments or termination statements in relation to any UCC-1 financing statements then of record, and shall promptly return to the relevant Loan Party any share certificates (and related powers and proxies), instruments, chattel paper, negotiable documents and other Collateral theretofore delivered to the Administrative Agent, each in the form in which the same was received, free and clear of all Liens created by and through the Administrative Agent.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 10.1) to take any action requested by the Borrower having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 10.1 or (ii) under the circumstances described in paragraphs (a) or (b) above.

10.15    Confidentiality. Each of the Administrative Agent and each Lender agrees to keep confidential all non-public information provided to it by any Loan Party, the Administrative Agent or any Lender pursuant to or in connection with this Agreement that is designated by the provider thereof as confidential; provided that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent, any other Lender or any affiliate thereof, (b) subject to an agreement to comply with the provisions of this Section, to any actual or prospective

144

Transferee or any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty), in each case made expressly for the benefit of the Loan Parties, (c) to its employees, directors, agents, attorneys, accountants and other professional advisors or those of any of its affiliates, that are advised of the confidential nature of such information and of this Section 10.15, (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed other than as a result of a breach of this Section 10.15 or any other applicable confidentiality or non-disclosure requirement, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, (i) in connection with the exercise of any remedy hereunder or under any other Loan Document to the extent relevant to the proceedings pursuant to which such remedy is being exercised, (j) to data service providers (including league table providers) that serve the lending industry to the extent such information is of the type customarily provided to such providers or (k) if agreed by the Borrower in its sole discretion, to any other Person.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their Related Parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their Related Parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including federal and state securities laws.

Holdings represents and warrants that it and its Subsidiaries either (i) have no registered or publicly traded securities outstanding, or (ii) files its financial statements with the SEC and/or makes its financial statements available to potential holders of its 144A securities, and, accordingly, Holdings hereby (i) authorizes the Administrative Agent to make the financial statements to be provided under Section 6.1(a) and (b), along with the Loan Documents, available to Public-Siders and (ii) agrees that at the time such financial statements are provided hereunder, they shall already have been made available to holders of its securities. Holdings will not request that any other material be posted to Public-Siders without expressly representing and warranting to the Administrative Agent in writing that such materials do not constitute material non-public information within the meaning of the federal securities laws or that Holdings and its Subsidiaries have no outstanding publicly traded securities, including 144A securities. For the avoidance of doubt, the Budget and monthly financial statements provided pursuant to Section 6.1(c) shall not be posted to Public-Siders.

Holdings hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, the "Borrower Materials") by posting the Borrower Materials on IntraLinks/IntraAgency or another similar electronic system (the "Platform") and (b) certain of the Lenders may be Public-Siders. If any Borrower Materials are designated by the Loan Parties as "PRIVATE", such Borrower Materials will not be made available to that portion of the Platform designated "Public Investor," which is intended to

contain only information that is either publicly available or not material information (though it may be sensitive and proprietary) with respect to Borrower, its Subsidiaries or their securities for purposes of federal and state securities laws. The Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PRIVATE" or "CONFIDENTIAL" as not containing any material non-public information with respect to Holdings, its Subsidiaries or their securities for purposes of federal and state securities laws.

10.16    **WAIVERS OF JURY TRIAL**.  THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

10.17    USA Patriot Act; Beneficial Ownership Regulation.

(a)    Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

(b)    Promptly following any request therefor, the Borrower shall provide information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with the Beneficial Ownership Regulation.

10.18    [Reserved].

10.19    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(c)    a reduction in full or in part or cancellation of any such liability;

(d)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(e)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

146

10.20    Acknowledgement Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for hedging agreements or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

10.21    Orders Control.  To the extent that any specific provision hereof is inconsistent with any of the Orders, the Interim DIP Order or Final DIP Order (as applicable) shall control.

10.22    Milestones.Interim DIP Order. By no later than five (5) days following the Petition Date, the Interim DIP Order in form and substance acceptable to the Administrative Agent shall have been entered by the Bankruptcy Court.

(b)    Final DIP Order. By no later than forty (40) days following the Petition Date (or if such fortieth (40th) calendar day is not a Business Day, the immediately succeeding Business Day), the Final DIP Order in form and substance acceptable to the Administrative Agent shall have been entered by the Bankruptcy Court.

(c)    Bidding Procedures Motion. By no later than ten (10) days following the Petition Date, the Chapter 11 Debtors shall have filed a motion with the Bankruptcy Court seeking to establish procedures for the sale of all or substantially all of the assets of the Debtors (the "Bidding Procedures") in form and substance reasonably satisfactory to the Administrative Agent;

(d)    Bidding Procedures Order. By no later than forty (40) days following the Petition Date (or if such fortieth (40th) calendar day is not a Business Day, the immediately succeeding Business Day), the Bankruptcy Court shall have entered the Bidding Procedures Order;

(e)    Binding Offers. By no later than the Bid Deadline, the Debtors or the Debtors' professionals shall have received one or more binding offers satisfying the bid procedures set forth

in the Bidding Procedures Order for the purchase of the Sale Assets, which binding offers (i) do not contain financing or diligence contingencies and (ii) provide for either (x) Payment in Full or (y) the assumption of the Facility subject to the prior written consent of each of the Lenders.

[Remainder of this page intentionally left blank.  Signature pages follow.]

# EXHIBIT B

*Draft 7.1.25*

---

# SUPER-PRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

### dated as of July [  ], 2025

### among

### DEL MONTE FOODS CORPORATION II INC.,
### as Borrower and a Debtor,

### DM INTERMEDIATE II CORPORATION,
### as Holdings and a Debtor,

### CERTAIN SUBSIDIARIES OF DEL MONTE FOODS CORPORATION II INC.,
### as Guarantors and Debtors,

### VARIOUS LENDERS,

### WILMINGTON SAVINGS FUND SOCIETY, FSB,
### as Administrative Agent and Collateral Agent,

### and

### OPY CREDIT CORP.,
### as Trading Agent

---

# TABLE OF CONTENTS

**Page**

SECTION 1.   DEFINITIONS AND INTERPRETATION ............................................................2

    1.1.   Definitions.................................................................................................... 2
    1.2.   Accounting Terms ...................................................................................... 43
    1.3.   Interpretation, Etc. .................................................................................... 43
    1.4.   Rates ........................................................................................................... 44
    1.5.   [Reserved] .................................................................................................. 44
    1.6.   References to Agreements, Laws, Etc. .................................................... 44
    1.7.   [Reserved] .................................................................................................. 44
    1.8.   Divisions .................................................................................................... 44

SECTION 2.   LOANS .............................................................................................................45

    2.1.   Term Loans ................................................................................................ 45
    2.2.   [Reserved] .................................................................................................. 46
    2.3.   [Reserved] .................................................................................................. 46
    2.4.   [Reserved] .................................................................................................. 46
    2.5.   Pro Rata Shares; Availability of Funds ................................................. 46
    2.6.   Use of Proceeds ......................................................................................... 47
    2.7.   Evidence of Debt; Register; Lenders' Books and Records; Notes ...... 47
    2.8.   Interest on Loans ...................................................................................... 48
    2.9.   Conversion/Continuation ....................................................................... 49
    2.10.   Default Interest ........................................................................................ 50
    2.11.   Fees ............................................................................................................ 50
    2.12.   Scheduled Payments ................................................................................ 50
    2.13.   Voluntary Prepayments ........................................................................... 51
    2.14.   Mandatory Prepayments ......................................................................... 52
    2.15.   Application of Prepayments/Reductions................................................ 52
    2.16.   General Provisions Regarding Payments ............................................... 54
    2.18.   Making or Maintaining SOFR Loans ..................................................... 56
    2.19.   Increased Costs; Capital Adequacy ....................................................... 58
    2.20.   Taxes; Withholding, Etc. ......................................................................... 60
    2.21.   Obligation to Mitigate ............................................................................. 64
    2.22.   Defaulting Lenders................................................................................... 64
    2.23.   Removal or Replacement of a Lender .................................................... 66
    2.24.   [Reserved] .................................................................................................. 66
    2.25.   [Reserved] .................................................................................................. 66
    2.26.   [Reserved] .................................................................................................. 66
    2.27.   Syndication ............................................................................................... 67
    2.28.   Benchmark Replacement Setting ............................................................ 67

SECTION 3.   CONDITIONS PRECEDENT.........................................................................69

    3.1.   Effectiveness of this Agreement and Credit Extensions on the Effective
        Date ............................................................................................................ 69
    3.2.   Conditions to Final Draw ........................................................................ 71

i

SECTION 4.    REPRESENTATIONS AND WARRANTIES.....................................................72

    4.1.    Organization; Requisite Power and Authority; Qualification.............................. 72
    4.2.    Subsidiaries ............................................................................................................. 73
    4.3.    Due Authorization ................................................................................................... 73
    4.4.    No Conflict ............................................................................................................... 73
    4.5.    Governmental and Third Party Consents ............................................................ 73
    4.6.    Binding Obligation ................................................................................................. 73
    4.7.    Historical Financial Statements ............................................................................ 73
    4.8.    [Reserved] ................................................................................................................ 74
    4.9.    No Material Adverse Effect .................................................................................... 74
    4.10.    Adverse Proceedings, Etc. .................................................................................... 74
    4.11.    Payment of Taxes .................................................................................................. 74
    4.12.    Properties ............................................................................................................... 74
    4.13.    Environmental Matters ......................................................................................... 75
    4.14.    Governmental Regulation .................................................................................... 75
    4.15.    Federal Reserve Regulations; Exchange Act .................................................... 75
    4.16.    [Reserved] ............................................................................................................. 75
    4.17.    Employee Benefit Plans ....................................................................................... 75
    4.18.    [Reserved] ............................................................................................................. 76
    4.19.    [Reserved] ............................................................................................................. 76
    4.20.    [Reserved] ............................................................................................................. 76
    4.21.    Disclosure .............................................................................................................. 76
    4.22.    Compliance with Statutes, etc. ........................................................................... 76
    4.23.    Use of Proceeds .................................................................................................... 77
    4.24.    Collateral Documents ........................................................................................... 77
    4.25.    [Reserved] ............................................................................................................. 77
    4.26.    Intellectual Property ............................................................................................. 77
    4.27.    Bankruptcy Matters .............................................................................................. 78

SECTION 5.    AFFIRMATIVE COVENANTS .....................................................................78

    5.1.    Financial Statements and Other Reports ............................................................ 78
    5.2.    Existence .................................................................................................................. 81
    5.3.    Payment of Taxes ................................................................................................... 81
    5.4.    Maintenance of Properties ..................................................................................... 81
    5.5.    Insurance ................................................................................................................. 81
    5.6.    Books and Records; Inspections ........................................................................... 82
    5.7.    [Reserved] ................................................................................................................ 82
    5.8.    Compliance with Laws ........................................................................................... 82
    5.9.    [Reserved] ................................................................................................................ 82
    5.10.    Additional Guarantors .......................................................................................... 82
    5.11.    [Reserved] ............................................................................................................. 83
    5.12.    Further Assurances ............................................................................................... 83
    5.13.    Maintenance of Ratings ....................................................................................... 83
    5.14.    [Reserved] ............................................................................................................. 83
    5.15.    [Reserved] ............................................................................................................. 83
    5.16.    Use of Proceeds .................................................................................................... 83

| | | |
|---|---|---|
| 5.17. | ERISA | 84 |
| 5.18. | Conduct of Business | 84 |
| 5.19. | Fiscal Year | 84 |
| 5.20. | Transactions with Shareholders and Affiliates | 84 |
| 5.21. | Lender Advisors; Professional Services Firm | 85 |
| 5.22. | Weekly Advisor Calls | 85 |
| 5.23. | Milestones | 85 |
| 5.24. | Approved DIP Budget | 86 |
| 5.25. | Cash Management | 87 |

SECTION 6.    NEGATIVE COVENANTS ....................................87

| | | |
|---|---|---|
| 6.1. | Indebtedness | 87 |
| 6.2. | Liens | 90 |
| 6.3. | [Reserved] | 93 |
| 6.4. | Restricted Junior Payments | 93 |
| 6.5. | Restrictions on Subsidiary Distributions | 95 |
| 6.6. | Investments | 96 |
| 6.7. | [Reserved] | 98 |
| 6.8. | Fundamental Changes; Disposition of Assets; Acquisitions | 98 |
| 6.9. | Minimum Liquidity | 100 |
| 6.10. | Sales and Lease-Backs | 100 |
| 6.11. | Material Property | 100 |
| 6.12. | [Reserved] | 101 |
| 6.13. | [Reserved] | 101 |
| 6.14. | [Reserved] | 101 |
| 6.15. | Director Appointments | 101 |

SECTION 7.    GUARANTY ....................................101

| | | |
|---|---|---|
| 7.1. | Guaranty of the Obligations | 101 |
| 7.2. | Contribution by Guarantors | 101 |
| 7.3. | Payment by Guarantors | 102 |
| 7.4. | Liability of Guarantors Absolute | 102 |
| 7.5. | Waivers by Guarantors | 104 |
| 7.6. | Guarantors' Rights of Subrogation, Contribution, Etc. | 105 |
| 7.7. | [Reserved] | 105 |
| 7.8. | Continuing Guaranty | 105 |
| 7.9. | Authority of Guarantors or Borrower | 105 |
| 7.10. | Financial Condition of Borrower | 105 |
| 7.11. | Bankruptcy, Etc. | 106 |
| 7.12. | Discharge of Guaranty Upon Sale of Guarantor | 106 |

SECTION 8.    EVENTS OF DEFAULT ....................................107

| | | |
|---|---|---|
| 8.1. | Events of Default | 107 |
| 8.2. | Application of Funds | 115 |

SECTION 9.    AGENTS ....................................115

| | | |
|---|---|---|
| 9.1. | Appointment of Agents | 115 |

9.2.     Powers and Duties.......................................................................................... 116

9.3.     General Immunity .......................................................................................... 116

9.4.     Agents Entitled to Act as Lender .................................................................. 118

9.5.     Lenders' Representations, Warranties and Acknowledgment ........................ 119

9.6.     Right to Indemnity ........................................................................................ 119

9.7.     Successor Administrative Agent and Successor Collateral Agent ................. 120

9.8.     Collateral Documents and Guaranty .............................................................. 121

9.9.     Withholding Taxes ......................................................................................... 124

9.10.    Administrative Agent May File Bankruptcy Disclosure and Proofs of
         Claim ............................................................................................................. 124

9.11.    Certain ERISA Matters .................................................................................. 125

9.12.    Acknowledgement Regarding any Supported QFCs ...................................... 126

9.13.    Erroneous Payment ....................................................................................... 127

SECTION 10. MISCELLANEOUS ..........................................................................................130

10.1.    Notices .......................................................................................................... 130

10.2.    Expenses ....................................................................................................... 132

10.3.    Indemnity ...................................................................................................... 132

10.4.    Set-Off .......................................................................................................... 135

10.5.    Amendments and Waivers ............................................................................. 135

10.6.    Successors and Assigns; Participations ......................................................... 138

10.7.    Independence of Covenants ........................................................................... 142

10.8.    Survival of Representations, Warranties and Agreements .............................. 142

10.9.    No Waiver; Remedies Cumulative ................................................................. 143

10.10.   Marshalling; Payments Set Aside .................................................................. 143

10.11.   Severability ................................................................................................... 143

10.12.   Obligations Several; Independent Nature of Lenders' Rights ......................... 143

10.13.   Headings ....................................................................................................... 143

10.14.   APPLICABLE LAW ...................................................................................... 143

10.15.   CONSENT TO JURISDICTION..................................................................... 144

10.16.   WAIVER OF JURY TRIAL............................................................................ 144

10.17.   Confidentiality .............................................................................................. 145

10.18.   Usury Savings Clause .................................................................................... 146

10.19.   Effectiveness; Counterparts ........................................................................... 147

10.20.   Integration ..................................................................................................... 147

10.21.   PATRIOT Act................................................................................................ 147

10.22.   Electronic Execution of Assignments and Certain Other Documents ............. 147

10.23.   No Fiduciary Duty ........................................................................................ 147

10.24.   DIP Orders; Conflicts ................................................................................... 148

10.25.   [Reserved] ..................................................................................................... 148

10.26.   Acknowledgement and Consent to Bail-In of Affected Financial
         Institutions..................................................................................................... 149

**SCHEDULES:**         1.01(A)    Commitments
                       1.01(B)    Backstop Allocation Schedule
                       2.27       Syndication
                       4.2        Subsidiaries
                       4.12       Real Estate Assets
                       5.15       Post-Closing Deliverables
                       5.20       Certain Affiliate Transactions
                       5.23       [Reserved]
                       6.1        Certain Indebtedness
                       6.2        Certain Liens
                       6.5        Certain Restrictions on Subsidiary Distributions
                       6.6        Certain Investments


**EXHIBITS:**          A-1        Funding Notice
                       A-2        Conversion/Continuation Notice
                       B          Term Loan Note
                       C          Compliance Certificate
                       D          Assignment Agreement
                       E          [Reserved]
                       F-1        Effective Date Certificate
                       F-2        [Reserved]
                       G          Counterpart Agreement
                       H          [Reserved]
                       I-1        [Reserved]
                       I-2        [reserved]
                       J          Intercompany Note
                       K          Joinder Agreement
                       L          [Reserved]
                       M-1        Form of U.S. Tax Compliance Certificate for Foreign Lenders that are not Partnerships
                       M-2        Form of U.S. Tax Compliance Certificate for Foreign Participants that are not Partnerships
                       M-3        Form of U.S. Tax Compliance Certificate for Foreign Participants that are Partnerships
                       M-4        Form of U.S. Tax Compliance Certificate for Foreign Lenders that are Partnerships
                       N          [Reserved]
                       O          Approved DIP Budget


**ANNEXES:**           1          Milestones

## SUPER-PRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

This **SUPER-PRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT**, dated as of July [  ], 2025, is entered into by and among **DEL MONTE FOODS CORPORATION II INC.,** a New Jersey corporation (the **"Borrower"**), **DM INTERMEDIATE II CORPORATION**, a New Jersey corporation (**"Holdings"**), **CERTAIN SUBSIDIARIES OF HOLDINGS**, as Guarantors, the Lenders party hereto from time to time, **WILMINGTON SAVINGS FUND SOCIETY, FSB ("WSFS")**, as Administrative Agent (together with its permitted successors in such capacity, **"Administrative Agent"**) and as Collateral Agent (together with its permitted successor in such capacity, **"Collateral Agent"**) and **OPY CREDIT CORP** ("OPY"), as Trading Agent.

### RECITALS:

**WHEREAS**, capitalized terms used in these recitals shall have the respective meanings set forth for such terms in <u>Section 1.1</u> hereof;

**WHEREAS**, on July [1], 2025 (the "**Petition Date**"), Holdings, the Borrower and certain Domestic Subsidiaries of the Borrower (collectively, the "**Debtors**" and, each individually, a "**Debtor**") voluntarily commenced chapter 11 cases (the "**Chapter 11 Cases**") under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") and the Debtors have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operations of their businesses as debtors-in-possession;

**WHEREAS**, prior to the Petition Date, the Lenders (together with the Prepetition Lenders (as defined below)) provided financing to the Borrower pursuant to that certain Super-Priority Credit and Guaranty Agreement, dated as of August 2 ,2024, among Holdings, the Borrower, Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent (the "**Prepetition Agent**"), and the lenders party thereto from time to time (the "**Prepetition Lenders**") (as amended by that certain Amendment No. 1 to Super-Priority Credit and Guaranty Agreement, dated as of April 8, 2025, that certain Amendment No. 2 to Super-Priority Credit and Guaranty Agreement, dated as of June 24, 2025, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition Credit Agreement**");

**WHEREAS**, on the Petition Date, the Prepetition Lenders were owed approximately $999,243,404 in outstanding principal balance of Term Loans (as defined in the Prepetition Credit Agreement) (the "**Prepetition Term Loans**") plus interest, fees, costs and expenses and all other Prepetition Obligations under the Prepetition Credit Agreement;

**WHEREAS**, the Borrower has requested and the Lenders have agreed to make available to the Borrower, a super-priority senior secured debtor-in-possession term loan credit facility (the "**DIP Facility**"), consisting of (i) term loans in an initial aggregate principal amount equal to $165,000,000 (the "**DIP Term Loans**") available in Dollars and (ii) a term loan facility in an aggregate principal amount not to exceed $247,500,000 (the "**Roll-Up Loans**", together with

1

the DIP Term Loans, the "**Term Loans**"), which Roll-Up Loans will result from the conversion from and exchange of certain of the Prepetition Term Loans;

**WHEREAS**, the proceeds of the Term Loans shall be used in accordance with the Approved DIP Budget (subject to Permitted Variances); and

**WHEREAS**, subject to the terms of this Agreement, the other Credit Documents and the DIP Orders, Holdings, the Borrower and the other Credit Parties have agreed to secure all of their Obligations under the Credit Documents by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a first priority priming security interest in and lien upon substantially all of their property (subject to the DIP Orders and Carve Out), whether now existing or acquired after the date hereof, subject to exceptions specified herein or in the other Credit Documents;

**NOW**, **THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1.    DEFINITIONS AND INTERPRETATION

**1.1.    Definitions**. The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**ABL DIP Agent**" has the meaning specified in the definition of ABL DIP Credit Agreement.

"**ABL DIP Credit Agreement**" means that certain Debtor-in-Possession ABL Credit Agreement, dated as of July [  ], 2025, among the Borrower, certain other parties thereto, JPMorgan Chase Bank, N.A., as administrative agent (the "**ABL DIP Agent**") and the lenders party thereto (the "**ABL DIP Lenders**") with respect to the ABL DIP Facility.

"**ABL DIP Credit Documents**" means the ABL DIP Credit Agreement and the other Loan Documents (as defined in the ABL DIP Credit Agreement).

"**ABL DIP Facility**" means that certain senior secured postpetition revolving credit facility comprised of a roll-up or refinancing of the outstanding loans under the Prepetition ABL Credit Agreement on a dollar-for-dollar basis into new revolving loans or commitments, as applicable pursuant to terms reasonably satisfactory to the Requisite Lenders.

"**ABL DIP Loans**" means the Revolving Loans (as defined in the ABL DIP Credit Agreement).

"**ABL Priority Collateral**" has the meaning specified in the Prepetition ABL Intercreditor Agreement.

"**Actual Disbursements**" shall mean the Actual Non-Operating Items / Restructuring Items and the Actual Operating Disbursements.

2

"**Actual Non-Operating Items / Restructuring Items**" means with respect to any period, the amount of non-operating items / restructuring items expended during such period for which the Credit Parties are liable for payment (including as reimbursement to any Secured Party or the Lender Advisors) that correspond to the heading "Non-Operating Items / Restructuring Items" in the Approved DIP Budget as then in effect.

"**Actual Operating Disbursements**" shall mean with respect to any period, the sum, for such period, of all such disbursements for all such line items which comprise "Operating Disbursements", (as set forth in the Approved DIP Budget) on a cumulative basis, as determined by reference to the Approved DIP Budget as then in effect.

"**Actual Receipts**" shall mean with respect to any period, as the context requires, (x) the amount of actual receipts during such period of the Credit Parties (excluding any borrowings under this Agreement or the ABL DIP Credit Agreement) under the heading "Receipts" in the Approved DIP Budget and/or (y) the sum, for such period, of all such receipts for all such line items which comprise "Receipts" (as set forth in the Approved DIP Budget), on a cumulative basis, in each case, as determined by reference to the Approved DIP Budget as then in effect. For the avoidance of doubt, any proceeds received from asset sales shall be excluded.

"**Adjusted Term SOFR**" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"**Administrative Agent**" as defined in the preamble hereto.

"**Administrative Agent Fee Letter**" means that certain Fee Letter dated as of the Effective Date between the Borrower and the Administrative Agent.

"**Adverse Proceeding**" means any action, suit, proceeding, hearing (in each case, whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of Holdings or any of its Subsidiaries, threatened in writing against or affecting Holdings or any of its Subsidiaries or any property of Holdings or any of its Subsidiaries, but excluding the Chapter 11 Cases.

"**Affected Financial Institution**" means (i) any EEA Financial Institution or (ii) any UK Financial Institution.

"**Affected Lender**" as defined in Section 2.18(b).

"**Affected Loans**" as defined in Section 2.18(b).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly

3

or indirectly, of the power to direct or cause the direction of the management and policies of that Person.

"**Agent**" means each of (i) Administrative Agent, (ii) Collateral Agent, (iii) any other Person appointed under the Credit Documents to serve in an agent or similar capacity and (iv) where applicable, the Trading Agent.

"**Agent Affiliates**" as defined in Section 10.1(b)(iii).

"**Aggregate Amounts Due**" as defined in Section 2.17.

"**Aggregate Payments**" as defined in Section 7.2.

"**Agreement**" means this Super-Priority Senior Secured Debtor-in-Possession Credit and Guaranty Agreement, dated as of July [   ], 2025, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Allowed Professional Fees**" has the meaning assigned to such term in the Interim Order.

"**Anti-Corruption Laws**" as defined in Section 4.22(b).

"**Applicable Holdings**" means DMFHL; provided that if DMFHL or any of its Subsidiaries (other than Subsidiaries of Holdings) commences new operations after the Effective Date, or expands its existing operations after the Effective Date or acquires any Person or business after the Effective Date, Applicable Holdings shall mean Holdings.

"**Applicable Margin**" means (i) with respect to the DIP Term Loans, a per annum rate equal to 9.50% for SOFR Loans, of which 8.50% will be paid in kind and the remainder shall be paid in cash and 8.50% for Base Rate Loans, of which 7.50% will be paid in kind and the remainder shall be paid in cash and (ii) with respect to the Roll-Up Loans, a per annum rate equal to 9.50% for SOFR Loans, which will be paid in kind and 8.50% for Base Rate Loans, which will be paid in kind.

"**Approved Commercial Bank**" means a commercial bank with a consolidated combined capital and surplus of at least $5,000,000,000.

"**Approved DIP Budget**" means the then most current budget prepared by the Borrower and approved by the Requisite Lenders (which may be communicated via a Direction of the Requisite Lenders) in accordance with Section 5.24.  As of the Effective Date, the Approved DIP Budget is attached hereto as Exhibit O.

"**Approved Budget Variance Report**" shall mean, with respect to a Testing Period, a report provided by the Borrower to the Administrative Agent and the Lender Advisors, for prompt further delivery to the Lenders, (a)(i) showing, on a line item by line item and cumulative basis, the Actual Disbursements and the Actual Receipts for such Testing Period, (ii) showing, on a line item by line item and cumulative basis, a comparison (whether positive or negative, in dollars and expressed as a percentage) of the Actual Disbursements and the Actual for

such Testing Period to the Budgeted Disbursements and the Budgeted Receipts, (iii) an indication as to whether each variance is temporary or permanent and analysis and explanations in detail for all variances, (iv) only in the event that a Subsequent DIP Budget has been requested during the last week of a Budget Period, a weekly roll forward of the Credit Parties' cash forecast; and (v) a cash balance for the Credit Parties; and (b) which such reports shall be in a form, and shall contain supporting information, satisfactory to the Requisite Lenders in their sole discretion (it being acknowledged and agreed that the form of the variance report provided by the Borrower to the Lenders prior to the Effective Date shall be deemed satisfactory).

"**Approved Electronic Communications**" means any notice, demand, communication, information, document or other material that any Credit Party provides to Administrative Agent pursuant to any Credit Document or the transactions contemplated therein that is distributed to Agents or Lenders by means of electronic communications pursuant to Section 10.1(b).

"**Asset Sale**" means a voluntary sale, lease or sub-lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, exclusive license (as licensor or sublicensor), transfer or other disposition to, or any exchange of property with, any Person (other than the Borrower or any Guarantor), in one transaction or a series of transactions, of all or any part of Holdings' or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, including the Equity Interests of any of Holdings' Subsidiaries, other than:

(i) inventory (or other assets) sold, leased or licensed out in the Ordinary Course of Business, including the abandonment of intellectual property rights in the Ordinary Course of Business which in the reasonable view of the Borrower are not individually or in the aggregate material to the business of Holdings and its Subsidiaries, taken as a whole (excluding any such sales, leases or licenses out by operations or divisions discontinued or to be discontinued);

(ii) sales, leases or licenses out of other assets to the extent not materially interfering with the business of Holdings and its Subsidiaries (other than as would have a material adverse effect on the value of the Collateral or the ability of the Collateral Agent or the Lenders to realize the benefits of, and intended to be afforded by, the Collateral);

(iii) [reserved];

(iv) the sale of all or any of the facilities of the Borrower located in Toppenish, Washington and/or Markesan, Wisconsin, in each case, solely to the extent that such proceeds are being used in accordance with the Approved DIP Budget; and

(v) trade-ins and exchanges of assets with third parties conducted in the Ordinary Course of Business to the extent substantially comparable (or better) assets useful in the operation of the business of any Credit Party is obtained in exchange therefor.

"**Assignment Agreement**" means, as applicable, an Assignment and Assumption Agreement substantially in the form of Exhibit D, with such amendments or modifications as may be approved by Administrative Agent.

5

**"Assignment Effective Date"** as defined in <u>Section 10.6(b)</u>.

**"Attorney Costs"** means and includes all reasonable and documented or invoiced out-of-pocket fees, expenses and disbursements of any specified law firm or other specified external legal counsel.

**"Authorized Officer"** means, as applied to any Person, any individual holding the position of director, chairman of the board (if an officer), chief executive officer, president, vice president (or the equivalent thereof), chief financial officer (or the equivalent thereof or treasurer of such Person); <u>provided</u> that the secretary or assistant secretary or any other Authorized Officer of such Person shall have delivered an incumbency certificate to Administrative Agent as to the authority of such Authorized Officer.

**"Available Tenor"** means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to <u>Section 2.28(d)</u>.

**"Backstop Parties"** means the entities set forth on <u>Schedule 1.01B</u> hereto, on file with the Administrative Agent (the "**Backstop Allocation Schedule**"), together with their respective successors and permitted assignees.

**"Bail-In Action"** means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

**"Bail-In Legislation"** means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule from time to time and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

**"Bankruptcy Code"** means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

**"Bankruptcy Court"** as defined in the preamble hereto.

**"Base Rate"** means, for any day, a rate *per annum* equal to the greatest of (i) the Prime Rate in effect on such day, (ii) the Federal Funds Effective Rate in effect on such day <u>plus</u> 0.50% and (iii) the sum of (a) the Adjusted Term SOFR (after giving effect to the Floor) that would

be payable on such day for a SOFR Loan with a one-month interest period <u>plus</u> (b) 1%. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

**"Base Rate Loan"** means a Loan bearing interest at a rate determined by reference to the Base Rate. All Base Rate Loans shall be denominated in Dollars.

**"Base Rate Term SOFR Determination Day"** has the meaning specified in the definition of "Term SOFR".

**"Benchmark"** means, initially, the Term SOFR Reference Rate; <u>provided</u> that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to <u>Section 2.28(a)</u>.

**"Benchmark Replacement"** means, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent (acting at the Direction of the Requisite Lenders) for the applicable Benchmark Replacement Date:

(a)    Daily Simple SOFR; and

(b)    the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent (acting at the Direction of the Requisite Lenders) and the Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (x) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (y) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for U.S. dollar-denominated syndicated credit facilities at such time and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to <u>clause (a)</u> or <u>(b)</u> above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Credit Documents.

**"Benchmark Replacement Adjustment"** means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected by the Administrative Agent (acting at the Direction of the Requisite Lenders) and the Borrower for the applicable Corresponding Tenor giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities.

**"Benchmark Replacement Date"** means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)      in the case of <u>clause (a)</u> or <u>(b)</u> of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)      in the case of <u>clause (c)</u> of the definition of "Benchmark Transition Event", the date of the public statement or publication of information referenced therein.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

**"Benchmark Transition Event"** means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(c)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(d)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(e)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative or in compliance with or aligned with the

International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Unavailability Period**" means the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with <u>Section 2.28</u> and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with <u>Section 2.28</u>.

"**Beneficial Ownership Certification**" shall have the meaning provided in <u>Section 3.1(k)</u>.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Beneficiary**" means each Agent and Lender.

"**Benefit Plan**" as defined in <u>Section 9.11</u>.

"**BHC Act Affiliate**" as defined in <u>Section 9.12(b)</u>.

"**Board of Governors**" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Borrower**" as defined in the preamble hereto.

"**Borrowing**" means Loans of the same Class and Type of Loan, made, converted, or continued on the same date, and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"**Budget Period**" means each four-week period set forth in the Approved DIP Budget in effect at such time, with each new four-week period commencing at the end of the prior four-week period. The first Budget Period shall be the four-week period ending July 25, 2025.

"**Budgeted Disbursements**" shall mean the Budgeted Non-Operating Items / Restructuring Items and the Budgeted Operating Disbursements.

"**Budgeted Non-Operating Items / Restructuring Items**" shall mean with respect to any period, the amount of non-operating items / restructuring items for such period that are set forth under the heading "Non-Operating Items / Restructuring Items" in the Approved DIP Budget, as then in effect.

"**Budgeted Operating Disbursements**" means with respect to any period, as the context requires, the sum of all such line items under the heading "Operating Disbursements" (as set forth in the Approved DIP Budget), as determined by reference to the Approved DIP Budget as then in effect.

"**Budgeted Receipts**" means with respect to any period, as the context requires, (x) the line item under the heading "Receipts" in the Approved DIP Budget and/or (y) the sum, for such period, of all the amounts for all such line items which comprise "Receipts" (as set forth in the Approved DIP Budget), on a cumulative basis, in each case, as determined by reference to the Approved Budget as then in effect.

"**Budgeted Liquidity**" shall mean as of any date of determination, as the context requires, for the Credit Parties, the amount set forth as of such date as Liquidity, in each case as determined by reference to the Approved DIP Budget as then in effect.

"**Business Day**" means (i) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close and (ii) if such day relates to any interest rate settings as to a SOFR Loan denominated in Dollars, any fundings, settlements, payments and disbursements in Dollars in respect of any such SOFR Loan or any other dealings in Dollars to be carried out pursuant to this Agreement in respect of any such SOFR Loan, any such day described in <u>clause (i)</u> above that is also a London Banking Day or a U.S. Government Securities Business Day.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with IFRS, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Carve Out**" has the meaning assigned to such term in the DIP Orders.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Collateral**" has the meaning assigned to such term in the DIP Orders.

"**Cash Equivalents**" means, as at any date of determination, any of the following: (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (b) issued by any agency or instrumentality of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within two years after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's; (iii) commercial paper maturing no more than 365 days from the date of acquisition thereof and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within 365 days after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that

(a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $250,000,000; (v) repurchase obligations of any Lender or any commercial bank satisfying the requirements of clause (iv) of this definition having a term of not more than 30 days with respect to securities of the types described in clauses (i) and (iv); (vi) securities with maturities of three months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least P-2 by Moody's or at least A-2 by S&P; (vii) shares of any money market mutual fund that (a) has at least 90% of its assets invested continuously in the types of investments referred to in clauses (i) through (vi) above and (b) has the highest rating obtainable from either S&P or Moody's; and (viii) in the case of any Foreign Subsidiary, (a) such local currencies in those countries in which such Foreign Subsidiary transacts business from time to time in the Ordinary Course of Business and (b) investments of comparable tenor and credit quality to those described in the foregoing clauses (i) through (vii) customarily utilized in countries in which such Foreign Subsidiary operates for short term cash management purposes.

"**Cash Management Order**" has the meaning assigned to such term in the DIP Order.

"**CFC**" means a direct or indirect non-U.S. Subsidiary of Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code.

"**CFC Holding Company**" means a direct or indirect Subsidiary of Borrower substantially all of the assets of which consist of Equity Interests (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) and/or Indebtedness or receivables of one or more direct or indirect Foreign Subsidiaries that are CFCs and/or other CFC Holding Companies.

"**Change of Control**" means, (i) Holdings ceases, directly or indirectly, to own legally and beneficially 100% of the issued and outstanding equity interests (for avoidance of doubt, excluding unexercised options and warrants) of the Borrower, (ii) DMFI ceases, directly or indirectly, to own legally and beneficially 100% of the issued and outstanding common equity interests (for avoidance of doubt, excluding unexercised options and warrants) of the Borrower, (iii) DMFHL ceases, directly or indirectly, to own legally and beneficially 100% of the issued and outstanding common equity interests (for avoidance of doubt, excluding unexercised options and warrants) of the Borrower, (iv) Permitted Holders shall fail to own beneficially, directly or indirectly, in the aggregate Equity Interests representing at least a majority of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings, (v) any "person" or "group" (within the meaning of Rules 13d 3 and 13d 5 under the Exchange Act) (other than the Permitted Holders) shall acquire, directly or indirectly, at any time beneficial ownership representing (a) more than 35% of the ordinary voting power represented by the issued and outstanding Equity Interests of DMPL and (b) more than the percentage of the ordinary voting power represented by the issued and outstanding Equity Interests of DMPL beneficially owned, directly or indirectly, by the Permitted Holders, or (vi) any "Change of Control" (or words of like import) as defined in the ABL DIP Credit Agreement.

"**Chapter 11 Cases**" as defined in the preamble hereto.

"**Chapter 11 Plan**" means a joint plan filed by the Debtors in the Chapter 11 Cases, which shall be in form and substance acceptable to the Requisite Lenders.

"**Chapter 11 Plan Effective Date**" means the date on which all of the conditions precedent to consummation of the Chapter 11 Plan have been satisfied in full or waived, in accordance with the terms of the Chapter 11 Plan.

"**Chapter 11 Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Chapter 11 Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Class**" (i) when used in reference to any Lender, refers to whether such Lender has a Loan or Commitment of such Class and (ii) when used in reference to any Loans, refers to whether such Loans are DIP Term Loans or Roll-Up Loans. Any Loans or Commitments of one or more Lenders with the same rights and obligations (other than with respect to fees paid to Lenders as consideration for consenting to an amendment under this Agreement) as the Loans or Commitments of any other Lender shall be construed to be in the same Class as such Loans or Commitments with such same rights and obligations.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations, which, for the avoidance of doubt, shall exclude all Excluded Collateral.

"**Collateral Agent**" as defined in the preamble hereto.

"**Collateral Documents**" means the License Intercreditor Agreement (including the License Intercreditor Joinder Agreement), DIP Orders and all other instruments, documents and agreements delivered by or on behalf of any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to, or perfect in favor of, the Collateral Agent, for the benefit of Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Commitment**" means any Term Loan Commitment of a Lender.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit C.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Chapter 11 Plan pursuant to section 1129 of the Bankruptcy Code.

"**Conforming Changes**" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.18 and other technical, administrative or operational matters) that the Administrative Agent (with the consent of the Borrower) decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent (with the consent of the Borrower) decides is reasonably necessary in connection with the administration of this Agreement and the other Credit Documents).

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Contributing Guarantors**" as defined in Section 7.2.

"**Contribution Agreement**" means that certain Investment and Contribution Agreement dated as of August 2, 2024, by and among DMFI, DM Intermediate Corporation, Holdings and the Borrower.

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a Conversion/Continuation Notice substantially in the form of Exhibit A-2.

"**Copyrights**" means, with respect to any Person, all of such Person's right, title, and interest in and to the following: (a) all copyrights, rights and interests in copyrights, works protectable by copyright, copyright registrations, and copyright applications; (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements for any of the foregoing; and (d) the right to sue for past, present, and future infringements of any of the foregoing.

"**Corresponding Tenor**" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

**"Counterpart Agreement"** means a Counterpart Agreement substantially in the form of Exhibit G delivered by a Credit Party pursuant to Section 5.10.

**"Covered Party"** has the meaning specified in Section 9.12(b).

**"Credit Date"** means the date of a Credit Extension.

**"Credit Document"** means any of this Agreement, the Notes, if any, the Collateral Documents, the DIP Orders, the Administrative Agent Fee Letter, and all other documents, certificates, instruments or agreements agreed in writing by the Borrower and the Administrative Agent (acting at the Direction of the Requisite Lenders) or Collateral Agent (acting at the Direction of the Requisite Lenders) to be a Credit Document.

**"Credit Extension"** means the making of a Loan.

**"Credit Facilities"** means, collectively, each category of Commitments and each extension of credit hereunder.

**"Credit Party"** means each Person (other than any Agent or any Lender or any other representative thereof) from time to time party to a Credit Document as the Borrower or Guarantor.

**"Currency Agreement"** means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with Holdings' and its Subsidiaries' operations and not for speculative purposes.

**"Daily Simple SOFR"** means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

**"Debtor"** as defined in the preamble hereto.

**"Debtor Relief Laws"** means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions (including, without limitation, in the British Virgin Islands, the Insolvency Act, 2003) from time to time in effect.

**"Declined Proceeds"** as defined in Section 2.15(c).

**"Default"** means a condition or event that, after notice or lapse of time or both, in each case, pursuant to Section 8.1, would constitute an Event of Default.

14

"**Defaulting Lender**" means, subject to Section 2.22(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies Administrative Agent and the Borrower in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (which conditions precedent, together with the applicable default, if any, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower, Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lenders' obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with the applicable default, if any, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by Administrative Agent or the Borrower, to confirm in writing to Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by Administrative Agent and the Borrower), or (d) Administrative Agent has received notification that such Lender has, or has a direct or indirect parent company that is (i) insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, (ii) the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor or sequestrator or the like has been appointed for such Lender or its direct or indirect parent company, or such Lender or its direct or indirect parent company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment or (iii) the subject of a Bail-In Action; provided that, for the avoidance of doubt, a Lender shall not be a Defaulting Lender solely by virtue of (i) the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority or (ii) in the case of a solvent person, the precautionary appointment of an administrator, guardian, custodian or other similar official by a Governmental Authority under or based on the law of the country where such person is subject to home jurisdiction supervision if applicable law requires that such appointment not be publicly disclosed, in any such case, where such action does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"**Definitive Documents**" means, collectively, all documents, instruments, deeds, notifications, agreements, and filings related to the documentation, implementation, and consummation of the Chapter 11 Plan, including, without limitation:  (a) the Chapter 11 Plan; (b) the Confirmation Order; (c) the Disclosure Statement (and any motions or orders related thereto); (d) the order of the Bankruptcy Court approving the Disclosure Statement; (e) the Solicitation Materials; (f) the First Day Pleadings and all orders sought pursuant thereto; (g) the Chapter 11 Plan Supplement (including but not limited to any restructuring transactions memorandum and/or schedules to assume, reject or renegotiate executory contracts and unexpired leases); (h)(x) the Credit Documents (including the Approved DIP Budget and each motion filed with the Bankruptcy

Court seeking entry of the DIP Orders) and (y) the ABL DIP Credit Documents; (i) the DIP Orders; (j) the MIP Documents; (k) any documents and/or filings with the Bankruptcy Court providing for any key employee incentive and/or retention plan(s); (l) the New Organizational Documents (including any shareholders' or similar agreements and/or any corporate formational documents necessary or desirable to give effect to the Chapter 11 Plan); (m) the Exit Facilities Documents; (n) [reserved]; and (o) all other material pleadings and/or other material documents filed with the Bankruptcy Court; in each case, including any amendments, modifications, and supplements thereto and any related notes, certificates, agreements, documents, and instruments (as applicable). For the avoidance of doubt, all Definitive Documents shall (i) be reasonably satisfactory to the Requisite Lenders and (ii) not provide for any treatment or recovery on account of DIP Superpriority Claims or Prepetition Claims (each as defined in the Interim Order) that are not consented to by the Requisite Lenders in their sole discretion.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Derivative Counterparty**" as defined in <u>Section 10.17</u>.

"**DIP Facility**" as defined in the preamble hereto.

"**DIP Orders**" means the Interim Order and the Final Order.

"**DIP Term Lender**" means, at any time, any Lender that has a DIP Term Loan Commitment or a DIP Term Loan at such time.

"**DIP Term Loans**" as defined in the preamble hereto.

"**DIP Term Loan Claims**" means any Claim that arises under the Credit Documents.

"**DIP Term Loan Commitment**" means, as to each DIP Term Lender, its obligation to make a DIP Term Loan to the Borrower pursuant to <u>Section 2.1(a)</u> in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on <u>Schedule 1.01(A)</u> under the caption "DIP Term Loan Commitment" or in the Assignment and Assumption pursuant to which such DIP Term Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"**DIP Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the DIP Term Loans of such Lender; <u>provided</u>, that at any time prior to the making (or deemed making) of the DIP Term Loans, the DIP Term Loan Exposure of any Lender shall be equal to such Lender's DIP Term Loan Commitment.

"**Direction of the Requisite Lenders**" means a written direction or instruction from Lenders constituting the Requisite Lenders which may be in the form of an email or other form of written communication and which may come from any Lender Advisor. Any such email or other communication from a Lender Advisor shall be conclusively presumed to have been authorized by a written direction or instruction from the Requisite Lenders and such Lender

Advisor shall be conclusively presumed to have acted on behalf of and at the written direction or instruction from the Requisite Lenders (and the Administrative Agent and the Borrower shall be entitled to rely on such presumption). For the avoidance of doubt, with respect to each reference herein to (i) documents, agreements or other matters being "satisfactory," "acceptable," "reasonably satisfactory" or "reasonably acceptable" (or any expression of similar import) to the Requisite Lenders, such determination may be communicated by a Direction of the Requisite Lenders as contemplated above and/or (ii) any matter requiring the consent or approval of, or a determination by, the Requisite Lenders, such consent, approval or determination may be communicated by a Direction of the Requisite Lenders as contemplated above. The Administrative Agent and the Borrower shall be entitled to rely upon, and shall not incur any liability for relying upon, any purported Direction of the Requisite Lenders, and the Administrative Agent and the Borrower shall not have any responsibility to independently determine whether such direction has in fact been authorized by the Requisite Lenders.

"**Disclosure Statement**" means that certain disclosure statement disclosing the terms and conditions of the Chapter 11 Plan, as may be amended, supplemented, or otherwise modified from time-to-time in accordance with the terms of this Agreement and in accordance with, among other things, applicable securities Law, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law.

"**Disqualified Equity Interests**" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (i) matures or is mandatorily redeemable (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (ii) is redeemable at the option of the holder thereof (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), in whole or in part, (iii) provides for the scheduled payments or dividends in cash, or (iv) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case of clauses (i) through (iv) above, prior to the date that is 91 days after the Latest Maturity Date, except, in the case of clauses (i) and (ii), if as a result of a change of control or asset sale, so long as any rights of the holders thereof upon the occurrence of such a change of control or asset sale event are subject to the prior Payment in Full of all Obligations.

"**Disqualified Institution**" means such Persons (i) separately identified in writing by the Borrower to the Administrative Agent from time to time so long as such additions are consented to by the Administrative Agent (acting at the Direction of the Requisite Lenders), (ii) who are competitors of Holdings and its Subsidiaries that are separately identified in writing by the Borrower to the Administrative Agent from time to time, and (iii) in the case of each of clauses (i) and (ii), any of their Affiliates (other than any such Affiliate that is affiliated with a financial investor in such Person and that is not itself an operating company or otherwise an Affiliate of an operating company so long as such Affiliate is a bona fide Fund) that are either (a) identified in writing by the Borrower to the Administrative Agent from time to time or (b) clearly identifiable on the basis of such Affiliate's name. Notwithstanding the foregoing, (x) each Credit Party and the Lenders acknowledge and agree that the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Institution and the Administrative Agent shall have no liability with respect to any assignment or participation

made to a Disqualified Institution and (y) any such designation of a Disqualified Institution may not apply retroactively to disqualify any Person that has previously acquired an assignment or participation in any Credit Facility.

"**DMFI**" means Del Monte Foods, Inc., a Delaware corporation.

"**DMFHL**" means Del Monte Foods Holdings Limited, a company limited by shares incorporated under the laws of the British Virgin Islands with registered number 1798494.

"**DMPL**" means Del Monte Pacific Limited, a company limited by shares incorporated under the laws of the British Virgin Islands with registered number 326349.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary that is not a Foreign Subsidiary.

"**EAR**" means all incentive programs providing for equity appreciation rights or similar plans, in each case, in the Ordinary Course of Business.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Effective Date**" means July [  ], 2025.

"**Effective Date Certificate**" means an Effective Date Certificate substantially in the form of Exhibit F-1.

"**Effective Date Roll-Up Lenders**" as defined in Section 2.1(b).

"**Effective Date Roll-Up Term Loans**" as defined in Section 2.1(b).

"**Eligible Assignee**" means any Person other than a natural Person that is (i) a Lender, an Affiliate of any Lender under common control with such Lender or a Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purpose hereof) or (ii) a commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans in the ordinary course of business; provided, that no Defaulting Lender,

Disqualified Institution, natural person, Credit Party or Affiliate of a Credit Party shall be an Eligible Assignee.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by, Holdings or any of its Subsidiaries.

"**Environmental Claim**" means any written notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise) by any Governmental Authority or any other Person arising (i) pursuant to Environmental Law in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to natural resources or the environment.

"**Environmental Laws**" means any and all foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations or any other requirements of Governmental Authorities relating to (i) the protection of human health (from an exposure to Hazardous Materials) or the environment; (ii) any Hazardous Materials Activity; or (iii) the Release, generation, use, storage, transportation or disposal of, or exposure to, Hazardous Materials, in any manner applicable to Holdings or any of its Subsidiaries regarding any Facility.

"**Equity Interests**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock or authorized shares of a corporation or company, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means, as applied to Holdings and its Subsidiaries, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which Holdings or its Subsidiaries is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which Holdings and its Subsidiaries is a member; and (iii) solely for purposes of Section 302 of ERISA and Section 412 of the Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which Holdings and its Subsidiaries, is a member. Any former ERISA Affiliate of Holdings or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of Holdings or any such Subsidiary within the meaning of this definition with respect to the period that Holdings or its Subsidiaries could be liable for such ERISA Affiliates' liability under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the

failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to Holdings, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan or the appointment of a trustee to administer any Pension Plan, or the receipt of a written notice in which the Pension Benefit Guaranty Corporation states that either such an event is forthcoming; (vi) the imposition of liability on Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is a reasonable expectation of potential liability therefor, or the receipt by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is insolvent within the meaning of Section 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or of the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (ix) the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code.

"**Erroneous Payment**" has the meaning assigned to it in <u>Section 9.13(a)</u>.

"**Erroneous Payment Deficiency Assignment**" has the meaning assigned to it in <u>Section 9.13(d)</u>.

"**Erroneous Payment Impacted Class**" has the meaning assigned to it in <u>Section 9.13(d)</u>.

"**Erroneous Payment Return Deficiency**" has the meaning assigned to it in <u>Section 9.13(d)</u>.

"**Erroneous Payment Subrogation Rights**" has the meaning assigned to it in <u>Section 9.13(d)</u>.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" means each of the conditions or events set forth in <u>Section 8.1</u>.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Collateral**" means all licenses and any other property and assets (including any lease, license, permit or agreement) (i) to the extent that the Collateral Agent may not validly possess a security interest therein under, or such security interest is restricted by, (x) applicable laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or (y) by contract, lease, license or other agreement with a counterparty that is not a Debtor or an affiliate thereof and that exists on the Effective Date or (ii) the pledge or creation of a security interest in which would require the consent, approval, license or authorization of (x) a Governmental Authority or (y) a third party that is not a Debtor or an affiliate thereof, which third party right to consent, approve or authorize such a pledge or creation of a security interest exists on the Effective Date and, in each case of clause (i) and (ii), other than to the extent such prohibition or limitation is rendered ineffective under the UCC, the U.S. Bankruptcy Code, other applicable insolvency laws or other applicable law notwithstanding such prohibition or limitation; *provided*, however, that Excluded Collateral shall not include any proceeds, substitutions, replacements, economic interest and economic value unless such proceeds, substitutions, replacements economic interest and economic value constitute Excluded Collateral in accordance with clause (i) or (ii) above. For the avoidance of doubt, any property in the Wells Fargo Account (as defined in the DIP Orders) shall not constitute "Excluded Collateral."

"**Excluded Swap Obligation**" means, with respect to any Guarantor at any time, any obligation (a "**Swap Obligation**") to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act, if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is illegal at such time under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such guarantee or grant of a security interest becomes effective with respect to such related Swap Obligation.

"**Excluded Taxes**" means with respect to any the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Credit Party under any Credit Document, (a) Taxes based upon, or measured by, such Person's (or a branch of such Person's) net income (however denominated), franchise Taxes, and branch profits or other similar taxes, imposed by a taxing authority (i) in a jurisdiction in which such Person is organized, (ii) in a jurisdiction in which such Person's principal office is located, (iii) in a jurisdiction in which such Person's lending office (or branch) in respect of which payments under this Agreement are made is located, or (iv) in a jurisdiction where such Person is deemed to conduct business or otherwise have a taxable presence or has a present or former connection (other than connections arising from such Person having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document), (b) U.S. federal withholding Taxes imposed

21

on amounts payable to such Person (i) at the time that such Person becomes party to this Agreement, or (ii) such Person changes its lending office, except in each case to the extent that, pursuant to Section 2.20, amounts with respect to such Taxes were payable either to such Person's assignor immediately before such Person became a party hereto or to such Person immediately before it changed its lending office, (c) Taxes imposed on amounts payable to such Person that are attributable to such Person's failure to comply with Section 2.20(c) or Section 2.20(d) (in each case after being given timely notice and a reasonable opportunity to cure such failure) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"**Exit ABL Credit Agreement**" means the credit agreement for the Exit ABL Facility, if any.

"**Exit ABL Facility**" means that certain exit facility issued pursuant to the Exit ABL Credit Agreement, if any.

"**Exit Facilities**" means the Exit Term Loan Facility, the Exit ABL Facility, and/or any other financing facility effective on the Chapter 11 Plan Effective Date that is approved by the Company Parties (as defined in the RSA) and the Requisite Lenders.

"**Exit Facilities Documents**" means the Exit ABL Credit Agreement and the Exit Term Loan Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith or with any other Exit Facility contemplated by the Company Parties (as defined in the RSA) and the Requisite Lenders, including, without limitation, any guarantee agreements, pledge, and collateral agreements, intercreditor agreements, and other security documents.

"**Exit Term Loan Credit Agreement**" means the credit agreement for the Exit Term Loan Facility, if any.

"**Exit Term Loan Facility**" means that certain exit facility, if any, issued pursuant to the Exit Term Loan Credit Agreement.

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by Holdings or any of its Subsidiaries or any of their respective predecessors.

"**Fair Share**" as defined in Section 7.2.

"**Fair Share Contribution Amount**" as defined in Section 7.2.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code (effective as of the Effective Date) (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Internal Revenue Code.

"**Federal Funds Effective Rate**" means for any day, the rate *per annum* equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; <u>provided</u>, that (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate charged to Administrative Agent on such day on such transactions as determined by Administrative Agent (acting at the Direction of the Requisite Lenders); <u>provided</u> further, that if the Federal Funds Effective Rate would otherwise be negative, it shall be deemed to be 0.00% per annum.

"**First Day Pleadings**" means the first-day motions and related pleadings that the Debtors determine are necessary or desirable to file upon the commencement of the Chapter 11 Cases.

"**Final Draw**" as defined in <u>Section 2.1(a)</u>.

"**Final Draw Funding Date**" as defined in <u>Section 2.1(a)</u>.

"**Final Order**" means the order entered by the Bankruptcy Court approving, among other things, the terms of the ABL DIP Facility and the DIP Term Loan Facility, the Debtors' entry into the Credit Documents, and the use of Cash Collateral on a final basis.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the Fiscal Year of Holdings and its Subsidiaries ending on the last Sunday closest to April 30 of each calendar year.

"**Flood Hazard Property**" means any Real Estate Asset subject to a mortgage in favor of Collateral Agent, for the benefit of Secured Parties, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Flood Program**" means the National Flood Insurance Program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, the National Flood Insurance Reform Act of 1994 and the Flood Insurance Reform Act of 2004, in each case as amended from time to time, and any successor statutes.

"**Flood Zone**" means areas having special flood hazards as described in the National Flood Insurance Act of 1968, as amended from time to time, and any successor statute.

"**Floor**" means a rate of interest equal to 1.00% per annum.

"**Foreign Subsidiary**" means any Subsidiary (i) that is a CFC, (ii) that is disregarded as separate from its owner for U.S. federal income Tax purposes and owns 100% of the Equity Interests of a CFC and substantially all of the assets of which consist (directly or indirectly) of Equity Interests and/or Indebtedness of CFCs or (iii) that is a CFC Holding Company.

**"Fronting Lender"** means Jefferies Capital Services, LLC.

**"Fronting Lender Fee Letter"** means that certain Fee Letter, dated as of July [  ], 2025, between the Borrower and the Fronting Lender.

**"Fund"** means any Person (other than a natural Person) that is engaged or advises funds or other investment vehicles that are engaged in making, purchasing, holding, or investing in commercial loans and similar extensions of credit in the ordinary course.

**"Funding Guarantors"** as defined in Section 7.2.

**"Funding Notice"** means a notice substantially in the form of Exhibit A-1.

**"Governmental Authority"** means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

**"Governmental Authorization"** means any permit, license, authorization, directive, consent order or consent decree of or from any Governmental Authority.

**"Guaranteed Obligations"** as defined in Section 7.1.

**"Guarantor"** means (i) the Parent Guarantors, and (iii) each Domestic Subsidiary of the Borrower; provided that any Subsidiary of Holdings that is a "Guarantor" (as defined in the ABL Credit Agreement) shall also be a Guarantor hereunder; provided, further, that the each Debtor shall be a Guarantor hereunder.

**"Guaranty"** means (i) the guaranty of each Guarantor set forth in Section 7 and (ii) any other guaranty of the Obligations made by a Subsidiary in form and substance reasonably acceptable to the Administrative Agent (acting at the Direction of the Requisite Lenders).

**"Hazardous Materials"** means any chemical, contaminant, pollutant, waste, material or substance, of a type or quantity prohibited, limited or regulated as hazardous pursuant to any Environmental Law.

**"Hazardous Materials Activity"** means any activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, presence, Release, threatened Release, discharge, placement, generation, transportation, processing, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

**"Highest Lawful Rate"** means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable

24

laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

**"Historical Financial Statements"** means (a) the audited consolidated balance sheets as of DMFHL and the related audited consolidated statements of operations and comprehensive income and cash flows of Holdings and its Subsidiaries and (b) the unaudited consolidated balance sheets and the related unaudited consolidated statements of operations and comprehensive income and cash flows of Holdings and its Subsidiaries as of and for each fiscal quarter ended at least 45 days prior to the Effective Date (and the same period in the prior fiscal year).

**"Holdings"** as defined in the preamble hereto.

**"IFRS"** means, subject to the provisions of Section 1.2, the international financial reporting standards as issued by the International Accounting Standards Board as in effect from time to time.

**"Indebtedness"** means, as applied to any Person, without duplication,

(i)    all indebtedness for borrowed money and guarantees of such indebtedness;

(ii)    that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with IFRS;

(iii)    notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money;

(iv)    any obligation owed for all or any part of the deferred purchase price of property or services, including any earn-out obligations which are due and payable for at least 3 Business Days (excluding any such obligations (w) incurred under ERISA, (x) pursuant to any employee program, (y) payables in the Ordinary Course of Business (it being acknowledged that the certain trade payable owed by Holdings or any of its subsidiaries to DMPL (or its affiliates) is a payable in the Ordinary Course of Business) or (z) which are supported by a third party escrow arrangement or indemnifiable obligation in favor of such Person), which purchase price is (a) due more than six months from the date of incurrence of the obligation in respect thereof or (b) evidenced by a note or similar written instrument;

(v)    all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person;

(vi)    the outstanding balance of any letter of credit or any bank guarantee issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings;

(vii)    Disqualified Equity Interests;

25

(viii)    the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the Ordinary Course of Business), co-making, discounting with recourse or sale with recourse by such Person of Indebtedness of another;

(ix)    any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof constituting Indebtedness will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof;

(x)    any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclause (a) or (b) of this clause (x), the primary purpose or intent thereof is as described in clause (ix) above; and

(xi)    all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including under any Interest Rate Agreement or Currency Agreement, in each case, whether entered into for hedging or speculative purposes or otherwise.

"**Indemnified Liabilities**" as defined in Section 10.3(a).

"**Independent Director**" means a member of the Board of Directors of DMFHL who is not an officer or employee of DMFHL or any Affiliate thereof and who otherwise is "independent" in accordance with the rules of the New York Stock Exchange (or any successor thereto).

"**Initial Draw**" as defined in Section 2.1(a).

"**Installment Date**" as defined in Section 2.12.

"**Installments**" as defined in Section 2.12.

"**Insurance Premium Financers**" means Persons who are non-Affiliates of Holdings that advance insurance premiums for Holdings and its Subsidiaries pursuant to Insurance Premium Financing Arrangements.

"**Insurance Premium Financing Arrangements**" means, collectively, such agreements with Insurance Premium Financers pursuant to which such Insurance Premium Financers advance insurance premiums for Holdings and its Subsidiaries. Such Insurance Premium Financing Arrangements shall provide for the benefit of such Insurance Premium Financers a security interest in no property of Holdings or any of its Subsidiaries other than gross unearned premiums for the insurance policies, the proceeds of such policies and related rights.

"**Intellectual Property**" means the collective reference to all rights, priorities and privileges relating to intellectual property arising under United States laws, including, without limitation, the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the

26

Trademarks and the Trademark Licenses, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all Proceeds and damages therefrom.

"**Intellectual Property Asset**" means, at the time of determination, any interest (fee, license or otherwise) then owned by any Credit Party in any Intellectual Property.

"**Intercompany Note**" means a promissory note substantially in the form of Exhibit J evidencing Indebtedness owed among Credit Parties and their Subsidiaries.

"**Interest Payment Date**" means as to any Loan, including SOFR Loans and Base Rate Loans, the last day of each Interest Period and the Maturity Date of the Facility under which such Loan was made.

"**Interest Period**" means, in connection with a SOFR Loan, the period commencing on the date such Loan is advanced, disbursed or converted to or continued as a Term SOFR Loan and ending on the date one month thereafter ; provided, that (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c) of this definition, end on the last Business Day of a calendar month; and (c) no Interest Period with respect to any portion of any Class of Term Loans shall extend beyond such Class's Maturity Date.

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with Holdings' and its Subsidiaries' operations and not for speculative purposes.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"**Interim Order**" means the order entered by the Bankruptcy Court approving, among other things, the terms of the ABL DIP Facility and the DIP Facility, the Debtors' entry into the DIP Documents, and the use of Cash Collateral on an interim basis.

"**Internal Revenue Code**" or "**Code**" means the Internal Revenue Code of 1986, as amended to the Effective Date and from time to time hereafter.

"**Internal Revenue Service**" or "**IRS**" means the United States Internal Revenue Service.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by Holdings or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person (other than a Guarantor) or the acquisition of all or substantially all of the assets or a division, line of business or other business unit of a Person; (ii) any direct or indirect purchase or

other acquisition for value, by any Subsidiary of Holdings from any Person (other than any Guarantor or the Borrower), of any Equity Interests of such Person; (iii) any direct or indirect loan (including guarantees), advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the Ordinary Course of Business) or capital contributions by Holdings or any of its Subsidiaries to any other Person (other than a Guarantor), including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the Ordinary Course of Business and (iv) all investments consisting of any exchange traded or over the counter derivative transaction, including any Interest Rate Agreement and Currency Agreement, whether entered into for hedging or speculative purposes or otherwise. The amount of any Investment of the type described in clauses (i), (ii) and (iii) shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment less, to the extent cash is received by Credit Party, the amount of any redemptions, returns of capital or repayments.

"**ISDA CDS Definitions**" has the meaning assigned to it in Section 8.3(c)(iv).

"**Joinder Agreement**" means an agreement substantially in the form of Exhibit K.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form with bona fide third parties that are not Affiliates of the Credit Parties.

"**Latest Maturity Date**" means, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time as extended in accordance with this Agreement from time to time.

"**Lender**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement or a Joinder Agreement.

"**Lender Advisors**" means, collectively, Gibson, Dunn & Crutcher LLP and Houlihan Lokey Capital, Inc., as counsel and financial advisor and investment banker, respectively, to the Lenders (other than the Fronting Lender, which may retain its own counsel).

"**Licenses**" means, with respect to any Person, all of such Person's right, title, and interest in and to (a) any and all licensing agreements or similar arrangements in and to its Patents, Copyrights, or Trademarks, (b) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future breaches thereof, and (c) all rights to sue for past, present, and future breaches thereof.

"**License Intercreditor Agreement**" means that certain Amended and Restated Intercreditor Agreement, dated as of December 5, 1989, as supplemented by the Joinder Agreement dated as of August 2, 2024 (the "**License Intercreditor Joinder Agreement**") (and as further amended, restated, supplemented or otherwise modified from time to time), as executed by Wafer Limited, The First National Bank of Chicago, Nabisco Brands Canada Ltd. and

Compañia Venezolana de Conservas C.A., among others, and consented to by Del Monte Corporation.

**"License Intercreditor Joinder Agreement"** as defined in the definition of "License Intercreditor Agreement".

**"Lien"** means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance in the nature of a security interest of any kind (including any conditional sale or other title retention agreement, and any financing lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

**"Liquidity"** shall mean, as of any date, an amount equal to the sum of (A) Excess Availability (as such term is defined in the ABL Credit Agreement in effect as of the date hereof or, with the consent of the Requisite Lenders, as such defined term is amended) and (B) an amount equal to the aggregate amount of cash and Cash Equivalents of the Borrower and the Guarantors as of such date, but excluding any such cash and Cash Equivalents that (i) would be listed as "restricted" on a balance sheet of the Borrower or the applicable Guarantors as of such date or (ii) constitute Net Asset Sale Proceeds required to be applied to prepay the Term Loans.

**"Loan"** means a Term Loan.

**"London Banking Day"** means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank market.

**"Margin Stock"** as defined in Regulation U.

**"Material Adverse Effect"** means a material adverse effect on (a) the business, operations, properties, assets or financial condition of Holdings and its Subsidiaries taken as a whole; (b) the ability of the Credit Parties, taken as a whole, to fully and timely perform their material Obligations, taken as a whole; (c) the legality, validity, binding effect or enforceability against the Credit Parties of the Credit Documents, taken as a whole; or (d) the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under the Credit Documents, taken as a whole (other than the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Cases, the events that lead to the commencement of the Chapter 11 Cases, events that customarily and reasonably result from the commencement of the Chapter 11 Cases (in each case, other than matters affecting the Loan Parties that are not subject to the automatic stay) and the consummation of the transactions contemplated by the First Day Orders).

**"Material Property"** means assets, including, without limitation, intellectual property, owned by the Borrower and its Subsidiaries that are material to the business, operations, assets, financial condition or prospects of the Borrower and its Subsidiaries, taken as a whole.

**"Maturity Date"** means, the earliest of (a) [  ][1]; (b) acceleration of the Term Loans and termination of the Commitments; (c) the Bankruptcy Court orders a conversion of these

---

[1] NTD:  to be the date that is 9 months after the execution of the DIP CA.

Chapter 11 Cases to a Chapter 7 liquidation or a dismissal of any of these Chapter 11 Cases; (d) substantial consummation (as defined in 11 U.S.C. § 1101(2)) of a plan of reorganization of the Debtors which has been confirmed by the Confirmation Order (as defined in the RSA); (e) appointment of a Chapter 11 trustee or other Bankruptcy Court-mandated fiduciary with decision-making authority (including an examiner with expanded powers); (f) consummation of a sale of all or substantially all of the Debtors' assets; and (g) termination of the RSA in accordance with Section 12 of the RSA.

"**MIP Documents**" mean such agreements, instruments, and documents as may be reasonably desired or necessary to implement a management incentive plan, to be filed with the Chapter 11 Plan Supplement.

"**Moody's**" means Moody's Investors Service, Inc.

"**Multiemployer Plan**" means any Employee Benefit Plan, as well as an employee pension benefit plan (as defined in Section 3(3) of ERISA) subject to Title IV of ERISA and contributed to by Holdings, its Subsidiaries or its ERISA Affiliates, or with respect to which Holdings or its Subsidiaries have sponsored or contributed and could have liability, which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale permitted by Section 6.8(c), an amount equal to 60% of: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by Holdings or any of its Subsidiaries from such Asset Sale, minus (ii) any bona fide direct costs or reasonable and customary expenses incurred in connection with such Asset Sale, including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale, (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans or the ABL DIP Loans) that is secured by a Lien having priority to the Obligations on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale, (c) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Holdings or any of its Subsidiaries in connection with such Asset Sale; provided that upon release of any such reserve, the amount released shall be considered Net Asset Sale Proceeds and (d) the amount of any escrow or other reserves established by Holdings, the Borrower and the Subsidiaries to fund contingent liabilities reasonably estimated to be payable, that are directly attributable to such event, and including any appropriate amounts as a reserve required in accordance who IFRS against any adjustment in the sale price of such asset or liabilities associated with such Asset Sale and retained by Holdings or its Subsidiaries, as the case may be, after such Asset Sale, including pensions and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated who such Asset Sale, provided that any reduction at any time in the amount of any such reserves (other than as a result of payments made in respect thereof) that are permanently returned to Holdings, the Borrower, or the Subsidiaries shall be deemed to constitute the receipt by Holdings, the Borrower, or the Subsidiaries, as applicable, at such time of Net Asset Sale Proceeds in the amount of such reduction. For the avoidance of doubt, Net Asset Sale Proceeds shall not include cash receipts from proceeds of insurance or indemnity payments to the extent that such proceeds,

30

awards or payments are received by Holdings or any Subsidiary with respect to ABL Priority Collateral.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (i) any Cash payments or proceeds received by Holdings or any of its Subsidiaries (a) under any casualty insurance policy in respect of a covered loss thereunder or (b) as a result of the taking of any assets of Holdings or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (ii)(a) any actual and reasonable costs incurred by Holdings or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Holdings or such Subsidiary in respect thereof, and (b) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including income taxes payable as a result of any gain recognized in connection therewith.

"**Net Mark-to-Market Exposure**" of a Person means, as of any date of determination, the excess (if any) of all unrealized losses over all unrealized profits of such Person arising from Interest Rate Agreements and Currency Agreements or other Indebtedness of the type described in clause (xi) of the definition thereof. As used in this definition, "unrealized losses" means the fair market value of the cost to such Person of replacing such Interest Rate Agreements and Currency Agreement or such other Indebtedness as of the date of determination (assuming the Interest Rate Agreements and Currency Agreement or such other Indebtedness were to be terminated as of that date), and "unrealized profits" means the fair market value of the gain to such Person of replacing such Interest Rate Agreements and Currency Agreement or such other Indebtedness as of the date of determination (assuming such Interest Rate Agreements and Currency Agreement or such other Indebtedness were to be terminated as of that date).

"**New Organizational Documents**" means the documents providing for the corporate governance of the Reorganized Debtors, including any charters, bylaws, operating agreements, or other organizational documents or shareholder's agreements, as applicable, which shall be consistent with section 1123(a)(6) of the Bankruptcy Code, as applicable.

"**Non-Defaulting Lender**" means, at any time, each Lender that is not a Defaulting Lender at such time.

"**Non-Excluded Taxes**" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document.

"**Non-U.S. Lender**" as defined in Section 2.20(c).

"**Note**" means a promissory note in the form of Exhibit B, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Notice**" means a Funding Notice or a Conversion/ Continuation Notice.

"**Obligations**" means (a) all obligations of every nature of each Credit Party, including obligations from time to time owed to Agents (including former Agents), Lenders or any of them, under any Credit Document, whether for principal, interest (including interest which, but

31

for the filing of a petition in bankruptcy or the commencement of any insolvency, reorganization or like proceeding, with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy, insolvency, reorganization or like proceeding), fees, expenses, indemnification or otherwise, excluding, with respect to any Guarantor, Excluded Swap Obligations with respect to such Guarantor and (b) Erroneous Payment Subrogation Rights.

"**Obligee Guarantor**" as defined in <u>Section 7.7</u>.

"**Ordinary Course of Business**" means the ordinary course of business of DMFI and its Subsidiaries prior to the date hereof, consistent with the past practices of DMFI and its Subsidiaries prior to the date hereof; provided, however, for the avoidance of doubt, the foregoing shall not include the Transactions, or any portion thereof, which shall not be considered ordinary course of business or consistent with past practices.

"**Organizational Documents**" means (i) with respect to any corporation or company, its certificate, memorandum or articles of incorporation, organization or association, as amended, and its by-laws, as amended, (ii) with respect to any limited partnership, its certificate or declaration of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such Organizational Document shall only be to a document of a type customarily certified by such governmental official.

"**Other Taxes**" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes or any other excise or property Taxes, charges or similar levies (and interest, fines, penalties and additions related thereto) arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Credit Document.

"**Outstanding Amount**" means, with respect to the Term Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of the Term Loans, as the case may be, occurring on such date.

"**Paid in Full**" or "**Payment in Full**" or "**Pay in Full**" means the payment in full in cash or other consideration acceptable to the Administrative Agent (acting at the Direction of the Requisite Lenders) of all Obligations (or Guaranteed Obligations, as applicable) (other than indemnities and other contingent obligations not yet due and payable) and cancellation, termination or expiration of all Commitments.

"**Parent Guarantors**" means (a) Holdings, (b) Del Monte Foods Holdings Limited, (c) Del Monte Foods Holdings II, Inc., (d) Del Monte Foods Holdings, Inc. and (e) Del Monte Foods, Inc.

"**Participant Register**" as defined in <u>Section 10.6(g)(i)</u>.

32

"**Patents**" means, with respect to any Person, all of such Person's right, title, and interest in and to: (a) any and all patents and patent applications; (b) all inventions and improvements described and claimed therein; (c) all reissues, reexaminations, divisionals, continuations, renewals, extensions, and continuations-in-part thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future infringements thereof; and (e) all rights to sue for past, present, and future infringements thereof.

"**PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"**Payment Recipient**" has the meaning assigned to it in Section 9.13(a).

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any Employee Benefit Plan, as well as an employee pension benefit plan (as defined in Section 3(3) of ERISA) sponsored or contributed to by Holdings, its Subsidiaries or its ERISA Affiliate, or with respect to which Holdings or its Subsidiaries have sponsored or contributed and could have liability, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"**Periodic Term SOFR Determination Day**" has the meaning specified in the definition of "Term SOFR".

"**Permitted Holders**" means NutriAsia Pacific Limited, a company organized under the laws of the Philippines or its Affiliates.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Permitted Variances**" as defined in Section 5.24.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Petition Date**" as defined in the preamble hereto.

"**Platform**" as defined in Section 5.1(n).

"**Position Representation**" as defined in Section 8.3(d).

"**Prepetition ABL Administrative Agent**" means the "Administrative Agent" (or similar term) as defined in the Prepetition ABL Credit Agreement.

"**Prepetition ABL Collateral Agent**" means the "Collateral Agent" (or similar term) as defined in the Prepetition ABL Credit Agreement.

"**Prepetition ABL Credit Agreement**" means that certain ABL Credit Agreement, dated as of May 15, 2020, among DMFHL, DMFI, the lenders from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent, as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date.

"**Prepetition ABL Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of August 2, 2024, (as amended, restated, supplemented or otherwise modified from time to time), among the Borrower, the other Grantors (as defined therein) party thereto, the ABL Representative (as defined therein), the Term Loan Representative (as defined therein) and the additional representatives in respect of Additional Debt (as defined therein) from time to time party thereto.

"**Prepetition Agent**" as defined in the preamble hereto.

"**Prepetition Claims**" means any Claim that arises under the Prepetition Credit Agreement.

"**Prepetition Credit Agreement**" as defined in the preamble hereto.

"**Prepetition Lenders**" as defined in the preamble hereto.

"**Prepetition Term Loans**" as defined in the preamble hereto.

"**Prime Rate**" means the rate of interest quoted in the print edition of *The Wall Street Journal*, Money Rates Section as the Prime Rate, as in effect from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. The Administrative Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Principal Office**" means the Administrative Agent's "Principal Office" as set forth on Appendix B, or such other office or office of a third party or sub-agent, as appropriate, as such Person may from time to time designate in writing to the Borrower, Administrative Agent and each Lender.

"**Private Lenders**" means Lenders that wish to receive Private-Side Information.

"**Private-Side Information**" means any information with respect to Holdings and its Subsidiaries that is not Public-Side Information.

"**Pro Rata Share**" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments (and, if applicable and without duplication, Term Loans) of such Lender at such time and the denominator of which is the aggregate amount of all Commitments (and, if applicable and without duplication, all Term Loans).

**"Protected Persons"** as defined in Section 10.3(a).

**"PTE"** as defined in Section 9.11.

**"Public Company Costs"** means, as to any Person, costs associated with, or in anticipation of, or preparation for, compliance with the requirements of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith and costs relating to compliance with the provisions of the Securities Act and the Exchange Act or any other comparable body of laws, rules or regulations, as companies with listed equity, directors' compensation, fees and expense reimbursement, costs relating to enhanced accounting functions and investor relations, shareholder meetings and reports to shareholders, directors' and officers' insurance and other executive costs, legal and other professional fees, and listing fees, in each case to the extent arising solely by virtue of the listing of such Person's equity securities on a national securities exchange or issuance of public debt securities.

**"Public Lenders"** means Lenders that do not wish to receive Private-Side Information.

**"Public-Side Information"** means (i) at any time prior to Holdings or any of its Subsidiaries becoming the issuer of any Traded Securities, information that is either (x) of a type that would be made publicly available if Holdings or any of its Subsidiaries were issuing securities pursuant to a public offering or (y) not material (for purposes of United States federal, state or other applicable securities laws) to make an investment decision with respect to securities of Holdings or any of its Subsidiaries, and (ii) at any time on or after Holdings or any of its Subsidiaries becoming the issuer of any Traded Securities, information that is either (x) available to all holders of Traded Securities of Holdings and its Subsidiaries or (y) not material (for purposes of United States federal, state or other applicable securities laws) to make an investment decision with respect to securities of Holdings or any of its Subsidiaries.

**"QFC"** has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

**"QFC Credit Support"** has the meaning specified in Section 9.12(a).

**"Qualified ECP Guarantor"** means, in respect of any Swap Obligation, each Credit Party that has total assets exceeding $10,000,000 at the time such Swap Obligation is incurred.

**"Real Estate Asset"** means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property.

**"Reference Time"** with respect to any setting of the then-current Benchmark means (1) if such Benchmark is Term SOFR Reference Rate, 11:00 a.m. (London time) on the day that is two London Banking Days preceding the date of such setting, and (2) if such Benchmark is not Term SOFR Reference Rate, the time determined by the Administrative Agent (acting at the Direction of the Requisite Lenders) in its reasonable discretion.

**"Register"** as defined in Section 2.7(b).

"**Registered Equivalent Notes**" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act, substantially identical notes (having the same Guaranties) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the U.S. Securities and Exchange Commission.

"**Regulated Bank**" means an Approved Commercial Bank that is (i) a U.S. depository institution the deposits of which are insured by the Federal Deposit Insurance Corporation; (ii) a corporation organized under Section 25A of the U.S. Federal Reserve Act of 1913; (iii) a branch, agency or commercial lending company of a foreign bank operating pursuant to approval by and under the supervision of the Board of Governors under 12 CFR part 211; (iv) a non-U.S. branch of a foreign bank managed and controlled by a U.S. branch referred to in clause (iii); or (v) any other U.S. or non-U.S. depository institution or any branch, agency or similar office thereof supervised by a bank regulatory authority in any jurisdiction.

"**Regulation D**" means Regulation D of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation T**" means Regulation T of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" means Regulation U of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" means Regulation X of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Related Fund**" means, with respect to any Lender or Eligible Assignee that is an investment fund or other entity, any other investment fund or other entity that invests in commercial loans and that is managed or advised by the same investment advisor/manager as such Lender/Eligible Assignee or by an Affiliate of such investment advisor/manager under common control therewith.

"**Related Parties**" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, members, advisors, controlling persons and other representatives of such Person and their respective successors and assigns and any Person that possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Relevant Governmental Body**" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or

36

convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

**"Reorganized Debtors"** means the Debtors as reorganized under the Chapter 11 Plan, or any successor or assign thereto, by transfer, merger, consolidation, or otherwise.

**"Required Prepayment Date"** as defined in <u>Section 2.15(c)</u>.

**"Requisite Lenders"** means one or more Lenders having or holding Term Loan Exposure and representing more than 50% of the aggregate Voting Power Determinants of all Lenders.

**"Resolution Authority"** means anybody which has authority to exercise any Write-Down and Conversion Powers.

**"Restricted Junior Payment"** means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of Holdings or any of its Subsidiaries now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class; (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of Holdings or any of its Subsidiaries (or the direct parent thereof) now or hereafter outstanding; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of Holdings or any of its Subsidiaries (or the direct parent thereof) now or hereafter outstanding; and (iv) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to any Subordinated Indebtedness.

"**Restructuring Plan**" means any plan of reorganization, plan of liquidation, plan of arrangement, agreement for composition, or any other type of dispositive restructuring plan proposed in or in connection with any proceeding under any Debtor Relief Law.

**"Roll-Up Amount"** as defined in <u>Section 2.1(b)</u>.

**"Roll-Up Loan Exposure"** means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Roll-Up Loans of such Lender.

"**Roll-Up Loans**" as defined in the preamble hereto.

**"Rolled-Up Prepetition Loans"** as defined in <u>Section 2.1(b)</u>.

"**RSA**" means that certain Restructuring Support Agreement, dated as of July [1], 2025 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time) between the Company Parties and the Consenting Lenders (each as defined therein).

"**S&P**" means Standard & Poor's Financial Services LLC, a subsidiary of the S&P Global, Inc.

"**Sale and Leaseback Transaction**" as defined in <u>Section 6.10</u>.

"**Sanctions**" as defined in <u>Section 4.22(a)</u>.

"**Sanctions Laws**" as defined in <u>Section 4.22(a)</u>.

"**Secured Obligations**" means, collectively, the Obligations.

"**Secured Parties**" means, collectively, the Administrative Agent, the Lenders, and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to <u>Section 9.3(c)</u>.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Similar Businesses**" means any business conducted or proposed to be conducted by Holdings, the Borrower and the Subsidiaries on the Effective Date or any business that is similar, reasonably related, synergistic, incidental, or ancillary thereto.

"**SOFR**" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**SOFR Borrowing**" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"**SOFR Loan**" means a Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "Base Rate".

"**Solicitation Materials**" means, collectively, all documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on the Chapter 11 Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, including, but not limited to, the Disclosure Statement.

"**Specified Intellectual Property**" means the Intellectual Property subject, as of the Effective Date, to the License Intercreditor Agreement.

"**Subsequent DIP Budget**" as defined in <u>Section 5.24</u>.

**"Subordinated Indebtedness"** means Indebtedness of the Borrower or any Guarantor that is by its express terms subordinated in right of payment to the obligations of the Borrower or such Guarantor, as applicable, in accordance with the terms of the subordination agreement applicable thereto.

**"subsidiary"** means, with respect to any Person, any corporation, partnership, limited liability company, association, Joint Venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other subsidiaries of that Person or a combination thereof; provided, that in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

**"Subsidiary"** means, unless the context otherwise expressly requires, a subsidiary of Holdings.

**"Supported QFC"** has the meaning specified in Section 9.12(a).

**"Swap Obligation"** as defined in the definition of "Excluded Swap Obligation."

"**Syndication**" has the meaning assigned in Section 2.27.

"**Syndication Procedures**" has the meaning assigned in Section 2.27.

**"Tax"** means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding (including backup withholding) (together with interest, penalties and other additions thereto) of any nature and whatever called, by any Governmental Authority, on whomsoever and wherever imposed, levied, collected, withheld or assessed.

**"Tax Group"** has the meaning specified in Section 6.4(k).

**"Term Loan"** means a DIP Term Loan or a Roll-Up Loan, as applicable.

**"Term Loan Commitment"** means respect to any Lender, such Lender's DIP Term Loan Commitment.

**"Term Loan Exposure"** means, with respect to any Lender, such Lender's DIP Term Loan Exposure or Roll-Up Loan Exposure, as applicable.

**"Term SOFR"** means,

(a)     for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the **"Periodic Term SOFR Determination Day"**) that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR

Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)     for any calculation with respect to a Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the **"Base Rate Term SOFR Determination Day"**) that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate Term SOFR Determination Day.

**"Term SOFR Adjustment"** means, for any calculation with respect to a Base Rate Loan or a SOFR Loan, a percentage per annum as set forth below for the applicable Type of Loan and (if applicable) Interest Period therefor:

Base Rate Loans:

| 0.10% |
|-------|

SOFR Loans:

| Interest Period | Percentage |
|-----------------|------------|
| One month | 0.10% |

**"Term SOFR Administrator"** means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

**"Term SOFR Reference Rate"** means the forward-looking term rate based on SOFR.

**"Threshold Amount"** means $5,000,000.

**"Traded Securities"** means any debt or equity Securities issued pursuant to a public offering or Rule 144A offering or other similar private placement.

**"Trademarks"** means, with respect to any Person, all of such Person's right, title, and interest in and to the following: (a) all trademarks (including service marks), trade names, trade dress, trade styles, Internet domain names and all other sources of commercial indicia and the registrations and applications for registration thereof and the goodwill of the business symbolized by the foregoing; (b) all Licenses of the foregoing, whether as licensee or licensor; (c) all renewals of the foregoing; (d) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims, and payments for past and future infringements thereof; and (e) all rights to sue for past, present, and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing.

**"Trading Agent"** means OPY (and its affiliates) as that certain party available solely to facilitate trades of the Borrower's Loans, securities or other debt instruments currently outstanding or to be issued by the Borrower under the Credit Documents. The Trading Agent shall be entitled to the same rights, protections and benefits provided to the other Agents under Sections 9.3, 9.5, 9.6, 10.2, 10.3, 10.8, 10.14, 10.15, 10.16, 10.17, 10.19, 10.20 and 10.23 of this Agreement. For the avoidance of doubt, the Trading Agent shall not have any duties, responsibilities or obligations under this Agreement (other than pursuant to Section 10.17 (Confidentiality)).

**"Transaction Costs"** means the fees, costs and expenses payable by Holdings, Borrower or any other Subsidiaries of Holdings on or before the Effective Date in connection with the Transactions.

**"Transactions"** means the transactions contemplated by the RSA.

**"Transition Services Agreement"** means the Transition Services Agreement dated as of August 2, 2024 between DMFI and the Borrower.

**"Treasury Regulations**" means the United States Treasury regulations promulgated under the Internal Revenue Code from time to time.

"**Testing Period**" as defined in <u>Section 5.24</u>.

**"Type of Loan"** means a Base Rate Loan or a SOFR Loan.

**"U.S." or "United States"** means the United States of America.

**"U.S. Government Securities Business Day"** means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

**"U.S. Lender"** as defined in <u>Section 2.20(c)</u>.

41

"**U.S. Special Resolution Regime**" has the meaning specified in <u>Section 9.12(a)</u>.

"**U.S. Withholding Certificate**" as defined in <u>Section 2.20(c)</u>.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"**UK Financial Institution**" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**Unadjusted Benchmark Replacement**" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"**Voting Power Determinants**" means, collectively, DIP Term Loan Exposure and Roll-Up Loan Exposure.

"**Voting Stock**" means, with respect to any Person as of any date, the Equity Interests of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"**Waivable Mandatory Prepayment**" as defined in <u>Section 2.15(c)</u>.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"**WSFS**" as defined in the preamble hereto.

**1.2.    Accounting Terms**. Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with IFRS. Financial statements and other information required to be delivered by the Borrower to Lenders pursuant to <u>Sections 5.1(b)</u> and <u>5.1(c)</u> shall be prepared in accordance with IFRS as in effect on the Effective Date. If at any time any change in IFRS would affect the computation of any financial ratio or requirement set forth in any Credit Document, and the Borrower shall so request, Administrative Agent (acting at the Direction of the Requisite Lenders) and the Borrower shall negotiate in good faith, and consent, to amend such ratio or requirement to preserve the

42

original intent thereof in light of such change in IFRS, <u>provided</u> that, until so amended, such ratio or requirement shall continue to be computed in conformity with those accounting principles and policies used to prepare the Historical Financial Statements. Without limiting the foregoing, (a) leases shall continue to be classified and accounted for on a basis consistent with that reflected in the Historical Financial Statements for all purposes of this Agreement, notwithstanding any change in IFRS (or implementation of previously adopted IFRS) relating thereto, unless the parties hereto shall enter into a mutually acceptable amendment addressing such change in IFRS, as provided for above, and (b) when determining or calculating obligations or liabilities under this Agreement in respect of leases (including such obligations liabilities or leases as Indebtedness or Capital Leases), such leases, obligations or liabilities resulting from a change in IFRS subsequent to January 1, 2019 shall be excluded (and, for the avoidance of doubt, without giving effect to IFRS 16 Leases).

**1.3.     Interpretation, Etc.** Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided. The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. The terms lease and license shall include sub-lease and sub-license, as applicable. Unless otherwise specifically indicated, the term "consolidated" with respect to any Person refers to such Person consolidated with its Subsidiaries.

**1.4.     Rates.** The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes. The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The Administrative Agent may select information sources or services in its reasonable discretion (acting at the Direction of the Requisite Lenders) to ascertain Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and

whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

**1.5.**    **[Reserved]**.

**1.6.**    **References to Agreements, Laws, Etc.** Unless otherwise expressly provided herein, (a) references to Organizational Documents, agreements (including the Credit Documents), and other Contractual Obligations shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements, modifications, replacements, refinancings, renewals, or increases (in each case, whether pursuant to one or more agreements or with different lenders or agents), but only to the extent that such amendments, restatements, amendment, and restatements, extensions, supplements, modifications, replacements, refinancings, renewals, or increases are not prohibited by any Credit Document, (b) references to any requirements of law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing, or interpreting such requirement of law and (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

**1.7.**    **[Reserved]**.

**1.8.**    **Divisions**. For all purposes under the Credit Documents, in connection with any division or plan of division under the Delaware Limited Liability Company Act (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

**SECTION 2.**    **LOANS**

**2.1.**    **Term Loans**.

(a)    <u>DIP Term Loan Borrowings</u>. Subject to terms and conditions hereof and in DIP Orders, each DIP Term Lender severally agrees to make the DIP Term Loans to the Borrower hereunder in two Borrowings in an aggregate principal amount not to exceed its DIP Term Loan Commitment. The first Borrowing of DIP Term Loans (the "**Initial Draw**") will be in an amount equal to $100,000,000 and shall occur on the Effective Date. The second Borrowing of DIP Term Loans (the "**Final Draw**") will be in an amount equal to $65,000,000 and shall occur on or after the date of entry of the Final Order (such date on which the Final Draw occurs, the "**Final Draw Funding Date**"). Upon each DIP Term Lender's funding of a DIP Term Loan, such DIP Term Lender's DIP Term Loan Commitment with respect to such DIP Term Loan shall be permanently reduced by the amount of such DIP Term Loan (it being understood that the DIP Term Loan Commitment of such DIP Term Lender shall be (x) reduced to the amount of DIP Term Loans to be funded under the Final Draw following the Initial Draw and (y) zero following the Final Draw).

(b)    <u>Roll-Up Loans</u>. Subject to terms and conditions hereof and in the DIP Orders, concurrently and automatically with the making of the Initial Draw pursuant to <u>Section</u>

44

2.1(a) above, $[150,000,000] in aggregate principal amount of Prepetition Term Loans constituting First Out Term Loans (as defined in the Prepetition Credit Agreement) shall be deemed converted into and exchanged for Roll-Up Loans (the Prepetition Term Loans rolled-up pursuant to this Section 2.1(b), the "**Rolled-Up Prepetition Loans**"), and $[150,000,000] of Roll-Up Loans shall be deemed funded on the Effective Date (such Roll-Up Loans, the "**Effective Date Roll-Up Term Loans**"), without constituting a novation, and shall satisfy and discharge $[150,000,000] in aggregate principal amount of Rolled-Up Prepetition Loans.  On the Effective Date, the Effective Date Roll-Up Loans shall be deemed to be made by each Prepetition Lender (or an investment advisor, manager, or beneficial owner for the account of such Prepetition Lender, or an affiliated fund or trade counterparty designated by such Prepetition Lender) (such initial lender holding Effective Date Roll-Up Loans, the "**Effective Date Roll-Up Lenders**") in the amount set forth opposite such Effective Date Roll-Up Lender's name in Schedule 1.01A under the caption "Roll-Up Term Loan Commitment" (such amount, such Lender's "**Roll-Up Amount**").

(c)      Borrowing Mechanics for Term Loans. The Borrower shall deliver to Administrative Agent a fully executed Funding Notice no later than, with respect to the Term Loans, (x) the Effective Date with respect to Base Rate Loans and (y) one (1) U.S. Government Securities Business Day prior to the Effective Date with respect to SOFR Loans (or such shorter period as may reasonably be acceptable to Administrative Agent (acting at the Direction of the Requisite Lenders)). Promptly upon receipt by Administrative Agent of such Funding Notice, Administrative Agent shall notify each Lender of the proposed borrowing.

(d)      Amounts borrowed under this Section 2.1 and repaid or prepaid may not be re-borrowed.  Term Loans may be Base Rate Loans or Term SOFR Loans, as further provided herein.

(e)      On the Effective Date (after giving effect to the funding of the Term Loans to made on such date), the Commitments of each Lender as of the Effective Date will automatically and permanently be reduced by the amount of such Term Loans funded pursuant to the Initial Draw.  On the date on which the Final Draw occurs (after giving effect thereto), the then-outstanding Commitments of each Lender will automatically and permanently terminate.

**2.2.      [Reserved]**.

**2.3.      [Reserved]**.

**2.4.      [Reserved]**.

**2.5.      Pro Rata Shares; Availability of Funds**.

(a)      Pro Rata Shares. All Loans shall be made, and all participations purchased, by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

(b) <u>Availability of Funds</u>. Unless Administrative Agent shall have been notified by any Lender prior to the applicable Credit Date that such Lender does not intend to make available to Administrative Agent the amount of such Lender's Loan requested on such Credit Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Credit Date and Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to the Borrower a corresponding amount on such Credit Date. If such corresponding amount is not in fact made available to Administrative Agent by such Lender, Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the customary rate set by Administrative Agent for the correction of errors among banks for three Business Days and thereafter at the Base Rate. In the event that (i) Administrative Agent declines to make a requested amount available to the Borrower until such time as all applicable Lenders have made payment to Administrative Agent, (ii) a Lender fails to fund to Administrative Agent all or any portion of the Loans required to be funded by such Lender hereunder prior to the time specified in this Agreement and (iii) such Lender's failure results in Administrative Agent failing to make a corresponding amount available to the Borrower on the Credit Date, at Administrative Agent's option, such Lender shall not receive interest hereunder with respect to the requested amount of such Lender's Loans for the period commencing with the time specified in this Agreement for receipt of payment by the Borrower through and including the time of the Borrower's receipt of the requested amount. If such Lender does not pay such corresponding amount forthwith upon Administrative Agent's demand therefor, Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to Administrative Agent together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the rate payable hereunder for Base Rate Loans for such Class of Loans. Nothing in this <u>Section 2.5(b)</u> shall be deemed to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder.

**2.6.    Use of Proceeds**. The Credit Parties and their Subsidiaries will use the proceeds of the DIP Term Loans as set forth in Section 5.16.

**2.7.    Evidence of Debt; Register; Lenders' Books and Records; Notes**.

(a) <u>Lenders' Evidence of Debt</u>. Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of the Borrower to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on the Borrower, absent manifest error; <u>provided</u>, that the failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's Obligations in respect of any applicable Loans; and <u>provided further</u>, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b) <u>Register</u>. Administrative Agent (or its agent or sub-agent appointed by it) shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and the principal amounts of (and stated interest on) Loans of each Lender from time to time (the **"Register"**). The Register shall be available for inspection by the Borrower or any

Lender (with respect to (i) any entry relating to such Lender's Loans and (ii) the identity of the other Lenders (but not any information with respect to such other Lenders' Loans)) at any reasonable time and from time to time upon reasonable prior notice. Administrative Agent shall record, or shall cause to be recorded, in the Register the Loans in accordance with the provisions of <u>Section 10.6</u>, and each repayment or prepayment in respect of the principal amount of (and stated interest on) the Loans, and any such recordation shall be conclusive and binding on the Borrower and each Lender, absent manifest error; <u>provided</u>, that failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's Obligations in respect of any Loan. The Borrower hereby designates Administrative Agent, and Administrative Agent agrees, to serve as the Borrower's agent solely for purposes of maintaining the Register as provided in this <u>Section 2.7</u>. The requirement for the Register set forth in this <u>Section 2.7(b)</u> and the Participant Register set forth in <u>Section 10.6(g)(i)</u> shall be construed so that the Loans are at all times maintained in "registered form" within the meaning of Treasury Regulation Section 5f.103-1 and Proposed Treasury Regulation Section 1.163-5(b) and within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code.

(c)     <u>Notes</u>. If so requested by any Lender and reflected in the Register, by written notice to the Borrower (with a copy to Administrative Agent) at least two Business Days prior to the Effective Date, or at any time thereafter, the Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to <u>Section 10.6</u>) on the Effective Date (or, if such notice is delivered after the Effective Date, promptly after the Borrower's receipt of such notice) a Note or Notes to evidence such Lender's Term Loan.

### 2.8.     Interest on Loans.

(a)     Except as otherwise set forth herein, each Class of Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows:

(i)   if a Base Rate Loan, at the Base Rate <u>plus</u> the Applicable Margin; or

(ii)  if a SOFR Loan, at the Adjusted Term SOFR <u>plus</u> the Applicable Margin; and

(b)     The basis for determining the rate of interest with respect to any Loan, and the Interest Period with respect to any SOFR Loan, shall be selected by the Borrower and notified to Administrative Agent and Lenders pursuant to the applicable Funding Notice or Conversion/Continuation Notice, as the case may be.

(c)     In connection with SOFR Loans there shall be no more than ten (10) Interest Periods outstanding at any time. In the event the Borrower fails to specify between a Base Rate Loan or a SOFR Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan (if outstanding as a SOFR Loan) will be automatically converted into a Base Rate Loan on the last day of the then-current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan). In the event the Borrower fails to specify an Interest Period for any SOFR Loan in the applicable Funding Notice

or Conversion/Continuation Notice, the Borrower shall be deemed to have selected an Interest Period of one month. As soon as practicable after 10:00 a.m. (New York City time) on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the SOFR Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrower and each Lender.

(d)     Interest payable pursuant to Section 2.8(a) shall be computed (i) in the case of Base Rate Loans, on the basis of a 360-day year (or, in the case of Base Rate Loans determined by reference to the "Prime Rate," a 365-day or 366-day year, as applicable), as the case may be, and (ii) in the case of SOFR Loans, on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Term Loan, the last Interest Payment Date with respect to such Term Loan or, with respect to a Base Rate Loan being converted from a SOFR Loan, the date of conversion of such SOFR Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a SOFR Loan, the date of conversion of such Base Rate Loan to such SOFR Loan, as the case may be, shall be excluded; provided, that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(e)     Except as otherwise set forth herein, interest on each Loan (i) shall accrue on a daily basis and shall be payable in arrears on each Interest Payment Date with respect to interest accrued on and to each such payment date; (ii) shall accrue on a daily basis and shall be payable in arrears upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) shall accrue on a daily basis and shall be payable in arrears at maturity of the Loans; provided, however, with respect to any voluntary prepayment of a Base Rate Loan, accrued interest shall, at the option of the Borrower, instead be payable on the applicable Interest Payment Date (it being acknowledged that in the event such interest is payable on the applicable Interest Payment Date pursuant to this proviso, interest shall not accrue on such amount).

(f)     On each Interest Payment Date, accrued and unpaid interest on the Term Loans shall be paid in cash or be paid in kind by capitalizing and adding such amount to (and thereby increasing) the principal amount of Term Loans outstanding hereunder on each such Interest Payment Date, in each case, in the amount specified in the definition of "Applicable Margin", on such Interest Payment Date.

(g)     Interest shall begin to accrue on the Roll-Up Loans from (and including) the date such Roll-Up Loans are deemed made in accordance with Section 2.01(b) (which, in the case of the Effective Date Roll-Up Loans deemed made pursuant to Section 2.01(b), shall be the Effective Date).

(h)     In connection with the use or administration of Term SOFR, the Administrative Agent (acting at the Direction of the Requisite Lenders) (with the consent of the Borrower) will have the right to make Conforming Changes from time to time and,

notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document. The Administrative Agent will promptly notify the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

**2.9.    Conversion/Continuation**.

(a)    Subject to <u>Section 2.18</u> and so long as no Event of Default under <u>Section 8.1(a)</u>, <u>(f)</u> or <u>(g)</u> shall have occurred and then be continuing, the Borrower shall have the option:

(i)    to convert at any time all or any part of any Term Loan equal to $1,000,000 and integral multiples of $250,000 in excess of that amount from one Type of Loan to another Type of Loan; <u>provided</u>, that a SOFR Loan may only be converted on the expiration of the Interest Period applicable to such SOFR Loan unless the Borrower shall pay all amounts due under <u>Section 2.18</u> in connection with any such conversion; or

(ii)    upon the expiration of any Interest Period applicable to any SOFR Loan, to continue all or any portion of such Loan equal to $1,000,000 and integral multiples of $250,000 in excess of that amount as a SOFR Loan.

(b)    Subject to <u>Section 3.2(b)</u>, the Borrower shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 11:00 a.m. (New York City time) at least one Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a SOFR Loan). Except as otherwise provided herein (including <u>Section 2.18</u>), a Conversion/Continuation Notice for conversion to, or continuation of, any SOFR Loans shall be irrevocable on and after the related Interest Rate Determination Date, and the Borrower shall be bound to effect a conversion or continuation in accordance therewith. If on any day a Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be a Base Rate Loan. Notwithstanding any contrary provision herein or in the other Loans Documents, if an Event of Default has occurred and is continuing, then, so long as such Event of Default is continuing (i) no Loan may be converted to or continued as a SOFR Loan and (ii) unless repaid as provided herein, each SOFR Loan shall automatically be converted to a Base Rate Loan.

**2.10.    Default Interest**. Upon the occurrence and during the continuance of an Event of Default, all amounts shall thereafter bear interest (including post-petition interest in any proceeding under Debtor Relief Laws) payable on demand at a rate that is 2% *per annum* in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans. Payment or acceptance of the increased rates of interest provided for in this <u>Section 2.10</u> is not a permitted

alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.

**2.11. Fees**.      The Borrower agrees to pay (i) to the Agents such fees in the amounts and at the times separately agreed upon in the Administrative Agent Fee Letter, (ii) to the Administrative Agent for the ratable account of the Lenders, the Commitment Premium (as defined in the RSA, (iii) to the Fronting Lender on behalf of each of the Backstop Parties, the Backstop Premium (as defined in the RSA), in each case, to the extent payable and (iv) to the Fronting Lender, for its own account, such fees in the amounts and at the times separately agreed upon in the Fronting Lender Fee Letter.

**2.12. Scheduled Payments**. The Borrower hereby unconditionally promises to pay to the Administrative Agent, for the account of each Lender the then unpaid principal amount of outstanding Term Loans, plus any interest accrued and unpaid on such Term Loans, on the Maturity Date unless such Term Loans have been otherwise satisfied in accordance with the Chapter 11 Plan.  The Lenders hereby expressly agree that to the extent provided therein, the Obligations shall be satisfied in accordance with the Chapter 11 Plan.  Notwithstanding anything herein or the other Credit Documents to the contrary, if the Requisite Lenders support a Chapter 11 Plan that provides for the Lenders to receive non-Cash distributions on account of the Obligations and related Claims on account thereof, each Lender shall be deemed to have (i) elected to have its DIP Term Loan Claims paid on the Plan Effective Date with the non-cash option provided in the Chapter 11 Plan and (ii) forgone a cash distribution on account of such Lender's Obligations and related Claims, unless otherwise consented to by the Credit Parties and the Requisite Lenders (each such consent not to be unreasonably withheld).

**2.13. Voluntary Prepayments**.

(a)      Voluntary Prepayments.

(i)  Any time and from time to time:

(1)      with respect to Base Rate Loans, the Borrower may prepay any such Loans on any Business Day in whole or in part, in an aggregate minimum amount of $1,000,000 and integral multiples of $250,000 in excess of that amount;

(2)      with respect to SOFR Loans, the Borrower may prepay any such Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $250,000 in excess of that amount; and

(3)      [Reserved].

(ii) All such prepayments shall be made:

(1)      upon not less than one Business Day's prior written or telephonic notice in the case of Base Rate Loans;

(2)      upon not less than three Business Days' prior written or telephonic notice in the case of SOFR Loans; and

(3)      [Reserved];

in each case given to Administrative Agent, as the case may be, by 1:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed by delivery of written notice thereof to Administrative Agent (and Administrative Agent will promptly transmit such original notice for Term Loans by facsimile or telephone to each Lender). Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein (provided, that any such prepayment may be conditioned upon the closing of a transaction or refinancing, in which case, upon the failure of such transaction or refinancing to close, such notice of prepayment may be withdrawn). Any such voluntary prepayment shall be applied as specified in Section 2.15(a).

(b)      [Reserved].

(c)      [Reserved].

## 2.14.    Mandatory Prepayments.

(a)      Asset Sales. Subject to the DIP Order, no later than the fifth Business Day following the date of receipt by the Borrower of any Net Asset Sale Proceeds from any Asset Sale (except with respect to any ABL Priority Collateral) pursuant to Sections 6.8(c), the Borrower shall prepay the Loans as set forth in Section 2.15(b) in an aggregate amount equal to 100% of such Net Asset Sale Proceeds in excess of the amount required for the Borrower to remain in pro forma compliance with Section 6.9.

(b)      Insurance/Condemnation Proceeds. Subject to the DIP Order, no later than the fifth Business Day following the date of receipt by Holdings or any of its Subsidiaries, or Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds, the Borrower shall prepay the Loans as set forth in Section 2.15(b) in an aggregate amount equal to 100% of such Net Insurance/Condemnation Proceeds.

(c)      Issuance of Debt. On the third Business Day after receipt by Holdings or any of its Subsidiaries of any Cash proceeds from the incurrence of any Indebtedness of Holdings or any of its Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 6.1), the Borrower shall prepay the Loans as set forth in Section 2.15(b) in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

## 2.15.    Application of Prepayments/Reductions.

(a)      Application of Prepayments by Type of Loans. Any prepayment of any Loan pursuant to Section 2.13(a) or Section 2.14 shall be applied, first, ratably to the DIP Term Loans included in the repaid Borrowing, until all DIP Term Loans are repaid in full, and, second,

ratably to the Roll-Up Loans included in the repaid Borrowing, until all Roll-Up Loans are repaid in full.

(b)    <u>Application of Prepayments after an Event of Default</u>. After the occurrence and during the continuation of an Event of Default, monies to be applied to the Obligations, whether arising from payments by the Credit Parties, realization on Collateral, set-off or otherwise, shall be allocated as follows (subject, in all respects, to the Carve Out):

*first*, to the payment of all reasonable and documented costs and expenses incurred by the Administrative Agent or the Collateral Agent in connection with any collection or sale of the Collateral or otherwise in connection with any Credit Document, including all court costs and the reasonable fees and expenses of its agents and legal counsel, the repayment of all advances made by the Administrative Agent or the Collateral Agent hereunder or under any other Credit Document on behalf of any Credit Party and any other reasonable and documented costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Credit Document to the extent reimbursable hereunder or thereunder,

*second,* to pay interest and principal due in respect of DIP Term Loans, until paid in full,

*third*, to pay interest and principal due in respect of the Roll-Up Loans, until paid in full,

*fourth*, to the Secured Parties, an amount equal to all remaining Obligations owing to them on the date of any distribution, and

*fifth*, any surplus then remaining shall be paid to the applicable Credit Parties or their successors or assigns or to whomsoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

(c)    <u>Waivable Mandatory Prepayment</u>. Anything contained herein to the contrary notwithstanding, in the event the Borrower is required to make any mandatory prepayment under Section 2.14 (a) or 2.14(c) (a **"Waivable Mandatory Prepayment"**) of the Term Loans, not less than four Business Days prior to the date (the **"Required Prepayment Date"**) on which the Borrower is required to make such Waivable Mandatory Prepayment, the Borrower shall notify Administrative Agent of the amount of such prepayment, and Administrative Agent will promptly thereafter notify each Lender holding an outstanding Term Loan of the amount of such Lender's Pro Rata Share of such Waivable Mandatory Prepayment and such Lender's option to refuse such amount (such refused amounts, the **"Declined Proceeds"**). Each such Lender may exercise such option by giving written notice to the Borrower and Administrative Agent of its election to do so on or before the second Business Day prior to the Required Prepayment Date (it being understood that any Lender which does not notify the Borrower and Administrative Agent of its election to exercise such option on or before the second Business Day prior to the Required Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option). On the Required Prepayment Date, the Borrower shall pay to Administrative Agent the amount of the Waivable Mandatory Prepayment, which amount shall be applied in an

amount equal to that portion of the Waivable Mandatory Prepayment payable to those Lenders that have elected not to exercise such option, to prepay the Term Loans of such Lenders (which prepayment shall be applied in accordance with <u>Section 2.15(b)</u>). Any Declined Proceeds remaining shall be *first* offered to Lenders holding DIP Term Loans in accordance with the provisions of this Section 2.15(c), *second*, offered to Lenders holding Roll-Up Loans in accordance with the provisions of this Section 2.15(c), and *third* retained by the Borrower (in which event the Borrower may use the proceeds for any purpose not prohibited by the Credit Documents).

(d)    In the case of a prepayment required pursuant to (i) <u>Section 2.14(a)</u> due to an Asset Sale by a Foreign Subsidiary (or a Subsidiary thereof) or (ii) <u>Section 2.14(b)</u> due to Net Insurance/Condemnation Proceeds received by a Foreign Subsidiary (or a Subsidiary thereof)(x) if such Net Asset Sale Proceeds or Net Insurance/Condemnation Proceeds are prohibited (or delayed) by applicable local law in such foreign jurisdiction from being repatriated to the United States, the portion of such Net Asset Sale Proceeds or Net Insurance/Condemnation Proceeds so subject to such prohibition will not be required to be applied to repay Loans at the times provided in <u>Section 2.14</u> but may be retained by the applicable Foreign Subsidiary (or a Subsidiary thereof) so long as the applicable local law will not permit (or otherwise delays) repatriation to the United States (and the Borrower hereby agrees to cause the applicable Foreign Subsidiary (or a Subsidiary thereof) to promptly take all commercially reasonable actions required by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Asset Sale Proceeds or Net Insurance/Condemnation Proceeds is permitted under the applicable local law, such repatriation will be promptly effected and such repatriated Net Asset Sale Proceeds or Net Insurance/Condemnation Proceeds will be promptly (and in any event not later than five Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to this <u>Section 2.15</u> and (y) to the extent that the Borrower has determined in good faith that repatriation to the Borrower of any of or all the Net Asset Sale Proceeds or Net Insurance/Condemnation Proceeds attributable to Foreign Subsidiaries would cause material adverse tax or regulatory consequences to Holdings and its Subsidiaries, such Net Asset Sale Proceeds or Net Insurance/Condemnation Proceeds so affected may be retained by the applicable Foreign Subsidiary, <u>provided</u> that once such material adverse consequences no longer apply, such repatriation will be promptly effected and such repatriated Net Asset Sale Proceeds or Net Insurance/Condemnation Proceeds will be promptly (and in any event not later than five Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to this <u>Section 2.15</u>.

(e)    <u>Application of Prepayments of Loans to Base Rate Loans and SOFR Loans</u>. Considering each Class of Loans being prepaid separately, any prepayment thereof shall be applied first to Base Rate Loans to the full extent thereof before application to SOFR Loans, in each case in a manner which minimizes the amount of any payments required to be made by the Borrower pursuant to <u>Section 2.18(c)</u>.

## 2.16.    **General Provisions Regarding Payments**.

(a)    All payments by the Borrower of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, recoupment, setoff or counterclaim, free of any restriction or condition, and delivered to Administrative Agent not later

than 1:00 p.m. (New York City time) on the date due at the Principal Office of Administrative Agent for the account of Lenders; for purposes of computing interest and fees, funds received by Administrative Agent after that time on such due date shall be deemed to have been paid by the Borrower on the next succeeding Business Day.

(b)     All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest then due and payable before application to principal.

(c)     Administrative Agent (or its agent or sub-agent appointed by it) shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by Administrative Agent.

(d)     Notwithstanding the foregoing provisions hereof, if any Conversion/ Continuation Notice is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any SOFR Loans, Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(e)     Subject to the provisos set forth in the definition of "Interest Period", whenever any payment to be made hereunder with respect to any Loan shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

(f)     Administrative Agent shall deem any payment by or on behalf of the Borrower hereunder that is not made in same day funds prior to 1:00 p.m. (New York City time) to be a non-conforming payment. Any such payment shall not be deemed to have been received by Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day. Administrative Agent shall give prompt telephonic notice to the Borrower and each applicable Lender (confirmed in writing) if any payment is non-conforming. Any non-conforming payment may constitute a Default or Event of Default in accordance with the terms of Section 8.1(a). Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.10 from the date such amount was due and payable until the date such amount is paid in full.

2.17.     Ratable Sharing. Lenders hereby agree among themselves that if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as Cash Collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other Credit

Documents (collectively, the **"Aggregate Amounts Due"** to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; provided that, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of the Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. The Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, consolidation, set-off or counterclaim with respect to any and all monies owing by the Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder, subject to Section 10.4. The provisions of this Section 2.17 shall not be construed to apply to (a) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), (b) any payment obtained by any Lender as consideration for the assignment or sale of a participation in any of its Loans or other Obligations owed to it or (c) any payment of any fee in connection with any amendment, waiver or consent or in connection with any extension or commitment of funds.

### 2.18.    Making or Maintaining SOFR Loans.

(a)    Inability to Determine Applicable Interest Rate. Subject to Section 2.28, in the event that (i) the Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto absent manifest error), on any Interest Rate Determination Date with respect to any SOFR Loans, that the interest rate applicable to such Loans on the basis provided for in the definition of "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof, or (ii) the Requisite Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Adjusted Term SOFR for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, and the Requisite Lenders have provided notice of such determination to the Administrative Agent, in each case, the Administrative Agent will promptly so notify (by facsimile or by telephone confirmed in writing) the Borrower and each Lender of such determination. Upon such notice thereof, (i) no Loans may be made as, or converted to, SOFR Loans until such time as Administrative Agent notifies the Borrower and Lenders that the circumstances giving rise to such notice no longer exist, (ii) any Conversion/Continuation Notice given by the Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by the Borrower, (iii) any Funding Notice given by the Borrower with respect to SOFR Loans shall be deemed to be a request for Base Rate Loans (provided that, the Borrower shall have the option, subject to the provisions of Section 2.18(c), to rescind such Funding Notice) and (iv) any outstanding affected SOFR Loans will be deemed to have been converted into Base Rate Loans at the end of the applicable Interest Period. Upon any such conversion, the Borrower shall also pay accrued interest

on the amount so converted, together with any additional amounts required pursuant to <u>Section 2.18(c)</u>. Subject to <u>Section 2.28</u>, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on Base Rate Loans shall be determined by the Administrative Agent without reference to <u>clause (ii)</u> of the definition of "Base Rate" until the Administrative Agent revokes such determination.

(b)     <u>Illegality or Impracticability of SOFR Loans</u>. In the event that on any date (i) any Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto absent manifest error) that the making, maintaining, converting to or continuation of its Loans whose interest is determined by reference to SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) Administrative Agent is advised by the Requisite Lenders (which determination shall be final and conclusive and binding upon all parties hereto absent manifest error) that the making, maintaining, converting to or continuation of its SOFR Loans has become impracticable, as a result of contingencies occurring after the Effective Date which materially and adversely affect SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR or the position of the Lenders or, on any Interest Rate Determination Date with respect to any SOFR Loans, the interest rate for such Loans for any requested Interest Period does not adequately and fairly reflect the cost to Requisite Lenders of funding such SOFR Loans in that market, then, and in any such event, such Lenders (or in the case of the preceding <u>clause (i)</u>, such Lender) shall be an **"Affected Lender"** and such Affected Lender shall on that day give notice (by e-mail or by telephone confirmed in writing) to the Borrower and Administrative Agent of such determination (which notice Administrative Agent shall promptly transmit to each other Lender). If Administrative Agent receives a notice from (x) any Lender pursuant to <u>clause (i)</u> of the preceding sentence or (y) a notice from Lenders constituting Requisite Lenders pursuant to <u>clause (ii)</u> of the preceding sentence, then (1) the obligation of the Lenders (or, in the case of any notice pursuant to <u>clause (i)</u> of the preceding sentence, such Lender) to make Loans as, or to convert Loans to, SOFR Loans shall be suspended until such notice shall be withdrawn by each Affected Lender and any right of the Borrower to continue SOFR Loans or to convert Base Rate Loans to SOFR Loans, shall be suspended, (2) to the extent such determination by the Affected Lender relates to a SOFR Loan then being requested by the Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, the Lenders (or in the case of any notice pursuant to <u>clause (i)</u> of the preceding sentence, such Lender) shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) a Base Rate Loan (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to <u>clause (ii)</u> of the definition of "Base Rate") (<u>provided</u> that, the Borrower shall have the option, subject to the provisions of <u>Section 2.18(c)</u>, to rescind such Funding Notice), (3) the Lenders' (or in the case of any notice pursuant to <u>clause (i)</u> of the preceding sentence, such Lender's) obligations to maintain their respective outstanding SOFR Loans (the **"Affected Loans"**) shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, (4) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination

and (5) if necessary to avoid such illegality, the Administrative Agent shall during the period of such suspension compute the Base Rate without reference to clause (ii) of the definition of "Base Rate," in each case until the Administrative Agent is advised in writing by each Affected Lender that it is no longer illegal for such Affected Lender to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate or Adjusted Term SOFR. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a SOFR Loan then being requested by the Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, the Borrower shall have the option, subject to the provisions of Section 2.18(c), to rescind such Funding Notice or Conversion/Continuation Notice as to all Lenders by giving written or telephonic notice (promptly confirmed by delivery of written notice thereof) to Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission Administrative Agent shall promptly transmit to each other Lender). Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 2.18(c).

(c)    Compensation for Breakage or Non-Commencement of Interest Periods. The Borrower shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all actual reasonable losses, expenses and liabilities (including any interest paid or payable by such Lender to Lenders of funds borrowed by it to make or carry its SOFR Loans and any actual reasonable loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender) a borrowing of any SOFR Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing, or a conversion to or continuation of any SOFR Loan does not occur on a date specified therefor in a Conversion/Continuation Notice or a telephonic request for conversion or continuation; (ii) if any prepayment or other principal payment of, or any conversion of, any of its SOFR Loans occurs on a date prior to the last day of an Interest Period applicable to that Loan; or (iii) if any prepayment of any of its SOFR Loans is not made on any date specified in a notice of prepayment given by the Borrower.

(d)    Booking of SOFR Loans. Any Lender may make, carry or transfer SOFR Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Lender.

**2.19.    Increased Costs; Capital Adequacy**.

(a)    Compensation for Increased Costs and Taxes. In the event that any Lender shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that after the Effective Date (A) any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof, including the introduction of any new law, treaty or governmental rule, regulation or order but excluding solely proposals thereof, or any determination of a court or Governmental Authority, in each case that becomes effective after the Effective Date, or (B) any guideline, request or directive by any central bank or other governmental or quasi-Governmental Authority (whether or not having the force of law) or any implementation rules or interpretations of previously issued guidelines, requests or directives, in each case that is issued or made after the

Effective Date: (i) subject any Lender to any new Taxes (other than (A) Non-Excluded Taxes (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) any Taxes resulting from the imposition of a new rate of an existing Tax) on its loans, loan principal, letters of credit, bank guarantees, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, liquidity, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender (other than any such reserve or other requirements with respect to SOFR Loans that are reflected in the definition of "Adjusted Term SOFR") or any company controlling such Lender; or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or any company controlling such Lender or such Lender's obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, the Borrower shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or in a lump sum or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder. Such Lender shall deliver to the Borrower (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.19(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b)    Capital Adequacy Adjustment. In the event that any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that (A) the adoption, effectiveness, phase-in or applicability of any law, rule or regulation (or any provision thereof) regarding capital adequacy or liquidity requirements, or any change therein or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or (B) compliance by any Lender (or its applicable lending office) or any company controlling such Lender with any guideline, request or directive regarding capital adequacy or liquidity (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, in each case after the Effective Date, has or would have the effect of reducing the rate of return on the capital of such Lender or any company controlling such Lender as a consequence of, or with reference to, such Lender's Loans or participations therein or other obligations hereunder with respect to the Loans to a level below that which such Lender or such controlling company could have achieved but for such adoption, effectiveness, phase-in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling company with regard to capital adequacy or liquidity, as applicable), then from time to time, within ten Business Days after receipt by the Borrower from such Lender of the statement referred to in the next sentence, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling company on an after-tax basis for such reduction. Such Lender shall deliver to the Borrower (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional

amounts owed to Lender under this <u>Section 2.19(b)</u>, which statement shall be conclusive and binding upon all parties hereto absent manifest error. For the avoidance of doubt, <u>subsections (a)</u> and <u>(b)</u> of this <u>Section 2.19</u> shall apply to all requests, rules, guidelines or directives concerning liquidity and capital adequacy issued by any United States or foreign regulatory authority (i) under or in connection with the implementation of the Dodd-Frank Wall Street Reform and Consumer Protection Act and (ii) in connection with the implementation of the recommendations of the Bank for International Settlements or the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority), regardless of the date adopted, issued, promulgated or implemented.

(c)     <u>Delay in Requests; Similarly Situated Persons</u>. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this <u>Section 2.19</u> shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this <u>Section 2.19</u> for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender notifies the Borrower of the event giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if any such event giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof). Notwithstanding anything to the contrary in this <u>Section 2.19</u>, the Lenders shall not be permitted to request compensation under this <u>Section 2.19</u> unless such Lender is also requesting compensation (to the extent contractually permitted to do so) from similarly situated borrowers.

**2.20.     Taxes; Withholding, Etc.**

(a)     <u>Payments to Be Free and Clear</u>. All sums payable by or on behalf of any Credit Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax imposed, levied, collected, withheld or assessed by any Governmental Authority.

(b)     <u>Withholding of Taxes</u>. If any Credit Party or any other Person (acting as a withholding agent) is (in such withholding agent's reasonable good faith discretion) required by law to make any deduction or withholding for Taxes from any sum paid or payable by any Credit Party to Administrative Agent or any Lender under any of the Credit Documents: (i) the Borrower shall notify Administrative Agent of any such requirement or any change in any such requirement as soon as the Borrower becomes aware of it; (ii) the Borrower shall pay, or cause to be paid, any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Credit Party) for its own account or (if that liability is imposed on Administrative Agent or such Lender, as the case may be) on behalf of and in the name of Administrative Agent or such Lender; (iii) in the case of Non-Excluded Taxes, the sum payable by such Credit Party in respect of which the relevant deduction, withholding or payment of Non-Excluded Taxes is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment of Non-Excluded Taxes (including such deductions and withholdings applicable to additional sums payable under this Section), Administrative Agent or such Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made; (iv) in the case of Excluded Taxes, the sum payable shall not be increased, and (v) within

thirty (30) days after the due date of payment of any Tax which it is required by <u>clause (ii)</u> above to pay, the Borrower shall deliver to Administrative Agent an original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority.

    (c)  <u>Evidence of Exemption From U.S. Withholding Tax</u>. Each Lender that is not a "United States person" (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income Tax purposes (a **"Non-U.S. Lender"**) shall, to the extent such Lender is legally able to do so, deliver to Administrative Agent for transmission to the Borrower, on or prior to the Effective Date (in the case of each Lender listed on the signature pages hereof on the Effective Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), and at such other times as may be necessary in the determination of the Borrower or Administrative Agent (each in the reasonable exercise of its discretion), (i) two copies of executed IRS Form W-8BEN, IRS Form W-8BEN-E, IRS Form W-8ECI, IRS Form W-8EXP and/or IRS Form W-8IMY (or, in each case, any successor forms), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by the Borrower to establish that such Lender is not subject to (or is subject to a reduced rate of) deduction or withholding of United States federal income tax with respect to any payments to such Lender of principal, interest, fees or other amounts payable under any of the Credit Documents and (ii) if such Lender is claiming exemption from U.S. federal withholding Tax under Section 871(h) or 881(c) of the Internal Revenue Code with respect to payments of "portfolio interest", a copy of a properly completed and duly executed IRS Form W-8BEN or IRS Form W-8BEN-E (together with a certificate substantially in the form of Exhibit M-1 representing that such Non-U.S. Lender is not a "bank" for purposes of Section 881(c)(3)(A) of the Code, is not a "10-percent shareholder" (within the meaning of Section 871(h)(3)(B) or Section 881(c)(3)(B) of the Code) of the Borrower and is not a "controlled foreign corporation" related to the Borrower (within the meaning of Section 881(c)(3)(C) of the Code) (a **"U.S. Withholding Certificate"**)) and such other documentation required under the Internal Revenue Code and reasonably requested by the Borrower to establish that such Lender is not subject to (or is subject to a reduced rate of) deduction or withholding of United States federal income Tax with respect to any payments to such Lender of interest payable under any of the Credit Documents and (iii) to the extent a Non-U.S. Lender is not the beneficial owner (for example, where the Non-U.S. Lender is a partnership or a participating Lender granting a participation), copies of properly completed and duly executed Internal Revenue Service Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Withholding Certificate substantially in the form of Exhibit M-2 or Exhibit M-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable (provided that if the Non-U.S. Lender is a partnership for U.S. federal income tax purposes (and not a participating Lender) and one or more direct or indirect partners are claiming the portfolio interest exemption, the U.S. Withholding Certificate may be provided by such Non-U.S. Lender on behalf of such direct or indirect partners and shall be substantially in the form of Exhibit M-4). Each Lender that is a "United States person" (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) (a **"U.S. Lender"**) shall deliver to Administrative Agent and the Borrower on or prior to the Effective Date (or, if later, on or prior to the date on which such Lender becomes a party to this Agreement) two copies of executed

Internal Revenue Service Form W-9 (or any successor form), properly completed by such Lender, certifying that such U.S. Lender is entitled to an exemption from United States backup withholding Tax, or otherwise prove that it is entitled to such an exemption. Each Lender required to deliver any forms, certificates or other evidence with respect to United States federal income tax withholding matters pursuant to this Section 2.20(c) hereby agrees, from time to time after the initial delivery by such Lender of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Lender shall promptly deliver to Administrative Agent for transmission to the Borrower two new copies of executed IRS Form W-8BEN, IRS Form W-8BEN-E, IRS Form W-8ECI, IRS Form W-8EXP, IRS Form W-8IMY and/or IRS Form W-9 (or, in each case, any successor form), or a U.S. Withholding Certificate and two copies of executed IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor form), as the case may be, properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by the Borrower to confirm or establish that such Lender is not subject to (or is subject to a reduced rate of) deduction or withholding of United States federal income Tax with respect to payments to such Lender under the Credit Documents, or notify Administrative Agent and the Borrower of its inability to deliver any such forms, certificates or other evidence, and (iv) in addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 2.20(c)(i)-(iii) and clause (d) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender. The Administrative Agent shall deliver to the Borrower two duly completed copies of IRS Form W-9, or any subsequent versions or successors to such form, certifying that it is exempt from U.S. federal backup withholding. On or before the date it becomes a party to this Agreement, any successor or supplemental Agent (i) that is not a "United States person" as defined in Section 7701(a)(30) of the Code, shall deliver to the Borrower (A) two copies of duly completed IRS Form W-8ECI (or any successor form) with respect to any amounts payable under any Credit Document to the Administrative Agent for its own account, and (B) two copies of duly completed IRS Form W-8IMY (or any other successor form) with respect to any amounts payable under any Credit Document to the Administrative Agent for the account of others, certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of its trade or business within the United States and that it is using such form as evidence of its agreement with the Borrower to be treated as a United States person and thus act as the withholding agent with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent as a United States person with respect to such payments as contemplated by Treasury Regulation Section 1.1441-1(b)(2)(iv)(A)), and (ii) that is a "United States person" as defined in Section 7701(a)(30) of the Code, shall deliver to the Borrower two copies of duly completed IRS Form W-9, or any subsequent versions or successors to such form, certifying that it is exempt from U.S. federal backup withholding.

(d)       (d) If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Borrower such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with its obligations under FATCA and to determine the amount to deduct and withhold from such payment, if any. Solely for purposes of this clause (d), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(e)       Without limiting the provisions of Section 2.20(b), the Borrower shall timely pay all Other Taxes to the relevant Governmental Authorities in accordance with applicable law. The Borrower shall deliver to Administrative Agent original receipts issued by such Governmental Authorities evidencing such payment or other evidence of such payment reasonably satisfactory to Administrative Agent in respect of any Other Taxes payable hereunder promptly after payment of such Other Taxes.

(f)       The Borrower shall indemnify Administrative Agent and any Lender for the full amount of Non-Excluded Taxes and Other Taxes for which additional amounts are required to be paid pursuant to Section 2.20(b) arising in connection with payments made under this Agreement or any other Credit Document and Other Taxes (including any such Non-Excluded Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.20) paid by Administrative Agent or Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. Such payment shall be due within thirty (30) days of such Credit Party's receipt of such written demand.

(g)       If the Administrative Agent or any Lender determines, in its sole discretion exercised in good faith, that it has received a refund (or credit against a future Tax in lieu of a refund) of any Taxes as to which it has been indemnified pursuant to this Section 2.20 (including additional amounts pursuant to this Section 2.20), it shall pay to the Borrower an amount equal to such refund or credit (but only to the extent of indemnity payments made under this Section 2.20 with respect to the Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including Taxes) of the Administrative Agent or Lender, as applicable, in obtaining such refund or credit, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). The Borrower, upon the request of the Administrative Agent or such Lender, shall repay to the Administrative Agent or such Lender the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority or such credit is disallowed by such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the Administrative Agent or any Lender be required to pay any amount to the Borrower pursuant to this paragraph (g) the payment of which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the Administrative Agent or such Lender would have been in if the indemnification payments or additional amounts giving rise to such

refund or credit had never been paid. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(h)    Notwithstanding anything herein to the contrary, no Borrower or any other Credit Party shall be required to pay any additional amounts hereunder or under any other Credit Document with respect to Taxes if such Taxes are Excluded Taxes.

(i)    Each party's obligations under this Section 2.20 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

2.21.    **Obligation to Mitigate**. Each Lender agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Loans becomes aware of the occurrence of an event or the existence of a condition that would cause such Lender to become an Affected Lender or that would entitle such Lender to receive payments under Section 2.18, 2.19 or 2.20, it will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extensions, including any Affected Loans, through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the circumstances which would cause such Lender to be an Affected Lender would cease to exist or the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.18, 2.19 or 2.20 would be materially reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Loans or the interests of such Lender; provided that, such Lender will not be obligated to utilize such other office pursuant to this Section 2.21 unless the Borrower agrees to pay all incremental and reasonable out-of-pocket expenses incurred by such Lender as a result of utilizing such other office as described above. A certificate as to the amount of any such expenses payable by the Borrower pursuant to this Section 2.21 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to the Borrower (with a copy to Administrative Agent) shall be conclusive absent manifest error.

2.22.    **Defaulting Lenders**.

(a)    Defaulting Lender Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 8 or otherwise) or received by Administrative Agent from a Defaulting Lender pursuant to Section 10.4 shall be applied at such time or times as may be determined by Administrative Agent (acting at the Direction of the Requisite Lenders) as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to Administrative Agent hereunder; *second*, as the Borrower may request (so long as no

63

Default or Event of Default shall have occurred and be continuing), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by Administrative Agent (acting at the Direction of the Requisite Lenders); *third*, if so determined by Administrative Agent (acting at the Direction of the Requisite Lenders) and the Borrower, to be held in a Deposit Account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default shall have occurred and be continuing, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 3.2 were satisfied and waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the applicable Commitments without giving effect to Section 2.22(a)(iii). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 2.22(a)(i) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(ii)    Certain Fees.

(A)    No Defaulting Lender shall be entitled to receive any fee pursuant to Section 2.11(a) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)    With respect to any fees not required to be paid to any Defaulting Lender pursuant to clause (A) above, the Borrower shall not be required to pay the remaining amount of any such fee.

(b)    Defaulting Lender Cure. If the Borrower and Administrative Agent (acting at the Direction of the Requisite Lenders) agree in writing that a Lender is no longer a Defaulting Lender, Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the applicable Commitments, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided further, that except to the extent otherwise expressly agreed by the affected

parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender having been a Defaulting Lender.

(c)        [Reserved].

(d)        [Reserved].

(e)        [Reserved].

**2.23.**    **Removal or Replacement of a Lender**. Anything contained herein to the contrary notwithstanding, in the event that: (a)(i) any Lender (an **"Increased-Cost Lender"**) shall give notice to the Borrower that such Lender is an Affected Lender or that such Lender is entitled to receive payments under Section 2.18, 2.19 or 2.20, (ii) the circumstances which have caused such Lender to be an Affected Lender or which entitle such Lender to receive such payments shall remain in effect, and (iii) such Lender shall fail to withdraw such notice within five Business Days after the Borrower's request for such withdrawal; or (b)(i) any Lender shall become and continues to be a Defaulting Lender, and (ii) such Defaulting Lender shall fail to cure the default pursuant to Section 2.22(b) within five Business Days after the Borrower's request that it cure such default; then, with respect to each such Increased-Cost Lender or Defaulting Lender (the **"Terminated Lender"**), the Borrower may, by giving written notice to Administrative Agent and any Terminated Lender of its election to do so, elect to cause such Terminated Lender (and such Terminated Lender hereby irrevocably agrees) to assign its outstanding Loans, if any, in full to one or more Eligible Assignees (each a **"Replacement Lender"**) in accordance with the provisions of Section 10.6 (or terminate the applicable Commitments of such Lender, and repay in full in cash all Obligations (other than any premium with respect to a Defaulting Lender) of the Borrower then due and owing to such Lender relating to the applicable Loans and participations held by such Lender as of such termination date) and the Borrower shall pay the reasonable-out-of-pocket fees, if any, payable thereunder in connection with any such assignment from an Increased-Cost Lender; provided that, (1) on the date of such assignment, the Replacement Lender shall pay to Terminated Lender an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Terminated Lender and (B) an amount equal to all accrued, but theretofore unpaid fees owing to such Terminated Lender pursuant to Section 2.11; (2) on the date of such assignment or payment, the Borrower shall pay any amounts payable to such Terminated Lender pursuant to Section 2.13(c), 2.18(c), 2.19 or 2.20; or otherwise as if it were a prepayment; and (3) in the case of any such assignment or payment resulting from a claim for compensation under Section 2.19 or payments required to be made pursuant to Section 2.20, such assignment or payment will result in a reduction in such compensation or payments thereafter; provided that, any rights of such Terminated Lender to indemnification hereunder shall survive as to such Terminated Lender solely to the same extent as if it were not a Terminated Lender. Each Lender agrees that if the Borrower exercises its option hereunder to cause an assignment by such Lender as a Terminated Lender, such Lender shall, promptly after receipt of written notice of such election, execute and deliver all documentation necessary to effectuate such assignment in accordance with Section 10.6. In the event that a Lender does not comply with the requirements of the immediately preceding sentence within one Business Day after receipt of such notice, each Lender hereby authorizes and directs Administrative Agent to execute and deliver such documentation as may be required to give effect to an assignment in accordance with Section 10.6 on behalf of a Terminated Lender and any such documentation so

executed by Administrative Agent shall be effective for purposes of documenting an assignment pursuant to Section 10.6.

**2.24.** **[Reserved]**.

**2.25.** **[Reserved]**.

**2.26.** **[Reserved]**.

**2.27.** **Syndication**. Following the Effective Date, the Borrower shall use commercially reasonable efforts to assist the Lenders in connection with a syndication process (the "**Syndication**") for the assignment to additional Prepetition Lenders of a share of the DIP Term Loans pro rata to their respective holdings of Prepetition Term Loans in accordance with syndication procedures (the "**Syndication Procedures**") acceptable to each of the Administrative Agent and the Requisite Lenders (each in their sole discretion), in consultation with the Borrower and in accordance with the terms of this Agreement. Upon completion of the Syndication, a Schedule 2.27, which shall be prepared by the Lender Advisors and satisfactory to the Requisite Lenders, shall be delivered to the Administrative Agent and the Borrower, which shall set forth the aggregate principal amount of DIP Term Loans and Roll-Up Loans held by each Lender upon closing of the Syndication.

**2.28.** **Benchmark Replacement Setting**.

(a) Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Credit Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred in respect of any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Requisite Lenders of each Class.

(b) Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent (acting at the Direction of the Requisite Lenders) and the Borrower will have the right to make Conforming Changes from time to time (in consultation with the Borrower) and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Conforming Changes will become effective without any further action or

consent of any other party to this Agreement or any other Credit Document.

(c)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. The Administrative Agent will promptly notify the Borrower of the removal or reinstatement of any tenor of a Benchmark pursuant to clause (d) below. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.28, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Credit Document, except, in each case, as expressly required pursuant to this Section 2.28.

(d)    Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Credit Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent (acting at the Direction of the Requisite Lenders) in its reasonable discretion or (B) the administrator of such Benchmark or the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable, non-representative, non-compliant or non-aligned tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)    Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Base Rate.

## SECTION 3.      CONDITIONS PRECEDENT

**3.1.      Effectiveness of this Agreement and Credit Extensions on the Effective Date**. The effectiveness of this Agreement and the obligation of each Lender to make a Credit Extension hereunder on the Effective Date (including the Initial Draw) is subject to the satisfaction, or waiver in accordance with Section 10.5, of the following conditions on or before the Effective Date:

(a)      Credit Documents. The Administrative Agent shall have received copies of this Agreement, the Notes (to the extent requested at least three Business Days prior to the Effective Date) and the Administrative Agent Fee Letter, executed and delivered by each applicable Credit Party and each other party thereto.

(b)      Organizational Documents; Incumbency. The Administrative Agent shall have received, in respect of each Credit Party, (i) copies of each Organizational Document, and, to the extent applicable, certified as of the Effective Date or a date no earlier than 30 days prior thereto by the appropriate Governmental Authority; (ii) signature and incumbency certificates of the officers or directors (as applicable) of such Credit Party; (iii) resolutions of the board of directors or similar governing body of such Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Effective Date, certified as of the Effective Date by its secretary or an assistant secretary or other Authorized Officer as being in full force and effect without modification or amendment; and (iv) a good standing certificate (to the extent applicable in the relevant jurisdiction) from the applicable Governmental Authority of such Credit Party's jurisdiction of incorporation, organization or formation, each dated within 30 days of the Effective Date.

(c)      No Material Adverse Effect. Since the Petition Date, there has been no Material Adverse Effect other than the events and developments related to, or arising as a result of, the Chapter 11 Cases.

(d)      Funding Notice. The Administrative Agent shall have received a fully executed Funding Notice.

(e)      Representations and Warranties. On the Effective Date, the representations and warranties in Section 4 of this Agreement shall be true and correct in all material respects (provided that any such representations, which are qualified by materiality, material adverse effect or similar language shall be true and correct in all respects).

(f)      Event of Default. On the Effective Date and immediately after giving effect to the Initial Draw, no event shall have occurred and be continuing or would immediately result from the consummation of the Credit Extension that would constitute an Event of Default or a Default.

(g)      Opinions of Counsel to Credit Parties. Agents and Lenders and their respective counsel shall have received executed copies of the favorable written opinions of (i) Herbert Smith Freehills Kramer (US) LLP, counsel for Credit Parties and (ii) Cole Schotz P.C., as special New Jersey counsel for the Credit Parties, in each case, as to such matters as Administrative Agent may reasonably request, dated as of the Effective Date and in form and substance reasonably

satisfactory to Administrative Agent (acting at the Direction of the Requisite Lenders) (and each Credit Party hereby instructs such counsel to deliver such opinions to Agents and Lenders).

(h)     Fees. The Agents, Lenders and the Lender Advisors shall have received, substantially simultaneously with the funding of the Term Loans, fees and, to the extent invoiced at least three Business Days prior to the Effective Date (except as otherwise reasonably agreed by the Borrower) reasonable out-of-pocket expenses in the amounts previously agreed in writing to be received on the Effective Date (which amounts may, at the Borrower's option, be offset against the proceeds of the Term Loans).

(i)     Consents and Approvals. All necessary governmental and third party consents and approvals necessary in connection with the DIP Facility and the Transactions shall have been obtained (without the imposition of any materially adverse conditions that are not acceptable to the Requisite Lenders (which may be communicated via a Direction of the Requisite Lenders)) and shall remain in effect; and the making of the loans under the DIP Facility shall not violate any material applicable requirement of law and shall not be enjoined temporarily, preliminarily or permanently.

(j)     Effective Date Certificate. The Borrower shall have delivered to Administrative Agent an originally executed Effective Date Certificate, together with all attachments thereto.

(k)     PATRIOT Act. The Agents shall have received at least three Business Days prior to the Effective Date all documentation and other information about the Borrower and the Guarantors as shall have been reasonably requested in writing by any Agent at least ten calendar days prior to the Effective Date and as required by U.S. regulatory authorities under applicable "know your customer" and anti-money laundering laws. For the avoidance of doubt, to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, any Lender that has requested, in a written notice to the Borrower at least ten Business Days prior to the Effective Date, a certification regarding beneficial ownership in relation to the Borrower as required by the Beneficial Ownership Regulation (the **"Beneficial Ownership Certification"**), shall have received such certification at least three Business Days prior to the Effective Date. As of the Effective Date, the information included in the Beneficial Ownership Certification with respect to any beneficial owner of the Borrower is true and correct in all material respects to the best knowledge of the Borrower.

(l)     Transactions. Substantially simultaneously with the Borrowing of the Term Loans, the Transactions shall be consummated in accordance with the RSA and the respective terms thereof.

(m)     ABL DIP Credit Documents. The Administrative Agent shall have received executed copies of each ABL DIP Credit Document entered into by a Credit Party, a Debtor or any Subsidiary on the Closing Date in connection with the ABL DIP Facility (including, for the avoidance of doubt, the ABL DIP Credit Agreement), in each case, duly executed and delivered by a Responsible Officer of each of the Credit Parties party thereto and such ABL DIP Credit Documents shall be acceptable and on terms satisfactory to the Lenders and shall be in full force

69

and effect and there shall not be a default or Event of Default (as defined in the ABL DIP Credit Agreement) under the ABL DIP Credit Documents.

(n)     <u>RSA</u>. The RSA remains in full force and effect and the Credit Parties are not in Default under such agreement.

(o)     <u>Financials</u>. The Administrative Agent and the Lender Advisors shall have received the most recent information required to be delivered under <u>Section 5.1</u> of the Prepetition Credit Agreement.

(p)     <u>Interim Order</u>. (i) The Interim Order shall have been entered by the Bankruptcy Court and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the Requisite Lenders (which consent may be communicated via a Direction of the Requisite Lenders), and (ii) no motion for reconsideration of the Interim Order shall have been timely filed by any Credit Party, any Debtor, any Subsidiary or any Affiliate thereof.

(q)     <u>Chapter 11 Cases</u>. The Chapter 11 Cases shall have been commenced by Debtors and the same shall each be a debtor and a debtor in possession.  The Chapter 11 Cases of the Debtors shall not have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.  No trustee under chapter 7 or chapter 11 of the Bankruptcy Code shall have been appointed in the Chapter 11 Cases.

(r)     <u>Perfected Liens</u>. After giving effect to the Interim Order, the Collateral and Guarantee Requirement shall be satisfied and the Administrative Agent shall have a fully perfected lien on the Collateral to the extent required by the other Credit Documents and the DIP Orders, having the priorities set forth in the DIP Orders.

(s)     <u>First Day Pleadings</u>. All First Day Pleadings filed by the Credit Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the Requisite Lenders.

(t)     <u>Approved DIP Budget</u>. The Administrative Agent and Lender Advisors on behalf of the Lenders shall have received the Approved DIP Budget in form and substance satisfactory to the Requisite Lenders.

(u)     <u>Master Consent to Assignment</u>. The Fronting Lender shall have received a copy of that certain Master Consent to Assignment, dated as of the Effective Date, duly executed by the Borrower and the Administrative Agent.

**3.2.     Conditions to Final Draw**. The obligation of each Lender to make the Final Draw after the Effective Date is subject to the satisfaction, or waiver in accordance with <u>Section 10.5</u>, of the following conditions precedent:

(a)     as of such Credit Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of that Credit Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such

representations and warranties shall have been true and correct in all material respects on and as of such earlier date; <u>provided</u> that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof;

(b)        the Administrative Agent shall have received a fully executed Funding Notice;

(c)        no Default or Event of Default shall exist or would result from such proposed Credit Extension or from the application of the proceeds therefrom;

(d)        the Final Order shall have been entered by the Bankruptcy Court and shall not have been amended, modified, repealed or stayed in any respect without the Requisite Lenders' consent (which consent of the Requisite Lenders may be communicated via a Direction of the Requisite Lenders);

(e)        the Credit Parties shall be in compliance with the Approved DIP Budget (subject to Permitted Variances) in all respects and the proceeds of the Final Draw shall be used solely in accordance with the Approved DIP Budget (subject to Permitted Variances);

(f)        the RSA remains in full force and effect and the Credit Parties are not in Default under such agreement;

(g)        the Borrower shall be in compliance in all respects with the Milestones; and

(h)        each Collateral Document duly executed by each Credit Party or Subsidiary (as applicable) thereto, together with, if required pursuant to the terms of the relevant Collateral Document, certificates, if any, representing the pledged Equity Interests referred to therein accompanied by undated stock powers executed in blank and instruments, if any, evidencing the pledged Indebtedness referred to therein indorsed in blank.

**SECTION 4.        REPRESENTATIONS AND WARRANTIES**

In order to induce Agents and Lenders to enter into this Agreement and to make each Credit Extension to be made thereby, each Credit Party represents and warrants to each Agent and Lender on the Effective Date and on each Credit Date, that the following statements are true and correct:

**4.1.        Organization; Requisite Power and Authority; Qualification**. Each of Holdings and its Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, formation or incorporation (as applicable), (b) subject to the entry of the Interim Order, has all requisite corporate or other entity power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, except where a failure in any aspect of this <u>clause (b)</u> would not reasonably be expected to have a Material Adverse Effect (other than with respect to Holdings and the Borrower) and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except, in each

case, in jurisdictions where the failure to be so qualified or in good standing would not reasonably be expected to have a Material Adverse Effect.

**4.2.** **Subsidiaries**. Schedule 4.2 lists each Subsidiary of Holdings and the Borrower (and the direct and indirect ownership interest of Holdings and the Borrower therein), in each case existing on the Effective Date after giving effect to the Transactions.

**4.3.** **Due Authorization**. Subject to the entry of the Interim Order, the execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto.

**4.4.** **No Conflict**. Subject to the entry of the Interim Order, the execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate (i) any provision of any law or any governmental rule or regulation applicable to Holdings or any of its Subsidiaries, except to the extent such violation would not reasonably be expected to have a Material Adverse Effect, (ii) any of the Organizational Documents of Holdings or any of its Subsidiaries, or (iii) any order, judgment or decree of any court or other agency of government binding on Holdings or any of its Subsidiaries, except to the extent such violation would not reasonably be expected to have a Material Adverse Effect; and (b) except as a result of and in connection with the Chapter 11 Cases, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of Holdings or any of its Subsidiaries except to the extent such conflict, breach or default would not reasonably be expected to have a Material Adverse Effect.

**4.5.** **Governmental and Third Party Consents**. Subject to the entry of the Interim Order, the execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority or other third party, except for (i) filings and recordings with respect to the Collateral to be made, or otherwise delivered to Collateral Agent for filing and/or recordation, as of the Effective Date and any necessary continuations thereof under applicable law and (ii) those registrations, consents, approvals, notices or other actions, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**4.6.** **Binding Obligation**. Subject to the entry of the Interim Order, each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

**4.7.** **Historical Financial Statements**. The Historical Financial Statements were prepared in conformity with IFRS with customary adjustments and carve-outs as agreed between the Lenders and the Borrower and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates

thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments.

**4.8.    [Reserved]**.

**4.9.    No Material Adverse Effect**. Since the Petition Date, no event, circumstance or change has occurred that has caused or evidences, or would reasonably be expected to result in, either in any case or in the aggregate, a Material Adverse Effect.

**4.10.    Adverse Proceedings, Etc.** There are no Adverse Proceedings, individually or in the aggregate, that would reasonably be expected to have a Material Adverse Effect. Neither Holdings nor any of its Subsidiaries (a) is in violation of any applicable laws (including Environmental Laws) that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

**4.11.    Payment of Taxes**. Except as otherwise permitted under Section 5.3, all Tax returns and reports of Holdings and its Subsidiaries required to be filed by any of them have been timely filed, except where the failure to so file would not reasonably be expected to result in a Material Adverse Effect, and all Taxes to be due and payable have been paid when due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with IFRS or except where the failure to pay such Taxes would not reasonably be expected to result in a Material Adverse Effect. There is no proposed Tax assessment against Holdings or any of its Subsidiaries that would, if made, reasonably be expected to have a Material Adverse Effect and which is not being actively contested by Holdings or such Subsidiary in good faith and by appropriate proceedings; provided that, such reserves or other appropriate provisions, if any, as shall be required in conformity with IFRS shall have been made or provided therefor.

**4.12.    Properties**.

        (a)    Title. Each of Holdings and its Subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), (iii) valid licensed rights in (in the case of licensed interests in Intellectual Property) and (iv) good title to (in the case of all other personal property), all of their respective properties and assets reflected in the Historical Financial Statements referred to in Section 4.7 and in the most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements in the Ordinary Course of Business or as otherwise permitted under Section 6.8 and in each case except for such defects in title as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Except as permitted by this Agreement, all such properties and assets are free and clear of Liens (other than Permitted Liens).

**4.13.    Environmental Matters**. Neither Holdings nor any of its Subsidiaries nor any of their respective Facilities or operations are subject to any pending or, to each of Holdings' and its Subsidiaries' knowledge, threatened Environmental Claim that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. There are and, to each of Holdings' and its Subsidiaries' knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which would reasonably be expected to form the basis of an Environmental Claim against Holdings or any of its Subsidiaries that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. Neither Holdings nor any of its Subsidiaries is conducting, funding or responsible for any investigation, remediation, remedial action or cleanup of any Hazardous Materials at any Facilities that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The operations of Holdings and each of its Subsidiaries are in compliance with all Environmental Laws, except for any failure to comply that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. To the knowledge of Holdings and its Subsidiaries, compliance with all applicable requirements pursuant to or under Environmental Laws would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No event or condition has occurred or is occurring with respect to Holdings or any of its Subsidiaries relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which, individually or in the aggregate would reasonably be expected to have, a Material Adverse Effect.

**4.14.    Governmental Regulation**. No Credit Party is required to be registered as an "investment company" under the Investment Company Act of 1940.

**4.15.    Federal Reserve Regulations; Exchange Act**. Neither Holdings nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock. No portion of the proceeds of any Credit Extension shall be used in any manner, whether directly or indirectly, that causes or would reasonably be expected to cause, such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors or any other regulation thereof or to violate the Exchange Act.

**4.16.    [Reserved]**.

**4.17.    Employee Benefit Plans**. Except, in each case, where the failure to so comply would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect: (a) Holdings and each of its Subsidiaries are in compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan; (b) each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service or may rely on a favorable opinion letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and, to the knowledge of Holdings, nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status; (c) no liability to the PBGC (other than required premium payments) has been or is expected to be incurred by Holdings, any of its Subsidiaries or any of their ERISA Affiliates; (d) no ERISA Event has occurred or is reasonably expected to occur; (e) except to the extent required under

Section 4980B of the Internal Revenue Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of Holdings or any of its Subsidiaries; and (f) Holdings, each of its Subsidiaries and each of their ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

**4.18.**   **[Reserved]**.

**4.19.**   **[Reserved]**.

**4.20.**   **[Reserved]**.

**4.21.**   **Disclosure**. No representation or warranty of any Credit Party contained in any Credit Document or in any other documents, certificates or written statements furnished to any Agent or Lender by or on behalf of Holdings or any of its Subsidiaries for use in connection with the transactions contemplated, when taken as a whole, hereby contains any untrue statement of a material fact or omits to state a material fact (known to Holdings or the Borrower, in the case of any document not furnished by any of them) necessary in order to make the statements contained herein or therein (in each case, taken as a whole) not materially misleading in light of the circumstances in which the same were made, as supplemented. Any projections, budgets and other forward looking information and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by Holdings to be reasonable at the time made, it being recognized by Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results.

**4.22.**   **Compliance with Statutes, etc.** (a) Each of Holdings and its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property, except such non-compliance that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, including, without limitation, none of Holdings or any of its Subsidiaries or any of their respective directors, officers or, to the knowledge of Holdings, employees, agents, advisors or Affiliates is the target of any sanctions or economic embargoes administered or enforced by the U.S. Department of State, the U.S. Department of Treasury (including the Office of Foreign Assets Control), the United Nations Security Council, the European Union, Her Majesty's Treasury of the United Kingdom, or any other applicable sanctions authority (collectively, **"Sanctions"**, and the associated laws, rules, regulations and orders, collectively, **"Sanctions Laws"**).

(b)   Each of Holdings and its Subsidiaries and their respective directors, officers and, to the knowledge of Holdings, employees, agents, advisors and Affiliates is in compliance, in all material respects, with (i) applicable Sanctions Laws, (ii) the United States Foreign Corrupt Practices Act of 1977, as amended, the United Kingdom Bribery Act of 2010 and any other applicable anti-bribery or anti-corruption laws, rules, regulations and orders (collectively, **"Anti-Corruption Laws"**) and any other applicable terrorism and money laundering laws, rules, regulations and orders and (iii) the PATRIOT Act.

(c)      No part of the proceeds of the Loans will be used, directly or indirectly, by the Borrower (i) in violation of Anti-Corruption Laws or (ii) for the purpose of financing any activities or business of or with any Person, or in any country or territory, that, at the time of such financing, is the target of any Sanctions, except to the extent permissible under applicable Sanctions Laws.

**4.23.    Use of Proceeds**. The proceeds of the Loans shall be used for the purposes set forth in <u>Section 2.6</u>.

**4.24.    Collateral Documents**. Subject to the entry thereof, the Interim Order creates in favor of the Collateral Agent (for the benefit of the Secured Parties), in each case, a legal, valid and enforceable security interest in and Liens on the Collateral described therein and proceeds thereof, which security interest and Lien shall be valid and perfected as of the Closing Date by entry of the Interim Order with respect to each Loan Party and which shall constitute a continuing security interest and Lien on the Collateral having priority over all other security interests and Liens on the Collateral and securing all the Obligations, other than as set forth in the Interim Order. The Collateral Agent and Lenders shall not be required to file or record any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the security interest and Lien granted pursuant to the Interim Order.

Pursuant to Section 364(c)(1) of the U.S. Bankruptcy Code, subject to the entry of the DIP Orders, the Obligations of the Credit Parties shall at all times constitute allowed senior administrative expenses against each of the Credit Parties in the Chapter 11 Cases (without the need to file any proof of claim or request for payment of administrative expense), with priority over any and all other administrative expenses, adequate protection claims, diminution claims and all other claims against the Credit Parties, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the U.S. Bankruptcy Code, and over any and all other administrative expense claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the U.S. Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, which allowed claims shall for purposes of Section 1129(a)(9)(A) of the U.S. Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the U.S. Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Credit Parties and their estates and all proceeds thereof other than as set forth in the DIP Orders.

**4.25.    [Reserved]**.

**4.26.    Intellectual Property**. Each of Holdings and the Subsidiaries owns or has the right to use all Intellectual Property that is used in or is otherwise necessary for the operation of their respective businesses as currently conducted, except where the failure to own or have a right to use such Intellectual Property would not reasonably be expected to have a Material Adverse Effect. To the knowledge of Holdings, the operation of their respective businesses by each of Holdings and the Subsidiaries does not infringe upon, misappropriate, violate or otherwise conflict with the Intellectual Property of any third party, except as would not reasonably be expected to have a Material Adverse Effect.

**4.27.** **Bankruptcy Matters.** (a) The Chapter 11 Cases were commenced on the Petition Date in accordance in all material respects with applicable law and proper notice thereof was given.  Proper notice under the circumstances was also provided for (x) the motion seeking approval of the Credit Documents pursuant to the DIP Order and (y) the hearing for the approval of the DIP Order.

(b)    After entry of the Interim Order (and the Final Order when applicable) and pursuant to and to the extent provided in the Interim Order and the Final Order, as applicable, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, (i) encumbered by no Liens other than Liens permitted by Section 7.1 and (ii) prior and superior to any other Person or Lien pursuant to Section 364(d)(1) of the Bankruptcy Code, in each case, other than the Carve-Out and the Prior Senior Liens (as defined in the DIP Order) and subject to the priorities set forth in the Interim Order or the Final Order, as applicable.

(c)    The Interim Order (with respect to the period prior to the entry of the Final Order) or the Final Order (with respect to the period on and after the entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended without the Requisite Lenders' consent (which consent of the Requisite Lenders may be communicated via an email from the Lender Advisors).

## SECTION 5.    AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Commitment is in effect and until Payment in Full of all Obligations, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this <u>Section 5</u>.

**5.1.** **Financial Statements and Other Reports**. The Borrower will deliver to Administrative Agent for prompt further distribution by the Administrative Agent to each Lender:

(a)    <u>Monthly Financial Statements</u>. Within 45 days after the end of each fiscal month, commencing with the month ended June 30, 2025, an unaudited consolidated balance sheet of Applicable Holdings and its Subsidiaries as at the end of such fiscal month and the related (i) unaudited consolidated statements of income or operations for such fiscal month and for the portion of the fiscal year then ended and (ii) unaudited consolidated statements of cash flows for such fiscal month and the portion of the fiscal year then ended, all in reasonable detail, certified by an Authorized Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of Applicable Holdings and its Subsidiaries in accordance with IFRS;

(b)    <u>Quarterly Financial Statements</u>. Within 45 days after the end of each  Fiscal Quarter of each Fiscal Year, commencing with the Fiscal Quarter ended July 31, 2025, the consolidated balance sheets of Applicable Holdings and its Subsidiaries as at the end of such Fiscal Quarter from the consolidated financial statements, the related consolidated statements of income and cash flows of Applicable Holdings and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form solely with respect to the consolidated statement of income

the corresponding figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail;

(c)    Annual Financial Statements. Within 90 days after the end of each Fiscal Year, commencing with the Fiscal Year in which the Effective Date occurs, (i) the consolidated balance sheets of Applicable Holdings and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of Applicable Holdings and its Subsidiaries for such Fiscal Year, and (ii) with respect to such consolidated financial statements a report thereon of SyCip Gorres Velayo & Co. or other independent certified public accountants of recognized national standing selected by the Borrower, or other accounting firm reasonably satisfactory to Administrative Agent (acting at the Direction of the Requisite Lenders) and scope of audit, and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of Applicable Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with IFRS and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards) subject only to normal year-end audit adjustments and the absence of footnotes;

(d)    Compliance Certificate. Commencing with the financial statements for the Fiscal Quarter ended July 31, 2025, together with each delivery of financial statements of DMFHL and its Subsidiaries pursuant to Sections 5.1(b) and 5.1(c), a duly executed and completed Compliance Certificate;

(e)    Additional Reporting. The Borrower shall deliver to the Administrative Agent any additional reporting required to be delivered to the ABL DIP Agent under the ABL DIP Credit Agreement;

(f)    Notice of Default. Promptly upon any Authorized Officer of the Borrower obtaining knowledge (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to the Borrower with respect thereto; provided, that, subject to Section 8.1(c), the delivery of a notice of Default at any time will cure an Event of Default arising from the failure of the Borrower to timely deliver such notice of Default; (ii) that any Person has given any notice to Holdings or any of its Subsidiaries or taken any other action with respect to any event or condition set forth in Section 8.1(b); or (iii) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of an Authorized Officer specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action the Borrower has taken, is taking and proposes to take with respect thereto;

(g)    Notice of Litigation. Promptly upon any Authorized Officer of the Borrower obtaining knowledge of (i) any Adverse Proceeding not previously disclosed in writing by the Borrower to Lenders, or (ii) any development in any Adverse Proceeding that, in the case of either clause (i) or (ii), is reasonably expected to be adversely determined and, if reasonably expected to be adversely determined, such adverse determination would reasonably be expected to have a Material Adverse Effect, written notice thereof together with such other information as

78

may be reasonably available to the Borrower to enable Lenders and their counsel to evaluate such matters (<u>provided</u>, that the Borrower shall not be obligated to provide information relating to such matters solely to the extent the provision of such information would result in a loss of attorney-client privilege or other similar privilege);

(h)　　[Reserved];

(i)　　[Reserved];

(j)　　[Reserved];

(k)　　[Reserved];

(l)　　[Reserved];

(m)　　<u>Other Information</u>. (A) Promptly upon their becoming available, copies of (i) all financial statements, reports, notices and proxy statements sent or made available generally by DMFHL or Holdings, as applicable, or made available by any of its Subsidiaries to its material bondholders or holders of any other of its material debt securities acting in such capacity or made available by any Subsidiary of DMFHL or Holdings, as applicable, to its debt security holders other than DMFHL or Holdings or another Subsidiary of DMFHL or Holdings, (ii) all regular and periodic reports and all registration statements and prospectuses, if any, filed by DMFL or Holdings or any of its Subsidiaries with any securities exchange or with the Securities and Exchange Commission or any other Governmental Authority, (iii) all press releases and other statements made available generally by DMFHL or Holdings, as applicable, or any of its Subsidiaries to the public concerning material developments in the business of DMFHL or Holdings or any of its Subsidiaries; <u>provided</u>, that <u>subclauses (i)</u> and <u>(ii)</u> of this <u>clause (A)</u> shall not require delivery of any such information as the result of customary reporting or filing requirements in foreign jurisdictions, and (B) promptly following written request, such other information and data with respect to DMFL or Holdings or any of its Subsidiaries as from time to time may be reasonably requested by Administrative Agent or any Lender; and

(n)　　<u>Certification of Public Information</u>. The Borrower and each Lender acknowledge that certain of the Lenders may be Public Lenders and, if documents or notices required to be delivered pursuant to this <u>Section 5.1</u> or otherwise are being distributed through IntraLinks/IntraAgency, SyndTrak or another relevant website or other information platform (the **"Platform"**), solely to the extent the Borrower has indicated that a document or notice contains only Public-Side Information should such document or notice shall be posted on that portion of the Platform designated for such Public Lenders. The Borrower agrees to clearly designate all information provided to Administrative Agent by or on behalf of the Borrower which contains only Public-Side Information, and by doing so shall be deemed to have represented that such information contains only Public-Side Information. If the Borrower has not indicated whether a document or notice delivered pursuant to this <u>Section 5.1</u> contains Private-Side Information, Administrative Agent reserves the right to post such document or notice solely on that portion of the Platform designated for Private Lenders. The Borrower acknowledges and agrees that the list of Disqualified Institutions shall be deemed to be suitable for posting on a portion of the Platform for Public Lenders and may be posted on the Effective Date to all Lenders by the Administrative

Agent, and thereafter all written supplements updating the list of Disqualified Institutions may be posted to all Lenders by the Administrative Agent after receipt thereof from the Borrower.

**5.2.    Existence**. Except as otherwise permitted under <u>Section 6.8</u>, each Credit Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights and franchises, licenses and permits material to its business, except as expressly permitted by <u>Section 6.8</u>; <u>provided</u>, that no Credit Party (other than the Borrower with respect to existence) or any of its Subsidiaries shall be required to preserve any such existence, right or franchise, licenses and permits if the failure to so preserve would not reasonably be expected to result in a Material Adverse Effect.

**5.3.    Payment of Taxes**. Each Credit Party will, and will cause each of its Subsidiaries to, pay all Taxes imposed upon it or any of its properties or assets or in respect of any of its income before any penalty or fine accrues thereon; <u>provided</u>, that no such Tax need be paid if (a) it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (x) adequate reserve or other appropriate provision, as shall be required in conformity with IFRS shall have been made therefor, and (y) in the case of a Tax or claim which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim or (b) the failure to pay such Taxes would not reasonably be expected to result in a Material Adverse Effect.

**5.4.    Maintenance of Properties**. Each Credit Party will, and will cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear, casualty and condemnation excepted, all material properties used or useful in the business of Holdings and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof, except, in each case, where the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

**5.5.    Insurance**. Holdings will maintain or cause to be maintained, with reputable insurers, such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of Holdings and its Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in Similar Businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons, in each case as determined by Holdings in its business judgment. Without limiting the generality of the foregoing, Holdings will maintain or cause to be maintained (a) flood insurance with respect to each Flood Hazard Property in respect of any real property that is located in a community that participates in the Flood Program, in each case in compliance with any applicable regulations of the Board of Governors solely to the extent that any such flood insurance relating to such real property is required by law, and (b) replacement value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation engaged in Similar Businesses.

**5.6.    Books and Records; Inspections**. Each Credit Party will, and will cause each of its Subsidiaries to, keep proper books of record and accounts in which full, true and correct entries

in conformity in all material respects with IFRS shall be made of all dealings and transactions in relation to its business and activities. Each Credit Party will, and will cause each of its Subsidiaries to, permit any authorized representatives designated by the Administrative Agent to visit and inspect any of the properties of any Credit Party and any of its respective Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants (underline provided that an officer of the Borrower shall be given a reasonable opportunity to be present at all meetings with the accountants of the Credit Parties), all upon reasonable notice and at such reasonable times during normal business hours; provided, that absent an Event of Default, only one such visit per Fiscal Year shall be permitted (and such visit shall be limited to the chief executive office and such other facilities as reasonably determined by the Administrative Agent and the Borrower); provided further, that, absent an Event of Default, only one such visit per Fiscal Year shall be required to be reimbursed by the Credit Parties.

5.7.    **[Reserved]**.

5.8.    **Compliance with Laws**. Each Credit Party will comply, and shall cause each of its subsidiaries and all other Persons, if any, on or occupying any Facilities to comply, with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including all Environmental Laws), except to the extent that non-compliance therewith would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (or, in the case of the laws, rules, regulations and orders referred to in Section 4.22, except to the extent that non-compliance therewith is not material); provided that with respect to Anti-Corruption Laws, anti-money laundering laws and Sanctions Laws, Holdings will, and will cause each of its subsidiaries to, comply with such laws in all material respects.

5.9.    **[Reserved]**.

5.10.    **Additional Guarantors**. In the event that any Person becomes a Subsidiary of any Credit Party after the Effective Date, Holdings shall, or shall cause such Credit Party, within 15 days of such event (as extended in the sole discretion of the Administrative Agent (acting at the Direction of the Requisite Lenders)) (i) cause such Subsidiary to become a Guarantor hereunder by executing and delivering to Administrative Agent and Collateral Agent a Counterpart Agreement, and (ii) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates reasonably requested by Collateral Agent (acting at the Direction of the Requisite Lenders).

5.11.    **[Reserved]**.

5.12.    **Further Assurances**. At any time or from time to time upon the reasonable request of Administrative Agent (acting at the Direction of the Requisite Lenders), each Credit Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as Administrative Agent or Collateral Agent (each acting at the Direction of the Requisite Lenders) may reasonably request in order to effect fully the purposes of the Credit Documents to the extent required under the Credit Documents. In furtherance and not in limitation of the foregoing but subject to the terms of the Credit Documents, each Credit Party shall take such actions as Administrative Agent or Collateral Agent (each acting at the Direction of the Requisite

Lenders) may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by substantially all of the assets of Holdings and its Subsidiaries and all of the outstanding Equity Interests of the Holdings and its Subsidiaries (subject to limitations contained in the Credit Documents with respect to Foreign Subsidiaries and the Excluded Collateral). Notwithstanding anything to the contrary herein, neither Holdings nor any of its Subsidiaries shall be required to grant a security interest in the Excluded Collateral.

     **5.13.    Maintenance of Ratings**. The Borrower shall use commercially reasonable efforts to obtain within thirty (30) calendar days after the date that the Final Order is entered and maintain (i) a public corporate family rating (but no specific rating) issued by Moody's and a public corporate credit rating issued by S&P and (ii) a public credit rating (but no specific rating) from each of Moody's and S&P with respect to the Term Loans.

     **5.14.    [Reserved]**.

     **5.15.    [Reserved]**.

     **5.16.    Use of Proceeds**. Subject to the terms and conditions herein, use the proceeds of the Loans on or after the Effective Date, solely in accordance with the DIP Orders and the Approved DIP Budget (subject to the Permitted Variance), including to: (i) pay related transaction costs, fees and expenses (including attorney's fees required to be paid hereunder with respect to the DIP Facility, (ii) fund interest, fees, and other payments contemplated in respect of the DIP Facility and adequate protection payments contemplated by the DIP Orders, (iii) provide working capital and for other general corporate purposes of the Credit Parties and their Subsidiaries, (iv) fund the costs of the administration of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court for payment, including amounts paid pursuant to customary "first day" orders, and (v) fund and pay obligations arising out of, or that are related to, the Carve Out. The Credit Parties shall not be permitted to use the proceeds of the Loans or any cash collateral in contravention of the provisions of the Credit Documents, the Approved DIP Budget (subject to the Permitted Variance), the DIP Orders or the Bankruptcy Code; provided, that this Section 5.16 shall not be construed to limit Allowed Professional Fees.

     **5.17.    ERISA**. When applicable, (a) the Borrower will furnish to the Administrative Agent promptly following receipt thereof, copies of any documents described in Section 101(k) or 101(l) of ERISA that any Credit Party or any of its Subsidiaries may request with respect to any Multiemployer Plan to which a Credit Party or any of its Subsidiaries is obligated to contribute; provided that if the Credit Parties or any of their Subsidiaries have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, then, upon reasonable request of the Administrative Agent (acting at the Direction of the Requisite Lenders), applicable Credit Party or Subsidiary shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof; provided, further, that the rights granted to the Administrative Agent in this Section 5.17 shall be exercised not more than once during a 12-month period, and (b) the Borrower will notify the Administrative Agent promptly following the occurrence of any ERISA Event that, alone or together with any other ERISA Events

that have occurred, would reasonably be expected to result in liability of any Credit Party that would reasonably be expected to have a Material Adverse Effect.

**5.18.    Conduct of Business**. From and after the Effective Date, no Credit Party shall, nor shall it permit any of its Subsidiaries to, engage in any business other than (i) the businesses engaged in by such Credit Party on the Effective Date and extensions thereof or otherwise similar, incidental, complementary, synergistic, reasonably related, or ancillary to any of the foregoing, in each case as determined by the Borrower in good faith and (ii) such other lines of business as may be consented to by Requisite Lenders.

**5.19.    Fiscal Year**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, change its Fiscal Year-end from the Sunday closest to April 30, unless approved by the Administrative Agent (acting at the Direction of the Requisite Lenders), such consent not to be unreasonably withheld.

**5.20.    Transactions with Shareholders and Affiliates**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of Holdings on terms that are less favorable to Holdings, the Borrower or that Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate; <u>provided</u>, that the foregoing restriction shall not apply to:

(a)    any transaction between Holdings and any Subsidiary, including loans and other transactions among Holdings and the Subsidiaries or any entity that becomes a Subsidiary as a result of such loan or other transaction to the extent permitted under this <u>Section 5.20</u> (excluding, for the avoidance of doubt, any acquisition of an entity from a Person other than Holdings or a Subsidiary);

(b)    reasonable and customary fees paid to members of the board of directors (or similar governing body) of Holdings and its Subsidiaries;

(c)    compensation arrangements (including bonuses) and other benefits and indemnification arrangements for directors, officers and other employees of Holdings and its Subsidiaries entered into in the Ordinary Course of Business;

(d)    transactions described in <u>Schedule 5.20</u>, and any amendments or modifications thereto so long as such amendment or modification is not materially less favorable to Holdings or such Subsidiary than the terms in effect on the Effective Date;

(e)    [reserved];

(f)    transactions permitted by <u>Sections 6.4(a),(k)</u> and <u>(l)</u>;

(g)    the Transactions;

(h)    non-exclusive licensing of intellectual property in the Ordinary Course of Business that does not interfere with the business of Holdings or any of its Subsidiaries, made in good faith, for a bona fide business purpose (and not for any other purpose, including, without

limitation, a "liability management transaction"); and

(i)    payments to or from, and transactions with, Joint Ventures (to the extent any such Joint Venture is only an Affiliate as a result of Investments by Holdings and the Subsidiaries in such Joint Venture) in the Ordinary Course of Business and permitted by Section 6.6.

**5.21.    Lender Advisors; Professional Services Firm**. The Lenders (taken as a whole) shall be entitled to retain or continue to retain (either directly or through counsel) any Lender Advisor as the Requisite Lenders may deem necessary to provide advice and analysis of the reporting delivered for the benefit of the Lenders as expressly provided herein. The Credit Parties shall pay all reasonable and documented out of pocket fees, charges and disbursements of each Lender Advisor within the timeframe as set forth in the DIP Orders, and all such fees and expenses shall constitute Obligations and be secured by the Collateral.

**5.22.    Weekly Advisor Calls**. Commencing the week of [  ], 2025, the Borrower, and the Borrower's advisors shall hold weekly calls with the Lender Advisors provided that, to the extent requested by the Lender Advisors, such weekly call shall include representatives from the Lenders and the Borrower, as applicable. The date and time of the weekly advisor calls shall be agreed among the Requisite Lenders and the Borrower.

**5.23.    Milestones**. The Borrower shall, or shall cause, the actions and events set forth on Annex I to occur by the times and dates set forth therein, unless waived by the Administrative Agent (acting at the Direction of the Requisite Lenders), as any such time and date may be extended from time to time by the Administrative Agent (acting at the Direction of the Requisite Lenders); provided that, without limiting the foregoing, where used in Annex I, any "delivery" required by this Section 5.23 shall require delivery to the Lender Advisors (and all such deliveries are to be in form and substance satisfactory to the Requisite Lenders in their sole discretion), as well as to any other Person specified in Annex I attached hereto  (each, a "**Milestone**" and collectively, the "**Milestones**")[2].

**5.24.    Approved DIP Budget**.

(a)    The use of Loans by the Credit Parties under this Agreement and the other Credit Documents shall be limited in accordance with the Approved DIP Budget (subject to Permitted Variances). The Approved DIP Budget shall set forth, on a weekly basis, for the period ending the week of [  ], 2025 covered thereby, the Budgeted Receipts, Budgeted Disbursements and Budgeted Liquidity for the period commencing with the week that includes the Petition Date and shall be approved by, and be in form and substance satisfactory to, the Requisite Lenders (it being acknowledged and agreed that the form of Approved DIP Budget set forth as Exhibit O hereto is approved by and satisfactory to the Requisite Lenders and is and shall be the Approved DIP Budget unless and until replaced in accordance with the terms of this Section 5.24). The Approved DIP Budget shall (i) include line-item reporting, the nature and scope of which shall be satisfactory to the Requisite Lenders and (ii) otherwise be in form and substance satisfactory to,

---

[2] NTD:  Milestone Annex to include all Milestones from the RSA.

and subject to the approval of, the Requisite Lenders.

(b)      On or before the fifth (5th) Business Day before the end of each Budget Period, the Borrower and/or the Administrative Agent (acting at the Direction of the Requisite Lenders) may request that the Approved DIP Budget be updated by the Borrower for the subsequent 13-week period (a "**Subsequent DIP Budget**"), which Subsequent DIP Budget shall be in form and substance satisfactory to, and subject to the approval of, the Requisite Lenders; provided that Subsequent DIP Budget shall be deemed to an Approved DIP Budget absent response or objection by the Requisite Lenders (which objection may be communicated by means of a Direction of the Requisite Lenders) within ten (10) Business Days of receipt; provided, further, however, that in the event the Requisite Lenders, on the one hand, and the Borrower, on the other hand, cannot agree as to a Subsequent DIP Budget, the then current Approved DIP Budget shall remain in effect and the Borrower shall be required to work in good faith with the Requisite Lenders to modify such Subsequent DIP Budget until the Requisite Lenders approve such Subsequent DIP Budget as an "Approved DIP Budget".  Each Approved DIP Budget delivered to the Administrative Agent and the Lender Advisors shall be accompanied by such supporting documentation as reasonably requested by the Requisite Lenders.  Each Approved DIP Budget shall be prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time of preparation thereof.

(c)      During each Budget Period, Permitted Budget Variances shall be tested on a cumulative weekly basis for the following periods (each, a "Testing Period") (i) the first and second weeks of such Budget Period, (ii) the first, second and third weeks of such Budget Period and (iii) such Budget Period in its entirety. With respect to each Budget Period, the Borrower shall not permit, for any Testing Period during such Budget Period: (x) Actual Disbursements (in the aggregate) to be more than 115% (on a cumulative basis during the Budget Period) of the Budgeted Disbursements (for the avoidance of doubt, excluding the fees and expenses of Professional Persons (as defined in the DIP Orders)) (in the aggregate) as set forth in the Approved DIP Budget with respect to such period; and (y) Actual Receipts (in the aggregate) to be less than 85% (on a cumulative basis during the Budget Period) of the Budgeted Receipts (in the aggregate) as set forth in the Approved DIP Budget with respect to such period (the "**Permitted Variances**").

(d)      With respect to each Testing Period in a Budget Period, the Borrower shall deliver to the Administrative Agent and the Lenders on or before 5:00 p.m. New York City time on Friday of the week immediately following the end of such Testing Period, an Approved DIP Budget Variance Report.

(e)      The Borrowers shall deliver to the Administrative Agent and the Lender Advisors concurrently with the delivery of the Approved DIP Budget Variance Report pursuant to clause (d) above, a certificate which shall include such detail as is reasonably satisfactory to the Requisite Lenders, signed by a Responsible Officer of the Borrower certifying that (i) the Credit Parties are in compliance with the covenants contained in Section 5.24, (ii) no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and (iii) the Credit Parties are in compliance with the Minimum Liquidity Covenant set forth in Section 6.9.

(f)     The Lenders (i) may assume that the Credit Parties will comply with the Approved DIP Budget (subject to Permitted Variances), (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved DIP Budget.  The line items in the Approved DIP Budget for payment of interest, expenses and other amounts to the Administrative Agent and the Lenders are estimates only, and the Credit Parties remain obligated to pay any and all Obligations in accordance with the terms of the Credit Documents regardless of whether such amounts exceed such estimates. Nothing in any Approved DIP Budget shall constitute an amendment or other modification of any Credit Document or other lending limits set forth therein.

**5.25.     Cash Management**. Maintain the cash management of the Credit Parties in accordance in all material respects with the Cash Management Order.

## SECTION 6.     NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Commitment is in effect and until Payment in Full of all Obligations, such Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

**6.1.     Indebtedness**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)     the Obligations;

(b)     Indebtedness of any Subsidiary to Holdings or to any other Subsidiary, or of Holdings to any Subsidiary; provided, that (i) all such Indebtedness shall be evidenced by the Intercompany Note, (ii) all such Indebtedness shall be unsecured and subordinated in right of payment to the Payment in Full of the Obligations pursuant to the terms of the Intercompany Note and (iii) such Indebtedness is permitted as an Investment under Sections 6.6(e), (k), (l) or (m);

(c)     (i) Indebtedness incurred under the ABL DIP Credit Agreement and any other ABL DIP Credit Document not to exceed at any time $[500,000,000][3] and (ii) Indebtedness under the Prepetition Credit Agreement;

(d)     Indebtedness incurred by Holdings or any of its Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price, holdbacks or similar obligations or from guaranties or letters of credit, bank guarantees, surety bonds or performance bonds securing the performance of Holdings or any such Subsidiary pursuant to such agreements, in connection with Investments permitted hereunder or permitted dispositions of any business, assets or Subsidiary of Holdings or any of its Subsidiaries in the Ordinary Course of Business;

(e)     [reserved];

---

[3] NTD: To equal the amount of ABL DIP Commitments on the Effective Date.

(f)    obligations (including in respect of letters of credit, bank guarantees, bankers' acceptances, or similar instruments issued or created in the Ordinary Course of Business) in respect of bids, tenders, trade contracts, governmental contracts and leases, statutory obligations, surety, stay, customs, bid, and appeal bonds, performance and return of money bonds, performance and completion guarantees, agreements with utilities and other obligations of a like nature (including those to secure health, safety and environmental obligations, including in respect of workers' compensation, unemployment insurance and other social security legislation, health, disability or other employee benefits or property, casualty or liability insurance), in each case (other than in the case of appeal bonds) in the Ordinary Course of Business;

(g)    Indebtedness arising from (i) the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the Ordinary Course of Business, in respect of netting services, overdraft protections and otherwise in connection with deposit accounts, employee credit card programs and (ii) other cash management and similar arrangements, in the case of clause (ii), in the Ordinary Course of Business;

(h)    guaranties in the Ordinary Course of Business of the obligations of suppliers, customers, franchisees and licensees of Holdings and its Subsidiaries;

(i)    guaranties by Holdings of Indebtedness of a Subsidiary or guaranties by a Subsidiary of Indebtedness of Holdings or another Subsidiary with respect, in each case, to Indebtedness otherwise permitted to be incurred pursuant to this Section 6.1; provided, that if the Indebtedness that is being guarantied is unsecured and/or subordinated to the Obligations, the guaranty shall also be unsecured and/or subordinated to the Obligations; provided, further, that no Credit Party shall guarantee the Indebtedness of a Subsidiary that is not a Credit Party unless such guarantee is also permitted under Section 6.6;

(j)    (i) Indebtedness (other than Capital Leases and purchase money Indebtedness, which shall be deemed incurred pursuant to Section 6.1(k)) of Holdings and/or any Subsidiary existing, or pursuant to commitments existing, on the Effective Date and (ii) to the extent such Indebtedness is in excess of $1,000,000, described in Schedule 6.1 as of the Effective Date, but not any extensions, renewals or replacements of such Indebtedness except renewals and extensions expressly provided for in the agreements evidencing any such Indebtedness as the same are in effect on the date of this Agreement; provided, that such Indebtedness shall not (A) include Indebtedness of an obligor that was not an obligor with respect to the Indebtedness being extended, renewed or refinanced, (B) exceed in a principal amount the Indebtedness being renewed, extended or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the refinancing or (C) be incurred, created or assumed if any Default or Event of Default under Section 8.1(a), (f) or (g) has occurred and is continuing or would result therefrom;

(k)    [reserved];

(l)    [reserved];

(m)    [reserved];

(n)      other unsecured Indebtedness of Holdings and its Subsidiaries that are Credit Parties in the Ordinary Course of Business, made in good faith, for a *bona fide* business purpose (and not for any other purpose, including, without limitation, a "liability management transaction"), in an aggregate amount not to exceed at any time $1,000,000;

(o)      [reserved];

(p)      [reserved];

(q)      [reserved];

(r)      [reserved];

(s)      [reserved];

(t)      Indebtedness representing deferred compensation to current or former officers, directors, managers, consultants and employees members of management and consultants of Holdings and its Subsidiaries incurred in the Ordinary Course of Business;

(u)      [reserved];

(v)      Indebtedness consisting (i) solely of obligations under Insurance Premium Financing Arrangements or (ii) of take-or-pay obligations contained in supply arrangements, in each case, in the Ordinary Course of Business;

(w)      [reserved];

(x)      Indebtedness consisting of Interest Rate Agreements and Currency Agreements; provided, that such obligations are entered into in the Ordinary Course of Business, made in good faith, for a bona fide business purpose (and not for any other purpose, including, without limitation, a "liability management transaction"), for the purpose of mitigating risks associated with liabilities, commitments, investments, assets or property held or reasonably anticipated by such Person, and not for purposes of speculation;

(y)      [reserved];

(z)      [reserved];

(aa)      [reserved]; and

(bb)      Indebtedness of Subsidiaries of Holdings that are non-Credit Parties incurred under working capital lines not to exceed $1,000,000 in the Ordinary Course of Business, made in good faith, for a *bona fide* business purpose (and not for any other purpose, including, without limitation, a "liability management transaction").

Notwithstanding the foregoing, Indebtedness of the Borrower or any Credit Party owing to Holdings, the Borrower or another Subsidiary that is not a Credit Party shall be unsecured, subordinated in right of payment to the Guaranty of Holdings, the Borrower or such Guarantor as

the case may be and any guarantee by Holdings, the Borrower or any Credit Party of Indebtedness of Holdings, the Borrower or another Subsidiary that is not a Credit Party shall be subordinated in right of payment to the Guaranty of Holdings, the Borrower or such Guarantor as the case may be.

**6.2.    Liens**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of Holdings or any of its Subsidiaries, whether now owned or hereafter acquired or licensed, or any income, profits or royalties therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income, profits or royalties under the UCC of its State of organization or under any similar recording or notice statute or under any applicable intellectual property laws, rules or procedures, except:

(a)    Liens on Indebtedness permitted by Section 6.1(a) and Liens otherwise granted to secure the Obligations pursuant to the Credit Documents;

(b)    Liens for Taxes (i) if obligations with respect to such Taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and adequate reserves have been made in accordance with IFRS or (ii) if the failure to pay such amounts would not reasonably be expected to result in a Material Adverse Effect;

(c)    statutory Liens of landlords, banks (and rights of set-off), of carriers, warehousemen, mechanics, repairmen, construction contractors, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code), in each case incurred in the Ordinary Course of Business (i) for amounts not yet overdue or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of sixty days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by IFRS shall have been made for any such contested amounts;

(d)    Liens incurred in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security legislation, health, disability or other employee benefits (other than any such Lien imposed pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code), or to secure the performance of tenders, statutory obligations, stay, customs, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds, performance and completion guarantees, agreements with utilities and other similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

(e)    easements, rights-of-way, servitudes, restrictions, protrusions, covenants, variations in area of measurement, encroachments, declarations on or with respect to the use of property, and other minor defects or irregularities in title, in each case which do not and will not

interfere in any material respect with the ordinary conduct of the business and consistent with the past practice of Holdings or any of its Subsidiaries and do not secure any monetary obligations;

(f)     any interest or title of a lessor or sublessor under any lease which does not (i) interfere in any material respect with the business of Holdings and its Subsidiaries, taken as a whole, or (ii) secure any Indebtedness for borrowed money;

(g)     Liens solely on any cash earnest money deposits made by Holdings or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(h)     purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the Ordinary Course of Business;

(i)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)     any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(k)     licenses of patents, copyrights, trademarks and other intellectual property rights granted by Holdings or any of its Subsidiaries in the Ordinary Course of Business, made in good faith, for a *bona fide* business purpose (and not for any other purpose, including, without limitation, a "liability management transaction");

(l)     (i) Liens existing on the Effective Date, (ii) to the extent securing obligations in excess of $1,000,000, Liens described in Schedule 6.2 or (iii) Liens described on a title report delivered pursuant to Section 5.11;

(m)     [reserved];

(n)     [reserved];

(o)     other Liens on assets securing Indebtedness or other obligations in an aggregate amount at any time outstanding not to exceed $1,000,000; provided, that if such Lien is securing Indebtedness for borrowed money, such Lien shall be expressly subordinated or junior to the Liens securing the Obligations;

(p)     [reserved];

(q)     [reserved];

(r)     [reserved];

(s)     Liens arising from judgments or orders for the payment of money (or appeal or other surety bonds relating thereto) not constituting an Event of Default;

(t)       Liens (i) of a collection bank arising under Section 4-208 of the UCC or similar provisions of applicable law on items in the course of collection, (ii) in favor of a banking or other financial institution arising as a matter of common or statutory law encumbering deposits or other funds maintained with a financial institution (including the right of setoff (A) relating to the establishment of depository relations with banks or other deposit-taking financial institutions in the Ordinary Course of Business and not given in connection with the issuance of Indebtedness and (B) relating to pooled deposit, automatic clearinghouse accounts or sweep accounts of Holdings or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the Ordinary Course of Business); and (iii) in connection with cash management arrangements entered into in the Ordinary Course of Business;

(u)       Liens consisting of an agreement to dispose of any property in a disposition permitted under Section 6.8, solely to the extent such disposition would been permitted on the date of the creation of such Lien;

(v)       Liens on property of a Subsidiary that is not a Credit Party in respect of Indebtedness permitted under Section 6.1(bb);

(w)       (i) Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by Holdings or any of its Subsidiaries in the Ordinary Course of Business and (ii) Liens or similar provisions of applicable law under Article 2 of the UCC or similar provisions of applicable law in favor of a seller or buyer of goods;

(x)       with respect to any Foreign Subsidiary, other Liens and privileges arising as a matter of law;

(y)       Liens created pursuant to Insurance Premium Financing Arrangements otherwise permitted under this Agreement, so long as such Liens attach only to gross unearned premiums for the insurance policies and related rights;

(z)       customary rights of first refusal and tag, drag and similar rights in Joint Venture agreements entered into in the Ordinary Course of Business;

(aa)      Liens on cash and Cash Equivalents (which may be in the form of letters of credit or bank guarantees) securing Interest Rate Agreements, Currency Agreements and/or other hedging contracts, agreements, confirmations or other similar transaction or arrangement enter into in the Ordinary Course of Business, made in good faith, for a bona fide business purpose (and not for any other purpose, including, without limitation, a "liability management transaction"), for the purpose of mitigating risks associated with liabilities, commitments, investments, assets or property held or reasonably anticipated by such Person, and not for purposes of speculation, in each case to the extent not consisting of part of the Obligations in an aggregate amount at any time outstanding not to exceed $1,000,000; and

(bb)      Liens on Specified Intellectual Property (and proceeds thereof) in favor of licensees of such Specified Intellectual Property licensed by any of Holdings and its Subsidiaries to such licensee, which Liens secure damage claims in the event of a rejection of such applicable license in a bankruptcy case under Debtor Relief Laws, provided such Liens are subject to the License Intercreditor Agreement.

**6.3.**    **[Reserved]**.

**6.4.**    **Restricted Junior Payments**. No Credit Party shall, nor shall it permit any of its Subsidiaries through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment except that:

(a)    any Subsidiary of Holdings may declare and pay dividends or make other distributions ratably to its equity holders;

(b)    [reserved];

(c)    [reserved];

(d)    [reserved];

(e)    [reserved];

(f)    [reserved];

(g)    [reserved];

(h)    [reserved];

(i)    Holdings and its Subsidiaries may make regularly scheduled payments of interest in respect of any Subordinated Indebtedness in accordance with the terms of the subordination agreement applicable thereto;

(j)    [reserved];

(k)    if and for so long as the Borrower files or joins in filing a consolidated, combined, unitary or similar federal, state, provincial, territorial or local income tax return with Holdings (or any other direct or indirect parent entity of the Borrower) of which Holdings or any other direct or indirect parent entity of the Borrower is the common parent, the Borrower may make, and may cause its Subsidiaries to make, distributions, directly or indirectly, to Holdings (and/or any other direct or indirect parent entity of the Borrower) to permit such entities to pay federal, state, provincial, territorial and/or local income Taxes (and franchise Taxes), as applicable, attributable to the income of the Borrower and/or its Subsidiaries then due and payable for such taxable period in respect of which a tax return is filed by Holdings or such direct or indirect parent entity of the Borrower that includes the Borrower (for the avoidance of doubt, taking into account any net operating losses or other attributes of the Borrower or its Subsidiaries to the extent such attributes would reduce the Taxes of the Borrower or its Subsidiaries if calculated on a stand-alone basis or as a stand-alone group) and reduced by the amount of such Taxes directly paid by the Borrower and/or its Subsidiaries to an applicable Governmental Authority; <u>provided</u> that the amount of such distributions for any taxable period shall not be greater than the amount of such Taxes that would have been due and payable by the Borrower and its applicable Subsidiaries for such taxable period had the Borrower and its applicable Subsidiaries paid such Taxes on a stand-alone basis or as a stand-alone group;

(l)     Holdings may make Restricted Junior Payments to the direct or indirect parent company of Holdings to permit such parent company to pay, without duplication, the following expenses to the extent such costs and expenses are attributable to the ownership or operation of Holdings and its Subsidiaries, including Holdings' proportionate share of such amount relating to such parent company being a public company, in each case in the Ordinary Course of Business:

(i)     ordinary course corporate operating and overhead expenses consistent with past practices (including administrative, legal, accounting and similar expenses provided by third parties) and other fees and expenses required to maintain its or their corporate existence (including franchise and similar Taxes);

(ii)     reasonable fees and expenses in connection with compliance with reporting obligations under, or connection with compliance with applicable law;

(iii)     cash, in lieu of issuing fractional shares, in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Equity Interests of such Person;

(iv)     reasonable directors' fees and indemnification payments, in each case of such direct parent company; and

(v)     Public Company Costs; and

(m)     so long as such payment is in accordance with the Approved DIP Budget, payments made to DMFI pursuant to the terms of (i) the Transition Services Agreement and (ii) the Contribution Agreement, in the case of this clause (ii) in respect of liabilities owing by the Borrower to DMFI under Section 18 of the Contribution Agreement.

Notwithstanding anything to the contrary contained in this Agreement, in no event shall (a) the Borrower or any Credit Party sell, transfer or otherwise dispose of any Material Property (whether pursuant to a sale, lease, license, transfer, Investment, restricted payment, dividend or otherwise or relating to the exclusive rights thereto) to any Subsidiary that is not a Credit Party; provided that in no event shall this sentence prohibit the Borrower or its Subsidiaries from entering into non-exclusive licensing arrangements of Intellectual Property to a Subsidiary in the Ordinary Course of Business for a bona fide business purpose and (b) no Subsidiary that is not a Credit Party shall own or hold an exclusive license to any Material Property.

**6.5.     Restrictions on Subsidiary Distributions**. Except as provided herein, no Credit Party shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of Holdings to:

(a)     pay dividends or make any other distributions on any of such Subsidiary's Equity Interests owned by Holdings or any other Subsidiary of Holdings,

(b)     repay or prepay any Indebtedness owed by such Subsidiary to Holdings or any other Subsidiary of Holdings,

(c)      make loans or advances to Holdings or any other Subsidiary of Holdings, or

(d)      transfer, lease or license any of its property or assets to Holdings or any other Subsidiary of Holdings

other than, in each case:

(A)      restrictions:

(i)      by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, Joint Venture agreements and similar agreements entered into in the Ordinary Course of Business,

(ii)      that are or were created by virtue of any transfer of, agreement to transfer or option or right with respect to any property, assets or Equity Interests not otherwise prohibited under this Agreement,

(iii)      described on Schedule 6.5,

(iv)      [reserved],

(v)      in any agreement, document, instrument or other arrangement that is assumed by Holdings or any of its Subsidiaries (or existed at the time such Person was acquired) in connection with an Investments permitted hereunder (and was not created in contemplation of such Investment),

(vi)      on cash or other deposits imposed by customers under contracts entered into in the Ordinary Course of Business or arise in connection with cash or cash deposits permitted under Section 6.2 and limited to such cash or cash deposit,

(vii)      imposed by any agreement relating to a Permitted Lien (provided that such restrictions shall only apply to the assets or property secured thereby), or

(B)      [reserved], and

(C)      agreements evidencing Indebtedness permitted by Section 6.1(c), (k)and (n).

**6.6.      Investments**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including any Joint Venture, except:

(a)      Investments in Cash and Cash Equivalents;

(b)        (i) equity Investments owned as of the Effective Date in any Subsidiary or any Joint Venture described in Schedule 6.6(b) and (ii) Investments made after the Effective Date in (x) Holdings, the Borrower or any Subsidiary, (y) by any Subsidiary that is not a Credit Party in another Subsidiary that is a wholly owned Subsidiary and (z) by any Subsidiary that is not a Credit Party in a Credit Party; provided, that any Investments made by Credit Parties in any non-Credit Party pursuant to clause (ii) shall not exceed $1,000,000 and shall be made in good faith, for a *bona fide* business purpose (and not for any other purpose, including, without limitation, a "liability management transaction");

(c)        Investments (i) in any Securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors and (ii) deposits, prepayments and other credits to suppliers made in the Ordinary Course of Business;

(d)        Investments consisting of the purchase of the remaining Equity Interests in Joint Ventures in which Holdings or a Subsidiary owned as of the Effective Date;

(e)        intercompany loans and guarantees to the extent permitted under Sections 6.1(b), (i) and (n);

(f)        [reserved];

(g)        [reserved];

(h)        [reserved];

(i)        Investments described in Schedule 6.6(i) as of the Effective Date;

(j)        Interest Rate Agreements and Currency Agreements which constitute Investments;

(k)        reserved;

(l)        [reserved];

(m)        [reserved];

(n)        Investments consisting of extensions of credit in the nature of accounts receivable or securities of trade creditors or customers that are received in settlement of bona fide disputes arising from the grant of trade credit in the Ordinary Course of Business;

(o)        to the extent constituting Investments, Permitted Liens and Restricted Junior Payments permitted under Section 6.4;

(p)        guarantees of (i) leases (other than Capital Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the Ordinary Course of Business, and (ii) Indebtedness to the extent permitted under Section 6.1 and other obligations of Credit Parties not prohibited hereunder;

(q)     promissory notes and other non-cash consideration that is permitted to be received in connection with dispositions permitted by Section 6.8 (other than Section 6.8(p));

(r)     loans and advances to the direct parent of Holdings in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Junior Payments in respect thereof), Restricted Junior Payments to the extent permitted to be made to such Person in accordance with Section 6.4; and

(s)     advances of payroll payments to directors, officers, employees, members of management and consultants in the Ordinary Course of Business.

For purposes of this Section 6.6, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment (including any write-downs or write-offs thereof) but giving effect to any cash returns or cash distributions received by such Person with respect thereto in an amount not to exceed the original amount of such Investment. Notwithstanding the foregoing, in no event shall any Credit Party make any Investment which results in or facilitates in any manner any Restricted Junior Payment not otherwise permitted under the terms of Section 6.4.

Notwithstanding anything to the contrary contained in this Agreement, in no event shall (a) the Borrower or any Credit Party sell, transfer or otherwise dispose of any Material Property (whether pursuant to a sale, lease, license, transfer, Investment, restricted payment, dividend or otherwise or relating to the exclusive rights thereto) to any Subsidiary that is not a Credit Party; provided that in no event shall this sentence prohibit the Borrower or its Subsidiaries from entering into non-exclusive licensing arrangements of Intellectual Property to a Subsidiary in the ordinary course of business for a bona fide business purpose and (b) any Subsidiary that is not a Credit Party own or hold an exclusive license to any Material Property.

**6.7.    [Reserved]**.

**6.8.    Fundamental Changes; Disposition of Assets; Acquisitions**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, enter into any transaction of merger, consolidation or continuation or migration, or liquidate, wind-up or dissolve itself (or suffer any liquidation, dissolution or strike-off), or convey, sell, lease or license, exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment and capital expenditures in the Ordinary Course of Business) the business, property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, except:

(a)     any Credit Party or any of its Subsidiaries may be merged with or into the Borrower or any Credit Party, or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to the Borrower or any Credit Party pursuant to the

Chapter 11 Cases; <u>provided</u>, that in the case of such a merger, the Borrower or such Credit Party, as applicable shall be the continuing or surviving Person;

        (b)      sales or other dispositions of assets that do not constitute Asset Sales;

        (c)      Asset Sales so long as (1) the consideration received for such assets shall be in an amount at least equal to the fair market value thereof (determined in good faith by the board of directors of the Borrower (or similar governing body)), (2) with respect to Asset Sales in excess of $1,000,000, no less than 100% thereof shall be paid in Cash and Cash Equivalents; and (3) the Net Asset Sale Proceeds thereof shall be applied as required by <u>Section 2.14(a)</u>;

        (d)      disposals or transfers of obsolete, damaged, worn out or surplus property and dispositions, abandonment, or expiration of property (including, for the avoidance of doubt, intellectual property) that, in the Borrower's reasonable judgment, are no longer necessary, used or useful in the conduct of the business of Holdings and its Subsidiaries; and

        (e)      [reserved];

        (f)      Investments made in accordance with <u>Section 6.6</u> and transfer of assets (including Equity Interests) that are governed by, and made in accordance with, <u>Section 6.4</u>, <u>6.5</u>, or <u>6.6</u>;

        (g)      [reserved];

        (h)      [reserved];

        (i)      [reserved];

        (j)      [reserved];

        (k)      any Subsidiary that is not a Credit Party may be merged with or into another Subsidiary that is not a Credit Party or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to a Subsidiary that is not a Credit Party (it being understood that for purposes of this <u>Section 6.8(k)</u> and <u>Section 6.6(b)(ii)</u>, any merger of a Subsidiary that is not a Credit Party with or into another Subsidiary that is not a Credit Party may alternatively be consummated by the sale, distribution or contribution (or a series of sales, distributions and/or contributions involving the Credit Parties and their subsidiaries) ultimately resulting in the transfer of the Equity Interests of a Subsidiary that is not a Credit Party to a Subsidiary that is not a Credit Party);

        (l)      dispositions of property to the extent that (x) such property is exchanged for credit against the purchase price of similar replacement property or (y) the proceeds of such disposition are promptly applied to the purchase price of such replacement property;

        (m)      dispositions of property among Holdings and/or its Subsidiaries; <u>provided</u> that if the transferor of such property is a Credit Party (i) the transferee thereof must be a Credit Party or (ii) such Investment must be a permitted Investment in accordance with <u>Section 6.6</u>;

(n)     Permitted Liens;

(o)     [reserved];

(p)     dispositions of Cash and Cash Equivalents in the Ordinary Course of Business, made in good faith, for a bona fide business purpose (and not for any other purpose, including, without limitation, a "liability management transaction");

(q)     transfers of assets upon condemnation, the exercise of eminent domain or casualty events;

(r)     dispositions of Investments in Joint Ventures or any Subsidiary that is not wholly owned to the extent required by, or made pursuant to customary buy/sell arrangements between, the Joint Venture or similar parties set forth in joint venture arrangements and similar binding arrangements;

(s)     (i) dispositions or discounts without recourse of accounts receivable in connection with the compromise or collection thereof in the Ordinary Course of Business; (ii) dispositions of assets received in settlement of debts accrued in the Ordinary Course of Business; (iii) a disposition of receivables in connection with the compromise, settlement or collection thereof in the Ordinary Course of Business or in bankruptcy or similar proceedings and exclusive of factoring and similar arrangements; and (iv) the sale of delinquent notes and accounts receivable in the Ordinary Course of Business for purposes of collection only (and not for the purpose of any bulk sale or securitization transaction);

(t)     the unwinding of any Interest Rate Agreements or Currency Agreements;

(u)     any disposition by reason of the exercise of termination rights under any lease, sublease, license, sublicense, concession or other agreement;

(v)     leases and subleases of real or personal property and sales, non-exclusive licenses, transfers and sublicenses of intellectual property that do not interfere with the business of Holdings and its Subsidiaries; and

(w)     the Borrower and any Subsidiary may merge, amalgamate or consolidate with or into any other Subsidiary in order to effect an Investment permitted pursuant to Section 6.6 or transaction permitted pursuant to Section 6.8; provided that if a Credit Party is a party to the transaction effected pursuant to this clause (w), (i) such Credit Party shall be the continuing or surviving Person or the continuing or surviving Person shall expressly assume the obligations of such Credit Party under the Credit Documents in a manner reasonably acceptable to the Administrative Agent (acting at the Direction of the Requisite Lenders) and (ii) such transaction shall not result in such Credit Party ceasing to be a Domestic Subsidiary;

Notwithstanding anything to the contrary contained in this Agreement, in no event shall (a) the Borrower or any Credit Party sell, transfer or otherwise dispose of any Material Property (whether pursuant to a sale, lease, license, transfer, Investment, restricted payment, dividend or otherwise or relating to the exclusive rights thereto) to any Subsidiary that is not a Credit Party; provided that in no event shall this sentence prohibit the Borrower or its Subsidiaries from entering

into non-exclusive licensing arrangements of Intellectual Property to a Subsidiary in the ordinary course of business for a bona fide business purpose and (b) no Subsidiary that is not a Credit Party shall own or hold an exclusive license to any Material Property.

**6.9.** **Minimum Liquidity**. The Borrower shall not permit Liquidity at any time to be less than $50,000,000; provided that such amount shall be reduced by 10% of any paydown of the ABL Credit Agreement in connection with the implementation of a Cumulative Reserve (as defined in the ABL Credit Agreement as in effect on the date hereof) up to an aggregate reduction of up to $25,000,000 (the "**Minimum Liquidity Covenant**").

**6.10.** **Sales and Lease-Backs**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease, rental or similar arrangement of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Credit Party (a) has sold or transferred or is to sell or to transfer to any other Person (other than a Credit Party), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Credit Party to any Person (other than Holdings or any of its Subsidiaries) in connection with such lease (any such transaction, a "**Sale and Leaseback Transaction**").

**6.11.** **Material Property**. Notwithstanding anything to the contrary contained in this Agreement, in no event shall (a) the Borrower or any Credit Party sell, transfer or otherwise dispose of any Material Property (whether pursuant to a sale, lease, license, transfer, Investment, restricted payment, dividend or otherwise or relating to the exclusive rights thereto) to any Subsidiary that is not a Credit Party; provided that in no event shall this sentence prohibit the Borrower or its Subsidiaries from entering into non-exclusive licensing arrangements of Intellectual Property to a Subsidiary in the ordinary course of business for a bona fide business purpose and (b) no Subsidiary that is not a Credit Party shall own or hold an exclusive license to any Material Property.

**6.12.** **[Reserved]**.

**6.13.** **[Reserved]**.

**6.14.** **[Reserved]**.

**6.15.** **Director Appointments**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, appoint, remove, replace, or otherwise modify any directors without the express written consent of the Requisite Lenders.**GUARANTY**

**7.1.** **Guaranty of the Obligations**. Subject to the provisions of Section 7.2, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent, for the ratable benefit of the Beneficiaries, the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "**Guaranteed Obligations**").

**7.2.**    **Contribution by Guarantors**. All Guarantors desire to allocate among themselves (collectively, the **"Contributing Guarantors"**), in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a **"Funding Guarantor"**) under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date. **"Fair Share"** means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the Guaranteed Obligations. **"Fair Share Contribution Amount"** means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, that solely for purposes of calculating the Fair Share Contribution Amount with respect to any Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor. **"Aggregate Payments"** means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including in respect of this Section 7.2), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.2. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor. The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.2.

**7.3.**    **Payment by Guarantors**. Subject to Section 7.2, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), Guarantors will upon demand pay, or cause to be paid, in Cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is

allowed against the Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

**7.4.     Liability of Guarantors Absolute**. Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than Payment in Full of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)     this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)     Administrative Agent (acting at the Direction of the Requisite Lenders) may enforce this Guaranty upon the occurrence and during the continuance of an Event of Default notwithstanding the existence of any dispute between the Borrower and any Beneficiary with respect to the existence of such Event of Default;

(c)     the obligations of each Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of any the Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Borrower or any of such other guarantors and whether or not the Borrower is joined in any such action or actions;

(d)     payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid. Without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)     any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce

101

and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any other Credit Party or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents; and

(f)      this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than Payment in Full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Holdings or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which the Borrower may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**7.5.     Waivers by Guarantors**. Each Guarantor hereby waives, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against the Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any

security held from the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of any Credit Party or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e)(i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Borrower and notices of any of the matters referred to in <u>Section 7.4</u> and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

**7.6.    Guarantors' Rights of Subrogation, Contribution, Etc.** Until the Guaranteed Obligations shall have been Paid in Full, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against the Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary. In addition, until the Guaranteed Obligations shall have been Paid in Full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by <u>Section 7.2</u>. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against the Borrower, to all right, title and interest any Beneficiary may have in any such collateral

or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and Paid in Full, such amount shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

**7.7.    [Reserved]**.

**7.8.    Continuing Guaranty**. This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been Paid in Full. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

**7.9.    Authority of Guarantors or Borrower**. It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or the Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**7.10.    Financial Condition of Borrower**. Any Credit Extension may be made to the Borrower or continued from time to time without notice to or authorization from any Guarantor regardless of the financial or other condition of the Borrower at the time of any such grant or continuation. No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Borrower. Each Guarantor has adequate means to obtain information from the Borrower on a continuing basis concerning the financial condition of the Borrower and its ability to perform its obligations under the Credit Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and of all circumstances bearing upon the risk of non-payment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrower now known or hereafter known by any Beneficiary.

**7.11.    Bankruptcy, Etc.** (a) Other than the Chapter 11 Cases, so long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of Administrative Agent (acting at the Direction of the Requisite Lenders) acting pursuant to the instructions of Requisite Lenders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against the Borrower or any other Guarantor. The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation, winding up, strike-off or arrangement of the Borrower or any other Guarantor or by any defense which the Borrower or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)    Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in <u>clause (a)</u> above (or, if interest on any portion of the Guaranteed Obligations ceases

to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve Holdings or any of its Subsidiaries of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar Person to pay Administrative Agent, or allow the claim of Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)      In the event that all or any portion of the Guaranteed Obligations are paid by Holdings or any of its Subsidiaries, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

**7.12.    Discharge of Guaranty Upon Sale of Guarantor**. If all of the Equity Interests of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such event provided, that if any Guarantor (other than Holdings, or, if applicable, DMFI or DMFHL) ceases to be wholly-owned, directly or indirectly, by Holdings, such subsidiary shall not be released from its Guaranty or otherwise not required to be a Guarantor as a result of the disposition of less than all of the Equity Interests in such subsidiary owned by Holdings or any Subsidiary, unless (A) such disposition is made in good faith for fair market value and for a bona fide business purpose (as determined in good faith by the Borrower in consultation with the Administrative Agent (acting at the Direction of the Requisite Lenders)), (B) at the time such Guarantor ceases to be wholly-owned, the primary purpose of such transaction was not to evade the guarantee requirements, (C) the transaction by which such Guarantor ceases to be wholly-owned was consummated on an arms' length basis with an unaffiliated third party and (D) such transaction otherwise complies with the terms of Section 6.4 (with the Borrower being deemed to have made an Investment in such resulting non-Guarantor Subsidiary, and such transaction constitutes a Permitted Investment).

## SECTION 8.      EVENTS OF DEFAULT

**8.1.    Events of Default**. If any one or more of the following conditions or events shall occur:

(a)      Failure to Make Payments When Due. Failure by the Borrower to pay (i) when due any installment of principal of any Loan, whether at stated maturity, by acceleration, by mandatory prepayment or otherwise; (ii) any interest on any Loan within three Business Days after the date due; or (iv) any fee or other payment amount due hereunder within five Business Days after the date due; or

(b)      Default in Other Agreements. (i) Failure of any Credit Party or any of their respective Subsidiaries to pay when due any principal of or interest on or any other amount, including any payment in settlement, payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a) and excluding, for the avoidance of doubt, Indebtedness under the Prepetition Credit Agreement as long as enforcement of remedies thereunder is subject to the automatic stay of Section 362 of the Bankruptcy Code) with an aggregate principal amount (or Net Mark-to-Market Exposure) in excess of the Threshold Amount or more beyond any applicable grace period, if any, provided therefor; or (ii) breach or default by any Credit Party with respect to any other material term of (1) one or more items of Indebtedness in the individual or aggregate principal amounts (or Net Mark-to-Market Exposure) referred to in clause (i) above (other than any such Indebtedness that was incurred prior to the commencement of the Chapter 11 Cases, as long as enforcement of remedies thereunder is subject to the automatic stay of Section 362 of the Bankruptcy Code), (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness (other than any such Indebtedness that was incurred prior to the commencement of the Chapter 11 Cases, as long as enforcement of remedies thereunder is subject to the automatic stay of Section 362 of the Bankruptcy Code), or (3) any other Indebtedness of DMFI and/or DMFHL in excess of the Threshold Amount (other than any such Indebtedness that was incurred prior to the commencement of the Chapter 11 Cases, as long as enforcement of remedies thereunder is subject to the automatic stay of Section 362 of the Bankruptcy Code), in each case, beyond any applicable grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redemption) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(c)      Breach of Certain Covenants. Failure of any Credit Party to perform or comply with any term or condition contained in Section 5.1(f)(i), Section 5.2 (solely with respect to the existence of the Borrower), Section 5.16, Section 5.21, Section 5.15, Section 5.22, Section 5.23, Section 5.24, Section 5.25 or Section 6; or

(d)      Breach of Representations, Etc. Any representation, warranty, certification or other written statement of fact made or deemed made by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made and, to the extent capable of being cured, such incorrect representation or warranty shall remain incorrect for a period of thirty days after written notice thereof from the Administrative Agent to the Borrower; or

(e)      Other Defaults Under Credit Documents. Any Credit Party shall default in the performance of or compliance with any covenant contained herein or any of the other Credit Documents, other than any such term referred to in any other paragraph of this Section 8.1, and such default shall not have been remedied or waived within thirty days after the date on which written notice thereof is delivered by the Administrative Agent to the Borrower; or

(f)      Involuntary Bankruptcy; Appointment of Receiver, Etc. Other than the Chapter 11 Cases, (i) a court of competent jurisdiction shall enter a decree or order for relief in

respect of the Parent Guarantors or any of their Subsidiaries in an involuntary case under any Debtor Relief Laws now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable international, federal, state or local law; or (ii) an involuntary case shall be commenced against the Parent Guarantors or any of their Subsidiaries under any Debtor Relief Laws now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over the Parent Guarantors or any of their Subsidiaries, or over any of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee, custodian or any other person having similar powers of the Parent Guarantors or any of their Subsidiaries for any of its property; or a warrant of attachment, execution or similar process shall have been issued against any part of the property of the Parent Guarantors or any of their Subsidiaries, and any such event described in this clause (f) shall continue for sixty days without having been dismissed, bonded or discharged; or

(g)    Voluntary Bankruptcy; Appointment of Receiver, Etc. Other than the Chapter 11 Cases, (i) the Parent Guarantors or any of their Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case under any Debtor Relief Laws, now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for any of its property; or the Parent Guarantors or any of their Subsidiaries shall make any assignment for the benefit of creditors; or (ii) the Parent Guarantors or any of their Subsidiaries shall be unable, or shall fail generally, or shall admit in writing its general inability, to pay its debts as such debts become due; or the board of directors (or similar governing body) of the Parent Guarantors or any of their Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to in this Section 8.1(g) or in Section 8.1(f); or

(h)    Judgments and Attachments. Any money judgment, writ or warrant of attachment or similar process involving individually, or in the aggregate at any time, an amount in excess of the Threshold Amount (in either case to the extent not covered by insurance or reimbursement as to which a solvent and unaffiliated insurance company or third party has not denied coverage or payment, as applicable) shall be entered or filed against the Parent Guarantors or any of their Subsidiaries or any of their respective assets and shall remain undischarged, unsatisfied, unvacated, unbonded or unstayed for a period of sixty days; or

(i)    [Reserved]; or

(j)    Employee Benefit Plans. There shall occur one or more ERISA Events which individually or in the aggregate results in or would reasonably be expected to result in liability of the Parent Guarantors or any of their Subsidiaries which would reasonably be expected to result in a Material Adverse Effect; or

(k)    Change of Control. A Change of Control shall occur; or

(l)    RSA; A default under the RSA by any Credit Parties or any of its Affiliates or Subsidiaries party to the RSA shall have occurred and be continuing (with all applicable grace periods having expired) or the RSA is terminated for any reason; or

(m)    <u>Guaranties, Collateral Documents and other Credit Documents</u>. At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the Payment in Full of all Obligations and other than if otherwise expressly permitted hereunder, shall cease to be in full force and effect in any material respect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder in writing, (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the Payment in Full of the Obligations in accordance with the terms hereof) in any material respect or shall be declared null and void, or Collateral Agent shall not have or shall cease to have a valid and perfected Lien in a material portion of the Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Collateral Agent or any Secured Party to take any action within its control or by reason of a release of Collateral in accordance with the terms hereof or thereof, or (iii) any Credit Party shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party or shall contest the validity or perfection of any Lien in any Collateral purported to be covered by the Collateral Documents; or

(n)    <u>[Reserved]</u>; or

(o)    <u>[Reserved]</u>; or

(p)    <u>Lender-Appointed Directors</u>; The removal (other than as a result of death, disability or voluntary resignation) of any lender-appointed Director from the Board of Directors of any of the Parent Guarantor or any of their Subsidiaries without the consent of the Requisite Lenders;

(q)    <u>Bankruptcy Matters</u>. Any of the following occurs in any of the Chapter 11 Cases, except to the extent consented to by the Requisite Lenders in their discretion (which may be evidenced by a Direction of the Requisite Lenders);

(i) other than a motion in support of the DIP Orders or actions in accordance with the RSA, the bringing of any motion, taking of any action, or the filing of any pleading, Chapter 11 Plan, or Disclosure Statement attendant to such plan, by any of the Credit Parties or any Affiliates or Subsidiary of a Credit Party in the Chapter 11 Cases (or the entry of an order of the Bankruptcy Court granting a motion) seeking: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Liens permitted under Section 6.2; (C) except as provided in the DIP Orders, to use cash collateral of the Administrative Agent and the other Secured Parties or the Prepetition Lenders under Section 363(c) of the Bankruptcy Code without the written consent of such parties; or (D) to approve any other action or actions adverse to the Administrative Agent and the other Secured Parties' rights and remedies under the Credit Documents or the validity or perfection of their Liens on the Collateral;

(ii) other than in accordance with the RSA or with the consent of the Requisite Lenders, (A) the filing of any Chapter 11 Plan or Disclosure Statement attendant thereto by a Credit Party that would not result in the full and final satisfaction and discharge of all

Obligations on or before the effective date of such Chapter 11 Plan or (B) if any of the Credit Parties or their Affiliates or Subsidiaries shall seek, support, or fail to contest in good faith the filing or confirmation of any Chapter 11 Plan or entry of any such order that would not result in the full and final satisfaction and discharge of all Obligations on or before the effective date of any such Chapter 11 Plan;

(iii) the entry of any final order terminating any Credit Party's exclusive right to file a Chapter 11 Plan or the expiration of any Credit Party's exclusive right to file a Chapter 11 Plan, provided that termination of such exclusivity periods is not the result of any action by a Lender;

(iv) the entry of an order in the Chapter 11 Cases confirming a Chapter 11 Plan that is not either (A) in accordance with the RSA or (B) otherwise acceptable to the Requisite Lenders in their discretion, other than to the extent that such Chapter 11 Plan provides for the full and final satisfaction and discharge of all Obligations on or before the effective date of any such Chapter 11 Plan;

(v) the entry by a Credit Party into any proposed settlement of any Claim, litigation, dispute, cause of action, or other proceeding, in each case, against the Debtors which requires a payment by the Debtors of any amount greater than $250,000;

(vi) the Debtors' filing of a Definitive Document that is not acceptable to the Requisite Lenders or the filing of a Chapter 11 Plan that provides for any treatment or recovery on account of DIP Term Loan Claims or Prepetition Claims that are not consented to by the Requisite Lenders in their sole discretion;

(vii)    (A) the entry of an order amending, supplementing, staying, revoking, vacating or otherwise modifying the Credit Documents, the Cash Management Orders, or the DIP Orders (including any order in respect of the Milestones specified herein), (B) the filing by a Credit Party of a motion for reconsideration with respect to the DIP Orders, or (C) any Credit Party or any Affiliate or Subsidiary shall fail to comply with the DIP Orders;

(viii)    the entry of an order amending, supplementing, staying, revoking, vacating or otherwise modifying the Credit Documents, the Cash Management Orders, or the DIP Orders (including any order in respect of the Milestones specified herein), (B) the filing by a Credit Party of a motion for reconsideration with respect to the DIP Orders, or (C) any Credit Party or any Affiliate or Subsidiary shall fail to comply with the DIP Orders;

(ix) (A) the dismissal or conversion of any Chapter 11 Case or (B) any Credit Party or any Affiliate or Subsidiary of a Credit Party shall file a motion or other pleading seeking the conversion or dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise;

(x) any Credit Party or any Subsidiary of a Credit Party shall file a motion (without consent of the Requisite Lenders) seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Administrative Agent) to execute upon or enforce a Lien on any Collateral, solely if the value of such collateral exceeds $250,000;

(xi) the entry of an order in the Chapter 11 Cases avoiding or requiring the disgorgement of any portion of the payments made on account of the Obligations owing under this Agreement, the other Credit Documents, the RSA or the DIP Orders;

(xii)    other than in respect of this Agreement and the other Credit Documents, or as otherwise permitted under the applicable Credit Documents, the DIP Orders, or the orders approving any of the First Day Pleadings, (A) the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code, clause (b) of Section 503 of the Bankruptcy Code, or clause (b) of Section 507 of the Bankruptcy Code of the Bankruptcy Code *pari passu* with or senior to the claims of the Administrative Agent and the Secured Parties under this Agreement and the other Credit Documents or (B) there shall arise or be granted by the Bankruptcy Court any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted by the Credit Documents, in each case, other than with respect to the ABL DIP Facility (including the adequate protection claims granted in relation thereto);

(xiii)    the DIP Orders shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal (other than through the entry of the Final Order), in each case so as to cause the DIP Orders to cease to create a valid and perfected Lien on the Collateral (without further action other than the entry and terms of the DIP Orders) to the extent the DIP Orders do so on the Effective Date;

(xiv)    an order in the Chapter 11 Cases shall be entered (i) charging any of, or authorizing the recovery of any amount from, the Collateral under Section 506(c) of the Bankruptcy Code, or (ii) prohibiting or limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Prepetition Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Credit Party after the Petition Date;

(xv)    any order having been entered or granted (or requested, unless actively opposed by the Credit Parties) by either the Bankruptcy Court or any other court of competent jurisdiction adversely and materially impacting the rights of the Administrative Agent and the other Secured Parties under the Credit Documents;

(xvi)    an order of the Court shall be entered denying or terminating use of cash collateral by the Credit Parties authorized by the DIP Orders;

(xvii)    if the Final Order does not include a waiver, in form and substance acceptable to the Requisite Lenders, of (i) the right to surcharge, or recover any amount from, the Collateral under Section 506(c) of the Bankruptcy Code and (ii) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Prepetition Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Credit Party after the Petition Date;

(xviii) (A) any Credit Party shall challenge (or support or encourage a challenge of) the validity, enforceability, perfection or priority (as applicable) of (1) the Prepetition Credit Agreement and any prepetition attendant debt documents, (2) any of the Liens created

110

pursuant to the foregoing, (3) any of the obligations thereunder or (4) any payments made (I) to any Secured Party with respect to the Obligations or (II) to any Prepetition Secured Party (as defined in the DIP Orders) with respect to the obligations under the Prepetition Credit Agreement or any attendant prepetition debt documents or (B) the filing of any motion by the Credit Parties or any of their Affiliates or Subsidiaries seeking approval of (or the entry of an order by the Court approving) adequate protection to any prepetition creditor in respect of Liens on the Collateral that is inconsistent with the DIP Orders;

(xix)    if, unless otherwise approved by the Administrative Agent and the Requisite Lenders, an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Chapter 11 Cases;

(xx)    any Credit Party or any Subsidiary thereof files any motion, pleading or other request with the Bankruptcy Court seeking to modify or affect any of the rights of the Administrative Agent or the Lenders under the DIP Orders or the Credit Documents without the prior written consent of the Administrative Agent or the Requisite Lenders (which consent of the Requisite Lenders may be communicated via an email from the Lender Advisors);

(xxi)    (A) any Credit Party or any Subsidiary thereof takes any action in support of any matter prohibited by this Section 8.1(q) or (B) any other Person files a motion or pleading before the Bankruptcy Court seeking the entry of order in violation of this Section 8.1(q) and such motion is not contested in good faith by the Credit Parties;

(xxii)    the filing of a motion, pleading or the taking of any action in the Chapter 11 Cases by any Credit Party seeking the entry of an order by the Bankruptcy Court precluding the Administrative Agent or the Prepetition Agent from having the right to, or being permitted to, or precluding any holder of Prepetition Claims from directing or instructing any of the foregoing parties to exercise the right to, "credit bid" in any manner in respect of any applicable collateral;

(xxiii)   the commencement of a suit or an action against the Administrative Agent or any Lender or any Prepetition Agent or any Prepetition Lender and, as to any suit or action brought by any Person other than a Credit Party or an Affiliate, Subsidiary, officer, or employee of a Credit Party, that asserts or seeks by or on behalf of a Credit Party, any official committee in the Chapter 11 Cases or any other party in interest in the Chapter 11 Cases, a claim or any legal or equitable remedy that would, other than as contemplated by the DIP Orders or the Cash Management Order, (x) have the effect of invalidating, subordinating or challenging (I) any or all of the Obligations or Liens of the Administrative Agent or any Lender under the Credit Documents or (II) any portion of the obligations under the Prepetition Credit Agreement or attendant prepetition debt documents or Liens of the Prepetition Agent or the Prepetition Lenders under the Prepetition Credit Agreement or attendant prepetition debt documents to any other claim, or (y) have an adverse effect on the rights and remedies of the Administrative Agent or any Lender under any Credit Document or the Prepetition Agent or Prepetition Lenders under the Prepetition Credit Agreement or attendant prepetition debt documents or the collectability of all or any portion of the Obligations under the Credit Documents or the obligations under the Prepetition Credit Agreement or attendant prepetition debt documents;

(xxiv) the entry of a judgment or order by the Bankruptcy Court (i) sustaining any defense, objection or challenge to the validity, security, perfection, priority, extent or enforceability of the DIP Documents, the DIP Liens, the Obligations, the Prepetition Documents, the Prepetition Liens or the Prepetition Obligations (each as defined in the Interim Order), (ii) invalidating, disallowing avoiding, subordinating, recharacterizing, limiting or otherwise impairing any of the DIP Obligations, DIP Superpriority Claims, DIP Liens, the Prepetition Obligations or the Prepetition Liens (each as defined in the Interim Order); any Debtor shall deny in writing that such Debtor has liability or obligation under this Agreement for the Obligations;

(xxv) any Debtor denies in writing that such Debtor has liability or obligation under this Agreement for the Obligations or seek to recover any monetary damages from any Secured Party or Prepetition Agent or Prepetition Lender in their capacity as such;

(xxvi) the Bankruptcy Court grants relief under any motion or other pleading filed by any Debtor that results in the occurrence of an Event of Default; provided that the Credit Parties hereby agree that the Administrative Agent (with the consent of the Requisite Lenders) shall be entitled to request an expedited hearing on any such motion and hereby consent to such expedited hearing (and the Administrative Agent is authorized to represent to the Bankruptcy Court that the Credit Parties have consented to such expedited hearing on the motion);

(xxvii) the Debtors file any motion, Definitive Document, objection, or pleading with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that is inconsistent with this Agreement (nor directly or indirectly direct any other Person to make such a filing) or is otherwise not in form and substance acceptable to the Requisite Lenders;

(xxviii)the Debtors sell, or file any motion, pleading or application seeking to sell, any material assets outside of the ordinary course of business without the prior written consent of the Requisite Lenders;

(xxix) any Credit Parties amend any of their existing corporate governance or organizational documents without the prior written consent of the Requisite Lenders;

(xxx) any party obtains derivative standing to pursue a chapter 5 cause of action with the Bankruptcy Court or any other court;

(xxxi) the Debtors pursue any chapter 5 cause of action without the consent of the Required Consenting Lenders (as defined in the RSA);

(xxxii) other than in the ordinary course of business and consistent with past practice, (i) enter into any material agreement, (ii) amend, supplement, modify, or terminate any material agreement, (iii) allow any material permit, license, or regulatory approval to be terminated, revoked, suspended, or modified, in each case without the prior written consent of the Requisite Lenders, or (iv) enter into, terminate, or modify any material operational contracts, leases, or other agreements that would, individually or in the aggregate, reasonably be expected to have a material and adverse effect on the Credit Parties, taken as a whole, without the consent of the Requisite Lenders; other than in connection with and as consistent with the RSA;

(xxxiii)any Credit Parties (i) authorize, create, issue, sell, or grant any additional Equity Interests, (ii) reclassify, recapitalize, redeem, purchase, acquire, declare any distribution on, or make any distribution on any Equity Interests, or (iii) enter into, terminate, or modify any material operational contracts, leases, or other agreements that would, individually or in the aggregate, be expected to have an adverse effect on the Credit Parties, taken as a whole, without the consent of the Requisite Lenders; other than in connection with the RSA and Sale Documents;

(xxxiv)any Credit Parties pledge, encumber, assign, sell, or otherwise transfer, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any Equity Interests in the Credit Parties, whether held directly or indirectly, to the extent such pledge, encumbrance, assignment, sale, or other transfer will impair any of the Credit Parties' tax attributes and is expected to result in adverse tax consequences to the Credit Parties;

(xxxv) any Credit Parties take any action (except to the extent expressly contemplated by this Agreement) if such action would result in a change in the tax status of any Credit Party or (ii) make any election outside the ordinary course of business, or settle any tax audit or contest, in each case, if such election or action pursuant to clause (i) or (ii) is expected to result, individually or in the aggregate, in adverse tax consequences to any of the Credit Parties;

(xxxvi)any Credit Parties encourage or facilitate any Person (including, for the avoidance of doubt, any non-Debtor Affiliate) to do any of the foregoing actions described in clauses (xxi) through (xxxvii);

**THEN**, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Requisite Lenders shall, by notice to the Borrower, take any of the following actions, at the same or different times, in each case, subject to provisions of the DIP Orders: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and at the request of the Requisite Lenders shall, exercise any rights and remedies provided to the Administrative Agent under the DIP Orders and the Credit Documents or at law or equity, including all remedies provided under the UCC, in each case, subject to the provisions of the DIP Orders.

Any Event of Default under this Agreement or the other Credit Documents (and any Event of Default resulting from failure to provide notice thereof) shall be deemed not to be "continuing" or "existing" if the events, acts or conditions that gave rise to such Event of Default have been remedied or cured (if any such cure  right exists) or have ceased to exist.

113

**8.2.**    **Application of Funds**. Subject to the Carve Out, any amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement, in each case that is continuing, shall be applied as set forth in Section 2.15.

## SECTION 9.    AGENTS

**9.1.**    **Appointment of Agents**. WSFS is hereby appointed Administrative Agent and Collateral Agent hereunder and under the other Credit Documents and each Lender hereby authorizes WSFS to act as Administrative Agent and Collateral Agent in accordance with the terms hereof and the other Credit Documents. Each Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Credit Documents, as applicable, it being understood that the provisions of this Section 9 apply to the Administrative Agent in its capacity as such and references to the Administrative Agent shall be interpreted accordingly to include references to the Collateral Agent. The provisions of this Section 9 are solely for the benefit of Agents and Lenders and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof (except as provided under Sections 9.7 and 9.8(d)). In performing its functions and duties hereunder, each Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Holdings or any of its Subsidiaries. The Administrative Agent may resign from such role at any time, with immediate effect, by giving prior written notice thereof to the Borrower.

**9.2.**    **Powers and Duties**. Each Lender irrevocably authorizes each Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto. Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents. Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees. No Agent shall have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Lender or any other Person; and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein.

**9.3.**    **General Immunity**.

(a)    No Responsibility for Certain Matters. No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof to the Agent by the Borrower or any Lender and such written notice is clearly identified as a "notice of default" and no Agent shall be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Lenders or by or on behalf of any Credit Party to any Agent or any Lender in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall any Agent be required

114

to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing. Anything contained herein to the contrary notwithstanding, Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans. No Agent shall be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Agent.

(b)     Exculpatory Provisions. No Agent nor any of its officers, partners, directors, employees or agents shall be liable for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction; provided, that any such action taken or omitted to be taken by the Agent at the instruction of Requisite Lenders shall not constitute gross negligence or willful misconduct. Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5) and, upon receipt of such instructions from Requisite Lenders (or such other Lenders, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions, including for the avoidance of doubt refraining from any action that, in its opinion or the opinion of its counsel, may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law. Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for Holdings and its Subsidiaries), accountants, experts and other professional advisors selected by it; and (ii) no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5). No Agent shall have liability for any failure, inability, unwillingness on the part of any Lender or Credit Party to provide accurate and complete information on a timely basis to such Agent, or otherwise on the part of any such party to comply with the terms of this Agreement, and shall not have any liability for any inaccuracy or error in the performance or observance on such Agent's part of any of its duties hereunder that is caused by or results from any such inaccurate, incomplete or untimely information received by it, or other failure on the part of any such other party to comply with the terms hereof.

(c)     For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to either Agent hereunder (including without limitation this Section 9), phrases such as "satisfactory to the Administrative Agent," "approved by the Administrative Agent," "acceptable to the Administrative Agent," "as determined by the Administrative Agent," "in the Administrative Agent's discretion," "selected by the

Administrative Agent," "elected by the Administrative Agent," "requested by the Administrative Agent," and phrases of similar import that authorize and permit the Administrative Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to the Administrative Agent receiving written direction from the Requisite Lenders (or such other number or percentage of the Lenders as expressly required hereunder or under the other Credit Documents) to take such action or to exercise such rights.

(d)    Delegation of Duties. Administrative Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Credit Document by or through any one or more sub-agents appointed by Administrative Agent. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory, indemnification and other provisions of this Section 9.3 and of Section 9.6 shall apply to any the Affiliates of Administrative Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of this Section 9.3 and of Section 9.6 shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein. Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by Administrative Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of Credit Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to Administrative Agent and not to any Credit Party, Lender or any other Person and no Credit Party, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents, except to the extent that a court of competent jurisdiction determines in a final nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

(e)    Disqualified Institutions. Any assignor of a Loan or seller of a participation hereunder shall be entitled to rely conclusively on a representation of the assignee Lender or purchaser of a participation in the relevant Assignment Agreement or participation agreement, as applicable, that such assignee or purchaser is not a Disqualified Institution. No Agent shall have any responsibility or liability for monitoring the list or identities of, or enforcing provisions relating to Disqualified Institutions . The Administrative Agent shall have the right to post the list of Disqualified Institutions (and any updates thereto from time to time) on the Platform. Notwithstanding the foregoing, each Credit Party and the Lenders acknowledge and agree that the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Institution and the Administrative Agent (in its capacity as such) shall not have liability with respect to any assignment made to a Disqualified Institution.

**9.4.** **Agents Entitled to Act as Lender**. The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder. With respect to its participation in the Loans, each Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity. Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with the Borrower or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from the Borrower for services in connection herewith and otherwise without having to account for the same to Lenders.

**9.5.** **Lenders' Representations, Warranties and Acknowledgment**.

(a) Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Holdings and its Subsidiaries in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Holdings and its Subsidiaries. No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b) Each Lender, by delivering its signature page to this Agreement, an Assignment Agreement or a Joinder Agreement and funding its Term Loan on the Effective Date shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable on the Effective Date.

(c) Each Lender acknowledges that Holdings and the other Credit Parties are Eligible Assignees hereunder and may purchase Loans and/or Commitments hereunder from Lenders from time to time, subject to the restrictions set forth in the definition of "Eligible Assignee" and Section 10.6.

**9.6.** **Right to Indemnity**. Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify each Agent, to the extent that such Agent shall not have been reimbursed by any Credit Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Agent in any way relating to or arising out of this Agreement or the other Credit Documents; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction. If any indemnity furnished to any Agent for any purpose shall, in the opinion of such

117

Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, that in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof; and provided further, that this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

**9.7.    Successor Administrative Agent and Successor Collateral Agent**.

(a)    Administrative Agent shall have the right to resign at any time by giving prior written notice thereof to Lenders and the Borrower and Administrative Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to the Borrower and Administrative Agent and signed by Requisite Lenders. Administrative Agent shall have the right to appoint a financial institution to act as Administrative Agent and/or Collateral Agent hereunder, subject to the reasonable satisfaction of the Borrower and the Requisite Lenders, and Administrative Agent's resignation shall become effective on the earliest of (i) 30 days after delivery of the notice of resignation (regardless of whether a successor has been appointed or not), (ii) the acceptance of such successor Administrative Agent by the Borrower and the Requisite Lenders or (iii) such other date, if any, agreed to by the Requisite Lenders. Upon any such notice of resignation or any such removal, if a successor Administrative Agent has not already been appointed by the retiring Administrative Agent, Requisite Lenders shall have the right, upon five Business Days' notice to the Borrower and subject to the reasonable consent of the Borrower (such consent not to be unreasonably withheld or delayed; provided that such consent shall not be required after the occurrence and during the continuance of an Event of Default), to appoint a successor Administrative Agent. If neither Requisite Lenders nor Administrative Agent have appointed a successor Administrative Agent, Requisite Lenders shall be deemed to have succeeded to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent; provided that, until a successor Administrative Agent is so appointed by Requisite Lenders or Administrative Agent, any collateral security held by Administrative Agent in its role as Collateral Agent on behalf of the Lenders under any of the Credit Documents shall continue to be held by the retiring Collateral Agent as nominee until such time as a successor Collateral Agent is appointed. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent, and the retiring or removed Administrative Agent shall promptly (i) transfer to such successor Administrative Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent under the Credit Documents, and (ii) execute and deliver to such successor Administrative Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent of the security interests created under the Collateral Documents, whereupon such retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder. Except as provided above, any resignation or removal of WSFS or its successor as Administrative Agent pursuant to this Section 9.7 shall also constitute

118

the resignation or removal of WSFS or its successor as Collateral Agent. After any retiring or removed Administrative Agent's resignation or removal hereunder as Administrative Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it (i) while it was acting as Administrative Agent hereunder and (ii) following such resignation or removal for so long as the retiring or removed Administrative Agent continues in any capacity hereunder while transferring the agency to the successor Administrative Agent. Any successor Administrative Agent appointed pursuant to this Section 9.7 shall, upon its acceptance of such appointment, become the successor Collateral Agent for all purposes hereunder.

(b)    In addition to the foregoing, Collateral Agent may resign at any time by giving prior written notice thereof to Lenders and the Borrower, and Collateral Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to the Borrower and Collateral Agent signed by Requisite Lenders. Administrative Agent shall have the right to appoint a financial institution as Collateral Agent hereunder, subject to the reasonable satisfaction of the Borrower, and the Requisite Lenders and Collateral Agent's resignation shall become effective on the earliest of (i) 30 days after delivery of the notice of resignation, (ii) the acceptance of such successor Collateral Agent by the Borrower and the Requisite Lenders or (iii) such other date, if any, agreed to by the Requisite Lenders. Upon any such notice of resignation or any such removal, Requisite Lenders shall have the right, upon five Business Days' notice to Administrative Agent and the Borrower and subject to the reasonable consent of the Borrower (such consent not to be unreasonably withheld or delayed; provided that such consent shall not be required after the occurrence and during the continuance of an Event of Default), to appoint a successor Collateral Agent. Until a successor Collateral Agent is so appointed by Requisite Lenders or Administrative Agent, any collateral security held by Collateral Agent on behalf of the Lenders under any of the Credit Documents shall continue to be held by the retiring Collateral Agent as nominee until such time as a successor Collateral Agent is appointed. Upon the acceptance of any appointment as Collateral Agent hereunder by a successor Collateral Agent, that successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Collateral Agent under this Agreement and the Collateral Documents, and the retiring or removed Collateral Agent under this Agreement shall promptly (i) transfer to such successor Collateral Agent all sums, Securities and other items of Collateral held hereunder or under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Collateral Agent under this Agreement and the Collateral Documents, and (ii) execute and deliver to such successor Collateral Agent or otherwise authorize the filing of such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Collateral Agent of the security interests created under the Collateral Documents, whereupon such retiring or removed Collateral Agent shall be discharged from its duties and obligations under this Agreement and the Collateral Documents. After any retiring or removed Collateral Agent's resignation or removal hereunder as the Collateral Agent, the provisions of this Agreement and the Collateral Documents shall inure to its benefit as to any actions taken or omitted to be taken by it under this Agreement or the Collateral Documents while it was acting as the Collateral Agent hereunder, including for so long as the retiring or removed Collateral Agent continues in any capacity hereunder while transferring agency to the successor Collateral Agent.

**9.8.    Collateral Documents and Guaranty**.

119

(a)      Agents under Collateral Documents and Guaranty. Each Secured Party hereby further authorizes Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of Secured Parties with respect to the Guaranty, the Collateral and the Collateral Documents. Subject to Section 10.5, without further written consent or authorization from any Secured Party, Administrative Agent or Collateral Agent, as applicable may execute any documents or instruments necessary to (i) in connection with a sale or disposition of assets permitted by this Agreement or the release of any Guarantor from the Guaranty as provided below, release any Lien encumbering any item of Collateral that is the subject of such sale or other disposition of assets or to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented or (ii) release any Guarantor from the Guaranty pursuant to Section 7.12 or with respect to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented.

(b)      Right to Realize on Collateral and Enforce Guaranty. Anything contained in any of the Credit Documents to the contrary notwithstanding, the Borrower, Administrative Agent, Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Credit Documents may be exercised solely by Administrative Agent or Collateral Agent, as applicable, for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), Collateral Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code,) may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and Collateral Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from Requisite Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Collateral Agent at such sale or other disposition.

(c)      [Reserved].

(d)      Release of Collateral and Guaranties, Termination of Credit Documents. Notwithstanding anything to the contrary contained herein or any other Credit Document, when all Obligations have been Paid in Full or except as otherwise permitted hereunder or under the terms of any other Credit Document, upon request of the Borrower, Collateral Agent (acting at the Direction of the Requisite Lenders) shall take such actions as shall be required to release its security interest in all Collateral, and to release all guarantee obligations provided for in any Credit Document. Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or

120

returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(e)    No Agent shall be responsible for or have a duty to ascertain or inquire into (i) the value or sufficiency of any Collateral, (ii) the creation, perfection or priority of any Lien on the Collateral or the existence, value or sufficiency of the Collateral or to assure that the Liens granted to the Collateral Agent pursuant to any Credit Document have been or will continue to be properly or sufficiently or lawfully created, perfected or enforced or are entitled to any particular priority, (iii) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under this Agreement, any other Credit Document or any agreement or instrument contemplated hereby or thereby, (iv) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (v) providing, maintaining, monitoring or preserving insurance on (including any flood insurance policies or for determining whether any flood insurance policies are or should be obtained in respect of the Collateral, which each Lender shall be solely responsible for), or the payment of taxes with respect to, any of the Collateral.

(f)    The Lenders hereby irrevocably agree that the Liens granted to the Collateral Agent by the Credit Parties on any Collateral shall be automatically released (without any action by the Administrative Agent, Collateral Agent, any Lender, any Secured Parties or any other Person) (i) in full, upon the Payment in Full of the Obligations, (ii) upon the sale or other disposition of such Collateral (including as part of or in connection with any other sale or other disposition permitted hereunder) to any Person other than another Credit Party, to the extent such sale or other disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Credit Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Credit Party, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Requisite Lenders (or such other percentage of the Lenders whose consent may be required in accordance with this Section 9.8), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the applicable Guaranty (in accordance with the second following sentence), (vi) as required to effect any sale or other disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Collateral Documents, and (vii) if such assets constitute Excluded Collateral. Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Credit Parties in respect of) all interests retained by the Credit Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Credit Documents. Additionally, the Lenders hereby irrevocably agree that any Subsidiary that is a Guarantor shall be released from the Guaranteed Obligations upon consummation of any transaction not prohibited hereunder resulting in such Subsidiary ceasing to constitute a wholly-owned Subsidiary; provided, that if any Guarantor (other than Holdings) ceases to be wholly-owned, directly or indirectly, by Holdings, such subsidiary shall not be released from its Guaranty as a result of the disposition of less than all of the Equity Interests in such subsidiary

owned by Holdings or any Subsidiary, unless (A) such disposition is made in good faith for fair market value and for a bona fide business purpose (as determined in good faith by the Borrower in consultation with the Administrative Agent (acting at the Direction of the Requisite Lenders)), (B) at the time such Guarantor ceases to be wholly-owned, the primary purpose of such transaction was not to evade the guarantee requirements, (C) the transaction by which such Guarantor ceases to be wholly-owned was consummated on an arms' length basis with an unaffiliated third party and (D) such transaction otherwise complies with the terms of Section 6.4 (with the Borrower being deemed to have made an Investment in such resulting non-Guarantor Subsidiary, and such transaction constitutes a Permitted Investment). The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender.

9.9.    **Withholding Taxes**. To the extent required by any applicable law, Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, or if Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall indemnify Administrative Agent fully for all amounts paid, directly or indirectly, by Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

9.10.    **Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim**. In case of the pendency of any proceeding under any Debtor Relief Laws relative to any Credit Party, Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(b)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its respective agents and counsel and all other amounts due Administrative Agent under Sections 2.4, 2.11, 10.2 and 10.3) allowed in such judicial proceeding; and

(c)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent under Sections 2.11, 10.2 and 10.3. To the extent that the payment of any such compensation, expenses, disbursements and advances of Administrative Agent, its agents and counsel, and any other amounts due Administrative Agent under Sections 2.11, 10.2 and 10.3 out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

(d)     Nothing contained herein shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

### 9.11.   Certain ERISA Matters.

(a)     Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of the Administrative Agent and Collateral Agent and their respective Affiliates and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that at least one of the following is and will be true:

(i)     such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans (as defined below) in connection with the Loans, the Letters of Credit or the Commitments,

(ii)     the transaction exemption set forth in one or more PTEs (as defined below), such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable, with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)    Such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of the Administrative Agent and Collateral Agent and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that neither the Administrative Agent and Collateral Agent or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Credit Document or any documents related to hereto or thereto).

For purposes of this Section 9.11, the following definitions apply to each of the capitalized terms below:

**"Benefit Plan"** means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

**"PTE"** means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

**9.12.    Acknowledgement Regarding any Supported QFCs.** (a) To the extent that the Credit Documents provide support, through a guarantee or otherwise, for swap contracts or any other agreement or instrument that is a QFC (such support **"QFC Credit Support"** and each such QFC a **"Supported QFC"**), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the **"U.S. Special Resolution Regime"**) in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Credit Documents and any Supported QFC may in fact be stated to be

governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(b)        In the event a QFC covered entity that is party to a Supported QFC (each, a **"Covered Party"**) becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, default rights under the Credit Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such default rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Credit Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support. As used in this <u>Section 9.12</u>, **"BHC Act Affiliate"** of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

**9.13.    Erroneous Payment**. Each Lender hereby agrees that:

(a)        If the Administrative Agent notifies a Lender or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party or other recipient, a **"Payment Recipient"**) that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding <u>clause (b)</u>) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an **"Erroneous Payment"**) and demands the return of such Erroneous Payment (or a portion thereof) (<u>provided</u> that, without limiting any other rights or remedies (whether at law or in equity), the Administrative Agent may not make any such demand under this <u>clause (a)(i)</u> with respect to an Erroneous Payment unless such demand is made within ten (10) Business Days of the date of receipt of such Erroneous Payment by the applicable Payment Recipient), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such

amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)    Without limiting immediately preceding clause (a), each Lender or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party, hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(i)    (A) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)    such Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 9.13(b).

(c)    Each Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Credit Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured Party from any source, against any amount due to the Administrative Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement (it being understood that nothing herein shall require reimbursement by the Borrower unless it is otherwise required under the Credit Documents).

(d)    In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding clause (a), from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an **"Erroneous Payment Return Deficiency"**), upon the Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Loans (but not its Commitments) of the relevant Class with respect to which such Erroneous Payment was made (the **"Erroneous Payment Impacted Class"**) in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of

the Loans (but not Commitments) of the Erroneous Payment Impacted Class, the **"Erroneous Payment Deficiency Assignment"**) at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment Agreement (or, to the extent applicable, an agreement incorporating an Assignment Agreement by reference pursuant to a Platform as to which the Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement. In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Lender or Secured Party under the Credit Documents with respect to each Erroneous Payment Return Deficiency (the **"Erroneous Payment Subrogation Rights"**).

(e)     The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Credit Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Credit Party for the purpose of making such Erroneous Payment.

(f)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)     Each party's obligations, agreements and waivers under this Section 9.13 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or

obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Credit Document.

### SECTION 10.    MISCELLANEOUS

#### 10.1.    Notices.

(a)    <u>Notices Generally</u>. Any notice or other communication herein required or permitted to be given to a Credit Party, Collateral Agent or Administrative Agent shall be sent to such Person's address as set forth on <u>Appendix B</u> or in the other relevant Credit Document, and in the case of any Lender, the address as indicated on <u>Appendix B</u> or otherwise indicated to Administrative Agent in writing. Except as otherwise set forth in <u>Section 3.2(b)</u> or <u>paragraph (b)</u> below, each notice hereunder shall be in writing and may be personally served or sent by facsimile (except for any notices sent to Administrative Agent) or United States (or international, as the case may be) mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile, or three Business Days after depositing it in the United States mail with postage prepaid (or deposited with such international courier delivery service, as the case may be) and properly addressed; <u>provided</u>, that no notice to any Agent shall be effective until received by such Agent; <u>provided</u> <u>further</u>, that any such notice or other communication shall at the request of Administrative Agent be provided to any sub-agent appointed pursuant to <u>Section 9.3(c)</u> as designated by Administrative Agent from time to time. Holdings hereby irrevocably designates and appoints the Borrower (in such capacity, the **"Process Agent"**) as its authorized agent upon which process may be served in any action, suit, proceeding or claim arising out of or relating to the transactions contemplated hereby or the performance of services hereunder or under the other Credit Documents that may be instituted by the Administrative Agent or any Lender or any other Secured Party. Holdings hereby agrees that service of any process, summons, notice or document by U.S. registered mail addressed to the Process Agent, with written notice of said service to Holdings at the address provided for in <u>Appendix B</u>, shall be effective service of process for any action, suit, proceeding or claim arising out of or relating to the transactions contemplated hereby or the performance of services hereunder or under the other Credit Documents.

(b)    <u>Electronic Communications</u>.

(i)    Notices and other communications to any Agent and Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites, including the Platform) pursuant to procedures approved by Administrative Agent, <u>provided</u> that the foregoing shall not apply to notices to any Agent or any Lender pursuant to <u>Section 2</u> if such Person has notified Administrative Agent that it is incapable of receiving notices under such Section by electronic communication. Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, <u>provided</u> that approval of such procedures may be limited to particular notices or communications. Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written

acknowledgment), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(ii)     Each Credit Party understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct, bad faith or gross negligence of Administrative Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(iii)     The Platform and any Approved Electronic Communications are provided "as is" and "as available." None of the Agents or any of their respective officers, directors, employees, agents, advisors or representatives (the **"Agent Affiliates"**) warrant the accuracy, adequacy, or completeness of the Approved Electronic Communications or the Platform and each expressly disclaims liability for errors or omissions in the Platform and the Approved Electronic Communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects is made by the Agent Affiliates in connection with the Platform or the Approved Electronic Communications.

(iv)     Each Credit Party, each Lender and each Agent agrees that Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications on the Platform in accordance with Administrative Agent's customary document retention procedures and policies.

(v)     Any notice of Default or Event of Default may be provided by telephone if confirmed promptly thereafter by delivery of written notice thereof.

(c)     Private Side Information Contacts. Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States federal and state securities laws, to make reference to information that is not made available through the "Public-Side Information" portion of the Platform and that may contain Private-Side Information. In the event that any Public Lender has determined for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) other Lenders may have availed themselves of such information and (ii) neither the Borrower nor Administrative Agent has any responsibility for such Public Lender's decision to limit the scope of the information it has obtained in connection with this Agreement and the other Credit Documents.

**10.2.    Expenses**. Any action taken by any Credit Party under or with respect to any Credit Document, even if required under any Credit Document or at the request of the Agent or Requisite Lenders, shall be at the expense of such Credit Party, and neither the Agent nor any other Secured Party shall be required under any Credit Document to reimburse any Credit Party or any Subsidiary of any Credit Party therefor except as expressly provided therein. In addition, the Borrower agrees (a) to pay or reimburse the Agent for all reasonable and documented or invoiced out-of-pocket costs and expenses, including any and all recording and filing fees, costs and expenses incurred pursuant to any Credit Document, associated with the syndication of the Loans and the preparation, execution and delivery, administration, amendment, modification, waiver and/or enforcement of this Agreement and the other Credit Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), including all Attorney Costs of one primary counsel (it being understood such counsel shall be ArentFox Schiff LLP) (and a single local counsel in each relevant jurisdiction or otherwise retained with the Borrower's consent (such consent not to be unreasonably withheld, conditioned or delayed)), (b) to pay or reimburse the Agent for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Credit Documents (including Attorney Costs of one firm or counsel to the Agent and, to the extent required, one firm or local counsel in each relevant local jurisdiction or otherwise retained with the Borrower's consent (such consent not to be unreasonably withheld, conditioned or delayed), which may include a single special counsel acting in multiple jurisdictions) and (c) to pay or reimburse the Lenders for all their reasonable and documented out of pocket costs and expenses (without duplication) incurred in connection with the development, preparation, execution and delivery of, and any amendment, supplement, modification to, waiver, enforcement and preservation of rights under this Agreement and the other Credit Documents and any other documents in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable fees, disbursements and other charges of one firm of counsel to the Lenders taken as a whole (it being understood such counsel shall be Gibson, Dunn & Crutcher LLP), and, to the extent required one firm of local counsel in each relevant local jurisdiction (which may include a single special counsel acting in multiple jurisdictions). Subject to the limitations above, the foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable and documented or invoiced out-of-pocket expenses incurred by the Agent. The agreements in this Section 10.5 shall survive the termination of the Commitments and repayment of all other Obligations. All amounts due under this Section 10.5 shall be paid within ten (10) Business Days of receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail.

**10.3.    Indemnity**.

(a)    The Borrower agrees to pay, indemnify and hold harmless the Agent, each Lender at any time party hereto (whether or not such Lender remains a party hereto) and each of their respective Related Parties (without duplication) (each such Person being "**Protected Persons**" or "**Indemnitees**") from and against all Liabilities that may be imposed on, incurred by or asserted against any such Protected Person and the reasonable and documented or invoiced out-of-pocket expenses to which such Protected Person may become subject, in each case to the extent of any such Liabilities and related expenses, to the extent arising out of, or resulting from, or in

connection with the Credit Documents, the use or proposed use of proceeds of any Loan or any Proceeding (regardless of whether such Protected Person is a party thereto or whether or not such Proceeding was brought by the Borrower, its equityholders, Affiliates or creditors or any other third Person) and to reimburse each such Protected Person promptly for any reasonable and documented or invoiced out-of-pocket fees and expenses incurred in connection with investigating, responding to or defending any of the foregoing (which, in the case of Attorney Costs, shall be limited to (w) Attorney Costs of one firm of counsel for the Agent and its respective Affiliates, directors, officers, employees, agents, advisors and other representatives (it being understood such counsel shall be ArentFox Schiff LLP), (x) Attorney Costs of one firm of counsel for the Lenders (other than the Fronting Lender) and their respective Affiliates, directors, officers, employees, agents, advisors, and other representatives (it being understood such counsel shall be Gibson, Dunn & Crutcher LLP), (y) Attorney Costs of one firm of counsel at a time for the Fronting Lender and its Affiliates, directors, officers, employees, agents, advisors, and other representatives and (z) if reasonably necessary, Attorney Costs of a single firm of local counsel in each appropriate jurisdiction (which may include a single firm of special counsel acting in multiple jurisdictions) (and, in the case of an actual or perceived conflict of interest where the indemnitee affected by such conflict notifies the Borrower of the existence of such conflict and in connection with the investigating, responding to or defending any of the foregoing has retained its own counsel, of one other firm of counsel and, if reasonably necessary, on additional firm of local counsel in each relevant jurisdiction for such similarly situated affected Protected Persons)), in each case relating to the Transactions or the execution, delivery, enforcement, performance and administration of this Agreement, the other Credit Documents and any such other documents or the use or proposed use of the proceeds of the Loans (all the foregoing in this clause (a), collectively, the "**Indemnified Liabilities**"); provided that this clause (a) shall not apply with respect to Taxes other than any Taxes that represent Liabilities arising from any non-Tax claim; and provided, further, that the Borrower shall have no obligation hereunder to any Protected Person with respect to Indemnified Liabilities to the extent arising from (i) the gross negligence, bad faith or willful misconduct of such Protected Person or any of its Related Parties as determined in a final and non-appealable decision of a court of competent jurisdiction, (ii) a material breach of the obligations of such Protected Person or any of its Related Parties under the terms of this Agreement or any other Credit Document by such Indemnitee or any of its Related Parties as determined in a final and non-appealable decision of a court of competent jurisdiction or (iii) any Proceeding brought by any Indemnitee against any other Indemnitee that does not involve an act or omission by Holdings, the Borrower or its Subsidiaries; provided that the Agent, to the extent fulfilling its role in its capacities as such, shall remain indemnified in respect of such a Proceeding, to the extent that none of the exceptions set forth in clause (i) or (ii) of the immediately preceding proviso applies to such Person at such time.

(b)    No Credit Party or any Protected Person shall have any liability for any special, punitive, indirect or consequential damages resulting from this Agreement or any other Credit Documents or arising out of activities in connection herewith or therewith (whether before or after the Effective Date); provided that the foregoing shall not limit the Borrower's indemnification obligations to the Protected Persons pursuant to Section 10.3(a) in respect of damages incurred or paid by a Protected Person to a third party.

(c)    No Credit Party shall be liable for any settlement of any Proceeding effected without written consent of the Borrower, but if settled with the Borrower's written consent or if

there is a final and non-appealable judgment by a court of competent jurisdiction in any such Proceeding, each Credit Party agrees to indemnify and hold harmless each Indemnitee from and against any and all Liabilities and reasonable and documented or invoiced legal or other out-of-pocket expenses by reason of such settlement or judgment in accordance with and to the extent provided in the other provisions of this Section 10.6. If any Person has reimbursed any Indemnitee for any legal or other expenses in accordance with such request and there is a final and non-appealable determination by a court of competent jurisdiction that the Indemnitee was not entitled to indemnification or contribution rights with respect to such payment pursuant to this Section 10.6, then the Indemnitee shall promptly refund such amount.

(d)     No Credit Party shall without the prior written consent of any Indemnitee (which consent shall not be unreasonably withheld or delayed, it being understood that the withholding of consent due to non-satisfaction of any of the conditions described in clauses (i), (ii) and (iii) of this sentence shall be deemed reasonable), effect any settlement of any pending or threatened Proceeding in respect of which indemnity could have been sought hereunder by such Indemnitee unless such settlement (i) includes a full and unconditional release of such Indemnitee in form and substance reasonably satisfactory to such Indemnitee from all liability or claims that are the subject matter of such Proceeding, (ii) does not include any statement as to or any admission of fault, culpability, wrongdoing or a failure to act by or on behalf of any Indemnitee, and (iii) includes customary confidentiality and non-disparagement agreements.

**10.4.    Set-Off**. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default each Lender is hereby authorized by each Credit Party at any time or from time to time subject to the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to any Credit Party or to any other Person (other than Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts, payroll accounts, employee benefits accounts, tax withholding accounts or other similar fiduciary accounts) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of any Credit Party against and on account of the obligations and liabilities of any Credit Party to such Lender hereunder and participations therein and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto and participations therein or with any other Credit Document, but solely to the extent the Obligations are due and owing; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to Administrative Agent for further application in accordance with the provisions of Sections 2.17 and 2.22 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender and their respective Affiliates under this Section 10.4 are

in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.

**10.5.    Amendments and Waivers**.

(a)    Requisite Lenders' Consent. No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of Requisite Lenders and the Borrower; provided that Administrative Agent may, with the consent of the Borrower only, amend, modify or supplement this Agreement or any other Credit Document to cure any ambiguity, omission, defect or inconsistency (as reasonably determined by Administrative Agent), so long as such amendment, modification or supplement does not adversely affect the rights of any Lender or the Lenders shall have received at least five Business Days' prior written notice thereof and Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Requisite Lenders stating that the Requisite Lenders object to such amendment.

(b)    Affected Lenders' Consent. Without the written consent of each Lender that would be directly and adversely affected thereby (but not the Requisite Lender consent required by Section 10.5(a) other than with respect to clauses (viii) and (ix)), no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)    extend the scheduled final maturity of any Loan or Note;

(ii)    waive, reduce or postpone any scheduled repayment (but not prepayment, mandatory or otherwise, which shall require the consent of Requisite Lenders only) of principal;

(iii)    alter the required application of any repayments or prepayments as between Classes pursuant to Section 2.15 or Section 8.2;

(iv)    reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.10) or any fee or any premium payable hereunder;

(v)    extend the time for payment of any such interest, fees or premium;

(vi)    (i) amend modify, terminate or waive the last paragraph of Section 6.1 or (ii) permit the issuance or incurrence of any Indebtedness (excluding, for the avoidance of doubt any "debtor-in-possession" facility pursuant to Section 364 of the Bankruptcy Code (or similar financing under applicable law)) with respect to which the Obligations would be subordinated in right of payment or Liens on the Collateral securing the Obligations would be subordinated (any such other Indebtedness to which the Obligations are subordinated in right of payment or such Liens securing any of the Obligations are subordinated, "**Specified Indebtedness**"), unless each adversely affected Lender has been offered a bona fide opportunity to fund or otherwise provide its pro rata share (based on the principal amount of Obligations that are adversely affected thereby held by each Lender) of the Specified Indebtedness on the same terms (other than bona fide backstop fees and reimbursement of counsel fees and other expenses

in connection with the negotiation of the terms of such transaction; such fees and expenses, "**Ancillary Fees**") as offered to all other providers (or their Affiliates) of the Specified Indebtedness and to the extent such adversely affected Lender decides to participate in the Specified Indebtedness, receive its pro rata share of the fees and any other similar benefit (other than Ancillary Fees) of the Specified Indebtedness afforded to the providers of the Specified Indebtedness (or any of their Affiliates) in connection with providing the Specified Indebtedness;

(vii)    amend, modify, terminate or waive any provision of this Section 10.5(b), Section 10.5(c) or any other provision of this Agreement that expressly provides that the consent of all or all directly affected Lenders is required;

(viii)    amend the definition of "Class", "Requisite Lenders" or "Pro Rata Share" or Section 2.17;

(ix)    release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Credit Documents and except in connection with a "credit bid" undertaken by the Collateral Agent at the direction of the Requisite Lenders pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code or other sale or disposition of assets in connection with an enforcement action with respect to the Collateral permitted pursuant to the Credit Documents;

(x)    consent to the assignment or transfer by the Borrower of any of its rights and obligations under any Credit Document (except as permitted by Sections 6.8(a) and (w)); or

(xi)    amend, modify or waive any provision of the Credit Documents in a manner that would permit any Subsidiary to be designated as an "Unrestricted Subsidiary" or permit the transfer of any assets (including by Disposition, Investment, restricted payments or otherwise) to "Unrestricted Subsidiaries" or otherwise permit the creation or existence of, or transfer of any assets (including by Disposition, Investment, restricted payments or otherwise) to, a subsidiary otherwise not subject to the provisions of the Credit Documents (it being acknowledged that no Subsidiary is an "Unrestricted Subsidiary" as of the Closing Date);

(xii)    amend, modify or waive any provision of the Credit Documents in a manner that would permit transfers of Material Property (whether pursuant to a sale, lease, license, transfer, Investment, restricted payment, dividend or otherwise or relating to the exclusive rights thereto) to any Subsidiary that is not a Guarantor (including for the avoidance of doubt, (I) the last paragraph of Sections 6.4, 6.6 and 6.8 and Section 6.11 or (II) the definition of "Material Property") or otherwise amend, modify or waive the last paragraph of Section 6.6;

(xiii)    to the extent not otherwise permitted by this Agreement as of the Effective Date, authorize additional Indebtedness that would be issued under the Credit Documents (or otherwise) for the purpose of influencing voting thresholds;

(xiv)    amend, modify or waive any provision of the Credit Documents to allow for purchases of any Loans (by open market purchase or through other assignments) by the Borrower or any of its Subsidiaries or other Affiliates;

134

(xv)    amend, modify, terminate or waive any provision of <u>Section 7.12</u> and/or <u>Section 9.8(f)</u>;

(xvi)    amend, modify, terminate or waive any provision of <u>Section 10.6(c)</u>;

(xvii)    [reserved];

(xviii)    [reserved]

(xix)    amend, modify, terminate or waive any provision of the Credit Documents in a manner that affects the rights or obligations of any member of a Class differently than any other member of the Class, without the written consent of each Lender directly and adversely affected thereby (other than with respect to fees paid to Lenders as consideration for consenting to an amendment of the Credit Documents);

<u>provided</u> that, for the avoidance of doubt, all Lenders shall be deemed directly affected thereby with respect to any amendment described in <u>clauses (iii)</u>, <u>(vi)</u>, <u>(vii)</u>, <u>(viii)</u>, <u>(ix)</u>, <u>(ix)</u>, <u>(xii)</u>, <u>(xiii)</u>, <u>(xiv)</u>, <u>(xv)</u>, <u>(xvi)</u>, <u>(xvii)</u> and <u>(xviii)</u>.

(c)    <u>Other Consents</u>. No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall:

(i)    increase the aggregate amount of the Commitments of any Lender or extend the Commitments of any Lender without the consent of such Lender;

(ii)    [reserved];

(iii)    amend the provisions of <u>Section 2.17</u>, in a manner that would by its terms alter the pro rata sharing of payments required thereby without the prior written consent of each Lender;

(iv)    [reserved];

(v)    amend, modify or waive this Agreement so as to alter the ratable treatment of Obligations arising under the Credit Documents or the definition of "Secured Obligations" (as defined in any applicable Collateral Document) in each case in a manner adverse to any Lender with Obligations then outstanding (as compared to any other Lender) without the written consent of any such Lender;

(vi)    amend, modify, terminate or waive any section reference used in this <u>Section 10.5</u> without the written consent of each Lender;

(vii)    amend, modify, terminate or waive any provision of the Credit Documents as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of such Agent; or

(viii)    amend, modify, terminate or waive the requirements set forth in Section 5.23 or Section 5.24 without the consent of each Lender.

(d)    Execution of Amendments, Etc. Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.5 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party.

**10.6.    Successors and Assigns; Participations**.

(a)    Generally. This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders. No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party (except as permitted by Sections 6.8(a), (g) and (w)) without the prior written consent of all Lenders directly affected thereby. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Lenders and other indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Register. The Borrower, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until recorded in the Register following receipt of a fully executed Assignment Agreement effecting the assignment or transfer thereof, together with the required forms and certificates regarding tax matters and any fees payable in connection with such assignment, in each case, as provided in Section 10.6(d). Each assignment shall be recorded in the Register promptly following receipt by Administrative Agent of the fully executed Assignment Agreement and all other necessary documents and approvals, prompt notice thereof shall be provided to the Borrower and a copy of such Assignment Agreement shall be maintained, as applicable. The date of such recordation of a transfer shall be referred to herein as the **"Assignment Effective Date"**. Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.

(c)    Right to Assign. Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitment or Loans owing to it or other Obligations (provided, however, that pro rata assignments shall not be required and each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Loan and any related Commitments; provided, further, that no assignments shall be made to Defaulting Lenders or

Disqualified Institutions or to any Affiliate of any Credit Party); <u>provided</u> that the Fronting Lender may assign DIP Term Loans separately from DIP Term Loan Commitments;

<u>provided further</u>, that, each such assignment pursuant to this <u>Section 10.6(c)</u> shall be in an aggregate amount of not less than (w) $1,000,000 with respect to the assignment of the Term Loans, (x) such lesser amount as agreed to by the Borrower and Administrative Agent, (y) the aggregate amount of the Loans of the assigning Lender with respect to the Class being assigned or (z) the amount assigned by an assigning Lender to an Affiliate under common control with such Lender or Related Fund of such Lender; <u>provided</u> that simultaneous assignments to or from two or more Related Funds shall be aggregated for purposes of determining compliance with this <u>Section 10.6(c)(ii)</u>.

Notwithstanding anything herein to the contrary, the consent of the Administrative Agent will not be required to effectuate the Syndication or any initial assignments by the Fronting Lender.

Notwithstanding the foregoing, no such assignment shall be made to a natural Person, Disqualified Institution or Defaulting Lender. For the avoidance of doubt, (x) assignments shall only be made to Eligible Assignees and (y) the Administrative Agent shall bear no responsibility or liability for monitoring and enforcing the list of Persons who are Disqualified Institutions at any time.

        (d)    <u>Mechanics</u>.

        (i)  Assignments and assumptions of Loans and Commitments by Lenders shall be effected by manual execution and delivery to Administrative Agent of an Assignment Agreement. Assignments made pursuant to the foregoing provision shall be effective as of the Assignment Effective Date. In connection with all assignments there shall be delivered to Administrative Agent such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver pursuant to <u>Section 2.20(c)</u>, together with payment to Administrative Agent of a registration and processing fee of $3,500 (except that no such registration and processing fee shall be payable in the case of an assignee which is already a Lender or is an Affiliate or Related Fund of a Lender or a Person under common management with a Lender); <u>provided</u> that only one fee shall be payable for simultaneous assignments to or from two or more Related Funds.

        (ii) In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and Administrative Agent, the applicable Pro Rata Share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to Administrative Agent and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any

Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(e)    <u>Representations and Warranties of Assignee</u>. Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the Commitments and Loans, as the case may be, represents and warrants as of the Effective Date or as of the Assignment Effective Date that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; and (iii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this <u>Section 10.6</u>, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control).

(f)    <u>Effect of Assignment</u>. Subject to the terms and conditions of this <u>Section 10.6</u>, as of the Assignment Effective Date (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent of its interest in the Loans and Commitments as reflected in the Register and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned to the assignee, relinquish its rights (other than any rights which survive the termination hereof under <u>Section 10.8</u>) and be released from its obligations hereunder (and, in the case of an assignment covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto on the Assignment Effective Date; <u>provided</u>, that anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); and (iii) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon the Borrower shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new outstanding Loans of the assignee and/or the assigning Lender.

(g)    <u>Participations</u>.

(i)    Each Lender shall have the right at any time to sell one or more participations to any Person (other than a Disqualified Institution, Holdings, any of its Subsidiaries or any of its Affiliates) in all or any part of its Commitments, Loans or in any other Obligation. Each Lender that sells a participation pursuant to this <u>Section 10.6(g)</u> shall, acting solely for U.S. federal income tax purposes as an agent of the Borrower, maintain a register on which it records the name and address of each participant and the principal amounts of (and stated interest on) each participant's participation interest with respect to the Term Loan (each, a **"Participant Register"**); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or any information relating to a

participant's interest in any Commitments, Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Treasury Regulation Section 5f.103-1 and Proposed Treasury Regulation Section 1.163-5(b) and within the meaning of Section 163(f), 871(h)(2) and 881(c)(z) of the Code. Unless otherwise required by the Internal Revenue Service, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the Internal Revenue Service. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of a participation with respect to the Term Loan for all purposes under this Agreement, notwithstanding any notice to the contrary.

(ii)      The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (A) extend the final scheduled maturity of any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (B) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement (except as permitted by Sections 6.8(a), (g) and (w)) or (C) release all or substantially all of the Collateral under the Collateral Documents or all or substantially all of the Guarantors from the Guaranty (in each case, except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.

(iii)      The Borrower agrees that each participant shall be entitled to the benefits of Sections 2.18(c), 2.19 and 2.20 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (c) of this Section 10.6; provided, that a participant shall not be entitled to receive any greater payment under Section 2.19 or 2.20 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, unless the sale of the participation to such participant is made with the Borrower's prior written consent (not to be unreasonably withheld or delayed). To the extent permitted by law, each participant also shall be entitled to the benefits of Section 10.4 as though it were a Lender, provided such participant agrees to be subject to Section 2.17 as though it were a Lender.

(h)      Certain Other Assignments and Participations. In addition to any other assignment or participation permitted pursuant to this Section 10.6 any Lender may assign, pledge and/or grant a security interest in (other than to a Disqualified Institution) all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender including, without limitation, any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors and any operating circular issued by such Federal Reserve Bank or any central bank having jurisdiction over such Lender in accordance with applicable law; provided, that no Lender, as between the Borrower and such Lender, shall be

relieved of any of its obligations hereunder as a result of any such assignment and pledge, and
<u>provided</u> <u>further</u>, that in no event shall the applicable Federal Reserve Bank, central bank, pledgee
or trustee, be considered to be a "Lender" or be entitled to require the assigning Lender to take or
omit to take any action hereunder.

      **10.7.    Independence of Covenants**. All covenants hereunder shall be given independent
effect so that if a particular action or condition is not permitted by any of such covenants, the fact
that it would be permitted by an exception to, or would otherwise be within the limitations of,
another covenant shall not avoid the occurrence of a Default or an Event of Default if such action
is taken or condition exists.

      **10.8.    Survival of Representations, Warranties and Agreements**. All representations,
warranties and agreements made herein shall survive the execution and delivery hereof and the
making of any Credit Extension. Notwithstanding anything herein or implied by law to the
contrary, the agreements of each Credit Party set forth in <u>Sections 2.18(c)</u>, <u>2.19</u>, <u>2.20</u>, <u>10.2</u> and
<u>10.3</u> and the agreements of Lenders set forth in <u>Sections 2.17</u>, <u>9.3(b)</u> and <u>9.6</u> shall survive the
payment of the Loans and the termination hereof.

      **10.9.    No Waiver; Remedies Cumulative**. No failure or delay on the part of any Agent
or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit
Document shall impair such power, right or privilege or be construed to be a waiver of any default
or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege
preclude other or further exercise thereof or of any other power, right or privilege. The rights,
powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in
addition to and independent of all rights, powers and remedies existing by virtue of any statute or
rule of law or in any of the other Credit Documents. Any forbearance or failure to exercise, and
any delay in exercising, any right, power or remedy hereunder shall not impair any such right,
power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise
of any such right, power or remedy.

      **10.10.    Marshalling; Payments Set Aside**. Neither any Agent nor any Lender shall be
under any obligation to marshal any assets in favor of any Credit Party or any other Person or
against or in payment of any or all of the Obligations. To the extent that any Credit Party makes a
payment or payments to Administrative Agent or Lenders (or to Administrative Agent, on behalf
of Lenders), or any Agent or Lender enforces any security interests or exercises any right of setoff,
and such payment or payments or the proceeds of such enforcement or setoff or any part thereof
are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to
be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or
federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation
or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or
related thereto, shall be revived and continued in full force and effect as if such payment or
payments had not been made or such enforcement or setoff had not occurred.

      **10.11.    Severability**. In case any provision in or obligation hereunder or under any other
Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality

and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**10.12.  Obligations Several; Independent Nature of Lenders' Rights**. The obligations of Lenders hereunder are several, and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder. Nothing contained herein or in any other Credit Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a Joint Venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**10.13.  Headings**. Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

**10.14.  APPLICABLE LAW**. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

**10.15.  CONSENT TO JURISDICTION. SUBJECT TO <u>CLAUSE (E)</u> OF THE FOLLOWING SENTENCE, ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENTS, OR ANY OF THE OBLIGATIONS, SHALL BE BROUGHT IN ANY FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN THE BOROUGH OF MANHATTAN OR, IF THAT COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, IN ANY STATE COURT LOCATED IN THE CITY AND COUNTY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY HERETO, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (A) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE (SUBJECT TO <u>CLAUSE (E)</u> BELOW) JURISDICTION AND VENUE OF SUCH COURTS; (B) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (C) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH <u>SECTION 10.1</u> OR THE APPLICABLE ASSIGNMENT AGREEMENT; (D) AGREES THAT SERVICE AS PROVIDED IN <u>CLAUSE (C)</u> ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING**

**SERVICE IN EVERY RESPECT; AND (E) EACH CREDIT PARTY AGREES THAT AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY CREDIT DOCUMENT OR AGAINST ANY COLLATERAL OR THE ENFORCEMENT OF ANY JUDGMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF, AND CONSENTS TO VENUE IN, ANY SUCH COURT.**

**10.16.   WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS <u>SECTION 10.16</u> AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

**10.17.   Confidentiality**. Each Agent and each Lender shall hold all non-public information regarding Holdings and its Subsidiaries, Affiliates and their businesses and obtained by such Agent or such Lender pursuant to the requirements hereof in accordance with such Agent's and such Lender's customary procedures for handling confidential information of such nature, it being understood and agreed by the Borrower that, in any event, Administrative Agent may disclose such information to the Lenders and each Agent and each Lender and each Agent may make (i) disclosures of such information to Affiliates of such Lender or Agent and to their respective officers, directors, partners, employees, legal counsel, independent auditors and other advisors, experts or agents who need to know such information in connection with the Transactions

and who are informed of the confidential nature of such information and who are subject to customary confidentiality obligations of professional practice or who agree to be bound by the terms of this Section 10.17 (or language substantially similar) (with each such Person, to the extent within its control, responsible for such Person's compliance with this paragraph), (ii) disclosures of such information to any potential or prospective Lenders, hedge providers (or other derivative transaction counterparties) (any such person, a **"Derivative Counterparty"**) participants or assignees, in each case who agree (pursuant to customary syndication practice) to be bound by the terms of this Section 10.17 (or confidentiality provisions at least as restrictive as those set forth in this Section 10.17); provided that (x) the disclosure of any such information to any Lenders, Derivative Counterparties or prospective Lenders, Derivative Counterparties or participants or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such Lender, Derivative Counterparty or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis (on substantially the terms set forth in this Section 10.17 or confidentiality provisions at least as restrictive as those set forth in this Section 10.17) in accordance with the standard syndication processes of such Person or customary market standards for dissemination of such type of information, which shall in any event require "click through" or other affirmative actions on the part of recipient to access such information and (y) no such disclosure shall be made by any Person to whom a list of Disqualified Institutions has been made available to any Person that is at such time a Disqualified Institution, (iii) disclosure to any rating agency when required by it, provided that, prior to any disclosure, such rating agency shall undertake in writing to preserve the confidentiality of any confidential information relating to Credit Parties received by it from any Agent or any Lender, (iv) [Reserved], (v) [Reserved], (vi) disclosures made pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case such Person agrees (except with respect to any routine or ordinary course audit or examination conducted by bank accountants or any governmental, bank regulatory or self-regulatory authority licensing examination or regulatory authority) to inform the Borrower promptly thereof to the extent practicable and not prohibited by law), (vii) disclosures made upon the request or demand of any regulatory or quasi-regulatory authority (including any self-regulatory authority) purporting to have jurisdiction over such Person or any of its Affiliates (in which such Person agrees to inform the Borrower promptly thereof (except with respect to any routine or ordinary course audit or examination conducted by bank accountants or any governmental bank regulatory or self-regulatory authority exercising examination or regulatory authority) to the extent practicable and not prohibited by applicable law) and (viii) to the extent that such information becomes publicly available other than by reason of improper disclosure by such Person or any of its Affiliates or any Related Parties thereto in violation of any confidentiality obligations owing under this Section 10.17, (ix) to the extent that such information is received by such Person from a third party that is not, to such Person's knowledge, subject to confidentiality obligations owing to any Credit Party or any of their respective Subsidiaries or Affiliates, (x) to the extent that such information was already in the possession of the Persons prior to any duty or other undertaking of confidentiality or is independently developed by such Persons without the use of such information and (xi) for purposes of establishing a "due diligence" defense. In addition, each Agent and each Lender may disclose the existence of this Agreement and the information about this Agreement to market data collectors, similar services providers to the lending industry, and service providers to the Agents

and the Lenders in connection with the administration and management of this Agreement and the other Credit Documents.

**10.18.    Usury Savings Clause**. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the Outstanding Amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrower shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lenders and the Borrower to conform strictly to any applicable usury laws. Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the Outstanding Amount of the Loans made hereunder or be refunded to the Borrower.

**10.19.    Effectiveness; Counterparts**. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by the Borrower and Administrative Agent of written notification of such execution and authorization of delivery thereof. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic format (i.e., "pdf" or "tif" shall be effective as delivery of a manually executed counterpart of this Agreement).

**10.20.    Integration.** This Agreement, together with the other Credit Documents and the Fronting Lender Fee Letter, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  In the event of any conflict between the provisions of this Agreement and those of any other Credit Document, the provisions of this Agreement shall control; *provided* that the inclusion of supplemental rights or remedies in favor of the Agent or the Lenders in any other Credit Document or in favor of the Fronting Lender in the Fronting Lender Fee Letter shall not be deemed a conflict with this Agreement.  Each Credit Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

**10.21.    PATRIOT Act**. Each Lender subject to the PATRIOT ACT and Beneficial Ownership Regulation and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Credit Party that pursuant to the requirements of the PATRIOT Act and the Beneficial Ownership Regulation, it is required to obtain, verify and record information that

identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender or Administrative Agent, as applicable, to identify such Credit Party in accordance with the PATRIOT Act and the Beneficial Ownership Regulation.

**10.22. Electronic Execution of Assignments and Certain Other Documents**. The words "execution," "signed," "signature," and words of like import in any Credit Document, any Assignment Agreement, any Funding Notice or any amendment or other modification hereof or thereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**10.23. No Fiduciary Duty**. Each Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the **"Lenders"**), may have economic interests that conflict with those of the Credit Parties, their stockholders and/or their affiliates. Each Credit Party agrees that nothing in the Credit Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Credit Party, its stockholders or its affiliates, on the other. The Credit Parties acknowledge and agree that (i) the transactions contemplated by the Credit Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Credit Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Credit Party, its stockholders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Credit Party, its stockholders or its Affiliates on other matters) or any other obligation to any Credit Party except the obligations expressly set forth in the Credit Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Credit Party, its management, stockholders, creditors or any other Person. Each Credit Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each Credit Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Credit Party, in connection with such transaction or the process leading thereto.

**10.24. DIP Orders; Conflicts**.

(a)    Each Lender hereunder:

(i)  consents to the creation of Liens on the Collateral pursuant to the ABL DIP Credit Documents, which Liens will be subject to the terms and conditions (including with respect to priority) of the DIP Orders;

(ii) consents to the subordination of Liens provided for in the DIP Orders, solely to the extent so provided therein; and

(iii) agrees that it will be bound by and will take no actions contrary to the provisions of the DIP Orders.

(b)      The parties hereto agree that in the event of any conflict between the DIP Orders and this Agreement, that the terms of the DIP Orders shall govern and control.

**10.25.   [Reserved]**.

**10.26.   Acknowledgement and Consent to Bail-In of Affected Financial Institutions**. Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)  a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document;

(iii)  the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

[*Signature pages follow*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**BORROWER**                         **DEL MONTE FOODS CORPORATION II INC.**


By: _____
    Name:
    Title:


**HOLDINGS**                         **DM INTERMEDIATE II CORPORATION**


By: _____
    Name:
    Title:

**GUARANTORS:**                        **JOYBA, INC.**


By: _____
    Name:
    Title:

**KITCHEN BASICS, INC.**


By: _____
    Name:
    Title:


**GREEN THUMB FOODS**
**DEL MONTE CHILLED FRUIT SNACKS,**
**LLC**


By: _____
    Name:
    Title:

**DEL MONTE VENTURES, LLC**


By: _____
    Name:
    Title:

**SAGER CREEK FOODS, INC.**


By: _____
    Name:
    Title:

**HI CONTINENTAL CORP.**

By: _____
      Name:
      Title:

**COLLEGE INN FOODS**

By: _____
      Name:
Title:

**CONTADINA FOODS, INC.**

By: _____
      Name:
      Title:

**S & W FINE FOODS, INC.**

By: _____
      Name:
      Title:

*[DIP Credit and Guaranty Agreement]*

**WILMINGTON SAVINGS FUND SOCIETY, FSB,**
as Administrative Agent and Collateral Agent


By: _____
            Authorized Signatory

**OPY CREDIT CORP.**, solely in its capacity as Trading Agent and solely with respect to Sections <u>9.3</u>, <u>9.5</u>, <u>9.6</u>, <u>10.2</u>, <u>10.3</u>, <u>10.8</u>, <u>10.14</u>, <u>10.15</u>, <u>10.16</u>, <u>10.17</u>, <u>10.19</u>, <u>10.20</u> and <u>10.23</u> herein

By: _____
         Authorized Signatory