UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Wojciech F. Jung
**WOMBLE BOND DICKINSON (US) LLP**
888 Seventh Avenue, 38th Floor
New York, New York 10106
Telephone: (332) 258-8400
Email: wojciech.jung@wbd-us.com

*Counsel for Pacific Coast Producers*

-and-

Scott A. Zuber
Sam Della Fera
Terri Jane Freedman
**CHIESA SHAHINIAN & GIANTOMASI PC**
105 Eisenhower Parkway
Roseland, New Jersey
Telephone: (973) 325-1500
Email: szuber@csglaw.com
       sdellfera@csglaw.com
       tfreedman@csglaw.com

*Counsel for Morning Star Packing Company, L.P., and Morning Star Kings LLC*

| | |
|---|---|
| In re:<br><br>Del Monte Foods Corporation II Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.: 25-16984 (MBK)<br><br>(Jointly Administered) |

## MOTION OF CO-MOVANTS PACIFIC COAST PRODUCERS, MORNING STAR PACKING COMPANY, L.P. AND MORNING STAR KINGS, LLC FOR ENTRY OF AN ORDER (I) (A) COMPELLING DEBTORS TO ASSUME OR REJECT CERTAIN EXECUTORY CONTRACT AND UNEXPIRED LEASE AND (B) GRANT ADEQUATE PROTECTION, OR (II) IN THE ALTERNATIVE, GRANTING <u>RELIEF FROM THE AUTOMATIC STAY</u>

---

[1] The last four digits of Debtor Del Monte Foods Corporation II Inc.'s tax identification number are 1894. A complete list of the Debtors in these Chapter 11 Cases and their respective tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent, at https://cases.stretto.com/DelMonteFoods. The location of the Debtor Del Monte Foods Corporation II Inc.'s principal place of business and the Debtors' service address is 205 North Wiget Lane, Walnut Creek, California 94598.

Pacific Coast Producers a California, a nonprofit California Agricultural Cooperative ("PCP"), Morning Star Packing Company, L.P. ("Morning Star LP") and Morning Star Kings, LLC ("Morning Star Kings", together with Morning Star LP, and PCP, the "Movants"), by their respective undersigned counsel, seek, by way of this motion (the "Motion"), (i) entry of an order pursuant to section 365(d)(2) of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"), and Rules 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (A) compelling the above-captioned Debtors (the "Debtors") to immediately assume or reject the Products Supply Agreement[2] and the Sale and Lease Back Agreement (together, the "Agreements")[3], (B) granting the Movants adequate protection in the form of a letter of credit which Del Monte must post to assume the Products Supply Agreement or, in the alternative (C) if the Agreements are rejected, or the Court defers the decision on assumption or rejection, or if the Court declines to grant the Motion to compel, granting relief from the automatic stay under sections 105(a) and 362(d) of the Bankruptcy Code to allow Movants to suspend (or terminate) their obligations under the applicable Agreement (to the extent the Products Supply Agreement was not terminated prepetition)[4] including but not limited to processing and packing Products for debtor Del Monte Food Corporation II Inc. ("Del Monte") during the 2025 through 2030 tomato seasons, and (D) for such other and further relief as is just or proper under the circumstances. In support of this Motion, the Movants incorporate herein PCP's Declaration of Matt Strong (President and Chief Executive Officer) and Morning Star's Declaration of James

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion, the applicable Products Supply Agreement or in the Sale and Lease Back Agreement.

[3] Due to confidential commercial information, including marketing and product information contained in the Agreements, they are being filed under seal.

[4] See footnote 7, infra.

Sherwood (Commercial Director and Officer), both submitted herewith, and respectfully state as follows:

## INTRODUCTION

1.      In January of this year, Del Monte and the Movants (Morning Star Kings, Morning Star L.P. and PCP) effectively entered into three separate but interrelated agreements.  Del Monte entered into all three of these agreements as a result of its decision to exit the business of processing and packing tomato products, and its desire to maintain a co-manufacturing relationship with Movants in order to market and sell tomato products and secure the value of the Del Monte brand. In addition, by the sale of the Plant (defined below), Del Monte secured needed liquidity for its business.

2.      PCP and Morning Star LP had the processing capacity to accommodate manufacturing, packaging and preparing the Products for shipment.  In aid of fulfilling obligations under the Products Supply Agreement, and simultaneously therewith, Del Monte and Morning Star Kings entered into the *Purchase and Sale Agreement and Joint Escrow Instructions* (the "Purchase Agreement") by which, *inter alia*, Del Monte agreed to sell to Morning Star Kings certain tomato processing plant located in Hanford CA (the "Plant"), and pursuant to that certain *Commercial Lease Back Agreement* annexed thereto as Exhibit F, Morning Star Kings leased the Plant back to Del Monte (together, the "Sale and Lease Back Agreement").  In fact, pursuant to sections 2.4(d) and 2.5(d) of the Purchase Agreement, entry into the Sale and Lease Back Agreement was contingent upon execution of the Products Supply Agreement.

3.      Under the Products Supply Agreement, PCP and Morning Star LP are required to, among other things, source Raw Materials and manufacture, process, and package certain branded, finished processed tomato Products a significant portion of which are Del monte proprietary

formulations.    In essence, the Products Supply Agreement guarantees Del Monte maintains a certain level of inventory, which remains stored by PCP and Morning Star LP until shipped to Del Monte's customers sometimes months later.  Critical to this Motion, PCP and Morning Star LP just commenced their 2025 tomato processing pack season (PCP started the 2025 pack season on July 8, 2025, Morning Star LP started its 2025 pack on July 13, 2025).  It is anticipated that both PCP and Morning Star LP will conclude the 2025 fresh tomato pack on October 3, 2025, the first packing season under the Products Supply Agreement.  During this 2025 pack season, 100% of the inventory to be produced for Del Monte by PCP and Morning Star LP will be processed into "Brite" (canned but unlabeled) cans (the "Brites Products").  Importantly, time is of the essence under the Products Supply Agreement.  *See* Products Supply Agreement, section 7.17.

4.    Morning Star Kings (on behalf of Morning Star LP) proceeded and contracted in good faith with Del Monte with the Products Supply Agreement and the Sale and Lease Back Agreement as financially integrated agreements for the benefit of Del Monte.  The Products Supply Agreement and the Sale and Lease Back Agreement were executed as contingent agreements. Absent the execution of the Sale and Lease Back Agreement that required Del Monte to continue to carry the interest cost of the $56M of funds advanced by Morning Star Kings for the orderly sale of the Plant, and Del Monte's agreement to continue to pay all operating costs associated with the Plant (while it was marketed for sale over the next 36 months), Morning Star LP would not have provided the heavily discounted product pricing in the Products Supply Agreement.  The product pricing in the Products Supply Agreement represents a significant discount from Del Monte's cost of manufacturing the tomato products at the Plant, let alone the cost of operating the inefficient, obsolete and underutilized facility.

5.      As set forth in paragraphs 65 and 66 of the First Day Declaration of Jeff Goulding, it would have cost Del Monte in excess of $9M just to update the Plant, let alone incur significant additional operating costs, including (as represented by the Del Monte management team to Morning Star), in excess of $40 million in fixed costs over the next three (3) years.

6.      The Sale and Lease Back Agreement is a critical piece to the broader set of agreements with Del Monte to exit the tomato production business.  The Sale and Lease Back Agreement was the intended vehicle for an orderly transition of that exit.  Without the Sale and Lease Back Agreement, Morning Star would not have been able to offer the low market prices in the Products Supply Agreement.  Due to their interrelated nature and the discounting embodied in Products Supply Agreement due to entry into the Sale and Lease Back Agreement, both the Products Supply Agreement and the Sale and Lease Back Agreement must be assumed or rejected together.

7.      The entry into the Purchase Agreement was a contingent sale to Morning Star as evidenced by the deferred purchase price and the leaseback mechanisms and the 3-year term whereby Morning Star Kings (acting as an agent on behalf of Del monte) agreed to market the facility and Del Monte agreed to pay all carrying costs during the 3-year term of that marketing effort.

8.      Tomato processing packs are extremely complicated to organize and successfully run.  Tomatoes must be harvested, inspected, cleaned and processed within hours of harvest to achieve product safety.  Movants will be running lines with different cans and different ingredients and recipes and certifying bodies must inspect all aspects of production.  Certain PCP and Morning Star LP (non-Del Monte tomato product lines) are fully booked on every day of the pack.

9.      It is crucial for the Court to consider the fact that the 2025 fresh tomato pack has already started for PCP and Morning Star LP.   The fresh tomato pack season is only 93 days. Every day that passes that does not include line time for Del Monte's pack are days that cannot be recovered and the pack pursuant to the Products Supply Agreement will not be produced for sale for Del Monte's pre-contracted customers.  Each day PCP and Morning Star LP are and will be incurring significant cost in producing inventory Products for Del Monte.   Financial assurance is crucial so that the fiscal integrity of PCP and Morning Star is not compromised.

10.      It is equally important for the Court to take into consideration that Del Monte is in default under the Sale and Lease Back Agreement, which agreement represents significant value to potential purchasers of the Del Monte assets.  The Sale and Lease Back Agreement not only permits Del Monte to continue to ship its 2025 pack products (and inventory) from the Plant, it includes provisions for the sharing of facility sale proceeds and protections related to the potential ongoing liability of Del Monte. In accordance with the Sale and Lease Back Agreement, Del Monte is responsible for maintaining/operating the Plant.  Del Monte is in breach of its obligation to maintain the facility including but not limited to the health and safety issues being created by its failure and refusal to maintain the on-site water system.  Numerous notices have been provided to Del Monte to immediately rectify the health and safety concerns related to the premise with no corrective actions being taken by Del Monte.  As this Court can appreciate, marketing a property that is in violation of regional and State law is a serious concern and does not permit the broker to obtain highest value for the property.   The Movants believe that if assumption of the Sale and Leaseback Agreement and the Products Supply Agreement is not made simultaneously, the value of Del Monte as an ongoing concern will be significantly compromised.  Both the value of Del Monte's assets and its brand will be jeopardized.

11.     Del Monte is also in default under the Products Supply Agreement. As set forth in their June 2025 correspondence to Del Monte, PCP and Morning Star LP cannot move forward with any production for Del Monte during the 2025 pack season because Del Monte breached the Products Supply Agreement prior to the Petition Date.  Specifically, although required by section 3.1 of the Products Supply Agreement, Del Monte failed to provide the Movants with an Irrevocable Standby Letter in the amount of $4 million (the "$4 Million LC"), to protect the Movants against future non-payment.  In fact, as set forth in pre-petition correspondence to Del Monte, they may consider the Products Supply Agreement terminated. Reserving all rights, unless and until Del Monte posts the $4 Million LC and until it provides the Movants with adequate assurance of future performance, Del Monte remains in breach of the Products Supply Agreement. The relief herein is necessary given Del Monte's non-compliance with the Products Supply Agreement. The Movants have serious doubts about the Debtors' go-forward operations in this space, and lack of certainty as to whether the Supply Products Agreement will be assumed and assigned (and the timing thereof) in connection with the Debtors' sale process under section 363 of the Bankruptcy Code.

12.     Immediate relief is warranted as Movants face substantial and potentially devastating risks given the Debtors' existing defaults and the substantial expenses that the Movants would need to incur in the very near term.   PCP alone will expend an estimated $17.432 million in variable costs[5] to produce the Brites Products in 2025, a process that has already started.  These expenses will need to be worked onto PCP's 2025 pack plan in the very near future, but Movants

---

[5] In addition to the variable costs, PCP has expended significant capital to purchase equipment at the processing plan ($3.176 Million) and approximately $3 million for label and casing equipment. Additionally, PCP hired mechanics and maintenance personnel that would not have otherwise been necessary. but for or the Products Supply Agreement in the approximate amount $2.1 million. If the Products Supply Agreement is immediately rejected, it may be possible that a significant portion of these expenses could be avoided or reduced as they are "fixed" costs for accounting purposes but are actually also variable expenses as mitigation possibilities may exist.

can only expend the funds if they are assured that the Agreements are assumed and adequate protection is provided.   As a joint party to the Products Supply Agreement, Morning Star LP is similarly situated. Morning Star LP will expend over $1.7 million in variable expenses for the Del Monte tomato pack and has already invested $1.5 million in capital purchases for a total of $3.2 million, so that it can perform on the Products Supply Agreement to Produce Del Monte's pack.

13.    If Movants do not produce Del Monte's pack in accordance with the Products Supply Agreement, Del Monte is at risk of losing its organic brand value, and if PCP and Morning Star together do not pack the "non-organic" tomatoes required under the Product Supply Agreement, Del Monte will face a real risk of the loss of the value of its iconic canned tomato business.

14.    While Del Monte has requested that Movants process tomatoes during the 2025 pack season, Del Monte has failed to cure its ongoing defaults.  To add insult to injury, Del Monte even requested that Movants extend more favorable credit terms than provided for in the Products Supply Agreement and informed Movants that it would need "less" product than required to be purchased under the Products Supply Agreement, significantly impairing the benefits to the Movants and which would directly impact pricing of the products in the Products Supply Agreement.  These requests are violative of the parameters set forth in section 2.1 of the Products Supply Agreement.

15.    Given the seasonality of obligations under the Products Supply Agreement, and the immediacy by which Movants will have to incur millions of dollars in obligations for Products that Del Monte may ultimately not need (and may not be able to pay for), cause exists to compel Del Monte to decide whether it will assume both Agreements.  Cause also exists to require adequate protection in the form of the posting of the $4 Million LC, and the providing of additional

collateral as requested below, and the Court approval of a super-priority administrative claim if the $4 Million LC and the additional collateral is insufficient to provide adequate protection for Movants.   In the event that adequate protection cannot be provided, the Court should direct the Debtors to reject the Product Supply Agreement and/or grant Movants relief from the stay to terminate the Products Supply Agreement.

## JURISDICTION AND VENUE

16.     The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered on July 23, 1984, and amended on September 18, 2012 (*Simandle, C.J.*). Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

17.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

18.     The statutory predicates for the relief sought herein are sections 105(a), 362, and 365 of the Bankruptcy Code and Rules 4001 and 6006(b) of the Bankruptcy Rules.

## GENERAL BACKGROUND

19.     On July 1, 2025, (the "Petition Date"), Del Monte and each of the above-captioned Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, commencing the above-captioned Chapter 11 case (collectively, the "Chapter 11 Case").

20.     The Debtors continues to operate their business and manage their properties as debtors- in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

21.     To date, no trustee or examiner has been appointed in the Chapter 11 Case.  On July 17, 2025, the Office of the United States Trustee appointed the official committee of unsecured creditors [Docket No. 168].

## <u>SPECIFIC BACKGROUND</u>

22.    PCP is a not-for-profit farmer-owned California agricultural food processor that was founded in 1971 as a non-for-profit cooperative association." Approximately 165 family farms as members of PCP grow and deliver produce to the PCP production facilities. PCP employs approximately 4,000 employees throughout the year, peaking during its "pack" season.

23.    The family farmer members of PCP are significantly tied to PCP  85% of PCP's conventional tomato products comes from a 20-mile radius of the PCP plant, and these family farmers will be essentially funding the 2025 pack season, and the risks should PCP overproduce inventory that is not sold to Del Monte under the Products Supply Agreement.

24.    Morning Star LP is a California Limited Partnership that operates three factories and supplies 40 percent of the national markets with tomato paste and diced tomatoes as ingredients. Morning Star has already contracted with dozens of regional tomato growers to provide tomatoes to pack Del Monte's products under the Products Supply Agreement.

25.    Morning Star LP and PCP are both parties to the Products Supply Agreement with Del Monte. The initial Term of said agreement starts with the 2025 tomato processing season and runs through the 2029 Crop Year.  *See* Products Supply Agreement, Section 6.1.

26.    Unlike the Products Supply Agreement, only Morning Star LP is a party to the Sale and Lease Back Agreement with Del Monte. Because the Agreements are interrelated, Movants asks the Court to address the Agreements in concert, as only assumption of *both* Agreements. The acceptance of both agreements will benefit both the Debtors and the Movants and maximize Del Monte's brand and marketability to a potential buyer.

27.    Pursuant to the Sale and Lease Back Agreement, Del Monte is in possession of the Plant and is responsible for all operational costs and repairs related thereto. Del Monte is currently

operating from the Plant, including shipping its 2024 tomato pack from the facility as well as storing other products. In addition, Del Monte has employees on site at the Plant.

28.    Morning Star has been advised by the regional and State authorities that the water system at the Plant is currently in violation of local and state law.  Morning Star has communicated (via correspondence annexed to the Sherwood Declaration) with Del Monte outlining the health and safety issues and the specific water system reporting and health and safety deficiencies.  Del Monte has not responded to the multiple requests to immediately address the Plant's water system health and safety issues.  The Sale and Lease Back Agreement requires Del Monte to maintain the operation of the water system during the leaseback period.  Despite the numerous requests to Del Monte, it has not maintained the system and completed the required repairs to ensure that the water system is not in violation of state and local law.

29.    Time is critical because the tomato pack season in California has commenced and 100% of all the tomatoes to be processed during 2025 will be processed during this 2025 pack period that is projected to end on for PCP on October 3, 2025, and Morning Star LP on October 10, 2025.  As such, Movants have requested prompt hearing on the Motion.

30.    Under the Products Supply Agreement, ownership of the Brites Products remains with the Movants until they are labeled and shipped to a Del Monte customer, often many months after harvest and production.

31.    Del Monte's obligation under the Products Supply Agreement to post the $4 Million LC protects the Movants against Del Monte's payment defaults (hereafter referred to as the "Trade Creditor Risk").  Del Monte, however, never posted the $4 Million LC, despite frequent inquiries by PCP and obvious risks of termination of the Products Supply Agreement.

32.     A similar process governs the processing of the "organic" and conventional tomatoes that Morning Star LP will process, label, and sell under the Products Supply Agreement.

33.     During the ongoing 90-93 day 2025 pack season, 100% of the canned tomatoes are produced for the entire year, requiring an enormous capital investment with the variable cost for tomatoes contemplated to be processed under the Products Supply Agreement by the Movants, which the Movants have estimated will equal or exceed $19 million plus over $9.5 million in fixed costs described in above, a substantial portion of which could be mitigated should rejection of the Products Purchase Agreement occur promptly.

34.     Of the produced Products, 62% will be in Brites Products that could be labeled and sold to other customers, but 38% will have the Del Monte recipe and IP, creating significant risk that if Del Monte or a successor does not fulfill their obligations under the Products Supply Agreement that product could not be sold elsewhere.

35.     If the Products Supply Agreement is not assumed and assigned (or promptly rejected), PCP and Morning Star will lose 38% of approximately $20 million in variable costs or approximately $8 million in variable costs (plus those fixed costs that could be mitigated) for the 2025 pack season alone for producing the Del Monte Brites Products because it was processed to Del Monte's specifications and Movants may not have the ability (or right) to resell it.

36.     Even if 62% of the Del Monte Brites Product are sold to other PCP customers, the availability of that Product may produce an oversupply that injures PCP and the family farmer members because the oversupply could decrease the price paid to them for PCP's raw product.

37.     The risks of overproducing Brites Products are not acceptable without an immediate assumption of the Products Supply Agreement, the posting of the $4 Million LC, and any additional collateral to compensate for the absence of any adequate assurance of future

performance by either Del Monte or, at this time, any purchaser of its assets. The foregoing "inventory" risk is hereafter referred to as the "Del Monte Brites Liquidation Risk".

38.    Morning Star LP faces the same variable cost risks. 100% of the organic tomatoes processed in 2025 will also occur during this short 90-93 day 2025 pack season.

39.    In addition to the Trade Creditor Risks and the Brites Liquidation Risk PCP and Morning Star LP have received no adequate assurance of future performance in any form or fashion.  PCP and Morning Star LP do not know whether the Agreements will be assumed and assigned during the course of the Chapter 11 Case, and whether the purchaser of the Debtors' assets will be able to offer PCP and Morning Star LP adequate assurance of future performance under the Agreements (hereafter referred to as the "Adequate Assurance of Future Performance Risk.")

40.    To compound the critical nature of this situation, Del Monte has requested that the Movants agree to significantly "better for Del Monte" trade credit terms, including asking the Movants to waive the obligation that Del Monte post the $4 Million LC, and has unilaterally reduced the quantity of Products that it will purchase from the 2025 Pack.  Movants cannot accept these modification requests outside the context of assumption.

41.    The situation is critical; PCP and Morning Star LP have attempted in good faith to negotiate with Del Monte before the Movants collectively expend well in excess of $20 million plus additional mitigatable fixed costs for the Debtors that may be out of the tomato business in short order.  The Brites Liquidation Risk, the Trade Creditor Risk, and the Adequate Assurance of Future Performance Risk (together, the "Risks"), each individually warrant an immediate direction by the Court to compel Del Monte to assume or reject the Agreements.  When all these time sensitive Risks are assessed, hearing the Motion is justified on the time frame requested in the Application for Order Shortening Time.  In addition to the Risks, Morning Star Kings maintains

that the Products Supply Agreement may not be assumed unless the Sale and Lease Back Agreement is also assumed concurrently.  In fact, as lessor, Morning Star King is exposed to risk of non-payment of obligations due under the lease, but even more importantly, if not assumed the value that Del Monte is contractually entitled to receive from the sale of the Plant will be jeopardized.  Furthermore, Del Monte will be exposed to significant liability if it does not continue to maintain and operate the Plant as agreed in the Sale and Leaseback Agreement.

42.    The Products Supply Agreement and the Sale and Lease Back Agreement were negotiated and entered into at the same time.  In fact, entry into the Sale and Lease Back Agreement and thus Morning Star King's purchase of the Plant was, at the Debtors are aware, conditioned upon the Movants' entry into the Products Supply Agreement.   See Sale and Lease Back Agreement, Sections 2.4(d) and 2.5(d).

43.    The additional risk to Morning Star Kings of a failure to assume the Sale and Lease Back Agreement is that Morning Star Kings calculated in the receipt of the rents as a critical part of being able to process the organic tomatoes in Morning Star LP under the Products Supply Agreement at prices that it considers are significantly below market for custom packing organic tomatoes.   Both Morning Star entities believe that they cannot perform the expensive processing required to process organic tomatoes without the lease payments under the Sale and Lease Back Agreement and seek that the $4 Million LC collateral is posted and additional collateral and/or adequate protection is provided as described in this Motion.

**RELIEF REQUESTED**

44.    By this Motion, the Movants respectfully request that the Court:

a.    Compel Del Monte to assume or reject (a) the Products Supply Agreement; AND (b) the Sale and Lease Back Agreement, and

b.      If Del Monte elects to assume the Agreements, require, and authorize the

Debtors to post the $4 Million LC, and

c.       Provide Movants with superpriority administrative expense claim to

protect the Movants against any detrimental treatment of the Agreements

during the Chapter 11 Case, and

d.      In the event that Del Monte chooses to reject either of the Agreements, or if

the Court elects to give Del Monte more time to consider whether to assume

or reject, or the Court denies the relief sought, grant the Movants immediate

relief from the automatic stay to allow the Movants to suspend performance

and effectuate (to the extent it did not occur prepetition, as discussed below

and the Strong Declaration) termination of the Products Supply Agreement;

and

e.      Grant such other relief as is just or proper in the circumstances of this

Motion.

## **ARGUMENT**

**A.      The Court Should Compel the Debtors to Immediately Assume or Reject the Products Supply Agreement and the Sale and Lease Back Agreement.**

45.     The Court should compel Del Monte to assume or reject the Agreements within two

(2) days of entry of the Proposed Order.  Pursuant to section 365(d)(2) of the Bankruptcy Code, a

debtor has until plan confirmation to decide whether to assume or reject an executory contract. *See*

11 U.S.C. § 365(d)(2). However, section 365(d)(2) further provides that the Court has the power

to compel a debtor to assume or reject an executory contract within a specified period of time:

> In a case under chapter . . . 11 . . . of this title, the trustee may assume or
> reject an executory contract...of the debtor at any time before the
> confirmation of a plan *but the court, on the request of any party to such*

> *contract or lease, may order the trustee to determine within a specified*
> *period of time whether to assume or reject such contract. . .*

11 U.S.C. §365(d)(2) (*emphasis added*); 11 U.S.C. §1107(a).

46.     Congress intended this provision to "prevent parties in contractual or lease
relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate."
*Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1079 (3d Cir. 1992) (citing S.
Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5845).

47.     Although the Bankruptcy Code provides chapter 11 debtors with a "breathing
space" within which to determine whether a particular executory contract should be assumed or
rejected, such "breathing space . . . is not without limits." *In re Enron Corp.*, 279 B.R. 695, 702
(Bankr. S.D.N.Y. 2002). In assessing a section 365(d) motion, a court must consider not only the
debtor's need for "breathing room," but also the non-debtor party's need for certainty and stability.
The limit placed on the time for the debtor's assumption or rejection determination by case law
and commentators is "reasonableness." *See e.g. In re Teligent, Inc.*, 268 B.R. 723, 738–39 (Bankr.
S.D.N.Y. 2001). The determination of what constitutes a reasonable time to assume or reject a
particular executory contract is within the bankruptcy court's discretion and has to be decided in
light of the particular facts of each case.  *In re G-I Holdings, Inc.*, 308 B.R. 196, 213 (Bankr. D.N.J.
2004) ("What constitutes a reasonable time is left to the bankruptcy court's discretion in the light
of the circumstances of the particular case."); *In re Adelphia Comm 'cns Corp.*, 291 B.R. 283, 292
(Bankr. S.D.N.Y. 2003); *In re Physician Health Corp.*, 262 B.R. 290, 292 (Bankr. D. Del. 2001);
*In re St. Mary Hosp.*, 89 B.R. 503, 513 (Bankr. E.D. Pa. 1988); *Matter of Dunes Casino Hotel*, 63
B.R. 939, 949 (D.N.J. 1986) ("In determining what constitutes a reasonable time within which a
debtor should assume or reject a contract, the court should consider a number of factors.").

48.     Among the factors that courts have used to determine what may constitute "reasonable time" for the purposes of section 365(d)(2) of the Bankruptcy Code are the following: (a) the nature of the interests at stake, (b) the balance of harm to the litigants, (c) the good to be achieved, (d) the safeguards afforded to the parties, (e) whether the action to be taken is so in derogation of Congress' scheme as to be said to be arbitrary, and (f) the broad purpose of Chapter 11, which is to permit successful rehabilitation of debtors. *Dunes Casino Hotel*, 63 B.R. at 949; *In re Monroe Well Serv., Inc.*, 83 B.R. 317, 323 (Bankr. E.D. Pa. 1988). *See also In re Hawker Beechcraft, Inc.*, 483 B.R. 424, 429 (Bankr. S.D.N.Y. 2012) (including further elements for consideration[6]).

49.     The Court must make an equitable determination, based on the balance of harm, in light of the particular circumstances of the parties to the case. In applying these factors, Movants respectfully submit that the Court should compel the Debtors to make an immediate determination whether to assume or reject the Agreements.

50.     Here, these factors weigh in favor of compelling the Debtors to immediately assume or reject the Products Supply Agreement due to timing of the California tomato pack season.  As of the hearing on this Motion, the 2025 pack season will have commenced and, before the movants expand tens of millions of dollars to fulfill their obligations under the Products Supply Agreement, they need certainly whether the Agreement will be assumed.  This is heightened by the fact that 38% of the Products scheduled to be supplied will contain Del Monte specific recipe and IP:

---

[6] (1) the nature of the interests at stake; (2) the balance of the hurt to the litigants; (3) the good to be achieved; (4) the safeguards afforded to the litigants; (5) whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary; (6) the debtor's failure or ability to satisfy post-petition obligations; (7) the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code; (8) the importance of the contract to the debtor's business and reorganization; (9) whether the debtor has sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan of reorganization; (10) whether there is a need for judicial determination as to whether an executory contract exists; (11) whether exclusivity has been terminated; and (12) above all, the broad purpose of Chapter 11, which is to permit successful rehabilitation of debtors.

a.     <u>The nature of the interests at stake</u>: The Risks to the Movants of the Debtors' failure to assume the Agreements immediately are potentially catastrophic (*e.g.*, as described above, and in the Declarations filed herewith).  The Movants are exposed to tens of millions in variable costs invested in Brites Products containing Del Monte recipe Products that the Movants may not have a present right to liquidate outside of the Products Supply Agreement and a potential lowering of the price for other products if not sold to Del Monte customers.  Even the Brites Products without Del Monte recipes and ingredients pose a significant risk of oversupply and price reductions if Del Monte customers are not purchasing them.

b.     <u>The balance of harm to the litigants</u>: In the Chapter 11 Case, Del Monte seeks to sell its business, in whole or in parts. Because it sold its tomato processing plant to Morning Star King, its tomato business may not be viable absent the assumption of the Products Supply Agreement and continued compliance with the Sale and Lease Back Agreement. As such, to maximize the value of its assets, it is in Del Monte's interest to immediately assume the Products Supply Agreement and fulfill its obligations under the Sale and Lease Back Agreement.  The Risks to the Movants are grave if the Products Supply Agreement is not immediately assumed or rejected. In fact, PCP and Morning Star LP face incredible harm occurring in the short term because unless promptly assumed or rejected Movants will have to expand tens of millions in cost to secure and produce the Product without assurance that the Debtors will take delivery of the Products or pay for them.  The Products Supply Agreement is in default. Del Monte failed to post the $4 Million LC (i.e., No Del Monte Trade Creditor Risk protection) to protect the Movants (in part) against payment defaults. Movants face an immediate and massive "Del Monte Brite Inventory Risk." Plus, without assumption and the posting of the $4 Million LC, there is no adequate assurance of future performance of any kind.

c.     <u>The good to be achieved</u>: Both parties will benefit from compelling Del Monte to immediately assume or reject the Agreements. If the Agreements are assumed, the sale price for Del Monte's assets will reflect a multiplier of the going concern value of the Del Monte canned tomato business, which it otherwise will likely not be able to obtain in a sale given that it has shut down its California production facilities. Likewise, Movants will know that they will not be harmed by the Debtors' ultimate rejection of the contracts and the Products (particularly those produced in Brite) will not go to waste.

d.     <u>The safeguards afforded to the parties</u>: Del Monte has requested that PCP and Morning Star LP proceed with the 2025 Pack without any protections and even asked that they extend better trade terms. No reciprocal protection is being offered to PCP and Morning Star LP.  Only if assumption occurs and the $4 Million LC is posted will Movants obtain any safeguards or protections.

e.    <u>Whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary</u>: Congress established the bankruptcy courts with broad equitable powers. Imposing an immediate deadline on Del Monte with respect to the Agreements is appropriate here. It would be wholly inequitable to the Movants to expand tens of millions in cost to later find out that Del Monte will reject the Agreements. Due to the impending start of the 2025 pack season, timing is critical.    There may not be tomorrow, unfortunately, if Movants are required to produce the Product during the 2025 pack season (and expand tens of millions of dollars to do so) to later find out that the Products Supply Agreement will be rejected and substantial amount of the Products would have to be disposed of.

f.    <u>The broad purpose of Chapter 11, which is to permit successful rehabilitation of debtor</u>: Immediate assumption of the Agreements will maximize the Debtors' efforts to sell substantially all of their assets during the Chapter 11 Case.

51.    Based on the foregoing, it would be entirely prejudicial to the Movants to allow the Debtors to delay a decision here.  In order to prevent irreparable harm to the Movants, the Debtors should be compelled to either assume or reject the Agreement within two (2) days of entry of the Proposed Order.

**B.    Alternatively, the Court Should Lift the Automatic Stay to Allow Movants to <u>Terminate the Agreements</u>.**

52.    Bankruptcy Code section 362(d) provides that the Court may grant relief from the automatic stay on request from a party in interest for cause, including the lack of adequate protection of an interest in property. 11 U.S.C. § 362(d). Whether "cause" exists should be determined on a case-by-case basis and is left to the discretion of the bankruptcy judge. *See In re Adelphia Comm'cns Corp.*, 291 B.R. 283 292 (Bankr. S.D.N.Y. 2003); *In re Wilson*, 116 F.3d 87 (3d Cir .1997); *In re Denny*, 2006 WL 2806232, at *3 (Bankr. D. N.J. Sept. 28, 2006).

53.    As described above in detail, the Risks of operating without an assumed contract represent cause for termination of the Products Supply Agreement[7], including the Brites Liquidation Risk, the Trade Creditor Risk, and the Adequate Assurance of Future Performance Risk.  The handling of the organic pack also raises the Below Market Production Risk for Morning Star LP.

54.    Any delay in the Debtors' assumption or rejection of the Products Supply Agreement, or the lifting of the automatic stay, will result in the incurrence of enormous costs to the Movants and damages to Del Monte (loss of sale value), which may be reduced or avoided if relief is granted promptly.

55.    Finally, Movants respectfully request a waiver of any stay under Federal Rules 4001, 6006 or otherwise.  As set forth herein, the Debtors need to act expeditiously with respect to the Agreements and any further delay will cause extreme prejudice to Movants.

---

[7] This is without prejudice to the Movants right to argue that the Products Supply Agreement was terminated prepetition, as set forth in the Strong declaration.  Much like the automatic stay does not prevent an agreement from expiring on its own terms, the automatic stay does not apply to a party's absolute right to terminate an agreement entered into with the debtor pre-petition. Rather, the non-debtor party is entitled to cancel the agreement, without relief from the automatic stay, in accordance with the agreement's cancellation provisions. *See In re Unidigital Inc.*, No. 00-3806 (MFW), 2000 WL 33712306, at *2 (Banks. D. Del. Dec. 8, 2000) ("[T]he intervening filing of a petition for relief [does not] give the lessee a right to extend a contract beyond its original terms. . . . The Bankruptcy Code neither enlarges the rights of a debtor under a contract, nor prevents the termination of a contract by its own terms . . . . The Bankruptcy Court cannot recreate an interest for the Debtor where none exists.") (internal citation and quotation omitted); *Valley Forge Plaza Assocs. v. Schwartz*, 114 B.R. 60, 62 (E.D. Pa. 1990) ("A debtor in bankruptcy has no greater rights or powers under a contract than the debtor would have outside bankruptcy.") (citations omitted). *ETS Payphones, Inc. v. AT&T Universal Card (In re PSA, Inc.)*, 335 B.R. 580, 588 (Bankr. D. Del. 2005) ("It is ... clear that the filing of a bankruptcy petition does not permit a debtor in possession to enjoy greater contract or property rights than it possessed outside of [its] bankruptcy case.")

Bankruptcy courts in other jurisdictions have also followed this "fundamental" rule, holding that a party's absolute right to terminate an agreement survives post-petition and the automatic stay does not prevent that party post-petition from terminating that agreement. *See, e.g., In re Rives*, 95 B.R. 946, 947 (Bankr. W.D. Ky. 1988) (ruling that the non-debtor party had the right to terminate its pre-petition agreement after debtor filed for Chapter 11 because the agreement provided that a party had the right to refuse to renew the agreement if it gives proper notice of non-renewal; "this Court does not have the authority to direct [the non-debtor] to renew [the agreement] and thereby create new contractual rights between it and the debtors where none heretofore existed") (*citing In re Heaven Sent, Ltd. v. Commercial Union Ins. Co.*, 37 B.R. 597 (Bankr. E.D. Pa. 1984)).

**C.      Alternatively, the Court Should Refuse to Approve any Attempt by the Debtors to Assume the Products Supply Agreement on Terms not Acceptable to Movants because the Products Supply Agreement includes "Financial Accommodations."**

56.      If Debtors seek to assume the Agreements without curing the defaults and without adequately addressing the complete absence of any adequate assurance of future performance (e.g., by providing additional collateral as requested herein), the Court must deny assumption of the Agreements.  Otherwise, the Movants oppose assumption because virtually every aspect of the Products Supply Agreement requires the Movants to provide financial accommodations to Del Monte. For example, as described above, PCP is funding the Debtors' business by investing $32 million in out-of-pocket variable costs to process the entire 2025 pack of Del Monte over the next several weeks.  After it produces the Product, it stores it at its warehouse, labels it and then and ships the Brites Products to Del Monte's customers.  Under the Products Supply Agreement, the Movants are funding Del Monte's tomato business by providing its trade terms for many years in the future (five years is the initial term).

57.      Section 365(c)(2) restricts the ability of the Debtor to assume an executory contract if "such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor. . ."

58.      Because the Products Supply Agreement is a financial accommodation, the Debtors cannot force an assumption of the Products Supply Agreement absent the consent of the Movants.

59.      Absent the consent of the Movants, and to the extent not terminated pre-petition, the Debtors cannot force an assumption of the Products Supply Agreement.

## NOTICE

60.      Notice of this Motion has been provided to: (i) the Office of the U.S. Trustee; (ii) counsel to the Debtors; and (iii) all parties that, as of the filing of this Motion, have requested

notice in this Chapter 11 Case pursuant to Bankruptcy Rule 2002. Movants respectfully submit

that such notice is reasonable, is good and proper notice and in light of the nature of the relief

requested, no other or further notice is necessary.

## CONCLUSION

**WHEREFORE**, based upon the foregoing, Movants respectfully request that the Court

enter the Proposed Order, substantially in the form attached hereto, granting Movants such other

and further relief as is just and proper under the circumstances.

Dated: July 17, 2025

| **WOMBLE BOND DICKINSON (US) LLP** | **CHIESA SHAHINIAN & GIANTOMASI PC** |
|---|---|
| */s/ Wojciech F. Jung* <br> Wojciech F. Jung <br> 888 Seventh Avenue, 38th Floor <br> New York, New York 10106 <br> Telephone: (332) 258-8400 <br> Facsimile:  (332) 258-8949 <br> Email: wojciech.jung@wbd-us.com <br><br> -and- | */s/ Scott A. Zuber* <br> Scott A. Zuber, Esq. <br> Terri Jane Freedman, Esq. <br> 105 Eisenhower Parkway <br> Roseland, New Jersey <br> Telephone: (973) 325-1500 <br> Email: szuber@csglaw.com <br>        tfreedman@csglaw.com <br><br> -and- |
| **FELDERSTEIN FITZGERALD WILLOUGHBY PASCUZZI & RIOS LLP** <br> Thomas A. Willoughby <br> 500 Capitol Mall, Suite 2250 <br> Sacramento, California 95814 <br> Telephone: (916) 231-6651 <br> Email: twilloughby@ffwplaw.com <br><br> *Counsel for Pacific Coast Producers* | **WANGER JONES HELSLEY PC** <br> Riley C. Walter, Esq <br> 265 E. River Park Circle, Suite 310 <br> Fresno, California  93720 <br> Telephone: (559) 490-0949 <br> Email: rwalter@wjhattorneys.com <br> (Admission pro hac vice to be filed) <br><br> *Counsel for Morning Star Packing Company, L.P., and Morning Star Kings LLC* |