**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff, Esq. (admitted *pro hac vice*)
Rachael L. Ringer, Esq. (admitted *pro hac vice*)
Megan M. Wasson, Esq. (admitted *pro hac vice*)
Andrew W. Pollack, Esq. (*pro hac vice* forthcoming)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Del Monte Foods Corporation II Inc., *et al.*,[1] | ) | Case No. 25-16984 (MBK) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE AUCTION AND BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) AUTHORIZING THE DEBTORS TO ENTER INTO THE STALKING HORSE PURCHASE AGREEMENT, (III) SCHEDULING AN AUCTION AND SALE HEARING, (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (V) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, AND (VI) GRANTING RELATED RELIEF

The above-captioned debtors in possession (collectively, the "**Debtors,**" "**Del Monte,**" or the "**Company**") in the above-captioned chapter 11 cases respectfully state as follows in support of this motion (the "**Motion**") for the relief set forth herein.[2]

---

[1] The last four digits of Debtor Del Monte Foods Corporation II Inc.'s tax identification number are 1894. A complete list of the Debtors in these Chapter 11 Cases and their respective tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent, at https://cases.stretto.com/DelMonteFoods (the "**Case Website**"). The location of Debtor Del Monte Foods Corporation II Inc.'s principal place of business and the Debtors' service address is 205 North Wiget Lane, Walnut Creek, California 94598.

[2] Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in (i) the Bidding Procedures (as defined herein); (ii) the restructuring support agreement (the "**RSA**") entered into as of July 1, 2025, by and among (a) Debtor Del Monte Foods Corporation II, Debtor Del Monte Foods Holdings Limited, and certain of their respective subsidiaries, and (b) the Consenting Lenders; and (iii) the *Declaration of Jonathan*

## <u>PRELIMINARY STATEMENT</u>

1.      By this Motion, Del Monte – one of the country's leading producers, distributors, and marketers of premium quality, plant-based packaged food products – seeks approval for a process by which it will sell all, or substantially all, of its assets.  Del Monte has been a cornerstone of American grocery stores for more than 130 years, produces and sells its products through some of the most well-known food brands (including *Del Monte®*, *Contadina®*, and *Joyba®*, among others), enjoys market leading brand recognition and trust, and (taking into account seasonal needs) employs over 2,700 people.  The Debtors are committed, not just to the survival of their iconic company, brands and business units, but to their future prosperity.  A going concern sale, conducted in the manner outlined below, maximizes the likelihood of an ongoing business and future prosperity to the benefit of all of the Company's stakeholders.

2.      In particular, as anticipated in the RSA filed at the outset of these cases, the Debtors have obtained the agreement of their Ad Hoc Term Lender Group to act as a stalking horse bidder (the "**<u>Stalking Horse Bidder</u>**") for a going concern sale (the "**<u>Sale</u>**"), providing fair baseline transaction terms (the "**<u>Stalking Horse Bid</u>**"), but – importantly – also providing ample process and opportunity for higher or better going concern bids, a goal shared by the Debtors and all parties-in-interest.  The terms and bidding procedures that the Debtors have negotiated include allowance for an appropriate marketing process, due diligence, marketplace competition, bidding optionality (through bids for the whole company or its business units), potential process flexibility (through either a 363 sale or plan of reorganization under certain circumstances) and more.

---

*Goulding, as Chief Restructuring Officer, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 19] (the "**<u>First Day Declaration</u>**"), as applicable.

Additionally, to encourage other bidders to participate, and to avoid value leakage, there are no breakup fee or expense reimbursement bid protections for the Stalking Horse Bidder.

3.     In short, the Sale process is designed to achieve maximum value for the Debtors' iconic enterprise, while the Stalking Horse Bid provides all stakeholders with certainty of a going concern operation for the benefit of employees, vendors, contract counterparties, and customers of these beloved brands and products.

4.     Relatedly, to allow sufficient time for an organized and effective marketing process, but to avoid a protracted and costly stay in bankruptcy (and to achieve compliance with the milestones in the RSA and the DIP Credit Agreements (as defined in the Interim DIP Order)), the Sale timeline has been heavily negotiated. The Bidding Procedures contemplate the following key dates and deadlines:

- **<u>Deadline to Submit Qualified Bids</u>** – September 15, 2025
- **<u>Auction</u>** – September 19, 2025 at 10:00 a.m. EST
- **<u>Sale Hearing</u>** – September 30, 2025, at 10:00 a.m. EST, or such later date as subject to the Court's calendar [3]

5.     The Debtors and their advisors are committed to using this time to ensure a competitive Sale process. Indeed, following the commencement of these Chapter 11 Cases and the announcement of the Debtors' intention to pursue a court-sanctioned Sale process, PJT (the Debtors' investment banker) has already received multiple inbound inquiries about participating in the Sale process.

*     *     *

6.     As noted more fully in the First Day Declaration, after struggling for several years from, among other things, the marketplace after-effects of COVID-19, reduced margins, increased

---

[3] Approval of the Sale will occur by order entered by the Bankruptcy Court approving the Sale Transaction (the "**<u>Sale Order</u>**") or, subject to the terms of the RSA, through confirmation of a plan of reorganization.

interest expense, and higher than sustainable leverage, the Debtors are in the process of re-setting the table for their future success.  The Debtors negotiated a pre-petition RSA with the Ad Hoc Term Lender Group, which committed that group to negotiate the Stalking Horse Bid alongside these bidding procedures.  The Debtors also agreed to the terms of the DIP Term Loan Facility with the Ad Hoc Term Lender Group, and the DIP ABL Facility with the ABL Lenders.  Moreover, the Debtors obtained approval of critical relief as part of the DIP Facilities, payment of wages and employee benefits, payment of critical vendors, and of continued use of bank accounts and cash management systems.  All of this was aimed at providing certainty for these Chapter 11 Cases, to preserve the Debtors' employee, customer and vendor relationships, and to guarantee the Debtors' ability to achieve success in the 2025 "Pack Season" (which largely runs from June through October for many of the Debtors' key products).  Approval of this Motion is the crucial next step in the Debtors' turnaround and provides a path to Del Monte's fresh start.

## **RELIEF REQUESTED**

7.      Part 1 of this Motion seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"), (a) approving the bidding procedures attached to the Bidding Procedures Order as Exhibit 1 (the "**Bidding Procedures**"); (b) approving the manner of the notice of the auction (the "**Auction**"), if any, and Sale (the "**Auction Notice**") attached to the Bidding Procedures Order as Schedule 1; (c) establishing certain dates and deadlines, including the Bid Deadline and Auction Date (each as defined below); (d) approving the Assumption Procedures (as defined below); (e) authorizing the Debtors to enter into an asset

purchase agreement with the Stalking Horse Bidder (the "**Stalking Horse Purchase Agreement**");[4] and (f) granting related relief.

8.      Part 2 of this Motion seeks entry of an order at the conclusion of the Sale Hearing (as defined below) (a) approving the Sale and entry into the Stalking Horse Purchase Agreement, or a similar agreement(s) with the successful bidder(s) if other than the Stalking Horse Bidder (the "**Successful Bidder**");[5] (b) authorizing the sale of the Debtors' assets (the "**Assets**") free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the successful bid(s) (the "**Successful Bid**"); (c) authorizing and approving assumptions and assignment of the Debtors' applicable Executory Contracts and Unexpired Leases (together, the "**Contracts**"); and (d) granting related relief.  The Debtors will file a proposed form of Sale Order in advance of the hearing on the Sale (the "**Sale Hearing**") to consider the relief requested herein.

9.      In support of this Motion, the Debtors rely on the First Day Declaration, which is incorporated herein by reference, and such other declarations or materials that may be filed by the Debtors in advance of, or presented live at, the hearing on this Motion (the "**Bidding Procedures Hearing**").

## JURISDICTION AND VENUE

10.      The United States Bankruptcy Court for the District of New Jersey (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Standing Order*

---

[4] A term sheet reflecting the material terms of the Stalking Horse Purchase Agreement is attached hereto as **Exhibit B**.  The Stalking Horse Purchase Agreement will be filed with this Court in advance of the Bidding Procedures Hearing (as defined below).

[5] For the avoidance of doubt, if there is no third-party Successful Bidder, the Stalking Horse Bidder shall be designated the Successful Bidder and shall purchase the Assets in accordance with the terms of the Stalking Horse Purchase Agreement.

*of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.).

11.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

12.    Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

13.    The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), 503(b), and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 2002-1, 6004-1, 6004-2, 6004-3 and 9013-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "**Local Rules**").

## DISCLOSURES UNDER LOCAL RULES 6004-1 AND 6004-2

14.    Local Rule 6004-1 requires, among other things, that a debtor include the "material terms of the proposed sale" in a sale motion.  Additionally, Local Rule 6004-2 requires, among other things, that a debtor include the "material provisions" governing a bidder's qualifications, a bid's qualifications, and proposed stalking horse bidder protections, in a motion requesting approval of bidding and auction procedures.  These standards are satisfied by the contents of this Motion, its supporting papers, and the Bidding Procedures Order.

## BACKGROUND

15.    On July 1, 2025 (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their

business and manage their financial affairs as debtors in possession.  As of the date hereof, no request for the appointment of a trustee or examiner has been made.

16.    A detailed description of the Debtors and their business operations, capital structure, and the events leading up to the commencement of the Chapter 11 Cases are set forth in detail in the First Day Declaration, which is incorporated herein by reference.

## SALE PROCESS OVERVIEW

17.    Through the Bidding Procedures, the Debtors will be able to run a Sale process to preserve and improve their going-concern businesses.  Through this process – supported by the Stalking Horse Bid – the Debtors seek to sell substantially all of their Assets, and assume and assign certain contracts relating to the operation of the Debtors' businesses.  As set forth in the Bidding Procedures, the Debtors will consider bids that are made for all or substantially all of the Debtors' Assets, or for certain of the Debtors' Assets, including any of the Debtors' business units as described in more detail in the Bidding Procedures and related materials.

18.    The timeline, Bidding Procedures, and Stalking Horse Bid, each described in detail herein, have all been carefully crafted to maximize the likelihood of success for this Sale process.

**I.    Key Dates and Deadlines.**

19.    Below is a summary of the proposed key dates and deadlines contemplated by the Bidding Procedures:

| Event | Proposed Date |
|---|---|
| Filing of Stalking Horse Purchase Agreement | July 25, 2025 (or the date that is three (3) days prior to the Bidding Procedures Objection Deadline) |
| Bidding Procedures Objection Deadline | July 28, 2025 at 4:00 p.m. EST |
| Finalize Key Sale Process Materials | July 31, 2025 |

| Event | Proposed Date |
|---|---|
| Bidding Procedures Hearing | August 4, 2025 (or such other date as set by the Court) |
| Non-Binding Indications of Interest Deadline | August 20, 2025 |
| Bid Deadline | September 15, 2025 at 5:00 p.m. EST |
| Auction Date | September 19, 2025 at 10:00 a.m. EST |
| Sale Objection Deadline | 5:00 p.m. EST on the date that is seven (7) days prior to the Sale Hearing, or September 23, 2025 |
| Sale Hearing | September 30, 2025, at 10:00 a.m. EST or such later date as subject to the Court's calendar |

20.     The Debtors believe that the proposed Sale timeline maximizes the possibility of receiving a higher or otherwise better offer without unduly prejudicing the Debtors' estates through a protracted stay in chapter 11, while also maintaining compliance with the important milestones in the RSA and the DIP Credit Agreements.  Following entry of the Bidding Procedures Order, the Debtors' advisors will continue to market the Debtors' Assets to solicit higher or otherwise better bids in an effort to achieve the best outcome for the estates.

**II.     The Bidding Procedures.**

21.     While the Debtors maintain that the Stalking Horse Bid, detailed below, sets forth the terms of a fair baseline sale transaction for the Debtors' businesses, the Debtors are optimistic that a robust marketing process may generate additional and/or otherwise better bids.  To solicit and evaluate bids in a fair and transparent manner, the Debtors have developed the proposed Bidding Procedures, attached as Exhibit 1 to the Bidding Procedures Order.

22.    The following recitation sets forth the salient provisions of the Bidding

Procedures:[6]

a) *Public Announcement of Auction*.  As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall (i) serve on the parties that receive notice of the Motion, including the Consultation Parties (as defined herein), a notice (A) setting forth (I) the date, time, and place of the (a) Auction and (b) the Sale Hearing (as defined below) and (II) the deadlines and procedures for objecting to the proposed Sale Transaction(s), and (B) the Bidding Procedures Order and the Bidding Procedures in the form attached to the Bidding Procedures as Schedule 1 (the "Auction Notice"); (ii) publish the Auction Notice, with any modifications necessary for ease of publication, on one occasion in the national edition of The Wall Street Journal, The New York Times, USA Today, or another publication of similar circulation, as determined by the Debtors, to provide notice to any other potential interested parties; and (iii) post the Auction Notice on their case website (https://cases.stretto.com/DelMonteFoods).  The Auction Notice shall include a complete list and general description of the Assets for sale (such Assets, the "Acquired Assets"). The Debtors and/or their advisors may likewise contact individual parties with respect to the Sale of the Acquired Assets and provide such other information as they deem necessary and appropriate.

*See* Bidding Proc., at § III.

b) *Potential Bidder Requirements*.  To participate in the bidding process or otherwise be considered for any purpose hereunder, including to receive access to due diligence materials, a person or entity interested in purchasing the Assets or part of the Assets (a "**Potential Bidder**") must deliver or have previously delivered to the Debtors' Advisors[7] the following preliminary documentation (collectively, the "**Preliminary Bid Documents**"):

    1. an executed confidentiality agreement (a "**Confidentiality Agreement**") in form and substance acceptable to the Debtors;[8]

    2. sufficient information that the Potential Bidder has or can reasonably obtain the financial capacity to close a purchase of any portion, all, or

---

[6] This summary is qualified in its entirety by the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

[7] The Debtors' Advisors refers to the Debtors' proposed (a)  counsel, HSF Kramer: Adam C. Rogoff (Adam.Rogoff@hsfkramer.com), Rachael L. Ringer (Rachael.Ringer@hsfkramer.com), Megan M. Wasson (Megan.Wasson@hsfkramer.com), and Andrew W. Pollack (Andrew.Pollack@hsfkramer.com), and (b) investment banker, PJT, Attn: David Tcholakian (Tcholakian@pjtpartners.com), Benjamin Brash (Ben.Brash@pjtpartners.com), Sandeep Chhabra (Sandeep.Chhabra@pjtpartners.com), and Carly Devereux (Carly.Devereux@pjtpartners.com).

[8] Potential Bidders may obtain a copy of the Confidentiality Agreement by contacting the Debtors' Advisors.

substantially all of the Debtors' Assets, the adequacy of which must be acceptable to the Debtors, in consultation with the Consultation Parties;

3. a statement that the Potential Bidder has a *bona fide* interest in submitting a Partial Bid (defined below) (including an identification of which business unit(s) or assets such party is interested in submitting a Partial Bid for) or a statement that Potential Bidder has a *bona fide* interest in submitting a Bid (defined below) on all or substantially all of the Acquired Assets;

4. the identification of the Potential Bidder and any principals and representatives thereof (including counsel), including by identifying those principals and representatives who are authorized by the Potential Bidder to appear and act on such Potential Bidder's behalf for all purposes under these Bidding Procedures regarding the Potential Bidder's contemplated Sale Transaction; and

5. a description of any and all connections the Potential Bidder (including its affiliates and any related persons) may have to the Debtors, any current or former directors and officers of the Debtors, the Debtors' non-Debtor affiliates (including any and all parent companies), and the Debtors' primary creditors as identified by the Debtors.

*See* Bid Proc., at § IV.

c) *Non-Binding Indications of Interest.*   In addition to receiving the information noted in Section IV, above, prior to the deadline for the submission of Non-Binding Indications of Interest (the "**Non-Binding Indication of Interest Deadline**"), a Potential Bidder is required to submit a non-binding written indication of interest ("**Non-Binding Indication of Interest**") specifying the following terms for an indicative proposal (an "**Indicative Proposal**"):

1. the amount and type of consideration to be offered;

2. whether any external financing is required in connection with the Indicative Proposal and, if so, the sources of such external financing and status of commitments (including the expected amount, timing, and process) from such sources for the amount of financing required to complete the Sale Transaction;

3. the level of review that the Indicative Proposal has received within your organization and any additional approvals (board, shareholders, investment committee, legal, regulatory or otherwise) needed to be obtained to complete the Sale Transaction, including an outline of the process and expected timing for obtaining all internal and external approvals, execution of definitive documentation, and consummation of the proposed Sale Transaction;

4. a description of the estimated time required to complete due diligence review of the Company, obtain all necessary internal and external approvals, execute a definitive agreement and close the Transaction and any other material conditions or contingencies needed to be satisfied after execution of definitive documentation prior to closing and timing;

5. names of any advisors (including financial, legal, and accounting advisors) that have been or will be retained to provide assistance in connection with the proposed Sale Transaction; and

6. any other material information, assumptions or conditions.

*See* Bid Proc., at § V.

d) *Qualified Bid Requirements*. To participate in the Auction, an Acceptable Bidder must deliver to the Debtors and their advisors an irrevocable offer via email (in .pdf or similar format) for the purchase of some or all of the Assets (each, a "**Bid**"), and shall meet the following criteria, in each case, on or prior to the Bid Deadline (as defined herein):

    a. *Purchased Assets and Assumed Liabilities*: Each Bid must clearly state the following: (a) the particular Assets, or the portion thereof identified with reasonable specificity, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt and cure costs to be assumed; and (c) as applicable, whether the Acceptable Bidder intends to operate the Debtors' business as a going concern;

    b. *Partial Bidders*: Acceptable Bidders that indicate an intent to submit a bid to purchase one or more, but not all of the, Debtors' assets and/or business units will be considered "**Acceptable Partial Bidders**," and such bids will be referred to as "**Partial Bids**";

    c. *Good Faith Deposit*: Except with respect to any credit bid (including a credit bid by the Stalking Horse Bidder), the Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Good Faith Deposit**"). To the extent that a Bid is modified at or prior to the Auction, the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals 10% of the increased aggregate purchase price promptly and in no event later than one (1) business day following the conclusion of the Auction;

    d. *Purchase Price*: Each Bid must (a) clearly set forth the purchase price to be paid, assuming a purchase of the applicable Assets and any assumption of liabilities (the "**Purchase Price**"), (b) identify separately the cash and non-cash components of the Purchase Price, and (c) indicate the allocation of the Purchase Price among the applicable Assets; provided that, for the

avoidance of doubt, such allocation shall not prejudice the rights of any party in interest to contest such allocation. The Purchase Price should be a single point value in U.S. Dollars for the applicable Assets on a cash-free, debt-free basis. Any Bid for substantially all of the Assets must also include a statement as to whether the Bid is conditioned on purchasing all Assets or whether the Qualified Bid should be viewed as a separate Bid for one or more sets of Assets. For any Bid for ABL Priority Collateral, such bid must provide for such treatment of the DIP ABL Obligations satisfactory to the DIP ABL Agent and the requisite DIP ABL Lenders (in their sole discretion);

e. **_Wind-Down Budget_**:  The Bid must (a) provide an estimate as to the anticipated costs of the wind-down of the Debtors' operations and payments following the closing of the Sale based on what assets and liabilities the Acceptable Bidder intends to retain (the "**_Wind-Down Budget_**"), (b) ensure that the Debtors will retain sufficient cash to fund such costs in a manner at least as equivalent to the Wind-Down Budget agreed to by the Debtors and the Stalking Horse Bidder, (c) contain a statement that the Acceptable Bidder understands and accepts that the Sale is contingent upon the approval by the Debtors of an acceptable Wind-Down Budget, and (d) provide a transition services agreement or similar arrangement acceptable to the Debtors to assist with the wind down of the Debtors' operations;

f. **_Same or Better Terms; Bid Documents_**:  Each Bid must include duly executed and non-contingent, where applicable, transaction documents necessary to effectuate the transactions contemplated in the Bid (the "**_Bid Documents_**").  The Bid Documents shall include: (i) a form of purchase agreement; (ii) a schedule of contracts and leases to be assumed and assigned to the bidder at closing to the extent applicable to the Bid, and confirmation that the bidder will be responsible for any cure costs associated with such assumption, and include a good faith estimate of such cure costs (which estimate may be provided by the Debtors); (iii) the identification of causes of action to be purchased, if any; (iv) with respect to the purchase agreement, a redline of such agreement marked against the Stalking Horse Purchase Agreement to reflect the amendments and modifications; (v) any other material documents integral to such Bid; and (vi) a statement from the Acceptable Bidder that (A) it is prepared to enter into and consummate the transactions contemplated in the form purchase agreement, no later than ten (10) business days after the conclusion of the Auction, subject to any necessary regulatory approvals, as specified by the Acceptable Bidder (or, if no Auction is held, the deadline by which all Qualified Bids must be actually received pursuant to the Bidding Procedures (the "**_Bid Deadline_**")), and (B) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or next highest or otherwise best bid (the "**_Back-Up Bid_**")) until the consummation of the Sale Transaction;

g. ***No Qualified Bidder Bid Protections***:  A Qualified Bid must include a statement disclaiming any right to receive a fee analogous to a break-up fee, expense reimbursement, or "topping" or termination fee, or any other similar form of compensation.  No Qualified Bidder (including the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code related to bidding for the applicable Assets;

h. ***Employee and Pension Obligations***:  Each Bid must (1) indicate whether the Acceptable Bidder intends to hire all employees who are primarily employed in connection with the applicable Assets included in such Bid, (2) contain a description of how the Acceptable Bidder intends to treat pension plans operated by the Debtors, including the potential assumption thereof, (3) contain a statement of proposed terms with respect to the Debtors' collective bargaining agreements and labor unions with respect to the applicable Assets included in such Bid, and (4) expressly propose the treatment of the Debtors' other prepetition compensation, incentive, retention, bonus or other compensatory arrangements, plans, or agreements, including offer letters, employment agreements, consulting agreements, severance arrangements, retention bonus agreements, change in control agreements, retiree benefits, and any other employment-related agreements, in each case, as applicable to the Debtors.  The Acceptable Bidder must include a description of the Acceptable Bidder's intentions with respect to the relevant members of the Debtors' current management team and other employees who are primarily employed in connection with the applicable Assets, and a description of any contemplated incentive plan, to the extent applicable;

i. ***Proof of Financial Ability to Perform; Sources of Financing***:  To the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Sale Transaction set forth in its Bid with cash on hand, the Bid must include committed financing, documented to the Debtors' satisfaction, in consultation with the Consultation Parties, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Sale Transaction and other obligations under its Bid.    Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, and shall include (i) contact names, telephone numbers, and email addresses for verification of financing sources; (ii) proof of fully executed and effective financing

commitments with limited conditionality customary for transactions of the proposed Sale Transaction's type from one or more reputable financing sources in an amount equal to the consideration offered through the Bid; and (iii) any other financial disclosure requested by the Debtors demonstrating an ability to timely close the Sale Transaction in accordance with the Bidding Procedures;

j.  ***Contingencies; No Financing or Diligence Outs***:  The Bid must not contain any contingencies as to the validity, effectiveness, or binding nature of the Bid, including, without limitation, contingencies for due diligence and inspection or financing of any kind (including any conditions pertaining to financial performance, conditions, or prospects) and all diligence must be completed before the Bid Deadline;

k.  ***Identity***:  Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered to complete the transactions on the terms contemplated by the parties.  Each Bid must also include contact information for the specific person(s) whom PJT and HSF Kramer should contact regarding such Bid;

l.  ***As-Is, Where-Is***:  Each Bid must include a written acknowledgement and representation that the Acceptable Bidder: (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Acceptable Bidder's proposed purchase agreement;

m.  ***Authorization***:  Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.  The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder;

n.  ***Joint Bids***:  No joint bids or consortium bids are permitted unless expressly authorized by the Debtors, in consultation with the Consultation Parties;

o.   ***Adequate Assurance of Future Performance***:  Each Bid must (i) identify any executory contracts (the "**Executory Contracts**") and any unexpired leases (the "**Unexpired Leases**") to be assumed or assumed and assigned in connection with the proposed Sale Transaction, (ii) provide for the payment of all cure amounts (the "**Cure Payments**") related to such Executory Contracts and Unexpired Leases by the Acceptable Bidder, (iii) demonstrate, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties (as defined herein), that the Acceptable Bidder can provide adequate assurance of future performance under all such Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code, and (iv) provide the following documentation:

  i.   The legal name of the proposed assignee of Unexpired Leases (the "**Proposed Assignee**") and any guarantors, as applicable;

  ii.   Financial statements for the calendar or fiscal years ended 2023 and 2024, and interim financial statements for 2025, for the Proposed Assignee and any guarantors, as applicable, and other financial information about the Proposed Assignee to demonstrate its ability to provide adequate assurance of future performance; and

  iii.   Summary documentation regarding the Proposed Assignee's and any guarantor's, as applicable, retail experience and present retail operations;

p.   ***Acknowledgement of Compliance with Bidding Procedures, Bidding Procedures Order, Bankruptcy Code, and Non-Bankruptcy Law***:  Each Bid must acknowledge its compliance in all respects with these Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code and any applicable non-bankruptcy law;

q.   ***No Collusion***:  The Acceptable Bidder must acknowledge in writing (i) that it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code or other applicable non-bankruptcy law with respect to any Bids or the Sale Transaction, specifying that it did not agree with any Acceptable Bidders or Potential Bidders to control price; and (ii) agree not to engage in any collusion with respect to any Bids, the Auction, or the Sale Transaction.  For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (email being sufficient);

r.   ***Good Faith Offer***:  The Bid must constitute a good faith, *bona fide* offer to consummate the Sale Transaction and must include a statement that the

Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code;

s.   ***Irrevocable***:  The Bid must include a letter stating that the Acceptable Bidder's offer is irrevocable and binding until the closing of the Sale if such Acceptable Bidder is the Successful Bidder, and that the Acceptable Bidder agrees to serve as a Backup Bidder (as defined herein) if such bidder's Bid is selected as the next highest or otherwise next best bid after the Successful Bid (as defined herein);

t.   ***Back-Up Bid***:  Each Bid shall provide that the Acceptable Bidder will serve as a Back-Up Bidder (as defined herein) if the Acceptable Bidder's Bid is the next highest or otherwise best bid;

u.   ***Regulatory Approvals and Covenants***:  A Bid must set forth each regulatory and third-party approval required for the Acceptable Bidder to consummate the applicable Sale Transaction, if any, and the time period within which the Acceptable Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the applicable purchase agreement and/or confirmation of the Plan, those actions the Acceptable Bidder will take to ensure receipt of such approvals as promptly as possible);

v.   ***Expected Closing Date***:  Each Bid must state the Acceptable Bidder's expected date of closing of the Sale Transaction;

w.   ***Time Frame for Closing***:  A Bid by an Acceptable Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined herein), within a time frame acceptable to the Debtors, in consultation with the Consultation Parties.  The Acceptable Bidder must commit to closing the proposed Sale(s) contemplated by the Bid as soon as practicable subject to any potential regulatory issues that may arise as set forth above;

x.   ***No Fees***:  Each Acceptable Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction, and by submitting its Bid(s) is agreeing to disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or other similar form of compensation; *provided, however,* that nothing in these Bidding Procedures shall limit, alter or impair the rights of any party to payment and reimbursement of expenses that are set forth in the DIP Orders;

y. ***Adherence to the Bidding Procedures***:  By submitting its Bid, each Acceptable Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction;

z. ***Consent to Jurisdiction***:  The Acceptable Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, to the Auction, the Sale, the Sale Transaction(s) and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, and the Closing, as applicable;

aa. ***Conditions to Closing***:  Each Bid must identify with particularity each and every condition to closing, including the Executory Contracts and Unexpired Leases for which assumption and assignment is required; and

bb. ***Other Information***:  Each Bid must contain such other information as may be reasonably requested by the Debtors and the Consultation Parties with such requests made through the Debtors.

*See* Bid Proc., at § VII.

### III.    Material Terms of the Stalking Horse Bid.

23.    The Debtors have negotiated, at arms' length and in good faith, the material terms of the Stalking Horse Bid, which are reflected in the term sheet attached hereto as **Exhibit B**.  The key terms and conditions of the Stalking Horse Bid are listed below.[9]

| Material Terms of Stalking Horse Bid | |
| --- | --- |
| **Sellers** | Each of the Debtors. |
| **Buyer** | An entity to be formed by or on behalf of the Consenting Lenders (the "Buyer") will serve as the stalking horse bidder in connection with the Sale Transaction. The stalking horse asset purchase agreement shall be acceptable to the Sellers and the Required Consenting Lenders (the "Stalking Horse APA").  If the Sale Transaction with the Buyer is consummated, the resulting entity will be "NewCo." |

---

[9] This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Stalking Horse Term Sheet, the Stalking Horse Term Sheet shall govern; in the event of any inconsistency between this summary and the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement shall govern. The Stalking Horse Purchase Agreement, which will be filed with this Court in advance of the Bidding Procedures Hearing, shall otherwise govern in all respects.

| | |
|---|---|
| **Sale Transaction** | The sale transaction will be consummated through a sale of all or substantially all of the assets of the Sellers (or, if mutually agreed by the Sellers and the Required Consenting Lenders solely if necessary to maintain tax attributes, the equity of the Debtors) (the "Sale Transaction"), which sale shall be undertaken either pursuant to section 363 or, if mutually agreed by the Required Consenting Lenders and Sellers solely if necessary to maintain or maximize favorable tax attributes, section 1123 of chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), as provided in the Stalking Horse Term Sheet and subject to the Bidding Procedures. The consummation of the Sale Transaction is the "Closing" and the date on which the Closing occurs is the "Closing Date." The Closing is subject to the conditions precedent set forth in the Stalking Horse APA and the sale milestones set forth in the Bidding Procedures. <br><br>The Sale Transaction shall be subject to the Stalking Horse APA and the other Definitive Documents, the terms of the Restructuring Support Agreement (including the exhibits thereto), and the consent rights set forth therein. <br><br>The consummation of the Sale Transaction pursuant to the Stalking Horse APA is contingent on the assumption (or refinancing) of the indebtedness under the applicable ABL Loan Documents[10] at Closing or other mutually acceptable treatments as agreed between the Buyer, the ABL Agent, and Requisite ABL Lenders; *provided that,* prior to going forward with the hearing to approve the Bidding Procedures, there shall be an agreement for the satisfaction of such contingency. <br><br>The proposed Sale Transaction shall remain subject to higher or otherwise better offers that may be obtained by the Sellers in connection with the Bidding Procedures and the Bidding Procedures Order. |
| **Stalking Horse Purchase Price** | As part of the Sale Transaction, the Consenting Lenders shall serve as the stalking horse bidder (the "Stalking Horse Credit Bid") with a purchase price consisting of: <br><br>(a) $575 million, comprised of (i) the assumption of the indebtedness under the applicable ABL Loan Documents, on mutually acceptable terms as agreed between the Buyer, the ABL Agent, and Requisite ABL Lenders, each in their sole discretion, and (ii) a "credit bid" of the DIP Facility claims; <br><br>(b) the Retained Cash (as defined below); and <br><br>(c) the assumption of the Assumed Liabilities. |
| **Sale Order / Mutual Releases** | The Stalking Horse APA and the Sale Order will contain mutual general releases, subject to customary carveouts, and other than as expressly set forth in the Stalking Horse Term Sheet, as agreed between the Debtors and the Required Consenting Lenders (the "Sale Releases") effective on the Closing Date, by and among the following persons (and such other persons as may be agreed by the Debtors and the Required Consenting Lenders): (a) the Debtors, (b) NewCo, (c) the Buyer, (d) the Consenting Lenders, (e) the ABL Agent, (f) the ABL Lenders, (g) in the case of the entities listed in clauses (b) through (f), such entities' respective officers and directors and, solely with respect to the Debtors and the Non-Debtor Subsidiaries (as defined below), their respective Unaffiliated Officers and Directors (as defined below), and (h) in the case of the entities listed in clauses (a) through (g), such |

---

[10]    For the avoidance of doubt, all references herein to the ABL Loan Documents, ABL Agent and ABL Lenders shall include both the prepetition and DIP ABL Loan Documents, Agent and Lenders, as applicable.

entities' respective employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (the "Released Parties"), for any claims up to the Closing Date, except as expressly preserved in the Stalking Horse APA in a manner to be agreed by the Sellers and the Required Consenting Lenders; *provided*, *however*, that the Required Consenting Lenders may agree, in their sole discretion, that some amount of the Consenting Lenders' First Out Obligations will not be released and shall remain outstanding for treatment pursuant to a Chapter 11 plan, subject to the Bidding Procedures; *provided*, *further*, that, for the avoidance of doubt, Parent (as defined below) shall not be a Released Party.

"Unaffiliated Officers and Directors" shall mean all persons that (a) serve or served as an officer and/or director of any of the Debtors and the Non-Debtor Subsidiaries at any time; (b)(i) are not officers, directors, or employees of Del Monte Pacific Limited, DMPL Foods Limited, or any of its Affiliates (other than Del Monte Foods Holding Limited ("DMFHL") and its subsidiaries) or equity owners (collectively, "Parent"), (ii) were not appointed as a director or officer by or on behalf of Parent and prior to appointment, had no material relationship with or affiliation with Parent, or (iii) with respect to directors, are independent, including pursuant to NYSE standards, as to Parent; and (c) in all cases, have no material preexisting personal relationship (unrelated to the Sellers) or familial relationship with any director or officer of Parent.

The terms of the Sale Order, including the Sale Releases, and the Stalking Horse APA, including any schedules and exhibits thereto, shall be consistent with the Stalking Horse Term Sheet and otherwise acceptable to the Required Consenting Lenders and the Debtors in their respective sole discretion.

| | |
|---|---|
| **Purchased Assets** | Subject in all respects to the Stalking Horse APA, the Buyer will acquire on the Closing Date, all right, title and interest of the Sellers in, to or under all of the properties and assets of the Sellers of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible consisting of, relating to or developed or used in connection with the Sellers' business, but excluding the Excluded Assets (as defined below), as further described below (such assets collectively, the "Purchased Assets"). |

The "Purchased Assets" include, without limitation:

1)  subject to the other terms of the Stalking Horse Term Sheet, all contracts (including leases to which a Seller is a party with respect to leased real property and licenses and other contracts with respect to intellectual property), including (i) any confidentiality or non-disclosure agreements executed by any person for the benefit of any Seller to the extent relating to the Purchased Assets or the Assumed Liabilities and (ii) all purchase orders (collectively, "Purchased Contracts");

2)  all owned real property and all leased real property, in each case, together with any buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto;

3)  all tangible assets, including machinery, equipment, computers, information management systems (including software and hardware related thereto), telephone systems, supplies and other tangible personal property owned by any Seller, including any such personal property of a Seller located at any owned real property or leased real property and any other tangible assets on order to be delivered to any Seller;

4) all warranties, indemnities or guaranties from any person with respect to any Purchased Asset, including any item of real property, personal property or equipment;

5) all intellectual property of the Sellers;

6) all of the Sellers' interests in all of their non-Debtor subsidiaries (each, a "Non-Debtor Subsidiary");

7) all inventory, including raw and packing materials, work-in-progress, finished goods, supplies, parts and similar items related to, whether or not obsolete or carried on the Sellers' books of account, in each case, with any transferable warranty and service rights related thereto;

8) to the extent permitted by applicable law without the consent of any applicable service provider, all rights of the Sellers under non-disclosure or confidentiality, invention assignment, work made for hire, non-compete, or non-solicitation agreements with current or former service providers of any Seller;

9) all permits (to the extent transferable to Buyer pursuant to applicable law);

10) all cash and cash equivalents, other than cash actually held by the Sellers at the Closing that Buyer has instructed the Sellers to retain to fund the Wind-Down Budget (as defined below) ("Retained Cash"), which Retained Cash shall be in an amount in cash equal to the Wind-Down Budget;

11) all bank accounts of the Sellers (other than any account designated by DMFHL to Buyer prior to the Closing which shall be retained solely for the purposes of the Wind-Down (as defined below));

12) all deposits, credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items and duties related to the Purchased Assets;

13) all accounts receivable, notes, negotiable instruments and chattel paper owned or held, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, and other amounts receivable from any person (both third party and intercompany), whether or not in the ordinary course of business;

14) all insurance policies relating to the Purchased Assets or the Assumed Liabilities, and all rights and benefits of any nature of the Sellers with respect thereto (including any claims arising under such policies and all credits, premium refunds, proceeds, causes of action or rights thereunder); *provided*, *however*, that the Sellers shall retain access following the Closing Date to those insurance policies that may apply to any activities associated with the Wind-Down of any Excluded Assets;

15) all unexpired director and officer insurance policies (including, for the avoidance of doubt, all rights and benefits of any nature of the Sellers with respect thereto (including any claims arising under such policies and all credits, premium refunds, proceeds, causes of action or rights thereunder)) existing as of the Closing Date; *provided*, *however*, that the director and officer insurance policies will only be included if the Sellers consent to their inclusion and such inclusion does not adversely affect the availability, access, or terms and conditions of coverage thereunder; *provided*, *further*, that the Sellers shall use reasonable good faith efforts to obtain any insurer consents, if any, required to assume such policies as provided in the Stalking Horse Term Sheet;

16) all confidentiality, non-competition, non-solicitation or similar agreements entered into by any Seller or any of its representatives in connection with a sale of any Seller, any Purchased Asset or any Assumed Liabilities;

17) all annual cash incentive plans;

18) any individual employment agreements set forth in the applicable schedule to the Stalking Horse APA;

19) all pension plans, together with any applicable funding arrangements relating thereto (including but not limited to all assets, trusts, insurance policies, and administrative services contracts related thereto);

20) all health care, retirement, and other compensation and employee benefits plans and programs other than individual employment agreements (such assumed plans and programs, together with all annual cash incentive plans and pension plans, the "Transferred Benefit Plans"), together with any funding arrangements relating thereto (including but not limited to all assets, trusts, insurance policies, and administration service contracts related thereto);

21) all collective bargaining agreements in accordance with their terms, including obligations for any multiemployer pension plans;

22) all rights against any person (including (i) customers, suppliers, vendors, lessors, lessees, licensees, or licensors of any Seller and (ii) Buyer, Buyer's affiliates, the Sellers or their affiliates or any of its or their respective directors, officers, members, partners, shareholders, managers, advisors or representatives) arising under or related to any Purchased Asset (including any use, ownership, possession, operation, sale or lease thereof) or Assumed Liability or the operation or conduct of the Sellers' business, including proceedings, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds, rights of set off, rights of recovery (including rights to insurance proceeds), rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants, indemnities, exculpation, advancement, reimbursement of expenses or contract renewal rights and other similar rights, in each case, whether direct or derivative, known or unknown, liquidated or unliquidated, contingent or otherwise;

23) all claims and causes of action including but not limited to (a) any claims that could be asserted derivatively through the Debtors, (b) any claims arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), or 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents or non-U.S. law and the proceeds of such actions, (c) all claims and causes of action of the Debtors' estates, and (d) to the extent not included in clauses (a) through (c), all claims or causes of action against any of the Sellers' respective (i) directors or officers; (ii) employees other than officers; (iii) subsidiaries; (iv) affiliates, including Parent; or (v) trade vendors, suppliers, customers or other parties that the Sellers otherwise conduct business with in the ordinary course, including in each case all proceeds thereof; *provided* that all claims and rights referenced in clauses (a), (b), (c), (d)(i) through (iii) that constitute a claim against a Released Party shall be released by the Buyer on the Closing Date;

24) all goodwill related to the Purchased Assets (including the goodwill associated with the trademarks and other intellectual property included in the Purchased Assets);

25) other than the specifically excluded records, all of each Seller's and its subsidiaries' current or historical written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, tax returns (including all related schedules, workpapers and other material supporting information), ledgers, journals, title policies, customer lists, supplier lists, vendor lists, price lists, mailing lists, invoices, shipping records, standard forms of documents, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, *etc.*), user documentation (installation guides, user manuals, training materials, release notes, working papers, *etc.*), marketing documentation (catalogs, sales brochures, flyers, pamphlets, web pages, *etc.*), consulting materials, opinions and other documents commissioned by or on behalf of any Seller or its subsidiaries, development, quality control, quality assurance, regulatory, records and other regulatory documents, all personnel and employment records for the employees to be transferred to Buyer and any independent contractors of any Seller or its subsidiaries, and other books and records of the Sellers and any rights thereto owned by any Seller, in each case whether stored in hard copy form or on electronic, magnetic, optical or other media; and

26) other scheduled assets;

At any time prior to the Bid Deadline (as defined in the Bidding Procedures Order), Buyer may, in its sole discretion, by written notice to the Sellers, designate (a) any of the Purchased Assets as additional Excluded Assets ("Later Excluded Assets") and (b) any of the Assumed Liabilities as additional Excluded Liabilities (as defined below) ("Later Excluded Liabilities") (other than in respect of a Purchased Contract, which shall be separately governed under the Stalking Horse APA), which notice shall set forth in reasonable detail the Purchased Assets and Assumed Liabilities so designated; *provided* that there will be no modification to the Purchase Price as a result of any addition or elimination of any asset as a Purchased Asset; *provided, further*, that (i) in no event may the items set forth in clause 22 above be designated as Later Excluded Assets without the consent of the Sellers, (ii) in no event may the items set forth in clause 23 above be designated as Later Excluded Assets, and (iii) to the extent there are Later Excluded Assets or Later Excluded Liabilities that will need to be subject to the Wind-Down (and are not being separately sold to a Qualified Bidder as defined in and pursuant to the Bidding Procedures) the Wind-Down Budget shall be appropriately adjusted to reflect disposition of such additional assets and/or liabilities.  Notwithstanding any other provision hereof to the contrary, but subject to the provisions of this paragraph, (x) the liabilities of the Sellers under or related to any Purchased Asset designated as a Later Excluded Asset pursuant to this paragraph will constitute Excluded Liabilities and (y) the assets of the Sellers under or related to any Assumed Liability designated as a Later Excluded Liability pursuant to this paragraph will constitute Excluded Assets.

| | |
|---|---|
| **Assumed Liabilities** | The Buyer shall assume all liabilities related to the Purchased Assets (other than the Excluded Liabilities), which shall include, for the avoidance of doubt, those liabilities set forth in the Stalking Horse Term Sheet. |

| | |
|---|---|
| **Excluded Assets** | Purchased Assets will exclude those assets designated by the Buyer as Excluded Assets (as defined below) in a schedule to the Stalking Horse APA and the Retained Cash.

Notwithstanding any provision in the Stalking Horse Term Sheet to the contrary, Sellers shall not be deemed to sell, transfer, assign, convey or deliver, and Sellers will retain all right, title and interest to, in and under those certain assets, properties, interests and rights of Sellers (whether owned, licensed, leased or otherwise) detailed in the Stalking Horse Term Sheet (the "Excluded Assets"). |
| **Excluded Liabilities** | Assumed Liabilities will expressly exclude those liabilities designated by the Buyer as "Excluded Liabilities" in accordance with the Stalking Horse APA, which are also set forth in the Stalking Horse Term Sheet. |
| **Representations, Warranties and Covenants** | The Stalking Horse APA will contain usual and customary representations, warranties, and covenants of the parties for similar transactions of this type. |
| **Wind-Down Budget and Post-Closing Cooperation** | On the Closing Date, Buyer shall fund, or cause to be funded, an amount pursuant to the Stalking Horse APA for the purpose of funding the orderly wind-down of Sellers in accordance with applicable Law (the "Wind-Down" and such amount, the "Wind-Down Budget"), which amount shall be agreed upon by Sellers and Buyer, each in their sole discretion.  Buyer acknowledges that Buyer shall work in good faith with the Sellers to ensure that the Wind-Down Budget makes adequate provision for all expected administrative expense costs necessary to confirm a Wind-Down chapter 11 plan; *provided* that Sellers and Buyer shall reach agreement on the Wind-Down Budget, each in their sole discretion, by no later than the Bid Deadline (as defined in the Bidding Procedures Order); *provided*, *further*, that any residual amount of the Wind-Down Budget, if any, following completion of the Wind-Down shall be returned to the Buyer.

The Buyer shall use commercially reasonable efforts to provide reasonably requested finance, IT, and legal personnel to the Debtors that is reasonably necessary to assist the Debtors in an orderly Wind-Down of the Debtors' estates. |
| **Break Up Fee / Related Provisions** | The Buyer will not be entitled to a break-up fee or any expense reimbursement.

The Buyer will not be required to post a Good Faith Deposit under the Bidding Procedures. |
| **Back-Up Bid** | In the event that the Stalking Horse Credit Bid is not selected as the successful bid but is otherwise the next highest or best alternative bid, the Buyer will serve as the "back-up bid" for the Purchased Assets and will be binding and irrevocable until the date on which such other transaction is consummated. |
| **Other Terms and Conditions** | Closing of the Sale Transaction will be subject to, among other customary conditions, (a) entry of the Sale Order and such Sale Order not being subject to any stay, (b) the Sellers' and Buyer's (in the event of a Sale Transaction to the Buyer) representations and warranties in the Stalking Horse APA being true and correct in all respects except where such breaches would not constitute a material adverse effect, and (c) no breach of the Sellers' or Buyer's covenants in the Stalking Horse APA in any material respect. |

| | |
|---|---|
| **Employee Matters** | The Buyer will use reasonable good faith efforts to offer employment to all of the Sellers' active employees, subject to ongoing evaluation of the Sellers' financial condition and subject to satisfactory diligence.  If the Buyer makes any offer of employment, Buyer will use reasonable good faith efforts to provide employment offers for (i) comparable positions, responsibilities, and (ii) base salaries, short-term incentive opportunities, and employee benefits (excluding long-term incentives, change in control and retention benefits), taken as a whole, as those for such employees' positions, responsibilities, base salaries, short-term incentive opportunities, and employee benefits (excluding long-term incentives, change in control and retention benefits) immediately prior to the Closing Date.  For any employees that are covered by a collective bargaining agreement, subject to further Buyer diligence, the terms and conditions of such employee's employment shall be in accordance with the applicable collective bargaining agreement.<br><br>The Buyer will offer and assume all obligations to provide COBRA to all of Sellers employees (and dependents) who are "M&A qualified beneficiaries." |
| **Pension Matters** | The Buyer shall assume (i) all qualified pension plans sponsored or maintained by the Sellers and (ii) in accordance with 4204 of ERISA, all obligations for any multi-employer pension plans. |
| **Director, Officer, Manager, and Employee Tail Coverage** | The Buyer shall assume all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") existing as of the Closing Date, and the Sellers shall use reasonable good faith efforts to obtain any insurer consents, if any, required to assume such policies.  The Buyer shall not terminate any unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") existing as of the Closing Date. |
| **Tax Structuring and Implementation** | The Sellers and the Consenting Lenders shall reasonably cooperate to structure the Sale Transaction or any other transaction, including, by way of example, an equitization transaction in connection with a restructuring in place pursuant to a plan under section 1123 of the Bankruptcy Code (collectively, the "Tax Structure") to (a) minimize any cash taxes payable by the Sellers and the Consenting Lenders (including, as applicable, through the Wind-Down Budget) arising from the Tax Structure, and (b) maximize any favorable tax attributes of the Sellers (or successor), including tax basis, available after the restructuring, including, without limitation, by implementing a Tax Structure intended to qualify as a reorganization under Section 368(a)(1)(G) of the Internal Revenue Code of 1986, as amended. The final Tax Structure shall be subject to the consent of the Sellers and the Consenting Lenders. The Sellers (or the Consenting Lenders at the expense of the Sellers) shall engage a nationally recognized tax accounting firm selected by the Sellers, with the reasonable consent of the Consenting Lenders, to perform analysis for purposes of determining the final Tax Structure. |

## IV.    Form and Manner of Auction Notice

24.    Upon entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will cause the Auction Notice to be served on the following parties or their respective counsel, if known (collectively, the "**Auction Notice Parties**"): (a) the United States Attorney's Office for the District of New Jersey; (b) the Internal Revenue Service; (c) the attorneys

general for the states in which the Debtors operate; (d) the Consultation Parties; (e) any parties known or reasonably believed by the Debtors to have expressed an interest in the Debtors' Assets in the 12 months prior to the Petition Date (f) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in or on any of the Debtors' Assets; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In addition, the Debtors will also publish the Auction Notice, with any modifications necessary for ease of publication, (a) on the Case Website and (b) on one occasion in the national edition of The Wall Street Journal, The New York Times, USA Today, or another publication of similar circulation, as determined by the Debtors.

25.     The Debtors respectfully submit that the Auction Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale and relevant information related thereto, including: (a) the Bidding Procedures; (b) the date, time, and location of the Auction; (c) the date, time, and location of the Sale Hearing; (d) the deadline for filing objections to the Sale and entry of the Sale Order; (e) instructions for obtaining a copy of the Stalking Horse Purchase Agreement; (f) a summary of the Sale terms, including that the Sale contemplates a transfer of Assets free and clear of liens, claims, interests, and other encumbrances, with such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of applicable Contracts.  Accordingly, the Debtors request that this Court approve the form and manner of the Auction Notice.

## V.    The Assumption Procedures

26.     The Debtors are also seeking approval of certain procedures to carry out the assumption and assignment of the Contracts in connection with the Sale (the "**Assumption Procedures**").  The Assumption Procedures, set forth in detail in the Bidding Procedures Order,

outline the process by which the Debtors may serve notice to certain counterparties to the Contracts (each, a "**Contract Counterparty**") regarding the proposed assumption and assignment of contractual agreements, and the related cure amounts, if applicable.  The Assumption Procedures and associated notices likewise inform parties of their right to object and how and when to submit such an objection, along with other relevant deadlines and a means for resolving disputes, if necessary, relating to the assumption and assignment of contractual agreements.

## BASIS FOR RELIEF

**I.    The Relief Sought in This Motion Will Maximize Value and Is in the Best Interests of the Debtors' Estates.**

27.    The goal of any proposed sale of property in bankruptcy is to maximize value for the estates.  *See, e.g.*, *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004) (holding that a debtor has "a fiduciary duty to protect and maximize the estate's assets"); *In re Adams Res. Expl. Corp.*, No. 17-10866, 2017 WL 5484017, at *3 (Bankr. D. Del. Sept. 20, 2017) ("The relief requested in the Sale Motion . . . is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate, and its creditors.").

28.    To effectuate this goal, bankruptcy courts routinely approve bidding procedures in connection with sales carried out pursuant to section 363 of the Bankruptcy Code, understanding that these procedures can promote fair, robust and value-maximizing sale processes.  *See, e.g.*, *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Dura Auto. Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007) ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate . . . To that end, courts recognize that procedures intended to enhance competitive

bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales."); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("[T]he purpose of such rulings [approving bidding procedures] has been to ensure fair comparability between competing bids or to protect other bidders who have limited their bids to the announced terms").

29.     Courts in the Third Circuit have routinely held that a debtor's business judgment with respect to the procedures to be used in selling an estate's assets is entitled to substantial deference. *See, e.g.*, *In re Immune Pharms. Inc.*, 635 B.R. 118, 122 (Bankr. D.N.J. 2021) ("[U]nder normal circumstances, the court should defer to the [Debtor's] judgment so long as there is a legitimate business justification."); *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under [Section 363], courts require the [Debtor] to show that a sound business purpose justifies such actions.' If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)).

30.     The Debtors believe that the proposed Bidding Procedures will facilitate active, competitive bidding from parties with serious interest in purchasing the Debtors' Assets, and will elicit the most value-maximizing offers for these Assets. The proposed Bidding Procedures will allow the Debtors to execute a sale of their Assets in a streamlined, fair, and transparent process that will encourage participation by numerous financially-capable bidders and provide such potential bidders with enough time to conduct due diligence and obtain the information necessary to submit a timely and well-informed bid. Indeed, the Debtors' advisors have already received multiple inbound inquiries about the Debtors' Assets from potential bidders.

31.     To further ensure a broad outreach, the Bidding Procedures allow the Debtors to conduct a fair and transparent public auction with minimal barriers to entry.  The Debtors have generated a data room and detailed confidential information memorandum ("**CIM**") which will allow eligible potential bidders to conduct necessary diligence.  And because bidders can bid on all of the Debtors' Assets, or a portion of the Debtors' Assets (including individual business units), the universe of potential bidders may be broader than if only bids for the entire business were considered.  Moreover, to ensure the appropriate parties are sufficiently informed of and included in this process, the Debtors have built in robust consultation rights for any statutorily appointed committee in these Chapter 11 Cases.  Finally, the Bidding Procedures provide the Debtors with an adequate opportunity to evaluate competing bids and accept the highest or otherwise most value-maximizing offer or offers for the Debtors' Assets.

32.     The Debtors submit that the proposed Bidding Procedures comply with the relevant standards governing bidding, auction, and sale processes and are consistent with other bidding procedures that this District and others have approved.[11]

## II.     The Debtors Should be Authorized to Enter Into the Stalking Horse Purchase Agreement.

33.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale may bid

---

[11] *See e.g.*, *In re Invitae Corp.*, Case No. 24-11362 (MBK) (Bankr. D.N.J. Feb. 16, 2024) [Docket No. 57]; *In re Rite Aid Corp.*, Case No. 23-18993 (MBK) (Bankr. D.N.J. Oct. 18, 2023) [Docket No. 129]; *In re Bed Bath & Beyond Inc.*, Case No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 25, 2023) [Docket No. 92]; *In re David's Bridal, LLC*, Case No. 23-13131 (CMG) (Bankr. D.N.J. Apr. 19, 2023) [Docket No. 72]; *In re BlockFi Inc.*, Case No. 22-19361 (MBK) (Bankr. D.N.J. Jan. 30, 2023) [Docket No. 441]; *In re Coach USA, Inc.*, Case No. 24-11258 (MFW) (Bankr. D. Del. July 9, 2024) [Docket No. 241]; *In re Ambri Inc.*, Case No. 24-10952 (LSS) (Bankr. D. Del. June 12, 2024) [Docket No. 160]; *In re Robertshaw US Holding Corp.*, Case No. 24-90052 (CML) (Bankr. S.D. Tex. Mar. 21, 2024) [Docket No. 359].

at such sale, and, if designated the winning bidder, may offset such claim against the purchase price. 11 U.S.C. § 363(k). Thus, credit bidding is a statutory right of secured creditors that cannot be restricted absent cause shown.

34.    The use of a stalking horse in a public auction process for the sale of a debtor's assets is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and . . . facilitat[ing] a realization of that value." *See Off. Comm. Of Unsecured Creditors v. Interforum Holding LLC*, No. 11-CV-219, 2011 WL 2671254, at *1 n.1 (E.D. Wis. July 7, 2011).

35.    The Debtors maintain that entry into the Stalking Horse Purchase Agreement is a sound exercise of their business judgment and should be authorized. The Stalking Horse Bid sets the stage for a successful sale by providing certainty to the process, setting a minimum purchase price for the Debtors' Assets, and testing that price in a thorough marketing and bidding process. The existence of the Stalking Horse Bid may also attract other bidders and generate additional interest in the Debtors' Assets. To be sure, the Stalking Horse Bid helps ensure that any other offers will only improve the outcome of the Sale process. As such, designation of the Stalking Horse Bid as the stalking horse in this process best assures that the Sale will be value-maximizing to the estates.

36.    The Stalking Horse Bid does not include any break-up fee, topping fee, consent fee, or expense reimbursement tied to the Stalking Horse Bid and accordingly, the Debtors are not seeking approval of any stalking horse protections. As a result, the Stalking Horse Bid provides material value to the estates – and provides all parties with certainty of a going concern transaction, keeping the Debtors' businesses and work force operating and in tact.

37.    Accordingly, for all of the foregoing reasons, the Debtors should be permitted to enter into the Stalking Horse Purchase Agreement.

**III.    The Debtors Have Articulated a Sound Business Purpose for the Sale.**

38.    Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Courts, including courts within the Third Circuit, routinely authorize a sale of a debtor's assets pursuant to section 363 if the debtors' entry into the transaction is based on a sound business purpose.  *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("[U]nder normal circumstances the court would defer to the [debtor's] judgment so long as there is a legitimate business justification."); *In re Lehigh Valley Pro. Sports Clubs, Inc.*, No. 00-11296, 2000 WL 567905, at *3 (Bankr. E.D. Pa. May 5, 2000) ("The standard for court approval [of a sale of a debtor's property under section 363], commonly referred to as the business judgment test, is whether sound business purpose justifies the action."); *In re. Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176-77 (D. Del. 1991) (applying the "sound business purpose" standard for approval of a pre-confirmation sale of a debtor's assets rather than an "emergency" standard); *In re Olsen*, No. 14-11273, 2017 WL 3311218, at *7 (Bankr. D.N.J. July 20, 2017) ("The Third Circuit [has] adopted the 'sound business purpose' test . . . when examining the reason for an asset sale.").

39.    Once a debtor articulates a sound business justification for a proposed sale under section 363 of the Bankruptcy Code, the debtor is entitled to a presumption that the proposed sale is reasonable and in the best interests of the estate.  *See, e.g., In re Filene's Basement, LLC*, No. 11-13511, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate; the burden of rebutting that presumption falls to parties opposing the transaction."); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y.

1992) ("Parties opposing the proposed exercise of a debtor's business judgment have the burden

of rebutting the presumption of validity."); *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16

(Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business

by a debtor and a presumption of reasonableness attaches to a debtor's management decisions . . .

Where the debtor articulates a reasonable basis for its business decisions (as distinct from a

decision made arbitrarily or capriciously), courts will generally not entertain objections to the

debtor's conduct.").

40.     A sound business purpose exists for the proposed Sale.  The Sale, following the

robust marking process described herein, is designed to achieve the highest price for the Debtors'

Assets, generating as much recovery as possible for creditors while preserving the Debtors' going-

concern operations and access to capital.  The Auction invites credible, interested bidders to

participate in a competitive process and is thereby designed to yield the highest or otherwise best

offer for the Assets.  Further, because any sale of the Debtors' Assets will likely involve assuming

certain of the Debtors' Contracts, the Sale creates the greatest likelihood for payment in full and a

continuing business relationship for certain of the Debtors' go-forward creditors.

**IV.     The Sale Transaction Has Been Proposed in Good Faith, Without Collusion, for
Reasonably Equivalent Value and the Successful Bidder Will Be a Good-Faith
Purchaser.**

41.     Section 363(m) of the Bankruptcy Code protects the purchaser of assets sold

pursuant to a sale under section 363 of the Bankruptcy Code from the risk that the purchaser's

interest in the purchased assets will be clawed back if the applicable sale order is reversed on

appeal, so long as such purchaser purchased the assets in "good faith."  It provides, in relevant

part, as follows:

> [t]he reversal or modification on appeal of an authorization . . . of a
> sale or lease of property does not affect the validity of a sale or lease

under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

42.     The term "good faith" is not defined in the Bankruptcy Code, but courts, including within the Third Circuit, have held that a purchaser may demonstrate good faith through the "integrity of [the purchaser's] conduct in the course of the sale proceedings." *In re Jersey City Cmty. Hous. Corp.*, No. 21-15863, 2023 WL 3250267, at *3 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).  A lack of good faith can be demonstrated through activities such as "fraud, collusion between the purchaser and other bidders or the [debtor], or an attempt to take grossly unfair advantage of other bidders." *Jersey City*, 2023 WL 3250267, at *3. (quoting *Rock Indus.*, 572 F.2d at 1198).

43.     The Debtors intend to prove at the Sale Hearing that the Successful Bidder will be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse Purchase Agreement, or a similar agreement with the Successful Bidder if such bidder is not the Stalking Horse Bidder, will be a good-faith, arms'-length agreement without any collusion, fraud, or similar misconduct, and the Debtors will request a finding to that effect at the Sale Hearing.  Here, the Stalking Horse Bidder's good faith is already reflected in, among other things, the fair baseline transaction value, the fair Bidding Procedures that facilitate competing bids, and the absence of any break-up fee or similar fees.

44.     Additionally, in connection with the Sale Hearing the Debtors will request that the proposed Sale Order include a finding that the consideration provided by the Successful Bidder pursuant to the final purchase agreement for the purchase the applicable Assets and the assumption of the applicable liabilities constitutes reasonably equivalent value and fair consideration under

the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

   V.   **The Court Should Approve the Sale Free and Clear of Any Liens, Claims, Interests, or Encumbrances Under Section 363(f) of the Bankruptcy Code.**

       45.    Section 363(f) of the Bankruptcy Code allows a sale of a debtor's assets to be made "free and clear" of any liens, claims, interests, charges, or encumbrances (with such liens, claims, interests, charges, or encumbrances attaching to the net sale proceeds with the same rights and priorities as in the assets immediately prior to the sale). *See* 11 U.S.C. § 363(f). For a court to approve a sale of a debtor's assets pursuant to section 363 free and clear of such interests, only *one* of the five conditions set forth in section 363(f) must be satisfied. *See, e.g.*, *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if *any* of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all [interests]." (emphasis added)); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) ("[Section 363(f)] is written in the disjunctive, not the conjunctive. Therefore, if *any* of the five conditions of § 363(f) are met, the Trustee has the authority to conduct the sale free and clear of all [interests]." (emphasis added)).

       46.    The Debtors intend to demonstrate at the Sale Hearing that the Sale satisfies section 363(f) of the Bankruptcy Code because all parties with any interest in the Acquired Assets will either (i) have consented to the Sale, either expressly or by failure to object after notice and an opportunity to object, (ii) be deemed to consent to the Sale, if applicable; or (iii) could be compelled to accept a monetary satisfaction of such interest. Moreover, all such parties will receive replacement interests in the proceeds of the Sale, to the same extent as, and with the same priority as, those interests that existed immediately prior to the Sale. Accordingly, the Debtors

will, at the Sale Hearing, request approval of the Sale of the Debtors' Assets free and clear of all

liens, claims, interests, charges, and encumbrances.

**VI.    The Form and Manner of the Auction Notice Should Be Approved.**

47.    Bankruptcy Rule 2002(a) requires the Debtors to provide creditors with 21 days'

notice of the Auction (if any) and the Sale Hearing.  Bankruptcy Rule 2002(c) requires that such

notice must include the date, time, and location of the Auction (if any) and the Sale Hearing, and

the deadline for filing any objections to the proposed sale.

48.    As noted above, upon entry of the Bidding Procedures Order, or as soon as

reasonably practicable thereafter, the Debtors will serve the Auction Notice upon the Auction

Notice Parties and publish a modified version of the Auction Notice (with any such modifications

made to the extent necessary for ease of publication) (a) on the Case Website and (b) on one

occasion in the national edition of The Wall Street Journal, The New York Times, USA Today, or

another publication of similar circulation, as determined by the Debtors.  The Debtors submit that

notice of this Motion and the Bidding Procedures Hearing to consider entry of the Bidding

Procedures Order, together with service of the Auction Notice detailed herein, constitutes good

and adequate notice of the Sale, the Auction, and the associated proceedings in compliance with

the applicable requirements of Bankruptcy Rule 2002.  The Debtors respectfully submit that no

further notice is necessary and the Debtors request that this Court approve the form and manner of

the Auction Notice.

**VII.    Assumption and Assignment of the Assigned Contracts Should Be Approved.**

49.    As noted in the Bidding Procedures, the Stalking Horse Bid and any other Bid must

identify the Contracts to be assumed and assigned, and provide for the payment of all Cure

Amounts related thereto.  Section 365(a) of the Bankruptcy Code provides that, subject to certain

conditions, a debtor, "subject to the court's approval, may assume or reject any executory contract

or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Courts within the Third Circuit typically approve the assumption or rejection of a contract or lease where the debtor shows that it has exercised its sound business judgment in so doing.  *See, e.g.*, *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (affirming the Bankruptcy Court's approval of a debtor's decision to reject a contract using the "business judgment test"); *In re Taylor*, 103 B.R. 511, 517 (D.N.J. 1989) (noting that courts typically apply the "business judgment test" in their judicial review of a debtor's decision to reject a contract).  Courts applying the "business judgment test" typically only require that the debtor demonstrate that such decision to assume or reject would "benefit the estate."  *Sharon Steel*, 872 F.2d at 39; *Taylor*, 103 B.R. at 517.

50.     The assumption and assignment of the applicable Contracts in connection with the Sale are an exercise of the Debtors' sound business judgment.  Without the ability to assume and assign these Contracts, the Debtors risk missing out on the most competitive, value-maximizing bids, as bidders may determine that such Contracts are necessary to operate the business as a going concern.  The integrity of the assumption and assignment process will likewise be secured as such assignments will be conducted in accordance with the Assumption Procedures approved by the Court pursuant to the Bidding Procedures Order.

51.     Moreover, the assumption and assignment of the Contracts will fully comply with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1)(A) requires, in relevant part, that for any assumed executory contract or unexpired lease that is in default, the debtor must "cure[], or provide[] adequate assurance that the [debtor] will promptly cure, such default."  11 U.S.C. § 365(b)(1)(A).  The Debtors will file with the Court, and serve on each applicable Contract Counterparty, sufficient notice of any cure (each, a "**Contract Assumption Notice**") indicating the Debtors' calculation of the Cure Amount for each such Contract.  Such

Contract Counterparty will then have the opportunity to object to the proposed assumption and assignment of the applicable Contracts pursuant to the Sale, including the proposed Cure Amount, in advance of the Sale Hearing. The Debtors' assumption and assignment of the applicable Contracts will be contingent upon payment or reserve of the applicable Cure Amounts and will be effective only upon the closing of the Sale.

52.    Section 365(f)(2) requires that any assignment of an executory contract or unexpired lease of the debtor be contingent on "adequate assurance of future performance by the assignee of such contract or lease . . . whether or not there has been a default in such contract or lease." 11 U.S.C. § 365(f)(2). What constitutes "adequate assurance of future performance" is an inquiry "determined by consideration of the facts of the proposed assumption." *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001). While "adequate assurance of future performance" is a fact-specific inquiry, this district has held that such adequate assurance "is to be given a practical, pragmatic construction." *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988). One key indicator of adequate assurance of future performance that at least one court within the Third Circuit has cited is the "assignee's financial health and experience in managing the type of enterprise or property assigned." *In re Dura Auto. Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007).

53.    As set forth in the Bidding Procedures, any "Qualified Bid" must include information demonstrating adequate assurance of future performance. The Debtors will provide such information to all Contract Counterparties to any assigned Contract and/or direct the Contract Counterparty to any relevant publicly-available information regarding the financial condition of the Successful Bidder. Contract Counterparties will then have the opportunity to object to any proposed adequate assurance. Based on the foregoing provisions of the Assumption Procedures,

the Debtors' assumption and assignment of the applicable Contracts in connection with the Sale comply with section 365 of the Bankruptcy Code and should be approved.

54.     To facilitate the assumption and assignment of the assigned Contracts, the Debtors further request that the Court find that all anti-assignment provisions in the assigned Contracts, whether such provisions expressly prohibit or have the effect of restricting or prohibiting assignment of such contract, to be unenforceable under section 365(f) of the Bankruptcy Code.[12]

## VIII.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

55.     Bankruptcy Rule 6004(h) provides that "[u]nless the court orders otherwise, an order authorizing the use, sale, or lease of property . . . is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h).   Additionally, Bankruptcy Rule 6006(d) provides that "[u]nless the court orders otherwise, an order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed for 14 days after the order is entered."  Fed. R. Bankr. P. 6006(d).   The Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

56.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. Rs. Bankr. P. 6004(h) & 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that

---

[12] Section 365(f)(1) of the Bankruptcy Code provides, in relevant part, that, subject to certain conditions, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) of the Bankruptcy Code further provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the [debtor]."  11 U.S.C. § 365(f)(3).

the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately

"where there has been no objection to the procedure."  9A COLLIER ON BANKRUPTCY 6004.11

(16th ed. 2025).  Furthermore, if an objection is filed and overruled, and the objecting party informs

the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary

to file such appeal.  *Id.*

57.     To maximize the value received for the Assets, the Debtors seek to close the Sale

Transactions as soon as possible after each applicable Sale Hearing.  Accordingly, the Debtors

hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h)

and 6006(d).

## **<u>RESERVATION OF RIGHTS</u>**

58.     Nothing contained in this Motion or any order granting the relief requested in this

Motion, and no action taken pursuant to the relief requested or granted, is intended as or shall be

construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim

against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a

waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds;

(c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding

that any particular claim is an administrative expense claim, other priority claim, or otherwise of

a type specified or defined in this Motion or any order granting the relief requested by this Motion;

(e) an admission as to the validity, priority, enforceability, or perfection of any lien on, security

interest in, or other encumbrance on property of the Debtors' estates; or (f) a waiver or limitation

of any claims, causes of action, or other rights of the Debtors or any other party in interest against

any person or entity under the Bankruptcy Code or any other applicable law.  If the Court grants

the relief sought herein, any payment made pursuant to the Court's order is not intended, and

should not be construed, as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## REQUEST OF WAIVER OF STAY

59.     To the extent that the relief sought in the Motion constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).

## WAIVER OF BANKRUPTCY RULE 6004(a)

60.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a).

## WAIVER OF MEMORANDUM OF LAW

61.     The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the motion does not raise any novel issues of law.

## NO PRIOR REQUEST

62.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

## NOTICE OF MOTION AND ORDER

63.     Notice of the Motion will be given to (i) the Office of the United States Trustee for the District of New Jersey; (ii) counsel to the Ad Hoc Term Lender Group; (iii) counsel to the Super-Senior Agent; (iv) counsel to the Prepetition ABL Agent; (v) counsel to the DIP Agents; (vi) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (vii) counsel to the official committee of unsecured creditors appointed in these Chapter 11 Cases; and (viii) and all parties requesting notice pursuant to Bankruptcy Rule 2002.  Notice of this

Motion and any order entered hereon will be served in accordance with Bankruptcy Rule 2002 and Local Rule 9013-5.

64.     The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Auction Notice and the Contract Assumption Notice (where applicable), as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  The Debtors propose that no other or further notice of the Sale shall be required.

## **<u>CONCLUSION</u>**

WHEREFORE, the Debtors respectively request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and appropriate.

*[Remainder of page intentionally left blank]*

Dated: July 20, 2025

/s/ Michael D. Sirota
_____
Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota
David M. Bass
Felice R. Yudkin
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:  msirota@coleschotz.com
          dbass@coleschotz.com
          fyudkin@coleschotz.com

– and –

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff (admitted *pro hac vice*)
Rachael L. Ringer (admitted *pro hac vice*)
Megan M. Wasson (admitted *pro hac vice*)
Andrew W. Pollack (*pro hac vice* forthcoming)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
E-mail: Adam.Rogoff@HSFKramer.com
          Rachael.Ringer@HSFKramer.com
          Megan.Wasson@HSFKramer.com
          Andrew.Pollack@HSFKramer.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

## **EXHIBIT A**
## **(PROPOSED BIDDING PROCEDURES ORDER)**

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff, Esq. (admitted *pro hac vice*)
Rachael L. Ringer, Esq. (admitted *pro hac vice*)
Megan M. Wasson, Esq. (admitted *pro hac vice*)
Andrew W. Pollack, Esq. (*pro hac vice* forthcoming)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Del Monte Foods Corporation II Inc., *et al.*, | ) Case No. 25-16984 (MBK) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |

# ORDER (I) APPROVING THE AUCTION AND BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) AUTHORIZING THE DEBTORS TO ENTER INTO THE STALKING HORSE PURCHASE AGREEMENT, (III) SCHEDULING AN AUCTION AND SALE HEARING, (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (V) AUTHORIZING THE SALE OF ASSETS, AND (VI) GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered three (3) through [●], together with

the exhibits attached hereto, is **ORDERED**.

---

[1]   The last four digits of Debtor Del Monte Foods Corporation II Inc.'s tax identification number are 1894.   A complete list of the Debtors in these Chapter 11 Cases and their respective tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent, at https://cases.stretto.com/DelMonteFoods. The location of the Debtor Del Monte Foods Corporation II Inc.'s principal place of business and the Debtors' service address is 205 North Wiget Lane, Walnut Creek, California 94598.

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff (admitted *pro hac vice*)
Rachael L. Ringer (admitted *pro hac vice*)
Megan M. Wasson (admitted *pro hac vice*)
Andrew W. Pollack (*pro hac vice* forthcoming)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
E-mail: Adam.Rogoff@HSFKramer.com
          Rachael.Ringer@HSFKramer.com
          Megan.Wasson@HSFKramer.com
          Andrew.Pollack@HSFKramer.com

**COLE SCHOTZ P.C.**
Michael D. Sirota
David M. Bass
Felice R. Yudkin
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:   msirota@coleschotz.com
          dbass@coleschotz.com
          fyudkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

(Page 3)

| | |
|---|---|
| Debtors: | DEL MONTE FOODS CORPORATION II INC., *et al.* |
| Case No. | 25-16984 (MBK) |
| Caption of Order: | Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief |

Upon the *Debtors' Motion for an Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief* (the "**Motion**")[2] [Docket No. ●] of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in the above captioned chapter 11 cases (collectively, these "**Cases**"), for entry of an order (this "**Order**") (a) approving the proposed marketing, auction, and bidding procedures attached as **Exhibit 1** hereto (the "**Bidding Procedures**"), to govern the solicitation and selection of the highest or otherwise best offer(s) for the sale(s) (the "**Sale Transaction**") of substantially all of the Debtors' assets (the "**Assets**"); (b) designating the Stalking Horse Bidder as the stalking horse in connection with the Sale Transaction; (c) approving the dates and deadlines for scheduling an auction for any Sale Transaction (the "**Auction**"); (d) approving the manner of notice of the Auction and sale hearing (the "**Sale Hearing**") as may be necessary; (e) approving procedures for the assumption and assignment of certain Executory Contracts (as defined below) and Unexpired Leases (as defined below) in connection with the Sale Transaction, if any; and (f) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration and any such other materials filed in support of the Motion; and the Court having jurisdiction to consider the Motion and the relief

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion, or the DIP Documents, as applicable.

(Page 4)

| | |
|---|---|
| Debtors: | DEL MONTE FOODS CORPORATION II INC., *et al.* |
| Case No. | 25-16984 (MBK) |
| Caption of Order: | Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief |

requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "**Hearing**"); and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is **GRANTED** as set forth herein.

2.      The Debtors have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, which are fair, reasonable, and appropriate under the circumstances and designed to maximize recovery on, and realizable value of, the Debtors' enterprise, including with respect to the designation of the Stalking Horse Bidder and proposed Bidding Procedures.  The Bidding Procedures and all such steps undertaken by the Debtors in connection with the implementation of the Bidding Procedures and this Order, and in furtherance

(Page 5)

| | |
|---|---|
| Debtors: | DEL MONTE FOODS CORPORATION II INC., *et al.* |
| Case No. | 25-16984 (MBK) |
| Caption of Order: | Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief |

of the postpetition sale process, prior to the date hereof and in accordance with this Order, are reasonable and appropriate and within the sound business judgment of the Debtors pursuant to section 363(b) of the Bankruptcy Code.

3.      Notice of the Motion and the Hearing was (i) appropriate and reasonably calculated to provide all interested parties with timely and proper notice, (ii) in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and (iii) adequate and sufficient under the circumstances of these Chapter 11 cases, and no other or further notice is required. A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to all interested persons and entities.

4.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled prior to or at the Hearing are overruled.

**I.      Important Dates and Deadlines.**

5.      *Bid Deadline*. September 15, 2025 at 5:00 p.m., prevailing Eastern Time, is the deadline by which all Qualified Bids must be ***actually received*** by the parties and in the manner prescribed by the Bidding Procedures, which may be extended by the Debtors in consultation with the Consultation Parties and the Stalking Horse Bidder and upon written notice to the Acceptable Bidders. Notwithstanding the foregoing, the Debtors shall, in consultation with the Consultation Parties, retain the ability to consider a Qualified Bid that is submitted by the Bid Deadline by an Acceptable Bidder who did not submit a Non-Binding Indication of Interest by the Non-Binding Indication of Interest Deadline.

(Page 6)

| | |
|---|---|
| Debtors: | DEL MONTE FOODS CORPORATION II INC., *et al.* |
| Case No. | 25-16984 (MBK) |
| Caption of Order: | Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief |

6.     *Auction*.  The date and time of the Auction, if any, is September 19, 2025, at 10:00 a.m., prevailing Eastern Time, which may be extended by the Debtors in consultation with the Consultation Parties and the Stalking Horse Bidder, upon written notice with the Court.  The Auction will be held at the offices of the proposed co-counsel to the Debtors: Herbert Smith Freehills Kramer (US) LLP ("**HSF Kramer**"), 1177 Avenue of the Americas, New York, NY 10036.  The Debtors in consultation with the Consultation Parties, may elect to conduct the Auction via a virtual meeting (either telephonic or via videoconference).  Only the Debtors, the Consultation Parties, Qualified Bidders, the U.S. Trustee, and any other parties as the Debtors may determine to include in their reasonable discretion, in consultation with the Consultation Parties, in each case, along with their respective representatives and advisors, shall be entitled to attend the Auction, and only Qualified Bidders will be entitled to make Overbids (as defined in the Bidding Procedures) at the Auction.  The Debtors shall send written notice of the date, time, and place of the Auction to the Qualified Bidders and the U.S. Trustee no later than two (2) business days before such Auction, and will post notice of the date, time, and place of the Auction no later than two (2) business days before such Auction on the website of the Debtors' notice, claims, and solicitation agent, Stretto (https://cases.stretto.com/DelMonteFoods).  For the avoidance of doubt, the Debtors may also conduct more than one Auction with respect to non-overlapping material portions of the Debtors' Assets.

7.     *Notice of Successful Bidder*.  As soon as reasonably practicable upon conclusion of the Auction, the Debtors shall file a Notice of Successful Bidder.

(Page 7)

| | |
|---|---|
| Debtors: | DEL MONTE FOODS CORPORATION II INC., *et al.* |
| Case No. | 25-16984 (MBK) |
| Caption of Order: | Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief |

8.    *Sale Objection Deadline*.  Objections to the sale, if any, and any adequate assurance of future performance must be made by 5:00 p.m., prevailing Eastern Time, on the date that is seven (7) days prior to the Sale Hearing, or September 23, 2025.  Any party or entity who fails to timely make an objection to the sale on or before the Sale Objection Deadline shall be forever barred from asserting an objection to the sale, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances and other interests.

9.    *Sale Hearing*.  [September 30, 2025, at 10:00 a.m.], prevailing Eastern Time, or such later date as subject to the Court's calendar, is the date and time for the hearing for the Court to consider the Successful Bid or Successful Bids, if needed.

10.    The dates and deadlines set forth in this Order are subject to modification by the Debtors in accordance with the Bidding Procedures.

11.    Notwithstanding anything herein to the contrary, all extensions of any of the dates set forth herein or in the Bidding Procedures shall be subject to the milestones set forth in the RSA, the DIP Orders, and the DIP Credit Agreements (including the consent rights set forth therein).

**II.    Auction, Bidding Procedures, Auction Notice and Related Relief.**

12.    The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1,** are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to any proposed Sale Transaction. Any party desiring to submit a Bid shall comply with the Bidding Procedures and this Order.  The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

| (Page 8) | |
|---|---|
| Debtors: | DEL MONTE FOODS CORPORATION II INC., *et al.* |
| Case No. | 25-16984 (MBK) |
| Caption of Order: | Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief |

Subject to the terms of the Bidding Procedures, the Debtors may modify the Bidding Procedures (including deadlines) as necessary or appropriate to maximize value for their estates.  All rights of the Debtors, as they may reasonably determine to be in the best interests of their estates, in consultation with the Consultation Parties, to (i) modify the Bidding Procedures in good faith, (ii) to further the goal of attaining the highest or otherwise best offer for the Debtors' assets, or (iii) impose, at or prior to the selection of the Successful Bidder(s), additional customary terms and conditions on the Sale, are reserved to the extent set forth in the Bidding Procedures and otherwise consistent with the RSA; provided that any change to the dates or deadlines set forth herein shall comply with the milestones agreed upon in any order approving the DIP Motion, as may be modified in accordance with their terms.  The Debtors shall provide reasonable notice of any such modification to any Qualified Bidder, including the Stalking Horse Bidder.

13.    Any deposit (including any Good Faith Deposit) provided by a Qualified Bidder shall be held in escrow by the Debtors or their agent, and shall not become property of the Debtors' bankruptcy estates unless and until released from escrow to the Debtors pursuant to the terms of the applicable escrow agreement, the Bidding Procedures, or order of this Court, as applicable.

14.    The Auction Notice, substantially in the form attached to the Bidding Procedures as **Schedule 1,** is hereby approved.  As soon as reasonably practicable following the entry of this Order, the Debtors will cause the Auction Notice to be served upon (a) the United States Attorney's Office for the District of New Jersey; (b) the Internal Revenue Service; (c) the attorneys general for the states in which the Debtors operate; (d) the Consultation Parties; (e) any parties known or

(Page 9)

| | |
|---|---|
| Debtors: | DEL MONTE FOODS CORPORATION II INC., *et al.* |
| Case No. | 25-16984 (MBK) |
| Caption of Order: | Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief |

reasonably believed by the Debtors to have expressed an interest in the Debtors' assets in the twelve (12) months prior to the Petition Date; (f) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in or on any of the Debtors' Assets; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.

15.     Pursuant to Local Rule 6004-2: (a) each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale, as set forth in the Bidding Procedures; (b) the Auction shall be conducted openly; and (c) the Auction shall be transcribed or videotaped.

16.     No person or entity shall be entitled to any expense reimbursement, break-up fee, "topping," termination, or other similar fee or payment in connection with any Sale, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any other fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

## III.     The Stalking Horse Purchase Agreement

17.     The Ad Hoc Term Lender Group constitutes "Requisite Lenders" as defined in, and pursuant to, each of the DIP Term Loan Credit Agreement and the Super-Senior Credit Agreement, subject to the Prepetition Intercreditor Agreement (as defined in the DIP Documents).  The Ad Hoc Term Lender Group is authorized and may, in its sole and absolute discretion, credit bid pursuant to section 363(k) of the Bankruptcy Code (including directing the applicable agent under the DIP Term Loan Credit Agreement and/or Super-Senior Credit Agreement to credit bid) all or

(Page 10)

| | |
|---|---|
| Debtors: | DEL MONTE FOODS CORPORATION II INC., *et al.* |
| Case No. | 25-16984 (MBK) |
| Caption of Order: | Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief |

a portion of the obligations pursuant to the DIP Term Loan Credit Agreement, the DIP Documents, the Super-Senior Credit Agreement, and the Super-Senior Documents, as applicable, in each case subject to and in accordance with the terms of the RSA. The applicable agent under the DIP Term Loan Credit Agreement and/or Super-Senior Credit Agreement may take direction from the Requisite Lenders and shall be held harmless for taking direction from the Requisite Lenders for purposes of the Sale. Consistent with the DIP Orders and the Prepetition Intercreditor Agreement and any other intercreditor agreements that may be in effect, the credit bid by the DIP Term Loan Lenders, or any credit bid by the Prepetition ABL Lenders, for any assets that constitute ABL Priority Collateral must provide for such treatment acceptable to the DIP ABL Agent and the requisite DIP ABL Lenders in their sole discretion.

18. The Debtors have negotiated the Stalking Horse Purchase Agreement, the form of which is attached hereto as Exhibit [•], with an entity (the "**Stalking Horse Bidder**") formed by or at the direction of the Ad Hoc Term Lender Group. The Bidding Procedures and the Stalking Horse Purchase Agreement were negotiated at arm's-length and in good faith by the Debtors and the Stalking Horse Bidder, without collusion. The Debtors are authorized to enter into the Stalking Horse Purchase Agreement, subject to higher or otherwise better offers at the Auction. The Stalking Horse Bidder shall be deemed a Qualified Bidder, and the bid of the Stalking Horse Bidder (including, for the avoidance of doubt, any credit bid pursuant to the foregoing paragraph) contemplated by the Stalking Horse Purchase Agreement (the "**Stalking Horse Bid**") shall be deemed a Qualified Bid.

(Page 11)

| | |
|---|---|
| Debtors: | DEL MONTE FOODS CORPORATION II INC., *et al.* |
| Case No. | 25-16984 (MBK) |
| Caption of Order: | Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief |

19.     The Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code.  The Stalking Horse Bidder and its counsel and advisors have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in connection with the Stalking Horse Bidder's negotiation of the Bidding Procedures and the Stalking Horse Purchase Agreement.

20.     For the avoidance of any doubt and notwithstanding any other provisions in this Order or the Bidding Procedures, subject to the Prepetition Intercreditor Agreement (as defined in the DIP Documents) and any other intercreditor agreements that may then be in effect, the Required DIP ABL Lenders shall have the right to credit bid for ABL Priority Collateral (including through a direction to the applicable agent) at or prior to the Auction all or portion of the aggregate amount of their applicable outstanding secured obligations pursuant to section 363(k) of the Bankruptcy Code.  The DIP ABL Agent and, if applicable, the Prepetition ABL Agent may take direction from the Required DIP ABL Lenders and shall be held harmless for taking direction from the Required DIP ABL Lenders for purposes of the Sale.  To the extent any DIP ABL Agent or DIP ABL Lender submits a credit bid in accordance with Section VIII of the Bidding Procedures, and such credit bid is otherwise permitted by and in accordance with the DIP ABL Documents, such bid shall be a Qualified Bid, and such applicable DIP ABL Agent or DIP ABL Lender shall be a Qualified Bidder with respect to such Bid.

**IV.     Assumption and Assignment Procedures.**

(Page 12)

| | |
|---|---|
| Debtors: | DEL MONTE FOODS CORPORATION II INC., *et al.* |
| Case No. | 25-16984 (MBK) |
| Caption of Order: | Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief |

21.     The procedures set forth below regarding the assumption and assignment of the Executory Contracts and Unexpired Leases proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Successful Bidder, if any, pursuant to section 365(f) of the Bankruptcy Code in connection with the Sale are hereby approved to the extent set forth herein.   These Assumption and Assignment Procedures shall govern the assumption and assignment of all of the Debtors' Executory Contracts and Unexpired Leases to be assumed and assigned in connection with the Sale under the Stalking Horse Purchase Agreement or such other purchase agreement, as applicable, subject to the payment of any amount necessary pursuant to section 365 of the Bankruptcy Code or otherwise to cure all existing and continuing defaults under the applicable Executory Contract or Unexpired Lease (the foregoing amounts as stated in the Contract Assumption Notice, the "**Cure Payments**"):

(a) **Contract Assumption Notice**.   No later than [●], 2025 (the "**Assumption and Assignment Service Deadline**"), the Debtors shall serve a notice of contract assumption (the "**Contract Assumption Notice**"), in substantially the form attached to the Bidding Procedures as **Schedule 2** via first class mail on the Contract Counterparties and provide a copy of the same to the Consultation Parties.  The Contract Assumption Notice shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the  extent applicable, (i) the title of the executory contract or lease, (ii) the name of the counterparty to the executory contract or lease, (iii) Debtors' good faith estimates of the Cure Payments, if any, required in connection with the executory contract or lease, and (iv) the Sale Objection Deadline; provided, however, that service of a Contract Assumption Notice does not constitute an admission that any Contract listed thereon is an executory contract or that such stated Cure Payment constitutes a claim against the Debtors or a right against any Successful Bidder, all rights with respect thereto being expressly reserved. Further, the inclusion of a contract on the Contract Assumption Notice is not a guarantee that such contract will ultimately be assumed and assigned.

(Page 13)

| | |
|---|---|
| Debtors: | DEL MONTE FOODS CORPORATION II INC., *et al.* |
| Case No. | 25-16984 (MBK) |
| Caption of Order: | Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief |

(b) **Cure Payments**. The payment of the applicable Cure Payments by the Debtors and/or the Successful Bidder, as applicable, shall (i) effect a cure of all defaults existing thereunder, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the ultimately assumed Contracts by the Debtors and the assignment of such Contracts to the Successful Bidder, constitute adequate assurance of future performance thereof.

(c) **Supplemental Contract Assumption Notice**. To the extent the Debtors, at any time after the Assumption and Assignment Service Deadline (i) identify additional Executory Contracts or Unexpired Leases that may be assumed by and assigned to the Successful Bidder, (ii) remove any Executory Contracts or Unexpired Leases from the list attached to the Contract Assumption Notice, and/or (iii) modify the previously stated Cure Payment associated with any Executory Contract or Unexpired Lease, the Debtors will promptly file with this Court and serve by first-class mail a supplemental notice of contract assumption (a "**Supplemental Assumption Notice**") on each of the Contract Counterparties affected by the Supplemental Assumption Notice. Each Supplemental Assumption Notice will include the same information with respect to listed Contracts as was included in the Contract Assumption Notice. A Successful Bidder may designate additional Contracts to be assumed and assigned up to two (2) business days prior to closing and may remove Executory Contracts or Unexpired Leases from the list of Executory Contracts and Unexpired Leases up to two (2) business days prior to closing, subject in all cases to the terms of the applicable asset purchase agreement (which, in the case of the Stalking Horse Bidder shall be the Stalking Horse Purchase Agreement).

(d) **Objections**. Objections, if any, to the proposed assumption and assignment or the Cure Payment proposed with respect thereto, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, state the correct Cure Payment alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon (a) proposed counsel to the Debtors, (b) counsel to the Stalking Horse Bidder, (c) the Bid Notice Parties (as defined in the Bidding Procedures), and (d) any other party that has filed a notice of appearance in these chapter 11 cases, so as actually to be received on or before the Sale Objection Deadline or deadline set forth in the Supplemental Assumption Notice, as applicable.

(e) **Dispute Resolution**. In the event that the Debtors and a Contract Counterparty cannot resolve an objection to a Cure Payment, the Executory Contract or Unexpired Lease at issue may be assumed by the Debtors and assigned to the Successful Bidder, provided that

| (Page 14) | |
|---|---|
| Debtors: | DEL MONTE FOODS CORPORATION II INC., *et al.* |
| Case No. | 25-16984 (MBK) |
| Caption of Order: | Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief |

the Debtors shall segregate the Cure Payment that the Contract Counterparty asserts is required to be paid, pending a resolution of the dispute by the Court or mutual agreement by the parties. Any objection to the proposed assumption and assignment of a contract or related Cure Payment proposed in connection with the Sale Transaction that remained unresolved as of the Sale Hearing, shall be heard at the Sale Hearing (or at a later date as fixed by the Court). Notwithstanding the foregoing, in accordance with the terms of these Bidding Procedures Order, the Debtors may, in their discretion, and in consultation with the Stalking Horse Bidder or any Successful Bidder (as applicable), adjourn Cure Objections to be considered at a later hearing and assign Proposed Assumed Contracts while such objections remain outstanding.

(f) **Contract Assumption**. No Executory Contract or Unexpired Lease shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order assuming and assigning such Executory Contract or Unexpired Lease or (ii) the date the Sale Transaction has closed.

22. Any party failing to timely file an objection to the Cure Payments or the proposed assumption and assignment of an Executory Contract or Unexpired Lease listed on the Contract Assumption Notice or a Supplemental Assumption Notice is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Executory Contract or Unexpired Lease, (c) the related relief requested in the Motion, and (d) the Sale Transaction. Such party shall be forever barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Executory Contract or Unexpired Lease, adequate assurance of future performance, the relief requested in the Motion, whether or not applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtors and the Successful Bidder with respect to such party's Executory Contract or Unexpired Lease.

(Page 15)

| | |
|---|---|
| Debtors: | DEL MONTE FOODS CORPORATION II INC., *et al.* |
| Case No. | 25-16984 (MBK) |
| Caption of Order: | Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief |

## V.    Miscellaneous.

23.    The Debtors are authorized to revise the Sale timeline in consultation with the Consultation Parties and the Stalking Horse Bidder, and to the extent set forth herein and in the Bidding Procedures.  The Debtors are further authorized, but not directed, to conduct multiple Sale Transactions and/or Auctions (as may be necessary or appropriate under the circumstances) in substantial conformity with the Sale timeline and Bidding Procedures established through this Order.  For the avoidance of doubt, the Debtors  retain the right to cancel the Auction and proceed with a private sale transaction.

24.    The failure to include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness or enforceability of such a provision in the Bidding Procedures.  The Court, at the request of the Debtors in consultation with the Consultation Parties and subject to its availability, may modify and adjourn any hearing date set by this Order without further Order of this Court, *provided* that the Debtors will serve notice to all requisite parties informing them of such modification.

25.    The Debtors, in consultation with the Consultation Parties and the Stalking Horse Bidder, may modify any of the deadlines set forth herein or provide for additional deadlines within the Sale timeline, *provided* that the Debtors will disclose all applicable changes to the deadlines.

26.    The Debtors may modify any Good Faith Deposit, in consultation with the Consultation Parties, as necessary or appropriate, based on the Assets being sold.

(Page 16)

| | |
|---|---|
| Debtors: | DEL MONTE FOODS CORPORATION II INC., *et al.* |
| Case No. | 25-16984 (MBK) |
| Caption of Order: | Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief |

27.     Nothing in this Order or in the Bidding Procedures is intended to, or shall be deemed to, modify, waive, amend, or impair any of the provisions of the DIP Orders, the DIP Credit Agreements, and/or the DIP Documents, or the rights or obligations of the Debtors, the DIP Agents, or the DIP Lenders thereunder, and all such rights are expressly preserved and not waived or impaired by this Order or the Bidding Procedures.

28.     Nothing in this Order or the Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of a Debtor or any of its Debtor or Non-Debtor Affiliates to take any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body reasonably determines in good faith, after consultation with their outside counsel, that taking such action, or refraining from taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

29.     In the event of any inconsistencies between this Order and the Motion, this Order shall govern in all respects.  In the event of any inconsistencies between this Order and the Bidding Procedures, the Bidding Procedures shall govern in all respects.

30.     All persons or entities (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily (a) consented to the entry of a final order by this Court in connection with the Motion and (b) waived any right to jury trial in connection with any disputes relating to any of the foregoing matters. All actions by the Debtors

(Page 17)

| | |
|---|---|
| Debtors: | DEL MONTE FOODS CORPORATION II INC., *et al.* |
| Case No. | 25-16984 (MBK) |
| Caption of Order: | Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief |

necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion and to implement the Bidding Procedures are hereby authorized.

31.     Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Order shall be effective and enforceable immediately upon entry hereof.

32.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

33.     The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

34.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## **EXHIBIT 1**

**Bidding Procedures**

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff, Esq. (admitted *pro hac vice*)
Rachael L. Ringer, Esq. (admitted *pro hac vice*)
Megan M. Wasson, Esq. (admitted *pro hac vice*)
Andrew W. Pollack, Esq. (*pro hac vice* forthcoming)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| Del Monte Foods Corporation II Inc., *et al.*, | ) Case No. 25-16984 (MBK) |
|  | ) |
| Debtors.[1] | ) (Jointly Administered) |
|  | ) |

## BIDDING PROCEDURES FOR THE SUBMISSION, RECEIPT, AND ANALYSIS OF
## BIDS IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS

On July 1, 2025, the above-captioned debtors and debtors in possession (the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of New Jersey (the "**Court**").

On [●], 2025, the Court entered the *Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief* [Docket No. ●] (the "**Bidding Procedures Order**"),[2] by which the Court approved the following procedures (these "**Bidding Procedures**") setting forth the process by which the Debtors are authorized to solicit bids for and conduct an auction (the "**Auction**") for a sale or disposition (collectively, the "**Sale**," and each, a "**Sale Transaction**") of all or substantially all of the Debtors' Assets (as defined herein) or any portion thereof.

---

[1]    The last four digits of Debtor Del Monte Foods Corporation II Inc.'s tax identification number are 1894.  A complete list of the Debtors in these Chapter 11 Cases and their respective tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent, at https://cases.stretto.com/DelMonteFoods. The location of the Debtor Del Monte Foods Corporation II Inc.'s principal place of business and the Debtors' service address is 205 North Wiget Lane, Walnut Creek, California 94598.

[2]    Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Bidding Procedures Order.

The Restructuring Support Agreement, dated as of July 1, 2025 (the "**RSA**") contemplates that in connection with the Sale Transaction, the Debtors will sell the Acquired Assets (as defined herein) to the Successful Bidder(s) (defined herein) in accordance with the Bidding Procedures Order.  If there is no third-party Successful Bidder, the Stalking Horse Bidder (as defined herein) shall be designated the Successful Bidder and shall purchase the Assets in accordance with the terms of the RSA and the Stalking Horse Purchase Agreement, attached to the Bidding Procedures Order (the "**Stalking Horse Purchase Agreement**").  Approval of the Sale will occur by order entered by the Bankruptcy Court approving the Sale Transaction (the "**Sale Order**") or, solely if mutually agreed to by the Required Consenting Lenders (as defined in the RSA) and the Debtors if necessary to maintain tax attributes, section 1129(b)(2)(A)(ii) of the Bankruptcy Code, as applicable, and otherwise conducted pursuant to the Bidding Procedures.

> Copies of the Bidding Procedures Order or any other documents in the Debtors' chapter 11 cases are available upon request to Stretto by calling (833) 228-5497 (Toll-Free) and (714) 263-3709 (International) or visiting the Debtors' restructuring website at https://cases.stretto.com/DelMonteFoods.

## I.     Key Dates.

The key dates for the sale process are as follows. In accordance with the Bidding Procedures Order, the Debtors, after consultation with the Consultation Parties (as defined herein), may extend any of the deadlines, or delay any of the applicable dates, in these Bidding Procedures (subject to the milestones set forth in the DIP Orders, DIP Credit Agreements, and RSA (including the consent rights set forth therein)):[3]

| Event | Proposed Date |
|---|---|
| Filing of Stalking Horse Purchase Agreement | July 25, 2025 (or the date that is three (3) days prior to the Bidding Procedures Objection Deadline) |
| Bidding Procedures Objection Deadline | July 28, 2025 at 4:00 p.m. EST |
| Finalize Key Sale Process Materials[4] | July 31, 2025 |
| Bidding Procedures Hearing | August 4, 2025 (or such other date as set by the Court) |

---

[3]   The "DIP Orders" refers to the (i) *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 59], and (ii) any order of this Court approving the foregoing order on a final basis.

[4]   Key Sale Process Materials include a Confidential Information Memorandum, Forecast Model, Buyer's List, and Process Letter.

| Event | Proposed Date |
|---|---|
| Non-Binding Indications of Interest Deadline | August 20, 2025 |
| Bid Deadline | September 15, 2025 at 5:00 p.m. EST |
| Auction Date | September 19, 2025 at 10:00 a.m. EST |
| Sale Objection Deadline | Seven (7) days before the Sale Hearing at 5:00 p.m. EST, or September 23, 2025 at 5:00 p.m. EST |
| Sale Hearing | September 30, 2025, subject to the Court's availability[5] |

## II.    Assets to be Auctioned.

The Debtors are seeking to sell all of their assets, or any portion thereof.  These assets include, but are not limited to, the Debtors' going-concern business, unexpired leases, executory contracts, equipment, inventory, supplies, intellectual property, causes of action, insurance proceeds, prepaid expenses and deposits, and books and records, in each case, free and clear of all liens, claims, interests, or other encumbrances (collectively, the "**Assets**") to the fullest extent permitted by the Bankruptcy Code and any applicable non-bankruptcy law.

## III.    Public Announcement of Auction.

As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall (i) serve on the parties that receive notice of the Motion, including the Consultation Parties (as defined herein), a notice (A) setting forth (I) the date, time, and place of the (a) Auction and (b) the Sale Hearing (as defined below) and (II) the deadlines and procedures for objecting to the proposed Sale Transaction(s), and (B) the Bidding Procedures Order and the Bidding Procedures in the form attached to the Bidding Procedures as **Schedule 1** (the "**Auction Notice**"); (ii) publish the Auction Notice, with any modifications necessary for ease of publication, on one occasion in the national edition of The Wall Street Journal, The New York Times, USA Today, or another publication of similar circulation, as determined by the Debtors, to provide notice to any other potential interested parties; and (iii) post the Auction Notice on their case website (https://cases.stretto.com/DelMonteFoods).  The Auction Notice shall include a complete list and general description of the Assets for sale (such Assets, the "**Acquired Assets**").  The Debtors and/or their advisors may likewise contact individual parties with respect to the Sale of the Acquired Assets and provide such other information as they deem necessary and appropriate.

## IV.    Potential Bidder Requirements.

To participate in the bidding process or otherwise be considered for any purpose hereunder, including to receive access to due diligence materials, a person or entity interested in purchasing the Assets or part of the Assets (a "**Potential Bidder**") must deliver or have previously delivered

---

[5]    For the avoidance of doubt, the Milestone (as defined in the RSA) for entry of the Sale Order shall be two (2) days following the Sale Hearing.

to the Debtors' Advisors[6] the following preliminary documentation (collectively, the
"**Preliminary Bid Documents**"):

     a. an executed confidentiality agreement (a "**Confidentiality Agreement**") in form
and substance acceptable to the Debtors;[7]

     b. sufficient information that the Potential Bidder has or can reasonably obtain the
financial capacity to close a purchase of any portion, all, or substantially all of the
Debtors' Assets, the adequacy of which must be acceptable to the Debtors, in
consultation with the Consultation Parties;

     c. a statement that the Potential Bidder has a *bona fide* interest in submitting a Partial
Bid (defined below) (including an identification of which business unit(s) or assets
such party is interested in submitting a Partial Bid for) or a statement that Potential
Bidder has a *bona fide* interest in submitting a Bid (defined below) on all or
substantially all of the Acquired Assets;

     d. the identification of the Potential Bidder and any principals and representatives
thereof (including counsel), including by identifying those principals and
representatives who are authorized by the Potential Bidder to appear and act on
such Potential Bidder's behalf for all purposes under these Bidding Procedures
regarding the Potential Bidder's contemplated Sale Transaction; and

     e. a description of any and all connections the Potential Bidder (including its affiliates
and any related persons) may have to the Debtors, any current or former directors
and officers of the Debtors, the Debtors' non-Debtor affiliates (including any and
all parent companies), and the Debtors' primary creditors as identified by the
Debtors.

The Debtors, in consultation with their advisors, will determine and notify each Potential
Bidder whether such Potential Bidder has submitted adequate documents so that such Potential
Bidder may proceed to conduct due diligence and submit a Bid (such Potential Bidder, an
"**Acceptable Bidder**"); provided that the Debtors shall notify any Potential Bidder that has not
submitted adequate Preliminary Bid Documents so that such party has the opportunity to remedy
any inadequacies and become an Acceptable Bidder.  The Debtors shall promptly inform the
Consultation Parties of any entity that becomes an Acceptable Bidder.  Notwithstanding anything
to the contrary herein, the Stalking Horse Bidder, and any of its designees, shall be an Acceptable
Bidder.

---

[6]   The Debtors' Advisors refers to the Debtors' proposed (a)  counsel, HSF Kramer: Adam C. Rogoff
(Adam.Rogoff@hsfkramer.com), Rachael L. Ringer (Rachael.Ringer@hsfkramer.com), Megan M. Wasson
(Megan.Wasson@hsfkramer.com), and Andrew W. Pollack (Andrew.Pollack@hsfkramer.com), and (b)
investment banker, PJT, Attn: David Tcholakian (Tcholakian@pjtpartners.com), Benjamin Brash
(Ben.Brash@pjtpartners.com), Sandeep Chhabra (Sandeep.Chhabra@pjtpartners.com), and Carly Devereux
(Carly.Devereux@pjtpartners.com).

[7]   Potential Bidders may obtain a copy of the Confidentiality Agreement by contacting the Debtors' Advisors.

There shall be no communications regarding the Debtors' sale process between and amongst Potential Bidders or Acceptable Bidders (including, for the avoidance of doubt, the Stalking Horse Bidder), or between Potential Bidders or Acceptable Bidders, on the one hand, and the Consultation Parties, on the other hand, unless the Debtors have previously authorized such communication in writing (email being sufficient); provided that nothing in this paragraph or any Confidentiality Agreement will preclude the Stalking Horse Bidder from communicating with the Debtors, or the Consultation Parties on matters unrelated to Competing Bid Information (as defined herein), and such communication shall not result in the disqualification of the Stalking Horse Bidder as an Acceptable Bidder or a Qualified Bidder. The Debtors reserve the right, in their reasonable business judgment and in consultation with the Consultation Parties, to disqualify any Potential Bidders or Acceptable Bidders that have communications between and amongst themselves, or with a Consultation Party, without the Debtors' consent.

**V.    Non-Binding Indications of Interest.**

In addition to receiving the information noted in Section IV, above, prior to the deadline for the submission of Non-Binding Indications of Interest (the "**Non-Binding Indication of Interest Deadline**"), a Potential Bidder is required to submit a non-binding written indication of interest ("**Non-Binding Indication of Interest**") specifying the following terms for an indicative proposal (an "**Indicative Proposal**"):

    a.  the amount and type of consideration to be offered;

    b.  whether any external financing is required in connection with the Indicative Proposal and, if so, the sources of such external financing and status of commitments (including the expected amount, timing, and process) from such sources for the amount of financing required to complete the Sale Transaction;

    c.  the level of review that the Indicative Proposal has received within your organization and any additional approvals (board, shareholders, investment committee, legal, regulatory or otherwise) needed to be obtained to complete the Sale Transaction, including an outline of the process and expected timing for obtaining all internal and external approvals, execution of definitive documentation, and consummation of the proposed Sale Transaction;

    d.  a description of the estimated time required to complete due diligence review of the Company, obtain all necessary internal and external approvals, execute a definitive agreement and close the Transaction and any other material conditions or contingencies needed to be satisfied after execution of definitive documentation prior to closing and timing;

    e.  names of any advisors (including financial, legal, and accounting advisors) that have been or will be retained to provide assistance in connection with the proposed Sale Transaction; and

    f.  any other material information, assumptions or conditions.

Notwithstanding the foregoing, the Debtors, in consultation with the Consultation Parties, shall retain the ability to consider a Qualified Bid that is submitted by the Bid Deadline by a Potential Bidder who did not submit a Non-Binding Indication of Interest by the Non-Binding Indication of Interest Deadline.

## VI.    Obtaining Due Diligence Access.

Only Acceptable Bidders (including the Stalking Horse Bidder) shall be eligible to receive due diligence information, access to the Debtors' electronic data room (the "**Data Room**"), and additional non-public information regarding the Debtors.  ***No Acceptable Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement.***  Beginning on the date the Debtors determine that a party is an Acceptable Bidder, or as soon as reasonably practicable thereafter, the Debtors will provide such Acceptable Bidder with access to an electronic Data Room and reasonable due diligence information, as requested by such Acceptable Bidder, as soon as reasonably practicable after such request.  The Debtors shall post substantially all written due diligence provided to any Acceptable Bidder to the Debtors' electronic Data Room for the benefit of all Acceptable Bidders.  To the extent the Debtors provide any material written information to an Acceptable Bidder that the Debtors had not previously provided to a Consultation Party, the Debtors shall make such information available to such Consultation Party.

The Debtors may withhold or limit access by any Acceptable Bidder (including its affiliates and any related persons) to the Data Room or other due diligence materials at any time and for any reason, including, without limitation, if (a) any due diligence information is determined to be business sensitive, proprietary, or otherwise not appropriate for disclosure to an Acceptable Bidder by the Debtors, including, but not limited to, Acceptable Bidders who are customers or competitors of the Debtors or affiliates thereof, and other industry participants, (b) the Potential Bidder does not become, or the Debtors determine that the Acceptable Bidder is not likely to become a Qualified Bidder (as defined herein), (c) the Acceptable Bidder violates the terms of its Confidentiality Agreement, (d) the Debtors become aware that the information set forth on the Preliminary Bid Documents is inaccurate or misleading or of any other reason to doubt such Acceptable Bidder's ability to close its contemplated transaction, (e) the Acceptable Bidder (including its affiliates and any related persons) uses information obtained from the Data Room or the diligence process in connection with, or related to, any litigation or other legal action related to any Debtor, any current or former directors and officers of the Debtors, the Debtors' non-Debtor affiliates, and the Debtors' primary creditors as identified by the Debtors, (f) such disclosure would jeopardize protections afforded any Debtor or primary creditor as identified by the Debtors under the attorney-client privilege or the attorney work product doctrine, or (g) the bidding process is terminated in accordance with its terms.

Acceptable Bidders will not, directly or indirectly, contact or initiate or engage in discussions with respect to matters relating to the Debtors or a potential transaction with any customer, supplier, or other contractual counterparty of the Debtors without the prior written consent of the Debtors.  The due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not furnish any confidential information relating to the Debtors or a potential

transaction to any person except an Acceptable Bidder or such Acceptable Bidder's duly authorized representatives to the extent provided in an applicable Confidentiality Agreement.

The Debtors and their advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate a Sale Transaction. Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors (in consultation with the Consultation Parties) regarding the ability of such Qualified Bidder to consummate its contemplated transaction. Failure by a Qualified Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors (in consultation with the Consultation Parties) to determine that such bidder is no longer a Qualified Bidder or that a Bid made by such bidder is not a Qualified Bid.

For any bidder who is a competitor or customer of the Debtors or is affiliated with any competitors or customers of the Debtors, the Debtors reserve the right to withhold or modify any diligence materials that the Debtors and their advisors determine, in good faith and in the exercise of their business judgment, are business-sensitive or otherwise inappropriate for disclosure to such bidder.

A.    ***Communications with Acceptable Bidders (Including Qualified Bidders).***

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive direct communications, including any diligence requests, with Acceptable Bidders (including any Qualified Bidders) shall be made through the Debtors' Advisors, except as otherwise agreed.

B.    ***Due Diligence from Acceptable Bidders (Including Qualified Bidders).***

Each Acceptable Bidder (including any Qualified Bidder) shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors and their respective advisors, regarding the ability of such Acceptable Bidder (including any Qualified Bidder) to consummate its contemplated transaction. Failure by an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder) to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, to determine that such bidder is no longer an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder) or that a bid made by such bidder is not a Qualified Bid.

> All requests for additional information and due diligence access on behalf of the Debtors will be handled by the following contacts at PJT: David Tcholakian (Tcholakian@pjtpartners.com), Benjamin Brash (Ben.Brash@pjtpartners.com), Sandeep Chhabra (Sandeep.Chhabra@pjtpartners.com), and Carly Devereux (Carly.Devereux@pjtpartners.com).

## VII.   Qualified Bid Requirements.

To participate in the Auction, an Acceptable Bidder must deliver to the Debtors and their advisors an irrevocable offer via email (in .pdf or similar format) for the purchase of some or all of the Assets (each, a "**Bid**"), and shall meet the following criteria, in each case, on or prior to the Bid Deadline (as defined herein):

a. *Purchased Assets and Assumed Liabilities*:  Each Bid must clearly state the following: (a) the particular Assets, or the portion thereof identified with reasonable specificity, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt and cure costs to be assumed; and (c) as applicable, whether the Acceptable Bidder intends to operate the Debtors' business as a going concern;

b. *Partial Bidders*:  Acceptable Bidders that indicate an intent to submit a bid to purchase one or more, but not all of the, Debtors' assets and/or business units will be considered "**Acceptable Partial Bidders**," and such bids will be referred to as "**Partial Bids**";

c. *Good Faith Deposit*:  Except with respect to any credit bid (including a credit bid by the Stalking Horse Bidder), the Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Good Faith Deposit**").  To the extent that a Bid is modified at or prior to the Auction, the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals 10% of the increased aggregate purchase price promptly and in no event later than one (1) business day following the conclusion of the Auction;

d. *Purchase Price*:  Each Bid must (a) clearly set forth the purchase price to be paid, assuming a purchase of the applicable Assets and any assumption of liabilities (the "**Purchase Price**"), (b) identify separately the cash and non-cash components of the Purchase Price, and (c) indicate the allocation of the Purchase Price among the applicable Assets; provided that, for the avoidance of doubt, such allocation shall not prejudice the rights of any party in interest to contest such allocation.  The Purchase Price should be a single point value in U.S. Dollars for the applicable Assets on a cash-free, debt-free basis.  Any Bid for substantially all of the Assets must also include a statement as to whether the Bid is conditioned on purchasing all Assets or whether the Qualified Bid should be viewed as a separate Bid for one or more sets of Assets.  For any Bid for ABL Priority Collateral, such bid must provide for such treatment of the DIP ABL Obligations satisfactory to the DIP ABL Agent and the requisite DIP ABL Lenders (in their sole discretion);

e. *Wind-Down Budget*:  The Bid must (a) provide an estimate as to the anticipated costs of the wind-down of the Debtors' operations and payments following the closing of the Sale based on what assets and liabilities the Acceptable Bidder intends to retain (the "**Wind-Down Budget**"), (b) ensure that the Debtors will retain sufficient cash to fund such costs in a manner at least as equivalent to the Wind-

Down Budget agreed to by the Debtors and the Stalking Horse Bidder, (c) contain a statement that the Acceptable Bidder understands and accepts that the Sale is contingent upon the approval by the Debtors of an acceptable Wind-Down Budget, and (d) provide a transition services agreement or similar arrangement acceptable to the Debtors to assist with the wind down of the Debtors' operations;

f. ***Same or Better Terms; Bid Documents***:  Each Bid must include duly executed and non-contingent, where applicable, transaction documents necessary to effectuate the transactions contemplated in the Bid (the "**Bid Documents**").   The Bid Documents shall include: (i) a form of purchase agreement; (ii) a schedule of contracts and leases to be assumed and assigned to the bidder at closing to the extent applicable to the Bid, and confirmation that the bidder will be responsible for any cure costs associated with such assumption, and include a good faith estimate of such cure costs (which estimate may be provided by the Debtors); (iii) the identification of causes of action to be purchased, if any; (iv) with respect to the purchase agreement, a redline of such agreement marked against the Stalking Horse Purchase Agreement to reflect the amendments and modifications; (v) any other material documents integral to such Bid; and (vi) a statement from the Acceptable Bidder that (A) it is prepared to enter into and consummate the transactions contemplated in the form purchase agreement, no later than ten (10) business days after the conclusion of the Auction, subject to any necessary regulatory approvals, as specified by the Acceptable Bidder (or, if no Auction is held, the deadline by which all Qualified Bids must be actually received pursuant to the Bidding Procedures (the "**Bid Deadline**")), and (B) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or next highest or otherwise best bid (the "**Back-Up Bid**")) until the consummation of the Sale Transaction;

g. ***No Qualified Bidder Bid Protections***:  A Qualified Bid must include a statement disclaiming any right to receive a fee analogous to a break-up fee, expense reimbursement, or "topping" or termination fee, or any other similar form of compensation. No Qualified Bidder (including the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code related to bidding for the applicable Assets;

h. ***Employee and Pension Obligations***:  Each Bid must (1) indicate whether the Acceptable Bidder intends to hire all employees who are primarily employed in connection with the applicable Assets included in such Bid, (2) contain a description of how the Acceptable Bidder intends to treat pension plans operated by the Debtors, including the potential assumption thereof, (3) contain a statement of proposed terms with respect to the Debtors' collective bargaining agreements and labor unions with respect to the applicable Assets included in such Bid, and (4)

expressly propose the treatment of the Debtors' other prepetition compensation, incentive, retention, bonus or other compensatory arrangements, plans, or agreements, including offer letters, employment agreements, consulting agreements, severance arrangements, retention bonus agreements, change in control agreements, retiree benefits, and any other employment-related agreements, in each case, as applicable to the Debtors.  The Acceptable Bidder must include a description of the Acceptable Bidder's intentions with respect to the relevant members of the Debtors' current management team and other employees who are primarily employed in connection with the applicable Assets, and a description of any contemplated incentive plan, to the extent applicable;

i.  ***Proof of Financial Ability to Perform; Sources of Financing***:  To the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Sale Transaction set forth in its Bid with cash on hand, the Bid must include committed financing, documented to the Debtors' satisfaction, in consultation with the Consultation Parties, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Sale Transaction and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, and shall include (i) contact names, telephone numbers, and email addresses for verification of financing sources; (ii) proof of fully executed and effective financing commitments with limited conditionality customary for transactions of the proposed Sale Transaction's type from one or more reputable financing sources in an amount equal to the consideration offered through the Bid; and (iii) any other financial disclosure requested by the Debtors demonstrating an ability to timely close the Sale Transaction in accordance with the Bidding Procedures;

j.  ***Contingencies; No Financing or Diligence Outs***:  The Bid must not contain any contingencies as to the validity, effectiveness, or binding nature of the Bid, including, without limitation, contingencies for due diligence and inspection or financing of any kind (including any conditions pertaining to financial performance, conditions, or prospects) and all diligence must be completed before the Bid Deadline;

k.  ***Identity***:  Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered to complete the transactions on the terms contemplated by the parties.  Each Bid must also include contact information for the specific person(s) whom PJT and HSF Kramer should contact regarding such Bid;

l.  ***As-Is, Where-Is***:    Each Bid must include a written acknowledgement and representation that the Acceptable Bidder: (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Acceptable Bidder's proposed purchase agreement;

m.  ***Authorization***:    Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.    The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder;

n.  ***Joint Bids***:    No joint bids or consortium bids are permitted unless expressly authorized by the Debtors, in consultation with the Consultation Parties;

o.  ***Adequate Assurance of Future Performance***:    Each Bid must (i) identify any executory contracts (the "**Executory Contracts**") and any unexpired leases (the "**Unexpired Leases**") to be assumed or assumed and assigned in connection with the proposed Sale Transaction, (ii) provide for the payment of all cure amounts (the "**Cure Payments**") related to such Executory Contracts and Unexpired Leases by the Acceptable Bidder, (iii) demonstrate, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties (as defined herein), that the Acceptable Bidder can provide adequate assurance of future performance under all such Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code, and (iv) provide the following documentation:

1.  The legal name of the proposed assignee of Unexpired Leases (the "**Proposed Assignee**") and any guarantors, as applicable;

2.  Financial statements for the calendar or fiscal years ended 2023 and 2024, and interim financial statements for 2025, for the Proposed Assignee and any guarantors, as applicable, and other financial information about the Proposed Assignee to demonstrate its ability to provide adequate assurance of future performance; and

3.  Summary documentation regarding the Proposed Assignee's and any guarantor's, as applicable, retail experience and present retail operations;

p. ***Acknowledgement of Compliance with Bidding Procedures, Bidding Procedures Order, Bankruptcy Code, and Non-Bankruptcy Law***: Each Bid must acknowledge its compliance in all respects with these Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code and any applicable non-bankruptcy law;

q. ***No Collusion***: The Acceptable Bidder must acknowledge in writing (i) that it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code or other applicable non-bankruptcy law with respect to any Bids or the Sale Transaction, specifying that it did not agree with any Acceptable Bidders or Potential Bidders to control price; and (ii) agree not to engage in any collusion with respect to any Bids, the Auction, or the Sale Transaction. For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (email being sufficient);

r. ***Good Faith Offer***: The Bid must constitute a good faith, *bona fide* offer to consummate the Sale Transaction and must include a statement that the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code;

s. ***Irrevocable***: The Bid must include a letter stating that the Acceptable Bidder's offer is irrevocable and binding until the closing of the Sale if such Acceptable Bidder is the Successful Bidder, and that the Acceptable Bidder agrees to serve as a Backup Bidder (as defined herein) if such bidder's Bid is selected as the next highest or otherwise next best bid after the Successful Bid (as defined herein);

t. ***Back-Up Bid***: Each Bid shall provide that the Acceptable Bidder will serve as a Back-Up Bidder (as defined herein) if the Acceptable Bidder's Bid is the next highest or otherwise best bid;

u. ***Regulatory Approvals and Covenants***: A Bid must set forth each regulatory and third-party approval required for the Acceptable Bidder to consummate the applicable Sale Transaction, if any, and the time period within which the Acceptable Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the applicable purchase agreement and/or confirmation of the Plan, those actions the Acceptable Bidder will take to ensure receipt of such approvals as promptly as possible);

v. ***Expected Closing Date***: Each Bid must state the Acceptable Bidder's expected date of closing of the Sale Transaction;

w. ***Time Frame for Closing***: A Bid by an Acceptable Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined

12

herein), within a time frame acceptable to the Debtors, in consultation with the Consultation Parties. The Acceptable Bidder must commit to closing the proposed Sale(s) contemplated by the Bid as soon as practicable subject to any potential regulatory issues that may arise as set forth above;

x. ***No Fees***: Each Acceptable Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction, and by submitting its Bid(s) is agreeing to disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or other similar form of compensation; *provided, however,* that nothing in these Bidding Procedures shall limit, alter or impair the rights of any party to payment and reimbursement of expenses that are set forth in the DIP Orders;

y. ***Adherence to the Bidding Procedures***: By submitting its Bid, each Acceptable Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction;

z. ***Consent to Jurisdiction***: The Acceptable Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, to the Auction, the Sale, the Sale Transaction(s) and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, and the Closing, as applicable;

aa. ***Conditions to Closing***: Each Bid must identify with particularity each and every condition to closing, including the Executory Contracts and Unexpired Leases for which assumption and assignment is required; and

bb. ***Other Information***: Each Bid must contain such other information as may be reasonably requested by the Debtors and the Consultation Parties with such requests made through the Debtors.

Only Bids fulfilling all of the preceding requirements contained in this section may, or otherwise in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, be deemed to be "**Qualified Bids**," and only those parties submitting Qualified Bids may, at the Debtors' reasonable business judgment, in consultation with the Consultation Parties, be deemed to be "**Qualified Bidders**."

Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures;

provided that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Neither the Debtors nor any of their advisors are making or have at any time made any warranties or representations of any kind or character, express or implied, with respect to the Assets, including, but not limited to, any warranties or representations as to operating history or projections, valuation, governmental approvals, the compliance of the Assets with governmental laws, the truth, accuracy, or completeness of any documents related to the Assets, or any other information provided by or on behalf of the Debtors to a bidder, or any other matter or thing regarding the Assets.  All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer to the Successful Bidder and the Successful Bidder shall accept the applicable Assets, except to the extent expressly provided in the Bankruptcy Court's order approving the Sale Transaction.  The Debtors and the Consultation Parties, and each of their representatives and advisors, are not responsible for, and will bear no liability with respect to, any information obtained by any Acceptable Bidder in connection with any Sale or Sale Transaction.  Neither the Debtors nor any of their advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to the Assets or relating thereto that the Debtors, any advisor, or agent representing or purporting to represent the Debtors to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the Debtors only) specifically set forth in the Bankruptcy Court's order approving the Sale Transaction.

As soon as reasonably practicable after the Bid Deadline and prior to the Auction, the Debtors, in consultation with the Consultation Parties, shall determine which Acceptable Bidders are Qualified Bidders and will notify the Acceptable Bidders whether Bids submitted constitute Qualified Bids, which will enable such Qualified Bidders to participate in the Auction.  Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors; *provided* that if the Debtors receive a Bid prior to the Bid Deadline that does not satisfy the requirements of a Qualified Bid, the Debtors may provide the Acceptable Bidder with the opportunity to remedy any deficiencies prior to the Auction.  The Debtors may waive or modify any of the above requirements in the exercise of their reasonable business judgment.

Notwithstanding anything to the contrary in the Bidding Procedures, the Stalking Horse Bidder shall be deemed to be a Qualified Bidder, and the Stalking Horse Bid shall be deemed to be a Qualified Bid, such that the Stalking Horse Bidder shall not be required to submit an additional Qualified Bid. If the Stalking Horse Bid is chosen as the Successful Bid, the rights and obligations of the Stalking Horse Bidder shall be as set forth in the Stalking Horse Purchase Agreement. If the Stalking Horse Bid is selected as the Backup Bid (as defined herein), it must remain irrevocable only for so long as is required under the Stalking Horse Purchase Agreement.  Notwithstanding anything to the contrary in the Bidding Procedures, to the extent that any DIP ABL Agent or DIP ABL Lender submits a credit bid in accordance with Section VIII herein, and such credit bid is otherwise permitted by and in accordance with the DIP ABL Documents, such bid shall be a Qualified Bid, and such applicable DIP ABL Agent or DIP ABL Lender shall be a Qualified Bidder with respect to such Bid.

## VIII.    Right to Credit Bid.

Subject to the Prepetition Intercreditor Agreement (as defined in the DIP Documents) and any other intercreditor agreements that may then be in effect, any Qualified Bidder who has a valid and perfected lien on any Assets of the Debtors' estates, including the Stalking Horse Bidder (each, a "**Secured Creditor**") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; provided that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured, subject to the terms of any credit agreement or attendant debt documents governing such Secured Creditor's right to credit bid.

Notwithstanding anything to the contrary contained herein, but subject to the Prepetition Intercreditor Agreement (as defined in the DIP Documents) and any other intercreditor agreements that may then be in effect, the Ad Hoc Term Lender Group shall have the right to credit bid (including through a direction to the applicable agent under the DIP Term Loan Credit Agreement, DIP Term Loan Documents, Super-Senior Credit Agreement, and Super-Senior Documents) all or a portion of the aggregate amount of their applicable outstanding secured obligations pursuant to section 363(k) of the Bankruptcy Code, and any such credit bid will be considered a Qualified Bid to the extent such bid is received by the Bid Deadline and complies with section 363(k) of the Bankruptcy Code.  For the avoidance of doubt, any credit bid of the obligations under the DIP Term Loan Credit Agreement and/or the Super-Senior Credit Agreement can only be directed or otherwise undertaken through a direction by the Requisite Lenders (as defined in the DIP Term Loan Credit Agreement and/or Super-Senior Credit Agreement, as applicable) to the agent.

For the avoidance of any doubt and notwithstanding anything to the contrary contained herein, but subject to the Prepetition Intercreditor Agreement (as defined in the DIP Documents) and any other intercreditor agreements that may then be in effect, the Required DIP ABL Lenders shall have the right to credit bid for ABL Priority Collateral (including through a direction to the applicable agent) at or prior to the Auction all or portion of the aggregate amount of their applicable outstanding secured obligations pursuant to section 363(k) of the Bankruptcy Code, and any such credit bid will be considered a Qualified Bid to the extent such Bid complies with section 363(k) of the Bankruptcy Code.  For the avoidance of doubt, any credit bid of the obligations under the DIP ABL Credit Agreement and/or the Prepetition ABL Credit Agreement can be directed or otherwise undertaken through a direction by the Required DIP ABL Lenders to the DIP ABL Agent or the Prepetition ABL Credit Agreement, as applicable.

## IX.    Bid Deadline.

Qualified Bids must be submitted in writing to the following parties (the "**Bid Notice Parties**") so as to be **actually received** no later than 5:00 p.m. (prevailing Eastern Time) on September 15, 2025 (the "**Bid Deadline**"):

A.    Proposed co-counsel to the Debtors, HSF Kramer, 1177 Avenue of the Americas, New York, NY 10036, Attn: Adam C. Rogoff (Adam.Rogoff@hsfkramer.com), Rachael L. Ringer (Rachael.Ringer@hsfkramer.com), Megan M. Wasson (Megan.Wasson@hsfkramer.com), and Andrew W. Pollack (Andrew.Pollack@hsfkramer.com);

B.  Proposed co-counsel to the Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, NJ 07601, Attn: Michael D. Sirota (msirota@coleschotz.com), David M. Bass (dbass@coleschotz.com), and Felice R. Yudkin (fyudkin@coleschotz.com); and

C.  Proposed investment banker to the Debtors, PJT Partners ("**PJT**"), 280 Park Avenue, New York, NY 10017, Attn: David Tcholakian (Tcholakian@pjtpartners.com), Benjamin Brash (Ben.Brash@pjtpartners.com), Sandeep Chhabra (Sandeep.Chhabra@pjtpartners.com), and Carly Devereux (Carly.Devereux@pjtpartners.com).

The Debtors may extend the Bid Deadline for any reason whatsoever, in their reasonable business judgment, in consultation with the Consultation Parties and the Stalking Horse Bidder, for all or certain Acceptable Bidders.

## X.  Evaluation of Qualified Bids.

The Debtors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' business judgment, and in consultation with the Consultation Parties, the highest or otherwise best Qualified Bid or combination of Qualified Bids for any Assets (the "**Starting Bid**"). The Debtors shall promptly provide to the Consultation Parties copies of all Bids received by the Debtors, including the Starting Bid, but in no event later than the next business day following receipt; *provided* that the Consultation Parties must treat such Bids and any related information as confidential and shall not publicly disclose such information without the written consent of the Debtors and the applicable bidder.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors, in addition to any other factors that the Debtors deem appropriate: (a) the amount and nature of the total consideration; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents; (d) the tax consequences of such Qualified Bid; and (e) the impact on employees, the number or percentage of employees to be retained post-closing, employee claims against the Debtors, and the treatment of the Debtors' collective bargaining agreements, retiree benefits, and pension plans. In addition, the Debtors may consider the transaction structure and execution risk, including conditions to, timing of, and certainty of closing (including the closing of multiple Partial Bids within a reasonable time of one another). Prior to commencing the Auction, the Debtors shall notify the Stalking Horse Bidder, and all Qualified Bidders as to which Qualified Bid is the Starting Bid for the Auction with respect to the applicable assets. At such time, the Debtors shall also distribute copies of the Starting Bid to the Stalking Horse Bidder, and each Qualified Bidder.

## XI.  No Qualified Bids.

If no Qualified Bids other than the Bid submitted by the Stalking Horse Bidder (the "**Stalking Horse Bid**") are received for the Assets included in the Stalking Horse Bid by the Bid Deadline, then the Debtors may cancel the Auction with respect to such Assets. If the Stalking

Horse Bid is the only Qualified Bid received by the Bid Deadline, the Debtors may decide, in their reasonable business judgment, after consultation with the Consultation Parties, to designate the Stalking Horse Bid as the Successful Bid (as defined herein) as to the applicable Assets and pursue entry of an order approving a Sale Transaction with respect to such Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement. The Debtors shall promptly file notice of any cancellation of the Auction and/or designation of the Stalking Horse Bid, where applicable, as the Successful Bid with the Court. The Debtors shall immediately pursue entry of an order by the Court, in form and substance acceptable to the Stalking Horse Bidder, approving the Stalking Horse Purchase Agreement and authorizing the Sale to the Stalking Horse Bidder at the Sale Hearing (as defined herein).

### XII.    Auction.

Other than as expressly set forth herein, if the Debtors receive more than one Qualified Bid for any particular Asset or portion of Assets by the Bid Deadline, the Debtors shall conduct the Auction to determine the Successful Bidder in their reasonable business judgment, in consultation with the Consultation Parties, with respect to such Assets or portion of Assets. If the Debtors do not receive a Qualified Bid for any particular Asset by the Bid Deadline, the Debtors will not conduct the Auction with respect to such Asset. If one or more Qualified Bids (other than the Stalking Horse Bid) are received by the Bid Deadline with respect to the applicable Assets, then the Debtors shall conduct the Auction with respect to such Assets in accordance with the Auction Procedures (as defined herein).

The Auction shall commence on September 19, 2025 at 10:00 a.m. (prevailing Eastern Time), or such later time or other place as the Debtors determine, in consultation with the Consultation Parties and the Stalking Horse Bidder.

The Auction will be conducted in accordance with the following procedures (the "**Auction Procedures**"):

    a.  the Auction will be conducted openly;

    b.  except as otherwise provided herein, only Qualified Bidders shall be entitled to bid at the auction;

    c.  the Qualified Bidders, including the Stalking Horse Bidder, must appear in person or through duly-authorized representatives at the Auction;

    d.  bidding shall begin with the Starting Bid;

    e.  subsequent bids (each, an "**Overbid**") may only be made at the Auction and shall be at least a $500,000.00 increase in cash, cash equivalents, or other such consideration that the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, deem equivalent (including the right of a Secured Creditor to credit bid any remaining amount of its secured claims) over the previous bid (a "**Minimum Overbid**"), and each successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the

Minimum Overbid.  The Debtors may, in their reasonable business judgment, in consultation with the Consultation Parties, announce increases or reductions to the Minimum Overbid at any time during the Auction and may aggregate Partial Bids for the purposes of allocating Minimum Overbid amounts.  For the avoidance of doubt, each successive Bid that a Qualified Bidder may submit at the Auction must contain a Purchase Price in cash, cash equivalents, or such other consideration that the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, deem equivalent (including the right of a Secured Creditor to credit bid any remaining amount of its secured claims) that exceeds the then existing highest Bid by at least the amount of the Minimum Overbid;

f.   at the commencement of the Auction, the Debtors, in consultation with the Consultation Parties, may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive bid(s);

g.   each Qualified Bidder will be permitted a reasonable time to respond to previous bids at the Auction, as determined by the Debtors in consultation with the Consultation Parties;

h.   during the course of the Auction, the Debtors shall, after submission of each Overbid, promptly inform each Qualified Bidder of the terms of the previous bids and inform each Qualified Bidder which Overbid(s) reflect, in the Debtors' view, in consultation with the Consultation Parties, the highest or otherwise best bid(s) for the applicable Assets;

i.   the Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;

j.   each Qualified Bidder will be required to confirm on the record that it has not engaged, and will not engage, in any collusion with respect to the bidding or any Sale Transaction;

k.   each Qualified Bidder will be required to confirm that its Bid is a good faith, *bona fide* offer and it intends to consummate the Sale Transaction if selected as the Successful Bid in accordance with these Bidding Procedures (as may be modified in accordance herewith at the Auction);

l.   the Court and the Debtors will not consider Bids made after the Auction has been closed;

m.   the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale Transaction, or (iii)

contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders;

n.  the Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction;

o.  the Debtors reserve the right, in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things, (1) facilitate discussions between the Debtors and Qualified Bidders, (2) allow Qualified Bidders to consider how they wish to proceed, and (3) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, and in consultation with the Consultation Parties, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and

p.  notwithstanding anything herein to the contrary, the Debtors may, in consultation with the Consultation Parties and the Stalking Horse Bidder, at any time choose to adjourn the Auction by announcement at the Auction.  The Debtors shall promptly file notice of such adjournment with the Court.

The Auction shall include open bidding in the presence of all other Qualified Bidders. All Qualified Bidders shall have the right to submit additional bids and make modifications to any prior Qualified Bid or Overbid at the Auction to improve their bids; provided that any Overbid made by a Qualified Bidder (including with respect to any Back-Up Bid) must remain open and binding on the Qualified Bidder until the earlier of (a) the closing of a Transaction for the applicable Assets pursuant to the Successful Bid and (b) 120 days after the date of the Sale Hearing, unless otherwise decided (in consultation with the Consultation Parties).  The Debtors may, in their reasonable business judgment (in consultation with the Consultation Parties), negotiate with any and all Qualified Bidders participating in the Auction the terms of such Qualified Bidder's respective Bids.

For the avoidance of doubt, nothing in the Auction Procedures will prevent the Debtors from exercising their respective fiduciary duties under applicable law (as reasonably determined in good faith by the Debtors, in consultation with counsel).  Any Auction rules adopted by the Debtors will not modify any of the terms of the Stalking Horse purchase agreement or the rights of the Stalking Horse Bidder, without the consent of the Stalking Horse Bidder.

Except as otherwise determined by the Debtors, in consultation with the Consultation Parties, only (i) the Debtors, (ii) the Consultation Parties, (iii) the Office of the United States Trustee, (iv) any statutory committee appointed in these Chapter 11 Cases, (v) the Qualified Bidders (including the Stalking Horse Bidder), and (vi) the respective representatives and professionals of the foregoing parties shall be entitled to attend the Auction.

**XIII.   Acceptance of Successful Bid.**

The Auction shall continue until (i) there is only one Qualified Bid or a combination of Qualified Bids that the Debtors determine, in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties and outlined below in further detail, and in consultation with the Consultation Parties, is the highest or otherwise best bid to purchase the applicable Assets (each, a "**Successful Bid**"), and (ii) the Debtors determine, in their reasonable business judgment, in consultation with the Consultation Parties, that further bidding is unlikely to result in a different Successful Bid or Successful Bids that would be reasonably acceptable to the Debtors, at which point, the Auction will be closed.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors, in consultation with the Consultation Parties, may consider the following factors in addition to any other factors that the Debtors deem appropriate: (a) the amount and nature of the total consideration, which includes but is not limited to, assumed liabilities (administrative liabilities, Cure Payments), and the amount of executory contracts and leased locations being assumed; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents; (d) the tax consequences of such Qualified Bid; and (e) any other consideration that may impact the Debtors' stakeholders.

Any Qualified Bidder that submits a Successful Bid will be deemed a "**Successful Bidder**" with respect to the Assets contemplated for the purchase pursuant to such Successful Bid. The Debtors shall promptly file notice of the Successful Bid and the Successful Bidder with the Court. Following conclusion of the Auction and selection of a Successful Bidder, the Debtors shall present the results of the Auction at a hearing (the "**Sale Hearing**") and shall seek Court approval of the Sale Order to enter into a binding purchase agreement with the Successful Bidder on the terms of the Successful Bid. For the avoidance of doubt, the Sale Order shall deem the Debtors' selection of the Successful Bid final and, subject to the designation of the Back-Up Bid, the Debtors shall not solicit and/or accept any further bids or offers to submit a bid after such selection; *provided* that, notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any Debtor to take or refrain from taking any action that the Debtors determined in good faith, in consultation with counsel, would be inconsistent with applicable law or its fiduciary obligations under applicable law. The Sale Order shall provide for such treatment of the DIP ABL Obligations satisfactory to the DIP ABL Agent and requisite DIP ABL Lenders (in their sole discretion).

Within one (1) business day of the selection of the Successful Bidder, such Successful Bidder (including any Back-Up Bidder, if applicable, but excluding the Stalking Horse Bidder) shall make a cash deposit, in addition to its Good Faith Deposit, in an amount calculated on the basis of the increased aggregate purchase price, submitted by wire transfer of immediately available funds to an escrow account to be identified and established by the Debtors pursuant to a customary and reasonable escrow agreement. Each Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts,

instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

## XIV.    Designation of Back-Up Bidder.

The Back-Up Bid to purchase any applicable Assets (the "**Back-Up Bidder**") will be determined by the Debtors at the conclusion of the Auction, in consultation with the Consultation Parties, and will be announced at that time to all the Qualified Bidders participating in the Auction. Following consultation with the Consultation Parties, the Debtors' selection of a Back-Up Bid shall be deemed final and the Debtors shall not accept any further bids or offers to submit a bid after such selection.  The Debtors will be authorized, but not required, to consummate the Transaction with the Back-Up Bidder without further order of the Court, so long as such Back-Up Bid shall have been approved in connection with the Court's approval of the Successful Bid, or subject to Court approval if not.

If for any reason a Successful Bidder fails to consummate the purchase of such assets within the time permitted, then the Back-Up Bidder will automatically be deemed to have submitted the Successful Bid for such assets, and the Back-Up Bidder shall be deemed a Successful Bidder for such assets and shall be required to consummate any Sale Transaction with the Debtors as soon as is reasonably practicable without further order of the Court, upon 24 hours advance notice filed with the Court.

The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) ninety (90) days after completion of the Auction, (ii) consummation of a Sale Transaction with one or more Successful Bidders at an Auction, and (iii) the release of such Back-Up Bid by the Debtors in writing (the "**Back-Up Termination Date**").  The Debtors shall return the Back-Up Bidder's deposit owed within five (5) business days of the Back-Up Termination Date.

## XV.    Approval of the Sale Transaction.

Subject to the Court's availability, the Sale Hearing to consider approval of each Sale Transaction is currently scheduled to take place on September 30, 2025, before the Honorable Michael B. Kaplan, at the United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Courtroom 8, Trenton, New Jersey 08608 or by such other virtual or electronic means as determined by the Court.

At the Sale Hearing certain findings will be sought from the Court regarding the Auction, including, among other things, that: (1) the Auction was conducted, and the Successful Bidder (which may be the Stalking Horse Bidder) was selected, in accordance with the Bidding Procedures; (2) the Auction was fair in substance and procedure; (3) the Successful Bid was a Qualified Bid as defined in the Bidding Procedures; and (4) consummation of any Sale Transaction as contemplated by the Successful Bid in the Auction will provide the highest or otherwise best offer for the applicable Assets and is in the best interests of the Debtors and their estates.  **The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Consultation Parties and the Stalking Horse Bidder, by sending notice to creditors or other**

**parties in interest prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.**

Objections to the Sale Transaction(s), and entry of any Sale Order approving the sale must (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and all orders of the Court; and (iii) be filed with the Court and served so as to by **actually received** by the Debtors, the Consultation Parties, the Bid Notice Parties, and the foregoing parties' respective counsel by September 23, 2025, at 5:00 p.m. (prevailing Eastern Time).

To the extent any Sale Transaction(s) are to be consummated through a chapter 11 plan, the following milestones will apply (and shall be deemed "Milestones" under the RSA and the DIP ABL Credit Agreement):

- **Deadline for Entry of Order Approving a Disclosure Statement**: 180 days after the Petition Date, subject to the Bankruptcy Court's availability
- **Deadline for Entry of Confirmation Order**: 220 days after the Petition Date, subject to the Bankruptcy Court's availability
- **Deadline for Consummation of a Chapter 11 Plan**: 240 days after the Petition Date, subject to the Bankruptcy Court's availability

## XVI.    Return of Good Faith Deposit.

The Good Faith Deposit(s) of the Successful Bidder or Successful Bidders, if any, will, upon consummation of the Successful Bid or Successful Bids, become property of the Debtors' estates and be credited to the portion of such Successful Bidder's or Successful Bidders' applicable Purchase Price.

If the Successful Bidder or Successful Bidders (or Back-Up Bidder or Back-Up Bidders, if applicable), if any, fails to consummate the Successful Bid or Successful Bids (or Back-Up Bid or Back-Up Bids, if applicable), then the Good Faith Deposit(s) of such Successful Bidder or Successful Bidders (or Back-Up Bidder or Back-Up Bidders, if applicable) will be irrevocably forfeited to the Debtors and may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors.

The Good Faith Deposits of any unsuccessful Qualified Bidders (except for any Back-Up Bidder or Back-Up Bidders and the Stalking Horse Bidder) will be returned within five (5) business days after consummation of the applicable Sale Transaction or upon the permanent withdrawal of the applicable proposed Sale Transaction.

The Good Faith Deposit(s) of any Back-Up Bidder or Back-Up Bidders, if any, will be returned to such Back-Up Bidder or Back-Up Bidders no later than five (5) business days of the Back-Up Termination Date.

All such deposits shall be held in escrow and at no time shall be deemed property of the Debtors' estates absent further order of the Court.

### XVII.  Consultation by the Debtors.

The Debtors shall consult with the Consultation Parties as explicitly provided for in these Bidding Procedures. Each reference in these Bidding Procedures to "consultation" (or similar phrase) with the Consultation Parties shall mean consultation in good faith.    The term "**Consultation Parties**" as used in these Bidding Procedures shall mean counsel to any official committee appointed in these Chapter 11 Cases and counsel and financial advisor to the DIP ABL Agent (Simpson Thacher & Bartlett LLP and FTI Consulting, Inc., respectively) (to the extent the DIP ABL Agent and/or the Required DIP ABL Lenders do not submit a credit bid).  For the avoidance of doubt, the Stalking Horse Bidder shall not be considered a Consultation Party with respect to the evaluation and qualification of competing Bids, or with respect to obtaining information about other Bids, for such assets included in the Stalking Horse Bid (the "**Competing Bid Information**"), but shall be entitled to the consultation rights for the enumerated provisions set forth herein and in the Bidding Procedures Order, and as otherwise agreed between the Debtors and the Stalking Horse Bidder.  If after the Bid Deadline, the Stalking Horse Bidder no longer has an active Qualified Bid, the Ad Hoc Term Lender Group shall be considered a Consultation Party for all purposes under these Bidding Procedures and the Bidding Procedures Order; *provided, however*, that the Stalking Horse Bidder and/or the Ad Hoc Term Lender Group, as applicable, may submit one or more additional Bids for some or all of the Acquired Assets *provided* that the Ad Hoc Term Lender Group has not been disqualified as a Qualified Bidder because it had received Competing Bid Information, and to the extent such additional Bid or Bids constitute a credit bid, such Bid or Bids shall be automatically deemed a Qualified Bid.

Notwithstanding the forgoing, the consultation rights afforded herein shall not: (i) limit the Debtors' discretion in the evaluation of bids, compliance with these procedures, and other matters at the Auction; (ii) include the right to veto any decision made by the Debtors in the exercise of their reasonable business judgment; and (iii) otherwise limit the Debtors' reservation of rights in respect of their fiduciary obligations including as described herein.

### XVIII. Reservation of Rights.

The Debtors reserve their rights to (in consultation with the Consultation Parties as set forth herein) modify these Bidding Procedures in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties in any manner that will best promote the goals of the bidding process, or impose, at or before the Auction, additional terms and conditions on the sale of the applicable Assets, including, without limitation: (1) extending the deadlines set forth in the Bidding Procedures; (2) adjourning the Auction without further notice; (3) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (4) canceling the Auction; (5) rejecting any or all Bids or Qualified Bids; and (6) adjusting the applicable minimum overbid increment; *provided* that (i) the Debtors shall not amend these Bidding Procedures, the Bidding Procedures Order, or the bidding process to modify their obligations to (a) consult with the DIP ABL Agent and the advisors to the DIP ABL Agent or (b) obtain the consent of the DIP ABL Agent and/or the Required DIP ABL Lenders, without, in case of either (a) or (b) above, the consent of the DIP ABL Agent and/or the Required DIP ABL Lenders, as applicable, and (ii) notwithstanding anything to the contrary herein, the Debtors shall

23

not adopt new rules, procedures, or deadlines, or otherwise modify these Bidding Procedures of the Bidding Procedures Order in a manner that alters, limits, or imposes additional burdens on the rights of the DIP ABL Agent and/or the Required DIP ABL Lenders, including (x) requiring the DIP ABL Agent to include a deposit as part of a credit bid (subject to the DIP Documents), (y) imposing additional conditions on their rights to credit bid (subject to the DIP Documents) or to be deemed a Qualified Bidder (and their Bids deemed to Qualified Bids), or (z) modifying the requirement that a Qualified Bid (including, for the avoidance of doubt, the Stalking Horse Bid or any other Bid deemed to be a Qualified Bid) must provide for such treatment of the DIP ABL Obligations satisfactory to the DIP ABL Agent and the requisite DIP ABL Lenders (in their sole discretion).  All such modifications and additional rules will be communicated in advance to each of the Consultation Parties and the U.S. Trustee, Acceptable Bidders and Qualified Bidders; *provided, further,* that, to the extent such modifications occur at the Auction, disclosure of such modifications shall be limited to those in attendance at the Auction.  If the U.S. Trustee, the DIP ABL Agent, or any official committee of unsecured creditors appointed in these cases determines in good faith that any modification to these Bidding Procedures of the Bidding Procedures Order, or any adoption of new rules, procedures or deadlines, would not be consistent with this paragraph, the U.S. Trustee, the DIP ABL Agent and/or the Required DIP ABL Lenders, or any such committee may seek expedited review before the Bankruptcy Court.  For the avoidance of doubt, the Debtors  retain the right to cancel the Auction and proceed with a private sale transaction.

## XIX.    Consent to Jurisdiction.

All Qualified Bidders at the Auction will be deemed to have consented to the core jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the Sale, the Sale Transaction(s) and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to the Sale any Sale Transaction if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Court on an expedited basis.

## XX.    Fiduciary Out.

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor or any non-Debtor affiliate to take any action or to refrain from taking any action related to any Sale Transaction or with respect to these Bidding Procedures, to the extent such Debtor, board of director, board of managers, or such similar governing body reasonably determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

## **Schedule 1**

Auction Notice

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff, Esq. (admitted *pro hac vice*)
Rachael L. Ringer, Esq. (admitted *pro hac vice*)
Megan M. Wasson, Esq. (admitted *pro hac vice*)
Andrew W. Pollack, Esq. (*pro hac vice* forthcoming)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| Del Monte Foods Corporation II Inc., *et al.*, | ) |
|  | ) Case No. 25-16984 (MBK) |
| Debtors.[1] | ) |
|  | ) (Jointly Administered) |
|  | ) |

## NOTICE OF SALE BY AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE** that on [●], 2025, the United States Bankruptcy Court for the District of New Jersey (the "**Court**") entered the *Order (I) Approving the Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale of Assets, and (VI) Granting Related Relief* [Docket No. ●] (the "**Bidding Procedures Order**"),[2] in the chapter 11 cases of the above-captioned debtors and debtors in possession (the "**Debtors**").

**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of substantially all or a portion of the Assets consistent with the bidding procedures (the "**Bidding Procedures**") approved by the Court pursuant to the Bidding Procedures Order. All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order. To the extent that there are any inconsistencies between this notice and the Bidding Procedures or

---

[1]   The last four digits of Debtor Del Monte Foods Corporation II Inc.'s tax identification number are 1894. A complete list of the Debtors in these Chapter 11 Cases and their respective tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent, at https://cases.stretto.com/DelMonteFoods. The location of the Debtor Del Monte Foods Corporation II Inc.'s principal place of business and the Debtors' service address is 205 North Wiget Lane, Walnut Creek, California 94598.

[2]   Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Bidding Procedures Order.

Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an auction (the "**Auction**") of the Assets **on September 19, 2025, at 10:00 a.m. (prevailing Eastern Time)** at the office of the proposed co-counsel to the Debtors: Herbert Smith Freehills Kramer (US) LLP ("**HSF Kramer**"), 1177 Avenue of the Americas, New York, NY 10036, to the extent the Auction is to be held in person.

**PLEASE TAKE FURTHER NOTICE** that only the Debtors, the Consultation Parties, Qualified Bidders, the U.S. Trustee, and any other parties as the Debtors may determine to include in their reasonable discretion, in consultation with the Consultation Parties, in each case, along with their representatives and advisors, shall be entitled to attend the Auction, and only Qualified Bidders will be entitled to make Overbids at the Auction. **All interested or potentially affected parties should carefully read the Bidding Procedures and the Bidding Procedures Order.**

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale Transaction at a hearing scheduled to commence on or before **September 30, 2025 at 10:00 a.m. (prevailing Eastern Time)** (the "**Sale Hearing**") before the Honorable Michael B. Kaplan, at the United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Courtroom 8, Trenton, New Jersey 08608 or by such other virtual or electronic means as determined by the Court.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order, objections to consummation or approval of the Sale and each Sale Transaction must (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be *actually received* **on or before September 23, 2025, at 5:00 p.m. (prevailing Eastern Time)**[3] by the following parties: (i) the Debtors, Del Monte Foods Corporation II Inc., 205 North Wiget Lane, Walnut Creek, California 94598, Attn: Legal Department (notices@delmonte.com); (ii) counsel to the Debtors, HSF Kramer, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff (Adam.Rogoff@HSFKramer.com), Rachael L. Ringer (Rachael.Ringer@HSFKramer.com), Megan M. Wasson (Megan.Wasson@HSFKramer.com), and Andrew W. Pollack (Andrew.Pollack@HSFKramer.com); (iii) co-counsel to the Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn: Michael D. Sirota (msirota@coleschotz.com), David M. Bass (dbass@coleschotz.com), Felice R. Yudkin (fyudkin@coleschotz.com); (iv) co-counsel to the DIP Term Loan/Super-Senior Term Loan Group, (1) Gibson, Dunn & Crutcher LLP, 200 Park Ave., New York, NY 10166, Attn: Scott J. Greenberg (sgreenberg@gibsondunn.com), Jason Zachary Goldstein (jgoldstein@gibsondunn.com), Francis Petrie (fpetrie@gibsondunn.com), Kevin Liang (kliang@gibsondunn.com), Simon Briefel (sbriefel@gibsondunn.com), and Sue Su

---

[3]    To the extent the Debtors, in consultation with the Consultation Parties, reasonably determine to pursue a Sale pursuant to a chapter 11 plan, a separate hearing to consider such Sale shall be set.

(ssu@gibsondunn.com) and (2) Sills Cummis & Gross P.C., The Legal Center, One Riverfront Plaza, 1037 Raymond Blvd, Newark, New Jersey 07102, Attn: Andrew H. Sherman (asherman@sillscummis.com) and Gregory A. Kopacz (gkopacz@sillscummis.com); (v) co-counsel to the DIP ABL Agent, Prepetition ABL Agent, and the Prepetition ABL Lenders, (1) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Sandeep Qusba (squsba@stblaw.com), Nick Baker (nbaker@stblaw.com), Dov Gottlieb (dov.gottlieb@stblaw.com), and Zachary Weiner (zachary.weiner@stblaw.com) and (2) Greenberg Traurig LLP, 500 Campus Drive, Suite 400, Florham Park, NJ 07932-0677, Attn: Alan Brody (BrodyA@gtlaw.com); (vi) counsel to the DIP Term Loan Agent and the Super-Senior Agent, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, NY 10019, Attn: Jeffrey R. Gleit (jeffrey.gleit@afslaw.com) and Brett D. Goodman (brett.goodman@afslaw.com); (vii) the U.S. Trustee, Region 3, One Newark Center, Suite 2100, Newark, New Jersey 07102, Attn: Jeffrey M. Sponder (jeffrey.m.sponder@usdoj.gov) and Lauren Bielskie (lauren.bielskie@usdoj.gov); and (viii) counsel to any statutory committees appointed in these cases.

## CONSEQUENCES OF FAILING TO TIMELY OBJECT

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE OR A SALE TRANSACTION, AS APPLICABLE, ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE APPLICABLE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS MAY BE SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT OR THE PLAN, AS APPLICABLE.**

Dated: [●], 2025

*/s/ DRAFT*
Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota
David M. Bass
Felice R. Yudkin
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:  msirota@coleschotz.com
           dbass@coleschotz.com
           fyudkin@coleschotz.com

*– and –*

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**

Adam C. Rogoff (admitted *pro hac vice*)
Rachael L. Ringer (admitted *pro hac vice*)
Megan M. Wasson (admitted *pro hac vice*)
Andrew W. Pollack, Esq. (*pro hac vice* forthcoming)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
E-mail: Adam.Rogoff@HSFKramer.com
Rachael.Ringer@HSFKramer.com
Megan.Wasson@HSFKramer.com
Andrew.Pollack@HSFKramer.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

## **Schedule 2**

Contract Assumption Notice

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff, Esq. (admitted *pro hac vice*)
Rachael L. Ringer, Esq. (admitted *pro hac vice*)
Megan M. Wasson, Esq. (admitted *pro hac vice*)
Andrew W. Pollack, Esq. (*pro hac vice* forthcoming)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Del Monte Foods Corporation II Inc., *et al.*, | ) Case No. 25-16984 (MBK) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |

### NOTICE TO CONTRACT PARTIES TO POTENTIALLY ASSUMED EXECUTORY
### CONTRACTS AND UNEXPIRED LEASES

---

> YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR
> AFFILIATES ARE A COUNTERPARTY TO AN EXECUTORY CONTRACT OR
> UNEXPIRED LEASE WITH ONE OR MORE OF THE DEBTORS AS SET
> FORTH ON **EXHIBIT A** ATTACHED HERETO.

---

**PLEASE TAKE NOTICE** that on [●], 2025, the United States Bankruptcy Court for the
District of New Jersey (the "**Court**") entered the *Order (I) Approving the Auction and Bidding
Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing
the Debtors to Enter Into the Stalking Horse Purchase Agreement, (III) Scheduling an Auction and
Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Sale
of Assets, and (VI) Granting Related Relief* [Docket No. ●] (the "**Bidding Procedures Order**"),[2]
in the chapter 11 cases of the above-captioned debtors and debtors in possession (the "**Debtors**").

---

[1]  The last four digits of Debtor Del Monte Foods Corporation II Inc.'s tax identification number are 1894.  A
complete list of the Debtors in these Chapter 11 Cases and their respective tax identification numbers may be
obtained on the website of the Debtors' claims and noticing agent, at https://cases.stretto.com/DelMonteFoods.
The location of the Debtor Del Monte Foods Corporation II Inc.'s principal place of business and the Debtors'
service address is 205 North Wiget Lane, Walnut Creek, California 94598.

[2]  Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Bidding
Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume and assign to the Successful Bidder the contract or agreement listed on **Exhibit A** to which you are a counterparty, upon approval of the Sale Transaction.  The Debtors have conducted a review of their books and records and have determined that the Cure Payments for unpaid monetary obligations under such Executory Contract or Unexpired Lease is as set forth on **Exhibit A.**

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Payments, object to a proposed assignment to the Successful Bidder of any Executory Contract or Unexpired Lease, or dispute the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Contract, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payments, state the correct Cure Payments alleged to be owed to the objecting contract counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served and **actually received no later than [●], at 5:00 p.m. (prevailing Eastern Time) (the "Cure Objection Deadline")** on the following parties: (i) the Debtors, Del Monte Foods Corporation II Inc., 205 North Wiget Lane, Walnut Creek, California 94598, Attn: [●]; (ii) counsel to the Debtors, HSF Kramer, 1177 Avenue of the Americas, New York, New York 10036, Attn:  Adam C. Rogoff (Adam.Rogoff@HSFKramer.com), Rachael L. Ringer (Rachael.Ringer@HSFKramer.com), Megan M. Wasson (Megan.Wasson@HSFKramer.com), and Andrew W. Pollack (Andrew.Pollack@HSFKramer.com); (iii) co-counsel to the Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn:  Michael D. Sirota (msirota@coleschotz.com), David M. Bass (dbass@coleschotz.com), Felice R. Yudkin (fyudkin@coleschotz.com); (iv) co-counsel to the DIP Term Loan/Super-Senior Term Loan Group, (1) Gibson, Dunn & Crutcher LLP, 200 Park Ave., New York, NY 10166, Attn:  Scott J. Greenberg (sgreenberg@gibsondunn.com), Jason Zachary Goldstein (jgoldstein@gibsondunn.com), Francis Petrie (fpetrie@gibsondunn.com), Kevin Liang (kliang@gibsondunn.com), Simon Briefel (sbriefel@gibsondunn.com), and Sue Su (ssu@gibsondunn.com) and (2) Sills Cummis & Gross P.C., The Legal Center, One Riverfront Plaza, 1037 Raymond Blvd, Newark, New Jersey 07102, Attn: Andrew H. Sherman (asherman@sillscummis.com) and Gregory A. Kopacz (gkopacz@sillscummis.com); (v) co-counsel to the DIP ABL Agent, Prepetition ABL Agent, and the Prepetition ABL Lenders, (1) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Sandeep Qusba (squsba@stblaw.com), Nick Baker (nbaker@stblaw.com), Dov Gottlieb (dov.gottlieb@stblaw.com), and Zachary Weiner (zachary.weiner@stblaw.com) and (2) Greenberg Traurig LLP, 500 Campus Drive, Suite 400, Florham Park, NJ 07932-0677, Attn: Alan Brody (BrodyA@gtlaw.com); (vi) counsel to the DIP Term Loan Agent and the Super-Senior Agent, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, NY 10019, Attn:  Jeffrey R. Gleit (jeffrey.gleit@afslaw.com) and Brett D. Goodman (brett.goodman@afslaw.com); (vii) the U.S. Trustee, Region 3, One Newark Center, Suite 2100, Newark, New Jersey 07102, Attn: Jeffrey M. Sponder (jeffrey.m.sponder@usdoj.gov) and Lauren Bielskie (lauren.bielskie@usdoj.gov); and (viii) counsel to any statutory committees appointed in these cases.

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Payments, (b) the proposed assignment and assumption of any Executory Contract or Unexpired Lease, or (c) adequate assurance of the Successful Bidder's ability to perform is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Payments as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional Cure Payments are due under the Executory Contract or Unexpired Lease, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale Transaction.

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption and assignment of an Executory Contract or Unexpired Lease or related Cure Payments in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date as may be fixed by the Court.

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Executory Contract or Unexpired Lease on the Contract Assumption Notice or any Supplemental Assumption Notice does not require or guarantee that such Executory Contract or Unexpired Lease will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Executory Contracts and/or Unexpired Leases are reserved. Moreover, the Debtors explicitly reserve the right, in their reasonable discretion, to seek to reject or assume each Executory Contract or Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Executory Contract or Unexpired Lease as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Executory Contracts or Unexpired Leases or the validity, priority, or amount of any claims of a counterparty to any Contract against the Debtors that may arise under such Executory Contract or Unexpired Lease, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Executory Contract or Unexpired Lease against the Debtors that may arise under such Executory Contract or Unexpired Lease.

Dated: [●], 2025

/s/ DRAFT
Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota
David M. Bass
Felice R. Yudkin
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601

Telephone: (201) 489-3000
Email:   msirota@coleschotz.com
        dbass@coleschotz.com
        fyudkin@coleschotz.com

*– and –*

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff (admitted *pro hac vice*)
Rachael L. Ringer (admitted *pro hac vice*)
Megan M. Wasson (admitted *pro hac vice*)
Andrew W. Pollack, Esq. (*pro hac vice* forthcoming)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
E-mail: Adam.Rogoff@HSFKramer.com
Rachael.Ringer@HSFKramer.com
Megan.Wasson@HSFKramer.com
Andrew.Pollack@HSFKramer.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

# **EXHIBIT B**
## **(TERM SHEET)**

**Del Monte Foods Corporation II, Inc.,** *et al.*

**PURCHASE AGREEMENT TERM SHEET**[1]

THIS TERM SHEET (THE "<u>TERM SHEET</u>") SETS FORTH THE PRINCIPAL TERMS OF THE PROPOSED SALE TRANSACTION BETWEEN THE PARTIES DESCRIBED HEREIN. THIS TERM SHEET DOES NOT CONTAIN A COMPLETE LIST OF ALL TERMS AND CONDITIONS OF THE POTENTIAL TRANSACTIONS DESCRIBED HEREIN. THE TRANSACTION DESCRIBED HEREIN SHALL BE CONSUMMATED THROUGH A SALE PURSUANT TO CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532 IN THE BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY.

WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THIS TERM SHEET AND THE UNDERTAKINGS CONTEMPLATED HEREIN ARE SUBJECT IN ALL RESPECTS TO THE SATISFACTORY NEGOTIATION, EXECUTION, AND DELIVERY OF DEFINITIVE DOCUMENTATION.

THE REGULATORY, TAX, ACCOUNTING, AND OTHER LEGAL AND FINANCIAL MATTERS AND EFFECTS RELATED TO THE TRANSACTIONS DESCRIBED HEREIN HAVE NOT BEEN FULLY EVALUATED AND ANY SUCH EVALUATION MAY AFFECT THE TERMS AND STRUCTURE OF ANY TRANSACTION.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW, INCLUDING THE BANKRUPTCY CODE.

| Sellers | Each of the Debtors. |
|---|---|
| **Buyer** | An entity to be formed by or on behalf of the Consenting Lenders (the "<u>Buyer</u>") will serve as the stalking horse bidder in connection with the Sale Transaction. The stalking horse asset purchase agreement shall be acceptable to the Sellers and the Required Consenting Lenders (the "<u>Stalking Horse APA</u>").  If the Sale Transaction with the Buyer is consummated, the resulting entity will be "<u>NewCo</u>." |
| **Sale Transaction** | The sale transaction will be consummated through a sale of all or substantially all of the assets of the Sellers (or, if mutually agreed by the Sellers and the Required Consenting Lenders solely if necessary to maintain tax attributes, the equity of the Debtors) (the "<u>Sale Transaction</u>"), which sale shall be undertaken either pursuant to section 363 or, if mutually agreed by the Required Consenting Lenders and Sellers solely if necessary to maintain or maximize favorable tax attributes, section 1123 of chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "<u>Bankruptcy Code</u>"), as provided in this Term Sheet and subject to the |

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement.

| | |
|---|---|
| | Bidding Procedures. The consummation of the Sale Transaction is the "Closing" and the date on which the Closing occurs is the "Closing Date." The Closing is subject to the conditions precedent set forth in the Stalking Horse APA and the sale milestones set forth in the Bidding Procedures.<br><br>The Sale Transaction shall be subject to the Stalking Horse APA and the other Definitive Documents, the terms of the Restructuring Support Agreement (including the exhibits thereto), and the consent rights set forth therein.<br><br>The consummation of the Sale Transaction pursuant to the Stalking Horse APA is contingent on the assumption (or refinancing) of the indebtedness under the applicable ABL Loan Documents[2] at Closing or other mutually acceptable treatments as agreed between the Buyer, the ABL Agent, and requisite ABL Lenders; *provided that,* prior to going forward with the hearing to approve the Bidding Procedures, there shall be an agreement for the satisfaction of such contingency.<br><br>The proposed Sale Transaction shall remain subject to higher or otherwise better offers that may be obtained by the Sellers in connection with the Bidding Procedures and the Bidding Procedures Order. |
| **Stalking Horse Purchase Price** | As part of the Sale Transaction, the Consenting Lenders shall serve as the stalking horse bidder (the "Stalking Horse Credit Bid") with a purchase price consisting of:<br><br>(a) $575 million, comprised of (i) the assumption of the indebtedness under the applicable ABL Loan Documents, on mutually acceptable terms as agreed between the Buyer, the ABL Agent, and requisite ABL Lenders, each in their sole discretion, and (ii) a "credit bid" of the DIP Facility claims;<br><br>(b) the Retained Cash (as defined below); and<br><br>(c) the assumption of the Assumed Liabilities. |
| **Sale Order / Mutual Releases** | The Stalking Horse APA and the Sale Order will contain mutual general releases, subject to customary carveouts, and other than as expressly set forth herein, as agreed between the Debtors and the Required Consenting Lenders (the "Sale Releases") effective on the Closing Date, by and among the following persons (and such other persons as may be agreed by the Debtors and the Required Consenting Lenders): (a) the Debtors, (b) NewCo, (c) the Buyer, (d) the Consenting Lenders, (e) the ABL Agent, (f) the ABL Lenders, (g) in the case of the entities listed in clauses (b) through (f), such entities' respective officers and directors and, solely with respect to the Debtors and the Non-Debtor Subsidiaries (as defined below), their respective Unaffiliated Officers and Directors (as defined below), and (h) in the case of the entities listed in clauses (a) through (g), such entities' respective employees, agents, financial advisors, partners, attorneys, |

---

[2]     For the avoidance of doubt, all references herein to the ABL Loan Documents, ABL Agent and ABL Lenders shall include both the prepetition and DIP ABL Loan Documents, Agent and Lenders, as applicable.

| | |
|---|---|
| | accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (the "Released Parties"), for any claims up to the Closing Date, except as expressly preserved in the Stalking Horse APA in a manner to be agreed by the Sellers and the Required Consenting Lenders; *provided, however*, that the Required Consenting Lenders may agree, in their sole discretion, that some amount of the Consenting Lenders' First Out Obligations will not be released and shall remain outstanding for treatment pursuant to a Chapter 11 plan, subject to the Bidding Procedures; *provided, further*, that, for the avoidance of doubt, Parent (as defined below) shall not be a Released Party.<br><br>"Unaffiliated Officers and Directors" shall mean all persons that (a) serve or served as an officer and/or director of any of the Debtors and the Non-Debtor Subsidiaries at any time; (b)(i) are not officers, directors, or employees of Del Monte Pacific Limited, DMPL Foods Limited, or any of its Affiliates (other than Del Monte Foods Holding Limited ("DMFHL") and its subsidiaries) or equity owners (collectively, "Parent"), (ii) were not appointed as a director or officer by or on behalf of Parent and prior to appointment, had no material relationship with or affiliation with Parent, or (iii) with respect to directors, are independent, including pursuant to NYSE standards, as to Parent; and (c) in all cases, have no material preexisting personal relationship (unrelated to the Sellers) or familial relationship with any director or officer of Parent.<br><br>The terms of the Sale Order, including the Sale Releases, and the Stalking Horse APA, including any schedules and exhibits thereto, shall be consistent with this Term Sheet and otherwise acceptable to the Required Consenting Lenders and the Debtors in their respective sole discretion. |
| **Purchased Assets** | Subject in all respects to the Stalking Horse APA, the Buyer will acquire on the Closing Date, all right, title and interest of the Sellers in, to or under all of the properties and assets of the Sellers of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible consisting of, relating to or developed or used in connection with the Sellers' business, but excluding the Excluded Assets (as defined below), as further described below (such assets collectively, the "Purchased Assets").<br><br>The "Purchased Assets" include, without limitation:<br><br>1) subject to the other terms of the Term Sheet, all contracts (including leases to which a Seller is a party with respect to leased real property and licenses and other contracts with respect to intellectual property), including (i) any confidentiality or non-disclosure agreements executed by any person for the benefit of any Seller to the extent relating to the Purchased Assets or the Assumed Liabilities and (ii) all purchase orders (collectively, "Purchased Contracts");<br><br>2) all owned real property and all leased real property, in each case, together with any buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom, |

and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto;

3) all tangible assets, including machinery, equipment, computers, information management systems (including software and hardware related thereto), telephone systems, supplies and other tangible personal property owned by any Seller, including any such personal property of a Seller located at any owned real property or leased real property and any other tangible assets on order to be delivered to any Seller;

4) all warranties, indemnities or guaranties from any person with respect to any Purchased Asset, including any item of real property, personal property or equipment;

5) all intellectual property of the Sellers;

6) all of the Sellers' interests in all of their non-Debtor subsidiaries (each, a "Non-Debtor Subsidiary");

7) all inventory, including raw and packing materials, work-in-progress, finished goods, supplies, parts and similar items related to, whether or not obsolete or carried on the Sellers' books of account, in each case, with any transferable warranty and service rights related thereto;

8) to the extent permitted by applicable law without the consent of any applicable service provider, all rights of the Sellers under non-disclosure or confidentiality, invention assignment, work made for hire, non-compete, or non-solicitation agreements with current or former service providers of any Seller;

9) all permits (to the extent transferable to Buyer pursuant to applicable law);

10) all cash and cash equivalents, other than cash actually held by the Sellers at the Closing that Buyer has instructed the Sellers to retain to fund the Wind-Down Budget (as defined below) ("Retained Cash"), which Retained Cash shall be in an amount in cash equal to the Wind-Down Budget;

11) all bank accounts of the Sellers (other than any account designated by DMFHL to Buyer prior to the Closing which shall be retained solely for the purposes of the Wind-Down (as defined below));

12) all deposits, credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items and duties related to the Purchased Assets;

13) all accounts receivable, notes, negotiable instruments and chattel paper owned or held, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, and other amounts receivable from any person (both third party and intercompany), whether or not in the ordinary course of business;

14) all insurance policies relating to the Purchased Assets or the Assumed Liabilities, and all rights and benefits of any nature of the

Sellers with respect thereto (including any claims arising under such policies and all credits, premium refunds, proceeds, causes of action or rights thereunder); *provided*, *however*, that the Sellers shall retain access following the Closing Date to those insurance policies that may apply to any activities associated with the Wind-Down of any Excluded Assets;

15) all unexpired director and officer insurance policies (including, for the avoidance of doubt, all rights and benefits of any nature of the Sellers with respect thereto (including any claims arising under such policies and all credits, premium refunds, proceeds, causes of action or rights thereunder)) existing as of the Closing Date; *provided*, *however*, that the director and officer insurance policies will only be included if the Sellers consent to their inclusion and such inclusion does not adversely affect the availability, access, or terms and conditions of coverage thereunder; *provided*, *further*, that the Sellers shall use reasonable good faith efforts to obtain any insurer consents, if any, required to assume such policies as provided herein;

16) all confidentiality, non-competition, non-solicitation or similar agreements entered into by any Seller or any of its representatives in connection with a sale of any Seller, any Purchased Asset or any Assumed Liabilities;

17) all annual cash incentive plans;

18) any individual employment agreements set forth in the applicable schedule to the Stalking Horse APA;

19) all pension plans, together with any applicable funding arrangements relating thereto (including but not limited to all assets, trusts, insurance policies, and administrative services contracts related thereto);

20) all health care, retirement, and other compensation and employee benefits plans and programs other than individual employment agreements (such assumed plans and programs, together with all annual cash incentive plans and pension plans, the "Transferred Benefit Plans"), together with any funding arrangements relating thereto (including but not limited to all assets, trusts, insurance policies, and administration service contracts related thereto);

21) all collective bargaining agreements in accordance with their terms, including obligations for any multiemployer pension plans;

22) all rights against any person (including (i) customers, suppliers, vendors, lessors, lessees, licensees, or licensors of any Seller and (ii) Buyer, Buyer's affiliates, the Sellers or their affiliates or any of its or their respective directors, officers, members, partners, shareholders, managers, advisors or representatives) arising under or related to any Purchased Asset (including any use, ownership, possession, operation, sale or lease thereof) or Assumed Liability or the operation or conduct of the Sellers' business, including proceedings, claims, counterclaims, defenses, credits, rebates

(including any vendor or supplier rebates), demands, allowances, refunds, rights of set off, rights of recovery (including rights to insurance proceeds), rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants, indemnities, exculpation, advancement, reimbursement of expenses or contract renewal rights and other similar rights, in each case, whether direct or derivative, known or unknown, liquidated or unliquidated, contingent or otherwise;

23) all claims and causes of action including but not limited to (a) any claims that could be asserted derivatively through the Debtors, (b) any claims arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), or 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents or non-U.S. law and the proceeds of such actions, (c) all claims and causes of action of the Debtors' estates, and (d) to the extent not included in clauses (a) through (c), all claims or causes of action against any of the Sellers' respective (i) directors or officers; (ii) employees other than officers; (iii) subsidiaries; (iv) affiliates, including Parent; or (v) trade vendors, suppliers, customers or other parties that the Sellers otherwise conduct business with in the ordinary course, including in each case all proceeds thereof; *provided* that all claims and rights referenced in clauses (a), (b), (c), (d)(i) through (iii) that constitute a claim against a Released Party shall be released by the Buyer on the Closing Date;

24) all goodwill related to the Purchased Assets (including the goodwill associated with the trademarks and other intellectual property included in the Purchased Assets);

25) other than the specifically excluded records, all of each Seller's and its subsidiaries' current or historical written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, tax returns (including all related schedules, workpapers and other material supporting information), ledgers, journals, title policies, customer lists, supplier lists, vendor lists, price lists, mailing lists, invoices, shipping records, standard forms of documents, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, *etc.*), user documentation (installation guides, user manuals, training materials, release notes, working papers, *etc.*), marketing documentation (catalogs, sales brochures, flyers, pamphlets, web pages, *etc.*), consulting materials, opinions and other documents commissioned by or on behalf of any Seller or its subsidiaries, development, quality control, quality assurance, regulatory, records and other regulatory documents, all personnel and employment

<table>
<tr><td></td><td>

records for the employees to be transferred to Buyer and any independent contractors of any Seller or its subsidiaries, and other books and records of the Sellers and any rights thereto owned by any Seller, in each case whether stored in hard copy form or on electronic, magnetic, optical or other media; and

26) other scheduled assets;

At any time prior to the Bid Deadline (as defined in the Bidding Procedures Order), Buyer may, in its sole discretion, by written notice to the Sellers, designate (a) any of the Purchased Assets as additional Excluded Assets ("Later Excluded Assets") and (b) any of the Assumed Liabilities as additional Excluded Liabilities (as defined below) ("Later Excluded Liabilities") (other than in respect of a Purchased Contract, which shall be separately governed under the Stalking Horse APA), which notice shall set forth in reasonable detail the Purchased Assets and Assumed Liabilities so designated; *provided* that there will be no modification to the Purchase Price as a result of any addition or elimination of any asset as a Purchased Asset; *provided*, *further*, that (i) in no event may the items set forth in clause 22 above be designated as Later Excluded Assets without the consent of the Sellers, (ii) in no event may the items set forth in clause 23 above be designated as Later Excluded Assets, and (iii) to the extent there are Later Excluded Assets or Later Excluded Liabilities that will need to be subject to the Wind-Down (and are not being separately sold to a Qualified Bidder as defined in and pursuant to the Bidding Procedures) the Wind-Down Budget shall be appropriately adjusted to reflect disposition of such additional assets and/or liabilities.  Notwithstanding any other provision hereof to the contrary, but subject to the provisions of this paragraph, (x) the liabilities of the Sellers under or related to any Purchased Asset designated as a Later Excluded Asset pursuant to this paragraph will constitute Excluded Liabilities and (y) the assets of the Sellers under or related to any Assumed Liability designated as a Later Excluded Liability pursuant to this paragraph will constitute Excluded Assets.

</td></tr>
<tr><td>

**Assumed Liabilities**

</td><td>

The Buyer shall assume all liabilities related to the Purchased Assets (other than the Excluded Liabilities), which shall include, for the avoidance of doubt, the following:

1) all liabilities, including environmental liabilities, relating to or arising out of the ownership or operation of the Purchased Assets by Buyer for periods following the Closing Date;

2) all cure costs related to assumed contracts to the extent they have not been paid on or before the Closing Date;

3) all liabilities relating to, arising out of, or resulting from the employment or services, or termination of employment or services with respect to employees transferred to Buyer arising after the Closing Date;

4) all liabilities arising under or related to the Transferred Benefit Plans, any collective bargaining agreements, and all severance and

</td></tr>
</table>

indemnification obligations to the Sellers' directors, officers, and employees that are assumed by the Buyer;

5)  (A) the Buyer's obligation, if any, to provide COBRA continuation coverage to any "M&A qualified beneficiaries," and (B) all liabilities with respect to all employees hired by the Buyer, if any, to the extent such liabilities arising after the Closing Date;

6)  all liabilities of each Seller relating to or arising out of the Purchased Contracts and permits, solely after the Closing Date and not to the extent relating to or arising out of any breach or default thereof or other activities on or prior to the Closing Date;

7)  all (i) allowed and unpaid post-petition date accrued trade and non-trade payables, (ii) open purchase orders existing as of the Closing Date (except any purchase order entered into in connection with, or otherwise governed by, any contract that is an Excluded Asset) (excluding any liabilities arising out of default or breach thereof by any Seller), (iii) liabilities arising under drafts or checks outstanding at Closing, (iv) all liabilities arising from rebates, returns, recalls, chargebacks, coupons, discounts, failure to supply claims and similar obligations, but in each case, to the extent (and solely to the extent) (y) incurred in the ordinary course of business and otherwise in compliance with the terms and conditions of the Stalking Horse APA and (z) not arising under or otherwise relating to any Excluded Asset, and (v) accrued royalties;

8)  all liabilities for property taxes allocable to any post-Closing Date tax period;

9)  any liability to reimburse, indemnify, or advance amounts to any present officer, director, employee or agent of any Seller (including with respect to any breach of fiduciary obligations by any such party) from and after the Closing Date;

10) all liabilities derived from, based upon, or secured pursuant to the applicable ABL Loan Documents on mutually acceptable terms and conditions as agreed between the Buyer, the ABL Agent, and requisite ABL Lenders, each in their sole discretion; *provided* that if the liabilities derived from, based upon, or secured pursuant to the applicable ABL Documents are fully refinanced, the liabilities arising under such refinancing shall be Assumed Liabilities;

11) all claims arising prior to the petition date that are owed by any Seller or Non-Debtor Subsidiary to any other Seller, which claims may be reinstated, set off, settled, distributed, contributed, cancelled and released without any distribution on account of such claims, or such other treatment as is determined by the Required Consenting Lenders and the Sellers;

12) all liabilities (including, without limitation, under the applicable NDAs and INDs relating to the Sellers' business) arising out of, relating to or incurred in connection with the conduct or ownership

| | |
|---|---|
| | of the Sellers' business or the Purchased Assets from and after the Closing Date; and |
| | 13) other scheduled liabilities. |
| **Excluded Assets** | Purchased Assets will exclude those assets designated by the Buyer as Excluded Assets (as defined below) in a schedule to the Stalking Horse APA and the Retained Cash. |
| | Notwithstanding any provision herein to the contrary, Sellers shall not be deemed to sell, transfer, assign, convey or deliver, and Sellers will retain all right, title and interest to, in and under the following assets, properties, interests and rights of Sellers (whether owned, licensed, leased or otherwise) (the "Excluded Assets"): |
| | 1) if the Sale Transaction is not consummated as an equity sale, the organizational documents, corporate records and minute books, in each case to the extent solely pertaining to the organization, existence or capitalization of the Sellers; |
| | 2) any (i) records, documents or other information solely to the extent relating to any current or former employee who is not or does not become an employee of Buyer and any materials to the extent containing information about any employee, disclosure of which would violate applicable law, and (ii) all attorney-client privilege and attorney work-product protection of the Sellers or associated with their businesses solely to the extent arising with respect to legal counsel representation of the Sellers or their affiliates or their businesses in connection with the transactions contemplated by the Stalking Horse APA or any of the other transaction document; |
| | 3) any contract that is not a Purchased Asset; |
| | 4) all rights, claims or causes of action that accrue or will accrue to any Seller or any of its subsidiaries pursuant to the Stalking Horse APA or any of the other transaction documents; |
| | 5) if the Sale Transaction is not consummated as an equity sale, other than the equity interests of the Non-Debtors Subsidiaries, all shares of capital stock or other equity interests of any Seller or any subsidiary of a Seller; |
| | 6) any Seller employee benefit plans set forth in a schedule to the Stalking Horse APA (the "Excluded Plans") which shall include all equity incentive and other long-term incentive plans and grants thereunder and, if applicable, any funding arrangements related thereto; |
| | 7) all Retained Cash; |
| | 8) all proceeds received from the sale or liquidation of any other Excluded Assets; |
| | 9) any deposits, escrows, surety bonds or other financial assurances and any cash or cash equivalents securing any surety bonds or |

| | financial assurances, in each case, to the extent solely relating to the Excluded Assets or the Excluded Liabilities; |
| --- | --- |
| | 10) the Sellers' documents prepared in connection with the Stalking Horse APA or the transactions contemplated thereby, or relating to the Chapter 11 Cases and any books and records the Sellers are required by law to maintain; *provided* that following the Closing Date, at the request of Buyer, the Sellers will provide Buyer with copies or other appropriate access to the information in such documentation to the extent reasonably related to Buyer's operation and administration of the business; and |
| | 11) other scheduled assets. . |
| **Excluded Liabilities** | Assumed Liabilities will expressly exclude only those liabilities designated by the Buyer as "<u>Excluded Liabilities</u>" in a schedule to the Stalking Horse APA. |
| | "Excluded Liabilities" include: |
| | 1) all liabilities for or in respect of any specifically excluded taxes and transfer taxes; |
| | 2) all liabilities arising under any excluded contract; |
| | 3) unless otherwise assumed, all liabilities of the Sellers for indebtedness, including any intercompany indebtedness among the Sellers and between the Sellers and the Parent; |
| | 4) all liabilities of the Sellers to the Parent; |
| | 5) all pre-Closing employee liabilities, if any, other than (i) any liabilities assumed by Buyer under the Stalking Horse APA, (ii) any liabilities under any Transferred Benefit Plan, and (iii) any liabilities relating to the employment or termination of employment of, or otherwise with respect to, any employee of any Seller who is transferred to the Buyer and arising after the Closing Date; |
| | 6) all liabilities arising out of, relating to or with respect to any Excluded Plan; |
| | 7) all liabilities arising in connection with any violation of any applicable law by the Sellers relating to the period prior to the Closing Date; |
| | 8) all liabilities of the Sellers arising under or pursuant to any environmental laws due to the Sellers' ownership, operation, leasing or use of any real property, in each case, only to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing; |
| | 9) all liabilities arising out of, relating to or with respect to any order or proceeding or threatened proceeding involving, against or affecting any Purchased Asset, the Sellers' business, any Seller, or any assets or properties of any Seller (i) commenced, filed, initiated |

|  | or threatened in writing as of the Closing or (ii) relating to facts, events or circumstances arising or occurring prior to the Closing; |
|  | 10) all claims for product liability or under warranties associated with the Sellers' business or the Purchased Assets or otherwise (whether known or unknown, and whether recorded or reported), relating to facts, events or circumstances arising or occurring before the Closing Date (including with respect to products manufactured and sold by the Sellers prior to the Closing); |
|  | 11) all liabilities relating to an Excluded Asset, whether arising prior to or after the Closing Date; and |
|  | 12) other liabilities of Sellers not expressly included as Assumed Liabilities. |
| **Representations, Warranties and Covenants** | The Stalking Horse APA will contain usual and customary representations, warranties, and covenants of the parties for similar transactions of this type. |
| **Wind-Down Budget and Post-Closing Cooperation** | On the Closing Date, Buyer shall fund, or cause to be funded, an amount pursuant to the Stalking Horse APA for the purpose of funding the orderly wind-down of Sellers in accordance with applicable Law (the "Wind-Down" and such amount, the "Wind-Down Budget"), which amount shall be agreed upon by Sellers and Buyer, each in their sole discretion. Buyer acknowledges that Buyer shall work in good faith with the Sellers to ensure that the Wind-Down Budget makes adequate provision for all expected administrative expense costs necessary to confirm a Wind-Down chapter 11 plan; *provided* that Sellers and Buyer shall reach agreement on the Wind-Down Budget, each in their sole discretion, by no later than the Bid Deadline (as defined in the Bidding Procedures Order); *provided*, *further*, that any residual amount of the Wind-Down Budget, if any, following completion of the Wind-Down shall be returned to the Buyer. |
|  | The Buyer shall use commercially reasonable efforts to provide reasonably requested finance, IT, and legal personnel to the Debtors that is reasonably necessary to assist the Debtors in an orderly Wind-Down of the Debtors' estates. |
| **Break Up Fee / Related Provisions** | The Buyer will not be entitled to a break-up fee or any expense reimbursement. |
|  | The Buyer will not be required to post a Good Faith Deposit under the Bidding Procedures. |
| **Back-Up Bid** | In the event that the Stalking Horse Credit Bid is not selected as the successful bid but is otherwise the next highest or best alternative bid, the Buyer will serve as the "back-up bid" for the Purchased Assets and will be binding and irrevocable until the date on which such other transaction is consummated. |
| **Other Terms and Conditions** | Closing of the Sale Transaction will be subject to, among other customary conditions, (a) entry of the Sale Order and such Sale Order not being subject |

| | to any stay, (b) the Sellers' and Buyer's (in the event of a Sale Transaction to the Buyer) representations and warranties in the Stalking Horse APA being true and correct in all respects except where such breaches would not constitute a material adverse effect, and (c) no breach of the Sellers' or Buyer's covenants in the Stalking Horse APA in any material respect. |
|---|---|
| **Additional Terms** | |
| **Employee Matters** | The Buyer will use reasonable good faith efforts to offer employment to all of the Sellers' active employees, subject to ongoing evaluation of the Sellers' financial condition and subject to satisfactory diligence.  If the Buyer makes any offer of employment, Buyer will use reasonable good faith efforts to provide employment offers for (i) comparable positions, responsibilities, and (ii) base salaries, short-term incentive opportunities, and employee benefits (excluding long-term incentives, change in control and retention benefits), taken as a whole, as those for such employees' positions, responsibilities, base salaries, short-term incentive opportunities, and employee benefits (excluding long-term incentives, change in control and retention benefits) immediately prior to the Closing Date.  For any employees that are covered by a collective bargaining agreement, subject to further Buyer diligence, the terms and conditions of such employee's employment shall be in accordance with the applicable collective bargaining agreement.<br><br>The Buyer will offer and assume all obligations to provide COBRA to all of Sellers employees (and dependents) who are "M&A qualified beneficiaries." |
| **Pension Matters** | The Buyer shall assume (i) all qualified pension plans sponsored or maintained by the Sellers and (ii) in accordance with 4204 of ERISA, all obligations for any multi-employer pension plans. |
| **Director, Officer, Manager, and Employee Tail Coverage** | The Buyer shall assume all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") existing as of the Closing Date, and the Sellers shall use reasonable good faith efforts to obtain any insurer consents, if any, required to assume such policies.  The Buyer shall not terminate any unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") existing as of the Closing Date. |

| | |
|---|---|
| **Tax Structuring and Implementation** | The Sellers and the Consenting Lenders shall reasonably cooperate to structure the Sale Transaction or any other transaction, including, by way of example, an equitization transaction in connection with a restructuring in place pursuant to a plan under section 1123 of the Bankruptcy Code (collectively, the "Tax Structure") to (a) minimize any cash taxes payable by the Sellers and the Consenting Lenders (including, as applicable, through the Wind-Down Budget) arising from the Tax Structure, and (b) maximize any favorable tax attributes of the Sellers (or successor), including tax basis, available after the restructuring, including, without limitation, by implementing a Tax Structure intended to qualify as a reorganization under Section 368(a)(1)(G) of the Internal Revenue Code of 1986, as amended. The final Tax Structure shall be subject to the consent of the Sellers and the Consenting Lenders. The Sellers (or the Consenting Lenders at the expense of the Sellers) shall engage a nationally recognized tax accounting firm selected by the Sellers, with the reasonable consent of the Consenting Lenders, to perform analysis for purposes of determining the final Tax Structure. |
| **Conditions Precedent to the Closing Date** | It shall be a condition to the Closing Date that the following conditions shall have been satisfied or waived (in accordance with customary waiver provisions to be contained in the Stalking Horse APA or other Definitive Documents, as applicable): <br><br> a. The Restructuring Support Agreement shall not have been terminated as to the Required Consenting Lenders and shall be in full force and effect; <br><br> b. The Bankruptcy Court shall have entered the Sale Order in form and substance consistent with and subject to the consent rights set forth in the Restructuring Support Agreement (including this Restructuring Term Sheet), which shall have become a final order; <br><br> c. The Stalking Horse APA shall have been executed (or deemed executed) and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Sellers and the Buyer), other than such conditions that relate to the effectiveness of the Definitive Documents and related transactions; <br><br> d. All Restructuring Expenses shall have been paid in full in cash in accordance with the Restructuring Support Agreement; <br><br> e. The Definitive Documents shall (i) be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms consistent with the Restructuring Support Agreement and the Restructuring Term Sheet; |

13

|  | f. The Sellers shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are required by applicable Law to implement and effectuate the Plan, if applicable, and each of the other Restructuring Transactions; |
|  | g. None of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code or shall have been dismissed; |
|  | h. No trustee or examiner with expanded powers shall have been appointed under any chapter of the Bankruptcy Code with respect to the Debtors; |
|  | i. There shall not have been instituted or threatened or be pending any material action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim, or proceeding currently instituted, threatened, or pending) before or by any court, governmental, regulatory or administrative agency or instrumentality, domestic or foreign, or by any other person, domestic or foreign, in connection with the Restructuring Transactions that, in the judgment of the Sellers and the Required Consenting Lenders would prohibit, prevent, or restrict consummation of the Restructuring Transactions in a materially adverse manner; |
|  | j. The Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in the Restructuring Term Sheet in a manner consistent with the Restructuring Support Agreement and the Restructuring Term Sheet; |
|  | k. No party shall have been granted derivative standing to pursue any chapter 5 causes of action on behalf of the Debtors' estates or otherwise; and |
|  | l. Such other conditions precedent to the Closing Date that are customary or otherwise reasonably requested by the Required Consenting Lenders and agreed to by the Debtors. |
| **Termination** | This Stalking Horse APA may be terminated at any time prior to the Closing:<br><br>a. by mutual written agreement of Sellers and Buyer; |

b.  by either Sellers or Buyer, if the Closing shall not have been consummated on or before December 31, 2025, which such date may be extended for sixty (60) days by mutual written agreement of Sellers and Buyer (such date, as may be extended, the "<u>End Date</u>"); *provided*, *however*, if all of the conditions to Closing, other than the conditions related to HSR approval an and no injunction or orders shall have been satisfied or shall be capable of being satisfied at the End Date, either Sellers or Buyer may, by written notice to the other party, extend the End Date for two (2) additional thirty (30)-day periods (each, a "<u>Renewal Period</u>") and such date, as so extended to the end of the first or second Renewal Period, as the case may be, shall be deemed the End Date; *provided*, *further*, that this termination right shall not be available to a party whose breach of any of its representations, warranties, covenants or agreements contained in the Stalking Horse APA has been the primary cause of the failure of the Closing to occur on or before the End Date;

c.  by either Sellers or Buyer, if at the end of the auction for the Purchased Assets (if any), Buyer is not determined by Sellers to be either the "Successful Bidder" or the "Backup Bidder" (each as defined in the Bidding Procedures Order);

d.  by Sellers, if Sellers are not then in material breach of their obligations under the Stalking Horse APA and Buyer breaches or fails to perform any of its representations, warranties, covenants or agreements contained in the Stalking Horse APA and such breach or failure to perform (i) would prevent the satisfaction of a condition set forth in the mutual closing conditions or conditions of the Sellers' obligation to close, (ii) cannot be, or has not been, cured within ten (10) days following delivery of written notice to Buyer of such breach or failure to perform, and (iii) has not been waived by Sellers;

e.  by Buyer, if Buyer is not then in material breach of its obligations under the Stalking Horse APA and Sellers breach or fail to perform any of their representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform (i) would prevent the satisfaction of a condition set forth in the mutual closing conditions or conditions of the Buyer's obligation to close, (ii) cannot be, or has not been, cured within ten (10) days following delivery of written notice to Sellers of such breach or failure to perform, and (iii) has not been waived by Buyer;

f.  by either Buyer or Sellers, (i) if the Bankruptcy Court enters an order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under Chapter 11 of the Bankruptcy Code and comprising part of the Chapter 11 Cases without the prior approval of the Required Consenting Lenders, (ii) if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Sellers is appointed in the Chapter 11 Cases, or (iii) an order of dismissal, conversion or appointment is entered with respect to the Chapter 11 Cases prior to the Closing Date for any reason and not reversed or vacated within fourteen (14) days after entry thereof;

g.  automatically, if Sellers publicly announce, orally or in writing with the Bankruptcy Court, that they have taken steps to enter into an alternative, stand-alone plan of reorganization or liquidation that is not supported by the Required Consenting Lenders (other than a Wind-Down plan of Sellers' estates post-Closing consistent with the RSA and the Wind-Down Budget), which announcement is not revoked within two (2) business days of notice by the Consenting Lenders;

h.  by Buyer or Sellers, if any governmental authority issues any order permanently enjoining or otherwise permanently prohibiting the transactions contemplated by the Stalking Horse APA and such order shall have become final and non-appealable; *provided* that such termination right shall not be available to a party that failed to use its reasonable best efforts to contest, resolve or lift such order; *provided, further*, that such termination right shall not be available to any party if such order was primarily caused by (i) such party's material breach of any provision of the Stalking Horse APA or (ii) such party's failure to comply in any material respect with its obligations thereunder;

i.  by either Buyer or Sellers, if an order of the Bankruptcy Court is entered denying approval of the Sale Order and such order shall have become a final order;

j.  by Buyer if the DIP Facility is accelerated and the Required DIP Lenders exercise remedies as set forth in the DIP Credit Agreement and DIP Orders;

k.  by Buyer if, under section 363(k) of the Bankruptcy Code, Buyer is unable, pursuant to any final order to provide a credit bid (or otherwise bidding on such other terms as may be agreed by Buyer, in its sole discretion) as contemplated by the Stalking Horse APA in connection with the payment of the purchase price thereunder;

l.  by Sellers under Section 8.01 of the Restructuring Support Agreement if the Sellers determine, in good faith and after consultation with their advisors, that the continued performance under the Stalking Horse APA or any ancillary agreements would be inconsistent with their fiduciary obligations under applicable Law;

16

|  | m. | by Buyer upon the occurrence of an event described in Section 12 of the Restructuring Support Agreement which, with the passage of time or the taking of action thereunder, would result in the termination of the Restructuring Support Agreement ("RSA Termination Event") (other than as a result of a breach by the Required Consenting Lenders) that has not been cured or waived; or |
|  | n. | by Sellers upon the occurrence of any RSA Termination Event (other than as a result of a breach by Sellers) that has not been cured or waived. |