**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff, Esq. (admitted *pro hac vice*)
Rachael L. Ringer, Esq. (admitted *pro hac vice*)
Natan M. Hamerman, Esq.  (admitted *pro hac vice*)
Megan M. Wasson, Esq. (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Del Monte Foods Corporation II Inc., *et al.*,[1] | ) Case No. 25-16984 (MBK) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DEBTORS' OBJECTION TO MOTION OF CO-MOVANTS PACIFIC COAST PRODUCERS, MORNING STAR PACKING COMPANY, L.P., AND MORNING STAR KINGS, LLC FOR ENTRY OF AN ORDER (I)(A) COMPELLING DEBTORS TO ASSUME OR REJECT CERTAIN EXECUTORY CONTRACT AND UNEXPIRED LEASE AND (B) GRANT ADEQUATE PROTECTION, OR (II) IN THE ALTERNATIVE, GRANTING RELIEF FROM THE AUTOMATIC STAY

TO THE HONORABLE BANKRUPTCY JUDGE:

Debtors in the above-captioned Chapter 11 cases file this objection to the *Motion of Co-*

*Movants Pacific Coast Producers, the Morning Star Packing Company, L.P. and Morning Star*

*Kings, LLC  for Entry of an Order (I)(A) Compelling Debtors to Assume or Reject Certain*

*Executory Contract and Unexpired Lease and (B) Grant Adequate Protection, or (II) in the*

---

[1] The last four digits of Debtor Del Monte Foods Corporation II Inc.'s tax identification number are 1894.  A complete list of the Debtors in these Chapter 11 Cases and their respective tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent, at https://cases.stretto.com/DelMonteFoods.  The location of the Debtor Del Monte Foods Corporation II Inc.'s principal place of business and the Debtors' service address is 205 North Wiget Lane, Walnut Creek, California 94598.

*Alternative, Granting Relief From the Automatic Stay* (the "**Motion**") submitted by Pacific Coast Producers ("**PCP**"), Morning Star Packing Company, L.P. ("**Morning Star Packing**"), and Morning Star Kings, LLC ("**Morning Star Kings**") (together, "**Movants**"). In opposition to the Motion, the Debtors respectfully state the following:

## <u>INTRODUCTION</u>

1.      Movants seek an unprecedented and unwarranted acceleration of the Debtors' decision to assume or reject their Supply Agreement (supplying canned tomato products) and Lease (for a facility presently used by the Debtors to complete shipping of its remaining 2024 Pack Season products) less than seven weeks into this bankruptcy. Not only is this case recently filed, but the Debtors are in the initial stages of their sale process for, among other things, their valuable tomato business. Movants desire to lock the Debtors and their estates into a choice on these contracts now, well before the Debtors address the many other contracts and leases impacting their businesses as part of the sale process. For leverage, Movants are threatening to cease performance of their Supply Agreement obligations, which are essential to the 2025 Pack Season, which would seriously harm the Debtors' tomato operations – as well as violate the automatic stay. Their Motion flies in the face of Congress's intent to give debtors and their estates breathing room after filing a Chapter 11 petition. Forcing Debtors to make premature decisions so early into this complex bankruptcy risks unraveling the orderly sale process currently underway and disrupting these Chapter 11 cases as a whole to the detriment of all creditors. The alternative forms of relief Movants request – to lift the stay or preemptively dictate the terms of any future assumption or rejection – are unsupported by any authority. They are also end-runs around the breathing period granted by Congress and baseless under the applicable standards. In short, the Motion is deeply flawed and should be denied for multiple reasons.

2.      The legal authorities are resoundingly against the relief Movants seek.  Courts routinely reject motions to compel assumption or rejection so early in a bankruptcy.  In fact, *Movants have not identified a single comparable case in their favor*.  To the contrary, courts – including in the cases Movants cite – routinely uphold a debtor's right to assume or reject most executory contracts until confirmation, and for 120 days from the filing of the petition (subject to further extension) as to non-residential real property leases.  Without any precedent in their favor, and overwhelming precedent against them, the Motion fails at the starting blocks.

3.      Movants fare even worse on the facts.  Movants do not identify any harm that they will *actually* suffer by waiting for the Debtors to timely exercise their business judgment as to the two contracts at issue.  First and foremost, the Debtors have *already* posted the demanded Letter of Credit – which is the sole contractual assurance of performance Movants bargained for – mooting much of the Motion.  Moreover, at most, Movants contend only that there is a *risk* of harm *if* the Debtors do not continue as a going concern and *if* the Debtors do not buy the tomato products Movants are supplying.  Tellingly, however, Movants make little effort to predict how likely these risks are to come to pass.  And that's presumably because these risks are unlikely for numerous reasons, including the following:

- The Court recently gave final approval to the DIP Facility, providing the Debtors with $165 Million in new money.  The DIP budget contemplates that the Debtors will use these funds to pay for rent and product purchases needed for the 2025 Pack Season, including in their tomato business.

- The Debtors are running a sale process that includes their valuable tomato businesses which will address, among other things, the Supply Agreement.  The Debtors' ad hoc term lender group has agreed to act as a stalking horse bidder for a going concern sale of the Debtors' businesses (including the tomato business), and this Court has approved the bidding procedures for a sale of substantially all of Debtors' assets, with the notable consent of the Official Committee of Unsecured Creditors and a minority group of ad hoc term lenders.

- Movants boast about how valuable the contracts at issue are to the Debtors.  If the Court takes Movants at their own word, then the risk of non-assumption or a failure to purchase the products is minimal.

Thus, by Movants' own admission, and based on how the case already is progressing, the risk of harm to Movants is low and the safeguards protecting Movants are already in place.

4. In contrast, the Debtors, their estates and other creditors will be harmed if the Debtors are forced to decide on assumption at this point. Assuming or rejecting these long-term contracts before assessing any financial benefit to the Debtors and the sale process progresses risks reducing the value to the estates and the ultimate purchase price the Debtors may receive for their assets. Similarly, if Movants can jump the line and force assumption or rejection so early in the case, other vendors and landlords may seek to do the same, eviscerating the congressionally mandated breathing spell that is a cornerstone of every bankruptcy and throwing the sale process – and these very Chapter 11 cases – into disarray. In other words, Movants threaten to deprive the Debtors of their ability to run their case consistent with their reasonable business judgment, jeopardizing the Debtors' successful rehabilitation and harming the estates and creditors.

5. Similarly, Movants are not entitled to their alternative request for relief from the automatic stay to cease performance if this Court denies their motion to compel. Some courts have held that, as a matter of law, stay relief is not even available before the assumption or rejection deadline passes, as it would merely be accelerating the deadline by another name. And courts have routinely denied relief from the stay to non-debtors who wish to terminate their contracts. Movants have identified *no* cases to the contrary. Further, even if such relief was available, the equities weigh in favor of keeping the stay, one of the most fundamental protections available to debtors, in place.

6. As for Movants' arguments about the contracts being "financial accommodations" and "integrated agreements" that must be assumed or rejected together – all of those issues are premature (as well as disputed). These are questions for this Court to consider, if at all, only *after*

the Debtors make their decision to assume or reject, and only if the Debtors want to treat the contracts differently from one another. Movants identify no authority where a court has preemptively imposed similar conditions on a debtor before it has made its election decisions. Finally, contrary to Movants' assertions, there are no health and safety issues at the plant – and if any such issues were to exist, the appropriate avenue for Movants to seek redress would be a motion under 11 U.S.C. § 365(d)(3). No such motion is presently before the Court.

## BACKGROUND[2]

### I.    The Bankruptcy

7.      The Debtors are one of the country's leading producers, distributors, and marketers of primarily plant-based food products. For over 130 years, the Debtors' products have been a cornerstone of American grocery stores. The Debtors employ approximately 2,780 employees and operate four plants in North America. FDA ¶¶ 1-2. The Debtors do business with – and, in particular, source products from – hundreds of different vendors and farmers. FDA ¶¶ 1, 22.

8.      Most of the Debtors' products are seasonal, which means that produce is picked when ripe then processed in a relatively quick period. FDA ¶ 3. This creates Debtor's "**Pack Season**," which for many products runs from June through October. FDA ¶ 3. This is an incredibly intense period of work; in fact, approximately 1,370 employees are hired seasonally for the Pack Season. The Debtors are currently in the thick of the 2025 Pack Season. FDA ¶ 28. The resulting inventory is then sold over the next 12-18 months. FDA ¶ 3.

9.      On July 1 (the "**Petition Date**"), the Debtors filed for Bankruptcy due to industry headwinds and an over-leveraged balance sheet. FDA ¶ 46. The Debtors estimated over 10,000

---

[2] This Background section is drawn from Movants' papers, the Declaration of Jonathan Goulding as Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions (the "**FDA**"), Doc. 19, an additional Declaration of Jonathan Goulding filed contemporaneously herewith in opposition to the Motion (the "**Goulding Op. Decl.**"), the exhibits annexed thereto, and various other documents filed on the docket.

creditors and more than $1 billion in assets and liabilities.  Del Monte Foods Corporation II Inc.,

Voluntary Petition for Non-Individuals Filing for Bankruptcy, Doc. 1 at 3.  On July 2, this Court

approved an Interim DIP which provided the Debtors with $100 million in new money.

Doc. 59 (i)(a), (i)(d).  As originally contemplated, that amount was increased to $165 million on

August 12, 2025, upon final approval of the DIP Facility by the Court at the conclusion of the

Second Day Hearing.  Doc 359 (i)(a).

10.     An ad hoc group of the Debtors' pre-petition term loan lenders signed a

Restructuring Support Agreement ("**RSA**") with the Debtors as of the Petition Date.  FDA ¶ 9.

That RSA contemplated that the Debtors would subsequently file a motion to approve bidding

procedures for an auction to sell all or substantially all of the Debtors' assets, and that the ad hoc

group would serve as stalking horse bidder.  The Debtors filed that motion on July 20, 2025 (Doc.

190), the motion was granted at the Second Day Hearing (Doc. 365), and the sale process is already

underway.

## II.     The Products Supply Agreement

11.     In January of 2025, Debtor Del Monte Foods Corporation II Inc. ("**DMFC**")

entered into the Products Supply Agreement (the "**Supply Agreement**") with Morning Star

Packing and PCP.  Under the Supply Agreement, Morning Star Packing and PCP (the "**Suppliers**")

collectively agree to procure raw materials for and process tomatoes for Del Monte products.  The

Supply Agreement operates like many other contracts DMFC has with producers: DMFC provides

an estimate of its Pack Season and full year demand at intervals leading into the Pack Season.

Supply Agreement §§ 2.1, 2.3.  The final estimate is required to be made in April, and DMFC

provided that estimate to Morning Star Packing and PCP for the 2025 Pack Season.  Supply

Agreement § 2.3(1).  This essentially kicked off the initial performance cycle under this contract.

6

The Suppliers then purchase the tomatoes from farmers and pack the product during the Pack Season (which runs from July to early October).  Mot. ¶ 34.  DMFC must use "reasonable commercial efforts" to buy the product over the upcoming year, though DMFC has the ability to adjust the shipping schedule to match demand and stretch out delivery over a slightly longer period. Supply Agreement § 2.3.  Invoices are issued upon shipment of finished goods, and payment is due net-20 or net-30 terms depending on the time of year of the shipment.  The Supply Agreement runs for an initial term of five years, and it can be terminated after the 2029 Crop Year.  Supply Agreement § 6.1.  It can also be extended beyond that term.  Supply Agreement § 6.1.

12.    The Suppliers process the tomatoes and place them into "Brites," which are unlabeled cans.  According to Movants, the majority of the Brites are common-formula products (Mot. ¶ 34), meaning that essentially DMFC orders off a menu of supplier options and other companies can order the same.  In fact, all of the products produced by Morning Star Packing are common-formula products.  Goulding Op. Decl. ¶ 12.  The remaining Brites contain tomatoes prepared using a recipe or intellectual property belonging to DMFC.  Mot. ¶ 34.

13.    DMFC was supposed to provide a Letter of Credit to the Suppliers for $4 Million. Supply Agreement § 3.1(1).  It did not do so prior to the Petition Date, but the parties continued performing anyway.  In mid-June, PCP threatened to terminate the Supply Agreement if DMFC failed to provide the Letter of Credit, but it never sent a notice to cure in the manner mandated by the Supply Agreement (Supply Agreement § 6.2(1)(b)), nor did it purport to send a termination notice.  The parties generally continued to perform – although, post-petition, PCP has delayed packing some of DMFC's products and has threatened further delays.  Goulding Op. Decl. ¶ 14.

14.    Specifically, on July 16, 2025, PCP emailed DMFC and stated that "[b]ased on the turbulence involved with this legal activity, possible rejection of the contracts, and no letter of

credit," PCP had decided to "push back start dates for all [DMFC] production." Exhibit A. Debtors' counsel explained that such action would be a breach of contract and violation of the automatic stay, informed Movants that the Letter of Credit was forthcoming promptly and encouraged them to refrain from making the instant Motion. Exhibit C. Regrettably, Movants refused to wait. The Letter of Credit (which required coordination with and approval by the Movants and the issuing bank to finalize) has now been posted. Exhibit E.[3]

### III.    The Purchase and Sale Agreement and Lease of the Hanford Plant

15.    The Hanford Plant in Hanford, California was a facility previously owned by DMFC and previously used for the processing and packaging of tomatoes by DMFC. In January 2025, DMFC entered into two contracts related to the Hanford Plant. One was the Purchase and Sale Agreement and Joint Escrow Instructions ("**Purchase Agreement**"), which provided for the sale of the Hanford Plant to Morning Star Kings (an affiliate of Morning Star Packing). That sale closed on March 7, 2025. The other was a Commercial Lease Back Agreement (the "**Lease**" together with the Purchase Agreement, the "**Sale and Lease Back Agreement**"), a lease where Morning Star Kings would rent the Hanford Plant back to DMFC for a limited period so that DMFC could complete the labeling of unlabeled Brite cans produced in the 2024 Pack season, then store and ship out the majority of that unsold product prior to September 28, 2025. Goulding Op. Decl. ¶ 19.

16.    Contrary to the suggestion in the Motion, none of the tomatoes that are to be packed pursuant to the Supply Agreement are – or ever were – to be packed in Hanford. The Hanford

---

[3] The only other purported issue Movants identified with the Supply Agreement is that DMFC requested a downward adjustment of the volume of product it wished to order. Mot. ¶ 14. As reflected in Exhibit A, however, PCP *agreed to this adjustment*, which, in any event, is minimal. Given that voluntary agreement and the small numbers at issue, Movants' current claim that this is "violative" of the Supply Agreement (Mot. ¶ 14) is both disingenuous and wrong.

Plant is not being used to pack tomatoes at all.  It is being used by DMFC exclusively to label, store and ship existing inventory.  Goulding Op. Decl. ¶ 18.

17.    DMFC is scheduled to stop using the Hanford Plant by September 28, 2025. Nevertheless, the Lease requires DMFC to continue to make rent payments to Morning Star Kings until Morning Star Kings sells the property or until January 7, 2028, whichever is earlier.  Lease § 1.3(b).  In exchange, Morning Star Kings is required to use best efforts to market the Hanford Plant for sale and, depending on the sale price, share profits or a capped loss with DMFC.  Exhibit I to the Purchase and Sale Agreement at 6.[4]  DMFC's projected rental obligations for this Lease is included in the DIP budget.  Goulding Op. Decl. ¶ 20.

18.    Movants contend that there are unspecified "health and safety" issues at the Hanford Plant.  Mot. ¶ 10.  The Debtors disagree.  The items complained of relate to water testing that has now been conducted on water systems that are in use.[5]  Most of the "defaults" asserted are pre-petition as some even predate the "as is" sale of the property to Morning Star Kings.  Purchase Agreement § 4.4.  Many of the alleged defaults are also not defaults at all.  As one example, Morning Star Kings complains of "excessive weeds."  Goulding Op. Decl. ¶ 21.  In any event, without waiver of their rights, the Debtors already have addressed or are addressing most of the matters Movants complained of and *will continue to do so as may be required by section 365(d)(3)*

---

[4] In addition, it is noteworthy that Morning Star Kings can proceed at any time on the sale of the Hanford Plant and, in doing so, mitigate any longer-term concerns on the Lease.

[5] The Debtors understand based on communications with counsel that the purported source of Movants' safety concerns is that employees at the Plant may be consuming drinking water from faucets without the water in those faucets having undergone timely testing. The employees have, and have always had, access to water stations that provide bottled water throughout the portions of the Plant currently in use, meaning this concern is unfounded. Goulding Op. Decl. ¶ 23.

of the Bankruptcy Code.  Movants' trumped-up list of, at best, workaday matters does not warrant

the extraordinary relief they are demanding.[6]

## ARGUMENT

### I.     The Debtors Should Not Be Compelled To Prematurely Assume Or Reject Either Agreement

19.     Movants bear the burden of demonstrating cause to shorten the Debtor's time to

decide to assume or reject an executory contract or a lease.  *In re Mayer Pollock Steel Corp.*, 157

B.R. 952, 964 (Bankr. E.D. Pa. 1993); *In re Memory Lane of Bremen*, *LLC* 535 B.R. 901, 906

(Bankr. N.D. Ga. 2015).  They cannot meet that burden, as courts simply do not grant these types

of motions so soon into a case, and Movants' evidence, even if accepted as true, does not

demonstrate sufficient (or any) harm from waiting for a decision to assume or reject.

#### A.     Courts Routinely Deny Early Motions to Compel Assumption or Rejection

20.     Movants have failed to produce a *single* case from *any* jurisdiction that granted a

motion to compel a decision on whether to assume or reject a lease or any other contract this early

in a bankruptcy.  (*See* cases cited at Mot. ¶¶ 46-48.)  This is unsurprising.  Section 365 provides

that a Chapter 11 debtor has 120 days from the petition date to decide whether to assume or reject

a non-residential lease, and that time period is routinely extended further for cause.  11 U.S.C.

§ 365(d)(4)(A)(i).  For all other executory contracts, like the Supply Agreement here, a debtor can

assume or reject at any time until a plan is confirmed.  *Id.* § 365(d)(2).  Section 365, in other words,

supports the "clear policy of the Bankruptcy Code to provide the debtor with breathing space

following the filing of a bankruptcy petition."  *In re Enron Corp.*, 279 B.R. 695, 702 (Bankr.

---

[6] Movants repeatedly assert that PCP is a "nonprofit" (*e.g.*, Mot. ¶ 22) and also state that they entered into the agreements "for the benefit of Del Monte" (Mot. ¶ 4).  This is irrelevant and disingenuous.  PCP is a cooperative that passes profits through to its members rather than taking them itself, *as its own declarant acknowledges*.  Strong Decl. 20 (acknowledging that PCP is "essentially [a] pass through entity" and its "grower owners [receive] patronage (profit) and equity in the company").

S.D.N.Y. 2002); *see also In re EnCap Golf Holdings, Inc.*, *LLC,* 2008 WL 5955350, at \*3 (Bankr.

D.N.J. Dec. 24, 2008) ("In light of [Chapter 11's] rehabilitative purpose, courts frequently permit

a debtor to wait until late in its case to make a decision to assume or reject a contract.").

21.    Consistent with this clear policy, most cases simply reject any motion to compel an

early assumption or rejection outright.  *In re G-I Holdings, Inc.,* 308 B.R. 196, 213-14 (Bankr. D.

N.J. 2004) (denying motion); *In re Memory Lane of Brennan*, 535 B.R. at 906 (same); *In re

Physician Health Corp.,* 262 B.R. 290, 295 (Bankr. D. Del. 2001) (same); *In re Mayer Pollock

Steel Corp.*, 157 B.R. at 964 (same) *In re St. Mary Hosp.*, 89 B.R. 503, 514 (Bankr. E.D. Pa. 1988)

(same); *In re Dunes Casino Hotel*, 63 B.R. 939, 949-50 (D.N.J. 1986) (upholding denial of motion

to compel assumption or rejection); *In re Teligent, Inc.*, 268 B.R. 723, 738-39 (Bankr. S.D.N.Y.

2001) (adjourning motion).  *See also* 3 Collier on Bankruptcy ¶ 365.05 (16th ed. 2025) (observing

that the motion is rarely granted).

22.    In the few instances where *any* relief is granted on a motion to compel assumption

or rejection, the courts did so much later in the bankruptcy than here and set a much longer timeline

for a decision than the mere two days Movants request.  *In re Adelphia Commc'ns Corp.*, 291 B.R.

283, 300-01 (Bankr. S.D.N.Y. 2003) (setting deadline more than a year after the petition date and

affording the debtor 90 days to decide after the order); *In re Enron Corp.*, 279 B.R. at 704 (11

months after petition, over 3 months to decide); *In re Hawker Beechcraft, Inc.*, 483 B.R. 424, 433

(Bankr. S.D.N.Y. 2012) (8 months after petition, one month to decide); *In re EnCap Golf Holdings,

LLC*, 2008 WL 5955350, at \*5 (8 months after petition, over one month to decide).  *Cf. In re G-I

Holdings, Inc.*, 308 B.R. at 213-14 (observing that, if a deadline is to be set, the bankruptcy court

has discretion to set a reasonable deadline).

23.     Without a single case supporting their position on (very) early assumption or

rejection – and, to the contrary, ample precedent against it – Movants' Motion fails at the threshold.

**B.      Movants Have Not Met Their Burden to Justify Accelerating the Debtors'
Choice to Assume or Reject Either Contract**

24.     Given the strong statutory preference for giving a debtor time to organize its affairs

and exercise its judgment, the overwhelming precedent denying forced assumption or rejection,

and the complete absence of cases supporting Movants at this early juncture, one might have

expected the Movants to be approaching the Court with truly extraordinary facts.  That is not the

case.  Instead, the only purported "harm" Movants identify is not even definitive; it is a mere "risk"

of harm – and one that is overstated.  Movants' entire motion is predicated on a concern about

several million dollars of economic exposure that, like every other vendor, landlord, or contract

counterparty, Movants would prefer not to have to endure.  This does not meet – or even approach

– the high standard needed to upset the statutory framework, let alone so early in the case.

25.     When deciding whether to impose a deadline on whether to assume or reject a

contract, courts consider a number of factors, including "(1) the nature of the interests at stake; (2)

the balance of the hurt to the litigants; (3) the good to be achieved; (4) the safeguards afforded to

those litigants; . . . (5) whether the action to be taken is so in derogation of Congress' scheme that

the court may be said to be arbitrary," *In re G-I Holdings, Inc*., 308 B.R. at 212-13; (6) "whether

exclusivity has terminated"; and (7) "the complexity of the case," *In re Enron Corp.*, 279 B.R. at

702-05.  "Most importantly, however, 'the court should interpret reasonable time consistent with

the broad purpose of Chapter 11, which is to permit the successful rehabilitation of debtors." *In re

G-I Holdings*, *Inc.* 308 B.R. at 213 (cleaned up).  Recognizing that breathing space supports this

purpose, "courts frequently permit a debtor to wait until late in its case to make a decision to

assume or reject a contract."  *In re Encap Golf Holdings, LLC*, 2008 WL 5955350, at *3.  These factors weigh heavily in the Debtors' favor.

26.    **Nature of Interests**.  Movants' interest in accelerating a decision is an economic one: they contend they are exposed to financial risk (though, as demonstrated below, that risk is overstated and no greater than other post-petition vendors).  The Debtors, likewise, face financial risk, but also face a categorically different threat: if the Motion is granted, the Debtors risk losing control of their sale and restructuring process in only the second month of the case.  Allowing vendors to compel premature decisions significantly disrupts the orderly process provided by Chapter 11, including the sale process underway to preserve these businesses as a going concern. It forces the Debtors to make decisions – and incur costs or consequences associated with those decisions – prematurely.  In addition, granting the Motion threatens the sale process because it will deprive potential purchasers of the ability to determine for themselves whether assumption or rejection of Movants' multi-year contracts is value maximizing.  Premature rejection deprives the estates of important contracts relating to the Debtors' valuable tomato business.  However, premature assumption forces the Debtors to undertake a multi-year obligation on a business that is – at this very moment – being marketed to third parties and that the Debtors will not own post-sale.  Either choice makes no sense at this juncture.  Threatening the sale process – or the price that can be achieved in that process – simply harms the Debtors' estates and *all* creditors and other stakeholders.  Goulding Op. Decl. ¶ 24.

27.    **Balance of Harm**.  Movants face no harm in waiting for the Debtors to make their decision as part of their sale process, while requiring the Debtors to decide now limits the options available to a potential buyer and potentially destroys value to the estate.

28.     Starting with the Lease, the answer is easy: There is no harm to the landlord, Morning Star Kings, while the Debtors are considering whether to assume or reject the Lease.  This is a non-residential real property lease, and the Debtors will comply with any obligations they may have under section 365(d)(3) to timely perform their post-petition obligations under such lease.[7] Movants appear to agree.  The only risk of harm they allege is "if the *Products Supply Agreement* is not immediately assumed or rejected."  Mot. ¶ 50(b) (emphasis added).  No similar harm is asserted with respect to the Lease.

29.     Turning to the Supply Agreement, the Suppliers do claim some *risk* of harm if the Debtors are afforded their statutorily mandated time to determine whether to assume or reject the Supply Agreement, because they *may* be stuck with unsaleable goods, and they *may* incur costs that they otherwise would not have.[8]  This purported "harm" is overstated, for multiple reasons.

30.     *First*, the Letter of Credit has been posted (Exhibit E).  This provides Movants *the very assurances of performance they bargained for.*

31.     *Second*, Movants do not (and cannot) assert that the risks they identified *will certainly* come to pass or are even likely to occur.  Any harm is – by Movants' own implicit admission – speculative at best.  Movants make zero effort to predict how likely or unlikely it is that these risks will come to pass, and this failure alone shows that they have not met their burden of proof.  Indeed, Movants unwittingly concede that their hypothesized harm, i.e., that no one buys their tomatoes, is *unlikely* to occur.  Movants *repeatedly* assert that the Supply Agreement is

---

[7] The Debtors reserve their rights with respect to whether the Lease is a true lease and seek to recharacterize the Lease. Nothing herein is a waiver of their rights relating to the same, including whether the Debtors have any obligations under section 365(d)(3) of the Bankruptcy Code with respect to the Lease.

[8] *See, e.g.*, Mot. ¶ 15 (speculating that the Debtors "*may* ultimately not need" and "*may* not be able to pay for" some of the tomatoes if they do not assume the Supply Agreement) (emphasis added); Mot. ¶ 36 (speculating that producing the product "*may* produce an oversupply . . . [that] could decrease the price") (emphasis added); Mot. ¶ 41 (speculating that the Debtors "*may* be out of the tomato business in short order") (emphasis added).

exceedingly valuable to the Debtors (¶¶ 10, 50(c)), how it has below market pricing (¶¶ 4, 6, 43), and how foolish the Debtors (or any purchaser(s)) would be not to assume it (¶¶ 10, 13, 25, 50(f), 54). If Movants believe what they say about this value, either assumption is very likely, or, even if the contract is not assumed, someone will want to buy their profitable tomatoes to sell. Either way, the risk of the asserted potential harm occurring is low.

32.    *Third*, the facts and posture of the rest of this case likewise show the risk is remote. The Debtors secured a DIP order with $165 million of new liquidity. Doc. 359. One of the main purposes of the DIP Facility is to *pay for the budgeted costs of the 2025 Pack Season* – which includes the tomato orders the Debtors are scheduled to place and receive from the Suppliers. Goulding Op. Decl. ¶ 13. The case started with a restructuring support agreement already in place, which has now crystalized into an order approving the bidding procedures for a sale and a stalking horse term sheet to buy substantially all of the Debtors' assets in a going concern sale. Doc. 365. Furthermore, as noted in the accompany declaration of Mr. Goulding, the Debtors' tomato business is expected to be profitable – further increasing the likelihood that it will be purchased as a going concern. And, if not, the Debtors may still profit from buying the Suppliers' products for the 2025 Pack Season and reselling them at a profit. Goulding Op. Decl. ¶ 13.

33.    *Fourth*, as Movants are compelled to acknowledge, the majority of the Brites are common-formula products and can be resold by Movants or another customer of Movants – reducing Movants' economic exposure. Nevertheless, based on nothing, Movants speculate this could somehow cause a possible oversupply of tomatoes. Mot. ¶ 36. This logic simply does not check out. If DMFC were to reject the Supply Agreement and not order tomatoes, there would be a gap in the ability to fill consumer demand caused by DMFC's departure that another company – including Movants, who compete directly with the Debtors' tomato business – could fill by buying

the same tomatoes.  The Movants also claim that the production of Brites with DMFC's recipe or

IP leaves them at risk.  But this is not right either.  As an initial matter, this risk only applies to

PCP, because Morning Star Packing is producing only common-formula products that can be sold

to others.  Goulding Op. Decl. ¶ 12.  But even for PCP, proprietary blends are likely profitable to

the Debtors, and even if the Debtors' eventual purchaser declines to purchase the tomato business,

the Debtors can sell these products as part of their wind down.

34.    In contrast to the significantly overstated harm to Movants, the Debtors face real

and substantial harm if forced to assume or reject the contract prematurely and immediately.  For

one, many of the Debtors' product manufacturing contracts work like the Supply Agreement.  If

PCP and Morning Star get to jump the line in forcing a decision, other vendors will logically use

this precedent to force immediate decisions on their agreements, throwing these Chapter 11 cases

into disarray.  (And even if those other motions are denied, the distraction on the businesses during

this critical Pack Season would be harmful.)  Further, as the Debtors are in the midst of a sale

process, it is self-evident that the prospective buyers should get the opportunity to decide whether

to continue these contracts – one that has a *five-year* term – before a decision is made.  Making the

"wrong" decision could be costly and reduce the eventual sale price for DMFC's businesses.  This

would have a detrimental impact on the Debtors' estates *and creditors*, far in excess of the alleged

good to be achieved by an individual supplier (especially one who continues to receive post-

petition performance under their agreements).  As courts have recognized, "interests of the

creditors collectively and the bankrupt estate as a whole will not yield easily to the convenience or

advantage of one creditor out of many."  *In re Physician Health Corp.*, 262 B.R. at 295 (quoting

*In re Pub. Serv. Co. of N.H.*, 884 F.2d 11, 14-15 (1st Cir. 1989)); *see also In re G-I Holdings, Inc.*,

308 B.R. at 213-14 ("No possible benefit is accorded [to] this estate if it is required to make a

business judgment on issues not in proportion to the complexities of the total case before formulating its Plan of Reorganization.").

35.    **The Good To Be Achieved.**    Much like with the harm to be avoided, Movants fail to argue that assuming or rejecting specifically the *Lease* will provide them with any comfort. They contend that the "good to be achieved" *as to the Supply Agreement* is that products produced "will not go to waste" (Mot. ¶ 50(c)), but say nothing similar about the Lease.[9]   Further, there is little to be gained from forcing a premature decision on the Supply Agreement.   As explained above, the costs to be avoided are overstated and can be mitigated.   The good to be achieved for the Debtors by denying this Motion, however, is that the Debtors will have the opportunity to continue pursuing an orderly and effective going concern transaction.   This, too, weighs in the Debtors' favor.

36.    **The Safeguards Available to Each Party**.   This factor also weighs in favor of giving the Debtors breathing space.   PCP and Morning Star Packing have a safeguard: they have the Letter of Credit.   That is the security they *negotiated for*.   Indeed, they appear to acknowledge that the Letter of Credit would be an appropriate safeguard.   Mot. ¶ 50(d).   The DIP (and the DIP budget) is yet a further safeguard to the Movants.   It gives the Debtors the ability to purchase finished goods, pay their ongoing rent and other costs needed to achieve success during the Pack Season.   The Bankruptcy Code provides yet further assurances.   For example, if the Debtors fail to pay any sum due post-petition, Movants will have an administrative claim.   The Debtors also

---

[9] As for the purported breaches of the Lease, assumption or rejection of the Lease will not change anything.  If Morning Star Kings wishes to compel performance to remedy some alleged post-petition breach under Section 365(d)(3), it must file a motion to do so, and the Debtors will respond in due course.  As already discussed, these alleged breaches are overstated.  *Infra* p.13-15, Goulding Op. Decl. ¶¶13.  Almost all of them arose pre-petition and are thus not actionable.  *See, e.g.,* 11 U.S.C. § 365(d)(3) (mandating performance only of obligations arising "from and after" the petition date); *In re Plastech Engineered Prods., Inc.,* 402 B.R. 217, 221 (Bankr. E.D. Mich. 2009) (requiring a debtor to "cure a pre-petition breach of an unexpired lease under § 365(d)(3), even though the Debtor had not yet determined whether to assume or reject the Amended Lease, would eviscerate the Debtor's statutory right to take 120 days to determine whether to assume or reject a lease post-petition").

may be required to timely perform their post-petition Lease obligations under section 365(d)(3). Meanwhile, there are no safeguards for the Debtors if the Motion is granted and the Debtors are given a mere *two days* to decide whether to assume or reject these contracts.

37.    **Whether the Action Is in Derogation of Congress's Scheme**.    Granting the Motion would clearly derogate the congressional scheme.    Congress has *never* set a deadline so short for debtors, especially Chapter 11 debtors.    Congress, instead, provided important breathing space to give the Debtors an opportunity to reorganize and pursue a value-maximizing path for their businesses and assets for the benefit of the estates and creditors.

38.    **Whether Exclusivity Has Ended**.    The period of exclusivity has barely even started and certainly has not run.    This demonstrates another attempt by Congress to give debtors breathing space, and as such, weighs in the Debtors' favor.

39.    **The Complexity of the Bankruptcy**.    This is a highly complex bankruptcy (in fact, one of the largest Chapter 11 cases filed in 2025), with over 1,000 claimants, and over $1 billion dollars in assets and liabilities.    Bankruptcies where a deadline was imposed – again, months later than Movants demand here – were far simpler.    For example, the debtor in *En Cap* had only a "couple of employees," and did "not manufacture goods, sell goods, or provide services."    2008 WL 5955350, at *5.    Even then, the Court allowed eight months to decide whether to assume or reject a contract that had been in existence for *over two years*.    *Id.*    In this far more complex bankruptcy, the Debtors should have more than two months to decide whether to assume or reject any agreement.

40.    Finally, as to the factor that this jurisdiction has identified as the "[m]ost important[]," providing "reasonable time" to reach a business decision is in service of supporting the rehabilitation of the debtor, the broad purpose of Chapter 11.    *In re G-I Holdings*, *Inc.* 308 B.R.

at 213.  Movants spend a good deal of time arguing that the immediate assumption of the agreements will benefit the Debtors.  That may be true: the Debtors have not yet had an opportunity to determine that for themselves.  But the decision belongs to *the Debtors*.  And, at least as of today, the Debtors' business judgement is that it is not yet time to either assume or reject Movants' contracts.  Additionally, a future purchaser (whether the stalking horse bidder or otherwise) may have its own views as to whether to assume or reject these contracts.  It is perfectly reasonable for the Debtors to want that purchaser to have a say on what and when to assume or reject.

41.     Because every factor weighs in the Debtors' favor, this Motion should be denied.

## II.     Movants Are Not Entitled to Relief from the Automatic Stay

42.     As an alternative, Movants seek relief from the automatic stay.  Such relief would be nothing more than another attempted end-run by Movants around the timeline for assumption and rejection granted to debtors in the Code.  It would, in effect, let *non-debtor* Movants prematurely terminate the contracts even though the Bankruptcy Code specifically allows the *Debtors* ample time to decide whether to assume or reject those contracts.  And in any event, Movants' arguments in favor of stay relief are meritless.

43.     The automatic stay is "one of the most fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. N.J. Dep't of Env't Prot.*, 474 U.S. 494, 503 (1986) (quoting S. Rep. No. 95-989 at 54 (1978)).  Among other things, the stay allows a debtor to "avoid interference with the orderly liquidation or rehabilitation." *Assoc. of St. Croix Condominium Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982).  As Movants tacitly acknowledge, if a non-debtor refuses to perform an executory contract, they have violated the stay. *In re Penn Traffic Co.*, 524 F.3d 373, 382 (2d Cir. 2008); *In re Broadstripe, LLC*, 402 B.R. 646, 656 (Bankr. D. Del. 2009).

44.     Movants are not entitled to stay relief.  The stay relief provisions in the Bankruptcy Code are inapplicable "during the period where the trustee is making its decision to assume or reject."  *In re Att'ys Off. Mgmt, Inc.*, 29 B.R. 96, 98 (Bankr. C.D. Calif. 1983); *see also In re Winn-Dixie Stores, Inc.*, 345 B.R. 402, 405 (Bankr. M.D. Fla. 2006) (concluding stay relief motion is an "'improper statutory vehicle for determining the rights of parties involved in a non-terminated leasing arrangement'") (quoting *In re Easthampton Sand & Gravel Co.,* 25 B.R. 193, 197-98 (Bankr. E.D.N.Y. 1982)).  That makes inherent sense: the time granted to decide would be illusory if stay relief was given so that a non-debtor could terminate (or enforce) the contract.  And as such, granting it here would simply be accelerating the decision by another name.

45.     Even if relief from the stay was available, it should not be granted here.  Bankruptcy courts can grant relief from the stay "for cause," a flexible standard where the movant bears the burden of proof.  *In re Ward*, 837 F.2d 124, 128 (3d Cir. 1988); *In re Windhaven Top Ins. Holdings, LLC*, 636 B.R. 596, 604-05 (Bankr. D. Del. 2021).

46.     Here, again, Movants have failed to cite a single applicable case in favor of stay relief comparable to this one.  Movants cited three cases.  One does not even discuss the automatic stay, *In re Adelphia Commc'ns Corp.*, 291 B.R. at 301-02.  The other two do not involve executory contracts.  *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997) (holding Bankruptcy Court should grant stay to allow appeal of adverse state court judgment which otherwise would have been completely unreviewable); *In re Denny*, 2006 WL 2806232, at *1 (Bankr. D.N.J. 2006) (lifting stay for creditor who had a perfected security interest in a vehicle).

47.     These cases are far afield of the facts here.  In fact, even in executory contracts that can be terminated at will, courts routinely deny stay relief for non-debtors seeking to terminate the contract.  *See In re Nat'l Hydro-Vac Indus. Servs., L.L.C.*, 262 B.R. 781, 787 (Bankr. E.D. Ark.

2001) (collecting cases).  The Debtors are not aware of a *single* case that concluded sufficient cause exists to lift the stay simply so that a non-debtor can terminate an executory contract.[10]

48.     Moreover, based on the balance of equities noted above, the Court should not grant relief.  Movants do not face any issue not also faced by other creditors.  But removing one of the most "fundamental debtor protections" to allow Movants to jump in line jeopardizes the Debtors' orderly rehabilitation and sale process to the detriment of the Debtors' estates and creditors.

### III.    Movants Are Not Entitled to Adequate Protection

49.     In certain sections of their Motion, Movants make passing references to requiring adequate protection.  *See, e.g.,* Mot. ¶¶ 11, 12, 15, 43, 52.  Yet, Movants never bother to identify – let alone present a coherent argument concerning – the basis on which they would be entitled to "additional collateral" (Mot. ¶ 43) or "a super-priority administrative claim" (Mot. ¶ 15).  That alone means Movants fail to meet their burden of proof and waive the issue.  *Ammar v. McDonough*, 2025 WL 692084, at *9 (D. Del. Mar. 4, 2025) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.") quoting *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016).

50.     Moreover, when it comes to leases, adequate protection is provided by the debtor paying what is owed under the lease.  *In re P.J. Clarke's Rest. Corp.*, 265 B.R. 392, 405 (Bankr. S.D.N.Y. 2001).  That is exactly what the Debtors will do here.  The Debtors are not aware of any basis for the parties to the Supply Agreement to claim an entitlement to adequate protection, and

---

[10] Any suggestion that Movants are suffering the harm of having to perform while the Debtors are allegedly in breach – a point Movants never actually come out and say expressly – is without merit.  With respect to the Lease, Movants will comply with their obligations under section 365(d)(3), and, for the reasons already articulated, the supposed breaches complained of are not actually breaches (let alone material breaches), and/or they have already been remedied or will soon be remedied.  In fact, many of them originate prior to the Petition Date and thus are not actionable.  *See, e.g.,* 11 U.S.C. § 365(d)(3) (mandating performance only of obligations arising "from and after" the petition date).  As for the Supply Agreement, the Letter of Credit has been posted (Exhibit E), and the minor volume changes were consensual (Exhibit A).  These minor issues do not excuse Movants' own performance such that lifting the automatic stay to permit termination of the agreements would be appropriate.

none was provided.  To the contrary, as noted above, the parties agreed that assurance of performance would be provided in the form of the Letter of Credit, and that has now been posted. Movants have no basis to demand yet additional assurances.

### IV.    All of Movants' Other Requests Are Premature

51.    Movants' final request is that the Court should refuse to allow the Debtors to assume the Products Supply Agreement without also assuming the Lease because it includes "Financial Accommodations."  This argument is premature.  The Debtors have not yet endeavored to assume or reject the agreements.  Accordingly, this is merely hypothetical.  *Cf. TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) ("[F]ederal courts do not adjudicate hypothetical or abstract disputes").  The Court should spend no time on an argument that may not arise.  Moreover, this argument is wrong: "Courts define the term 'financial accommodations' narrowly, as the extension of money or credit to accommodate another."  *In re Sportsman's Warehouse, Inc.*, 457 B.R. 372, 392 (Bankr. D. Del. 2011) (cleaned up).  Because "almost every lease and other executory contract has some provision that could be characterized as a short-term loan to one side or the other," the key inquiry is whether "the contract as a whole is a 'financial accommodation,' not whether one clause could be so characterized."  *In re United Airlines, Inc.*, 368 F.3d 720, 724 (7th Cir. 2004) (Easterbrook, J.).  Here, neither of the contracts are financial accommodations.  The Supply Agreement is an agreement concerning the production of tomato products by two co-suppliers, and the Lease is a lease stemming from a facility purchase and sale contract providing that Morning Star Kings will sell promptly the facility and share future sale proceeds.  As such, there is no basis for concluding that these are financial accommodations.

52.    Also, Movants attempt to predetermine other decisions, such as whether the Lease is so integrated with the Supply Agreement that they must be assumed or rejected together.

Mot. ¶¶ 4, 6.  Again, the Movants state this without any legal citation.  It is similarly hypothetical and premature. The Debtors reserve their rights to address this argument if and when a decision is made to assume or reject these contracts.  The Court need not, and should not, reach it here.

## **CONCLUSION**

WHEREFORE, the Debtors respectively request that the Court deny the relief requested in the Motion and grant the Debtors such other relief as is just and proper.

Dated: August 13, 2025

/s/ Michael D. Sirota
Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota
David M. Bass
Felice R. Yudkin
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:   msirota@coleschotz.com
              dbass@coleschotz.com
              fyudkin@coleschotz.com

– and –

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff*
Rachael L. Ringer*
Natan M. Hamerman*
Megan M. Wasson*

1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
E-mail: Adam.Rogoff@HSFKramer.com
              Rachael.Ringer@HSFKramer.com
              Natan.Hamerman@HSFKramer.com
              Megan.Wasson@HSFKramer.com

*Admitted Pro Hac Vice*

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*