UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Edward J. LoBello, Esq. *(admitted pro hac vice)*
Giuseppe Franzella, Esq. *(admitted pro hac vice)*
Justin S. Krell, Esq.
**BOND, SCHOENECK & KING, PLLC**
600 Third Avenue
New York, New York 10016-1915
Telephone No.: (646) 253-2300
Email: elobello@bsk.com
     gfranzella@bsk.com
     jkrell@bsk.com

  - and -

Andrew Rivera, Esq. *(admitted pro hac vice)*
**BOND, SCHOENECK & KING, PLLC**
One Lincoln Center
Syracuse, New York 10016-1915
Telephone No.: (315) 218-8000
Email: arivera@bsk.com

*Counsel for Seneca Foods Corporation*

| | |
|---|---|
| In re: | Chapter 11 |
| Del Monte Foods Corporation II Inc., *et al.*,[1] | Case No: 25-16984 (MBK) |
| Debtors. | (Jointly Administered) |

## MOTION OF SENECA FOODS CORPORATION PURSUANT TO 11 U.S.C. §§ 105(a) AND 365(d)(2) COMPELLING DEBTORS TO ASSUME OR REJECT THE AMENDED AND RESTATED SUPPLY AGREEMENT

Seneca Foods Corporation ("Seneca"), by its undersigned counsel, as and for its motion

(the "Motion") for an Order pursuant to sections 105(a) and 365(d)(2) of title 11 of the United

---

[1] The last four digits of Debtor Del Monte Foods Corporation II Inc.'s tax identification number are 1894. A complete list of the Debtors in these Chapter 11 Cases and their respective tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent, at https://cases.stretto.com/DelMonteFoods. The location of the Debtor Del Monte Foods Corporation II Inc.'s principal place of business and the Debtors' service address is 205 North Wiget Lane, Walnut Creek, California 94598.

States Code, 11 U.S.C. § 101, *et seq.* (the "<u>Bankruptcy Code</u>"), and Rule 6006(b) of the Federal

Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), compelling Del Monte Foods

Corporation II Inc., *et al.* (collectively, the "<u>Debtors</u>") to immediately assume or reject the

Amended and Restated Supply Agreement dated March 15, 2024 (the "<u>Supply Agreement</u>"),[2] and

granting Seneca such other and further relief as is just or proper.  In support of the Motion, Seneca

incorporates the Declaration of Paul Palmby, Seneca's President, dated October 27, 2025 (the

"<u>Palmby Declaration</u>"), and respectfully states as follows:

### <u>INTRODUCTION</u>

1.      In a typical chapter 11 case, with a typical relationship between a debtor and non-

debtor contract counterparty, this Motion would likely not be necessary.  However, this is not a

typical chapter 11 case, and Seneca is decidedly <u>not</u> like other contract counterparties in this case.



2.      Under the Supply Agreement, Seneca supplies the Debtors with ███████████

███  their vegetable products (collectively, the "<u>Vegetables</u>") ████████████████

███████████████████.  Seneca is required to, among other things, source raw

materials and manufacture, process, and package certain branded, finished processed Vegetables,

most of which are made-to-order pursuant to the Debtors' precise specifications.  The Supply

Agreement enables the Debtors to maintain a ready inventory of Vegetables, stored and

warehoused by Seneca until shipped to the Debtors in accordance with the terms of the Supply

Agreement, ████████████████████████████████████████████.

3.      As of October 15, 2025, Seneca is holding approximately ███████ cases of

Vegetables made precisely to the Debtors' specifications, worth approximately ████████ if

purchased by the Debtors under the Supply Agreement as required.  If not purchased, these cases

---

[2] Due to confidential commercial information, including marketing and product information contained in the Supply
Agreement, the Supply Agreement is being filed under seal.

of Vegetables will be worth significantly less, and in many circumstances, unsaleable to any other buyer.

4.      Objectively, there is no question that the Supply Agreement <u>must</u> be assumed if the Debtors are to be sold as a going concern.  Simply put, there is no other producer in this industry which has the capability and production capacity to do what Seneca does for the Debtors.  Seneca has shared this view with the Debtors, and has requested on multiple occasions that the Debtors acknowledge this commercial reality by assuming the Supply Agreement.  Seneca seeks assurances that, as a longstanding and irreplaceable producer for the Debtors' business, it will be paid and will not suffer losses or negative consequences if the Supply Agreement is not assumed despite Seneca continuing to faithfully perform thereunder.

5.      The Debtors have repeatedly declined Seneca's requests.  While that response may have been tolerable when these Chapter 11 Cases were in their infancy and the marketing and sale process had not yet taken off the ground, at this juncture it is intolerable.  This is especially so because the Debtors have breached the Supply Agreement, depriving Seneca of $███████ in revenue, as described below.  Assumption of the Supply Agreement now is entirely warranted and should be recognized as the material foundation to the sale process that it is.

### JURISDICTION AND VENUE

6.      The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered on July 23, 1984, and amended on September 18, 2012 (*Simandle, C.J.*).  Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory predicates for the relief sought herein are sections 105(a) and 365(d)(2) of the Bankruptcy Code and Rule 6006(b) of the Bankruptcy Rules.

## CASE BACKGROUND

9.      On July 1, 2025 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, commencing the above-captioned Chapter 11 cases (collectively, the "Chapter 11 Cases").

10.      The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

11.      No trustee or examiner has been appointed in the Chapter 11 Case.

12.      On July 17, 2025, promptly after the Petition Date, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") [Docket No. 168].

## FACTUAL BACKGROUND

### Seneca Foods Corporation

13.      Seneca was founded in 1949 and is a leading provider of packaged fruits and vegetables, with facilities located throughout the United States.  Its high-quality products are primarily sourced from more than 1,100 American farms.  Seneca's fruits and vegetables are sold nationwide by major grocery outlets, including supermarkets, mass merchandisers, limited assortment stores, club stores and dollar stores. Seneca also sells its products to foodservice distributors, restaurant chains, industrial markets, other food processors, export customers in approximately 55 countries and federal, state and local governments for school and other food programs.  Seneca also packs canned and frozen vegetables under contract packing agreements like the one with the Debtors.

14.     Seneca's product offerings include canned, frozen and jarred produce, and snack chips. Its products are sold under private label as well as national and regional brands that Seneca owns or licenses, including Seneca®, Libby's®, Green Giant®, Aunt Nellie's®, CherryMan®, Green Valley® and READ®.

15.     Seneca relies upon 26 main facilities located throughout the United States.  As the most vertically integrated supplier in the vegetable processing industry, Seneca's facilities are comprised of plants for packaging, can manufacturing, seed production, a farming operation and a logistical support network. Food packaging operations are primarily supported by plant locations in New York, Michigan, Oregon, Wisconsin, Washington, Idaho, Illinois, and Minnesota.  Seneca also maintains warehouses which are generally located adjacent to its packaging plants.

**The Amended and Restated Supply Agreement**

16.     On or about March 15, 2024, one of the Debtors, Del Monte Foods, Inc., and Seneca, entered into an Amended and Restated Supply Agreement, which provides, among other things:



17.     Importantly and as background, Seneca provided critical support for the Debtors'

business as the Debtors implemented their "asset light" strategy.   The Debtors have divested

themselves of production plants and replaced those physical assets with key supply contracts with

outside third-party producers.   Seneca purchased supplies and idle assets from the Debtors,

purchased a production facility from the Debtors (that Seneca currently operates that would not be

needed by Seneca but for the Debtors' production), and made substantial investments in that facility and in Seneca's other facilities in order to be able to produce the volumes and acquire the unique capabilities to support the Debtors' needs.  These investments easily exceed $██████ .

**Seneca's Post-Petition Date Performance,**
**and the Debtors' Post-Petition Breach, Under the Supply Agreement**

18.    Post-Petition Date, Seneca has continued to stand behind and support the Debtors' business.  In fact, post-Petition Date, Seneca has continued to produce the Debtors' 2025 production needs and continues to do so.  In all, over ████████ *cases* of Vegetables worth at *least* $██████ have been or will be produced by mid-November, specifically for the Debtors' business.

19.    In stark contrast, the Debtors have failed to live up to their obligations under the Supply Agreement, and are in breach.  Specifically, the Debtors have failed to take possession of and pay for inventory from Seneca's ████████ Facility (and associated storage facility) in accordance with the contractually agreed upon shipping schedule consistent with the Supply Agreement.  Due, in part, to the Debtors' post-Petition Date breach, Seneca requires reasonable assurances of performance as required by the Supply Agreement.

20.    Seneca currently holds ██████ cases of Vegetables in its ████████ Facility (and associated storage facility).  The Debtors were required to purchase those Vegetables under the Supply Agreement pursuant to the agreed upon shipping schedule as and when they were produced, but have not yet done so.  As a result of the Debtors' failure to take delivery, Seneca was forced to ship the Vegetables to outside storage and bill the Debtors for the freight and storage charge.  The Debtors' post-Petition Date failure to take delivery and pay for such Vegetables constitutes a post-Petition Date breach of the Supply Agreement.  As of the date of this Motion,

22348836.v11

Seneca should have realized approximately $███████ in revenue on these Vegetables, which has not been paid for due to the Debtors' post-Petition Date breach.

21.     To make matters worse, it also does not appear that the Debtors will be able to comply with the Supply Agreement's requirement that the Debtors must take possession and pay for at least ████████████ of the 2025 Vegetable production by no later than ██████████ ███. To date, the Debtors have taken possession of approximately ████████████████ of the production. However, by this juncture in the shipping schedule, the Debtors should have taken possession of approximately ████████████ of the production if they are to meet the required ████████████ milestone by ████████████. Notably, the Debtors have recently slowed down their pace of taking possession and paying for the Vegetables. At this pace, it is questionable, if not doubtful, that the Debtors will be able to meet that obligation under the Supply Agreement.

**Seneca is Already Incurring Substantial Costs**
**Under the Supply Agreement to Prepare for the 2026 Pack Season**

22.     Moreover, Seneca now has to prepare for the 2026 processing pack season. Under the Supply Agreement, by ████████████ of this year the Debtors must provide their initial volumes to Seneca for the 2026 pack season, and by ████████, Seneca is required to formally reserve processing capacity in its facilities, by commodity, for the Debtors based upon their required volumes. It is unreasonable and unduly burdensome for Seneca to formally reserve production capacity in its numerous production facilities when it does not even know whether the Supply Agreement will be assumed or rejected.

23.     Significantly, Seneca has already begun expending time, money and resources to meet the Debtors' expected volume requirements, which represents a substantial portion of Seneca's total volume output across all production footprints. This includes maintenance and

repair of harvesting and production resources, labor costs, seed purchases for the crop solely dedicated to support the Debtors' specific business and ultimately contracting with third parties for farmland to grow the crops. But for the Debtors' requirements under the Supply Agreement, which remain unclear, Seneca would need to immediately consider restructuring its operations for the coming year, which would likely include permanently idling production and laying off staff that would be no longer necessary to support Seneca's other customers. Instead, the Debtors' indecision has placed Seneca in jeopardy of incurring these substantial costs without guarantying that the Debtors will ultimately uphold their end of the bargain under the Supply Agreement.

24.    Compliance with the Supply Agreement requires an enormous dedication of time, money and resources by Seneca. Farmland must be secured under contract, production equipment must be maintained or replaced, Vegetables must be harvested, inspected, cleaned and processed within hours of harvest to achieve product safety. Seneca operates multiple lines for the host of types of Vegetables that it provides to the Debtors, all with different cans, ingredients and specifications. All aspects of production are subject to inspection by the Debtors and certifying bodies, requiring an additional outlay of resources by Seneca.

25.    More specifically, going forward, Seneca would be saddled with an estimated, at a minimum, $█████████ in variable and capital expenses that would only be needed if the Debtors assume the Supply Agreement.

26.    For each and every month that the Debtors do not decide to assume or reject, Seneca incurs $██████ in variable expenses to keep and maintain plants for the off-season, plants which would not be necessary and which Seneca would wind down, but for the Debtors' needs under the Supply Agreement. In fact, Seneca has already begun to absorb these expenses beginning ██████ ██████, further evidence of Seneca's good faith performance under the Supply Agreement in

support of the Debtors' restructuring efforts. Seneca's exposure will increase by another $█

█████ each month thereafter.

27.     Unfortunately, that's not all. Seneca's variable costs for extraordinary capital expenditures for the plants that it would no longer need but for the Supply Agreement aggregate an estimated $████████. These expenses include expenses to upgrade and/or replace specific equipment needed to produce Vegetables for the Debtors, and to build and maintain dedicated housing for seasonal workers required to support seasonal production for the Debtors. To be sure, some of these capital expenses have already been paid (████████████████), with the balance payable, depending on the specific expense and equipment delivery, between ████████ ████.

28.     Seneca has already been required and must continue to order products and ingredients from domestic and international sources which are required to produce vegetables custom made-to-order pursuant to the Debtors' specifications. These products and ingredients, not needed by Seneca but for the Supply Agreement, will cost Seneca an estimated $████████.

**RELIEF REQUESTED**

29.     By this Motion, Seneca respectfully requests entry of an order compelling the Debtors to assume or reject the Supply Agreement within two (2) days of entry of the order, and granting Seneca such other relief as is just or proper.

**ARGUMENT**

**THE COURT SHOULD COMPEL THE DEBTORS TO
IMMEDIATELY ASSUME OR REJECT THE SUPPLY AGREEMENT**

30.     The Debtors' one hundred (120) day exclusivity period is nearly at its end. So too is the Debtors' section 363 sale process, with bids due November 4, 2025, an auction scheduled for November 12, 2025, and a sale hearing scheduled for November 20, 2025. As such, the

Debtors' case is certainly well beyond its infancy, and the Debtors by now have had sufficient time

to review and assess their key contracts for a determination to assume or reject under section 365

of the Bankruptcy Code.

31.    Seneca's Motion is timely and warranted, and fully comports with the requirements

of section 365(d)(2) of the Bankruptcy Code.

- The Supply Agreement with Seneca is indispensable to the Debtors' business as a going concern, as the Debtors have no other commercially feasible alternatives to source the Vegetables it purchases from Seneca. There is no capacity or capability in the industry to produce what Seneca produces for the Debtors. As such, the decision to assume or reject is straightforward.

- The Motion is timely. The Chapter 11 Cases have been pending for nearly four (4) months, and there are only a few days left in the Debtors' one hundred twenty (120) day exclusivity period.

- The Committee has retained co-counsel and financial advisors, so that it is fully up to speed regarding the sale process and the review of key executory contracts like the Supply Agreement.

- Only a single contract, the Supply Agreement between the Debtors and Seneca, is at issue. The assumption or rejection analysis is not clouded by a review of multiple related agreements as an integrated transaction.

- Seneca has no protections regarding the risks which have been imposed on it.

- The Supply Agreement with Seneca is responsible for █████████ Debtors' total Vegetable sales, which is by far the ██████████ of the Debtors' business.

- █████████████ supplied by Seneca are custom made-to-order pursuant to the Debtors' precise specifications. None of these Vegetables can be sold by Seneca in an orderly or timely manner, and a substantial portion of the Vegetables cannot be sold interchangeably with the rest of Seneca's business at all and would require liquidating in alternative markets, thus presenting an imposing substantial risk for Seneca.

- The Debtors do not need to fear that a premature decision to assume or reject will disrupt its marketing and sale process, as the process has been run and is now nearing completion, with only a sale hearing left to confirm the results.

32.     The point of the matter is this:  the Debtors' section 363 sale process has been run on the back of Seneca's Supply Agreement.  Seneca understands the rights and timeline afforded the Debtors under section 365 of the Bankruptcy Code.  But the commercial reality is that under the specific circumstances of the Debtors' business and these Chapter 11 Cases, no going concern sale is possible without the Supply Agreement being assumed.

33.     There is no reason for any delay by the Debtors.  The Debtors have had their breathing spell as contemplated by the Bankruptcy Code.  The Debtors and their advisors have fully analyzed the Supply Agreement.  The Debtors and their advisors have fully analyzed the industry and the market.  The Debtors have had a full opportunity to share information with their lenders, the Committee, prospective purchasers, and all their respective advisors.  The Debtors have preserved their optionality.  And finally, the Debtors have run and nearly concluded their marketing and sale process.

34.     At this juncture, in determining when is the appropriate time for assumption or rejection of the Supply Agreement, the balance of the hurt weighs in favor of Seneca.  In order to continue to meet the obligations of a very complex relationship and prepare to produce for the 2026 pack season, Seneca is required to expend considerable resources and is precluded from taking the additional steps to mitigate these expenditures, including the imperative for permanent removal of capacity should the Supply Agreement not be assumed.

35.     Moreover, in November of this year, ██████████████████████ of the Vegetables will have been produced custom made-to-order pursuant to the Debtors' precise specifications, creating significant risk that if the Debtors or a successor does not fulfill their obligations under the Supply Agreement, such product could not be readily sold elsewhere.

36.     The fact of the matter is that over the past seven (7) years the Debtors have moved to an almost exclusively "asset light" strategy as it relates to their vegetable business.  The Debtors

have closed or sold five (5) of six (6) of their vegetable facilities that supplied the products now covered by the Supply Agreement, leaving only Plover, Wisconsin as their sole vegetable production facility.  The Debtors' vegetable business is simply not viable without the Supply Agreement absent enormous investment in new production capacity which would be unlikely to be justified and literally take years to accomplish.

## LEGAL BASIS FOR RELIEF REQUESTED

37.    The Court should compel the Debtors to assume the Supply Agreement now. Although pursuant to section 365(d)(2) of the Bankruptcy Code, a debtor has until plan confirmation to decide whether to assume or reject an executory contract (see 11 U.S.C. § 365(d)(2)), this Court has the power and discretion to compel a debtor to assume or reject an executory contract within a specified period of time:

> In a case under chapter . . . 11 . . . of this title, the trustee may assume or reject an executory contract...of the debtor at any time before the confirmation of a plan *but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract*. . .

11 U.S.C. §365(d)(2) (*emphasis added*); 11 U.S.C. §1107(a).

38.    Congress intended this provision to "prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate." *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1079 (3d Cir. 1992) (citing S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5845).

39.    Although the Bankruptcy Code provides chapter 11 debtors with a "breathing space" within which to determine whether a particular executory contract should be assumed or rejected, such "breathing space . . . is not without limits." *In re Enron Corp.*, 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002).   While the "breathing space" is particularly important in the beginning

13

of the case, an earlier deadline for assumption or rejection may be warranted once the record is established. *In re Dunes Casino Hotel*, 63 B.R. 939, 950 (D.N.J. 1986) (Holding that because of the time that has passed since the petition date, the bankruptcy court is "in a far better position to set a specific timetable for" debtor to assume or reject executory contracts.). "As the case continues, the equities that may have favored the trustee or debtor in possession early in the case may change, as the other party to the contract is increasingly burdened by the failure to assume or reject the contract." 3 COLLIER ON BANKRUPTCY P 365.05 (16th 2025).

40. In assessing a section 365(d) motion, a court must consider not only the debtor's need for "breathing room," but also the non-debtor party's need for certainty and stability. The limit placed on the time for the debtor's assumption or rejection by case law and commentators is determined on a "reasonableness" standard. *See e.g. In re Teligent, Inc.*, 268 B.R. 723, 738–39 (Bankr. S.D.N.Y. 2001). The determination of what constitutes a reasonable time to assume or reject a particular executory contract is within the bankruptcy court's discretion and has to be decided in light of the particular facts of each case. *In re G-I Holdings, Inc.*, 308 B.R. 196, 213 (Bankr. D.N.J. 2004) ("What constitutes a reasonable time is left to the bankruptcy court's discretion in the light of the circumstances of the particular case."); *In re Adelphia Comm 'cns Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003); *In re Physician Health Corp.*, 262 B.R. 290, 292 (Bankr. D. Del. 2001); *Hiser v. Blue Cross of Greater Phila.*, 89 B.R. 503, 513 (Bankr. E.D. Pa. 1988); *Matter of Dunes Casino Hotel*, 63 B.R. 939, 949 (D.N.J. 1986) ("In determining what constitutes a reasonable time within which a debtor should assume or reject a contract, the court should consider a number of factors.").

41. Among the factors that courts have used to determine what may constitute "reasonable time" for the purposes of section 365(d)(2) of the Bankruptcy Code are the following: (a) the nature of the interests at stake; (b) the balance of hurt to the litigants; (c) the good to be

achieved; (d) the safeguards afforded to the parties; (e) whether the action to be taken is so in

derogation of Congress' scheme as to be said to be arbitrary; and (f) the broad purpose of

Chapter 11, which is to permit successful rehabilitation of debtors, *Dunes Casino Hotel*, 63 B.R.

at 949; *In re Monroe Well Serv., Inc.*, 83 B.R. 317, 323 (Bankr. E.D. Pa. 1988).

42.     Other courts have relied on a more fulsome set of factors, including in addition

(aa) the debtor's failure or ability to satisfy post-petition obligations; (bb) the damage that the non-

debtor will suffer beyond the compensation available under the Bankruptcy Code; (cc) the

importance of the contract to the debtor's business and reorganization; (dd) whether the debtor has

sufficient time to appraise its financial situation and the potential value of its assets in formulating

a plan of reorganization; (ee) whether there is a need for judicial determination as to whether an

executory contract exists; and (ff) whether exclusivity has been terminated.  *See In re Hawker*

*Beechcraft, Inc.*, 483 B.R. 424, 429 (Bankr. S.D.N.Y. 2012).

43.     The factors identified above are non-exhaustive, and the bankruptcy courts may

consider other factors.  *See S. St. Seaport Ltd. P'Ship v. Burger Boys, Inc. (In re Burger Boys,*

*Inc.)*, 94 F.3d 755, 761 (2d Cir. 1996).  For example, courts have accelerated a chapter 11 debtor's

timeline to assume or reject where, as here, the debtor is (i) failing to honor the terms of the contract

post-petition; or (ii) is otherwise unfairly putting the non-debtor counterparty's rights and interests

in jeopardy.  *See In re Rebel Rents, Inc.*, 291 B.R. 520, 531 (Bankr. C.D. Cal. 2003) (noting that

the debtor was in post-petition breach of executory contract, and directing that the debtor file a

motion to assume or reject within 30 days because by further delay debtor was attempting to have

"its cake and eat it too"); *see also In re EnCap Golf Holdings, LLC*, No. 08- 18581 (NLW), 2008

WL 5955350, at *5 (Bankr. D.N.J. Dec. 24, 2008) (holding that in light of the non-debtor contract

counterparty's significant obligations due to be performed under the contract, and the debtor's

failure to indicate whether it will make post-petition payments, "the lack of a specific time to

15

assume or reject the [contract] is a greater detriment to the [non-debtor contract counterparty] than it is a benefit to [the debtor]").

44.    Here, the balance of the hurt weighs in favor of compelling the Debtors to immediately assume or reject the Supply Agreement.  As of the hearing on this Motion, the 2025 pack season will have essentially concluded and, before Seneca expends tens of millions of dollars to fulfill its obligations under the Supply Agreement for the 2026 pack season, it needs certainty whether the Supply Agreement will be assumed or rejected.  This is heightened by the fact that over ███████████████ of the Vegetables scheduled to be produced by Seneca are produced custom made-to-order to the Debtors' precise specifications.

45.    The Court must make an equitable determination, based on the balance of hurt, in light of the particular circumstances of the parties to the case.  In applying these factors, Seneca respectfully submits that the Court should compel the Debtors to make an immediate determination to assume or reject the Supply Agreement.

***The nature of the interests at stake***

46.    The risks to Seneca of the Debtors' failure to assume or reject the Supply Agreement immediately are grave.  Seneca is exposed to tens of millions in costs invested in Vegetables custom made-to-order pursuant to the Debtors' precise specifications that Seneca does not have a present right to sell outside of the Supply Agreement.  Additionally, in the event the Supply Agreement is terminated and Seneca is forced to find alternative buyers for the Vegetables, Seneca will be compelled to deeply discount a substantial portion of the Vegetables.  This significant reduction of value would cause meaningful harm with respect to inventory Seneca is already holding, and would be compounded if Seneca is required to incur additional risk by performing in advance of the 2026 packing season without adequate assurance of future performance by the Debtors.

47.     To avoid a great risk of harm to Seneca, the Debtors must be compelled to decide whether they will assume or reject the Supply Agreement *before* Seneca is obligated to continue expending resources for the 2026 grow season as per the Debtors' specifications and Seneca's obligations under the Supply Agreement. *See In re Mirant Corp.*, 303 B.R. 319, 331 (Bankr. N.D. Tex. 2003) (holding that if non-debtor counterparty demonstrates that "certainty" is vital for its business planning or risk profile, and such certainty can only be achieved through requiring the debtor to "promptly" assume or reject a contract, "the court would likely grant such relief").

### *The balance of harm to the litigants*

48.     At this juncture in the Chapter 11 Cases, the Debtors face no harm by assuming the Supply Agreement.  They have run and essentially concluded the sale process for their business as a going concern, a business which requires the Supply Agreement to preserve value for the estate.

49.     In stark contrast, the harm to Seneca is grave if the Supply Agreement is not immediately assumed, as Seneca will have expended millions in cost to prepare production facilities, secure supplies and other inputs, expend labor cost and potentially run significantly underutilized production facilities without the Debtors' production.  All this while the Debtors fail to abide their obligations under the Supply Agreement post-Petition Date by failing to take delivery and pay for the Vegetables in accordance with the parties' agreed upon shipment schedule and the Supply Agreement.

### *The good to be achieved*

50.     Both parties will benefit from compelling the Debtors to immediately assume the Supply Agreement.  Assumption will lock in the going concern value of the Debtors' business, as the Supply Agreement is the critical and indispensable component of the Debtors' business.  And assumption will obviate any loss by Seneca regarding the 2025 pack season as well as the imminent outlay of millions of dollars to comport with its obligations to prepare for the 2026 pack season.

***The safeguards afforded to the parties***

51.    As of now, Seneca will be required to proceed with the 2026 pack without any

protections whatsoever.  Only if assumption occurs will Seneca obtain adequate safeguards and

protections.  The Debtors' post-Petition Date failure to take possession and pay for ██████ of

the Vegetables only exacerbates the harm to Seneca.

***Whether the action to be taken is so in derogation of Congress'
scheme that the court may be said to be arbitrary***

52.    Congress established the bankruptcy courts with broad equitable powers.  As

explained above, the Supply Agreement is the key and irreplaceable component of the Debtors'

all-important Vegetable business.  Requiring an immediate deadline to assume or reject the Supply

Agreement is appropriate here.  The Debtors have had their breathing spell and exclusivity.  It

would be wholly inequitable for Seneca to expend tens of millions in cost without knowing a final

determination regarding its Supply Agreement.  Due to already ongoing preparation for the 2026

pack season, including Seneca's obligation to formally reserve production capacity in its numerous

production facilities by November 30 (despite Seneca not even knowing whether the Supply

Agreement will be assumed or rejected), timing is critical.

***Whether exclusivity has been terminated***

53.    The Debtors' one hundred twenty (120) day exclusivity period has nearly expired.

It is clear that the Debtors have mapped out their Chapter 11 Case exit strategy:  a section 363 sale

followed by a liquidating plan or dismissal.  The Debtors do not require additional time to act

regarding the Supply Agreement.

***Whether the debtor has had sufficient time to appraise its financial
situation and the potential value of its assets in formulating a plan of reorganization***

54.    Prior to the Petition Date, the Debtors and their advisors thoroughly prepared for

the filing of the Chapter 11 Cases.  The filing was not sudden.  And of course, the Debtors and

their advisors redoubled their restructuring efforts after the Petition Date. The lenders and the

Committee and their respective advisors were brought into the process. The Chapter 11 Cases are

now nearly one hundred twenty (120) days old. The Debtors and all constituents have had

sufficient time to assess the Debtors' financial situation and the potential value of the Debtors'

assets, including the Supply Agreement.

55. As the Court is aware, early in the Chapter 11 Cases, other executory contract

counterparties filed a motion to compel assumption or rejection [Docket No. 173] just sixteen (16)

days after the Petition Date. That motion was ultimately denied [Docket No. 417], although this

Court suggested that movants' could renew their request in November of this year. Here, however,

just like in *Dunes Casino*, sufficient time has passed to support this Court setting a reasonable time

within which the Debtors must assume or reject the Supply Agreement. *See In re Dunes Casino

Hotel*, 63 B.R at 950 (noting that "the time period between the petition filing and [the motion to

compel, 12 days,] was relatively short", but that "[w]ith the amount of time that has passed between

the bankruptcy court's decision and now, the court has little doubt that the record has grown

substantially in this case. . . and the bankruptcy court should be in a far better position to set a

specific timetable for [the debtor] to act.").

***The importance of the contract to the Debtors' business and reorganization***

56. Arguably, the Supply Agreement is the most important contract to the Debtors'

business and reorganization. The Supply Agreement is the vehicle by which the Debtors obtain

▮▮▮▮▮▮▮▮▮▮ of their Vegetables which represents ▮▮▮▮▮▮▮ of the total sales and ▮▮▮▮▮

▮▮ of the profits of their entire business. The Debtors must now acknowledge that the Supply

Agreement is an integral and indispensable component of their business and reorganization.

***The broad purpose of Chapter 11, which is to permit successful rehabilitation of debtor***

57.     Seneca has not rushed into litigation with the Debtors and has not jeopardized the critical sale process which hopefully will generate value to be distributed to all creditors.  Instead, Seneca has produced and delivered under the Supply Agreement, and in so doing, has allowed the Debtors to market its business as a going concern on Seneca's back.  Immediate assumption of the Supply Agreement is warranted at this juncture.

58.     Based on the foregoing, it would be entirely prejudicial to the Seneca to allow the Debtors to further delay a decision here.  In order to prevent needless and avoidable harm to Seneca, the Debtors should be compelled to either assume or reject the Supply Agreement now.

## NOTICE

59.     Notice of this Motion in redacted form has been provided to: (a) co-counsel for the Debtors; (ii) co-counsel for the Committee; (iii) the Office of the United States Trustee; and (iv) all parties having requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002 as set forth in the Debtors' Master Service List [Docket No. 577].  Notice of this Motion in unredacted form shall be provided to co-counsel for the Debtors.  Notice of this Motion in unredacted form shall also be provided to co-counsel for the Committee and other required parties subject to an appropriate confidentiality agreement.  Seneca respectfully submits that such notice is good and sufficient, and that no other notice is necessary.

## CONCLUSION

**WHEREFORE**, Seneca respectfully requests that the Court enter the Proposed Order, substantially in the form attached hereto, compelling the Debtors to immediately assume or reject the Agreement, and granting Seneca such other and further relief as is just and proper.

Dated:  October 27, 2025

**BOND, SCHOENECK & KING, PLLC**

By:    */s/ Justin S. Krell*
    Edward J. LoBello, Esq.
    Giuseppe Franzella, Esq.
    Justin S. Krell, Esq.
600 Third Avenue
New York, New York 10016
Telephone No.:  (646) 253-2300
Email:  elobello@bsk.com
    gfranzella@bsk.com
    jkrell@bsk.com

Andrew Rivera, Esq.
One Lincoln Center
Syracuse, New York 10016-1915
Telephone No.: (315) 218-8000
Email:  arivera@bsk.com

*Counsel for Seneca Foods Corporation*