UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
Jeffrey M. Sponder, Esq.
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Email:  jeffrey.m.sponder@usdoj.gov

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: | : Chapter 11 |
|  | : |
|  | : Case No. 25-16984 (MBK) |
| Del Monte Foods Corporation II Inc.,[1] | : |
|  | : The Honorable Michael B. Kaplan |
| Debtors. | : |
|  | : Hearing Date: May 12, 2026 at 10:00 a.m. |
|  | : |

**OBJECTION OF THE UNITED STATES TRUSTEE TO CONFIRMATION
OF FIRST AMENDED JOINT CHAPTER 11 PLAN OF DEL MONTE FOODS
CORPORATION II INC. AND ITS DEBTOR AFFILIATES**

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his undersigned counsel, objects to confirmation of the *First Amended Joint Chapter 11 Plan of Del Monte Foods Corporation II and Its Debtor Affiliates* [D.I. 1315] (the "Plan"),[2] and respectfully states as follows:

---

[1]  The last four digits of Debtor Del Monte Foods Corporation II Inc.'s tax identification number are 1894. A complete list of the Debtors in these Chapter 11 Cases and their respective tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent, at https://cases.stretto.com/DelMonteFoods. The location of the Debtor Del Monte Foods Corporation II Inc.'s principal place of business and the Debtors' service address is 205 North Wiget Lane, Walnut Creek, California 94598.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan (including exhibits), as applicable.

## PRELIMINARY STATEMENT

1.      The U.S. Trustee objects to confirmation of the Plan because it would deem certain creditors to consent to third-party releases based on inaction, namely, their failure to opt out.  In addition, to the extent that exculpation is permissible beyond the provisions of Bankruptcy Code section 1125(e), the proposed Plan's exculpation provision violates controlling Third Circuit case law by attempting to shield non-fiduciaries of the Debtors' estates and includes pre-petition conduct.

2.      Further, the U.S. Trustee objects to confirmation of the Plan because the Plan contains (i) overbroad Debtor releases and injunctions, (ii) an improper gatekeeping role for the Court, (iii) language that improperly suggests that the Plan itself is a settlement agreement, (iv) language that impermissibly deems non-voting classes to accept the Plan, and (v) improperly seeks the waiver of the 14-day stay pursuant to Fed. R. Bankr. P. 3020(e).

3.      Also, the U.S. Trustee objects to several miscellaneous provisions of the Plan including (i) Article III of the Plan that contains the phrase "satisfaction, settlement, release and discharge of, and in exchange for such Claim" (Art. III.B.1.b, III.B.2.b, and III.B.4.b); (ii) improper language in Article XII.C concerning Statutory Fees; (iii) unnecessary language in Article IV.H.7 concerning exculpation, indemnification, insurance, and liability limitation of the Plan Administrator and all professionals retained by the Plan Administrator; and (v) unnecessary language in Article XII.D concerning the separate release and discharge of the liabilities of the Committee and its members.

4.      Accordingly, and for the reasons set forth in more detail herein, the U.S. Trustee respectfully requests that the Court enter an order denying confirmation of the Plan.

## JURISDICTION AND STANDING

5.      This Court has jurisdiction to hear and determine confirmation of the Plan and this objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable orders of the United States District Court of the District of New Jersey issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

6.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").  Under 28 U.S.C. § 586(a)(3)(B) the U.S. Trustee has the duty to monitor and comment on plans and disclosure statements filed in chapter 11 cases.

7.      The U.S. Trustee has standing to be heard concerning confirmation of the Plan and this objection pursuant to 11 U.S.C. § 307.  *See U.S. Tr. v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under section 307, which goes beyond mere pecuniary interest).

## BACKGROUND

### A.  The Chapter 11 Cases

8.      On July 1, 2025, Del Monte Foods Corporation II Inc. ("DMFC") and its affiliated debtors (the "Debtors") commenced these chapter 11 cases by filing voluntary petitions for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code" or "Code").  For example, *see* Case No. 25-16984/MBK at D.I. 1.

9. The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

10. On July 17, 2025, the U.S. Trustee appointed an Official Committee of Unsecured Creditors. *See* D.I. 168.

11. As of the date hereof, no trustee or examiner has been requested or appointed.

**B. The Debtors and their Businesses**

12. As set forth in the Amended Disclosure Statement to the First Amended Joint Chapter 11 Plan of Del Monte Foods Corporation II Inc. and its Debtor Affiliates (the "Disclosure Statement"), the Debtors are one of the country's leading producers, distributors, and marketers of premium quality, primarily branded, plant-based packaged food products. *See* D.I. 1316 at page 8 of 92. The Debtors were founded in 1886 and are headquartered in Walnut Creek, California as of the Petition Date. *See id.*

13. The Debtors filed bankruptcy cases in order to run a competitive sale and marketing process for all or substantially all of the Debtors' assets, which culminated in three separate going-concern sales. *See id.*

**C. The Settlement**

14. On December 29, 2025, the Debtors filed a Motion for Entry of an Order (A) Approving the Settlement Reached Among the Mediation Parties Pursuant to Bankruptcy Rule 9019 and (B) Granting Related Relief. *See* D.I. 954.

15. On February 20, 2026, the Court entered an Order (a) Approving the Settlement Reached Among the Mediation Parties and (b) Granting Related Relief (the "9019 Order"). *See* D.I. 1211.

16.     On March 5, 2026, a Notice of Appeal was filed on behalf of the Ad Hoc Group of Minority Secured Lenders.  *See* D.I. 1263.  Upon information and belief, the appeal is pending.

**D.  The Plans, Disclosure Statements, and Motion for Conditional Approval**

17.     On February 25, 2026, the Debtors filed the *Joint Chapter 11 Plan of Del Monte Foods Corporation II Inc. and its Debtor Affiliates* (the "Original Plan"), and the related Disclosure Statement.  *See* D.I. 1229 and 1230.

18.     On February 25, 2026, the Debtors filed *Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement on an Interim Basis, (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement and Plan Confirmation and Deadlines Related Thereto; (III) Approving the Solicitation, Notice, and Tabulation Procedures and the Forms Related Thereto; and  (IV) Granting Related Relief.*  *See* D.I. 1232.

19.     On March 13, 2026, the U.S. Trustee filed an *Objection to Debtors Motion for Entry of an Order (I) Approving the Disclosure Statement on an Interim Basis, (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement and Plan Confirmation and Deadlines Related Thereto; (III) Approving the Solicitation, Notice, and Tabulation Procedures and the Forms Related Thereto; and (IV) Granting Related Relief.*  *See* D.I. 1301.

20.     On March 16, 2026, the Debtor filed the Plan and Disclosure Statement.  *See* D.I. 1315 and 1316.  The Plan provides that it "constitutes a separate Plan for each Debtor."  *See* D.I. 1315 at page 5 of 93.

21.     On March 19, 2026, the Court entered an *Order (I) Approving the Disclosure Statement on an Interim Basis, (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement and Plan Confirmation and Deadlines Related Thereto; (III) Approving the*

*Solicitation, Notice, and Tabulation Procedures and the Forms Related Thereto; and (IV)*

*Granting Related Relief* (the "DS Conditional Approval Order").  *See* D.I. 1334.

22.     On April 13, 2026, the Debtors filed the Initial Plan Supplement.  *See* D.I. 1427.

23.     On April 27, 2026, the U.S. Trustee's counsel e-mailed Debtors' counsel informal comments about the Plan, including proposed revised Plan language.  However, due to the date and time when the comments were provided, Debtors' counsel did not have sufficient time to review and respond.[3]

### E.  Specific Provisions of the Plan

24.     The Plan includes the following provisions relevant to this Objection.

### i.     Third-Party Release Provision

---

[3]   The U.S. Trustee reserves his right to review any redlined documents and to object to any issues that are not satisfactorily captured in the redlines at the confirmation hearing.

25.    Article VIII.D of the Plan broadly provides that the Releasing Parties[4] and Settlement Releasing Parties[5] shall release and discharge each of the Released Parties[6] "from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in Law, equity, contract, tort, or arising under

---

[4] The Plan defines "Releasing Party" as follows:

"*Releasing Party*" means, collectively, in each case solely in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Prepetition Agents; (d) the Prepetition ABL Secured Parties, (e) the DIP Secured Parties; (f) each of the Consenting Lenders (as defined in the RSA, including the Ad Hoc Group and each of its members); (g) the Committee and each member of the Committee (solely in its capacity as such); (h) DMPL; (i) the Plan Administrator; (j) Black Diamond Capital Management LLC; (k) all Holders of Claims that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (l) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (m) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (n) each current and former Affiliate of each Entity in clauses (a) through (j); and (o) each Related Party of each Entity in clauses (a) through (j).

*See* D.I. 1315 at Art. I.A. 167.

[5] The Plan defines "Settlement Releasing Parties" as follows:

"*Settlement Releasing Parties*" means, collectively, in each case in its capacity as such: (a) each of the Consenting Lenders (as defined in the RSA, including the Ad Hoc Group and each of its members solely in their capacity as such), (b) the Prepetition ABL Secured Parties, (c) DMPL, (d) the Debtors, (e) the Committee and each member of the Committee (solely in its capacity as such), and (f) the Related Parties of each of the foregoing solely in their capacity as such.

*See* D.I. 1315 at Art. I.A. 189.

[6] The Plan defines "Released Party" as follows:

"*Released Party*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Releasing Parties (except with respect to any Retained Causes of Action); (d) the Prepetition Agents; (e) the Prepetition ABL Secured Parties; (f) the DIP Secured Parties; (g) each of the Consenting Lenders (as defined in the RSA, including the Ad Hoc Group and each of its members); (h) the Committee and each member of the Committee (solely in its capacity as such); (i) DMPL; (j) the Plan Administrator; (k) Black Diamond Capital Management LLC; (l) Holders of the DMFI 2022 Term Loan; (m) each current and former Affiliate of each Entity in clauses (a) through (l); and (n) with respect to the foregoing clauses (a) through (l), each such Entity's Related Parties, each in their capacity as such; *provided* that "Released Party" shall not include the Minority Lender Ad Hoc Group or the members of such group as identified in the *Verified Statement of the Ad Hoc Group of Minority Secured Lenders, Pursuant to Bankruptcy Rule 2019* [Docket No. 295].

*See* D.I. 1315 at Art. I.A. 168.

federal or state statutory or common Law, or any other applicable international foreign or domestic

Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise."[7] *See* D.I. 1315 at Art.

VIII.D.

---

[7] The Plan provides for a Third-Party Release as follows:

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties and the Settlement Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, in each case solely to the extent of the Releasing Parties' and the Settlement Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy Law, from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in Law, equity, contract, tort, or arising under federal or state statutory or common Law, or any other applicable international foreign or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them, including any derivative claims asserted or assertable on behalf of any of the Debtors, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the SOTP Transactions, the August 2024 Transactions, incurrence of the Super-Senior Term Loans, the Chancery Court Settlement, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the Debtors' operations, the business or contractual arrangements or interactions between or among the Debtors and any Released Party or Settlement Released Party, the distribution of any Cash or other property of the Debtors to any Released Party or Settlement Released Party, as applicable, the assertion or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Cases, any intercompany transactions, the negotiation, formulation, documentation, preparation, or consummation of the Definitive Documents, RSA, the SOTP Transactions, the ABL Loan Documents, the Super-Senior Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents in connection with the SOTP Transactions, including the Purchase Agreements and the other SOTP Transaction Documents, if applicable, the solicitation of votes with respect to the Plan, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

The foregoing Third-Party Release shall not operate to waive or release (i) any Cause of Action of any Releasing Party or Settlement Releasing Party against a Released Party or Settlement Released Party arising from any obligations owed to the Releasing Party or Settlement Releasing Party that are wholly unrelated to the Debtors or the Wind-Down Debtors, (ii) any Claims or Causes of Action expressly set forth in and preserved by this Plan or related documents; or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party or Settlement Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct. Notwithstanding anything to the contrary in

8

26.     The Released Parties include each Related Party[8] of each Person or Entity listed in clauses (a) through (l) of the definition of "Released Party" except the Minority Lender Ad Hoc Group or the members of such group as identified in the *Verified Statement of the Ad Hoc Group*

---

the foregoing, the "Third-Party Release" set forth above does not release any post-Effective Date obligations of any Entity under this Plan or any document, instrument or agreement executed in connection with this Plan. Notwithstanding anything to the contrary in the foregoing and other with respect to the DIP Term Loan Claim Waiver, the "Third-Party Release" set forth above does not release any post-Effective Date obligations of any Entity under this Plan or any document, instrument or agreement executed in connection with this Plan. Notwithstanding the foregoing, nothing herein or in the Confirmation Order shall have the effect of releasing, discharging, or compromising any rights of any of the DIP Secured Party or their Affiliates (in any capacity) arising under, related to, or in connection with any rights, Claims, or Causes of Action in respect of the DIP Term Loan Indemnity, any other indemnification obligations, and any other similar obligations of the Debtors to the DIP Term Loan Agent and the DIP Term Loan Lenders (which rights shall be fully enforceable against the Wind-Down Debtors).

Without limiting the foregoing, from and after the Effective Date, any Entity that is given the opportunity to opt out of the releases contained in this Article VIII.D in accordance with this Plan and does not exercise such opt out may not assert any claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors. From and after the Effective Date, any Entity that opts out of (or otherwise does not participate in) the releases contained in this Article VIII.D in accordance with this Plan may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in Article VIII.C of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article VIII.C of the Plan, and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party. For the avoidance of doubt, the terms of this paragraph shall not apply to the Plan Administrator. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XI of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

*See* D.I. 1315 at Art. VIII.D.

[8] The Plan defines "Related Party" as follows:

"*Related Party*" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

*See* D.I. 1315 at Art. I.A. 167.

9

*of Minority Secured Lenders, Pursuant to Bankruptcy Rule 2019* [Docket No. 295].  *See* D.I. 1315 at Art. I.A. 167 and 168.

27.    Holders of Claims in Classes 1 and 2, Holders of Intercompany Claims and Interests in Classes 6 and 7, Equity Interests in DMFHL in Class 8, and Section 510(b) Claims in Class 9 are either unimpaired or are insiders or Affiliates of the Debtor or impaired but deemed to reject; as a result, they are either presumed to have accepted the Plan or deemed to have rejected it, and so are not entitled to vote on the Plan. *See* D.I. 1315, Art. III.B.  Instead, pursuant to the Solicitation and Voting Procedures, the holders of claims in these classes received a Notice of Non-Voting Status and Opt-Out Form.  *See* D.I. 1334 at Exhibit 4.

28.    The Notice of Non-Voting Status and Opt-Out Forms specifies that a recipient who fails to timely and properly submit a Release Opt-Out Form to the Balloting Agent by the Opt-Out Deadline with the opt-out box checked will be deemed to have consented to the Article VIII.D third-party releases. *See id.*  The Notice of Non-Voting Status further provides that members of these classes may also opt out of the third-party release by objecting to the Plan by the objection deadline. *See id.*

29.    Holders of Claims in Classes 3, 4, and 5 are impaired and entitled to vote under the Plan.  *See* D.I. 1315 at Art. III.B.3, III.B.4, and III.B.5.  The ballots provided to the voting classes included an opt-out election.  *See* D.I. 1334 at Exhibits 3A, 3B, and 3C.  The opt-out election provides that a claimant will be deemed to provide the releases contained in Article VIII.D of the Plan unless the box is checked and the ballot submitted to the Balloting Agent prior to the Voting Deadline. *See id.*

### ii.    Debtor Release Provision

30.    Article VIII.C of the Plan broadly provides that each of the Released Parties and Settlement Released Parties[9] are deemed released and discharged on and after the Effective Date and as previously approved in the Settlement Order by the Debtors, their Estates, and, if applicable, the Wind-Down Debtors (on behalf of itself and its respective successors, assigns, and representatives). *See* D.I. 1315 at Art. VIII.C. The Claims being released include "any and all claims and Causes of Action whatsoever (including any avoidance actions and any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Wind-Down Debtors, but excluding any Retained Causes of Action or Retained Defensive Rights), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement or otherwise."[10] *See* D.I. 1315 at Art. VIII.C.

---

[9] The Plan defines "Settlement Released Party" as follows:

> "*Settlement Released Parties*" means, collectively, in each case in its capacity as such: (a) each of the Consenting Lenders (as defined in the RSA, including the Ad Hoc Group and each of its members solely in their capacity as such), (b) the Prepetition ABL Secured Parties, (c) DMPL, (d) Black Diamond Capital Management LLC, (e) the Debtors, (f) the Committee and each member of the Committee (solely in its capacity as such), and (g) the Related Parties of each of the foregoing, in each case, solely in their capacity as such.

*See* D.I. 1315 at Art. I.A. 188.

[10] The Plan provides for Debtor Releases as follows:

> Notwithstanding anything contained herein or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date and as previously approved in the Settlement Order and to the extent not already released pursuant to any of the Sale Orders, each of the Released Parties and the Settlement Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors, their Estates, and, if applicable, the Wind-Down Debtors, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that

may purport to assert any Cause of Action directly or derivatively, by, through, for, or because of the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any avoidance actions and any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Wind-Down Debtors, but excluding any Retained Causes of Action or Retained Defensive Rights), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, their Estates, or their heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim, Interest, or Intercompany Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the SOTP Transactions, the August 2024 Transactions, the incurrence of the Super-Senior Term Loans, the Chancery Court Settlement, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the Debtors' operations, the business or contractual arrangements or interactions between or among the Debtors and any Released Party or Settlement Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Cases, any intercompany transactions, the negotiation, formulation, documentation, preparation, or consummation of the RSA, the SOTP Transactions, the Prepetition ABL Loan Documents, the Super-Senior Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents in connection with the SOTP Transactions, including the Purchase Agreements and the other SOTP Transaction Documents, if applicable, the solicitation of votes with respect to the Plan, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Entry of the Settlement Order constituted the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases provided in the Settlement and implemented through this Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, to the greatest extent permissible under the Bankruptcy Code and the Bankruptcy Rules, of the Debtor Release (to the extent not already approved in the Settlement Order), which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties and the Settlement Released Parties, including the Released Parties' and the Settlement Released Parties' respective contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claim, Interests, and Intercompany Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Debtors' Estates, or, if applicable, the Wind-Down Debtors, asserting any claim or Cause of Action released pursuant to the Debtor Release.

The foregoing Debtor Release shall not operate to waive or release (i) any Retained Causes of Action or Retained Defensive Rights, (ii) any Cause of Action against a Released Party or Settlement Released Party arising from any obligations owed to the Debtors pursuant to an Executory Contract or Unexpired Lease that is otherwise not rejected by the Debtors pursuant to section 365 of the Bankruptcy Code before, after, or as of the Effective Date; (iii) any Cause of Action expressly set forth in and preserved in this Plan or related documents, or expressly preserved and transferred pursuant to any of the Sale Orders; (iv) any Cause of Action against a Holder of a Disputed Claim

iii.   **Exculpation Provision**

---

to the extent necessary to resolve and administer such Disputed Claim solely in accordance with this Plan; or (v) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party or Settlement Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct. Notwithstanding anything to the contrary in the foregoing, the "Debtor Release" set forth above does not release any post-Effective Date obligations of any Entity under this Plan or any document, instrument or agreement executed in connection with this Plan with respect to the Debtors, the Wind-Down Debtors, or the Estates. Notwithstanding anything to the contrary in the foregoing and other than with respect to the DIP Term Loan Claim Waiver, the "Debtor Release" set forth above does not release any post-Effective Date obligations of any Entity under this Plan or any document, instrument or agreement executed in connection with this Plan with respect to the Debtors, the Wind-Down Debtors, or the Estates. Notwithstanding the foregoing, nothing herein or in the Confirmation Order shall have the effect of releasing, discharging, or compromising any rights of any of the DIP Secured Party or their Affiliates (in any capacity) arising under, related to, or in connection with any rights, Claims, or Causes of Action in respect of the DIP Term Loan Indemnity, any other indemnification obligations, and any other similar obligations of the Debtors to the DIP Term Loan Agent and the DIP Term Loan Lenders (which rights shall be fully enforceable against the Wind-Down Debtors).

*See* D.I. 1315 at Art. VIII.C.

31.     Article VIII.E of the Plan contains an exculpation provision[11] for Exculpated

Parties.[12]  *See* D.I. 1315 at Art. VIII.E.

---

[11] The Plan's exculpation provision states as follows:

Effective as of the Effective Date, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or the Third-Party Release, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any claim or Cause of Action for any act or omission arising prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or Consummation of the Plan, any Definitive Documents, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation through the Effective Date of the Plan, the pursuit or consummation of the SOTP Transactions, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims or Causes of Action in each case arising out of or related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; *provided, however*, that no Person or Entity that is not an Exculpated Party shall be entitled to rely on the exculpation provided for in this Article VIII.E, including by asserting this Article VIII.E as a defense or the basis for a claim or Cause of Action in its own name (whether directly or derivatively, and, whether or not in the capacity as a subrogee, assignee, or successor to an Exculpated Party, except to the extent that such relation renders such Person or Entity an Exculpated Party in its own right). For the avoidance of doubt, nothing in this Plan or the Confirmation Order shall operate as a release of, and the Debtors shall not release, Claims or Causes of Action against any Exculpated Parties or any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes on this Plan and, therefore, are not, and will not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or Distributions made pursuant to this Plan. The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.

For the avoidance of doubt, each of the Debtors, the professionals retained by the Debtors, the Committee, each of its members, and the Committee Professionals shall be Exculpated Parties and shall be exculpated for any Claims or Causes of Action associated with the formulation, preparation, dissemination, negotiation or filing, or Consummation of the Plan and the SOTP Transactions, any Definitive Document, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the pursuit of consummation of the SOTP Transactions, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion).

### iv. Injunction Provision

32. Art. VIII.F of the Plan broadly provides a permanent injunction against "all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII of the Plan, released pursuant to the Debtor Release, the Third-Party Release, or another provision of the Plan (including the release of Liens pursuant to Article VIII.B of the Plan), or are subject to exculpation pursuant to Article VIII.E of the Plan" from and after the Effective Date from taking certain enumerated actions against "the Debtors, the Wind-Down Debtors, the Plan Administrator, the Exculpated Parties, or the Released Parties."[13] *See* D.I. 1315 at Art. VIII.F.

---

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

The exculpation will be in addition to, and not a limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability; *provided*, *however*, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan (including any Purchase Agreement and any documents in connection therewith).

*See* D.I. 1315 at Art. VIII.E.

[12] The Plan defines "Exculpated Parties" as follows:

"*Exculpated Parties*" means, collectively, and in each case solely in its capacity as such: (a) each of the Debtors; (b) the Wind-Down Debtors and the Plan Administrator; (c) the Committee and each of its respective members; (d) the Claims Oversight Administrator; and (e) each Related Party of each Entity in clauses (a) through (d).

*See* D.I. 1315 at Art. I.A. 102.

[13] The Plan's injunction provision states as follows:

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable Law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII of the Plan, released pursuant to the Debtor Release, the Third-Party Release, or another provision of the Plan (including the release of Liens pursuant to Article VIII.B of the Plan), or are subject to exculpation pursuant to Article VIII.E of the Plan, are permanently enjoined, from and

after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Plan Administrator, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan. For the avoidance of doubt, nothing contained in this Plan, including this Article VIII.F, shall release, compromise, impair, or in any way affect any Assigned Claims.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Wind-Down Debtors, the Plan Administrator, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Wind-Down Debtor, Plan Administrator, Exculpated Party, or Released Party. Notwithstanding the foregoing and other than with respect to the DIP Term Loan Claim Waiver, nothing herein or in the Confirmation Order shall have the effect of releasing, discharging, or compromising any rights of any of the DIP Secured Party or their Affiliates (in any capacity) arising under, related to, or in connection with any rights, Claims, or Causes of Action in respect of the DIP Term Loan Indemnity, any other indemnification obligations, and any other similar obligations of the Debtors to the DIP Term Loan Agent and the DIP Term Loan Lenders (which rights shall be fully enforceable against the Wind-Down Debtors).

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F of the Plan.

For the avoidance of doubt and notwithstanding section 1141(d)(3) of the Bankruptcy Code, as of the Effective Date, except as otherwise specifically provided in the Plan and any Sale Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that are treated under the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claim or Interest from the Debtors, the Estates, the Purchasers, or the Wind-Down Debtors, except for the receipt of the payments or distributions, if any, that are contemplated by the Plan from the Wind-Down Debtors or the Disbursing Agent, as applicable, or otherwise contemplated under the applicable Sale Order(s). Such injunction will not enjoin Persons or Entities that do not consent to the Third-Party Release from pursuing any direct (but not derivative) Claims or Cause of Action such Persons or Entities may

16

v.    **Gatekeeping Provision**

33.    Articles VIII.D and VIII.F of the Plan include gatekeeping provisions[14] that force

a non-debtor who wishes to pursue a claim or cause of action against another non-debtor to come

---

> have against Released Parties other than the Debtors, the Estates, the Purchasers, or the Wind-Down
> Debtors (if applicable).

*See* D.I. 1315 at Art. VIII.F.

[14] The Plan's gatekeeping provision in Art. VIII.D states as follows:

> Without limiting the foregoing, from and after the Effective Date, any Entity that is given the
> opportunity to opt out of the releases contained in this Article VIII.D in accordance with this Plan
> and does not exercise such opt out may not assert any claim or other Cause of Action against any
> Released Party based on or relating to, or in any manner arising from, in whole or in part, the
> Debtors. From and after the Effective Date, any Entity that opts out of (or otherwise does not
> participate in) the releases contained in this Article VIII.D in accordance with this Plan may not
> assert any claim or other Cause of Action against any Released Party for which it is asserted or
> implied that such claim or Cause of Action is not subject to the releases contained in Article VIII.C
> of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after
> notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in
> Article VIII.C of the Plan, and (b) specifically authorizing such Person or Entity to bring such claim
> or Cause of Action against any such Released Party. For the avoidance of doubt, the terms of this
> paragraph shall not apply to the Plan Administrator. The Bankruptcy Court will have sole and
> exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or
> derivative claim, is colorable and, only to the extent legally permissible and as provided for in
> Article XI of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying
> claim or Cause of Action.

*See* D.I. 1315 at Art. VIII.D.  The Plan's gatekeeping provision in Art. VIII.F states as follows:

> No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the
> Debtors, the Wind-Down Debtors, the Plan Administrator, the Exculpated Parties, or the Released
> Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in
> connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C,
> Article VIII.D, or Article VIII.E hereof, without the Bankruptcy Court (i) first determining, after
> notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind,
> and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against
> any such Debtor, Wind-Down Debtor, Plan Administrator, Exculpated Party, or Released Party.
> Notwithstanding the foregoing and other than with respect to the DIP Term Loan Claim Waiver,
> nothing herein or in the Confirmation Order shall have the effect of releasing, discharging, or
> compromising any rights of any of the DIP Secured Party or their Affiliates (in any capacity) arising
> under, related to, or in connection with any rights, Claims, or Causes of Action in respect of the DIP
> Term Loan Indemnity, any other indemnification obligations, and any other similar obligations of
> the Debtors to the DIP Term Loan Agent and the DIP Term Loan Lenders (which rights shall be
> fully enforceable against the Wind-Down Debtors).

*See* D.I. 1315 at Art. VIII.F.

17

to this Court—and only this Court—for a determination of whether such claim or cause of action can proceed. *See id.*

### vi.    Rule 3020(e) Waiver

34.    The Debtors seek an immediate waiver of the 14-day stay under Fed R. Bankr. P. 3020(e) upon occurrence of the Effective Date.[15]  *See* D.I. 1315 at Art. XII.A.

### vii.    Provisions Providing that the Plan is a Settlement

35.    Article IV.A[16] provides that the Plan is a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan.  *See* D.I. 1315 at Art. IV.A.

---

[15] The Plan provides for the waiver of the 14-day stay as follows:

> Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and any Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtors, any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to any Executory Contracts and Unexpired Leases with the Debtors.

*See* D.I. 1315 at Art. XII.A.

[16] Article IV.A of the Plan states as follows:

> As discussed in the Disclosure Statement and as otherwise provided herein, to the greatest extent permissible under the Bankruptcy Code and the Bankruptcy Rules, and consistent with the relief granted pursuant to the Settlement Order pursuant to Bankruptcy Rule 9019 and implemented under this Plan, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute and be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan that were not previously settled as part of the Settlement (other than the Retained Causes of Action), and shall implement and give force and effect to that. The releases provided for in the Settlement were approved in the Settlement Order, subject to implementation in this Plan.

> The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of compromises and settlements set forth and incorporated herein under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules, as well as a finding by the Bankruptcy Court that all such settlements and compromises are fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final. To the extent of any inconsistency between the Plan and the terms of the Settlement or the Settlement Order as to the terms of the Settlement, the Settlement and Settlement Order shall control.

### viii.   Deemed Acceptance Provision

36.      Article III.E of the Plan provides that a class will be deemed to accept the Plan if no votes are cast and the class contains claims or interests eligible to vote.[17]  *See* D.I. 1315 at Art. III.E.

### ix.   Other Provisions

37.      Article XII.C[18] of the Plan contains language concerning the payment of Statutory Fees pursuant to 11 U.S.C. § 1930(a)(6).  *See* D.I. 1315 at Art. XII.C.

38.      Article III.B.1, III.B.2, and III.B.4 of the Plan provides that for Classes 1, 2, and 4, in exchange for the proposed treatment in the Plan, Holders of an Allowed Other Secured Claim, Allowed Other Priority Claim, and Allowed General Unsecured Claim in these classes will receive payment "in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim."  *See* D.I. 1315 at Art. III.B.1, III.B.2, and III.B.4.

---

*See* D.I. 1315 at Art. IV.A.

[17] Article III.E of the Plan provides:

> If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

*See* D.I. 1315 at Art. III.E.

[18] Article XII.C of the Plan states as follows:

> All fees due and payable pursuant to section 1930(a) of the Judicial Code prior to the Effective Date, including fees and expenses payable to the U.S. Trustee, shall be paid by the Debtors on the Effective Date. After the Effective Date, the Wind-Down Debtors shall pay any and all such fees for each quarter (including any fraction thereof) and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each and every one of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee and File quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

*See* D.I. 1315 at Art. XII.C.

19

39.     Article IV.H.7 of the Plan includes exculpation and indemnification of the Plan Administrator and his or her professionals by the Wind-Down Debtors.[19]  *See* D.I. 1315 at Art. IV.H.7.

40.     Article XII.D of the Plan provides a separate release and discharge of liabilities to the Committee and its members.[20]  *See* D.I. 1315 at Art. XII.D.

---

[19] Article IV.H.7 of the Plan states as follows:

> The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Plan Administrator may obtain, at the expense of the Wind-Down Debtors and with funds from the Plan Administrator Account, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

> For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

*See* D.I. 1315 at Art. IV.H.7.

[20] Article XII.D of the Plan states as follows:

> On the Effective Date, the Committee shall dissolve automatically, and all members thereof and all Professionals retained thereby shall be released and discharged from all rights, duties, responsibilities, and liabilities arising on or prior to the Effective Date, from, or related to, the Chapter 11 Cases and under the Bankruptcy Code; *provided* that the Committee will remain in place after the Effective Date solely for the purposes solely for the following limited purposes and solely in accordance with the Committee's statutory and fiduciary duties given the facts and circumstances of these Chapter 11 Cases: (a) pursuing requests and the allowance of Professional Fee Claims and final fee applications Filed by Committee Professionals pursuant to sections 330 and 331 of the Bankruptcy Code in accordance with Article II.C hereof, and (b) any appeals of the Confirmation Order or any other appeal or pending adversary proceeding to which the Committee is a party. The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by the Committee Professionals or the members of the Committee after the Effective Date, except for any fees and expenses incurred in connection with the activities described in the foregoing sentence, and in all cases subject to and in accordance with the terms of the Settlement.

*See* D.I. 1315 at Art. XII.D.

## OBJECTION

### I.      Confirmation Standard

41.     A chapter 11 plan cannot be confirmed unless this Court finds the Plan complies with the provisions of section 1129(a) of title 11 of the United States Code (the "Bankruptcy Code"). *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 220-21 (Bankr. D.N.J. 2000). A plan proponent bears the burden of proof with respect to each element of section 1129(a). *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001).

42.     For the following reasons, the Plan cannot be confirmed in its present form.

### II.     The Plan is Not Confirmable Because It Proposes Nonconsensual Third-Party Releases That Are Not Authorized Under the Bankruptcy Code

#### A.  Introduction

43.     The Court should deny confirmation because the Plan contains nonconsensual third-party releases.

44.     The United States Supreme Court held in *Harrington v. Purdue Pharma L.P.* that bankruptcy courts cannot involuntarily alter relationships between non-debtors by imposing nonconsensual releases of, or injunctions barring, claims between them. 603 U.S. 204, 209, 227 (2024). The Court did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release." *Id*. at 226.

45.     A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law. As the Supreme Court recognized in *Purdue*, a release is a type of settlement agreement. *Purdue*, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual") (cleaned up). A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code. If a claim has been

extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right.

46. Here, the only existing release agreements are the Restructuring Support Agreement and the 9019 Order. *See* FDD, Ex. C at page 128 of 139 and D.I. 1211. The releases set forth in the Settlement Tem Sheet were approved, and were to be incorporated and implemented through the Plan on the Effective Date. *See id.* Beyond the parties to the Restructuring Support Agreement and the 9019 Order, the Debtors seek to impose third-party releases on other creditors (including general unsecured creditors) without their affirmative and voluntary consent. A confirmation order effectuating such releases would impermissibly alter the relations between non-debtors because a valid release does not exist under nonbankruptcy law.

47. State law governs whether non-debtors have agreed to release each other. *See infra* Part B. Nothing in the Bankruptcy Code allows parties to disregard state law when debtors seek to impose third-party releases in their plans. Under New York law (*see* Plan Art. I.D), as in other states, silence is not acceptance of an offer other than in limited circumstances inapplicable here. The Debtors thus cannot deem those who fail to opt out to have released their claims because those claimants have not agreed to the third-party release under state law.

**B. State Contract Law Applies**

48. "[T]he basic federal rule in bankruptcy is that state law governs the substance of claims." *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979). Thus, courts apply state law when the question is whether a debtor has entered into a valid settlement agreement. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La*

22

*Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

49.     The rule is no different for third-party releases.  They are separate agreements between non-debtors governed by state law.   Unlike a bankruptcy discharge, which "is an involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do so*." *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in original).  *See also Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority").  Thus, "the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed." *Arrowmill*, 211 B.R. at 507.

50.     Because the Bankruptcy Code does not authorize the imposition of an involuntary release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under non-bankruptcy law. There is no Bankruptcy Code provision that preempts otherwise applicable state contract law governing releases between non-debtors.  *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.").  Section 105(a), for example, "serves only to carry out authorities expressly conferred

23

elsewhere in the code." *Purdue,* 603 U.S. at 216 n.2 (quotation marks omitted). But the Bankruptcy Code does not confer any authority to impose a release of claims between non-debtors that would not be valid under state law. The Bankruptcy Code does not define a "consensual release." *See* 11 U.S.C. § 101. "There is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism" for third-party releases in chapter 11 plans. *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015). And no Bankruptcy Code provision authorizes bankruptcy courts to deem a non-debtor to have consented to release claims against other non-debtors where such consent would not exist as a matter of state law.

51.     Some courts have held that federal rather than state law applies to determine whether a third-party release is consensual. But because there is no applicable Bankruptcy Code provision, whether a non-debtor has consented to release another non-debtor is not, as one court concluded, a "matter of federal bankruptcy law." *In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *18, *22 (Bankr. S.D.N.Y Mar. 7, 2025); *see also In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district rather than any provision of the Bankruptcy Code). Absent express authority in the Bankruptcy Code, federal courts cannot simply make up their own rules for when parties have given up property rights by releasing claims. Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Indeed, nearly a hundred years ago, the Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional assumption of powers by the Courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct." *Erie*, 304 U.S. at 79 (cleaned up); *accord Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020) (holding state law

applies to determine allocation of federal tax refund resulting from consolidated tax return).  Courts thus may not invent their own rule for when parties may be "deemed" to have given up property rights by releasing claims.

52.     Accordingly, state-law contract principles govern whether a third-party release is consensual.  *See*, *e.g.*, *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original).  Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 603 U.S. at 223).  And "any such consensual agreement would be governed by state law." *Id.*

53.     Even if federal law applied, however, it would not lead to a different result.  That is because "federal contract law is largely indistinguishable from general contract principles under state common law." *Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d 344,

25

354 (5th Cir 2015) (cleaned up).  *See also Deville v. United States*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core principles of the common law of contracts that are in force in most states.' . . . These core principles can be derived from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003)); *In re GOL Linhas Aereas Inteligentes S.A.*, 675 B.R. 129, 130 (Bankr. S.D.N.Y. 2025) ("[I]t is not necessary to decide whether federal or state law controls. . . . Here, the same general principles of contract law apply under both federal and state law, so there is no conflict.  Those principles indicate that the third-party releases at issue here are nonconsensual and, thus, barred by the Supreme Court in Purdue.") (appeal pending sub nom. *In re GOL Linhas Aereas Inteligentes S.A.*, 26-49 (2d Cir.)).  *See* also *In re The Diocese of Buffalo, N.Y.*, --- B.R. ----, 2026 Bankr. Lexis 497 * 5-6 (W.D.N.Y. Feb. 27, 2026) *citing In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024)(As a voluntary contract among affected parties, a third-party release "would be governed instead by state law.")

## C.  Under State Law, Silence Is Not Acceptance

54.     The Debtors bear the burden to prove that the Plan is confirmable.  *In re American Cap. Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012).  The Debtors have not met that burden because they have failed to establish that the third-party release is consensual under applicable state law.

55.     Under New Jersey law, like in other states, an agreement to release claims—like any other contract—requires a manifestation of assent to that agreement.[21]    *See, e.g.,*

---

[21] Plan Art. I.D has a New York choice-of-law provision.  This provision does not control relations between non-debtors.  But regardless of whether New York or New Jersey law applies, the result would be the same.  *See In re GOL Linhas Aereas Inteligentes S.A.*, 675 B.R. at 131 ("the New York Court of Appeals has 'repeatedly' held that 'a binding contract requires an objective manifestation of mutual assent, through either words or conduct, to the essential terms comprising the agreement.'")(citing *Wu v. Uber Tech.*, 260 N.E.3d 1060, 1070 (2024)); *Weichert Co. Realtors*, 608 A.2d 280, 284 (N.J. 1992) ("[i]t is requisite that there be an unqualified acceptance to conclude the manifestation of assent."); *James v. Global Tel*Link Corp.*, 852 F.3d 262, 266 (3d. Cir. 2017) (discussing New Jersey law).  *See*

RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."); *In re Hertz Corp.*, 120 F.4th 1181, 1192 (3d Cir. 2024) ("Contract law does not bind parties to promises they did not make."); *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018) ("Under Delaware law, overt manifestation of assent . . . controls the formation of a contract.") (cleaned up).

56.      Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance."[22]  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). *See also Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."); *Jacques v. Solomon & Solomon P.C.*, 886 F. Supp. 2d 429, 433 n.3 (D. Del. 2012) ("Merely sending an unsolicited offer does not impose upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent without accepting."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3 (E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL 1700778, at *1 (E.D. Cal. Feb. 11, 2021); *In re GOL Linhas*, 675 B.R. at 131 ("the general principles of contract law, as embodied in the Restatement of Contracts, establish that, outside of rare exceptions, consent cannot be implied from silence."); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.).  *See also In re The Diocese of Buffalo, N.Y.*, ---

---

*also In re The Diocese of Buffalo, N.Y.*, --- B.R. ----, 2026 Bankr. Lexis 497 * 6 *citing More v. New York Bowery Fire Ins. Co.*, 130 N.Y. 537, 545 (1892) ("the state's highest court stated the applicable standard: 'The proper inference from failure to respond to a proposition of any kind is that it is rejected or declined. A party cannot be held to contract where there is no assent. Silence operates as an assent, and creates an estoppel, only when it has the effect to mislead'.")

[22] New Jersey, like many states, follows the Restatement (Second) of Contracts § 69.  *See, e.g., Weichert Co. Realtors*, 608 A.2d at 284; *James v. Global Tel*Link Corp.*, 852 F.3d at 266.

B.R. ----, 2026 Bankr. Lexis 497 * 9 (stating agreement with bankruptcy court's analysis in *In re GOL Linhas*, 675 B.R. at 131).

57.      There are only very limited exceptions to the "general rule of contracts . . . that silence cannot manifest consent." *Patterson*, 636 B.R. at 686; *see also*, *e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer"). "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

58.      But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *Id.*   And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69, cmt. c; *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out); *Jacques*, 886 F. Supp. 2d at 433 n.3.

**D.  Failing to Opt Out Does Not Provide the Required Affirmative Consent**

59.      The Plan imposes a third-party release on anyone who is provided a ballot and does not return it with the opt-out box checked and anyone who is provided the Non-Voting Status Notice, which contains a Release Opt-Out Form, and does not return the Release Opt-Out Form. In other words, the Debtor purports to impose an otherwise non-existent duty to speak on claimants regarding the offer to release non-debtors, and their silence—the failure to opt out—is "deemed" consent. But under black-letter law, silence is not acceptance of the offer to release non-debtors.

28

*See, e.g.*, *GOL Linhas,* 675 B.R. at 131 (under federal law, consent cannot be conferred by silence absent rare exceptions not applicable to third-party releases in a plan); *Patterson*, 636 B.R. at 688 ("Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent."). *See also In re The Diocese of Buffalo, N.Y.*, --- B.R. ----, 2026 Bankr. Lexis 497 * 6 ("The longstanding rule in New York is that silence does not constitute consent, except in instances where estoppel might apply.")

60.     A case from the Ninth Circuit illustrates the point.  In *Norcia v. Samsung Telecom. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), and the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), the court held that a failure to opt out did not constitute consent to an arbitration agreement.  A consumer bought a Samsung phone and signed the Verizon Wireless Customer Agreement.  *See Norcia*, 845 F.3d at 1282.  The phone came with a Samsung warranty brochure that contained an arbitration provision but gave purchasers the ability to opt out of it without affecting the warranty coverage.  *See id*. The customer did not opt out.  *See id*.  When the customer later sued Samsung, Samsung argued that the arbitration provision applied.  *See id*. at 1282-83.

61.     The Ninth Circuit in *Norcia* held that the customer's failure to opt out did not constitute consent to arbitrate.  The court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer."  *See Norcia*, 845 F.3d at 1284 (quotation marks omitted).  *See also, Weichert Co. Realtors v. Ryan*, 128 N.J. at 436 ([s]ilence does not ordinarily manifest assent, but the relationships between the parties or other circumstances may justify the offeror's expecting a reply and, therefore, assuming that silence indicates assent to the proposal).  The customer did not agree to arbitrate because he

did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *See Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *See id.* at 1286 (quotation marks and citation omitted).

62.     The Ninth Circuit held that none of the exceptions to this rule applied. *See Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *See id.* at 1286.

63.     Here, too, Debtors' creditors have not signed an agreement to release the non-debtors nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors.

### i.     Not voting and not opting out is not consent to release non-debtors

64.     Third-party releases cannot be imposed on those who do not vote and do not opt out. *See Smallhold,* 665 B.R. at 709; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82; *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011). 442 B.R. 314, 355 (Bankr. D. Del. 2011). This applies to both those creditors who simply abstain from voting and those creditors who are not entitled to vote on the Plan because they are deemed to accept or reject. There is no basis to infer consent by those who do not vote and are taking no action with respect to the Plan.

30

65.     Even where there are conspicuous warnings that a party will be bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-party release. *See SunEdison*, 576 B.R. at 458–61.  Creditors have no legal duty to vote on a plan, much less to respond to an offer to release non-debtors included in a plan solicitation.  *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *In re The Diocese of Buffalo, N.Y.*, --- B.R. ----, 2026 Bankr. Lexis 497 * 11 ("But the Bankruptcy Code imposes no duty on creditors to vote on a plan or even to read a disclosure statement."); (*GOL Linhas*, 675 B.R. at 132 ("[I]t is undisputed that the creditors had no duty to respond to the opt-out opportunity and courts do not enter default judgment when parties have no duty to respond."); *SunEdison,* 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence).  Consent thus cannot be inferred from their silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting."  *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. c (1981).  Nor can it "impose on him any duty to speak." *Id.* § 69 cmt. a.

66.     Further, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016).  Consent thus cannot be inferred here because parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases.  *See SunEdison*, 576 B.R. at 461.  This is especially true for those whose votes are not solicited at all—but who are instead sent a notice informing them they cannot vote, along with a form to opt-out that they must return to avoid being bound by the third-party release.

31

67.     "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *See Chassix*, 533 B.R. at 81.  "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *See Smallhold*, 665 B.R. at 721; *see also id.* at 719-20 (discussing *Chassix*).  "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent.  *See Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *See id.*

68.     Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *See In re Washington Mut., Inc.*, 442 at 355; *see also Chassix*, 533 B.R. at 81–82.

        **ii.     Voting on a plan plus a failure to opt out does not manifest consent to a non-debtor release**

69.     Voting to accept a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  Voting to approve a plan plus a failure to opt out of a third-party release is nothing more than silence with

32

respect to the offer to release claims against non-debtors.  The act of voting on a chapter 11 plan without opting out is not conduct that "manifest[s] [an] intention that silence may operate as acceptance" of a proposal that the creditor release claims against non-debtors.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  Impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan.  *See* 11 U.S.C. § 1126(a).  Merely exercising that right does not manifest consent to release claims against non-debtors.

70.      Even more obviously, those who vote to reject the plan are not consenting to third-party releases by failing to mark an opt-out box.  Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan.  As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan.  *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*"  *See* 533 B.R. at 79 (emphasis added).

### iii.      Smallhold's conclusion that voting plus a failure to opt out equals consent to a non-debtor release is incorrect

71.      One bankruptcy court has found that, in at least some circumstances, a failure to opt out constitutes consent when a claimant votes—either to accept or reject a plan—but not if they do not vote.  *See Smallhold*, 665 B.R. at 723.  The *Smallhold* court incorrectly reasoned that because the act of voting on a debtor's plan is an "affirmative step" taken after notice of the third-party release, failing to opt out binds the voter to the release.  *See id.*  But while voting is an "affirmative step" with respect to the debtor's plan, it is not a "manifestation of intention that silence may operate as acceptance" of a third-party release.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added).  That is because "[t]he mere receipt of an

33

unsolicited offer does not impair the offeree's freedom of action or inaction," id.—in this case, the federal right to vote on a chapter 11 plan. 11 U.S.C. § 1126(a). Nor does it "impose on him any duty to speak," RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a, such as by checking an opt out box.[23] Thus, consent to release third-party claims (which are governed by nonbankruptcy law) cannot properly be inferred from a party's failure to check an opt-out box on a ballot to vote on the proposed treatment of claims against the debtor (governed by bankruptcy law). *See supra*.

### E. Opt Outs Cannot Be Imposed Based on a Procedural Default Theory

72. Applicable state contract law cannot be disregarded on a procedural default theory, applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors if they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so.[24] *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6 (Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022); *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011). These courts reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation

---

[23] The *Spirit* court concluded that "creditors entitled to vote who returned a ballot but did not check the opt-out box on that ballot also clearly manifested their consent to the Third-Party Releases." *See In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *21 (Bankr. S.D.N.Y Mar. 7, 2025). That is wrong because an unsolicited offer of a third-party release cannot impose a duty to speak or impair the freedom to vote on a plan. Further, the *Spirit* court erred in assuming that the failure to check an opt-out box on a ballot necessarily shows that a creditor "affirmatively chose" not to check the box. *See id.* at *21. " When the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016). And a failure to check an opt-out box is equally consistent with inadvertence or lack of understanding.

[24] Although the court in *Spirit* disclaimed relying on a default theory, *Spirit Airlines,* 666 B.R. at 715, it based its holding on the same rationale: that a party may be deemed to consent based on notice and a failure to respond.

of due process from binding them to the release. *Cf. Smallhold*, 665 B.R. at 708 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

73.     A fuller explanation of this theory was articulated prior to the *Purdue* ruling in *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022). The *Mallinckrodt* court stated that "the notion that an individual or entity is in some instances deemed to consent to something by their failure to act is one that is utilized throughout the judicial system." *See id*. "When a party to a lawsuit is served with a complaint or a motion, they need to file an answer or otherwise respond, or a judgment is automatically entered against them." *See id*. at 879. The court reasoned that "[t]here is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization." *See id*.

74.     This is wrong. First, when a party in litigation is bound to a result based on a failure to timely respond, it is not because the defaulting party has *consented* to an adverse ruling. Rather, "failure to make timely assertion of [a] right before a tribunal having jurisdiction to determine it" results in *forfeiture* of the right. *See United States v. Olano*, 507 U.S. 725, 731 (1993). Forfeiture, unlike waiver, is not an intentional relinquishment of a known right. *See id*. at 733. *Cf. Smallhold*, 665 B.R. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default."). Forfeiture principles thus do not show consent.

75.     Second, there is no basis to hold that parties have forfeited claims against non-debtor third parties based on their silence in response to a debtor's chapter 11 plan. No one has submitted the released claims for adjudication by the bankruptcy court. *See Olano*, 507 U.S. at 731; *In re The Diocese of Buffalo, N.Y.*, --- B.R. ----, 2026 Bankr. Lexis 497 * 11 ("In deciding

whether to review a proposed plan, creditors have no reason to expect that the plan will address obligations other than those of the debtor itself. Under these circumstances, the imposition of a third-party release would constitute consent by ambush. An 'opt-out' approach creates an unacceptable trap for creditors having no reason to presume the inclusion of a third-party release into a plan."); *GOL Linhas*, 675 B.R. at 132 (rejecting arguments that: (i) creditors who have consented to the bankruptcy court's jurisdiction also consent to the approval of releases; (ii) class action opt-out procedures applied to the third-party releases before it; and (iii) that consent may be imputed from the failure to opt out).

76.    And under *Purdue*, imposition of a nonconsensual non-debtor release is not available relief through a debtor's chapter 11 plan. *See Purdue,* 603 U.S. at 215-227 & n.1; *see also Smallhold*, 2665 B.R. at 709 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."). It is therefore "no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *See Smallhold*, 665 B.R. at 719.

77.    The Supreme Court's *Purdue* decision rejected a fundamental premise of the procedural default theory—that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights. *See Smallhold*, 665 B.R. at 708-09; *see also id*. at 708 ("The possibility that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing."). The courts that relied on this procedural-default theory had reasoned that non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights, because pre-*Purdue* a chapter 11 plan could permissibly include nonconsensual, non-debtor releases under certain

circumstances. *See id*. at 717-18. As the *Smallhold* court explained, however, under the default theory, a plan's opt-out provision functions not as a method to secure consent, but rather serves as "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection." *See id*. at 709; *see also id*. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

78.  But "[u]nder established principles," courts may enter relief against a party who procedurally defaults by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation. *See id*. at *2; *see also id*. at *13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."); *see also Thomson v. Wooster*, 114 U.S. 104, 113 (1885) (holding a decree *pro confesso* may only be entered if it "is proper to be decreed"); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered.") (cleaned up).

79.  "[After *Purdue*], that is no longer the case in the context of a third-party release." *See Smallhold*, 665 B.R. at 722. A third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection." *See id*. "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *See id*. That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties. Because imposition of a nonconsensual non-debtor release is not

37

relief available through a debtor's chapter 11 plan, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *See id*. at 719-20.

80.   Because *Purdue* establishes that a *non*consensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *See id*. at 709. And besides the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *See id*. Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release.[25] Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required. *See id*. at 720 (emphasis added).

81.   In sum, the failure to opt out does not constitute the affirmative consent necessary to reflect unqualified acceptance by holders of Claims or Interests to the third-party releases the Plan seeks to provide to the many so-called "Released Parties" and "Settlement Released Parties." As a result, the Debtor does not meet its state-law burden of establishing that the members of the Classes in the Plan have agreed to release their property rights and have that release memorialized in the Plan. *See Mizuna, Ltd. 90 F.3d at 658.*

82.   Nothing in the Bankruptcy Code authorizes bankruptcy courts to extinguish claims by inferring consent outside the bounds of state law. It is especially egregious to do so here to

---

[25] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory. *See id.* at 716 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

parties that are not entitled to vote on the Plan.  The Plan's third-party releases are therefore non-consensual, and so are prohibited by *Purdue*.

### III.    The Debtor Release in the Plan Is Overbroad

83.    The Plan provides for a release by each Debtor, Estate, and Wind-Down Debtor to the Released Parties and the Settlement Released Parties, which includes Related Parties.  *See* D.I. 1315 at Art. VIII.C.

84.    The Plan does not establish that each of the proposed Released Parties and Settlement Released Parties are providing adequate consideration in exchange for receiving such releases. In addition, certain persons included in the definition of Released Parties and Settlement Released Parties do not appear to be entitled to such releases under applicable case law.  Many individuals and entities are also included in the definitions of Released Parties, Settlement Released Parties, and Related Parties that are unknown parties.  *See* D.I. 1315 at Art. I.A. 167, 168, and 188.  Further, Exculpated Parties include Related Parties of the Debtors, the Wind-Down Debtors, the Plan Administrator, the Committee and the Claims Oversight Administrator, who are not only receiving an exculpation under the Plan but are also receiving a release from the Debtors.

85.    In *In re Zenith Elecs. Corp.*, the Court identified five factors that are relevant to determine whether a debtor's release of a non-debtor is appropriate:

(1)    an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources;

(2)    a    substantial    contribution    to    the    plan    by    the    non-debtor;

(3)    the necessity of the release to the reorganization;

(4)    the overwhelming acceptance of the plan and release by creditors and interest holders; and

(5)    the payment of all or substantially all of the claims of the creditors and interest holders under the plan.

39

*See Zenith*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (*citing Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994). These factors are neither exclusive nor conjunctive requirements but provide guidance in the court's determination of fairness. *See Master Mortgage*, 168 B.R. at 935 (finding there is no "rigid test" to be applied in every circumstance and that the five factors are neither exclusive, nor conjunctive).

86. The first *Zenith* factor requires an "identity of interest between the debtor and the third-party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate." *See In re Spansion, Inc.*, 426 B.R. 114, n. 47 (Bankr. D. Del. 2010) (citing *Zenith*, 241 B.R. at 110). An identity of interest exists when, among other things, the debtor has a duty to indemnify the non-debtor receiving the release. *See Wash. Mut.*, 442 B.R. at 347 (recognizing that indemnification may create an identity of interest thereby satisfying the first factor of *Zenith*). Here, it is unclear whether an identity of interest exists between the Debtors and each of the Released Parties and the Settlement Released Parties.

87. The second *Zenith* factor involves whether the non-debtor party benefiting from the release made a substantial contribution of assets to the debtor's reorganization. *See In re Congoleum Corp.*, 362 B.R. 167, 193 (Bankr. D.N.J. 2007). In considering releases, substantial contribution does not include contributions to the reorganization related to operational restructuring or negotiating for the financial restructuring. *See In re Genesis Health*, 266 B.R. at 606-7 ("the officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization."). There is scant evidence that each of the Released Parties and Settlement Released Parties provided a substantial contribution of assets.

88.    As to the third *Zenith* factor, no information is provided to support the contention that all of the releases are necessary to a reorganization as this Plan is a liquidation.

89.    The fourth *Zenith* factor concerning acceptance of the Plan is premature and cannot be assessed at this time as the Debtors have not filed a certification of ballots.

90.    The fifth *Zenith* factor is not satisfied as it does not appear that unsecured creditors will receive all or substantially all of their claims.

91.    Accordingly, these factors do not support the Debtor Releases.

92.    Additionally, pursuant to the Plan, Exculpated Parties who are included in the definition of Released Parties, Settlement Released Parties, and Related Parties, will receive an exculpation for their actions or inactions.  *See* D.I. 1315 at Art. VIII.E.  These Exculpated Parties do not satisfy the *Zenith* factors and should only be granted an exculpation for their actions or inactions between the Petition Date and the Effective Date, not a release from the Debtors.

## IV.    The Plan Cannot Be Confirmed Because the Plan Exculpation Violates Circuit Precedent by Shielding Non-Estate Fiduciaries

93.    To the extent exculpation is permissible beyond the provisions of section 1125(e), this Circuit has only approved exculpations that are limited to estate fiduciaries. The Plan's definition of Exculpated Parties is inconsistent with controlling case law because it is not limited to estate fiduciaries.  In *In re PWS Holding Corp.*, the Third Circuit considered whether an official committee of unsecured creditors could be exculpated and held that 11 U.S.C. § 1103(c) implies both a fiduciary duty and a limited grant of immunity to members of the unsecured creditors' committee.  228 F.3d 224, 246 (3d Cir. 2000).  The Bankruptcy Court for the District of Delaware has repeatedly interpreted *PWS Holding* as requiring a party's exculpation to be based upon its status as an estate fiduciary.  *See In re Mallinckrodt PLC,* 639 B.R. 837, 882 (Bankr. D. Del. 2022); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013); *In re Tribune Co.*, 464

41

B.R. 126, 189 (Bankr. D. Del. 2011); *In re Washington Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011); *In re PTL Holdings LLC*, No. 11-12676 (BLS), 2011 WL 5509031, at *12 (Bankr. D. Del. Nov. 10, 2011).

94.    The Plan definition of Exculpated Parties includes many parties who are not fiduciaries of the estates— including members of any governing body, equity holders, affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, employees, members, agents, trustees and advisory board members of the Debtors.  *See In re Mallinckrodt,* 639 B.R. at 883 (holding that inclusion of a distribution agent in exculpation clause improper because entity is not in existence until after plan effective date); *In re Washington Mut.*, 442 B.R. at 350-51 ("[An] exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers.").

95.    The Exculpated Parties should be limited to the Debtors, the directors and officers of the Debtors who served during any portion of the cases and the Debtors' professionals retained in these cases.

96.    Because the definition of Exculpated Parties is not limited to fiduciaries who have served during the chapter 11 cases, the exculpation provision contravenes Circuit precedent, and the Plan cannot be confirmed as written.

97.    In addition, the Debtors seek to exculpate the Exculpated Parties "…from any claim or Cause of Action for any act or omission arising prior to the Effective Date," which includes prepetition conduct.  *See id.* at Article VIII.E.

42

98.     However, exculpation is only available for services rendered between the Petition Date and the Effective Date.  *See Mallinckrodt*, 639 B.R. at 883 (holding that exculpation "only extends to conduct that occurs between the Petition Date and the effective date," and ordering contrary language "must therefore be stricken").  As the Plan's exculpation provision would allow exculpation for conduct that occurred before the Petition Date, it exceeds the allowable scope of exculpation, and effectively imposes a non-consensual release of non-debtors by non-debtors in contravention of the Supreme Court's decision in *Purdue,* 144 S. Ct. at 2082-88.  As such, the Plan cannot be confirmed unless the exculpation provision is revised to comply with applicable law.

## V.     The Injunction Provision in the Plan is Overbroad and Impermissible

99.     This Court also may not approve the injunction enforcing the third-party release by barring claims against non-debtors.  *Purdue* held that non-consensual third-party releases and injunctions are generally not permitted by the Bankruptcy Code.  *See Purdue*, 603 U.S. at 227.  As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context:  asbestos-related bankruptcies, and these cases are not asbestos-related.  *See id.* at 222 (citing 11 U.S.C. § 524(g)).

100.     Even if the third-party release was consensual, that would not mean that the court has authority to impose an injunction.  An injunction is critically different from a consensual non-debtor release.  The legal effect of a consensual release is based on the parties' agreement. *See Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority").  The non-debtor parties themselves are altering their relations; the court is not using its judicial power to effect that change.  An injunction, by contrast, relies on the court's power to enter orders binding on parties.  The court must therefore have both constitutional and statutory

43

authority to enter an injunction.   And, once such jurisdiction and authority are established, the court still must determine that an injunction is warranted.

101.   In addition, the injunction language in the Plan appears to provide a discharge to the Debtors, who are being liquidated.  Pursuant to Section 524(a)(3) of the Bankruptcy Code, confirmation of a liquidating plan does not operate as an injunction.  Only a discharge operates as an injunction, and as this Plan is a liquidating plan, the Debtors are not entitled to a discharge. Instead, pursuant to Section 362(c) of the Bankruptcy Code, the automatic stay remains in effect until the earlier of the time the case is closed or the case is dismissed.  Additionally, pursuant to Section 1141(a), the provisions of a confirmed plan bind all parties, including debtors and creditors, to the terms of a plan.

102.   Because the Bankruptcy Code protects the Debtors by continuing the automatic stay until the earlier of the time the case is dismissed or the case is closed (11 U.S.C. § 362(c)), and by binding all parties to the terms of the Plan (11 U.S.C. § 1141(a)), the U.S. Trustee submits that Article VIII.F is unnecessary for the Debtors.  To the extent the Court disagrees, the U.S Trustee requests that the Plan or Confirmation Order should provide that "nothing contained in the Plan shall be deemed to constitute a discharge of the Debtors under section 1141(d)(3) of the Bankruptcy Code."

## VI.   The Plan Has an Improper Gatekeeping Injunction

103.   The Court should deny confirmation because Plan Art. VIII.D and Art. VIII.F have improper gatekeeping injunctions.

104.   Further, Plan Art. XI.13 and XI.25 would give this Court exclusive jurisdiction to resolve any cases, controversies, issues, disputes, or causes of action relating to Plan Art. VIII, including its injunction(s).

44

105.     The above provisions would force a non-debtor who wishes to pursue a claim or cause of action against another non-debtor to come to this Court—and only this Court—for a determination of whether such claim or cause of action can proceed.  By specifying that this Court shall determine whether a claimant can proceed, the Plan's gatekeeping injunctions effectively grants this Court exclusive jurisdiction to adjudicate the claim or cause of action between non-debtors.  The gatekeeping injunctions would apply even after the Debtors' bankruptcy cases have been closed, which would require a non-debtor seeking to pursue a claim against another non-debtor to first move to reopen the bankruptcy cases.

106.     The Plan's gatekeeping injunctions are improper because the bankruptcy court lacks jurisdiction and statutory authority to enter such an injunction, and there has been no showing that injunctive relief is warranted.  *See In re Highland Cap. Mgmt., L.P.*, 132 F.4th 353, 359-362 (5th Cir. 2025) (bankruptcy courts "do not have unrestricted power to protect non-debtors from liability via a pre-filing injunction" and holding that injunction be limited to and coextensive with definition of exculpated parties) (*cert. petition filed* Jul. 28, 2025, Case No. 25-119 (S. Ct.)); *In re AIO US, Inc.*, --- B.R. ----, 2025 WL 2426380 at *38 (Bankr. D. Del. Aug. 21, 2025) ("this Court does not believe there is a basis for imposing a 'gatekeeping' role.").

107.     In addition, because there is no "related to" jurisdiction over these non-debtor claims, not only does the bankruptcy court lack jurisdiction to enter the injunction, but it also lacks jurisdiction to perform the gatekeeping function the Plan would exclusively assign to it.

108.     Even if there were "related to" jurisdiction, reserving exclusive jurisdiction in the bankruptcy court to determine whether those non-debtor claims can proceed is contrary to Congress's grant of concurrent jurisdiction over such claims.  *See* 28 U.S.C. § 1334(b) (providing "original but not exclusive jurisdiction"); *In re Brady, Texas, Mun. Gas Corp.*, 936 F.2d 212, 218

45

(5th Cir. 1991).  The defense of "release" is an affirmative defense that cannot be adjudicated prior to the filing of the action to which it relates.  *See*, *e.g.*, Fed. R. Civ. P. 8(c)(1), incorporated in Fed. R. Bankr. P. 7008.  There is no reason why the court in which the relevant action has been filed cannot determine whether the non-debtor claim was released under the Plan.

109.    Further, the gatekeeping injunctions contravene the basic premise that once a company confirms a plan it "is without the protection of the bankruptcy court.  It may not come running to the bankruptcy judge every time something unpleasant happens."  *See In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390 (5th Cir. 2001) (cleaned up).  This is even more true for the non-debtors protected by the gatekeeping injunctions.  Gatekeeping would create inefficient piecemeal litigation contrary to the purpose of "related to" jurisdiction.  *See Matter of Zale Corp.*, 62 F.3d 746, 752 (5th Cir. 1995) ("[W]hen we define 'related to' jurisdiction, we should avoid the inefficiencies of piecemeal adjudication and promote judicial economy by aiding in the efficient and expeditious resolution of all matters connected to the debtor's estate.") (cleaned up).  Parties would have to go to the bankruptcy court for permission to sue, then to the court where they want to sue to file the complaint, and then back to the bankruptcy court again if they want to amend the complaint, then back to the court presiding over the suit if the bankruptcy court allows the amendment.  That makes no sense.  It increases the burden on the courts, imposes unnecessary costs and delay on the parties, and unnecessarily interferes with other courts' jurisdiction and ability to manage the cases before them.  *See Zale*, 62 F.3d at 755 ("[C]ourts must be particularly careful in ascertaining the source of their power, lest bankruptcy courts displace state courts for large categories of disputes.") (cleaned up).  There is no reason to deviate from the ordinary course in which the court presiding over a lawsuit determines whether the claims are "colorable,"

46

adjudicates any defenses, including the defense of release, and determines whether any amendments to the complaint should be permitted.

110.    A similar provision was rejected in *In re Gulf Coast Health Care, LLC*, where the court noted "the plan says what it says, and other courts should be entitled to exercise their authority to interpret it," and "[i]mposing such a requirement could also impose an unnecessary administrative hurdle and cost the parties when these cases are closed." *See Gulf Coast Health Care, LLC*, No. 21-11336 (KBO) (Bankr. D. Del.), D.I. 1236, Transcript of May 4, 2022, Confirmation Hearing at 30:18-23.

111.    The Court should deny confirmation unless the gatekeeping injunctions are removed from Plan Art. VIII.D and VIII.F, and the word "exclusive" is removed from Plan Art. XI.

## VII.    The Court Should Not Waive the Rule 3020 Stay

112.    The Plan provides the following request for waiver of the 14 day stay: "notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and any Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, Wind-Down Debtors, any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to any Executory Contracts and Unexpired Leases with the Debtors." *See* D.I. 1315 at Art. XII.A.  The Debtors' request for a waiver of the 14-day stay under Fed R. Bankr. P. 3020(e) is inappropriate and should be denied.

47

113.   Federal Rule of Bankruptcy Procedure 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." *See* Fed. R. Bankr. P. 3020(e).  The Committee Notes explain that subsection (e) was "added to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 9 or chapter 11 of the Code before the plan is implemented and an appeal becomes moot." *See id.*

114.   Plan proponents frequently include stay waiver provisions to invoke the doctrine of "equitable mootness" as a sword to evade appellate review.  *See In re Chemtura Corp.*, No. 09–11233, 2010 WL 4607822, at *1 (Bankr. S.D.N.Y. Nov. 3, 2010).  Courts, however, should be "wary of wholly denying any party at least an opportunity to seek a stay to avoid the mooting of its appeal" in deciding whether to waive Rule 3020(e)'s 14-day stay.  *See id.*; *see also In re Adelphia Comm. Corp.*, 368 B.R. 140, 282 (Bankr. S.D.N.Y. 2007) (denying request to waive automatic stay because "fairness to [objecting creditors] . . . requires that I not take an affirmative step that would foreclose all opportunities for judicial review").

115.   "An orderly bankruptcy process depends on a concomitantly efficient appeals process," *see In re Syncora Guarantee Inc.*, 757 F.3d 511, 517 (6th Cir. 2014) (citations omitted), and a waiver of the 14-day stay undermines this goal by forcing parties to seek an emergency stay.

116.   Debtors have presented no exigencies that would justify departing from the Rule's imposition of an automatic 14-day stay and impeding the ability to obtain appellate review.  The Court should thus deny their request to waive Rule 3020(e)'s stay.

## VIII.   The Plan Is Not a Global Settlement

117.   The Court should deny confirmation because Plan Art. IV.A improperly deems the entire Plan to be a Rule 9019 settlement.

118.   Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan proponent to "provide for [] the settlement or adjustment of any claim or interest *belonging to the debtor or to the estate*[.]" 11 U.S.C. § 1123(b)(3)(A) (emphasis added).

119.   Section 1123(b)(3) only allows a debtor to settle claims it has against others; it does not allow a debtor to settle claims that creditors and interest holders may have against it, which is what Plan § IV.A seeks to do.  *See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003) ("The only reference in [section 1123(b)] to adjustments of claims is the authorization for a plan to provide for 'the settlement or adjustment of any claim or interest *belonging* to the debtor or to the estate.' . . .  It is significant that there is no parallel authorization regarding claims *against* the estate.") (emphasis in original) (quoting section 1123(b)(3)(A)) (internal citation omitted).

120.   The resolution of claims against the Debtors is governed by sections 1129 and 1141 of the Bankruptcy Code.

121.   A plan may incorporate one or more negotiated settlements, but a plan is not itself a settlement.  Sending a plan to impaired creditors for a vote is not equivalent to parties negotiating a settlement among themselves.  A "settlement" is "an agreement ending a dispute or lawsuit." BLACK'S LAW DICTIONARY (10th ed. 2014).  An "agreement" is "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons." *Id.*

122.   Approval of settlements is governed by Federal Rule of Bankruptcy Procedure 9019, which provides that, "[o]n the trustee's [or chapter 11 debtor in possession's] motion and after notice and a hearing, the court may approve a compromise or settlement."  But, because a "settlement" requires an agreement between the settling parties, Rule 9019 governs only parties

49

that have entered into an express settlement agreement; it is not a blanket provision allowing general "settlements" to be unilaterally imposed upon broad swaths of claimants that have no formal agreement with any party to "settle" their claims.

123.    The decision whether to approve a settlement under Rule 9019 is left to the sound discretion of the bankruptcy court, which "must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'" *Washington Mut.*, 442 B.R. at 338 (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).[26]  In contrast, chapter 11 plans are subject to the requirements of Bankruptcy Code sections 1123 and 1129. *See In re Armstrong World Indus., Inc.*, 432 F.3d 507, 511 (3d Cir. 2005) ("Confirmation of a proposed Chapter 11 reorganization plan is governed by 11 U.S.C. § 1129.").  What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" outside of the plan context is different from what may be permissible under a plan.

124.    Here, Plan Art. IV.A purports to treat the Plan itself as if it were a Rule 9019 "settlement."  Further, it appears Plan Art. IV.A is not limited to settling claims belonging to the Debtors or the estates.  Thus, Plan Art. IV.A exceeds the scope of what can be settled under section 1123(b)(3)(A).

125.    Plan Art. IV.A cannot be used to impose nonconsensual third-party releases. Nothing in Bankruptcy Rule 9019 permits bankruptcy courts to force non-debtors who have not consented to release their rights to sue other non-debtors under applicable state law.  The Rule is limited to approvals of a debtor's "compromise or settlement."  Fed. R. Bankr. P. 9019(a).  But a

---

[26] The standard for approval of a settlement under Rule 9019 is guided by the following criteria: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (citations omitted).

debtor lacks standing to pursue its creditors' direct claims against third parties. *See Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 426-29 (1972). Moreover, a compromise or settlement is, by definition, consensual. *See* BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added) (defining a "settlement" as "an *agreement ending a dispute* or lawsuit," and defining an "agreement" as "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons") (emphasis added). By its plain terms, Bankruptcy Rule 9019 does not authorize the imposition of non-consensual releases between non-debtors.

126. Nor could Bankruptcy Rule 9019 authorize the imposition of nonconsensual releases, even if, counterfactually, it purported to do so. Because 28 U.S.C. § 2075 commands that bankruptcy rules shall not abridge substantive rights, Bankruptcy Rule 9019 cannot authorize bankruptcy courts to approve something the Supreme Court held in *Purdue* no Bankruptcy Code provision permits. *Purdue*, 603 U.S. at 227 ("[T]he bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.").

127. Nor can such a "settlement" be included in a chapter 11 plan. A plan and a settlement are not one and the same thing. What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" is different than what may be permissible under a plan, which is subject to the requirements of sections 1123 and 1129 of the Bankruptcy Code. *See, e.g., In re Tribune Co.*, 464 B.R. 126, 176 (Bankr. D. Del. 2011) (concluding at confirmation stage that a negotiated settlement could be approved because it was fair, reasonable and in the best interest of the debtors' estates and making an express finding that the settlement was properly part of the plan pursuant to section 1123(b)(3)(A)). Section

51

1123(b)(3)(A) of the Bankruptcy Code allows a plan proponent to propose "the settlement or adjustment of any claim or interest *belonging to the debtor or to the estate*[.]" 11 U.S.C. § 1123(b)(3)(A) (emphasis added). Thus, under section 1123(b)(3)(A), a chapter 11 may only provide for the settlement of claims or interests belonging to the debtor or the estate—not the settlement of claims held by third parties. *Purdue*, 603 U.S. at 219-20 ("[P]recisely nothing in § 1123(b) suggests those claims can be bargained away without the consent of those affected, as if the claims were somehow Purdue's own property.").

128.     For the above reasons, the Court should deny confirmation unless Plan Art. IV.A is narrowed so that (i) it pertains only to claims the Debtors are settling against others and (ii) it does not provide that the Plan itself is a settlement. Without that change, the Plan does not comply with section 1123(b)(3)(A) and does not satisfy section 1129(a)(1).

**IX.     The Deemed Acceptance Language Must be Removed From the Plan**

129.     Article III.E of the Plan provides that a class will be deemed to accept the Plan if no votes are cast and the class contains claims or interests eligible to vote. *See* D.I. 1315 at Art. III.E.

130.     The Debtors do not provide any basis under the Bankruptcy Code, Bankruptcy Rules or case law that supports this provision. As such, the provision should be removed from the Plan. Such provision may not be material based on the voting but the Debtors have not filed a voting certification as of the date of this Objection.

131.     Section 1129(a)(8) of the Bankruptcy Code provides that a plan can only be confirmed if "[w]ith respect to each class of claims or interests . . . such class has accepted the plan." 11 U.S.C. § 1129(a)(8). Section 1126 governs acceptance of a plan by a creditor, providing that the holder of a claim "may accept or reject a plan" and Rule 3018(c) requires such acceptances

52

or rejections to be in writing.  11 U.S.C. §1126; Fed. R. Bankr. Pro. 3018(c).  Section 1126 also enumerates who may vote on a plan and the numerosity and debt thresholds that must be met for a class to accept a plan for purposes of § 1129(a)(8).

132.    Only a few courts have held that a non-voting class should be deemed to have accepted a plan.  *See, e.g., In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir. 1988); *In re Cypresswood Land Partners I*, 409 B.R. 396, 430 (Bankr. S.D. TX 2009).  The majority of courts that have considered the issue have held that a non-vote cannot be deemed to be an acceptance.  *See e.g.*, *In re M. Long Arabians*, 103 B.R. 211 (B.A.P. 9th Cir. 1989); *see also In re Vita Corp.*, 358 B.R. 749, 751-52 (Bankr. C.D. Ill. 2007), *aff'd*, 380 B.R. 525, 528 (C.D. Ill. 2008); *In re 7th Street and Beardsley P'ship*, 181 B.R. 426 (Bankr. D. Ariz. 1994); *In re Townco Realty, Inc.*, 18 C.B.C.2d 13, 81 B.R. 707 (Bankr. S.D. Fla. 1987) (section 1126(c) and Bankruptcy Rule 3018 require express acceptance).

133.    In both *In re Franco's Paving, LLC* and *In re Hot'z Power Wash, Inc.*, two recent Subchapter V cases from the Southern District of Texas, the bankruptcy court held that non-voting classes should simply not be counted for purposes of § 1126 and plan confirmation.  Discussing the issue, the *Hot'z* court concluded that "that the result of a § 1126(c) computation for a nonvoting class is absurd, unsolvable, and was not contemplated by Congress."  *See In re Hot'z Power Wash, Inc.*, Case No. 23-30749 (Bankr. S.D. Tex. Nov. 7, 2023) (quoting *In re Franco's Paving, LLC*, 2023 Bankr. LEXIS 2505 at *8 ("a nonvoting class renders the mathematical calculation required by § 1126(c) as impossible to calculate. . . . the indeterminate result obtained by dividing zero by zero was absurd and could not have been intended by Congress.")).  This, not presumed acceptance, is the more appropriate treatment of non-voting classes.

134.    Art. III.E. of the Plan provides that, in the event that there are no votes cast with respect to a class entitled to vote on the Plan, that class is deemed to have accepted the Plan. But a "non-vote" does not satisfy the plain language of § 1126—it is neither an acceptance nor a rejection. Therefore, a class that does not vote cannot be deemed to accept the Plan. Unless Art. III.E is removed, the Plan should not be confirmed.

**X.      The Statutory Fee Provision Must be Revised in the Plan**

135.    Section XII.C of the Plan provides for the payment of statutory quarterly fees pursuant to 11 U.S.C. §  1930(a)(6). *See* D.I. 1315 at Art. XII.C.   The language in the Plan provides that Statutory Fees will be paid by the Debtors on the Effective Date and by the Wind-Down Debtors after the Effective Date. *See id.*

136.    The U.S. Trustee requests the language contained in Article XII.C be revised as follows:  "All fees due and payable pursuant to section 1930(a) of the Judicial Code prior to the Effective Date, including fees and expenses payable to the U.S. Trustee ("Statutory Fees"), shall be paid by the Debtors in full in Cash on the Effective Date. On and aAfter the Effective Date, the Debtors, the Wind-Down Debtors, and the Plan Administrator, shall be jointly and severally liable for paying any and all Statutory such Ffees in full in Cash when due and payable in each Chapter 11 Case for each quarter (including any fraction thereof) until the earliest of such Chapter 11 Case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.  The Debtors and shall Ffile all monthly operating reports due before the Effective Date when they become due using UST Form 11-MOR.  After the Effective Date, the Debtors, the Wind-Down Debtors, and the Plan Administrator shall file with the Bankruptcy Court a post-confirmation quarterly reports for each Chapter 11 Case for each quarter (including any fraction thereof) such case is pending, using UST Form 11-PCR in a form reasonably acceptable to the U.S. Trustee.

Notwithstanding anything to the contrary in the Plan, (i) Statutory Fees are Allowed; shall not be treated as providing any release under the Plan.  Each and every one of the Debtors shall remain obligated to pay quarterly fees to the (ii) the U.S. Trustee shall not be required to file any proof of claim or any other request(s) for payment with respect to Statutory Fees; and (iii) the U.S. Trustee shall not be treated as providing any release under the Plan ~~and File quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code~~."

## XI.   The Overbroad Language in the Plan Concerning Satisfaction, Settlement, Release and Discharge Must be Removed

137.    Pursuant to the Plan, the following parties are exchanging their claims in full and final satisfaction, compromise, settlement, and release for its Claim:  a Holder of Allowed Priority Non-Tax Claim (Article III.B.1), a Holder of an Allowed Other Priority Claim (Article III.B.2), and a Holder of an Allowed General Unsecured Claim (Article III.B.4).  *See* D.I. 1315, Art. III.B.1, III.B.2, and IIIB.4.

138.    These provisions should be revised to remove "satisfaction, compromise, settlement, and release."  The various Holders of these Claims have not agreed to a compromise or to settle their claims.  In addition, not all creditors have agreed to release their claims.  Instead, the language in these provisions should simply state that holders of claims are exchanging their claims in full and final satisfaction of such claims.

## XII.   Language Concerning Indemnification and Exculpation of the Liquidating Trustee Must be Removed From the Plan

139.    Article IV.H.7 of the Plan includes exculpation and indemnification of the Plan Administrator and all professionals retained by the Plan Administrator.  *See* D.I. 1315 at Art. IV.H.7.

140.    However, there is no reason to include indemnification and exculpation in the Plan of an entity that does not exist until after the Effective Date.  Here, the Plan Administrator Agreement provides indemnification and exculpation to the Indemnified Parties, which includes the Plan Administrator (in its capacity as such and as sole officer of each of the Wind-Down Debtors and representative of the Estates), and all professionals retained by the Wind-Down Debtors, each in their capacities as such.  *See* D.I. 1427, Exhibit G.  As such, Article IV.H.7 is duplicative and unnecessary.

## XIII.    The Separate Release and Discharge to the Committee and Its Members Must be Removed from the Plan

141.    Article XII.D of the Plan provides a separate release and discharge to the Committee and its members:  "On the Effective Date, the Committee shall dissolve automatically, and all members thereof and all Professionals retained thereby shall be released and discharged from all rights, duties, responsibilities, and liabilities arising on or prior to the Effective Date, from, or related to, the Chapter 11 Cases and under the Bankruptcy Code; *provided* that the Committee will remain in place after the Effective Date solely for the purposes solely for the following limited purposes and solely in accordance with the Committee's statutory and fiduciary duties given the facts and circumstances of these Chapter 11 Cases: (a) pursuing requests and the allowance of Professional Fee Claims and final fee applications Filed by Committee Professionals pursuant to sections 330 and 331 of the Bankruptcy Code in accordance with Article II.C hereof, and (b) any appeals of the Confirmation Order or any other appeal or pending adversary proceeding to which the Committee is a party. The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by the Committee Professionals or the members of the Committee after the Effective Date, except for any fees and expenses incurred in connection with the activities

described in the foregoing sentence, and in all cases subject to and in accordance with the terms of the Settlement." *See* D.I. 1315 at Art. XII.D.

142.    The Committee and its members act as fiduciaries for the estate.  As fiduciaries, the Committee and its members are entitled to an exculpation for actions or inactions occurring from the Petition Date to the Effective Date of a plan.

143.    Pursuant to the Plan, it appears that the Committee and its members are receiving an exculpation (Art. VIII.E), as well as debtor releases (Art. VIII.C), third-party releases (Art. VIII.D), and a release and discharge of liabilities (Art. XII.D).

144.    As the Committee and its members should only be entitled to an exculpation for their actions or inactions from the Petition Date to the Effective Date of a Plan, Article XII.D should simply dissolve the Committee and allow the Committee standing concerning fee applications and any appeals.

## CONCLUSION

WHEREFORE, the U.S. Trustee respectfully asks that this Court deny confirmation and

grant such other relief as the Court deems fair and just.

Dated: April 28, 2026                                      Respectfully submitted,
       Newark, New Jersey

**ANDREW R. VARA**
**UNITED STATES TRUSTEE,**
**REGIONS 3 & 9**

By: */s/ Jeffrey M. Sponder*
Jeffrey M. Sponder
Trial Attorney
One Newark Center
1085 Raymond Boulevard
Suite 2100
Newark, NJ 07102
(973) 645-3014 (Phone)
jeffrey.m.sponder@usdoj.gov