**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

John W. Weiss
David E. Sklar
**PASHMAN STEIN WALDER HAYDEN, P.C.**
21 Main Street, Suite 200
Hackensack, New Jersey 07601
Telephone: (201) 270-5477
Email: jweiss@pashmanstein.com
   dsklar@pashmanstein.com

-and-

Allan S. Brilliant (*pro hac vice admitted*)
G. Eric Brunstad, Jr. (*pro hac vice admitted*)
Stephen M. Wolpert (*pro hac vice admitted*)
James S. Moser, Jr. (*pro hac vice admitted)*
**DECHERT LLP**
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Email: allan.brilliant@dechert.com
  eric.brunstad@dechert.com
  stephen.wolpert@dechert.com
  james.moser@dechert.com

*Attorneys for the Ad Hoc Group of Minority Secured Lenders*

| | |
|---|---|
| | Chapter 11 |
| | Case Number: 25-16984 (MBK) |
| | Jointly Administered |
| In Re: | |
| Del Monte Foods Corporation II, Inc., *et al.*, | **Re D.I. 1336, 1337** |
| Debtors.[1] | **Hearing Date: May 12, 2026 at 10:00 am ET** |
| | **Objection Deadline: April 28, 2026 at 5:00 pm ET** |

### THE AD HOC GROUP OF MINORITY SECURED LENDERS' OBJECTION TO (I) CONFIRMATION OF LIQUIDATING PLAN AND (II) FINAL <u>APPROVAL OF THE DISCLOSURE STATEMENT</u>

---

[1] The last four digits of Debtor Del Monte Foods Corporation II Inc.'s tax identification number are 1894. A complete list of the Debtors in these Chapter 11 Cases and their respective tax identification numbers may be obtained on the website of the Debtors' Claims and Noticing Agent, at https://cases.stretto.com/DelMonteFoods. The location of the Debtor Del Monte Foods Corporation II Inc.'s principal place of business and the Debtors' service address is 205 North Wiget Lane, Walnut Creek, California 94598.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **PRELIMINARY STATEMENT** | | 1 |
| **BACKGROUND** | | 9 |
| I. | Minority Ad Hoc Group | 9 |
| II. | Events Leading to Plan Filing | 10 |
| | A. The Black Diamond Litigation and Settlement | 10 |
| | B. DIP Facility and Critical Vendor Orders | 12 |
| | C. The Settlement | 14 |
| | D. The 363 Sale | 17 |
| III. | The Disclosure Statement and Plan | 18 |
| | A. Sources of Recovery and the Waterfall | 19 |
| | B. Minority Ad Hoc Group's Claims | 20 |
| | C. Treatment of the DIP Claims | 21 |
| | D. "Insufficient Funds" for Term Loan and GUC Recoveries | 21 |
| | E. Wind-Down Budget | 22 |
| | F. Releases | 24 |
| **ARGUMENT** | | **24** |
| I. | The Liquidating Plan Does Not Provide for Payment of the Super-Senior Term Loan Lenders' 507(b) Claims and is Not Feasible | 25 |
| II. | The Liquidating Plan Does Not Satisfy the "Best Interests of Creditors" Test With Respect to the Minority Ad Hoc Group Members. | 30 |
| III. | The Liquidating Plan is Not Confirmable Because It Impermissibly Classifies Similar Claims In Different Classes. | 33 |
| IV. | The Liquidating Plan Is Not Confirmable Because Class 3 Must be Deemed to Reject Pursuant to Section 1126(g), It Does Not Meet the Fair and Equitable Test, and It Unfairly Discriminates | 37 |
| | A. Class 3 Must Be Deemed to Reject | 37 |

TABLE OF CONTENTS (continued)

Page

B.      The Liquidating Plan Does Not Meet the Cramdown Requirements Under
        Section 1129(b). ................................................................................................ 40

i.      Payment of Administrative Claims Ahead of the Claims of the Minority
        Ad Hoc Group Violates the Fair and Equitable Standard ..................................... 41

ii.     The Liquidating Plan Unfairly Discriminates Against the Minority Ad Hoc
        Group's Deficiency Claims.................................................................................... 44

V.      The Liquidating Plan Was Not Proposed In Good Faith. .................................................. 49

VI.     The Liquidating Plan is Unconfirmable Because it Contains Opt-Out Releases of
        Non-Debtor Third Parties. ............................................................................................... 50

VII.    Even if the Liquidating Plan is Confirmable, the Court Should Require it to
        Authorize the Liquidating Plan Administrator to Pursue the Avoidance Actions............. 51

VIII.   The Court Should Not Waive the Protections for Plan Opponents as Provided
        Under Bankruptcy Rules 3020(e), 6004(h), or 7062. ....................................................... 52

IX.     The Disclosure Statement Should Not Be Approved on a Final Basis............................... 53

**RESERVATION OF RIGHTS** ............................................................................................... **54**

**CONCLUSION** ..................................................................................................................... **54**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 203 North LaSalle St. L.P.*,
190 B.R. 567 (Bankr. N.D. Ill. 1995) ...................................................................47

*In re AIO US, Inc.*,
2025 WL 2426380 (Bankr. D. Del. Aug. 21, 2025) ...........................................37, 53

*In re AIO US, Inc.*,
672 B.R. 261 (Bankr. D. Del. Aug. 21, 2025) ..................................................24, 25

*Aluminum Mills Corp. v. Citicorp North America, Inc.*,
132 B.R. 869 (Bankr. N.D. Ill. 1991) ...................................................................36

*American United Mutual Life Insurance Co. v. City of Avon Park, Fla.*,
311 U.S. 138 (1940) .......................................................................... *passim*

*In re Armstrong World Indus., Inc.*,
320 B.R. 523 (D. Del. 2005) ...............................................................................48

*In re Armstrong World Indus., Inc.*,
432 F.3d 507 (3rd Cir. 2005) ..........................................................................43, 47

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...........................................................44, 47

*In re Bailey Tool & Mfg. Co.*,
Case No. 16-30503-BH, 2018 WL 550581 (Bankr. N.D. Tex. Jan. 23, 2018).......................26

*In re Becker*,
51 B.R. 975 (Bankr. D. Minn. 1985) .................................................................25, 29

*In re Boy Scouts of Am.*,
137 F.4th 126 (3d Cir. 2025) ..........................................................................24, 44

*Boyd v. Petrie (In re Tompkins)*,
430 B.R. 453 (Bankr. W.D. Mich. 2010)...............................................................36

*In re Breitburn Energy Partners LP*,
582 B.R. 321 (Bankr. S.D.N.Y. 2018).................................................................44

*In re Carpet Ctr. Leasing Co.*,
991 F.2d 682 (11th Cir. 1993) .........................................................................25

*In re Combustion Eng'g, Inc.*
  391 F.3d 190 (3d Cir. 2004) .................................................................................................49

*In re Creekside Landing, Ltd.*,
  140 B.R. 713 (M.D. Tenn. 1992) .........................................................................................47

*Czyzewski v. Jevic Holding Corp.*,
  580 U.S. 451 (2017) ...............................................................................................43, 44, 48

*In re DBSD N. Am., Inc.*,
  634 F.3d 79 (2d Cir. 2011) ..................................................................................................43

*In re Dispirito*,
  371 B.R. 695 (Bankr. D.N.J. 2007) ....................................................................................26

*In re Egan*,
  142 B.R. 730 (Bankr. E.D. Pa. 1992) .................................................................................38

*Ellis v. Westinghouse Elec. Co., LLC*,
  11 F.4th 221 (3d Cir. 2021) ................................................................................................27

*In re Energy Future Holdings Corp.*,
  648 F.App'x 277, 484 (3d Cir. 2016) ................................................................................44

*In re Energy Future Holdings Corp.*,
  990 F.3d 728 (3d Cir. 2021) ................................................................................................27

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) .....................................................................................41

*In re Fairfield Exec. Assocs.*,
  161 B.R. 595 (D.N.J. 1993) ................................................................................................34

*In re Forklift LP Corp.*,
  363 B.R. 388 (Bankr. D. Del. 2007) ...................................................................................29

*In re Friese*,
  103 B.R. 90 (Bankr. S.D.N.Y. 1989) .................................................................................24

*In re Genesis Global Holdco, LLC*,
  660 B.R. 439 (Bankr. S.D.N.Y. 2024) ...............................................................................44

*In re Genesis Health Ventures, Inc.*,
  266 B.R. 591 (Bankr. D. Del. 2001) .............................................................................47, 49

*Harrington v. Purdue Pharma L.P.*,
  603 U.S. 204 (2024) .............................................................................................................51

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
   530 U.S. 1 (2000) ............................................................................................................ 32

*In re JER/Jameson Mezz Borrower II, LLC*,
   461 B.R. 293 (Bankr. D. Del. 2011) ............................................................................ 37

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
   987 F.2d 154 (3d Cir. 1993) ................................................................................ *passim*

*In re Kmart Corp.*,
   359 F.3d 866 (7th Cir. 2004) ...................................................................................... 45

*In re Krehl*,
   86 F.3d 737 (7th Cir. 1996) ........................................................................................ 36

*In re Levelbest LLC*,
   2023 WL 187631 (Bankr. N.D.N.Y. 2023) ............................................................... 53

*In re Lisanti Foods, Inc.*,
   329 B.R. 491 (D.N.J. 2005) ........................................................................................ 30

*In re Los Angeles Dodgers LLC*,
   465 B.R. 18 (D. Del. 2011) ......................................................................................... 54

*Louisville Joint Stock Land Bank v. Radford*,
   295 U.S. 555 (1935) .................................................................................................... 43

*In re Mary Holder Agency*,
   2012 WL 4434362 (Bankr. D.N.J. Sept. 24, 2012) ................................................... 27

*In re Nuverra Env'tl Sols., Inc.*,
   590 B.R. 75 (D. Del. 2018) ......................................................................................... 49

*In re Nuverra Env'tl Sols., Inc.*,
   834 Fed. App'x 729 (3rd Cir. 2021) ........................................................................... 48

*In re One Times Square Assocs. Ltd. P'ship*,
   165 B.R. 773 (S.D.N.Y. 1994) ................................................................................... 34

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
   848 F.2d 414 (3d Cir. 1988) ................................................................................. 38, 40

*In re Quigley Co., Inc.*,
   437 B.R. 102 (Bankr. S.D.N.Y. 2010) ................................................................. 29, 30

*Rosenfeld v. Coastal Broad. Sys., Inc.*, 2013 U.S. Dist. LEXIS 91469 (D.N.J. June
   28, 2013) ...................................................................................................................... 37

*In re Scopac*,
    624 F.3d 274 (5th Cir. 2010) ...............................................................................26

*In re Sentry Operating Co. of Tex., Inc.*,
    264 B.R. 850 (Bankr. S.D. Tex. 2001) ..........................................................47, 48

*In re Serta Simmons Bedding, L.L.C.*,
    125 F.4th 555 (5th Cir. 2024)................................................................................35

*In re The Pet Apothecary LLC*,
    Case No. 24-11192, 2025 Bankr. LEXIS 2718 (Bankr. D. Del. Oct. 22, 2025)......49

*In re Transwest Resort Props.*,
    881 F.3d 724 (9th Cir. 2018) ...............................................................................37

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011) .....................................................................36

*In re Tribune Co.*,
    972 F3d 228 (3d Cir. 2020).......................................................................44, 45, 46

*In re TSIC, Inc.*,
    393 B.R. 71 (Bankr. D. Del. 2008) .......................................................................49

*In re Two Bros. XI, Inc.*,
    2013 WL 1856332 (Bankr. D. Ariz. May 2, 2013) . C. .........................................27

*United States v. Ron Pair Enterprises, Inc.*,
    489 U.S. 235 (1989)..............................................................................................37

*In re Visual Indus., Inc.*,
    57 F.3d 321 (3d Cir. 1995).....................................................................................32

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012)....................................................................................50

*In re Waterways Barge P'ship*,
    104 B.R. 776 (Bankr. N.D. Miss. 1989) ...............................................................38

*In re World Health Alts., Inc.*,
    344 B.R. 291 (Bankr. D. Del. 2006) .....................................................................49

*In re Wright*,
    2023 WL 3560551 (Bankr. D.N.J. 2023)..............................................................53

**Statutes**

11 U.S.C. § 101..........................................................................................................36

11 U.S.C. § 1129 ................................................................................................................ *passim*

11 U.S.C. § 1122 ..................................................................................................1, 4, 33, 46

11 U.S.C. § 503(b) ............................................................................................................ *passim*

11 U.S.C. § 1123 ................................................................................................................ *passim*

11 U.S.C. § 101 ........................................................................................................................36

11 U.S.C. § 507 ................................................................................................................ *passim*

11 U.S.C. § 1121 ......................................................................................................................37

11 U.S.C. § 1122 ................................................................................................................ *passim*

11 U.S.C. § 1125 ......................................................................................................................54

11 U.S.C. § 1126 ................................................................................................................ *passim*

## Other Authorities

Fed. R. Bankr. P. 3020 ....................................................................................................52, 53

Fed. R. Bankr. P. 6004 ..............................................................................................52, 53, 54

Fed. R. Bankr. P. 7062 ..............................................................................................52, 53, 54

Fed. R. Bankr. P. 9019 ................................................................................................15, 44

The Ad Hoc Group of Minority Secured Lenders (the "Minority Ad Hoc Group"),[2] the members of which are lenders under that certain prepetition Credit Agreement dated as of August 2, 2024 (as amended, the "Super-Senior Credit Facility," and the lenders thereunder, the "Prepetition Secured Lenders"), by and through its undersigned counsel, hereby submits the following combined objection (the "Objection") to confirmation of the *First Amended Joint Chapter 11 Plan of Del Monte Foods Corporation II Inc. and its Debtor Affiliates* [Docket No. 1315] (the "Liquidating Plan" or "Plan") and final approval of the *Amended Disclosure Statement to the First Amended Joint Chapter 11 Plan of Del Monte Foods Corporation II Inc. and its Debtor Affiliates* [Docket No. 1337] (the "Disclosure Statement").[3]

## PRELIMINARY STATEMENT

Due to numerous infirmities, the Liquidating Plan cannot be confirmed. Among other things, the Liquidating Plan impermissibly (1) fails to provide for payment of the Minority Ad Hoc Group members' super-priority administrative expense claims under section 507(b) of the Bankruptcy Code in violation of section 1129(a)(9), which also renders the Plan infeasible under section 1129(a)(11); (2) fails to meet the "best interests of creditors" test, as distributions to members of the Minority Ad Hoc Group are less than they would receive in a Chapter 7 liquidation; (3) includes a classification and voting scheme that violates sections 1122(a), 1126(g), 1123(a)(4), and 1129(a)(1); (4) is not fair and equitable because it fails to provide members of the Minority

---

[2]   The members of the Minority Ad Hoc Group (the "Members") are listed in the *Second Verified Statement of the Ad Hoc Group of Minority Secured Lenders Pursuant to Bankruptcy Rule 2019* [Docket No. 1262] (MAHG Ex. 57) (the "Second Rule 2019 Statement").

[3]   Throughout the Objection, the Minority Ad Hoc Group refers to the *Ad Hoc Group of Minority Secured Lenders' Witness and Exhibit List for May 7, 2026 Combined Hearing on Final Approval of Debtors' (I) Amended Disclosure Statement for the First Amended Joint Chapter 11 Plan of Del Monte Foods Corporation II Inc. and its Debtor Affiliates; Confirmation of (II) the First Amended Joint Chapter 11 Plan of Del Monte Foods Corporation II Inc. and its Debtor Affiliates* [Docket No. 1465] (the "MAHG Exhibit List"), and certain of the exhibits listed therein (each, "MAHG Ex.").

Ad Hoc Group with the value of their collateral; (5) unfairly discriminates by providing a distribution to non-deficiency claim unsecured creditors while providing no distribution to deficiency claims of the same priority held by the Minority Ad Hoc Group; (6) was not proposed in good faith; and (7) provides for impermissible third-party releases.

At the time the Chapter 11 Cases were filed, the outstanding amount of prepetition Super-Senior Term Loan[4] debt was $999.3 million ($395.5 million in First Out Term Loans, $468.8 million in Second Out Term Loans, and $135 million in Third Out Term Loans), which was secured by substantially all of the Debtors' assets.  Shortly after the Petition Date, the Debtors entered into a DIP Term Loan Facility that primed the prepetition Super-Senior Term Loan debt with DIP Liens securing $165 million in new money term loan debt and $247.5 million in roll-up loans.  As part of the DIP financing, the Debtors provided the prepetition lenders with adequate protection under the debtor-in-possession financing orders [Docket Nos. 59, 359] (MAHG Exs. 5, 8) (the "DIP Orders"), including replacement liens on all DIP Term Loan Collateral and proceeds of Avoidance Actions, to protect against diminution of the value of their prepetition collateral.  Immediately upon approval of the priming DIP (including the roll-up), the Super-Senior Term Loan lenders' interest in the prepetition collateral diminished, at a minimum to the extent of the roll-up.  This results in at least two insurmountable plan defects.

First, the Court-ordered adequate protection provided under the DIP Orders proved to be inadequate to protect the value of the prepetition Super-Senior Term Loan lenders' collateral as of the Petition Date.  Thus, those lenders, including members of the Minority Ad Hoc Group, have

---

[4]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Liquidating Plan, Disclosure Statement, First Day Declaration, or the *Ad Hoc Group of Minority Secured Lenders' Objection to Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement on an Interim Basis, (II) Scheduling a Combined Disclosure Statement Approval and Confirmation Hearing, (III) Approving Solicitation, Notice, and Tabulation Procedures, and (IV) Granting Related Relief* [Docket No. 1270] (MAHG Ex. 59) (the "Interim Disclosure Statement Objection"), as applicable.

2

valid administrative claims under section 503(b) of the Bankruptcy Code, with super-priority under section 507(b) over other administrative claims, for the diminution in value of their collateral due to, among other things, their collateral being primed by the DIP Facility.[5]  Despite their super-priority, the Liquidating Plan and the Wind-Down Budget do not provide for payment of these claims and, in any event, there is not sufficient funds to pay them.  Thus, the Liquidating Plan cannot meet the requirements of section 1129(a)(9)(A), and is not feasible under section 1129(a)(11), and therefore cannot be confirmed.

Second, according to the Debtors' Disclosure Statement and Wind-Down Budget, which was filed with the Plan Supplement on April 13, 2026, the value of the assets available for distribution exceeds the amount outstanding under the DIP facility.  The Liquidating Plan, however, improperly provides for distributions in an aggregate amount of $109.8 million to administrative claimants (other than professional fees), priority claims, and prepetition unsecured creditors, all while paying nothing to holders of Class 3 claims secured by liens in all of the Debtors' assets.  Such distributions are not fair and equitable and violate the best interest of creditors test.  The Majority Ad Hoc Group cannot "gift" the proceeds of asset liquidations or Avoidance Actions on which the Minority Ad Hoc Group has a valid perfected lien to lower priority administrative claims, priority claims or general unsecured creditors.

The Liquidating Plan also employs a defective classification and voting structure designed to gerrymander the vote, take away the constitutionally protected property rights of the members of the Minority Ad Hoc Group, and paper over an impermissible treatment of claims.  But there is no lawful justification for the Debtors' classification scheme.  As the Third Circuit has held, even

---

[5]   The Minority Ad Hoc Group intends to file a request for payment of its 507(b) Claim prior to the "Administrative Claim Bar Date," as defined in the Liquidating Plan.

if the holders of deficiency claims have legal rights distinct from the rights of trade creditors outside of bankruptcy, those differences do not render deficiency claims dissimilar from unsecured trade claims in bankruptcy. *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 161 (3d Cir. 1993). Further, for separate classification of similar claims to be justifiable, "each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed." *Id.* at 159.

Creditors are not being asked to decide on a reorganization, and no distinction between the classes exists sufficient to merit separate voting. The Debtors sold substantially all of their operating assets and have ceased doing business. Since the Debtors have no operations, they will have no ongoing relationships with vendors or trade partners. The SOTP Transactions will remain closed and final regardless of whether any creditor continues to do business with any acquirer. All that is left to do is merely distribute the pot of proceeds the Debtors received from the SOTP Transactions, and the proceeds of Other Excluded Assets, among the Debtors' stakeholders. In the context of a plan of liquidation of this kind, there simply can be no "distinct and weighty" voting interest that legitimately "merits a separate voice" for any class of similar claims. Unsecured claims in Classes 3, 4, and 5 must be classified together, and as mandated by section 1123(a)(4), all creditors in that combined class must receive the same treatment unless they have agreed to less favorable treatment.

The Majority Ad Hoc Group has agreed to forgo sharing in the GUC Cash Recovery under the Settlement, but the Minority Ad Hoc Group has not. As there is no supportable basis for the separate classification of the deficiency claims held by the Minority Ad Hoc Group other than to evade section 1123(a)(4), the Liquidating Plan does not comply with section 1122 of the

4

Bankruptcy Code and cannot be confirmed.  Thus, even if the GUC Cash Recovery could be distributed to general unsecured creditors (which, as noted, it cannot, for numerous reasons including the secured and super-priority claims of the Minority Ad Hoc Group), at a minimum it must be shared among the Minority Ad Hoc Group and other unsecured creditors.  Moreover, the Liquidating Plan provides releases for the Majority Ad Hoc Group members that are in Class 3, but not the Minority Ad Hoc Group.  Such treatment violates section 1123(a)(4)'s requirement that all class members receive the same treatment.

Even if separate classification were justified here (which it is not), the structure of the Liquidating Plan is improperly gerrymandered to manufacture "consent" to the Majority Ad Hoc Group's "gift" to administrative and general unsecured claimants and circumvent the Minority Ad Hoc Group rights with respect to its unsecured deficiency claims.  The Disclosure Statement provides that Class 3 will receive a 0% recovery.  "There's no range, it's just 0 percent."[6] Moreover, the Debtors argued at the hearing on the Settlement that the Super-Senior Term Loan Claims in Class 3 will receive no recovery under the Waterfall contained in the Liquidating Plan, and the Court relied on testimony to that effect in approving the Settlement.[7]  Thus, the Debtors are judicially estopped from arguing that Class 3 may receive a distribution under that Waterfall. But even though they claim they are "not shying away from the fact that Class 3 is not going to get a recovery, far from it,"[8] the Debtors have designated Class 3 Super-Senior Term Loan Claims

---

[6]    3/18/2026 Hr'g Tr. (MAHG Ex. 69) at 52:24-53:2.

[7]    The Minority Ad Hoc Group has appealed the order approving the Settlement.  Any references herein to the Debtors' positions and evidence, and the Court's findings and conclusions with respect thereto, at the Settlement approval stage do not constitute admissions by the Minority Ad Hoc Group that such positions, evidence, findings, or conclusions are meritorious.  All arguments made by the Minority Ad Hoc Group in opposition to the Settlement are incorporated by reference herein, and the Minority Ad Hoc Group does not waive any such arguments.  The Minority Ad Hoc Group reserves all rights to continue to challenge the Settlement, the Debtors' positions and evidence in support thereof, and the Court's findings and conclusions with respect thereto, on appeal or at later stages of these Chapter 11 cases.

[8]    *Id*. at 16:13-20.

as impaired and entitled to vote.  This conflicts with section 1126(g) of the Bankruptcy Code, which states, in mandatory terms, that "a class is deemed not to have accepted a plan" if it provides the class with no recovery.  11 U.S.C. § 1126(g) (emphasis added).

The reason for this unlawful structuring is clear: the Debtors intend to rely on (1) the Majority Ad Hoc Group to outvote the Minority Ad Hoc Group to carry Class 3, (2) the discriminatory preferential treatment of non-deficiency claim unsecured creditors (and the recommendation of a Committee that abandoned creditors holding deficiency claims) to obtain the votes to carry Class 4, and (3) the votes of insider unsecured creditors to carry Class 5, and then argue that they need not satisfy the cramdown requirements of section 1129(b) of the Bankruptcy Code because all impaired creditor classes accepted the Liquidating Plan.  This ignores the reality that any vote to accept a plan in a class that will receive no distribution—such as an accepting vote by a Majority Ad Hoc Group member in Class 3 or an insider creditor in Class 5—is necessarily motivated by benefits to the specific accepting creditors that have nothing to do with class treatment.  As the Supreme Court held in *American United Mutual Life Insurance Co. v. City of Avon Park, Fla.*, a vote by a creditor receiving "some special favor or inducement not accorded the others" cannot be considered "honest and unbiased,"[9] and it is precisely this kind of vote section 1126(g) precludes from being counted.

If the class of Super-Senior Term Loan Claims is properly deemed to reject the Liquidating Plan, the Debtors would be required to demonstrate that the Liquidating Plan is fair and equitable to, and does not unfairly discriminate against, the rejecting class under section 1129(b).  The Debtors cannot do so, as the Liquidating Plan clearly violates the fair and equitable standard with

---

[9]    311 U.S. 138, 147 (1940)

respect to the Minority Ad Hoc Group's secured claims, and discriminates unfairly with respect to the Minority Ad Hoc Group's deficiency claims.

Based on the Debtors' own numbers in the Disclosure Statement and Wind-Down Budget, there is at least $28 million of proceeds or projected proceeds of asset liquidations over and above the outstanding amount of the DIP Term Loan Claims (after payment of projected wind-down costs), as well as $8 million of proceeds from the Settlement of Avoidance Actions, that is collateral securing the Super-Senior Term Loan Lenders' post-petition adequate protection and prepetition secured claims. In order to cram down a class of secured creditors under section 1129(b)(2)(A), the plan must provide that the secured creditors retain the liens on their collateral or receive the value of such collateral or its indubitable equivalent. The Liquidating Plan does not do so. Rather, it provides no distribution to the Minority Ad Hoc Group on account of its collateral and proposes to distribute the value of its collateral to lower priority unsecured administrative and prepetition creditors. This is not fair and equitable and violates the cramdown requirements of section 1129(b)(2)(A).

Further, even if the Court were to find that the Liquidating Plan is fair and equitable with respect to the Minority Ad Hoc Group's partially secured claims (which it should not), the Liquidating Plan discriminates against the Minority Ad Hoc Group's deficiency claims by providing them with no recovery while distributing $8 million to non-deficiency unsecured claims, resulting in an infinitely higher percentage recovery for non-deficiency claims. This discrimination between claims of equal priority is patently not "fair." As noted above, there is no reasonable basis to discriminate against deficiency claims based on legal rights that may differ from trade creditors outside of bankruptcy,[10] and holders of non-deficiency unsecured claims will

---

[10]    *See John Hancock*, 987 F.2d at 161.

7

not be making a greater contribution to the reorganization of the Debtors than holders of deficiency claims, because the Debtors' assets have been sold and no such reorganization is in prospect.

Moreover, any suggestion that the remaining non-deficiency claim unsecured creditors made contributions to a "reorganization" is factually baseless.  The prepetition claims of any vendors that the Debtors deemed important to their operations during the Chapter 11 Cases would have been paid in full under the critical vendor orders entered early in the cases [Docket Nos. 65, 362] (MAHG Exs. 6, 9) (the "Critical Vendor Orders"), and any contract counterparties that were not paid under the Critical Vendor Orders but were identified as important to the ongoing businesses of the buyers in the SOTP Transactions would have had their contracts assumed and assigned, with any prepetition claims paid as cure amounts.  Accordingly, the Debtors and buyers have already decided that favoring the remaining non-deficiency claim unsecured creditors was not operationally warranted, and any argument that these creditors deserve materially greater treatment necessarily fails.  As the Debtors cannot justify the Liquidating Plan's discriminatory treatment, they cannot meet the requirements of section 1129(b) of the Bankruptcy Code, and the Liquidating Plan cannot be confirmed.

The Liquidating Plan is the culmination of a process by which the Debtors ceded all control to the Majority Ad Hoc Group and systematically channeled substantially all of their value to that group.  Shortly before the Petition Date, members of the Majority Ad Hoc Group advanced the Debtors a loan to pay off Black Diamond's unsecured, structurally subordinated debt.  In doing so, the Majority Ad Hoc Group members got the right to appoint the majority of the Debtors' board and took control of the Debtors and the reorganization process.  Despite all of those transactions being avoidable, the filing of the Chapter 11 Cases only further entrenched the Majority Ad Hoc Group's influence.  The DIP Facility, including new money loans and a roll-up that exceeded the

8

amount the DIP lenders were willing to credit bid on the Debtors' assets, immediately rendered the Debtors administratively insolvent. *See, e.g.,* Docket No. 1083 (MAHG Ex. 41) ¶¶ 12-13. Thus, payment of administrative claims, including a large amount of fees for the Committee's professionals, became dependent on the Majority Ad Hoc Group's whims.

The Majority Ad Hoc Group leveraged their outsized control into the Settlement, which provided for the release of highly valuable estate causes of action in exchange for the Majority Ad Hoc Group's agreement to allow payment of estate professional fees and to pay a paltry $8 million sum to certain prepetition creditors. *See* Docket No. 1021, (MAHG Ex. 28) (the "Settlement Term Sheet") Ex. A at 3. The parties to the Settlement agreed to direct that payment solely to non-deficiency claim unsecured creditors, and not the class that would include the Minority Ad Hoc Group's deficiency claims, despite having no reasonable (or legal) basis for doing so. The only purpose was strategic, as the Majority Ad Hoc Group-controlled Debtors now seek to use that distribution, and other forms of gerrymandering, to impose the Liquidating Plan on the Minority Ad Hoc Group, thereby ensuring that it remains the only creditor constituency that will receive nothing in these Chapter 11 Cases. In light of the above, the Court should find that the Liquidating Plan was not proposed in good faith as required under section 1129(a)(3), and for the reasons set forth herein should deny confirmation of the Liquidating Plan.

## BACKGROUND

### I.     Minority Ad Hoc Group

1.     On August 2, 2024, Del Monte Foods Corporation II Inc. ("DMFC"), as Borrower, entered into the Super-Senior Credit Facility, which provided for three tranches of term loans: the First Out Term Loan ($236 million)[11], the Second Out Term Loan ($468.8 million), and the Third

---

[11]   The Super-Senior Credit Facility originally provided for approximately $236 million in First Out Term Loans, which was upsized to $395 million in connection with the 2025 Amendment.

Out Term Loan ($135 million) (collectively, the "Prepetition Term Loans").  *See Declaration of Jonathan Goulding, as Chief Restructuring Officer of the Debtors, in Support of the Chapter 11 Petitions and the First Day Motions* [Docket No. 19] (MAHG Ex. 3) ("First Day Declaration" or "First Day Decl.") ¶¶41-44.

2.     The Prepetition Term Loans are secured by a first-priority lien on Term Loan Priority Collateral, and a second-priority lien on ABL Priority Collateral.  *See Super-Priority Credit and Guaranty Agreement* [Docket No. 1057] (MAHG Ex. 35), Section 10.25; Intercreditor Agreement (MAHG Ex. 79) Section 2.1.  The Super-Priority Credit Facility is secured by all assets. *See Super-Priority Credit and Guaranty Agreemen*t Section 1.1 (defining "Collateral" as "all of the real, personal and mixed property (including Equity Interests) …"); *see also* Final DIP Order [Docket No. 359] (MAHG Ex. 8) ¶F(iv) ("The Super-Senior Collateral consists of substantially all assets of the Prepetition Loan Party Debtors.").

3.     The members of the Minority Ad Hoc Group hold, in the aggregate, approximately $111.29 million in principal amount of Prepetition Term Loans ($23.42 million in First Out Term Loans, $44.10 million in Second Out Term Loans, and $43.78 million in Third Out Term Loans), or 11.14% of the principal amount outstanding under the Super-Senior Credit Facility as of the Petition Date and 14.8% after the payoff of certain First Out Term Loans through the rollup.  *See* Second Rule 2019 Statement (MAHG Ex. 57) ¶5.

## II.     Events Leading to Plan Filing

### A.  The Black Diamond Litigation and Settlement

4.     In the fall of 2024, a group of lenders to Del Monte Foods, Inc. ("DMFI") led by Black Diamond (the "Black Diamond Lenders") directed the Black Diamond Agent to replace the boards of DMFI and certain parent entities and commenced litigation in the Delaware Court of

Chancery (the "<u>Chancery Court</u>").  *See* First Day Decl. (MAHG Ex. 3) ¶57.  The suit did not assert any monetary claims.  Rather, the main purpose of the litigation was to obtain a declaration that the board members of DMFI had been validly removed and replaced by Black Diamond's appointed directors.  *See* 01/28/26 Hr'g Tr. (MAHG Ex. 44) at 51:10-13.  The Debtors, however, settled with the Black Diamond Lenders in April 2025 and funded this settlement through an incremental loan of $122 million funded by members of the Majority Ad Hoc Group (the "<u>Incremental Financing</u>").  *See id.* 125:16-20; 02/06/2026 Hr'g Tr. (MAHG Ex. 46) at 13:11-16.

5.     The Incremental Financing effectively subordinated other Second Out and Third Out Prepetition Secured Lenders, as well as the Debtors' general unsecured creditors, while strengthening the Majority Ad Hoc Group's position relative to other Prepetition Secured Lenders. The Incremental Financing also granted the Majority Ad Hoc Group the right to receive 25% of the equity of DMFHL, the Debtors' parent and a Debtor in the Chapter 11 cases.  First Day Decl. (MAHG Ex. 3) ¶60.

6.     The Majority Ad Hoc Group also received the right to appoint up to six "Special Directors" through the Incremental Financing transaction. *See id*. ¶¶33, 60. The Majority Ad Hoc Group appointed four "Special Directors," and the Debtors' CEO was named a director in lieu of a fifth "Special Director."  01/28/26 Hr'g Tr. (MAHG Ex. 44) at 58:25-59:17; 60:3-13.[12]  These equity and governance rights delivered effective control of the Debtors to the Majority Ad Hoc Group. First Day Decl. (MAHG Ex. 3) ¶¶32-34, 60.

---

[12]   Due to the Majority Ad Hoc Group's sixth unexercised appointment right, one of the five remaining directors effectively served at the pleasure of the Majority Ad Hoc Group.

**B. DIP Facility and Critical Vendor Orders**

7. The Debtors filed voluntary Chapter 11 petitions on July 1, 2025 (the "Petition Date"). Among other requests for first day relief, the Debtors filed (a) a motion for entry of interim and final DIP Orders approving the DIP Term Loan Facility and the DIP ABL Facility [Docket No. 17] (MAHG Ex. 2) (the "DIP Motion"), and (b) a motion for entry of the Critical Vendor Orders [Docket No. 13] (MAHG Ex. 1) (the "Critical Vendor Motion").

8. On August 12, 2025, the Court entered the Final DIP Order approving (a) the DIP Term Loan Facility consisting of $165 million in New Money Loans and $247 million in Roll-Up Loans, and (b) the DIP ABL Facility under which the existing prepetition ABL Loans and letter of credit obligations were converted into postpetition DIP obligations. *See* Final DIP Order (MAHG Ex. 8) ¶3. Under the Final DIP Order, the DIP Term Loan, including the Roll-Up Loan, was secured by, among other things, a senior priming DIP Lien on all collateral securing the prepetition Super-Senior Term Loan. *See id*. ¶7(a)(ii). In light of the priming of the collateral securing the First Out Term Loans (the "First Out Collateral"), the Final DIP Order granted the First Out Term Loan lenders certain adequate protection for diminution in value of the First Out Collateral "resulting from, among other things, *the imposition of the priming DIP Liens on the First Out Collateral*, the Carve Out, the Debtors' use of the First Out Collateral (including Cash Collateral), the imposition of the automatic stay, and/or any other reason permitted pursuant to the Bankruptcy Code." *Id*. ¶8 (emphasis added).

9. The adequate protection included (a) replacement liens "on all DIP Term Loan Collateral and all proceeds or property recovered from Avoidance Actions," subordinate only to the (i) Carve Out, (ii) the DIP Liens, (iii) the Prior Senior Liens, and (iv) solely with respect to ABL Priority Collateral, the DIP ABL Liens, the ABL Adequate Protection Liens, and the ABL

12

Liens, pursuant to the terms of the Prepetition Intercreditor Agreement, and "senior to all other security interests in, liens on, or claims against any of the DIP Collateral" and (b) "to the extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of these Cases ahead of and senior to any and all other administrative expense claims in such Cases," junior only to the Carve Out, the DIP Term Loan Super-priority Claims, and, solely with respect to ABL Priority Collateral, the DIP ABL Super-priority Claims, the ABL Adequate Protection Super-priority Claims, and the ABL Claims, pursuant to the terms of the Prepetition Intercreditor Agreement, and otherwise "not [] junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever…." *See id*. ¶¶8(a), 8(b).  The prepetition Second Out and Third Out lenders received similar forms of adequate protection. *See id.* ¶¶ 9(a), 9(b), 10(a), 10(b).

10.     On August 13, 2025, the Court entered the Final Critical Vendor Order [Docket No. 362] (MAHG Ex. 9), which authorized the Debtors "to pay, honor, or otherwise satisfy prepetition claims held by Domestic Critical Vendors, Foreign Critical Vendors, Lienholders, 503(b)(9) Claimants, and PACA Vendors in the ordinary course of their business and consistent with historical practice." *See* Final Critical Vendor Order (MAHG Ex. 9) ¶2.  The Final Critical Vendor Order imposed no cap on the amount the Debtors could pay to such creditors, and authorized, but did not direct, the Debtors to condition critical vendor payments on creditors agreeing to trade terms.  Moreover, nothing in the Final Critical Vendor Order prevented the Debtors from paying the prepetition claims of creditors that were subject to, and bound to continue performing under, prepetition contracts.  Accordingly, the Final Critical Vendor Order gave the Debtors wide latitude to pay the full amount of any prepetition claim of any unsecured creditor, so long as the Debtors

believed that not paying such creditor would result in potential harm, cost, delay, or disruption to the Debtors' business operations.

### C. The Settlement

11.    On December 3, 2025, the Debtors filed an application seeking approval of a mediation process to resolve certain issues in the Chapter 11 cases [Docket No. 840] (MAHG Ex. 11), which was granted on December 11, 2025 [Docket No. 900] (MAHG Ex. 16).

12.    The mediation process contemplated that additional parties could be allowed to participate upon request.  The Minority Ad Hoc Group filed a motion seeking to participate in the mediation.  *See* Docket No. 876, (MAHG Ex. 12).  The Debtors and the Committee opposed that motion, *see* Docket Nos. 881, 885, (MAHG Exs. 13, 14), and the Court denied it on December 15, 2025.[13]  *See* Docket No. 928, (MAHG Ex. 17).

13.    On December 29, 2025, the Debtors filed the Settlement Motion, seeking court approval of the mediation Settlement terms.  *See* Docket No. 954, (MAHG Ex. 20) at Ex. 1 (the "Initial Settlement Term Sheet").  Under the Initial Settlement Term Sheet, the parties agreed to sell all Avoidance Actions, including those against Black Diamond, to the Stalking Horse Bidder, which the Stalking Horse Bidder would then release.  *Id.*  The Initial Settlement Term Sheet also required the Parties to work together in the event that the Stalking Horse Bidder was not the Successful Bidder to implement such treatment of the Avoidance Actions.  *Id.*  On January 21, 2026, the Debtors filed an updated form of the Settlement Term Sheet to reflect that the Stalking Horse Bidder was not the Successful Bidder.  *See* Docket No. 1021 (MAHG Ex. 28) (the "Revised Settlement Term Sheet").  Under the Revised Settlement Term Sheet, the Debtors agreed to directly

---

[13]    As part of their oppositions, the Debtors and Committee disclosed that a settlement agreement in principle had been reached as of a mediation session held on December 5, just two days following the Debtors filing their application.  *See also* Docket No. 934, (MAHG Ex. 18) at 2.

14

release all Avoidance Actions, including against Black Diamond. The Revised Settlement Term Sheet also included broad mutual releases of the Debtors, DMPL, the Majority Ad Hoc Group and its members, the Committee and its members, each of the Consenting Lenders, and each of their Related Parties, to be effective on the Effective Date of the Liquidating Plan. *Id*. Ex. A at 6-7.

14. Under the Settlement Term Sheet, the Majority Ad Hoc Group agreed to the payment in full of the Committee's professional fees, and to not oppose any such fees requested in accordance with the Settlement. The Majority Ad Hoc Group also agreed to the payment of all allowed administrative and priority claims, including 503(b)(9) claims, as necessary to confirm a Chapter 11 plan, and to fund an $8,000,000 cash recovery for prepetition unsecured creditors (the "GUC Cash Recovery"). Settlement Term Sheet, Ex. 1 at 40. The parties to the Settlement, including the Committee, agreed to provide the GUC Cash Recovery solely to a certain subset of unsecured creditors. The Settlement provided that any deficiency claims of the Prepetition Secured Parties, including members of the Minority Ad Hoc Group who were not parties to the Settlement, would receive nothing from the GUC Cash Recovery. *See id.* at 2. The Minority Ad Hoc Group filed an objection to the Debtors' Settlement Motion, arguing, *inter alia*, that the proposed settlement was not in the best interests of the estate, the settlement was not fair and equitable, and that the Debtors could not carry their burden under Rule 9019.

15. In response, the Debtors filed a reply, [Docket No. 1083] (MAHG Ex. 41) ("Debtors' Settlement Reply") in which they argued that the Minority Ad Hoc Group's claims were "out of the money in any even vaguely plausible scenario," and asserted that the sale process confirmed that the Super-Senior Term Loan Claims "are entirely unsecured," and that "the net Sale proceeds are not sufficient to repay the DIP Facilities by a wide margin, meaning that ***every single junior creditor*** in this case is out of the money and not entitled to any recovery (with a likely

15

identical outcome even were the Black Diamond claims pursued)." Debtors' Settlement Reply (MAHG Ex. 41) at 3-5, 8 (emphasis in original).

16.     The Court held a hearing (the "Settlement Hearing") on the Debtors' Settlement Motion on January 28 and 29, 2026.  On February 6, 2026, the Court read a decision into the record granting the Debtors' Settlement Motion and overruling the Minority Ad Hoc Group's Settlement Objection.  In doing so, the Court credited the testimony of Mr. Goulding, finding that it "makes clear that the -- based on the net proceeds available to pay down the DIP, the DIP would be impaired by approximately $100 million."  02/06/2026 Hr'g Tr (MAHG Ex. 46) at 31:16-20.  On February 20, 2026, the Court entered an order approving the Settlement Motion [Docket No. 1211] (MAHG Ex. 51) (the "Settlement Order").

17.     The Settlement Order provides that "the Distribution of the GUC Cash Recovery shall be provided for in a Chapter 11 plan for the Debtors' estates" and that the "releases of the Released Parties by the Releasing Parties as set forth in the Settlement Term Sheet … shall be incorporated into, and implemented through, the Plan."  Settlement Order (MAHG Ex. 51) at 4. Moreover, the approved Settlement Term Sheet provides that the Settlement is "to be implemented and consummated through the Sale Order and a Chapter 11 plan," that the obligations of the parties thereto are "subject in all respect to … the incorporation and implementation of each of the terms of this Settlement that are subject to the effectiveness of the Plan in the confirmed and effective Plan," and provides for the funding of a Wind-Down Budget that "includes sufficient funds for payment of all allowed administrative and priority claims and all claims asserted under section 503(b)(9) of the Bankruptcy Code, and postpetition trade obligations, in each case, necessary to confirm a Plan." Id. at 8, 10.  In its oral ruling, the Court held that "[t]he Minority Group's rights

and other creditors' rights with respect to confirmation are preserved." 02/06/2026 Hr'g Tr. (MAHG Ex. 46) at 33:15-16.

### D. The 363 Sale

18.    On July 20, 2025, the Debtors filed the Sale Motion, proposing bidding procedures for the sale of substantially all of the Debtors' assets, with a credit bid of some, but not all, claims under the DIP Facility serving as a Stalking Horse Bid. Following negotiations, the Minority Ad Hoc Group consented to entry of an order approving the bidding procedures (and agreed not to object to the DIP Facility) after the Debtors agreed to amend the proposed bidding procedures and DIP Orders to address the Minority Ad Hoc Group's informal objections.

19.    Pursuant to the approved bidding procedures, the Debtors conducted an auction. *See* Docket No. 365 (MAHG Ex. 10). On January 14, 2026, the Debtors announced that the following strategic bids were the Successful Bids for the sale of certain of the Debtors' business lines (collectively the "SOTP Transactions"): (a) a multi-business segment bid from Del Monte Fresh Produce Company; (b) a bid for the broth & stock business from B&G Foods North America, Inc.; and (c) a bid for the canned fruit & plastic fruit cup business from Pacific Coast Producers. *See* Notice of Successful Bidders for the Sale of Substantially All of the Debtors' Assets (the "Sale Notice") [Docket No. 1007] (MAHG Ex. 24).

20.    On January 28 and 29, 2026, the Debtors sought approval of the SOTP Transactions at a hearing before the Bankruptcy Court (the "Sale Hearing"). The Bankruptcy Court approved the SOTP Transactions on the record at a further hearing on February 6, 2026. On February 20, 2026, the Court entered the sale orders [Docket Nos. 1208, 1209, 1210] (MAHG Exs. 48, 49, 50) (the "Sale Orders") approving each of the SOTP Transactions.

III.    **The Disclosure Statement and Plan**

21.    On February 25, 2026, the Debtors filed an initial Chapter 11 plan [Docket No. 1229] (MAHG Ex. 52) and accompanying disclosure statement [Docket No. 1230] (MAHG Ex. 53), along with a motion seeking interim approval of that disclosure statement [Docket No. 1232] (MAHG Ex. 54).

22.    On March 10, 2026, the Minority Ad Hoc Group filed an objection [Docket No. 1270] (MAHG Ex. 59) to interim approval of the disclosure statement on the basis that, among other reasons, the Chapter 11 plan was patently unconfirmable and the disclosure statement failed to provide adequate information.  On March 13, 2026, the U.S. Trustee (together with the Minority Ad Hoc Group, the "Objectors") also filed an objection [Docket No. 1301] (MAHG Ex. 61) to interim approval of the disclosure statement, with respect to the opt-out third-party releases in the plan.

23.    The Debtors filed amended versions of the plan [Docket No. 1315] (MAHG Ex. 62) and the disclosure statement [Docket No. 1316] (MAHG Ex. 63) on March 16, 2026.  The amended versions of the plan and disclosure statement did not include changes to address the Minority Ad Hoc Group's objections that the plan was patently unconfirmable.

24.    At a hearing on March 18, the Court conditionally approved the disclosure statement on an interim basis.  03/18/26 Hr'g Tr. (MAHG Ex. 69) at 68:18-19; *see also* Docket No. 1334, (MAHG Ex. 66).  The Court said that the risk of lack of adequate disclosure fell on the Debtors.  *See* 03/18/26 Hr'g Tr. (MAHG Ex. 69) at 68:18-25 ("it's at the risk to the proponent that if at the final hearing … this Court finds that the disclosures were indeed inadequate, everybody is set back").  The Court conditioned approval on the addition of "an amended paragraph in which it is clear that there have been objections raised by [the Minority Ad Hoc Group] as to the

18

classification and the voting rights with respect to Classes 3 and 5, and that the parties reserve their rights to argue … that such classes should be deemed to have rejected, and that the Liquidating Plan proponents will need to pursue cram-down under 1129(b) should the Court conclude that that is the case." *Id.* at 69:25-70:10. As part of the Court's ruling, the Court acknowledged that issues raised by the Objectors on "classification, voting rights, the impact on cram-down requirements, unfair discrimination, the impact of the Liquidating Plan on pending third-party litigation, the scope of the releases and exculpation" were "concerning" and "significant." *Id*. at 69:1-7.

25.     On March 19, 2026, the Debtors filed solicitation versions of the Liquidating Plan [Docket No. 1336] (MAHG Ex. 67) and the Disclosure Statement [Docket No. 1337] (MAHG Ex. 68).

### A.  Sources of Recovery and the Waterfall

26.     The Disclosure Statement states that the distributions under the Liquidating Plan will be funded with "(i) Cash on hand as of the Effective Date using Distributable Proceeds from the SOTP Transactions, (ii) Cash equal to the GUC Recovery Amount from the GUC Recovery Reserve with respect to Allowed General Unsecured Claims, and (iii) the proceeds from other assets sold or otherwise monetized as part of the Wind-Down, including Other Excluded Assets." Disclosure Statement § III.J; *see also* Plan art.1.A.83.

27.     The Liquidating Plan states that Administrative and Priority Claims will be paid in full.  Plan art. I.A.215.  Although the Disclosure Statement does not provide estimates for Administrative Claims or Priority Claims to be paid under the Liquidating Plan, the Wind-Down Budget estimates that combined Administrative and Priority Claims (excluding professional fees) to be paid under the Liquidating Plan are $109.8 million.  *See* Wind-Down Budget at 3.

28.     The Disclosure Statement and Wind-Down Budget do not disclose the existence of any Administrative or Priority claim held by the Minority Ad Hoc Group.  Nor does the Disclosure Statement disclose the existence of any liens held by the Super-Senior Term Loan Lenders on the remaining assets.

29.     "Other Excluded Assets" is defined in the Liquidating Plan as "the assets of the Debtors, if any, that are not Purchased Assets, other than (a) the Excluded Real Estate and (b) any Causes of Action released under the Settlement Order and pursuant to this Plan."  Plan art. I.131. The Disclosure Statement provides that the Other Excluded Assets "include, among other things, cash collateral for surety bonds under certain contracts assigned to the purchasers under the SOTP Transactions, release of executive deferred compensation funds held in a rabbi trust, and potential proceeds from tariff refunds and Retained Causes of Action." Disclosure Statement § III.J.2.

30.     Distributable Proceeds are allocated under the Liquidating Plan pursuant to the "Waterfall Recovery" (or the "Waterfall"), which provides for payment of such proceeds to the Holders of Allowed Claims or Interests until paid in full, on a Pro Rata basis in the following order of priority:  DIP Term Loan Claims; Allowed Other Secured Claims; and Allowed Super-Senior Term Loan Claims (*i.e.*, Class 3 claims); Allowed General Unsecured Claims, and Allowed Other General Unsecured Claims. Plan art. I.215.  As provided in the Settlement, the GUC Cash Recovery and the proceeds from the Excluded Real Estate are not subject to the Waterfall Recovery. *Id.*

### B.  Minority Ad Hoc Group's Claims

31.     The Minority Ad Hoc Group's claims are classified in Class 3, "Super-Senior Term Loan Claims," which includes all of the First Out, Second Out, and Third Out Term Loan Claims. Disclosure Statement § III.D.  Class 3 is characterized as impaired and entitled to vote.  *Id.*  The

Liquidating Plan states that each holder of claims in Class 3 will receive "its Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery, *if any*, up to the Allowed amount of such Super-Senior Term Loan Claim." Disclosure Statement § III.D. (emphasis added).

32.    The Disclosure Statement provides that there is an estimated $766.34 million worth of claims in Class 3, which are projected to receive a 0% recovery under the Liquidating Plan. Disclosure Statement § III.E.

### C.  Treatment of the DIP Claims

33.    The Liquidating Plan provides that all outstanding DIP ABL Claims will be paid in full from the proceeds from the SOTP Transactions. Disclosure Statement § III.F.5.a.

34.    The holders of DIP Term Loan Claims will receive a Pro Rata share of the Distributable Proceeds following the SOTP Transactions, any additional Distributable Proceeds in accordance with Article VI of the Liquidating Plan on the Effective Date, and on the Dissolution Date, any Distributable Proceeds after giving effect to the Waterfall Recovery, and any remaining funds from the Liquidating Plan Administrator Reserve. Disclosure Statement § III.F.5.b. Holders of DIP Term Loan Claims will also receive a Pro Rata share of proceeds from each Excluded Real Estate Disposition. *Id.*

### D.  "Insufficient Funds" for Term Loan and GUC Recoveries

35.    The Debtors state that the Cash proceeds of the SOTP Transactions are insufficient to repay the DIP Term Loan Facility in full. *See* Disclosure Statement § II; Plan art. IV.A. Of the three sources of distribution in the Disclosure Statement, one (the GUC Cash Recovery) is not subject to the Waterfall,[14] and one consists entirely of the proceeds from the SOTP Transactions, which will be used entirely to cover the DIP Term Loan Claims. The only remaining source that

---

[14] Excluded Real Estate is also not subject to the Waterfall. *See* Plan art. I.A.215; Disclosure Statement § III.J.2.

could possibly provide a recovery to Class 3 claims are the Other Excluded Assets, to be liquidated as part of the Wind-Down.  The proceeds of the Other Excluded Assets will first be applied to the DIP deficiency claim, which the Debtors claim will be approximately $91 million.  *See* Docket No. 1307-1 (MAHG Ex. 81) (Deficiency Claim – Illustrative Exhibit).

### E.  Wind-Down Budget

36.     On April 13, 2026, the Debtors filed the Plan Supplement, which included the Debtors' Wind-Down Budget.  *See* Notice of Filing of Initial Plan Supplement, [Docket No. 1427] (MAHG Ex. 75), Ex. E (the "Wind-Down Budget").  According to the Wind-Down Budget, the net cash proceeds the Debtors received from the SOTP Transactions were approximately $402.4 million.  *See id.* at n.1.  As the Sale Orders approved the repayment of the outstanding DIP ABL Facility (the "ABL Repayment") upon closing of the SOTP Transactions, and the Wind-Down Budget does not have a line item for that repayment, it is clear that the $402.4 million in SOTP Transactions proceeds are the remaining proceeds after the ABL Repayment.  The Wind-Down Budget also shows receipts of "Pre-Close AR Collections" of $86 million, "Sale of Assets" (including the Excluded Real Estate) of $52 million, and Other Excluded Assets of $11.4 million, for total receipts of $551.8 million.  *See id.* at 3. The Wind-Down Budget also shows beginning cash of $34 million.  *See id.*  Although the Liquidating Plan does not appear to include the "Pre-Close AR Collections" and beginning cash as "Distributable Assets," the Wind-Down Budget treats them as assets available for distribution to the DIP Term Loan Lenders and administrative claimants.

37.     As the Excluded Real Estate was given to the DIP Term Loan Lenders under the Settlement in exchange for their "waiver" of $70 million in DIP Term Loan Claims, the $52 million in asset sales (which, as shown at the Settlement Hearing, is up to $33 million less than the

appraised value) is not included in proceeds available for distribution.  Thus, according to the Wind-Down Budget, the proceeds available for distribution are as follows:

| | |
|---|---|
| SOTP Transaction Net Proceeds | $402.4 million |
| Pre-Close AR Collections | $86 million |
| Other Excluded Asset Receipts | $11.4 million |
| Beginning Cash | $34 million |
| **Total** | $533.8 million |

*See id.*

38.     From these proceeds, the Wind-Down Budget then deducts labor operating expenses of $39.6 million, non-labor operating expenses of $11.5 million, pre-confirmation professional fees of $48.2 million, and post-confirmation professional fees of $5.4 million, for a total of $104.7 million.  *See id.*   After these assumed disbursements, the net proceeds available for distribution as reflected in the Wind-Down Budget are $429.1 million.

39.     According to the Debtors, the amount of the DIP Term Loan Claim, after accounting for the $70 million "waiver," is $401.1 million.  *See* Docket No. 1307-1 (MAHG Ex. 81) (Deficiency Claim – Illustrative Exhibit).  Thus, under the Debtors' Wind-Down Budget, the remaining proceeds of estate assets available for distribution after payment of professional fees and operating expenses as reflected in the Wind-Down Budget ($429.1 million) **is enough to pay the DIP Term Loan Claims in full in cash, leaving $28 million of remaining proceeds subject to the adequate protection and prepetition liens of the Super-Senior Term Loan Lenders**. Rather than distributing that $28 million of collateral to the Super-Senior Term Loan Lenders, however, the Liquidating Plan provides that the DIP Lenders will voluntarily reduce the amount

they will receive on their DIP Term Loan Claims, and direct $109.8 million of asset liquidation proceeds to administrative and priority unsecured claims.  Wind-Down Budget at 3.  In addition, the Liquidating Plan directs $8 million of proceeds of the Settlement of Avoidance Actions, on which the Super-Senior Term Loan Lenders have a adequate protection liens, to creditors holding prepetition unsecured non-deficiency claims.

### F.  Releases

40.    The Liquidating Plan includes certain releases of claims, both from the Debtors and the Holders of Claims, for parties including the Debtors, their estates, and certain third parties. The Liquidating Plan's release, exculpation, and injunction provisions are set forth in Article VIII of the Liquidating Plan.  *See* Plan art. VIII; Disclosure Statement § VII.A.

41.    The "opt-out" Third-Party Release provision of Article VIII.D. of the Liquidating Plan does not require affirmative consent for third-party releases to be imposed on holders of Claims.  *See* Plan art. VIII.D.

### ARGUMENT

42.    A court cannot confirm a consensual Chapter 11 plan unless the debtor "carr[ies] its burden of satisfying each of section 1129(a)'s sixteen statutory requirements by a preponderance of evidence."  *In re Boy Scouts of Am.*, 137 F.4th 126, 158 n.18 (3d Cir. 2025), *cert. denied sub nom. Lujan Claimants v. Boy Scouts of Am.*, 223 L. Ed. 2d 511 (Jan. 12, 2026). "[T]hose requirements increase when a debtor seeks to 'cram down' a plan over the objection of a nonconsenting impaired class."  *Id.*  Even where there are no objections to a plan, a court must independently find that the debtor fulfilled the requirements of section 1129(a).  *In re Friese*, 103 B.R. 90, 91 (Bankr. S.D.N.Y. 1989); see also *In re AIO US, Inc.*, 672 B.R. 261, 275 (Bankr. D. Del. Aug. 21, 2025) (noting that courts have the obligation to ensure a plan conforms to the

requirements of the Bankruptcy Code) (citing *United Student Aid Funds, Inc. v. Espinosa,* 559 U.S. 260, 276-77 (2010)).

**I.**     **The Liquidating Plan Does Not Provide for Payment of the Super-Senior Term Loan Lenders' 507(b) Claims and is Not Feasible.**

43.     For a plan to be confirmed, section 1129(a)(9) requires that it provide for the full payment, in cash, of any administrative expense claims arising under section 507(a)(2), unless the holders of those claims agree to different treatment.  11 U.S.C. § 1129(a)(9).  The Liquidating Plan does not contemplate payment of the Minority Ad Hoc Group's super-priority administrative expense claims under section 507(b) (the "507(b) Claims"), and thus is not confirmable. Moreover, even if the Liquidating Plan did contemplate payment of such 507(b) Claims, the Wind-Down Budget does not provide enough cash to do so.  Therefore, the Liquidating Plan is insufficiently funded and infeasible, and does not meet the requirements of section 1129(a)(11) of the Bankruptcy Code.

44.     Section 507(b) provides a creditor with a super-priority administrative expense claim in the event that, notwithstanding that such creditor has been provided adequate protection, it still has a claim allowable under section 507(a)(2) due to, among other things, "the granting of a lien under section 364(d)[.]"  11 U.S.C. § 507(b).  Section 507(b) "provides that where adequate protection has been extended to a secured creditor and later proves to be inadequate, the creditor then becomes entitled to a superpriority administrative expense claim to the extent that the proffered adequate protection was insufficient."  *In re Carpet Ctr. Leasing Co.*, 991 F.2d 682, 686 (11th Cir. 1993) (internal citation omitted); *see also In re Becker*, 51 B.R. 975, 979 (Bankr. D. Minn. 1985) (section 507(b) is "an attempt to codify a statutory fail-safe system in recognition of the ultimate reality that protection previously determined the indubitable equivalent may later prove inadequate") (internal citations omitted).  Super-priority status is granted to compensate for

25

a diminution in a creditor's collateral value that is "not offset by replacement liens." *In re Bailey Tool & Mfg. Co.*, Case No. 16-30503-BH, 2018 WL 550581 at *4, *10 (Bankr. N.D. Tex. Jan. 23, 2018) (granting 507(b) claim to secured creditor subject to priming liens under DIP financing); *see also In re Scopac*, 624 F.3d 274, 284-86 (5th Cir. 2010) (holding that noteholders had 507(b) claim for inadequate adequate protection granted under cash collateral orders).

45.    Courts, including this court, evaluating the existence and extent of 507(b) claims apply a three-prong test:

> First, adequate protection must have been provided by the trustee under § 362, 363 or 364. Second, the creditor must have a claim under § 507(a)(2). Third, the protection afforded by the trustee under §§ 362, 363 and 364 must be inadequate.

*In re Dispirito*, 371 B.R. 695, 701 (Bankr. D.N.J. 2007).

46.    All three prongs of this test are satisfied here. *First*, under the DIP Orders, the Court ordered the Debtors to provide Super-Senior Term Loan lenders with adequate protection. On the Petition Date, members of the Minority Ad Hoc Group held Super-Senior Term Loan Claims secured by a first-priority lien on Term Loan Priority Collateral, and a second-priority lien on ABL Priority Collateral. Those claims were *pari passu* with other holders of Super-Senior Term Loan Claims of the same tranche. This priority changed upon approval of the DIP Facility, through which the prepetition First Out Term Loan Claims of certain First Out Term Loan lenders were paid off with Roll-Up Loans. Those Roll-Up Loans were secured by DIP Liens that primed the liens of the remaining First Out Term Loan lenders, including members of the Minority Ad Hoc Group, on their prepetition collateral. Under the DIP Orders, the Court granted the remaining First Out Term Loan lenders certain adequate protection for diminution in value of the First Out Collateral expressly "resulting from, among other things, *the imposition of the priming DIP Liens on the First Out Collateral*." Interim DIP Order (MAHG Ex. 5) ¶8; Final DIP Order (MAHG Ex.

26

8) ¶8 (emphasis added).  That adequate protection included replacement liens on the DIP Collateral

and proceeds of Avoidance Actions and super-priority administrative claims.

47.    *Second*, the Super-Senior Term Loan lenders have claims under section 507(a)(2)

of the Bankruptcy Code that the Court expressly allowed.  The DIP Orders granted the Super-

Senior Term Loan lenders "to the extent provided by sections 503(b), *507(a)*, and 507(b) of the

Bankruptcy Code, *allowed administrative expense claims*."  Interim DIP Order (MAHG Ex. 5) ¶8;

Final DIP Order (MAHG Ex. 8) ¶8 (emphasis added).[15]

48.    *Third*, the adequate protection granted under the DIP Orders has clearly proven

inadequate.  As noted, on the Petition Date, the current Super-Senior Term Loan lenders held

---

[15]    The DIP Orders' express granting of allowed 507(a) claims satisfies, without more, the second prong of the applicable test.  Even if it did not, however, the Minority Ad Hoc Group members have claims allowable under section 503(b), as required by section 507(a)(2).  11 U.S.C. § 507(a)(2) (granting administrative expense priority to claims under section 503(b)). Section 503(b) grants administrative expense priority to "the actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1)(A).  "Proving that the cost incurred by the creditor was an actual and necessary expense should not be difficult for a creditor to establish if the trustee has affirmatively provided adequate protection to the secured creditor… Under section 363, if the trustee used the secured creditor's collateral during the case, the trustee believed that the use was of necessary benefit to the estate. The same rationale applies when the trustee has granted an equal or priming lien under section 364(d)." 4 COLLIER ON BANKRUPTCY P 507.14 (16th 2026)[1][b].  In the Third Circuit, "[a]n administrative expense claim is entitled to priority under Section 503(b)(1)(A) if: (1) there was a post-petition transaction between the claimant and the estate, and (2) those expenses yielded a benefit to the estate" *In re Energy Future Holdings Corp.*, 990 F.3d 728, 741 (3d Cir. 2021).  Post petition transactions are "services that are rendered after the commencement of the bankruptcy case and that are needed for the purpose of preserving the estate." *Id.* (internal citation omitted) (holding out of pocket expenses for terminated merger agreement arose out of post-petition transaction); *see also Ellis v. Westinghouse Elec. Co., LLC,* 11 F.4th 221, 230 (3d Cir. 2021) (finding employment claims and tort claims administrative expenses as a "cost ordinarily incident to operation of a business").  Here, the 507(b) claims arise out of the deficiency of the replacement liens granted under the DIP Orders.  These liens were granted as part of larger negotiations related to the proposed DIP facility and 363 sale process.  The Minority Ad Hoc Group did not seek to lift the stay or object to the DIP in exchange for improvements in the sale process with the hope that it would lead to recoveries that would have at least equaled the value of their collateral on the Petition Date (which eventually failed).  Thus, the Minority Ad Hoc Group's claims arise out of a negotiated postpetition transaction which provided financing to the Debtors, including the adequate protection provided postpetition under the DIP Orders, and not purely out of the prepetition claims of the Minority Ad Hoc Group.  *See In re Two Bros. XI, Inc.*, 2013 WL 1856332 at *3 (Bankr. D. Ariz. May 2, 2013) ("A claim is based on a post-petition transaction when the debtor-in-possession's actions give rise to legal liability for the associated claim.").  *C.f. In re Mary Holder Agency*, 2012 WL 4434362 at *3 n.1 (Bankr. D.N.J. Sept. 24, 2012) (denying 507(b) claim where creditor was not provided adequate protection during the bankruptcy case and did "not possess two separate claims, one pre-petition and one post-petition").  This transaction unquestionably provided a benefit to the estate, as the DIP was necessary for the Debtors ability to finance these Chapter 11 Cases, and liens granted to the DIP Lenders at the expense of the Minority Ad Hoc Group members, was "necessary to obtain the financing under the DIP Facilities." *See, e.g.* Docket No. 17 (MAHG Ex. 2) ¶36.

27

Super-Senior Term Loan Claims that were *pari passu* with the Super-Senior Term Loan Claims of other lenders that were eventually repaid under the DIP facility with Roll-Up Loans. As of the Petition Date, the Prepetition Term Loan Collateral was of a value sufficient to provide a recovery on, at the very least, a portion of the First Out Term Loan Claims. Now, although the proceeds of the SOTP Transactions and Other Excluded Assets will be used to pay down the priming DIP Term Loan—including the full amount of the New Money Term Loan and a portion of the Roll-Up Loans—the Debtors assert that those proceeds are insufficient to provide any recovery to any prepetition Super-Senior Term Loans (whether First Out, Second Out, or Third Out) and the Super-Senior Term Loans are fully unsecured.

49.     In sum, (a) prior to the imposition of the DIP Liens, including those securing the Roll-Up Loans, the First Out Term Loans had recourse to valuable collateral on the Petition Date, (b) the Super-Senior Term Loan lenders received adequate protection replacement liens under the DIP Orders to ensure they remained secured at the same level, and (c) despite the adequate protection, the Super-Senior Term Loan Claims are now treated under the Liquidating Plan as fully unsecured.[16]

50.     The lenders holding Roll-Up Loans, which lenders held the same First Out Term Loans as members of the Minority Ad Hoc Group on the Petition Date prior to approval of the DIP Facility, will, according to the Wind-Down Budget, receive more than $145 million[17] in total

---

[16]   Even if the Debtors were liquidated on the Petition Date prior to the entry of the Interim DIP Order, holders of Super-Senior Term Loan Claims, which had a first lien on numerous valuable assets, would have received a recovery. First Day Decl. (MAHG Ex. 3) ¶39. On the Petition Date, the Debtors filed a restructuring support agreement under which the Majority Ad Hoc Group agreed to credit bid their claims, which they would not have done if they did not believe that the assets had significant value. *See* Restructuring Support Agreement (MAHG Ex. 148) at 2.

[17]   The Wind-Down Budget shows a distribution of $363 million to DIP Term Loan Claims, of which $52 million is proceeds of Excluded Real Estate. Subtracting the $165 million principal amount of the New Money DIP Loan from the $311.2 million in proceeds remaining after deducting the $52 million leaves $146.2 million remaining

distributions from proceeds of the SOTP Transactions and other asset liquidation proceeds under the Liquidating Plan. Had the roll-up not occurred, the First Out Term Loan lenders would have received a pro rata share of those recoveries. Thus, even putting aside the liens granted to secure the New Money Term Loans, the priming liens granted to secure the Roll-Up Loans led directly to a diminution in the value of the Super-Senior Term Loan lenders' interest in their collateral to what the Debtors assert is now $0. *See, e.g.,* Docket No. 1083 (MAHG Ex. 41) ¶42 ("[T]he Minority Ad Hoc Group is not entitled to *any* recovery.") That is the very definition of a failure of adequate protection, and is exactly the harm for which section 507(b) is designed to compensate. *In re Becker*, 51 B.R. at 979.

51.    Although the Liquidating Plan includes 507(b) claims in the definition of "Administrative Claims," and proposes to pay Administrative Claims in full in cash, the Debtors do not budget for, nor have the funds to, satisfy the Minority Ad Hoc Group members' substantial 507(b) Claims. Since the Debtors do not intend to, and cannot, pay these claims, the Liquidating Plan does not meet the requirements of section 1129(a)(9). *See In re Forklift LP Corp.*, 363 B.R. 388, 398 (Bankr. D. Del. 2007) (refusing to give effect to any provision that may give less than the full payment of an administrative defense claim). Even if the Debtors wanted to pay the 507(b) Claims, there are not sufficient funds available to pay those claims and all other projected administrative claims. Thus, confirmation of the Liquidating Plan would be "likely to be followed by the liquidation … of the debtor or any successor of the debtor," and would not meet the feasibility requirement of section 1129(a)(11). *See, e.g., In re Quigley Co., Inc.,* 437 B.R. 102,

---

to be distributed on account of the Roll-Up Loans, subject to further deduction for outstanding interest or fees on the New Money DIP Loan, excluding the post-petition interest prior to such date.

143, 160 (Bankr. S.D.N.Y. 2010) (denying plan confirmation because the debtors failed to show that the plan was feasible).  In either case, the Liquidating Plan is unconfirmable.

**II.      The Liquidating Plan Does Not Satisfy the "Best Interests of Creditors" Test With Respect to the Minority Ad Hoc Group Members.**

52.      Section 1129(a)(7)—the "best interests of creditors" test—provides, in relevant part, that:

with respect to each impaired class of claims or interests—

(A) each holder of a claim or interest in such class—

(i)  has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of this title on such date

11  U.S.C. § 1129(a)(7)(A).

53.      Notably, the "best interests of creditors test" must be satisfied with respect to each creditor, regardless of whether the creditor's class accepts the plan.  *In re Lisanti Foods, Inc.,* 329 B.R. 491, 500 (D.N.J. 2005), *aff'd sub nom. In re Lisanti Foods Inc.,* 241 F. App'x 1 (3d Cir. 2007); Docket No. 1337, (MAHG Ex. 68) Ex. B (the "Liquidation Analysis") at 1 ("Notwithstanding acceptance of the Plan by a voting Impaired Class, section 1129(a)(7) of the Bankruptcy Code requires the Bankruptcy Court to determine that the Plan satisfies the 'best interests of creditors' test").

54.      According to the Wind-Down Budget, assuming the Effective Date of the Liquidating Plan is soon after the May 7, 2026 Confirmation Hearing, the Debtors project to have assets (including cash proceeds of assets that have been sold and assets that they expect to liquidate post-Effective Date) valued at $585.8 million ($551.8 million in receipts plus $34 million in

30

beginning cash) after the ABL Repayment.  That $585.8 million is collateral securing the $471.1 million DIP Term Loan Claim, as well as the secured adequate protection and prepetition secured claims of the Super-Senior Term Loan lenders.

55.    Assuming, as the Debtors do in their Liquidation Analysis, that the DIP Term Loan Lenders' "waiver" of $70 million in DIP Term Loan Claim in exchange for the Excluded Real Estate (which the Wind-Down Budget values at $52 million) would be effective in a Chapter 7 liquidation, the DIP Term Loan Claims would be reduced to $401.1 million ($471.1 million *minus* $70 million), and the assets available for distribution in a Chapter 7 case would be reduced to $533.8 million ($585.8 million *minus* $52 million).  After full payment of the $401.1 million in DIP Term Loan Claims, $132.7 million in net available assets that are collateral for the Super-Senior Term Loan lenders would remain.

56.    The Wind-Down Budget then assumes disbursements for estate professional fees of $53.6 million and labor and non-labor operating costs of $51.1 million.  Assuming that all of the professional fees are included in the Carve-Out under the Final DIP order and would be paid ahead of Super-Senior Term Loan Claims in a Chapter 7 (which, with respect to at least some of Committee's professional fees, is not the case) and that operating costs would be the same magnitude and payable ahead of such secured claims (which is also not the case, as the costs would generally be lower and may not be paid ahead of secured claims), deduction of these amounts using the Debtors' numbers would leave $28 million of assets that are collateral securing the Super-Senior Term Loan lenders' adequate protection and prepetition secured claims.  Instead of distributing the $28 million to the Minority Ad Hoc Group members, the Liquidating Plan and Wind-Down Budget propose that the DIP lenders will take a haircut on their roll-up claims, and

31

projected administrative and priority claims will be paid $109.8 million despite being junior to the Minority Ad Hoc Group members' liens and 507(b) Claims.

57.    As the Debtors state in their Liquidation Analysis, "in accordance with the priorities established in the Bankruptcy Code," "[g]enerally, secured creditors are paid first from the proceeds of their collateral." Liquidation Analysis at 3.  Further, where proceeds of collateral are not sufficient to pay secured creditors in full, and as the Liquidation Analysis assumes, "administrative claims remaining as of the Conversion Date would not be paid." *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 5 (2000); *see also In re Visual Indus., Inc.,* 57 F.3d 321, 324 (3d Cir. 1995) ("The general rule is that post-petition administrative expenses and the general costs of reorganization ordinarily may not be charged to or against secured collateral."); Liquidation Analysis at 3.  Thus, assuming (but not conceding) that the Debtors' numbers in the Wind-Down Budget are correct, without further deductions for pre-Conversion Date administrative claims, the Super-Senior Term Loan lenders would recover at least $28 million in a Chapter 7 liquidation.  By comparison, they will receive $0 under the Liquidating Plan.

58.    Although based on the Wind-Down Budget there would be no DIP shortfall in a Chapter 7 liquidation, the Liquidation Analysis nevertheless asserts that the DIP Term Loan Deficiency Claim would be $79.69 million, and the Super-Senior Term Loan Lenders would still be entitled to nothing in a Chapter 7.  There are many inconsistencies between the Wind-Down Budget and the Liquidation Analysis that undermine the Liquidation Analysis's conclusions, which the Minority Ad Hoc Group will investigate through ongoing discovery.[18]  But the most glaring

---

[18]    The Minority Ad Hoc Group has identified these inconsistencies solely based on the Debtors' own Liquidation Analysis and Wind-Down Budget.  The Minority Ad Hoc Group requested documents from the Debtors in discovery in an attempt to reconcile these inconsistencies; but so far the Debtors have not provided sufficient information to do so.  Document discovery is ongoing, and the deposition of Jonathan Goulding has not yet taken

inconsistency is that the Liquidation Analysis does not account for the $86 million in "Pre-Close AR Collections" listed as distributable assets under the Wind-Down Budget. Merely adding in the $86 million as proceeds available to pay the Chapter 7 DIP Term Loan Deficiency Claim estimated in the Liquidation Analysis would, even under that flawed analysis, still result in $6.31 million ($86 million *minus* the supposed $79.69 million DIP Deficiency Claim) of proceeds available for distribution to Super-Senior Term Loan lenders on account of their secured adequate protection and prepetition secured claims. Because $6.31 million exceeds the $0 proposed to be paid to the Super-Senior Term Loan Lenders under the Liquidating Plan, the Liquidating Plan does not satisfy the "best interests of creditors" test with respect to the members of the Minority Ad Hoc Group, and therefore violates section 1129(a)(7) and cannot be confirmed.

III.   **The Liquidating Plan is Not Confirmable Because It Impermissibly Classifies Similar Claims In Different Classes.**

59.   Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Although section 1122(a) does not state that claims of the same priority must always be classified together, courts have consistently recognized that there are constraints on a debtor's ability to classify claims necessary to safeguard the integrity of the Bankruptcy Code's confirmation requirements, which include equal treatment of creditors in a class, acceptance by impaired classes and, in cramdown situations, treatment of impaired classes that is fair and equitable and not unfairly discriminatory. *See* 11 U.S.C. §§ 1123(a)(4), 1129(a)(8), (a)(10), (b)(1), (b)(2); *see also, e.g., John Hancock,* 987 F.2d at 159  (explaining that "each class

---

place. The Minority Ad Hoc Group reserves the right to update this analysis and raise any additional arguments and reserves the right to challenge the accuracy, completeness, or sufficiency of the information set forth in the Liquidation Analysis, the Wind-Down Budget, and any other exhibits that address sources and uses of liquidation proceeds.

must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," or else "the classification scheme would simply constitute a method for circumventing … 1129(a)(10)").  Among these constraints, the "one clear rule" with respect to classification of similar claims is "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."  *In re Fairfield Exec. Assocs.*, 161 B.R. 595, 604 (D.N.J. 1993) (quoting *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir.1991), *cert. denied*, 506 U.S. 821 (1992)); *see also In re One Times Square Assocs. Ltd. P'ship*, 165 B.R. 773, 776 (S.D.N.Y. 1994), *aff'd sub nom. In re One Times Square Assocs.*, 41 F.3d 1502 (2d Cir. 1994) ("[W]hile a debtor has a certain degree of flexibility in classifying claims, its discretion is limited by the principle that classification may not be used for the sole purpose of manipulating the vote.").

60.    In the context of a liquidating plan, there is no justifiable reason to classify unsecured claims of the same priority in separate classes, and such separate classification violates section 1122(a).  The only purpose for doing so here would be to impermissibly gerrymander "impaired" accepting classes, and to argue that all classes have accepted the Liquidating Plan, such that the Debtors need not satisfy 1129(b).

61.    As the Third Circuit has held, even if holders of deficiency claims have legal rights distinct from the rights of trade creditors outside of bankruptcy, those differences do not render deficiency claims dissimilar from unsecured trade claims in the context of a bankruptcy case.  *See John Hancock*, 987 F.2d at 161.  Further, for separate classification of similar claims to be justifiable, "each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed."  *Id.* at 159.  This does not apply in this instance because there is no reorganization in prospect that the

34

creditors must evaluate.  Instead, the Debtors classify Classes 3, 4, and 5 separately simply because classifying these claims together would require that the Liquidating Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment."  11 U.S.C. § 1123(a)(4).  In other words, it would require that the Minority Ad Hoc Group share in the GUC Cash Recovery, and for the Minority Ad Hoc Group to receive the same releases as the Majority Ad Hoc Group and insider Class 5 claimants.  *See in re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 591 (5th Cir. 2024), *as revised* (Jan. 21, 2025), *as revised* (Feb. 14, 2025), *cert denied sub nom. Barings L.L.C. v. AG Ctr. St. P'ship*, 146 S. Ct. 397 (2025) (holding that inclusion in the plan of an indemnity provided to some members of a voting class, and not others, violated section 1123(a)(4)).

62.     Although the Debtors want to avoid this result, they cannot sidestep the requirements of section 1123(a)(4) by separating similar claims into separate classes and treating them differently.  This is especially true where two of the classes—Classes 3 and 5—included insiders that are not receiving any distribution of property but are voting to obtain releases and other benefits under the Liquidating Plan.  In *Avon Park*, creditors voted overwhelmingly in favor of the plan, but the Supreme Court concluded that the favorable vote was not dispositive and the plan was overturned.  *See Avon Park*, 311 U.S. at 147-48 ("'if a vote is influenced by the expectation of advantage, though without any positive promise, it cannot be considered an honest and unbiased vote,'" and "[t]he fact that the vast majority of security holders may have approved a plan is not the test of whether that plan satisfies the statutory standard. The former is not a substitute for the latter.  They are independent.") (internal citations omitted).  In addition, the Court sharply criticized the inclusion in the same voting class of claims held by creditors with a "close identity of interests" with the debtor and claims held by creditors without such ties.  *See id*. at 148-

49 ("[T]here was such a close identity of interests between Crummer and the city vis-a-vis the refunding as to raise grave doubts as to the propriety of allowing those claims to vote in any event."). What the Supreme Court condemned in *Avon Park* is exactly what the Debtors are doing here.

63.    These difficulties would be avoided if the Liquidating Plan combined all unsecured claims in a single class and provided that they share in all distributions and benefit equally, unless creditors in the class have already agreed otherwise. In that case, consistent with *Avon Park*, the votes of the Majority Ad Hoc Group and the insiders in Class 5 would not be counted for purposes of determining whether the class is the requisite "impaired accepting class" under section 1129(a)(10), because that section requires a determination "without including the acceptance of plan by any insider."[19] Because the Debtors seek impermissibly to gerrymander the classification scheme to evade numerous confirmation safeguards, the Plan cannot be confirmed.[20]

---

[19]    The members of the Majority Ad Hoc Group are statutory insiders. As part of its agreement to backstop the Incremental First-Out Term Loans, the Majority Ad Hoc Group was given rights to receive more than 25% of the Debtors' equity and appoint six of the Debtors' ten board members. First Day Decl. ¶60. In turn, section 101(31)(E) of the Bankruptcy Code provides that "the term 'insider' includes [an] affiliate," and the term "affiliate" is defined in section 101(2)(A) to mean an "entity that directly or indirectly owns, controls, or holds with [the] power to vote, 20 percent or more of the outstanding voting securities of the debtor …." 11 U.S.C. §§ 101(31)(E); 101(2)(A). Thus, the Majority Ad Hoc Group is an insider by virtue of its equity entitlement. Even if it did not satisfy the statutory definition, the Majority Ad Hoc Group would still be deemed a "non-statutory" insider. The definition of "insider" in section 101(31) "is intended to be illustrative rather than exhaustive." *In re Krehl*, 86 F.3d 737, 741 (7th Cir. 1996); *see also Boyd v. Petrie (In re Tompkins),* 430 B.R. 453, 459 (Bankr. W.D. Mich. 2010) (same). Lending institutions and creditors have been deemed insiders when they exert "dominion and control," or "exercise sufficient authority over the corporate debtors so as to unquantifiably dictate corporate policy and the disposition of assets." *Aluminum Mills Corp. v. Citicorp North America, Inc. (In re Aluminum Mills Corp.),* 132 B.R. 869, 894 (Bankr. N.D. Ill. 1991). The Majority Ad Hoc Group's right to appoint over half the board members, its appointment of four board members, clear acquiescence to the reappointment of a fifth, and retention of the right to appoint a sixth member, in addition to its right to receive 25% of the equity, demonstrate a close relationship with the Debtors. *See* 01/28/2026 Hr'g Tr. (MAHG Ex. 44) at 59:18-60:18. These circumstances, when combined with the Majority Ad Hoc Group's control over the majority of the Debtors' First Out Term Loan debt—debt that dramatically increased in the months prior to filing—make clear its non-statutory insider status.

[20]    The results of voting on the Liquidating Plan are not yet available to the Minority Ad Hoc Group. The Minority Ad Hoc Group objects, however, to the counting of any insider votes in determining whether any class is an impaired accepting class. Moreover, the Liquidating Plan consolidates all the Debtors for purposes of voting. This is improper, as the voting requirements must be met on a debtor-by-debtor basis. *See, e.g., In re Tribune Co.,* 464 B.R. 126, 183 (Bankr. D. Del. 2011) (absent substantive consolidation, 1129(a)(10) must be met on a

**IV.**  **The Liquidating Plan Is Not Confirmable Because Class 3 Must be Deemed to Reject Pursuant to Section 1126(g), It Does Not Meet the Fair and Equitable Test, and It Unfairly Discriminates.**

**A. Class 3 Must Be Deemed to Reject.**

64.     Even if the separate classification of Class 3, 4, and 5 claims were permissible (which it is not), the Liquidating Plan's classification and voting scheme still violates the Bankruptcy Code. Section 1126(g) provides that "a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests." 11 U.S.C. § 1126(g). In other words, the section plainly directs that a class of claims that will neither "receive nor retain any property" is deemed to reject the plan. Where the language of a statute is clear on its face, the inquiry begins and ends with the text itself. *See United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242 (1989) (noting that the plain meaning of legislation is almost always conclusive).[21]

---

debtor-by-debtor basis); *In re AIO US, Inc.*, 2025 WL 2426380, at *30 n.218 (Bankr. D. Del. Aug. 21, 2025) (rejecting the reasoning of *In re Transwest Resort Props.*, 881 F.3d 724, 729-730 (9th Cir. 2018) as inconsistent with section 1121 of the Bankruptcy Code); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 301–02 (Bankr. D. Del. 2011) (applying the per-debtor approach to plan confirmation, and concluding that absent substantive consolidation, there must be a consenting class for each individual debtor in a joint plan for it to be confirmed). The Minority Ad Hoc Group objects to the extent that Plan is not accepted by an impaired class without counting the votes of insiders, including the members of the Majority Ad Hoc Group, on a debtor-by-debtor basis. 11 U.S.C. § 1129(a)(10).

[21]     In the Disclosure Statement Reply, the Debtors cite (at 18, n.9) *Rosenfeld v. Coastal Broad. Sys., Inc. (In re Coastal Broad. Sys., Inc.)*, 2013 U.S. Dist. LEXIS 91469, at *21–22 (D.N.J. June 28, 2013), a case that concerned whether a creditor could exercise voting rights granted under a subordination agreement to accept the plan on behalf of another creditor, such that the subordinated creditor could be deemed to have accepted the plan, a situation that is not at issue here. On appeal, the subordinated creditor argued that its class should be deemed to reject under section 1126(g), and therefore the exercise of voting rights on its behalf was ineffective. The district court found this argument was not raised below and therefore was waived. *Id*. at *13. In dicta, the court stated that 1126(g) "is ambiguous as to whether a class 'deemed not to have accepted a plan' based on the treatment of their claims can nonetheless affirmatively vote in favor of a plan." *Id*. at *21. Whether a creditor *can* submit a vote, however, the plain language of section 1126(g) makes clear that vote cannot result in class acceptance, as it is clearly "deemed to reject." This is supported by the language of the legislative history examined in *Rosenfeld*, which states "Subsection (g) provides that any class denied participation under the plan is conclusively deemed to have rejected the plan. There is obviously no need to submit a plan for a vote by a class that is to receive

65. A class receiving no property is deemed to reject, regardless of whether or not votes from the class were solicited or cast. *See In re Egan*, 142 B.R. 730, 732 (Bankr. E.D. Pa. 1992) (class receiving no payments under plan automatically deemed to reject, notwithstanding any affirmative votes recorded). Votes from a class deemed to reject are "irrelevant," *id.*, because a class that receives no recovery is "*conclusively* deemed not to have accepted the plan, and the class is to be treated as a dissenting class for purposes of confirmation." *In re Waterways Barge P'ship*, 104 B.R. 776, 783 (Bankr. N.D. Miss. 1989) (emphasis in original).

66. Although the Liquidating Plan provides that Class 3 may receive Distributable Proceeds that trickle down through the Waterfall, it is clear from, among, other things, the Disclosure Statement, that there will be no such proceeds and the class will receive no recovery. Disclosure Statement § III.E. When confronted with this argument at the interim Disclosure Statement approval stage, the Debtors did nothing to effectively refute it. In fact, their statements largely reinforced that Class 3 will receive no recovery:

- "The Disclosure Statement has been clarified to provide that, consistent with the testimony elicited at the Settlement Hearing, the Debtors believe there is insufficient value to repay the DIP Term Loan Facility in full and therefore holders of Class 3 Claims will not receive a distribution under the Plan. See Disclosure Statement, at 7." Debtors' Omnibus Reply to Objections to Disclosure Statement Motion [Docket No. 1319] (MAHG Ex. 64) (the "Disclosure Statement Reply")¶2.

- "Under the Plan, both Class 3 (Super-Senior Term Loan Claims) and Class 4 (General Unsecured Claims) are projected to receive no distributions under the Plan's waterfall recovery." *Id.* ¶31.

- "[T]he plan and the disclosure statement reflects that the company estimates no recovery for Class 3. That is entirely consistent with the positions that we took in the settlement hearing, and we're not shying away from the fact that Class 3 is not going to get a recovery, far from it." 03/18/2026 Hr'g Tr. (MAHG Ex. 69) at 16:13-20.

nothing. *But under subsection (g) the excluded class is like a class that has not accepted, and is a dissenting class for purposes of confirmation* under section 1130." *Id.*

38

- "I would note that the revised disclosure statement at page 7 of the red line pretty clearly says that the projected recoveries for that class are [0] percent. There's no range, it's just 0 percent." *Id*. at 52:24-53:2.

67.     Moreover, the record is replete with additional evidence that, in light of the release of valuable estate causes of action under the Settlement and the payment of lower priority administrative claims, Class 3 will receive no recovery under the Liquidating Plan.  For instance, the Disclosure Statement states that Class 3 will receive a 0% recovery, without designating a range of potential recoveries.  Further, the Debtors submitted calculations showing a DIP Term Loan deficiency claim under the Liquidating Plan in the range of $91.7 to $103 million.  Debtors' Settlement Reply at 8.  The Liquidation Analysis also shows a DIP Deficiency Claim under the Liquidating Plan scenario of $91.499 million.  Liquidation Analysis at 6.  On the other hand, the only evidence of the value of Other Excluded Assets is in the Liquidation Analysis and Wind-Down Budget, which estimate that such assets are worth $11.4 million and assume that value goes to pay the DIP Term Loan Claims.  There is no evidence that the Other Excluded Assets Disposition will yield any additional proceeds—let alone more than the $91 to $103 million to cover the asserted DIP Deficiency Claim—or that Class 3 will receive anything from that disposition.  Consequently, it is clear that (absent Settlement reversal) there is no circumstance in which Class 3 will receive or retain any property under the Liquidating Plan on account of such claims.

68.     In any event, the Debtors are judicially estopped from arguing that Class 3 will receive a recovery under the Liquidating Plan's Waterfall construct.  The Debtors presented testimony that, under the Plan construct, the DIP would be impaired and all other junior creditors would receive no recoveries under the Waterfall.  The Court relied on this testimony in its ruling on the Settlement.  *See* 02/06/2026 Hr'g Tr. (MAHG Ex. 46) at 31:16-32:2 (crediting Mr. Goulding's testimony that the DIP Lenders' claims will be impaired).  This satisfies the factors for

39

judicial estoppel. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988).

69. In light of the above, the Debtors' designation of Class 3 as entitled to vote is a mere subterfuge. By doing so, they seek to use the Majority Ad Hoc Group's votes to sidestep the Bankruptcy Code's cramdown requirements and attempt to bless the Majority Ad Hoc Group's improper "gift" to administrative and prepetition unsecured creditors. Moreover, given that Class 3 will receive no distribution, the Majority Ad Hoc Group's accepting votes in that class will be motivated by benefits outside of class treatment—such as releases from meritorious estate causes of action and their treatment on the DIP Term Loan Claims, including Excluded Real Estate that appraised for more than the value of their DIP claim "waiver"—which are not afforded to other members of Class 3 such as the Minority Ad Hoc Group. Allowing favored parties to create the artificial appearance of a consensual plan by voting in a class that receives no distribution based on ulterior motives is at odds with Supreme Court precedent, *see Avon Park,* 311 U.S. at 147, and is a result that 1126(g) is designed to prevent.

70. As the plain language of section 1126(g) of the Bankruptcy Code mandates, the Court should find that Class 3 is deemed to reject and is not entitled to vote on the Liquidating Plan, triggering the requirement that the Debtors demonstrate that the Liquidating Plan satisfies the cramdown standards under section 1129(b).

**B. The Liquidating Plan Does Not Meet the Cramdown Requirements Under Section 1129(b).**

71. Section 1129(a)(8) provides that "[t]he court shall confirm a plan only if … [w]ith respect to each class of claims or interest – (A) such claim has accepted the plan or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8). As explained above, Class 3 must be deemed to reject the Liquidating Plan because Class 3 Claims will not receive any property under

the Liquidating Plan.  Thus, the Liquidating Plan does not satisfy section 1129(a)(8).  Unlike the other subsections of section 1129(a), satisfaction of section 1129(a)(8) is not required to confirm a plan, so long as the plan meets the cramdown requirements of section 1129(b)(1).  That section provides that "if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court … shall confirm the plan … if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).  It is the burden of the proponents of the Liquidating Plan to show that it "does not unfairly discriminate against dissenting classes and the treatment of the dissenting classes is fair and equitable."  *In re Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003).

i. <u>Payment of Administrative Claims Ahead of the Claims of the Minority Ad Hoc Group Violates the Fair and Equitable Standard</u>

72.     Under 1129(b)(2)(A), the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A)     With respect to a class of secured claims, the plan provides—

(i) (I)   that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II)   that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11  U.S.C. § 1129(b)(2)(A).

73.    Thus, for a plan to be confirmed over the rejection of a class of secured creditors, the plan must provide those creditors with the value of their collateral.  Here, as discussed above, the DIP ABL Claims have been paid in full, and the value of the estate's assets exceed the DIP Term Loan plus any administrative claims granted priority over DIP Term Loan claims or secured adequate protection claims under the DIP Orders.  That excess value is collateral subject to the Super-Senior Term Loan Lenders' adequate protection replacement liens and prepetition liens. Moreover, since the Super-Senior Term Loan Lenders were granted replacement liens on the proceeds of Avoidance Actions, any consideration paid to settle those actions under the Settlement is subject to the replacement liens.  Under the Liquidating Plan, however, the Debtors and the Majority Ad Hoc Group seek to strip the Minority Ad Hoc Group members of the value of their collateral and use such value to pay the administrative and priority claims ($109.8 million) and certain favored general unsecured claims ($8 million).  As the Minority Ad Hoc Group does not consent to this, and their class under the Liquidating Plan must be deemed to reject, this alone violates the fair and equitable standard of section 1129(b)(2)(A).  Hence, the Plan cannot be approved.

74.    To make matters worse, however, the Liquidating Plan also seeks to "skip over" the Super-Senior Term Loan Claims and "gift" their collateral to lower priority administrative claims, priority claims, and non-deficiency claim unsecured creditors.  As the Third Circuit has held, "[t]he plain language of the statute makes it clear that a plan cannot give property to junior claimants over the objection of a more senior class that is impaired." *In re Armstrong World Indus., Inc.,* 432 F.3d 507, 513 (3d Cir. 2005).  Section 1129(b) was "designed to address" gifting or "'give-up' situations where a senior class [gives] property to a class junior to the dissenting class." *Id.*  In analogous situations where a proposed "gifting" arrangement would give value to junior

42

stakeholders over the objection of a class of unsecured creditors, courts have held those arrangements to be impermissible violations of the "absolute priority rule" codified in section 1129(b)(2)(B).  *See In re DBSD N. Am., Inc.*, 634 F.3d 79, 94-95 (2d Cir. 2011); *In re Armstrong,* 432 F.3d at 513; *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) (rejecting nonconsensual priority-skipping distributions).  The attempted gift here is no different, as it impermissibly seeks to give the Minority Ad Hoc Group's collateral to junior stakeholders over its objection in violation of the Bankruptcy Code's priority scheme.  *See Jevic* 580 U.S.  at 457 ("[A] bankruptcy court cannot confirm a plan that contains priority-violating distributions over the objection of an impaired creditor class. §§ 1129(a)(7), (b)(2).").  In *Jevic*, the Supreme Court noted "potentially serious" consequences of allowing for priority-skipping gifts.  These included "changes in the bargaining power of different classes of creditors even in bankruptcies that do not end in structured dismissals" and "risks of collusion, *i.e.,* senior secured creditors and general unsecured creditors teaming up to squeeze out priority unsecured creditors."  *Jevic*, 580 U.S. at 470.  Confirmation of the Liquidating Plan, however, would result in even worse consequences than those the Supreme Court criticized in *Jevic*.  Rather than using collusion to "squeeze out" priority unsecured creditors, the parties here "squeeze out" priority *secured* claims, stripping them of collateral in violation of constitutionally protected property rights.  *See, e.g., Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935) (bankruptcy statute that stripped lien holder of rights violated Fifth Amendment).  This cannot be approved.[22]

---

[22]   The Debtors have argued that the terms of settlements under Rule 9019 need not follow absolute priority, citing *In re Energy Future Holdings Corp.*, 648 F. App'x 277, 484 (3d Cir. 2016) and *In re Genesis Global Holdco, LLC*, 660 B.R. 439, 488 (Bankr. S.D.N.Y. 2024).  *See* Debtors' Settlement Reply (MAHG Ex. 41) ¶41.  Even if this principle were generally true (and it is not), providing for plan treatment through a settlement excluding affected creditors does not exempt such treatment from the requirements for plan confirmation under section 1129(a) and (b) of the Bankruptcy Code.  *See Jevic*, 580 U.S. at 470; *In re Boy Scouts of Am.*, 137 F.4th 126, 156 (3d Cir. 2025).

> ii.    The Liquidating Plan Unfairly Discriminates Against the Minority Ad Hoc
>        Group's Deficiency Claims.

75.    Even if the improper "gifting" of the Super-Senior Term Loan lenders' collateral to junior claimants were somehow permissible (which it is not), the Liquidating Plan also violates the second prong of the cramdown standard, which mandates that a plan must not "discriminate unfairly" against a rejecting class.  11 U.S.C. § 1129(b)(1).  The rule against unfair discrimination "is designed to protect against horizontal discrimination in the same way that the absolute priority rule prevents … nonconsensual vertical discrimination." *In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018).  Assuming, as the Debtors insist, that Class 3 claims are fully unsecured deficiency claims, then the Liquidating Plan unfairly discriminates against these deficiency claims by providing Class 4 creditors with $8 million of Settlement proceeds while providing nothing to Class 3.

76.    The phrase "discriminates unfairly" is not defined in the Bankruptcy Code, and Courts have used different tests to determine (a) where unfair discrimination exists and (b) in some of those tests, whether, if a presumption of unfairness exists, it can be rebutted to satisfy the requirements of section 1129(b)(1).  *In re Tribune Co.*, 972 F.3d 228, 240-41 (3d Cir. 2020).

77.    In *Tribune*, the Third Circuit acknowledged and distilled various tests applied by courts analyzing unfair discrimination, including the "Markell Test" and the *Aztec* test.  *Id*.  The court adopted from the "Markell Test" the presumption of unfair discrimination where there is "a 'materially lower' percentage recovery for the dissenting class or a 'materially greater risk to the dissenting class in connection with its proposed distribution,'" and agreed with the bankruptcy court that the nine-tenths of a percentage point difference between the recovery percentage that the Senior Noteholders received versus what they would have received absent the discrimination was not material.  *Id*. at 243.  The court expressly did not address the "outer boundary of [the]

44

inquiry" of what constitutes materiality when comparing differences in dissenting class and preferred class recoveries. *Id.* at 245. Here, given that Class 4 is receiving $8 million and Class 3 is receiving $0, the difference in percentage recovery is infinite, and thus clearly material. Moreover, the difference is exacerbated when considering that the Debtors have paid prepetition non-priority unsecured claims (which the Critical Vendor Motion states could be up to $67 million (Critical Vendor Motion (MAHG Ex. 1) at 3)) under the Critical Vendor Order, substantially increasing the blended recovery to general unsecured trade claims while providing no distribution to disfavored unsecured creditors. *See In re Kmart Corp.*, 359 F.3d 866, 872-74 (7th Cir. 2004) (without evidence of the need for the payment and a substantial benefit to disfavored creditors, paying pre-petition debts to "critical vendors" is not permitted under the Bankruptcy Code).

78. Under the "Markell Test," the presumption of unfair discrimination can be rebutted only if:

> [A] lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy, or that a greater recovery for the other class is offset by contributions from that class to the reorganization. The presumption of unfairness based on differing risks may be overcome by a showing that the risks are allocated in a manner consistent with the prebankruptcy expectations of the parties.

*In re Tribune Co.*, 972 F.3d at 241.

79. Here, general unsecured claimants holding trade claims will receive the GUC Cash Recovery. Meanwhile, holders of Prepetition Term Loan secured claims and deficiency claims, of the same priority as the general unsecured claims, will not. There is no basis to conclude, however, that trade claimants could have expected a greater recovery outside of bankruptcy than holders of Prepetition Term Loan deficiency claims. And the Third Circuit has held that even if holders of deficiency claims have legal rights distinct from the rights of trade creditors outside of bankruptcy, those differences do not render deficiency claims dissimilar from unsecured trade claims in

45

bankruptcy. *See John Hancock,* at 161; *see also Tribune*, 972 F.3d at 243 ("A typical refrain in bankruptcy is that many plan disputes in § 1129 begin as misclassifications under § 1122."). This is especially true here, in the context of a plan of liquidation.

80.     Further, any argument that trade claimants are providing greater contributions to a reorganization than holders of deficiency claims is inapposite here, due to the simple fact that there is no reorganization. And even if any creditors could have been considered to have made "contributions" to a "reorganization" (which they could not) there is no evidence in the record that the specific creditors being preferred under the Liquidating Plan made any such contributions. Creditors deemed important to operations would have been paid under the broad authority under the Critical Vendor Orders, or would have had their contracts assumed and assigned to the business line acquirers, with their prepetition claims paid in full as cure amounts. Even if there were evidence that any Class 4 creditor may continue doing business with the acquirers of certain of the Debtors' business segments, that provides no value to the estates as the sales have already closed. Thus, the disparate treatment between classes cannot possibly satisfy the Markell Test.[23]

81.     The proposed treatment of Super-Senior Term Loan deficiency claims also fails to meet other tests courts have utilized in an unfair discrimination analysis. The test from *In re Aztec*, applied by many courts outside the Third Circuit, requires the court to examine "(1) whether the discrimination is supported by a reasonable basis; (2) whether the debtor can confirm and consummate a plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against." *In re Aztec Co.*, 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989). The Debtors cannot satisfy the *Aztec* factors because there is no

---

[23]   Even if the Court were to approve the current classification and voting scheme under the Liquidating Plan, Class 4 would still be "obtaining some special favor or inducement not accorded [to Class 3]," violating the fundamental rule of "'equality between creditors' … applicable in all bankruptcy proceedings." *Avon Park,* 311 U.S. at 147. Even in that case, the Liquidating Plan should not be confirmed.

legitimate legal or practical basis to do so, they have not shown that they cannot confirm a plan without this treatment, and as noted, a $0 recovery versus an $8 million recovery is clear material discrimination between claims that are the same priority. *See In re Creekside Landing, Ltd.*, 140 B.R. 713, 716 (M.D. Tenn. 1992) (providing payments to trade creditors while unsecured deficiency claims receive no distribution constituted unfair discrimination under the *In re Aztec* test).[24]

82.     Unfair discrimination cannot be justified as a "horizontal gift." In *Armstrong*, the Third Circuit held that certain cases, including *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 602 (Bankr. D. Del. 2001), "do not stand for the unconditional proposition that creditors are generally free to do whatever they wish with the bankruptcy dividends they receive" without adherence to section 1129(b)(2)(B)(ii) of the Bankruptcy Code. 432 F.3d at 514. Although *Armstrong* held that a priority-skipping "vertical gift" is impermissible, the District Court also quoted with approval *In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 865 (Bankr. S.D. Tex. 2001), which involved "horizontal gifting." *In re Armstrong World Indus., Inc.*, 320 B.R. 523, 540 (D. Del. 2005). In *In re Sentry*, the court rejected the argument the Debtors press here that the unfair discrimination standard does not apply where secured creditors carve out property from their lien and make a "horizontal gift" to preferred unsecured creditors. In doing so, the court found that "[t]o accept [the secured lender's] argument that [it] can, without any reference to fairness, decide which creditors get paid and how much those creditors get paid, is to reject the historical foundation of equity receiverships and to read the § 1129(b) requirements out of the

---

[24]   A variation of the *Aztec* test, that the treatment must be "supported by a legally acceptable rationale" and "the extent of the discrimination…necessary in light of the rationale," fails to support the treatment of the Prepetition Term Loan deficiency claims for similar reasons. *In re 203 North LaSalle St. L.P.*, 190 B.R. 567, 585-86 (Bankr. N.D. Ill. 1995), *rev'd on other grounds sub nom. Bank of America Nat'l Trust and Savings Ass'n v. 203 North LaSalle St. Partnership*, 526 U.S. 434, 143 L. Ed. 2d 607, 119 S. Ct. 1411 (1999).

47

Code … To accept that argument is simply to start down a slippery slope that does great violence to history and to positive law." *Id.* The *Armstrong* court's quotation of this very language suggests that the Third Circuit would adopt the same rule and overrule the cases cited by the Debtors in support of "horizontal gifting,"[25] with good reason, because those cases are wrongly decided, especially in light of the Supreme Court's subsequent decision in *Jevic*. As *Jevic* recognized, "[t]he priority system applicable to [distributions in a Chapter 7 liquidation or Chapter 11 plans] has long been considered fundamental to the Bankruptcy Code's operation." *Jevic*, 580 U.S. at 465. Compliance with the fundamental priority system does not solely require adherence to vertical priorities, but also requires equal treatment of creditors of the same priority. And nothing in the Bankruptcy Code suggests that the fair and equitable requirement is sacrosanct, while the unfair discrimination requirements may be cast aside at the option of certain secured creditors. Both requirements are equally important, and the Court should reject the reasoning of any cases that suggest otherwise.[26]

---

[25] Although *In re Nuverra Env'l Sols., Inc.*, 834 Fed. App'x 729 (3d Cir. 2021) involved these issues, the Third Circuit dismissed the appeal on the grounds of equitable mootness without reaching the merits. Although Judge Krause concurred in the judgment, she disagreed that expressed regret that the court did not determine the issue of whether *Jevic* "foreclose[s] preferential treatment of a sub-class through horizontal gifting." *Id.* at 737 (Krause, J., Concurring)

[26] In any event, the reasoning of the Debtors' "horizontal gifting" cases is not applicable to the facts here. *In re Nuverra* found horizontal gift to be permissible where (i) the objecting creditor "is not entitled to a distribution under a plan, and (ii) no class junior to the [objecting] creditor receives a distribution under the plan." *See In re Nuverra Env'tl Sols., Inc.*, 590 B.R. 75, 95 (D. Del. 2018). As discussed above, however, members of the Minority Ad Hoc Group have secured claims on which they are entitled to a distribution. Thus, to the extent the distribution to Class 4 can be considered a gift, it is a gift from the Majority Ad Hoc Group of value that to which the Minority Ad Hoc Group is entitled, without the Minority Ad Hoc Group's consent. In *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 602 (Bankr. D. Del. 2001), the court's finding that a gift to unsecured creditors was based on the premise that "even if the Genesis Senior Lenders and the Multicare Senior Lenders receive all of the debt and equity distributed under the debtors' plan, the claims of the Senior Lenders would not be satisfied in full." That is not the case here, where the Debtors' assets are sufficient to satisfy all claims under the DIP facility. In *In re World Health Alts., Inc.*, 344 B.R. 291, 298 (Bankr. D. Del. 2006), the court distinguished approval of a settlement allowing a secured creditor to carve out value from its liens from approval of a gift under a Chapter 11 plan in which section 1129(b) and the absolute priority rule are implicated. Here, the "gift" is proposed to be implemented through a plan, so the reasoning of *In re World Health* does not apply. In *In re The Pet Apothecary LLC*, Case No. 24-11192, 2025 Bankr. LEXIS 2718, at *11 (Bankr. D. Del. Oct. 22, 2025) the gift was held to be permissible on the ground that the challenging creditor's class accepted the Liquidating Plan and thus consented to the treatment under the Liquidating Plan. Here, the Minority Ad Hoc Group's class (Class 3) must be deemed to

48

83.    As the Liquidating Plan unfairly discriminates against Super-Senior Term Loan deficiency claims, it does not meet the cramdown standards under section 1129(b)(1) and cannot be confirmed.

## V.    The Liquidating Plan Was Not Proposed In Good Faith.

84.    Section 1129(a)(3) requires that, for a plan to be confirmed, it must have "been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).   And in "determining good faith under section 1129(a)(3) … the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *See In re Combustion Eng'g, Inc.* 391 F.3d 190, 247 (3d Cir. 2004) (*quoting In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000)).

85.    In order to determine whether the debtor has proposed a plan in good faith, it should consider whether the plan

(1) fosters a result consistent with the [Bankruptcy] Code's objectives;

(2) has been proposed with honest and good intentions and with a basis for expecting that reorganization can be effected; and

(3) [exhibited] a fundamental fairness in dealing with the creditors.

*In re W.R. Grace & Co.,* 475 B.R. 34, 87-88 (D. Del. 2012).

86.    None of these factors are met here.  First, the Liquidating Plan is inconsistent with the Bankruptcy Code's objectives in multiple ways.  For instance, one of the main objectives of the Bankruptcy Code is to protect secured creditors' rights in their collateral, but the Liquidating

---

reject under 1126(g) and thus is not consenting to the treatment.  In addition, with respect to the decision cited by the Court in its ruling on the Settlement, *In re TSIC, Inc.*, 393 B.R. 71, 75 n.3 (Bankr. D. Del. 2008), the Court noted that the proposed "gift" was "not connected to plan confirmation," which is not the case here.

49

Plan attempts to strip collateral from Minority Ad Hoc Group members and "gift" it to lower priority unsecured administrative and prepetition unsecured creditors.  The Bankruptcy Code also prescribes a specific scheme by which creditors may manifest their consent to a Chapter 11 plan, which the Liquidating Plan is designed to bypass.  The Bankruptcy Code is also concerned with assuring that creditors are fairly compensated from the estate's assets, but the Liquidating Plan effectuates releases of highly valuable estate causes of action for less than reasonable value.

87.    Second, there is no "basis for expecting that reorganization can be effected," because no reorganization is in prospect.  In such circumstances, the Debtors' assets should be distributed fairly based on the Bankruptcy Code's priorities, but the Liquidating Plan fails to do that.  Instead, it separately classifies similar creditors, provides that deemed rejecting classes are allowed to vote, and favors trade creditors without any distinction in rights or good faith reason for discriminatory treatment.  The reason for all of this is to benefit the Majority Ad Hoc Group, which is an insider of the Debtors that has exercised control of the Chapter 11 process throughout, to the detriment of non-favored creditors.  These are not honest or good intentions.

88.    Third, for the same reasons as above, the Liquidating Plan does not "exhibit fundamental fairness in dealing with creditors."  Far from it.  Rather, the Liquidating Plan is a means of channeling substantially all of the Debtors' value to the Majority Ad Hoc Group, and providing them releases from liability for actions that caused great harm to other creditors.

89.    Accordingly, the Liquidating Plan was not proposed in good faith and should not be confirmed.

## VI.    The Liquidating Plan is Unconfirmable Because it Contains Opt-Out Releases of Non-Debtor Third Parties.

90.    The Liquidating Plan is unconfirmable because it includes opt-out third-party releases that cannot be approved.  In *Harrington v. Purdue Pharma L.P.*, the Supreme Court held

that "the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants."  603 U.S. 204, 227 (2024).  For the reasons set forth in paragraphs 56-59 of the Interim Disclosure Statement Objection, which are incorporated by reference as if fully set forth herein, the Liquidating Plan's releases are at odds with *Purdue Pharma*, which independently renders the Liquidating Plan unconfirmable.  In addition, the Minority Ad Hoc Group joins in the objection of the United States Trustee to the "gatekeeping" provisions of the Liquidating Plan in their entirety, which are wholly inappropriate.  *See* Docket No. 1474 ¶¶ 103-11.

## VII.    Even if the Liquidating Plan is Confirmable, the Court Should Require it to Authorize the Liquidating Plan Administrator to Pursue the Avoidance Actions.

91.    To the extent that the Court determines to confirm the Liquidating Plan (which it should not), the Court should require that Liquidating Plan be amended to provide that Retained Causes of Action include the estate causes of action settled under the Settlement in the event the Settlement Order is reversed on appeal, in order to allow the Plan Administrator to commence any such actions for the benefit of the estate.

92.    Further, the Court should require the Liquidating Plan to be amended to allow the Plan Administrator to succeed to the Committee's Challenge rights, and to toll the Challenge deadlines until the Settlement Order becomes a final order.  Under the Settlement, the Committee's Challenge deadlines are tolled solely through the Effective Date of the Liquidating Plan.  If this mechanic is allowed to stand, the Debtors and Majority Ad Hoc Group may argue that the expiration of the Challenge deadlines and the dissolution of the Committee, *see* Plan art. XII.D, due to the effectiveness of the Liquidating Plan forecloses the estate's ability to pursue Avoidance Actions subject to the Challenge deadlines notwithstanding an appellate court decision reversing

51

the Settlement Order and the releases of those Avoidance Actions.  The Court should not allow the Liquidating Plan to provide for an end run around the appellate courts' authority or provide for the destruction of estate assets that an appellate court may later find should have been preserved for the benefit of creditors.  Such would not be in the best interest of the creditors and, unless amended, supplies an additional reason to deny confirmation.

**VIII.   The Court Should Not Waive the Protections for Plan Opponents as Provided Under Bankruptcy Rules 3020(e), 6004(h), or 7062.**

93.      In the proposed confirmation order [Docket No. 1469] (the "Proposed Order"), the Debtors request a waiver of the 14-day stay imposed by Fed. R. Bankr. P. 3020(e), Fed. R. Bankr. P. 6004(h), Fed. R. Bankr. P. 7062 (the "Default Stay Rules").  *See* Proposed Order ¶52.   There are no grounds to grant such a waiver.  The purpose of the automatic 14-day stay period under the Default Stay Rules in this context is, among other things, "to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 9 or chapter 11 of the Code before the plan is implemented and an appeal becomes moot."   Fed. R. Bankr. P. 3020 Advisory Committee's Note (1999).

94.      Courts have held that these rules, and Rule 7062 in particular, "operate primarily as a courtesy to the district court" so it can have "some time to consider the merits of the motion for a stay pending appeal."  *In re AIO US, Inc.*, 2025 WL 2426380, at *29 (Bankr. D. Del. Aug. 21, 2025); *see also In re Levelbest LLC*, 2023 WL 187631, at *7 (Bankr. N.D.N.Y. 2023) ("The goal of Rule 3020(e) is to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 11 of the Code before the plan is implemented and an appeal becomes moot.") (internal citation omitted, cleaned up); *In re Wright*, 2023 WL 3560551 at *13 (Bankr. D.N.J. 2023) (both order confirming plan and judgment denying reconsideration of confirmation order were subject to the 14-day default stay under Rule 7062).  There is no urgency

to consummation of the Liquidating Plan.  There is no operating business at all, much less one that must emerge quickly from Chapter 11.   The Debtors are already in the process of conducting liquidation activities, and a short delay of the Effective Date and the distribution of proceeds under the Liquidating Plan will have little to no effect on those activities.  And the immaterial harm that may result from a short delay is outweighed by the harm to the Minority Ad Hoc Group from the potential inability to have a meaningful opportunity to seek a stay of the confirmation order.

95.     The Minority Ad Hoc Group is a key estate party, meaning that a waiver of Rule 3020(e) would clearly damage parties' rights with little benefit to the Debtors' estates.

96.     As for the requested waiver of Rule 6004(h), the Debtors have not made, nor can they make, the requisite showing that such waiver is appropriate. In determining whether it is appropriate to waive Rule 6004(h), courts must consider the likelihood of success on the merits, irreparable harm to the appellant in the absence of a stay, the absence of harm to other parties if the court grants the stay, and the public interest. *See In re Los Angeles Dodgers LLC*, 465 B.R. 18, 28, (D. Del. 2011) (holding that bankruptcy courts must apply this four-factor test to waive Rule 6004(h), and that the lower court committed an abuse of discretion in not doing so).[27]  Again, there is no irreparable harm in a short, potential delay in carrying out liquidation activities and distributing liquidation proceeds.

**IX.     The Disclosure Statement Should Not Be Approved on a Final Basis.**

97.     Due to the adequate information issues raised in the Interim Disclosure Statement Objection that were not addressed by the Debtors, as well as the failure of the Disclosure Statement to disclose the existence of the Minority Ad Hoc Group's secured claims, material 507(b) Claims and the impact of those claims on the feasibility of the Liquidating Plan, and the inconsistencies

---

[27]   For similar reasons, the Court should decline to waive the default stay under Rule 7062.

between the Liquidation Analysis and the Wind-Down Budget, the Disclosure Statement did not contain adequate information as required under section 1125(b) of the Bankruptcy Code, and should not be approved on a final basis. Thus, none of the votes solicited based on the information in the Disclosure Statement should count.

## RESERVATION OF RIGHTS

98.    As discovery is ongoing, the Minority Ad Hoc Group reserves all rights to raise additional arguments at the Combined Hearing, including with respect to the Liquidating Plan, the Disclosure Statement, the Plan Supplement, and the Proposed Order.

## CONCLUSION

WHEREFORE, the Minority Ad Hoc Group requests that the Court (a) deny confirmation of the Liquidating Plan, (b) deny final approval of the Disclosure Statement, and (c) grant such other relief as the Court deems just and proper.

Dated:  April 28, 2026                    Respectfully submitted,

By: */s/ John W. Weiss*
    John W. Weiss
    David E. Sklar
    **PASHMAN STEIN WALDER HAYDEN, P.C.**
    21 Main Street, Suite 200
    Hackensack, New Jersey 07601
    Telephone: (201) 270-5477
    Email: jweiss@pashmanstein.com
            dsklar@pashmanstein.com

    -and-

    Allan S. Brilliant (*pro hac vice* admitted)
    G. Eric Brunstad, Jr. (*pro hac vice* admitted)
    Stephen M. Wolpert (*pro hac vice* admitted)
    James S. Moser, Jr. (*pro hac vice* admitted)
    **DECHERT LLP**
    1095 Avenue of the Americas

54

New York, New York 10036-6797
Telephone: (212) 698-3500
Email: allan.brilliant@dechert.com
         eric.brunstad@dechert.com
         stephen.wolpert@dechert.com
         james.moser@dechert.com

*Attorneys for the Ad Hoc Group of
Minority Secured Lenders*

55